No. 26-1032

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

JORGE RIVERA LUJAN, *et al.*,
Petitioners-Appellants,

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION,
*et al.*,
Respondents-Appellees.

_____

BRIEF OF WASTE PRO USA AS AMICUS CURIAE
IN SUPPORT OF PETITIONERS-APPELLANTS'
EMERGENCY STAY MOTION

_____

SARAH S. WILSON
DAVID KIM
Colombo & Hurd, PL
301 E. Pine St. #450
Orlando, FL 32801
(407) 478-1111
swilson@colombohurd.com
dkim@colombohurd.com

*Counsel for Amicus Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and Amici.** All parties appearing before the Court are named in the petition for review, except for amicus in this brief and any other amici who have not yet entered an appearance.

**B. Rulings Under Review.** Petitioners identified the challenged action in their petition for review.

**C. Related Cases.** Petitioners previously filed a petition for review challenging an interim final rule of the Federal Motor Carrier Safety Administration (FMCSA) titled "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)," 90 Fed. Reg. 46509 (Sept. 29, 2025), as corrected 90 Fed. Reg. 47627 (Oct. 2, 2025), in *Rivera Lujan, et al. v. FMCSA, et al.*, No. 25-1215 (D.C. Cir.). That petition was consolidated with *Martin Luther King, Jr. County v. Duffy*, No. 25-1224 (D.C. Cir.). The Court stayed the interim final rule and later held the consolidated cases in abeyance pending completion of agency rulemaking. After FMCSA promulgated a final rule, 91 Fed. Reg. 7044 (Feb. 13, 2026), Petitioners filed a separate petition for review, *Rivera Lujan, et al. v. FMCSA, et al.*, No. 26-1032 (D.C. Cir.). The Court initially consolidated that petition with the earlier cases, but subsequently severed it and returned No. 26-1032 to the active docket while keeping Nos. 25-1215 and 25-1224 in abeyance.

Other than those matters, counsel is not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

## <u>RULE 29 CERTIFICATION</u>

All parties have consented to the filing of this brief. This brief has not been authored by counsel to any party in this appeal. *See* Fed. R. App. P. 29(4)(E)(i). No person, party, or party's counsel contributed money that was intended to fund the preparation or submission of the brief. *See* Fed. R. App. P. 29(4)(E)(ii)–(iii). Amicus is a privately held corporation; it has no parent corporation, and no publicly held corporation owns 10% or more of its stock. *See* Fed. R. App. P. 26.1(a).

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................v

INTEREST OF AMICUS CURIAE .........................................................1

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT ............................................................................................3

    I.    The Final Rule Threatens Essential Sanitation Services by Reducing the CDL Workforce..................................................................................3

    II.   The Final Rule Is Already Disrupting Route-Based Service, and the Disruption Will Worsen Absent Relief. ...................................................8

CONCLUSION ......................................................................................12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Regulations and Regulatory Materials**

U.S. Dep't of Transp., Final Rule, "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)," 91 Fed. Reg. 7044 (Feb. 13, 2026) (to be codified at 49 C.F.R. pts. 383–384) ("Final Rule") ................2, 6, 7

49 C.F.R. pt. 382 ...........................................................................................5

49 C.F.R. § 383.91(a)(1) ...............................................................................4

49 C.F.R. § 383.91(a)(2) ...............................................................................4

**State Statutes**

Fla. Stat. § 322.08(2)(c) ..............................................................................11

Fla. Stat. § 386.041(1)(e) ............................................................................11

**Other Authorities**

Cybersecurity & Infrastructure Sec. Agency, *Public Works*, https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/emergency-services-sector/public-works ........................................................................................................3

Fed. Motor Carrier Safety Admin., *Commercial Driver's License Drug and Alcohol Clearinghouse*, https://www.fmcsa.dot.gov/regulations/commercial-drivers-license-drug-and-alcohol-clearinghouse ...........................................................5

Fed. Motor Carrier Safety Admin., *Drivers*, https://www.fmcsa.dot.gov/registration/commercial-drivers-license/drivers ......4

Fed. Motor Carrier Safety Admin., *Non-Domiciled CDL 2026 Final Rule FAQs*, https://www.fmcsa.dot.gov/regulations/non-domiciled-cdl-2026-final-rule-faqs7

Fla. Dep't of Highway Safety & Motor Vehicles, *DAVID (Driver and Vehicle Information Database)*, https://david.flhsmv.gov/ .............................................11

Fla. Dep't of Highway Safety & Motor Vehicles, *What to Bring—Non-Immigrant*, https://www.flhsmv.gov/driver-licenses-id-cards/what-to-bring/non-immigrant/ .................................................................................................................11

IR Abubakar et al., *Environmental Sustainability Impacts of Solid Waste Management in the Global South*, Int'l J. Env't Res. Pub. Health (Oct. 5, 2022), https://www.mdpi.com/1660-4601/19/19/12717.................................................11

Nat'l Waste & Recycling Ass'n, *Solutions to the Waste & Recycling Industry's Growing Driver/Worker Shortage* (2023), https://wasterecycling.org/wp-content/uploads/2023/02/Solutions-to-the-Waste-Recycling-Industrys-Growing-Driver-Worker-Shortage-NWRA-White-Paper-2023.pdf ....................................7

Solid Waste Ass'n of N. Am., *Let's Work Together: Addressing the Labor Shortage in Solid Waste Collection Services*, https://swana.org/docs/default-source/resources-documents/arf-documents/labor-shortage-in-solid-waste-collection-services-2022_update.pdf....................................................................7

U.S. Env't Prot. Agency, *Criteria for the Definition of Solid Waste and Solid and Hazardous Waste Exclusions*, https://www.epa.gov/hw/criteria-definition-solid-waste-and-solid-and-hazardous-waste-exclusions ...............................................3

World Health Org., *WHO Highlights Health Risks and Opportunities in the Global Waste Crisis* (Dec. 16, 2025), https://iris.who.int/server/api/core/bitstreams/df2f9c7b-1063-401c-9e77-7c06751e48fb/content ..........................................................................................4

## INTEREST OF AMICUS CURIAE

Waste Pro USA, Inc. is a waste-collection and recycling company headquartered in Longwood, Florida, that provides sanitation services across twelve southeastern states. It employs more than 5,600 workers and serves over two million residential and 100,000 commercial customers from 140 operating locations.

Waste Pro's core business depends on licensed commercial drivers who operate waste-collection vehicles along fixed daily routes. Because those vehicles may be operated only by properly licensed drivers, Waste Pro's ability to meet its contractual obligations rests on maintaining a stable driver workforce.

Waste Pro has a substantial interest in the regulatory framework governing the issuance and renewal of commercial driver's licenses (CDL). The company operates in jurisdictions with strict licensing and verification requirements and has built its hiring, training, and compliance practices around those systems.

Waste Pro submits this amicus brief to provide the Court with the perspective of a sanitation operator responsible for essential waste-collection services in numerous communities. Its experience running daily collection routes, recruiting and training qualified drivers, and complying with licensing rules gives it a practical understanding of how changes to CDL eligibility affect day-to-day service.

## SUMMARY OF ARGUMENT

Sanitation is a core municipal service that must run on time for communities to function. That schedule depends on licensed drivers who can lawfully operate the waste collection fleet. The Federal Motor Carrier Safety Administration (FMCSA), however, has issued a Final Rule, "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)," that sharply narrows non-domiciled CDL eligibility to a small handful of visa categories. In doing so, it disqualifies many skilled drivers with valid employment authorization documents (EAD) who previously could carry CDLs and operate trash trucks after being tested, trained, and cleared. 91 Fed. Reg. 7044 (Feb. 13, 2026) (to be codified at 49 C.F.R. pts. 383–384). Bringing new CDL drivers onto routes is a time-intensive process that requires extensive screening and training. Lost driving capacity therefore cannot be replaced on short notice.

Waste Pro is encountering CDL revocations and denials of CDL renewals among its driver workforce. That is already producing delayed routes and forcing reassignment of properly trained and vetted employees into non-CDL roles to keep service moving. In a route-based operation with fixed daily schedules and limited service-hour windows, there is little margin for sudden losses of licensed drivers. Without interim relief, those impacts will only widen once the new eligibility

restrictions go into effect and Waste Pro can no longer rely on many of its work-authorized drivers to stay on the road and continue serving the public.

## ARGUMENT

A motion seeking a stay or other emergency relief pending review must address four factors: (1) the movant's likelihood of success, (2) the risk of irreparable injury absent relief, (3) the potential harm to other parties if relief is granted, and (4) the public interest. D.C. Cir. R. 18(a)(1). Waste Pro files this amicus brief to address the fourth factor—the public interest.

## I.   The Final Rule Threatens Essential Sanitation Services by Reducing the CDL Workforce.

Waste collection is a vital public-health service. The Environmental Protection Agency (EPA) makes the point explicitly, describing waste management as "an essential part of society's public and environmental health."[1] The Department of Homeland Security's critical-infrastructure framework also lists solid waste management among the specialized "public works" capabilities within the Emergency Services Sector.[2] Simply put, sanitation is not a service communities can

---

[1] U.S. Env't Prot. Agency, *Criteria for the Definition of Solid Waste and Solid and Hazardous Waste Exclusions*, https://www.epa.gov/hw/criteria-definition-solid-waste-and-solid-and-hazardous-waste-exclusions.

[2] Cybersecurity & Infrastructure Sec. Agency, *Public Works*, https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/emergency-services-sector/public-works

afford to have disrupted. When collection falls behind, and garbage accumulates on residential streets and in commercial corridors, health and regulatory consequences follow within days.[3]

Maintaining a stable CDL workforce is essential to the critical infrastructure that supports sanitation services. All fifty states require that collection vehicles be operated exclusively by CDL holders. As a result, in waste operations, daily route completion depends on having enough qualified CDL drivers available for each day. Waste Pro's operations show what is at stake. In southwest Florida alone, Waste Pro runs approximately 200 routes per day, and each route requires a CDL-B[4] driver. In fact, CDL drivers comprise roughly half of the workforce there. Based on Waste Pro's routine staffing and contingency plans, 15–20% of that driver pool—so roughly 30 to 40 employees—are non-domiciled individuals affected by the Final

---

[3] *See* World Health Org., *WHO Highlights Health Risks and Opportunities in the Global Waste Crisis* (Dec. 16, 2025), https://www.who.int/news/item/16-12-2025-who-highlights-health-risks-and-opportunities-in-the-global-waste-crisis (explaining that when waste is not collected or is mismanaged, it can "contaminate drinking-water sources and create breeding grounds for insects and rodents").

[4] A "CDL-B" (often called a Class B CDL) authorizes operation of a "heavy straight vehicle"—generally, a single vehicle with a GVWR (or "Gross Vehicle Weight Rating") of 26,001 pounds or more, or such a vehicle towing a trailer with a GVWR not exceeding 10,000 pounds. 49 C.F.R. § 383.91(a)(2); *see also* Fed. Motor Carrier Safety Admin., *Drivers*, https://www.fmcsa.dot.gov/registration/commercial-drivers-license/drivers. Class A is broader, covering combination vehicles of 26,001 pounds or more where the towed unit exceeds 10,000 pounds GVWR. 49 C.F.R. § 383.91(a)(1).

Rule. In a business organized around fixed daily routes, a reduction on that scale translates quickly into delayed service.

Waste Pro's route planning also demonstrates that the consequences of losing non-domiciled CDL drivers would be immediate. Routes are "right-sized" to be completed in approximately 10 to 11 hours, and they are built around the operating hours of local disposal facilities. If licensed drivers become unavailable, those schedules cannot be adjusted to absorb the shortfall. That is because the facility operating hours and Department of Transportation regulations limit the number of hours that the remaining drivers can work. Once those hours are reached, delayed routes and missed pickups are inevitable.

Not only that, once drivers are removed from the schedule, replacing them is very difficult. Federal law imposes a drug-and-alcohol testing regime for commercial drivers and requires carriers to check for any history of violations before placing a driver into service. *See* 49 C.F.R. pt. 382.[5] In addition to those mandatory checks, Waste Pro layers on safety steps that extend onboarding but reduce risk: a full week of training, pairing with a mentor, live route observation and monitoring, and a release interview before the driver can run routes alone. Some municipal and commercial contracts also require additional background screening for drivers

---

[5] *See also* Fed. Motor Carrier Safety Admin., *Commercial Driver's License Drug and Alcohol Clearinghouse*, https://www.fmcsa.dot.gov/regulations/commercial-drivers-license-drug-and-alcohol-clearinghouse.

assigned to sensitive sites, including certain airports, refineries, and residential communities governed by HOAs.

Those requirements and procedures exist for good reason, but they mean that a qualified CDL driver cannot be replaced in days or even weeks. When drivers are suddenly removed from eligibility, finding a substitute means putting a new hire through every step of that rigorous onboarding process from the start. Waste Pro's normal hiring cycle for CDL drivers in southwest Florida can take approximately 60 to 75 days from offer to full release on route, reflecting the time needed to complete the required screening, training, and safety steps.

Waste Pro is not alone. As the Final Rule itself confirms, the change to the longstanding CDL policy will dramatically impact the nationwide supply of eligible drivers. FMCSA estimates there are roughly 200,000 non-domiciled CDL holders across the country. Under the eligibility limits it adopts, only about 6,000 would be allowed to obtain CDLs, while the remaining 194,000 current holders would have to exit the market as their credentials expire or come up for renewal—or even earlier through revocation or downgrade actions. 91 Fed. Reg. at 7095–7096. Nor does the Final Rule hide how drastic the restrictions are, stating that only applicants in the H-

2A, H-2B, or E-2 categories will be permitted to obtain commercial licenses and no other immigration statuses will be eligible. *Id.* at 7046.[6]

The diminished supply of CDL workers is likely to affect the sanitation industry in a disproportionate way. The National Waste & Recycling Association reports that the industry has "experienced a growing shortage of employees possessing the required technical skills for driving and operating machinery," and that "waste and recycling companies are struggling to find enough CDL drivers."[7] The Solid Waste Association of North America likewise has concluded that "hiring and retaining drivers and helpers for solid waste and recycling collection services remains a challenge for many public and private sector service providers."[8]

Waste Pro's own experience aligns with those industry assessments. The company maintains dedicated recruiters who attend job fairs, hold on-site hiring events, and cultivate outreach relationships to attract qualified applicants in a tight

---

[6] *See* Fed. Motor Carrier Safety Admin., *Non-Domiciled CDL 2026 Final Rule FAQs*, https://www.fmcsa.dot.gov/regulations/non-domiciled-cdl-2026-final-rule-faqs.

[7] Nat'l Waste & Recycling Ass'n, *Solutions to the Waste & Recycling Industry's Growing Driver/Worker Shortage* (2023), https://wasterecycling.org/wp-content/uploads/2023/02/Solutions-to-the-Waste-Recycling-Industrys-Growing-Driver-Worker-Shortage-NWRA-White-Paper-2023.pdf.

[8] Solid Waste Ass'n of N. Am., *Let's Work Together: Addressing the Labor Shortage in Solid Waste Collection Services* (Sept. 2022), https://swana.org/docs/default-source/resources-documents/arf-documents/labor-shortage-in-solid-waste-collection-services-2022_update.pdf.

labor market. Waste Pro also partners with workforce-development pipelines, including with state corrections agencies to help place individuals with non-violent records into available roles. Those investments underscore the practical point that even with sustained recruiting and internal training, maintaining a reliable workforce takes considerable time and effort, and sudden losses of eligible drivers cannot be easily offset.

In addition, as CDL positions in other sectors are vacated by the Final Rule, those positions would be filled by drivers who have not been stripped of eligibility. Thus, Waste Pro stands to lose both domiciled and non-domiciled CDL drivers as a result of the new licensing restrictions. For operators like Waste Pro, the consequences will be dire: there will be routes that cannot be completed, and the communities that depend on daily, uninterrupted waste collection will feel the impacts of the shortfall immediately.

## II.    The Final Rule Is Already Disrupting Route-Based Service, and the Disruption Will Worsen Absent Relief.

In recent months, Waste Pro has seen growing instability in the CDL renewal process that is affecting day-to-day service. Even now, with the interim CDL rule stayed and the Final Rule yet to go into effect, Waste Pro has had to deal with unpredictable outcomes across locations as affected drivers have learned they cannot renew their licenses only upon arriving at the DMV office to complete the

transaction. In Florida, drivers have been losing their CDLs with little or no advance notice despite possessing active EADs. This has led to delayed routes while Waste Pro races to find replacements.

Unless the Final Rule were stayed, the risk of disruptions caused by the abrupt changes to the EAD policy would only compound. Waste Pro has identified approximately 80 employees holding temporary CDLs. Of that group, 17 CDLs have already expired through the end of February, with additional clusters set to expire in March (5), April (7), May (6), and June (6). Recently, as a stopgap measure, Waste Pro has had to move roughly ten employees into non-CDL roles to ensure the company can continue maintaining essential services. That is not sustainable, however, nor does it point to a smooth adjustment to the Final Rule for a company heavily reliant on its trained and vetted driver workforce.

In a route-based operation, there is limited slack. As discussed above, routes are planned around disposal-facility operating times and federal limits on service hours, and pickup schedules can be stretched only so far to cover a driver shortage. Against that backdrop, the present disruptions—sudden cancellations, uncertain renewals, and delayed routes—combined with all the licenses that need to be renewed in the coming months, make it likely that service gaps will broaden across more locations if the Final Rule is not stayed.

At that point, Waste Pro would be left making day-to-day coverage decisions among routes that all require service on a predictable schedule. As renewals are denied and otherwise compliant CDLs outright cancelled, Waste Pro will have to prioritize the most time-sensitive routes and reschedule or defer other pickups. Such delays would be felt most sharply on residential routes. And because personnel and equipment are shared across nearby areas, service disruptions can cascade from one location into another as the company shifts drivers and trucks to keep its core operations intact.

Those service interruptions bring follow-on effects that do not resolve on their own. With fewer licensed drivers available, the remaining drivers end up working longer days and more overtime. That not only pushes the company up against Department of Transportation service-hour limits, but also increases fatigue for drivers, which in turn raises the risk of injury and attrition. What's more, delays of this kind are difficult to unwind, given that the trucks and drivers needed to clear a backlog are the same ones already committed to the next day's routes.

Nor is it an answer to say that these disruptions are simply the cost of doing business under a strict vetting regime. Waste Pro already operates under Florida's demanding licensing framework—which requires in-person appearance and proof of

10

lawful presence before a CDL is issued or renewed. *See* Fla. Stat. § 322.08(2)(c).[9]
Florida also limits the duration of a license issued to a noncitizen to the period shown
on the person's immigration document, capped at one year. *Id.* Waste Pro complies
with those requirements in full. It verifies that each driver it deploys holds an active
Florida CDL issued through that in-person process, and it uses Florida's official
driver-record systems to confirm credentials as part of routine compliance.[10] The
losses Waste Pro is experiencing therefore do not reflect any deficiency in screening.
Instead, they stem from the harsh eligibility restrictions targeting drivers who have
already cleared the State's vetting process and remain authorized to work.

Finally, these harms do not remain confined to Waste Pro's operations. When
collection is delayed and solid waste sits for extended periods—especially in warm
conditions—public-facing impacts follow quickly, including vector-control
concerns and related safety and health issues.[11] Service delays also drive increased

---

[9] *See also* Fla. Dep't of Highway Safety & Motor Vehicles, *What to Bring—Non-Immigrant*, https://www.flhsmv.gov/driver-licenses-id-cards/what-to-bring/non-immigrant/ (explaining that non-immigrant applicants must appear in person with identity and status documents).

[10] Fla. Dep't of Highway Safety & Motor Vehicles, *DAVID (Driver and Vehicle Information Database)*, https://david.flhsmv.gov/

[11] *See* Fla. Stat. § 386.041(1)(e) (defining "sanitary nuisance" to include "any condition capable of breeding flies, mosquitoes, or other arthropods capable of transmitting diseases"); IR Abubakar et al., *Environmental Sustainability Impacts of Solid Waste Management in the Global South*, Int'l J. Env't Res. Pub. Health (Oct. 5, 2022), https://www.mdpi.com/1660-4601/19/19/12717 (stating that "uncollected organic waste from bins, containers and open dumps harbors rodents,

customer service volume and municipal pressure, as residents seek relief and local officials attempt to manage the deleterious effects of disrupted service.

Those are not projected harms. In the wake of the CDL rule changes, Waste Pro is already losing drivers who remain work-authorized as CDL renewals are denied without warning. And absent relief, the Final Rule will predictably intensify those harms as additional renewals and expirations come due.

## CONCLUSION

For the reasons set forth above, the public interest favors preserving stable sanitation service while the Court reviews the Final Rule. This Court should grant Petitioners' emergency motion and stay the Final Rule pending judicial review.

Dated: March 5, 2026                          Respectfully submitted,

                                              */s/ Sarah S. Wilson*
                                              SARAH S. WILSON
                                              DAVID KIM
                                              Colombo & Hurd, PL
                                              301 E. Pine St. #450
                                              Orlando, FL 32801
                                              (407) 478-1111
                                              swilson@colombohurd.com
                                              dkim@colombohurd.com

                                              *Counsel for Amicus Curiae*

---

insects, and reptiles that transmit diseases to humans," especially in summer conditions).

<u>**CERTIFICATE OF COMPLIANCE**</u>

I certify that this brief complies with the type-volume limitations provided under federal and local rules. The brief contains 2,354 words and was prepared using a proportionally spaced typeface (Garamond), 14-point font. *See* Fed. R. App. P. 29(a); Fed. R. App. P. 32(f).

<u>*/s/ Sarah S. Wilson*</u>
Sarah S. Wilson
Colombo & Hurd, PL

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on March 5, 2026, this brief was filed with the Court's CM/ECF

filing system, which will send an electronic notification and service of the brief to

all parties in the case.

*/s/ Sarah S. Wilson*
Sarah S. Wilson
Colombo & Hurd, PL
