No. 26-1046
(consolidated with 26-1032)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MARTIN LUTHER KING, JR. COUNTY,

Petitioner,

v.

SEAN DUFFY IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE U.S. DEPARTMENT OF TRANSPORTATION; THE U.S.
DEPARTMENT OF TRANSPORTATION; THE FEDERAL MOTOR
CARRIER SAFETY ADMINISTRATION; THE UNITED STATES,

Respondents.

**On Petition for Review of a Final Rule of the Federal Motor
Carrier Safety Administration**

**EMERGENCY MOTION FOR STAY PENDING JUDICIAL
REVIEW**

Paul J. Lawrence
Kevin J. Kennedy
Eugene Lee
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 240-1700

*Counsel for Petitioner*

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A. Parties and Amici:

Petitioner is Martin Luther King, Jr. County. Respondents are Sean Duffy, in his official capacity as Secretary of the Department of Transportation; the Department of Transportation; the Federal Motor Carrier Safety Administration; and the United States. No amici have entered appearances in this case. In the consolidated case *Jorge Lujan, et al v. FMCSA, et al*, No. 26-1032, the following amici have filed briefs in support of petitioner's motion to stay: Asylum Seeker Advocacy Project, National Immigration Law Center, and the National Employment Law Project; Waste Pro USA; various local governments (City of Albany, New York, City of Albuquerque, New Mexico, City of Cambridge, Massachusetts, Montgomery County, Maryland, City of New Haven, Connecticut, City of New York, New York, City of Portland, Oregon, City and County of San Francisco, California, County of Santa Clara, California, City of Seattle, Washington); various local government leaders (Celina Benitez, Jesse Brown, Chelsea Byers, Chris

Canales, Michael Chameides, John Clark, Alison Coombs, Christine Corrado, Nikki Fortunato Bas, Brenda Gadd, Caroline Torosis, Terry Vo, Ginny Welsch, Robin Wilt); the Sikh Coalition, California Sikh Youth Alliance, Sikh American Legal Defense and Education Fund, the Jakarta Movement, and United Sikhs. The Teamsters California have also lodged an amicus brief.

**B. Rulings under Review:**

Petitioner seeks review of the Federal Motor Carrier Safety Administration's final rule entitled "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)" (Docket No. FMCSA–2025–0622) and published in the Federal Register on February, 13, 2026 at 91 Fed. Reg. 7044.

**C. Related Cases:**

This case has not previously been before this Court or any other appellate court. This case has been consolidated with *Jorge Lujan, et al v. FMCSA, et al*, No. 26-1032, another case involving a petition for review concerning the same final rule.

/s/ Paul J. Lawrence
Paul J. Lawrence

# CERTIFICATE OF COMPLIANCE WITH RULE 18

This motion complies with Circuit Rule 18. On March 4, 2026, petitioner requested that the Federal Motor Carrier Safety Administration (FMCSA) stay the effective date of the interim final rule at issue pending judicial review. *See* Addendum 2. FMCSA responded on March 5, 2026, stating that it was denying the request. *See* Addendum 3.

In accordance with Circuit Rule 18(a)(2), on March 5, 2026, counsel for petitioner contacted counsel for respondents stating that petitioner planned to file this motion. Counsel for respondents oppose the relief requested.

*/s/ Paul J. Lawrence*
Paul J. Lawrence

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................1

STATEMENT ........................................................................................3

   I.  Legal and Factual Background.........................................................3
      A.  The Trump Administration Targets Non-Domiciled
          CDLs Issued to Noncitizens ...............................................3
      B.  FMCSA Issues an Interim Final Rule Restricting
          Eligibility for Non-Domiciled CDLs ...........................................5
      C.  This Court Stays the Interim Final Rule .................................5
      D.  FMCSA Issues the Final Rule ..................................................7
      E.  The Final Rule Disrupts Petitioner's Transit Services.............8

ARGUMENT ........................................................................................9

   I.  Petitioner Is Likely To Succeed On The Merits .................................9
      A.  The Final Rule exceeds FMCSA's statutory authority................9
      B.  The Final Rule is Arbitrary and Capricious Because
          It Does Not Reflect Reasoned Decision-Making ........................13
          1.  Driving history.....................................................................15
          2.  State compliance..................................................................22
      C.  The Final Rule is Arbitrary and Capricious Because It
          Is Based on a Pretextual Explanation ......................................24

   II.  Petitioner Satisfies the Remaining Stay Factors ............................26

CONCLUSION ...................................................................................28

# TABLE OF AUTHORITIES

**Federal Cases**

*Am. Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) ............................................................. 14

*Arizona v. United States,*
    567 U.S. 387 (2012) ............................................................................ 13

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin.,*
    *17 F.4th 604, 612 & n.13 (5th Cir. 2021)* ..................................... 24, 25

*Cigar Ass'n of Am. v. FDA,*
    132 F.4th 535 (D.C. Cir. 2025) ........................................................... 14

*Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
    466 F.3d 134 (D.C. Cir. 2006) ............................................................... 9

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ....................................................................... 24, 25

*Dist. Hosp. Partners, L.P. v. Burwell,*
    786 F.3d 46 (D.C. Cir. 2015) ............................................................... 20

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018) ............................................................................ 13

*Harrington v. Purdue Pharma L. P.,*
    603 U.S. 204 (2024) ............................................................................ 11

*In re NTE Connecticut, LLC,*
    26 F.4th 980 (D.C. Cir. 2022) ....................................................... 26, 28

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ................................................................. 27

*Lujan v. Fed. Motor Carrier Safety Admin.,*
    No. 25-1215 (consolidated with No. 25-1224), 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025) ................................................................. 6, 25, 27

*McDonnell v. United States*,
579 U.S. 550 (2016) .............................................................. 11

*Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*,
34 F.4th 1105 (D.C. Cir. 2022) ........................................ 15

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
595 U.S. 109 (2022) .............................................................. 24

*New York Stock Exch. LLC v. Sec. & Exch. Comm'n*,
962 F.3d 541 (D.C. Cir. 2020) .......................................... 11

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................ 9, 27

*Ohio v. EPA*,
603 U.S. 279 (2024) .............................................................. 13

*Tozzi v. U.S. Dep't of Health & Hum. Servs.*,
271 F.3d 301 (D.C. Cir. 2001) .......................................... 25

*United Scenic Artists, Loc. 829, Bhd. of Painters & Allied Trades, AFL-CIO v. NLRB*,
762 F.2d 1027 (D.C. Cir. 1985) ........................................ 12

*United States v. Stanchich*,
550 F.2d 1294 (2d Cir. 1977) ............................................ 24

*World Shipping Council v. Fed. Mar. Comm'n*,
152 F.4th 215 (D.C. Cir. 2025) ......................................... 15

**Federal Statutes**

5 U.S.C. § 706(2)(A) .................................................................. 13

28 U.S.C. § 2112(a)(4) ................................................................. 9

49 U.S.C. § 113(b) ....................................................................... 9

49 U.S.C. § 31311(a)(6) .............................................................. 11

49 U.S.C. §§ 31301–02 .................................................................. 3

49 U.S.C § 31305 ........................................................................ 10

49 U.S.C § 31305(a) .................................................................... 10

49 U.S.C § 31305(a)(1)–(8) ......................................................... 11

49 U.S.C § 31308 ................................................................... 10, 11

**Federal Regulations**

20 C.F.R. § 655.122(b) ............................................................... 19

20 C.F.R. § 655.18(a)(2) ............................................................. 19

49 C.F.R. § 383.5 .................................................................... 4, 5

49 C.F.R. § 383.71(f)(3)(i) ............................................................. 5

49 C.F.R. § 383.73(b)(3)(iv) ................................................... 11, 16

49 C.F.R. § 383.73(f)(2) ........................................................... 4, 16

49 C.F.R. §§ 383.31(a), 383.71(f)(2)(ii) ................................... 18

49 C.F.R. § 383.71(f)(2)(ii) ....................................................... 21

Restoring Integrity to the Issuance of Non-Domiciled Commercial
   Drivers Licenses (CDL),
   91 Fed. Reg. 7044 ...................................................... passim

Restoring Integrity to the Issuance of Non-Domiciled Commercial
   Drivers Licenses (CDL),
   90 Fed. Reg. 46509 ........................................................ 5, 7

**Other Authorities**

Executive Order (EO) 14159 ..................................................... 3

Executive Order (EO) 14286 ........................................... 3, 4, 25

Executive Order (EO) 14287 ................................................... 25

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CDL | Commercial Driver's License |
| CMV | Commercial Motor Vehicle |
| DOT | Department of Transportation |
| EAD | Employment Authorization Document |
| FMCSA | Federal Motor Carrier Safety Administration |
| IFR | Interim Final Rule |

# INTRODUCTION

The Federal Motor Carrier Safety Administration (FMCSA) (a U.S. Department of Transportation (DOT) operating administration) issued a final rule (the Rule) that restricts noncitizens' eligibility for commercial driver's licenses (CDLs) to those with specific visas. 91 Fed. Reg. 7044. It prohibits asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients from obtaining CDLs even though they are eligible to remain and work in the United States. By its own estimate, the Rule renders ineligible 97% of noncitizens who currently hold a CDL. *Id.* at 7096. The Rule will disrupt not only the lives of these noncitizens who rely on jobs that require CDLs, but also the services provided by their employers.

Petitioner King County employs noncitizens with CDLs to drive public transit buses. Without immediate relief staying the Rule, Petitioner faces a shortage of licensed bus drivers,[1] a substantial loss of resources invested in training bus drivers, budgetary uncertainty, and safety concerns from putting more inexperienced drivers on the roads.

---

[1] This motion uses "bus driver" and "bus operator" interchangeably. Eldred Declaration ¶ 16.

The Rule should be stayed because it is unlawful. FMCSA lacks statutory authority to issue the Rule because Congress authorized FMCSA to issue regulations that improve road safety, not rules that forbid entire classes of noncitizens from obtaining CDLs. The Rule is also arbitrary and capricious because it is based on unreasoned and pretextual rationales. Indeed, FMCSA concedes that no meaningful data supports the Rule as a driver-safety regulation. Thus, the Rule's true purpose is plain: to further President Donald J. Trump's anti-immigration efforts and perpetuate the myth that immigrants are dangerous and criminal.

Petitioner requests a stay by the Rule's effective date of March 16, 2026.[2]

---

[2] Petitioners in consolidated case No. 26-1032 have also moved for a stay of the rule by its effective date. To the extent that the Court is unable to act on the present motion before the effective date, that should not preclude the Court from granting relief on petitioners' motion to stay in No. 26-1032 by that date.

# STATEMENT

## I.    Legal and Factual Background

### A.    The Trump Administration Targets Non-Domiciled CDLs Issued to Noncitizens

The Rule arises out of the Trump Administration's efforts to address immigration. The day President Trump took office, he issued Executive Order (EO) 14159, "Protecting the American People Against Invasion." 90 Fed. Reg. 8443. It begins, "Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," and emphasizes that noncitizens who entered the country unlawfully are "committing vile and heinous acts against innocent Americans." *Id.*

On April 28, 2025, President Trump issued EO 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers" (the Truck EO) which asserts that "America's roadways have become less safe" because there are drivers who are not proficient in English. 90 Fed. Reg. 18759. To improve safety, the Truck EO requires FMCSA to review States' issuance of CDLs to noncitizens. *Id.* at 18759–60.

A CDL is required to operate "commercial motor vehicles" (CMVs) like buses and trucks. 49 U.S.C. §§ 31301–02. A noncitizen domiciled in

a foreign country is eligible for a non-domiciled CDL, which States issue to drivers who do not consider the issuing State to be their home. *See id.* § 31311(a)(12); 49 C.F.R. § 383.5 (defining "State of domicile"). A noncitizen can obtain a non-domiciled CDL if, in addition to satisfying the requirements for a regular CDL, *see* 49 C.F.R. § 383.73(f)(2), they provide: (1) a government issued unexpired employment authorization document (EAD)[3]; or (2) an unexpired foreign passport and an approved I-94 form regarding their most recent admittance to the United States. 91 Fed. Reg. at 7045. Thus, noncitizens of lawful status and those lawfully present in the United States[4] can obtain non-domiciled CDLs.

The Truck EO directs FMCSA to review States' issuance of non-domiciled CDLs for "unusual patterns" and to improve verification of driving credentials. 90 Fed. Reg. at 18760.

---

[3] The EAD is a work permit available to immigrants who are not permanent lawful residents. *Employment Authorization Document*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://perma.cc/S3RT-S29E.

[4] For simplicity, we refer to immigration status and lawful presence as "immigration status."

**B.      FMCSA Issues an Interim Final Rule Restricting Eligibility for Non-Domiciled CDLs**

On September 29, 2025, FMCSA issued an interim final rule (IFR) titled "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)" without notice-and-comment or consultation with the States. 90 Fed. Reg. 46509. FMCSA cited five crashes in 2025 that allegedly demonstrated the need for the IFR. *Id.* at 46512.

The IFR restricted eligibility for non-domiciled CDLs to only noncitizens who have H-2A, H-2B, and E-2 visas. 49 C.F.R. § 383.71(f)(3)(i) (citing *Id.* § 383.5). The IFR excludes, among others, asylum seekers, asylees, refugees, and DACA recipients, who are lawfully present and eligible for employment in the United States. 90 Fed. Reg. at 46515. FMCSA initially asserted that the eligibility changes would improve safety but conceded that there was not "sufficient evidence" to demonstrate that claim. *Id.* at 46520.

**C.      This Court Stays the Interim Final Rule**

On October 24, 2025, Petitioner King County moved for an emergency stay of the IFR, which was consolidated with another motion

filed by other Petitioners.[5] This Court granted the motions and stayed the IFR. *Lujan v. Fed. Motor Carrier Safety Admin.*, No. 25-1215 (consolidated with No. 25-1224), 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025) (per curiam). It held that petitioners were likely to succeed in their procedural challenges regarding lack of notice-and-comment and consultation with the States, and that the IFR was arbitrary and capricious. *Id.* at *1–2. This Court explained that "FMCSA's own data appears to indicate that the CDL holders excluded by the rule are involved in fatal crashes at a lower rate than CDL holders who are not excluded," because "according to FMCSA's own data, non-domiciled CDL holders account for approximately 5 percent of all CDL holders but only about 0.2 percent of fatal crashes." *Id.* at *2. And considering "FMCSA's anticipation that less-experienced drivers would replace the non-domiciled ones forced out of the market, it [did] not appear to have shown that the rule would produce any net safety benefit." *Id.* Thus,

---

[5] Petition filed by Jorge Rivera Lujan, Aleksei Semenovskii, American Federation of State, County & Municipal Employees, AFL-CIO (AFSCME), and American Federation of Teachers, AFL-CIO (AFT), No. 25-1215.

FMSCA did not "appear to have articulated a satisfactory explanation for how the rule would promote safety." *Id.* (cleaned up).[6]

FMCSA continued to accept comments on the IFR until November 28, 2025. 90 Fed. Reg. at 46515.

### D.     FMCSA Issues the Final Rule

On February 11, 2026, FMCSA issued the Rule, which has the same title as and is substantively identical to the IFR. 91 Fed. Reg. at 7091–92. FMCSA again acknowledges that no data supports its restrictions because "the necessary level of detail regarding the type of CDL a driver involved in a crash held is simply not available under current crash reporting requirements." *Id.* at 7065. Although FMCSA points to 17 crashes "for illustrative purposes," it explains that the Rule is not justified by a "specific crash count." *Id.*

Rather, FMCSA asserts that narrowing non-domiciled CDL eligibility addresses a two-pronged "safety gap" under the current regulations. *Id.* at 7044. First, FMCSA points to "the issuance of licenses to individuals whose safety fitness cannot be adequately

---

[6] The consolidated cases challenging the IFR are in abeyance. Order, No. 25-1215 (Feb. 20, 2026).

verified by [States]." *Id.* Second, FMCSA identifies "reliance on [EADs] to demonstrate eligibility for a non-domiciled CDL, . . . has proven administratively unworkable and resulted in widespread regulatory noncompliance." *Id.*

### E.     The Final Rule Disrupts Petitioner's Transit Services

On March 4, 2026, King County filed a petition for review of the Rule. King County has a population of about 2,411,700 and operates transit services (Metro) with an estimated ridership of 302,900 riders per weekday. Eldred Declaration ¶¶ 8–9. Metro employs about 50 bus operators and 50 related employees (e.g., mechanics and supervisors) who require non-domiciled CDLs, but are now ineligible under the Rule. *Id.* ¶ 23. The number of bus operators is not static; to account for the expansion of services and employee turnover, Metro continually recruits, hires, and trains new drivers. *Id.* ¶ 22. The Rule disrupts Metro's ability to retain enough bus operators to meet the needs of its communities. *Id.* ¶¶ 22–23. Absent a stay of the Rule, Metro will incur unbudgeted costs in hiring new bus operators and expose the public to an immediate, rather than gradual, transition to less experienced drivers who pose well-documented safety risks. *Id.* ¶¶ 30–33.

**ARGUMENT**

The Court should stay the effective date of the Rule pending its review. *See* 28 U.S.C. § 2112(a)(4). Petitioner is likely to succeed on the merits; will suffer irreparable harm without a stay; a stay would not substantially harm other parties; and the public interest supports a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

## I.   Petitioner Is Likely To Succeed On The Merits

The Rule is unlawful because it exceeds FMCSA's statutory authority and is arbitrary and capricious.

### A.        The Final Rule exceeds FMCSA's statutory authority

The Rule exceeds FMCSA's authority to issue regulations concerning motor vehicle safety. Congress tasked FMCSA with furthering "the highest degree of safety in motor carrier transportation." 49 U.S.C. § 113(b). The rulemaking authority DOT has delegated to FMCSA narrowly pertains to driver and vehicle safety. *See e.g.*, *id.* §§ 31305(a), 31308; *see also Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006) (a grant of "rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority."). The Rule—

which fundamentally concerns immigration status—is not an authorized road-safety regulation.

FMCSA invokes 49 U.S.C § 31305(a) and 49 U.S.C § 31308 as legal bases, but neither authorizes the Rule. 91 Fed. Reg. at 7046. Section 31305(a) states the Secretary shall "prescribe regulations on minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle," and enumerates the regulatory tasks that fall within that ambit. Subsection (a)(1), for example, tasks the Secretary with setting "minimum standards for written and driving tests." The remaining subsections all specify similarly narrow safety-related commands. The Rule addresses none of the subjects specified by Congress, and no subsection delegates open-ended authority to address safety as FMCSA sees fit.

Nor can FMCSA lean on the 49 U.S.C § 31305's introductory reference to "ensuring the fitness" of drivers as permitting it to categorically bar entire classes of noncitizens from obtaining CDLs, particularly where there is no "comprehensive data" supporting the asserted safety benefits. 91 Fed. Reg. at 7067. "Under the familiar interpretive canon *noscitur a sociis*," the phrase must be understood by

"the company it keeps." *McDonnell v. United States*, 579 U.S. 550, 568–69 (2016) (citation omitted). Because the phrase is followed by a list of specific regulatory tasks, *see e.g.* 49 U.S.C § 31305(a)(1)–(8), that all pertain narrowly to testing driver safety, it cannot be understood to confer such a "radically different power" on the agency. *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 205 (2024) (cleaned up). And "a court [does not] presume that an agency's promulgation of a rule is permissible because Congress did not expressly foreclose the possibility." *New York Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 546 (D.C. Cir. 2020) (cleaned up).

Section 31308 similarly does not grant FMCSA the authority to categorically bar substantial portions of the population from obtaining CDLs, irrespective of their ability to provide credible driver histories. Congress has, by statute, required States to obtain applicants' driving histories from other States (not foreign governments) before issuing CDLs, 49 U.S.C. § 31311(a)(6), and it gave FMCSA the authority to issue regulations concerning State *procedures* for issuing CDLs under 49 U.S.C. § 31308, including the driver-history requirement. 49 C.F.R. § 383.73(b)(3)(iv) (implementing a driving history requirement under

subsection "State procedures"). Prohibiting entire categories of people from obtaining CDLs is not a State procedure.

Even if FMCSA could regulate based on driver histories more broadly, the Rule exceeds that authority by, in effect, creating an irrebuttable presumption that persons with certain immigration statuses or visa categories will be unable to produce credible driver histories. "[A]n agency is not free to ignore statutory language by creating a presumption on grounds of policy to avoid the necessity for finding that which the legislature requires to be found." *United Scenic Artists, Loc. 829, Bhd. of Painters & Allied Trades, AFL-CIO v. NLRB*, 762 F.2d 1027, 1034 (D.C. Cir. 1985). Doing so "is beyond the [agency's] statutory authority." *Id.* at 1035.

FMCSA's assertion of rulemaking authority is especially suspect because it creates conflict with other federal statutes.[7] The Supreme Court has explained that the Immigration and Naturalization Act is a "comprehensive framework" requiring that, among other things, "every

---

[7] FMCSA's earlier regulations, by contrast, distinguished between noncitizens who were lawfully present and permitted to work in the United States from those who were not—a distinction consistent with the Immigration and Naturalization Act immigration scheme.

employer [] verify the employment authorization status of prospective employees." *Arizona v. United States*, 567 U.S. 387, 404 (2012). To be sure, federal law cannot preempt federal law. But courts have a "duty to interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). This Court should not read FMCSA's rulemaking authority to permit intrusion into Congress's comprehensive immigration scheme.

## B. The Final Rule is Arbitrary and Capricious Because It Does Not Reflect Reasoned Decision-Making

Even if FMCSA has statutory authority to issue the Rule, it violates the APA, which requires that agency action be "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted); *see also* 5 U.S.C. § 706(2)(A).

Most straightforwardly, the Rule suffers from the same flaw as the IFR: it adopts identical eligibility restrictions as those found wanting by this Court while once again providing no data to support a relationship between immigration status and driver safety. Conceding that "[t]he necessary level of detail regarding the type of CDL held by the drivers involved" in crashes "is not available," FMCSA points to 17 recent accidents involving non-domiciled CDL holders. 91 Fed. Reg. at

7065, 7099. But 17 accidents out of over 4,000 fatal crashes that occur annually[8] is statistically insignificant, not a basis for a sweeping categorical rule that renders the vast majority of lawfully present noncitizens ineligible for CDLs.[9] *See Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 540 (D.C. Cir. 2025) (A rule "unsupported by substantial evidence" is arbitrary and capricious) (citation omitted).

FMCSA's failure to consider any meaningful data is dispositive. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data.") (citation omitted). Put simply, FMSCA looked at the available evidence, found the evidence insufficient to support a change that benefits safety, and proceeded with the change anyway. That is arbitrary and capricious rulemaking.

---

[8] *See* 19 State Attorneys Gen. Comment, FMCSA-2025-0622-7571, at 6–7 (stating that there were 4,043 fatal large-truck and bus crashes in 2023).
[9] *See* 91 Fed. Reg. at 7096 (the Rule makes 97% of current non-domiciled CDL holders ineligible); Eldred Declaration ¶ 29 (estimating only 0.6% of current non-domiciled CDL holders in Washington will be eligible to renew under the Rule).

FMCSA attempts to brush aside the absence of a documented safety concern, suggesting that what matters is not "a specific crash count" but two unsupported generalizations about what might undermine road safety. 91 Fed. Reg. at 7065. As explained below, neither justification provides a reasoned basis for the Rule. And rendering 194,000 people ineligible for renewal of their CDLs based on "mere speculation" is the opposite of reasoned decision-making. *Id.* at 7096; *Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 34 F.4th 1105, 1113 (D.C. Cir. 2022) (citation omitted).

### 1.    Driving history

FMCSA principally maintains that the Rule serves a safety function because it "limit[s] licensure to only those individuals whose driver history can be vetted." 91 Fed. Reg. at 7067. Under the Rule, driver history entails both "the driver's historical record" and "their concurrent driving record outside the United States." *Id.* at 7048. A driver-history rationale, however, is incapable of justifying the Rule. *See World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 223 (D.C. Cir. 2025) (agency action unlawful given failure to explain "discrepancy in the reach of the Rule given its underlying rationale").

*First*, the Rule relies on the assumption that there is a "bifurcated standard in driver vetting" under which domestic-domiciled drivers' driving histories are more stringently evaluated than foreign-domiciled drivers' driving histories. 91 Fed. Reg. at 7044. The Rule, however, completely ignores that all CDL applicants must generally meet the same requirements, 49 C.F.R. § 383.73(f)(2), and that a person's driving history is not necessarily tied to their domicile. Because having a driving history does not appear to be a requirement to obtain a CDL, *see id.* § 383.73(b)(3)(i), both a domestic-domiciled driver and a foreign-domiciled driver may have no driving record, and thus no basis on which to "predict[ ] future safety outcomes on the road." 91 Fed. Reg. at 7049. And the Rule overlooks that many foreign-domiciled drivers have extensive domestic driving histories, while many domestic-domiciled drivers have extensive foreign driving histories. The Rule conducts no analysis of the extent to which a driver's domicile indicates the accessibility of their driving history.

The exclusion of DACA recipients, in particular, underscores the divergence between the agency's driver-history rationale and the Rule it adopted. DACA recipients came to the United States when they were

children and have "continuously resided" from 2007 until their request for DACA status.[10] They therefore necessarily lack foreign driving credentials. They are also less likely to have driven in a foreign jurisdiction before applying for a CDL or to drive in such a jurisdiction after acquiring one. Before traveling overseas, DACA recipients must apply for and receive advanced parole.[11] Thus, under the Rule's rationale, DACA recipients would appear to be perfectly suited for CDL eligibility. And yet, they are excluded on the false premise that a foreign-domiciled driver's driving history is necessarily inaccessible because it kept by a foreign country.

The inclusion of domestic-domiciled drivers who have significant foreign driving histories similarly undermines the agency's safety rationale. The Rule describes the inability of States to verify foreign driving histories as a "critical safety vulnerability." 91 Fed. Reg. at 7065. And yet, while it attempts to account for the foreign driving histories of foreign-domiciled drivers, it does nothing to address the

---

[10] 19 State Attorneys Gen. Comment, FMCSA-2025-0622-7571, at 7 n.24.
[11] *I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://perma.cc/UBU6-JRB5.

prospect that, unbeknownst to a State, a domestic-domiciled CDL applicant might have been involved in a serious traffic violation or a fatal crash abroad. Even though all CDL holders already have a continuous duty to notify States of driving violations that occur in other jurisdictions, *see* 49 C.F.R. §§ 383.31(a), 383.71(f)(2)(ii), the Rule only subjects foreign-domiciled drivers to greater scrutiny. The agency's failure to consider the possibility that domestic-domiciled drivers pose a significant safety risk is arbitrary and capricious.

*Second*, the Rule draws a line between those who remain eligible for non-domiciled CDLs (H-2A, H-2B, E-2) and those who are now ineligible (asylum seekers and others with EADs) because "the totality of Federal vetting for these specific visa categories" verifies foreign driving histories in a manner that is a "reasonable functional equivalent" to verification of U.S. driving history. 91 Fed. Reg. at 7050. But there is no identified support for drawing that line; indeed the Rule acknowledges it does not "perfectly replicate" the existing process for verifying driving histories (to which both domestic and foreign-domiciled drivers with U.S. driving histories are subject). The line is arbitrary. *Id.*

FMCSA points to labor certification by Department of Labor (DOL). But such certification does not apply to E-2 visa holders. *See id.* at 7050. And the vetting of H-2A and H-2B visa employers is not special: it approximates the vetting done by non-visa employers to complete the job order process. By regulation, the qualifications listed in job orders submitted by these visa employers are to be "consistent with the normal and accepted qualifications required by employers that do not use H-2A workers in the same or comparable occupation and crops." 20 C.F.R. § 655.122(b) (H-2A program); *id.* § 655.18(a)(2) (similar for H-2B program). Thus, FMCSA has not shown that drivers being hired under the H-2A and H-2B programs are vetted differently or more likely than any others to have safe driving records.

FMCSA's reliance on consular adjudication during the visa application process similarly withers under scrutiny. According to FMCSA, consular officers "have the authority" and "ability to request and review documentation related to driving history." 91 Fed. Reg. at 7050. That hardly establishes that consular offices in fact do so. And it is hard to see why a consular interview would provide FMCSA with greater "assurance" that a driver "possess[es] the basic English

proficiency necessary to operate a CMV safely" than FMCSA's current regulations, which *require* precisely that. *Id.*

FMCSA next points to the ongoing relationship between U.S. employers and visa holders, but that observation fails to justify the comparative judgment essential to the Rule's eligibility restrictions: namely, that non-domiciled CDL holders with the eligible statuses are *safer drivers* than others. To the contrary, evidence in the record and commonsense (liability and insurance concerns) suggest that equivalent screening is performed by non-visa employers hiring non-domiciled CDLs to drive trucks and buses.[12] Indeed, Metro carefully screens and trains its bus operators. Eldred Declaration ¶¶ 16–18.

FMCSA finally claims that H-2A, H-2B, and E-2 visas are subject to ongoing oversight through the visa renewal process, 91 Fed. Reg. at 7050, but that process also applies to visa holders who are newly ineligible under the Rule.

*Third*, FMCSA failed to consider "significant and viable and obvious alternatives" that would have better accomplished its stated objective. *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C.

---

[12] Asian Law Caucus Comment, FMCSA-2025-0622-7616, at 10.

Cir. 2015) (citation omitted). The most obvious is to directly require non-domiciled CDL applicants to present reliable, easy-to-process documentation regarding their foreign driving histories. Indeed, reasoning underlying the Rule's eligible statuses—that applicants for employment-based visas are screened for clean driving records— presupposes that individuals can obtain and present evidence of precisely this sort. 91 Fed. Reg. at 7050. FMCSA waves this alternative away based on the "substantial burden" such a rule would place on States, which are not properly equipped to "evaluat[e] those records." *Id.* at 7068. But this is not sufficient consideration under the APA. Regulations on the books assume that States can review foreign driving records. *See* 49 C.F.R. § 383.71(f)(2)(ii) (requiring non-domiciled CDL holders to report adverse actions against their driving privileges in foreign jurisdictions). And in any event, processing of foreign documents is hardly an insuperable or novel problem. FMCSA could have required applicants to fill out a standardized form, provide a certified translation of any foreign language documents, or even require documentation from an embassy attesting to a clean driving record.

In sum, the Rule's driver history rationale is based on an unsupported premise that foreign-domiciled drivers have worse foreign driving histories than domestic-domiciled drivers, implements a flawed proxy for addressing this supposed issue, and fails to meaningfully consider the most obvious alternative.

## 2. State compliance

FMCSA separately claims that the Rule addresses safety because its bright-line eligibility restrictions will make it easier for States to comply with the requirements for issuing CDLs. Specifically, it asserts the Rule is necessary because States have had difficulty appropriately issuing nondomiciled CDLs based on an applicant's EAD. 91 Fed. Reg. at 7052. But FMCSA does not connect this claimed non-compliance to data. FMCSA identifies no non-compliance with the processes in place to ensure driver fitness—knowledge, training, and testing requirements to operate CMVs—for all persons receiving non-domiciled CDLs.

To the extent that non-compliance, per se, is FMCSA's concern, its statutory mandate to ensure uniformity does not authorize it to create an arbitrary rule with no demonstrated relation to safety. And FMCSA could have addressed the issue by requiring States to revoke CDLs

issued to persons ineligible under prior rules and reissue CDLs with incorrect expiration dates. *See id.* at 7102 (49 C.F.R. § 383.73).

Finally, FMCSA's view that, going forward, States cannot—even with training—comply with the current eligibility rules runs counter to commonsense and the record before the agency. States, in partnership with the federal government, administer all sorts of complicated regulatory regimes from the Affordable Care Act to the Clean Air Act. And FMCSA identifies no prior efforts to clarify the eligibility standards or require that States train "front-line clerks" on those standards. *Id.* at 7052. Those are obvious alternatives to categorical exclusion of persons that pose no demonstrated safety risk. FMCSA claims that the widespread nature of noncompliance—present in "more than 30 States"—demonstrates that it is "not merely a training deficiency." *Id.* In reality, that observation supports the opposite conclusion: forty percent of the States are getting it right, the other sixty percent can presumably adopt their best practices. FMCSA's observation that there are "varying levels of noncompliance" among the 30 States similarly makes clear that noncompliance is a function of State level dynamics,

not a product of some unavoidable in-administrability of the current

eligibility requirements. *Id.*

### C. The Final Rule is Arbitrary and Capricious Because It Is Based on a Pretextual Explanation

The Rule must also be set aside as arbitrary and capricious

because its unreasoned decision-making underscores that road safety is

a pretext for an alternative purpose: expanding immigration

enforcement.

In reviewing agency actions, courts are "not required to exhibit a

naiveté from which ordinary citizens are free." *Dep't of Com. v. New

York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550

F.2d 1294, 1300 (2d Cir. 1977)). Thus, courts can reject an agency's

explanation if there is a "disconnect between the decision made and the

explanation given." *Id.* at 785. Although review of agency action is

generally limited to the administrative record, *id.* at 780, courts can

also consider public statements. *See Nat'l Fed'n of Indep. Bus. v. Dep't of

Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 122 (2022)

(Gorsuch, J., concurring) (relying on a retweet by the White House

Chief of Staff) (quoting *BST Holdings, L.L.C. v. Occupational Safety &*

*Health Admin.*, 17 F.4th 604, 612 & n.13 (5th Cir. 2021)); *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 312 (D.C. Cir. 2001).

The impetus for the Rule is immigration enforcement, not road safety. The Rule was issued pursuant to the Truck EO, which was part of a flurry of EOs that made vague statements about a relationship between noncitizens and safety concerns. *See e.g.*, 90 Fed. Reg. 18761. When FMCSA initially put this hypothesis to the test, it found no such relationship. 90 Fed. Reg. at 46520. But it still issued the IFR, which was followed by immigration enforcement efforts targeting non-domiciled CDL holders.[13] After this Court stayed the IFR and concluded that the agency had not presented evidence of a real safety concern, *Lujan*, 2025 WL 3182504, at *2, FMCSA tested its hypothesis again, only to reach the same conclusion. 91 Fed. Reg. at 7067, 7099. That FMCSA issued the Rule anyway demonstrates that its sole justification—improved road safety—is nothing more than a "distraction." *Dep't of Com.*, 588 U.S. at 785. FMCSA's efforts to justify the Rule based on unsupported generalizations about driving history

---

[13] *See, e.g., Secretary Noem Highlights More than 140 Illegal Alien Truck Drivers Arrested During Operation Midway Blitz*, DHS (Oct. 30, 2025), https://perma.cc/8DU5-LB42.

and state compliance, *see supra* Section I.B, are precisely the sort of "contrived" explanations provided to conceal an unreasoned purpose that does not survive APA review. *Id.*

## II. Petitioner Satisfies the Remaining Stay Factors

Petitioner will suffer irreparable harm absent a stay. This Court has "recognized that financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *In re NTE Connecticut, LLC*, 26 F.4th 980, 990–91 (D.C. Cir. 2022) (cleaned up). This is such a case. Metro employs roughly 50 bus drivers who are now ineligible under the Rule. Eldred Declaration ¶ 23. Absent a stay, these now-ineligible bus drivers may have their licenses revoked at any moment after the Rule's effective date. *Id.* In addition, four trainees in Metro's training class were disqualified by the IFR and remain interested in pursuing a CDL in the near future if they are eligible. *Id.* ¶¶ 24, 31. Petitioner will lose the substantial investment it incurred in training those bus drivers, with the initial training program alone representing an investment of approximately $15,000 per trainee. *Id.* ¶ 31. In total,

the four trainees and the 50 active bus drivers represent an investment of over $800,000 that will be lost without any recourse absent a stay. *Id.*

The imminent harms are not only economic: the Rule creates safety risks by replacing "safer experienced drivers with less-safe new drivers." *Lujan*, 2025 WL 3182504, at *2. Metro's data confirms the commonsense intuition that experienced bus drivers are safer than inexperienced ones. Specifically, the vast majority of accidents caused by bus operators in King County each year are caused by first-year drivers. Eldred Declaration ¶ 33. Losing experienced bus operators who are now ineligible under the Rule requires Metro to put a substantial number of new drivers on the roads causing risk to the public. *Id.*[14]

The balance of the equities and public interest factors, which merge here, warrant a stay. *See Nken*, 556 U.S. at 435. The Rule is unlawful, and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Moreover, the

---

[14] *See also* Local Gov'ts Comment, FMCSA-2025-0622-7894, at 9 & n.48; Nat'l Center for Surface Transp. Safety Excellence, Commercial Motor Vehicle Driver Risk Based on Age and Driving Experience (2020), https://perma.cc/K27V-2C2Z.

public interest supports Petitioner which—unlike FMCSA—presents data that the Rule will exacerbate, rather than alleviate, road safety. The balance of equities also tilts in favor of a stay, which ensures that FMCSA will "not impose unrecoverable losses" on King County's limited resources—and those of local governments across the nation—"without fulfilling the basic requirements of reasoned explanation." *In re NTE Connecticut, LLC*, 26 F.4th at 991 (considering effects of a stay on non-party consumers).

## CONCLUSION

Petitioner's motion for a stay of the Rule pending review should be granted.

Respectfully submitted,

By: */s/ Paul J. Lawrence*
    Paul J. Lawrence
    Kevin J. Kennedy
    Eugene Lee
    PACIFICA LAW GROUP LLP
    401 Union Street, Suite 1600
    Seattle, WA 98101-2668
    (206) 240-1700
*Counsel for Petitioner*

March 6, 2026

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,177 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Paul J. Lawrence*
Paul J. Lawrence

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2026, I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Paul J. Lawrence*
Paul J. Lawrence

# ADDENDA

# Index of Addenda

Addendum 1: Declaration of David Eldred

Addendum 2: Petitioner's request of the Department of Transportation to stay the effective date of *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 91 Fed. Reg. 7044

Addendum 3: The Department of Transportation's denial of Petitioner's request to stay the effective date

Addendum 4: *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 91 Fed. Reg. 7044

**ADDENDUM 1:**

**Declaration of David Eldred, Chief Administrative Officer ("CAO") for the Metro Transit Department of Martin Luther King, Jr. County, Washington**

DAVID ELDRED declares the following subject to the perjury laws of the United States and the State of Washington:

1. I am over the age of eighteen, competent to testify, and make this declaration based on my personal knowledge and on my review of relevant business records.

2. I am the Chief Administrative Officer ("CAO") for the Metro Transit Department of Martin Luther King, Jr. County, Washington ("King County Metro"). I have held this position for two years. Previously, I was Metro's General Counsel for five years and a Senior Deputy Prosecuting Attorney for King County for twenty-three years before that. I remain a licensed member of the Washington State Bar in good standing.

3. My responsibilities as CAO for King County Metro include providing strategic planning insights including financial health assessments, assisting in agency goal setting, and collaborating on program implementation. I oversee resource allocation, evaluate performance, and implement strategies to ensure the seamless operation of King County Metro's enterprise-wide services. I also manage and oversee all of Metro's internal services, including bus

1

operator recruitment.  I am also familiar with Metro's training program for bus operations and bus maintenance and repair.

4.     I am aware of the Interim Final Rule promulgated by the Federal Motor Carrier Safety Administration ("FMCSA") on September 29, 2025 ("IFR") at 90 Fed. Reg. 46509 and codified at 49 CFR Parts 383 and 384.  I am aware that, among other things, the IFR prevented a state from issuing a non-domiciled Commercial Learner Permit ("CLP") or Commercial Driver License ("CDL") to asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients. Under the IFR, apart from citizens and permanent residents, immigrants and nonimmigrants lawfully permitted to work in the United States were barred from obtaining a CLP or CDL unless they fall into one of the following narrow visa categories:  H-2A (Temporary Agricultural Workers), H-2B (Temporary Non-Agricultural Workers), or E-2 (Treaty Investors).  I understand that, under the IFR, anyone who was not a citizen, permanent resident, or a person holding one of those three visas is ineligible to receive, renew, update, or even change the address associated with their non-domiciled CLP or CDL.

5.     I am also aware of the FMCSA's final rule on the same subject, issued Friday, February 13, 2026, at 91 Fed. Reg. 7044, with an effective date of March 16, 2026. As stated in that final rule, the final rule "reaffirms, with minor changes, the provisions of the … (IFR)." 91 Fed Reg at 7044; see also *id.* at 7091 ("FMCSA makes minor changes from the IFR").

### King County

6.     Located in the Pacific Northwest and covering 2,307 square miles, King County has almost twice the land area of the State of Rhode Island and is the twelfth most populous county in the United States. King County contains over 800,000 acres of forests, more than 60 named lakes, over 3,000 miles of rivers and streams, and is bounded by Puget Sound to the west.

7.     King County is a general municipal government operating as a home rule charter county under the authority of the Washington Constitution, Article II, §4. The county provides a full range of services – local and regional, urban and rural – across the County's diverse geography and communities, managing nearly 17,700 employees and an overall budget of approximately $10.2 billion dollars per year.

8.    King County's April 1, 2025 estimated population was 2,411,700.  With approximately 25% of its population having been born outside of the United States, King County is a diverse and vibrant community.  Upward of 170 languages and dialects are spoken.  A language other than English is the primary language spoken at home in roughly 30% of King County households.

9.    In 2025, King County Metro had a ridership of approximately 96,179,320, and it averaged about 302,900 riders per weekday as of the second quarter of 2025.  Ridership counts individual passenger boardings of Metro-operated motor buses, trolley buses, the South Lake Union and First Hill Streetcars in downtown Seattle, and Dial-A-Ride Transit, or DART, a smaller transit vehicle service for communities needing more flexible service due to lower population density, greater distances, and fewer public transportation options.

## Metro

10.    According to the American Public Transportation Association (APTA) 2025 Public Transportation Fact Book, King County

Metro is the tenth largest bus agency in the United States.[1] Other

transit agencies in the top ten include MTA New York City Transit (#1),

Chicago Transit Authority (#3), Washington Metropolitan

Transportation Authority (#6), Massachusetts Bay Transportation

Authority (#6), Southeastern Philadelphia Transportation Authority

(#8), and City and County of San Francisco (#9). *Id.* Also according to

APTA, in 2024 Metro was one of just five transit agencies in the nation

with over 50,000,000 annual riders and had a 14% ridership increase

year over year.[2] King County Metro is one of the few transit agencies

that is operated by a general municipal government rather than a

special purpose government.

11. King County Metro operates fixed-route bus, paratransit,

and vanpool services throughout the county, which includes 39 cities,

towns, and unincorporated areas – among them the cities of Seattle,

Bellevue, Kirkland, Redmond, Sammamish, Issaquah, Shoreline,

Tukwila, Renton, Auburn, Kent, and Federal Way. In addition to its

---

[1] https://www.apta.com/wp-content/uploads/APTA-2025-Public-Transportation-Fact-Book.pdf at page 35 (Table 4).
[2] See https://www.metro-magazine.com/10232607/aptas-transit-wrapped-names-agencies-with-top-ridership-gains (visited April 17, 2025). According to the same source, Metro was second only to the Washington D.C. Metropolitan Area Transit Administration (WMATA), which had a 20% ridership increase.

5

bus transit operations, Metro also operates a water taxi system on the Puget Sound. No Metro transit operations cross state lines.

12. Metro also operates and maintains the Sound Transit Link light rail system and the Seattle streetcar system through contracts with the Central Puget Sound Regional Transit Agency ("Sound Transit") and the City of Seattle, respectively.

13. Metro has over 5,800 employees and approximately 1,400 buses in its fleet, spread across eight transit bases and numerous ancillary facilities. It serves over 7,100 bus stops, numerous park-and-ride lots, sixteen transit centers, and three passenger ferry terminals across the county. It also maintains substantial maintenance and repair facilities at multiple locations.

## Bus Operator Recruitment and Training

14. With about 2,600 drivers King County Metro runs a continuous recruitment process. Active recruitment is necessary to replace drivers who leave the department, replace retiring drivers, cover leave events, and staff new routes. In order to serve existing routes, preserve levels of service and staff new routes, Metro must maintain its corps of drivers. Even relatively small variations in available drivers can

negatively impact service to the public. Because the Rule effectively deprives drivers in the affected categories from holding CDLs, it will disrupt Metro operations and negatively impact transit options available to the public. These immigrants serve a crucial role in our workforce.

15.     Metro's recruitment efforts for its employees include advertising, attending job fairs, paying amongst the highest regional wages, and offering competitive benefits, including sick and vacation leave. Immigrants authorized to work in the United States have been an important focus of this recruitment effort.

16.     Metro thoroughly vets applicants for the Transit Operator position during the hiring process. "Transit Operator" is the job title Metro uses for a professional bus driver and the terms are used interchangeably in this declaration. Prior to receiving a conditional offer of employment, applicants are required to apply for the position and sit for an interview. If they receive a conditional offer, applicants must then successfully complete the Pre-Employment Process (PEP) within 45 days. The PEP requires applicants to:

      A. Obtain their Washington State Commercial Learners Permit (CLP) by passing three written knowledge tests. These include

the Commercial Driver License (CDL) tests for general

knowledge (A, B & C), the air brakes test, and the test for

carrying passengers.

B. Pass a Department of Transportation (DOT) physical

examination.

C. Pass a five-year driving record review.

D. Pass a drug screening.

E. Pass a criminal background check.

F. Present documents sufficient to meet U.S. Citizenship and

Immigration Services ("USCIS") guidelines for employment

verification.

17. After their hire, trainees must complete a ten-week training

program. Federal and state laws require that operators of transit vehicles

maintain valid CDLs. King County Metro, with the agreement of

Washington State, runs its own CDL training and testing program. The

program consists of two primary components: classroom instruction

including preparation and testing for the CDL (for new hires who do not

already have a CDL) and training on, and practice of, the skills to be a

Transit Operator. As a part of their training, operators drive with skilled

Metro instructors to learn and practice the skills needed. Operators must learn and are expected to follow an extensive list of policies and procedures comprising a 200-page manual, which is written entirely in English. Important bus operator skills include operating a coach in traffic, providing good customer service to all passengers, and requesting assistance when needed via radio to the Transit Control Center. This training focuses on safety and includes practice operating a bus in revenue service, which means under supervision while paying customers are on board. Trainees are assessed on their ability to drive safely, provide good customer service, be aware of their surroundings, and manage distractions before they graduate from the program. Metro's training program, including all knowledge and skills testing, is conducted entirely in English.

18. Following completion of CDL training, each trainee must complete mandatory CDL testing. Under U.S. Department of Transportation ("DOT") rule 49 C.F.R.§ 391.11(b)(2), all commercial motor vehicle drivers must be able to read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records. King County Metro

administers the CDL test to its trainees on behalf of the State of Washington. Metro staff are trained by the State of Washington to meet the state and federal testing standards. The knowledge and skills examinations conducted by Metro on behalf of the State of Washington at a minimum meet the requirements of 49 CFR 383.133, which requires that for skills testing, "[a]pplicants must be able to understand and respond to verbal commands and instructions in English... Neither the applicant nor the examiner may communicate in a language other than English during the skills test." 49 CFR 383.133(c)(5); see also WAC 308-100-040(3) (DOL regulation incorporating that CFR section by reference).

## Impact of the Rule on Metro Operations

19.     If a current King County Metro Transit Operator loses their CDL, they cannot perform their job and will be removed from their bus operator position. If a person who is in the training program loses their CLP or CDL or becomes ineligible to obtain one, they are not able to complete the training program and will not continue towards employment as a bus operator.

20.     Nationwide, transit agencies have been struggling to rebuild their workforce since the pandemic. Agencies, including King County

Metro, have suspended service and been unable to deliver promised levels of service. This includes both operating routes with shortened hours of service or less frequent service and suspending other routes entirely. As agencies attempt to staff service levels, drivers work more overtime, which may lead to fatigue and safety issues. This overtime also impacts budget and raises the general cost of service. Although these issues impacted Metro prior to the eligibility changes adopted by the IFR and the Rule, DOT's actions make the situation worse by excluding otherwise eligible drivers from the workforce.

21.     Under the Rule, FMCSA's choice to restrict "evidence of lawful immigration status" to just three narrow visa classifications – the H-2A, Temporary Agricultural Workers, H-2B, Temporary Non-Agricultural Workers, and E-2, Treaty Investors – will limit the availability of CDLs for non-domiciled drivers to the stringent caps on those three visas. As a practical matter, none of these visa categories provide the longer-term workers that Metro requires for an effective bus transit system. Few commercial drivers will qualify for a Temporary Agricultural Worker or Treaty Investor visa. The H-2B visa is for temporary jobs where there is a one-time need, seasonal need, peak load,

or intermittent need – common fields include landscaping, construction, hospitality, and seafood processing. As described below, these criteria are not useful for the continual need for training, hiring, and retaining Metro's drivers. Moreover, the visa cap for H-2B visas is 66,000 for FY 2026. These visas are issued in two half-year tranches. The first 33,000 cap for FY 2026 was reached on September 12, 2025, two weeks before FMCSA announced its IFR.[3] As of Feb. 6, 2026, USCIS received more than enough petitions to reach the cap for an additional 18,490 H-2B visas made available for the first allocation of returning workers for FY 2026.[4]

22.     Due to expansion of service, retirement, and other types of employee turnover, King County Metro recruits, hires, and trains drivers on a continuous basis to ensure we can deliver planned levels of service and meet the needs of the community. The implementation of the Rule will shrink our available applicant pool at the same time it causes loss of existing experienced, highly trained drivers who are lawfully permitted to work in the United States under federal law. Metro estimates about 10%

---

[3] https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-non-agricultural-workers/cap-count-for-h-2b-nonimmigrants (accessed Oct. 22, 2025).
[4] https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-non-agricultural-workers/temporary-increase-in-h-2b-nonimmigrant-visas-for-fy-2026

of the trainees in the 2025 recruitment classes are directly impacted and rendered ineligible for CDLs under the Rule.

23.     King County Metro estimates that up to 100 current Metro employees work in job classifications that require or often require a CDL but are now ineligible to hold a CDL under the Rule and can have their CDLs revoked. More than half of these employees are bus operators, all of whom are required to have a valid CDL. The remaining employees include positions such as mechanics and first line supervisors, many, but not all of whom, must possess a CDL. As these other workers lose their CDLs, they will no longer be able to drive buses for testing, vehicle recovery, etc., and Metro will need to redeploy existing assets or, potentially, hire and train new employees for these tasks. Together, these impacts will add stress on Metro's ability to provide transit services to the public.

24.     After the IFR was issued, the DOL directed King County Metro to forbid trainees who are disqualified under the Rule from taking the CDL exam. Four trainees in the training class at that time were not permitted to take the exam, and they were not allowed to train in revenue service. Metro removed these four trainees from the training program.

25.     In late 2025, King County Metro made conditional employment offers to eleven additional applicants who are now ineligible for non-domiciled CDLs under the Rule. Because they were not allowed to take the CDL exam or obtain a CDL due to the IFR, Metro was required to rescind these eleven conditional offers of employment.

26.     In late 2025, five King County Metro bus operators were issued incorrect CDLs by DOL and needed to have them replaced with corrected versions.  However, before DOL could issue corrected CDLs, FMCSA adopted the IFR, and those five drivers, who remain authorized to work in the United States, were not allowed to receive a corrected CDL. These five drivers were removed from their bus operator positions.

27.     In the months since the IFR, 8 King County Metro drivers who previously would have been eligible to renew their non-domiciled CDLs under the prior regime because they are legally authorized to work in the United States have not been allowed to renew their licenses. They have been removed from their bus operator positions and lost their community identities as public transit operators – not for any safety-related reason, but simply because they are not citizens or permanent residents.

28.     King County Metro has learned that, unrelated to the IFR or the Rule, the Washington Department of Licensing suspended issuing or renewing non-domicile CDLs. Based on news reports, King County Metro understands this is a temporary situation while the DOL works to make changes in their system, process, procedures, and training. King County Metro anticipates that DOL will resume issuing non-domicile CDLs unless the Rule prevents this from happening.

29.     King County Metro understands from DOL that approximately 4,200 drivers held Washington State-issued non-domiciled CDLs prior to the Rule, and only about 26 will be eligible to renew under the new Rule – roughly 0.6%. The impact on Metro operations is substantial. The Rule removes nearly all non-domiciled drivers from the available applicant pool and the bus operator workforce.

30.     Going forward, the Rule would require Metro to significantly adjust its recruitment approach to comply with the limitations that the Rule places on applicants in the affected immigration categories. This will have the impact of excluding immigrants in these affected categories from being employed as bus operators or in any other positions requiring a

CDL. This will narrow the pool of potential applicants, limiting Metro's ability to select the very best candidates to join its training program.

31.     The cost of training a replacement bus operator is approximately $15,000 per driver. This money is now a loss for each of the drivers whose CDL has or will be revoked or for whom CDL testing was denied. Specifically, King County spent approximately $60,000 on the four trainees that completed its training program but were ineligible to take the CDL exam at the relevant time under the IFR. These trainees remain interested in taking the CDL exam but would be ineligible to do so under the Rule. King County Metro also spent approximately $75,000 training the bus drivers who had their CDLs revoked by DOL because they became ineligible under the IFR. Those drivers, too, remain interested in renewing their CDLs but would be ineligible to do so under the Rule. If the Rule is not stayed, King County Metro will permanently lose the investments it made in those drivers. Finally, King County Metro spent approximately $675,000 training the roughly 45 bus drivers that currently hold CDLs but are now ineligible to renew their licenses under the Rule and thus will become ineligible to drive within the next year. Once those now-ineligible drivers are refused renewal of their CDLs, King County Metro will lose the

investments it made in training those bus operators. Metro operates on a very tight budget that is built months in advance of the budget year. The loss of Metro's investment in its operator training cannot be easily replaced. Not only is there limited budget to pay for recruiting and training new operators, the uncertainty caused by the Rule also creates significant challenges in creating future budgets.

32. The Rule states, "[t]he Agency acknowledges that this rule will affect various sectors of the transportation industry, including passenger transportation such as school buses. However, the rule does not have retroactive effect, therefore school bus service providers will have time to plan for a potential reduction in available drivers as non-domiciled CDLs expire and are not renewed." 91 Fed. Reg. 7069. However, there is in fact an opportunity cost to King County Metro of replacing these operators. Metro closely tracks attrition in the bus operator classification and is aggressively hiring and training both to replace leaving operators and to increase the overall number of operators. Metro is growing its bus operator workforce in order to restore suspended service and meet planned new growth in bus service. Metro has not estimated the specific impacts to its ability to deliver added hours of bus service, but at present we believe

17

that another likely negative impact of the Rule would be a reduced frequency of service compared to what Metro had planned going forward.

33.     The loss of experienced operators due to the Rule will also have a negative impact on safety.  In our experience, newly trained operators are involved in more accidents than their more experienced colleagues.  We understand this to be normal in the transit industry.  As operators gain experience, they become safer drivers.  This trend is demonstrated by Metro's "Accidents by Seniority" 2016-2025 data illustrated in the chart below, which identifies the total number of preventable accidents Metro bus operators have for each year of driving experience, aggregated over a ten-year span.  The data confirm a consistent trend over time – the longer King County Metro can keep drivers in service, the safer the service Metro provides to King County residents and visitors.  If Metro must hire and train new operators to replace experienced operators who lose their CDLs as a result of the Rule, Metro expects to experience a negative safety impact in its operations.



I declare under penalty of perjury under the laws of the United States of America and Washington State that the foregoing is true and correct.

SIGNED this _6th_ day of _March_____, 2026, in Martin Luther King, Jr. County, Washington.

_____
David Eldred

**ADDENDUM 2:**

**Petitioner's request of the Department of Transportation to stay the effective date of *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 91 Fed. Reg. 7044**



**T** 206.245.1700
401 Union Street, Suite 1600
Seattle, WA 98101-2668
pacificalawgroup.com

Kevin Kennedy
kevin.kennedy@pacificalawgroup.com

Via Email:     Jesse.Elison@dot.gov; Mary.pettit@dot.gov

March 4, 2026

Jesse Elison
*Deputy Administrator*
Rebecca Pettit
*Office of the Chief Counsel*
Federal Motor Carrier Safety Administration
U.S. Department of Transportation
1200 New Jersey Avenue SE
Washington, DC 20590

Re:     Final Rule "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers
Licenses (CDL)"

Dear Mr. Elison and Ms. Pettit:

We write to request a stay of the final rule entitled "Restoring Integrity to the Issuance of
Non-Domiciled Commercial Drivers Licenses (CDL)" (Docket No. FMCSA–2025–0622; RIN
2126-AC98) and published in the Federal Register on February 13, 2026, at 91 Fed. Reg. 7044.
We represent King County of Washington State and have filed a petition for review of the final
rule with the U.S. Court of Appeals for the District of Columbia Circuit. A copy of the petition is
attached.

The Final Rule should be stayed because it is substantively unlawful. The Final Rule
exceeds FMCSA's statutory authority because it is only authorized to issue regulations concerning
driver fitness. *See e.g.*, 49 U.S.C. § 31305(a). It is not authorized to make distinctions between
noncitizens. The Final Rule is also arbitrary and capricious because it is not based on reasoned
decisionmaking. 5 U.S.C. § 706(2)(A). Indeed, it admits that "the necessary level of detail
regarding the type of CDL a driver involved in a crash held is simply not available under current
crash reporting requirements." 91 Fed. Reg. at 7065.

For these reasons, we request that the Administrator use his discretion to stay the Final
Rule. If we do not hear back by 5 pm EST Thursday, March 5, 2026, we plan to move to stay the
final rule in the court of appeals.

//

Sincerely,

PACIFICA LAW GROUP LLP

Kevin Kennedy

**ADDENDUM 3:**

**The Department of Transportation's denial of Petitioner's request to stay the effective date**



**U.S. Department
of Transportation**

**Federal Motor Carrier
Safety Administration**

*Chief Counsel*

**1200 New Jersey Ave, SE
Washington, DC 20590**

March 5, 2026

<u>Via Electronic Mail</u>
Mr. Kevin Kennedy
Pacifica Law Group LLC
401 Union Street, Suite 1600
Seattle, WA 98101

      Re: Final Rule, Restoring Integrity to the Issuance of Non-Domiciled Commercial
      Drivers Licenses (CDL), 91 Fed. Reg. 7044

Dear Mr. Kennedy:

FMCSA has received Pacifica Law Group's request to stay the effective date of the Final Rule,
Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, published
on February 13, 2026. After due consideration, FMCSA denies Pacifica Law Group's request.

              Sincerely,

              Rebecca Pettit
              Chief Counsel

**ADDENDUM 4:**

***Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 91 Fed. Reg. 7044**



# DEPARTMENT OF TRANSPORTATION

## Federal Motor Carrier Safety Administration

### 49 CFR Parts 383 and 384

[Docket No. FMCSA–2025–0622]

RIN 2126–AC98

### Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** FMCSA amends the Federal regulations for State Driver's Licensing Agencies (SDLAs) issuing commercial driving credentials to non-domiciled individuals. This final rule reaffirms, with minor changes, the provisions of the interim final rule (IFR) published on September 29, 2025. Specifically, this final rule limits eligibility for non-domiciled Commercial Learner's Permits (CLPs) and Commercial Driver's Licenses (CDLs) for foreign-domiciled individuals to those who hold specific, verifiable employment-based nonimmigrant status. This rule reaffirms the IFR requirements, aligning the issuance of non-domiciled CDLs with FMCSA's statutory mandate to ensure the fitness of all drivers who operate a CMV. By limiting eligibility to statuses subject to enhanced consular vetting of driver history and interagency screening, FMCSA restores the integrity of the CDL system, closes a significant safety gap, and enhances the safety of the traveling public.

**DATES:** This final rule is effective March 16, 2026.

Comments on the information collection in this final rule must be submitted to the Office of Information and Regulatory Affairs (OIRA) at the Office of Management and Budget (OMB) by March 16, 2026.

**FOR FURTHER INFORMATION CONTACT:** Philip Thomas, Deputy Associate Administrator, Office of Safety, FMCSA, 1200 New Jersey Avenue SE, Washington, DC 20590–0001; (202) 366–2551; *CDLRulemaking@dot.gov*. If you have questions on viewing or submitting material to the docket, call Dockets Operations at (202) 366–9826.

**SUPPLEMENTARY INFORMATION:** FMCSA organizes this final rule as follows:

I. Availability of Rulemaking Documents
II. Comments on the Information Collection
III. Executive Summary
IV. Abbreviations
V. Legal Basis
VI. Discussion of the IFR and Comments
  A. Overview of the IFR
  B. Comments and Responses
VII. International Impacts
VIII. Section-by-Section Analysis
  A. Regulatory Provisions
  B. Guidance Statements and Interpretations
IX. Regulatory Analyses
  A. E.O. 12866 (Regulatory Planning and Review) and DOT Regulatory Policies and Procedures
  B. E.O. 14192 (Unleashing Prosperity Through Deregulation)
  C. Congressional Review Act
  D. Regulatory Flexibility Act (Small Entities)
  E. Assistance for Small Entities
  F. Unfunded Mandates Reform Act of 1995
  G. Paperwork Reduction Act
  H. E.O. 13132 (Federalism)
  I. Privacy
  J. E.O. 13175 (Indian Tribal Governments)
  K. National Environmental Policy Act of 1969

## I. Availability of Rulemaking Documents

To view any documents mentioned as being available in the docket, go to *https://www.regulations.gov/docket/FMCSA-2025-0622/document* and choose the document to review. To view comments, click the IFR, then click "Document Comments." If you do not have access to the internet, you may view the docket online by visiting Dockets Operations in room W58–213 of the DOT West Building, 1200 New Jersey Avenue SE, Washington, DC 20590–0001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. To be sure someone is there to help you, please call (202) 366–9317 or (202) 366–9826 before visiting Dockets Operations.

## II. Comments on the Information Collection

Written comments and recommendations for the information collection discussed in this final rule should be sent within 30 days of publication to *www.reginfo.gov/public/do/PRAMain*. Find this information collection by clicking the link that reads "Currently under Review—Open for Public Comments" or by entering OMB control number 2126–0087 in the search bar and clicking on the last entry to reach the "comment" button.

## III. Executive Summary

This final rule revises the regulations that allow SDLAs to issue and renew non-domiciled CLPs and CDLs to individuals not domiciled in a U.S State. This final rule builds on and makes minor revisions to the regulatory changes in the IFR published on September 29, 2025 titled, "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)" (90 FR 46509). In reaffirming the changes made in the IFR and making some revisions for clarity, this final rule closes a critical safety gap in the Nation's commercial drivers licensing system that has manifested in two ways: (1) the issuance of licenses to individuals whose safety fitness cannot be adequately verified by SDLAs; and (2) the reliance on Employment Authorization Documents (EAD)[1] to demonstrate eligibility for a non-domiciled CDL, which has proven administratively unworkable and resulted in widespread regulatory non-compliance.

First, the agency identified an unacceptable bifurcated standard in driver vetting. While domestic CDL applicants face rigorous driver history checks through the Commercial Driver's License Information System (CDLIS) and the Problem Driver Pointer System (PDPS), non-domiciled applicants were previously processed without equivalent checks on their foreign driving history. This effectively shielded unsafe driving behaviors—including serious violations or fatal crashes—simply because they occurred outside the reach of U.S. databases. It is important to recognize that a non-domiciled driver's foreign driving record is not only historical, but also concurrent, as the driver is not required to surrender their foreign license to obtain a non-domiciled CDL and may be driving in another country during the same time period in which they hold a non-domiciled CDL. In this case, the SDLA does not have access to either the historical or the concurrent information. To close this loophole and fulfill FMCSA's statutory mandate to ensure the safety fitness of CMV drivers, this rule establishes eligibility criteria for foreign-domiciled drivers seeking non-domiciled CDLs. Following consultation with the U.S. Department of State and the U.S. Department of Homeland Security, eligibility is limited to nonimmigrant status holders who undergo enhanced consular vetting and interagency screening which serves as a functional proxy for driver history vetting by the SDLAs. By limiting eligibility to the nonimmigrant status holders identified through consultation with the U.S. Department of State, H–2A (Temporary Agricultural Workers), H–2B (Temporary Non-Agricultural

---

[1] An Employment Authorization Document (Form I–766/EAD), issued by USCIS, indicates that the holder is authorized to work in the United States for a specific time period. *See https://www.uscis.gov/green-card/green-card-processes-and-procedures/employment-authorization-document.*

Workers), and E–2 (Treaty Investors) nonimmigrant status holders,[2] FMCSA ensures that non-domiciled drivers undergo rigorous driver history checks that SDLAs, who lack access to this critical information, are incapable of performing independently. This ensures all drivers on U.S. roadways satisfy a comparable standard of background and driver history vetting, consistent with FMCSA's statutory mandate to ensure the fitness of CMV operators.

FMCSA identified 17 fatal crashes in 2025 that were caused by actions of non-domiciled CDL holders whose fitness could not be ensured and thus would be ineligible under this new rule. FMCSA did not identify, out of all the crashes the Agency reviewed, any that were caused by non-domiciled CDL holders who would remain eligible under the revised regulations. These crashes resulted in 30 fatalities and numerous severe injuries, underscoring the lethal consequences of allowing unvetted operators behind the wheel of CMVs. FMCSA believes that that the previous SDLA-administered process for foreign-domiciled drivers was insufficient to screen for high-risk drivers.

Furthermore, Annual Program Reviews (APRs) revealed systemic non-compliance with FMCSA regulations governing the issuance of non-domiciled CDLs. Under 49 CFR 383.71 and 383.73, SDLAs must issue regular CLPs and CDLs to drivers who are U.S. citizens or lawful permanent residents. With respect to foreign-domiciled drivers, regulations in effect prior to September 29, 2025 IFR, and currently in effect, provide that States that issue non-domiciled CLPs and CDLs to foreign-domiciled drivers may only accept as valid proof of lawful presence (i) an unexpired EAD issued by the United States Citizenship and Immigration Services (USCIS) or (ii) an unexpired foreign passport accompanied by an approved I–94 form documenting the driver's most recent admittance into the United States. Further, the regulations require that States accept as valid only unexpired lawful presence documents, which also means that the State must make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver's lawful presence document(s). In other words, because FMCSA's regulations considered only unexpired lawful presence documents to be valid, States were required to ensure that the non-

domiciled CLP or CDL period of validity do not exceed the expiration of the driver's lawful presence documents. Therefore, State driver's licensing agencies are required to ensure that the validity of non-domiciled CLPs or CDLs did not exceed the expiration date of drivers' lawful presence documents. In addition, States may not issue a non-domiciled CLP or CDL to citizens of Mexico or Canada, with the exception of those present in the United States under the Deferred Action for Childhood Arrivals (DACA) program. Under FMCSA's 2023 guidance, which is being rescinded under this final rule, States were permitted to issue a non-domiciled CLP or CDL to citizens of Mexico or Canada only if they are present in the United States under the DACA program.

More than 30 States have issued tens of thousands non-domiciled CDLs contrary to Federal regulations. In this regard, SDLAs have issued noncompliant non-domiciled CDLs that extend beyond the expiration of drivers' lawful presence in the United States, issued non-domiciled CDLs to citizens of Mexico and Canada not present in the United States under the DACA program, issued non-domiciled CDLs to lawful permanent residents who should have been issued regular CDLs, and issued non-domiciled CDLs without providing evidence that it verified the driver's lawful presence in the United States under the standards set forth in 49 CFR part 383. For example, in California, FMCSA found a non-compliance rate of approximately 25 percent among reviewed non-domiciled files, while New York and Texas demonstrated staggering error rates of 53 and 49 percent respectively.

This rule also replaces a complex framework for the issuance of non-domiciled CDLs to DACA recipients and other EAD holders with a "bright-line" eligibility standard. For example, as explained above, under the prior regulations, States are prohibited from issuing a non-domiciled CLP or CDL to a driver domiciled in Canada or Mexico, with the exception of Canadian and Mexican drivers present in the United States under DACA. An individual's DACA status is indicated on the EAD under the category code "C33." However, SDLAs have demonstrated challenges reliably distinguishing between EAD codes and language that were considered under prior guidance to indicate a permissible basis for issuance of a non-domiciled CDL to a driver domiciled in Canada or Mexico (e.g., C33—"Deferred Action for Childhood Arrivals") and those considered to indicate an impermissible basis (e.g., C14—"Deferred Action" or

"Alien Granted Deferred Action").[3] This confusion, along with uneven application of the regulations and guidance, led to the improper issuance of many non-domiciled CDLs to drivers domiciled in Canada or Mexico. To restore system integrity, FMCSA now requires an unexpired foreign passport and an I–94 corresponding to a specific valid employment-based nonimmigrant status. This objective standard eliminates the burden on SDLAs to interpret complex immigration codes.

Ultimately, this rule aligns the issuance of non-domiciled CDLs with FMCSA's statutory mandate to "ensure the fitness" of CMV operators. By limiting eligibility to statuses subject to consular vetting and interagency screening, FMCSA closes a significant safety gap, solves the bifurcated standard, and prioritizes the safety of the traveling public.

## IV. Abbreviations

AAMVA   American Association of Motor Vehicle Administrators
AFL–CIO   American Federation of Labor & Congress of Industrial Organizations
AFSCME   American Federation of State, County and Municipal Employees
AFT   American Federation of Teachers
APA   Administrative Procedure Act
APR   Annual Program Review
APTA   American Public Transportation Association
ATA   American Trucking Associations
ATRI   American Transportation Research Institute
BLS   Bureau of Labor Statistics
CDL   Commercial driver's license
CDLIS   Commercial Driver's License Information System
CRA   Civil Rights Act of 1964
CFR   Code of Federal Regulations
CLP   Commercial learner's permit
CMV   Commercial motor vehicle
CMVSA   Commercial Motor Vehicle Safety Act of 1986
COFA   Compact of Free Association
COVID–19   Coronavirus Disease 2019 Pandemic
DACA   Deferred Action for Childhood Arrivals
DHS   Department of Homeland Security
DMV   Department of motor vehicles
DOL   Department of Labor
DOT   Department of Transportation
EAD   Employment Authorization Document
ELD   Electronic logging device
ELP   English language proficiency
E.O.   Executive Order
FARS   Fatality Analysis Reporting System
FAS   Freely Associated States
FMCSRs   Federal Motor Carrier Safety Regulations
FR   Federal Register
FSM   Federated States of Micronesia
ICR   Information collection request
IFR   Interim final rule

---

[2] For more information on the requirements and processes required for the listed statuses see *https://www.uscis.gov/working-in-the-united-states.*

[3] EAD codes correspond to eligibility categories listed in 8 CFR 274a.12. *See https://www.uscis.gov/employment-authorization.*

INA    Immigration and Nationality Act of 1952
IT    Information technology
MALDEF    Mexican American Legal Defense and Educational Fund
MCMIS    Motor Carrier Management Information System
NAICS    North American Industry Classification System
NJSBCA    New Jersey School Bus Contractors Association
NPRM    Notice of proposed rulemaking
OES    Occupational Employment Statistics
OFLC    Office of Foreign Labor Certification
OIRA    Office of Information and Regulatory Affairs
OMB    Office of Management and Budget
OOIDA    Owner-Operator Independent Drivers Association
PRA    Paperwork Reduction Act
PII    Personally identifiable information
RCUSA    Refugee Counsel USA
RFA    Regulatory Flexibility Act
RIA    Regulatory impact analysis
SALDEF    Sikh American Legal Defense and Education Fund
SAS    Service Annual Survey
SAVE    Systematic Alien Verification for Entitlements
SBTC    Small Business in Transportation Coalition
Secretary    The Secretary of Transportation
SDLA    State Driver's Licensing Agency
SSN    Social Security number
TPR    Training Provider Registry
TPS    Temporary Protected Status
USW    United Steelworkers
U.S.C.    United States Code
USCIS    U.S. Citizenship and Immigration Services
VLS    Verification of Lawful Status

## V. Legal Basis

This final rule is based on the broad authority granted to the Secretary of Transportation (Secretary) by the Commercial Motor Vehicle Safety Act of 1986 (CMVSA, 49 U.S.C. 31301, *et seq.*), as amended, which forms the basis for the CDL program and the performance standards with which State CDL programs must comply. Among other things, the statute requires the Secretary to prescribe regulations on minimum standards "for testing and ensuring the fitness of an individual operating a commercial motor vehicle" (49 U.S.C. 31305(a)). It also requires the Secretary, after consultation with the States, to prescribe regulations on minimum uniform standards for the issuance of CDLs and CLPs by the States and for information to be contained on each license and permit (49 U.S.C. 31308). Further, it prohibits States from issuing CDLs to drivers who have been disqualified as a result of committing serious traffic violations or certain offenses, such as driving a CMV under the influence of alcohol or controlled substance, leaving the scene of an accident, or using a CMV in committing a felony, or drivers whose licenses have

been suspended, revoked, or cancelled (49 U.S.C. 31310, 31311(a)(10)). In addition, section 32204 of the Moving Ahead for Progress in the 21st Century Act (MAP–21, 49 U.S.C. 31310(k)) explicitly provides that drivers licensed by an authority outside of the United States or foreign citizens operating CMVs in the United States are subject to the same disqualification requirements as domestic CMV drivers. This final rule fulfills FMCSA's statutory duty to prescribe minimum standards to ensure the safety fitness of drivers (49 U.S.C. 31305) and to prescribe issuance standards that are uniform (49 U.S.C. 31308). As discussed in greater detail in Section VI.B, the current regulatory framework has resulted in a bifurcated safety standard in which U.S.-domiciled drivers are subject to strict safety vetting, while permitting foreign-domiciled drivers to operate under a demonstrably lower threshold for scrutiny, thereby compromising public safety. This final rule aligns the issuance of non-domiciled CDLs with the statutory mandates to "ensure the fitness" of CMV operators (49 U.S.C. 31305(a)) and it also ensures consistent application of the laws consistent with the statutory mandate in 49 U.S.C. 31308.

The CMVSA provides that States may issue CDLs to individuals who are "not domiciled in a State that issues [CDLs]," but if they choose to issue non-domiciled CDLs, they must do so in accordance with regulations prescribed by FMCSA (49 U.S.C. 31311(a)(12)(B)). This statutory language grants the agency explicit discretion to define the parameters of eligibility. The regulations setting forth the standards States must apply when issuing non-domiciled CLPs and CDLs are found at 49 CFR 383.23, 383.71(f), 383.73(f), 384.201, and 384.212(a). By authorizing, but not requiring, the issuance of non-domiciled CDLs, Congress did not create an unqualified right for every foreign-domiciled driver who wishes to operate CMVs in the United States to obtain a CDL; rather, Congress created a pathway to permit States to issue CDLs and CLPs to foreign-domiciled drivers whom the Secretary determines are eligible. This final rule exercises that delegated authority to narrow eligibility for foreign-domiciled drivers who wish to obtain a non-domiciled CDL to those classes of individuals who are in an employment-based nonimmigrant category (H–2A, H–2B, E–2) and whose fitness, driver history, and qualifications can be reliably verified and vetted.

This final rule is also consistent with the concurrent authorities of the Motor Carrier Safety Act of 1984 (49 U.S.C.

31131, *et seq.*), as amended, and the Motor Carrier Act of 1935 (49 U.S.C. 31502), as amended. The 1984 Act granted the Secretary broad authority to issue regulations on "commercial motor vehicle safety," including regulations to ensure that "commercial motor vehicles are . . . operated safely" (as amended and codified at 49 U.S.C. 31136(a)(1)). This final rule is consistent with the safe operation of CMVs, as it rectifies critical safety gaps in the CLP and CDL vetting and issuance process as driving history has been cited consistently as a strong predictor of future driving safety outcomes. In accordance with 49 U.S.C. 31136(a)(2), the amendments contained in this rule will not impose any "responsibilities . . . on operators of commercial motor vehicles [that would] impair their ability to operate the vehicles safely" because it relates only to obtaining, renewing, and upgrading the credential that authorizes operation of CMVs, but does not have an impact on the way in which a driver operates such vehicles after having obtained the credential. This final rule does not implicate 49 U.S.C. 31136(a)(3) or (4) as it does not directly address medical standards for drivers (49 U.S.C. 31136(a)(3)) or possible physical effects caused by driving CMVs (49 U.S.C. 31136(a)(4)). FMCSA does not anticipate that this rule will result in the coercion of CMV drivers by motor carriers, shippers, receivers, or transportation intermediaries to operate a CMV in violation of the Federal Motor Carrier Safety Regulations (FMCSRs, 49 U.S.C. 31136(a)(5)). Limiting eligibility to those in certain employment-based nonimmigrant statuses who undergo additional vetting for dangerous driving history ensures that available drivers are less likely to be coerced to violate the FMCSRs. By excluding unvetted drivers who may be more prone to unsafe behaviors and thus more susceptible to pressure to violate safety rules, this requirement ensures the eligible driver population is less likely to be coerced.

Pursuant to 49 U.S.C. 31502(b), "[t]he Secretary of Transportation may prescribe requirements for—(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation." This final rule, which addresses the ability of individuals who are domiciled in foreign jurisdictions to operate CMVs in the United States, is related to the safe operation of motor carrier equipment

because the CDL program is designed to ensure that only individuals who have been determined by relevant State licensing agencies—in accordance with Federal standards—to be qualified to operate large commercial vehicles are allowed to drive such vehicles on the Nation's roadways. Both identity verification and skills testing are integral to the determination of a driver's qualifications and are implicated in this rule.

The Administrator of FMCSA is delegated authority under 49 U.S.C. 113(f) and 49 CFR 1.87 to carry out the functions vested in the Secretary by 49 U.S.C. chapters 311, 313, and 315 as they relate to CMV operators, programs, and safety.

## VI. Discussion of the IFR and Comments

### A. Overview of the IFR

On September 29, 2025, FMCSA published in the **Federal Register** (Docket No. FMCSA–2025–0622, 90 FR 46509) an IFR titled "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)." The agency also published a notice correcting an error in the amendatory instructions of the IFR on October 2, 2025 (90 FR 47627). The IFR revised the regulations that allow SDLAs to issue and renew non-domiciled CLPs and CDLs to individuals domiciled in a foreign jurisdiction. The changes were intended to strengthen the security of the CDL issuance process and enhance the safety of CMV operations. FMCSA undertook the IFR based on both a spate of recent, fatal crashes involving non-domiciled CDL holders and recently uncovered evidence of systemic, nationwide regulatory non-compliance by SDLAs in their issuance of non-domiciled CLPs and CDLs.

In the IFR, FMCSA amended its regulations to restrict issuance of non-domiciled CLPs and CDLs to individuals maintaining lawful immigration status in the United States in certain employment-based nonimmigrant statuses, to certain individuals domiciled in a U.S. territory, and to individuals domiciled in a State that is prohibited from the issuance of CLPs or CDLs as a result of the decertification of the State's CDL program. The agency stated that the revisions were intended to help ensure that individuals who do not have lawful immigration status in the United States, and those who do have lawful immigration status but whose status is not directly connected to a legitimate, employment-based reason to hold a CDL, will no longer be eligible to obtain non-domiciled CLPs or CDLs.

Specifically, the IFR made the following changes to the existing regulations: (1) limiting individuals eligible for non-domiciled CLPs and CDLs to those maintaining certain employment-based nonimmigrant statuses, certain individuals domiciled in a U.S. territory, and individuals domiciled in a State that is prohibited from issuing CLPs or CDLs because the State's CDL program is decertified; (2) requiring non-citizen applicants (except for lawful permanent residents) to provide an unexpired foreign passport and an unexpired Form I–94/I–94A (Arrival/Departure Record) indicating a specified type of employment-based nonimmigrant status at every issuance, transfer, renewal, and upgrade action defined in the regulation; (3) requiring SDLAs to query Systematic Alien Verification for Entitlements (SAVE), administered by USCIS, to confirm the applicant's claim to be in lawful immigration status in a specified category; (4) requiring that SDLAs retain copies of the application documents for no less than two years; (5) requiring the expiration date for any non-domiciled CLP or CDL to match the expiration date of the Form I–94/I–94A or one year whichever is sooner; (6) requiring the applicant to be present in-person at each renewal; and (7) requiring an SDLA to downgrade the non-domiciled CLP or CDL if the State becomes aware that the holder is no longer eligible to hold a non-domiciled CLP or CDL.

The IFR took effect immediately upon publication. However, on November 10, 2025, the U.S. Court of Appeals for the District of Columbia Circuit issued an Order in *Lujan, et al.* v. *Fed. Motor Carrier Safety Admin., et al.,* No. 25–1215, administratively staying the effective date of the IFR in response to two Petitions for Review challenging the rule.[4] The court subsequently stayed the IFR pending resolution of those cases on November 13, 2025. Therefore, since November 10, 2025, the previous regulations have been in effect. Accordingly, FMCSA advised SDLAs to follow the procedures set forth in the agency's regulations and guidance on non-domiciled CLPs and CDLs in effect immediately prior to issuance of the IFR.[5]

### B. Comments and Responses

FMCSA solicited comments concerning the IFR for 60 days ending November 28, 2025. By that date, 8,010 comments were received. A summary of the comments and FMCSA's responses follows.

1. Eligibility for Non-Domiciled CLPs or CDLs

a. Eligible Nonimmigrant Statuses (H–2A, H–2B, and E–2) and Vetting

Many commenters questioned FMCSA's rationale for limiting eligibility for non-domiciled CLPs and CDLs to individuals in H–2A, H–2B, or E–2 nonimmigrant statuses. The Sikh Coalition wrote that FMCSA failed to provide evidence that H–2A, H–2B, or E–2 visa holders are safer drivers than those that are excluded by the rule. The Sikh Coalition also wrote that the IFR claims H–2A, H–2B, or E–2 visa holders go through additional employer screening but does not provide any evidence to support this. The AFL–CIO and the Sikh Coalition argued that FMCSA asserts that State regulations do not allow for vetting of workers who have driving records in foreign jurisdictions, but the rule exempts workers from short-term immigration programs who are even less likely to have U.S. driving records than those groups that are not eligible under the IFR. The Asian Law Caucus wrote that the population of drivers being hired under the H–2A and H–2B programs are no more likely to be drivers with safe driving records because the qualifications of these drivers are required by Federal regulations to be consistent with those of U.S. drivers, and because the employer screening process highlighted in the IFR is primarily a means to screen U.S. drivers, including those the IFR excludes.

US Custom Harvesters, Inc. expressed appreciation for FMCSA's recognition of the critical needs that H–2A workers provide through being issued CDLs and requested that FMCSA ensure that the exemption for H–2A visa holders is retained. Two individuals asked how H–2A, H–2B, and E–2 visa holders are eligible to drive semi-trucks safely. Similarly, an individual asked how FMCSA can verify 10 years of driving experience for H–2A, H–2B, and E–2

---

[4] The first Petition for Review was filed on October 20, 2025 by the American Federation of State, County and Municipal Employees; the American Federation of Teachers; and two individual immigrant truck drivers. The second Petition for Review was filed on October 22, 2025 by Martin Luther King, Jr. County in Washington. The court consolidated the cases. *Lujan, et al.* v. *Fed. Motor Carrier Safety Admin., et al.,* No. 25–1215 (D.C. Cir.).

[5] See *e.g., https://www.fmcsa.dot.gov/newsroom/ interim-final-ruling-restoring-integrity-issuance-non-domiciled-drivers-licenses-cdl; https:// www.fmcsa.dot.gov/newsroom/order-granting-administrative-stay-interim-final-rule-titled-restoring-integrity-issuance.*

visa holders in their country of origin, and what makes these visa categories safer than other categories. US Custom Harvesters, Inc. stated that States are concerned regarding the issuance of CDLs for H–2A holders and may have inadvertently begun pausing issuance to H–2A holders; they requested confirmation from FMCSA that the H–2A program is exempt. An individual stated that the driving records and criminal records of H–2A visa holders are loosely monitored and recorded.

The Asian Law Caucus wrote that H–2A and H–2B visas are intended to be temporary and seasonal in nature while limited to certain geographical areas, but the IFR did not discuss how these limitations will be applicable to commercial driving. United, LLC and an individual said that visas should not be a registration requirement. Six individuals wrote that non-domiciled CDL holders undergo the same testing, training, and background verification processes as U.S. citizen drivers, and the focus should be on ensuring all drivers meet these standards rather than creating different rules based on immigration status. CPAC Foundation's Center for Regulatory Freedom wrote that FMCSA should collaborate with the Department of Homeland Security (DHS) and U.S. Department of State to initiate a systematic review of the framework overseeing and classifying employment-based nonimmigrant statuses as they pertain to CDL eligibility to ensure these designations cannot be abused as an indirect means to securing commercial driving privileges.

An individual questioned the IFR's eligibility criteria, which limit non-domiciled CDLs to holders of H–2A, H–2B, and E–2 visas. They argued that this restriction was arbitrary and failed to account for other categories of lawfully present individuals with work authorization. An individual stated that the IFR does not provide a clear rationale for excluding specific immigrant groups from operating commercial vehicles, while allowing other individuals from treaty countries who are associated with enterprises investing significant capital in the United States to obtain CDLs. Another individual stated that the rule ties eligibility to specific visa categories and document types, which has an obvious disparate-impact potential and may be challenged as discriminatory in practice if States apply it unevenly.

### FMCSA Response

After considering the comments and information provided, FMCSA declines to revise the scope of individuals eligible for a non-domiciled CLP or CDL from what was established in the IFR. The purpose of this final rule is to enhance safety by rectifying a critical gap in the Nation's non-domiciled licensing system that has manifested in two ways. First, non-domiciled CLPs and CDLs have been issued to individuals whose safety fitness cannot be adequately verified by SDLAs. Second, FMCSA has uncovered evidence of systemic, nationwide regulatory non-compliance by SDLAs in the issuance of non-domiciled CLPs and CDLs, which shows the need for a revised issuance process inclusive of a bright line standard that focuses on adequate vetting of non-domiciled drivers. As explained in greater detail below, under this final rule, all non-domiciled CLP and CDL drivers will be subject to sufficient vetting to ensure that they are as safe as practicable before allowing them to operate CMVs on our roadways, consistent with FMCSA's statutory mandate to ensure the fitness of CMV operators.

In the IFR, FMCSA amended its regulations to restrict issuance of non-domiciled CLPs and CDLs to individuals maintaining lawful immigration status in the United States in certain employment-based nonimmigrant categories, to certain individuals domiciled in a U.S. territory, and to individuals domiciled in a State that is prohibited from the issuance of CLPs or CDLs as a result of the decertification of the State's CDL program. FMCSA made these revisions to ensure that all drivers of CMVs on our Nation's roadways are properly vetted to maintain the highest level of safety practicable. Ultimately, the changes made in the IFR, and affirmed in this final rule, rectify a bifurcated safety standard in which U.S.-domiciled drivers are subject to strict safety vetting, while permitting foreign-domiciled drivers to operate under a demonstrably lower threshold for scrutiny, thereby compromising public safety. More importantly, the final rule aligns the issuance of non-domiciled CDLs with the statutory mandates to "ensure the fitness" of CMV operators (49 U.S.C. 31305(a)). It also ensures consistent application of the laws disqualifying drivers—regardless of whether they are domiciled or non-domiciled—from holding a CDL for a specified period of time after committing certain offenses or serious traffic violations, or having their driver's license revoked, suspended, or canceled (49 U.S.C. 31310–31311). By restricting eligibility to statuses subject to consular vetting and interagency screening,

FMCSA closes a significant safety gap and prioritizes the safety of the traveling public.

The general concerns raised by commenters fail to recognize that non-domiciled applicants have been subject to a lower level of scrutiny in the CLP and CDL application process than U.S.-domiciled individuals due to the severe limits on vetting their driving history. As noted above, non-domiciled drivers are not required to surrender their foreign license to obtain a non-domiciled CDL and may also operate in a foreign country while their non-domiciled CDL is valid, and under the previous regulations the SDLA would not have access to either the driver's historical record or their concurrent driving record outside the United States. The SDLA would not receive notifications of serious traffic violations that occur in a foreign country during the validity of the non-domiciled CDL, as they would if the violation occurs in a State. Studies have shown that drivers who have a history of driving offenses are more likely to be involved in future crashes. As explained in greater detail in Section X.A below, driving history has been cited consistently as a strong predictor of future driving safety outcomes. In the *Safety Performance of Passenger Carrier Drivers* report, prior crash involvement and past out-of-service violations were both found to increase significantly the likelihood of a driver being involved in future crashes.[6] ATRI has published similar findings for the truck transportation industry in their report, *Predicting Truck Crash Involvement*. Repeated multiple times since 2005, the top five stable predictors of crash risk include reckless driving violations and past crashes.[7] Similarly, the *Commercial Driver Safety Risk Factors* study found that prior moving violations in the last three years were associated with increased crash and moving violation risk.[8] Finally, an FMCSA commissioned literature review, *Driver Issues: Commercial Motor Vehicle Safety Literature Review,* concluded that drivers with prior crash involvement were 87 percent more likely to be involved in a future crash.[9] Together, these findings underscore a consistent conclusion across studies: a driver's historical performance, whether measured through crashes, violations, or

---

[6] *https://rosap.ntl.bts.gov/view/dot/7.*

[7] *https://truckingresearch.org/2022/10/predicting-truck-crash-involvement-2022-update/.*

[8] *Commercial Driver Safety Risk Factors (CDSRF),* available at *https://rosap.ntl.bts.gov/view/dot/49620.*

[9] *Driver Issues: Commercial Motor Vehicle Safety Literature Review,* available at *https://rosap.ntl.bts.gov/view/dot/11259.*

observable risky behaviors, provides a robust basis for predicting future safety outcomes on the road.

Given the link between a driver's safety history and overall roadway safety, Congress mandated that SDLAs request information from the National Driver Register and give "full weight and consideration" to that information in deciding whether to issue the individual a CDL (49 U.S.C. 31311(a)(16)(B)). Further, FMCSA requires SDLAs to perform additional screening of CDL applicants to ensure appropriate vetting. In this regard, when a U.S.-domiciled driver applies for a CLP or CDL, States are required to initiate and complete a check of the applicant's driving record to ensure that the person is not subject to any disqualification under 49 CFR 383.51, or any license disqualification under State law, and does not have a driver's license from more than one State or jurisdiction. (49 CFR 383.73(b)(3)). When a foreign-domiciled applicant applies for a CLP or CDL, States are also required to complete the same checks; however, information about a foreign-domiciled applicants' driver history in the foreign country of domicile are not accessible, because States do not have access to foreign nations' systems.

SDLAs are required to initiate and complete four distinct checks of the applicant's records. In this regard, States must check CDLIS to determine whether the driver applicant already has been issued a CDL, whether the applicant's license has been disqualified, and whether the applicant has been disqualified from operating a CMV (49 CFR 383.73(b)(3)(ii)). Based on the information in CDLIS, the SDLA may issue the license, promptly implement any disqualifications, licensing limitations, denials, or other penalties required (49 CFR 384.205). While CDLIS is the authoritative source of CDL records for each State, it does not contain information on whether the foreign-domiciled applicant is subject to any section 383.51- or 391.15-equivalent disqualifications in the foreign country of domicile, or whether the foreign-domiciled applicant has any license disqualifications under the foreign country's laws. For example, CDLIS would contain information about a CDL driver's conviction and disqualification for driving a motor vehicle (commercial and non-commercial) while under the influence of alcohol or a controlled substance, leaving the scene of an accident, or reckless driving (49 CFR 383.51 (requiring a period of disqualification upon conviction), 384.225 (requiring SDLAs to maintain information on convictions and

disqualifications on the CDLIS driver record)). However, CDLIS would not contain any information about a driver's conviction that occurred in a foreign country, or any subsequent foreign driver's license suspension or disqualification.

Through the PDPS, which allows States to search the National Driver Register, SDLAs must determine whether a driver has been disqualified from operating a motor vehicle (other than a CMV) for any reason, or had a license (other than a CDL) disqualified for cause in the three-year period ending on the date of application, or has been convicted of any offenses contained in 49 U.S.C. 30304(a)(3) (49 CFR 384.220; see e.g., 49 CFR 383.73(b)(3)(iii)) to ensure that the applicant is not subject to any of the sanctions under 49 CFR 383.51 based on previous motor vehicle convictions. As noted above, Congress mandated that States accord "full weight and consideration" to the information from the National Driver Register in deciding whether to issue the individual a CDL (49 U.S.C. 31311(a)(16)(B)). PDPS does not contain the foreign-domiciled applicant's driver history from the foreign country of domicile.

States must also request the applicant's complete driving record from all States where the applicant was previously licensed over the last 10 years to drive any type of motor vehicle (49 CFR 384.206, see e.g., 49 CFR 383.73(b)(3)(iv)). If, after reviewing this information, the State discovers adverse information about the applicant, the State may, among other actions, implement a disqualification, deny the CDL transaction, or implement a licensing limitation (49 CFR 384.206(b)(3)). In the case of foreign-domiciled applicants for which any portion of their driver history over the past 10 years was in a foreign country or whose previous licenses were issued in foreign countries, States are unable to check the driver's history because the previous jurisdictions of licensure are not States but foreign countries.

Finally, as of January 6, 2020, States must request information from the Drug and Alcohol Clearinghouse (DACH) (81 FR 87686). The DACH is the central repository of FMCSA's DOT drug and alcohol use and testing program violations, including but not limited to, a verified positive DOT drug test result, a blood alcohol content of .04 or higher on a DOT alcohol test, or a refusal to test violation (see generally, 49 CFR part 382, subpart B). Drivers who violate FMCSA's drug and alcohol regulations are prohibited from operating a CMV until they complete the return-to-duty

process (see 49 CFR 382.503 and the cross reference to 49 CFR part 40, subpart O), which includes evaluation by a substance abuse professional, completion of prescribed education or treatment, and a negative return-to-duty drug or alcohol test result. If, in response to a DACH query, the SDLA receives notification that the applicant is prohibited from operating a CMV due to a drug or alcohol violation in the driver's DACH record, the State must not issue the CDL (49 CFR 384.235, see e.g., 49 CFR 383.73(b)(10)). However, to the extent an applicant's foreign country of domicile has a similar or otherwise equivalent drug and alcohol testing program for commercial drivers, the DACH would not contain any information about a foreign-domiciled applicant's violations incurred under such a program. Therefore, SDLAs would not have the benefit of this information in assessing a driver's qualifications for a CDL.

The lack of available driving history information for non-domiciled applicants severely limits the effectiveness of these vetting processes. This inability to obtain driver history for non-domiciled applicants creates an unacceptable bifurcated standard in driver vetting and ensuring the fitness of an individual operating a commercial motor vehicle. While domestic CDL applicants face rigorous history checks through CDLIS, PDPS, DACH, and other State driving records, non-domiciled drivers were previously processed without equivalent checks on their foreign driving history. This effectively shielded unsafe driving behaviors, which may have included serious violations, equivalent to one or more of the disqualifying offenses listed in 49 CFR 383.51 (such as, driving a motor vehicle (commercial and non-commercial) while under the influence of alcohol or a controlled substance, leaving the scene of an accident, or reckless driving, causing a fatality through negligent operation of a CMV), that would have disqualified these drivers from obtaining a CLP or CDL, simply because they occurred outside the review of FMCSA or the SDLAs. To close this loophole, the IFR, as affirmed by this final rule, restricts eligibility for foreign-domiciled CLP or CDL holders exclusively to H–2A, H–2B, and E–2 nonimmigrant status holders, as these individuals are subjected to increased vetting, which provides a more equivalent history check to those encountered by domestic CDL applicants. FMCSA has determined that the totality of federal vetting processes applicable to these visa categories—

including consular screening, labor certification requirements, and employer verification—provides sufficient assurance of driver fitness to mitigate the safety gap created by the SDLA's inability to access and verify the foreign driving records. Certain eligible domiciliaries in a U.S. territory and individuals domiciled in a State that is prohibited from the issuance of CLPs or CDLs as a result of the decertification of the State's CDL program, remain eligible for a non-domiciled CLP or CDL.

The relevant vetting that occurred through the visa application and labor certification processes for the eligible nonimmigrant status holders were thoroughly detailed in the IFR.[10] In this regard, the H–2A (Temporary Agricultural Workers), H–2B (Temporary Non-Agricultural Workers), and E–2 (Treaty Investors) nonimmigrant categories require either a labor certification through DOL, current employment, or other specified proof of work established through the Federal visa process (90 FR 46515). These requirements ensure that individuals in the United States under these nonimmigrant categories are already approved to work specific jobs that may require acquisition of a non-domiciled CDL. Further, FMCSA understands that employer applications for labor certifications related to commercial trucking typically include some combination of the following job requirements: possess U.S. CDL or foreign CDL equivalent, related work experience (12 months to 2 years), clean driving record, pass drug or medical testing, and knowledge of or proficiency in English. This employer screening, in addition to the incentive to avoid unnecessarily repeating the lengthy job order process, helps ensure that the population of drivers being hired under one of the specified employment-based nonimmigrant categories are more likely to be drivers with safe driving records (90 FR 46516).

In addition, FMCSA has coordinated with the U.S. Department of State regarding visa adjudication processes for H–2A, H–2B, and E–2 applicants seeking employment that requires CMV operation. The Department of State has confirmed that consular officers adjudicating such visa applications assess certain factors relevant to both visa eligibility and CMV driver fitness, including but not limited to driving history, occupational qualifications, and English language proficiency. FMCSA's determination that these visa categories provide sufficient vetting is based on the totality of the federal screening

process, including consular review, labor certification, and employer attestations, rather than on any specific procedural requirements.

The U.S. Department of State procedures mitigate the safety gap created by the unavailability of foreign driving records in two essential ways. First, the enhanced vetting procedures facilitates the consular officer's review of visa applicants' demonstration of their ability to operate a CMV safely. These procedures serve as a functional proxy for the vetting requirements in the FMCSRs for U.S.-domiciled drivers. In determining whether an applicant has established the requisite experience to operate a CMV safely, such that they are eligible for the requested visa classification, the consular officer reviews and requests evidence establishing whether the H–2A, H–2B, and E–2 visa applicant has a history of unsafe driving, and other relevant factors to the visa adjudication (e.g., whether they possess the requisite years of experience listed for that particular job or hold a valid CDL or can obtain one). The procedures, which are conducted as part of the consular officer's determination under section 214(b) of the Immigration and Nationality Act of 1952 (INA) regarding whether the applicant qualifies for the visa classification sought, further enable the review of evidence that would demonstrate that the driver qualifies for a CDL, which generally includes requests for 10 years of driving history, past traffic violations, license suspensions and revocations, and other similar records. The review assists in uncovering incidents of dangerous driver behaviors similar to what would be revealed by the SDLA's review of CDLIS, PDPS, DACH, and other State driving histories outlined above.

Second, the enhanced screening and vetting procedures for H–2A, H–2B, and E–2 visa applicants require an assessment of the applicant's ability to meet the driver qualification requirements of 49 CFR 391.11(b)(2) to read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records. The consular officer's assessment of English proficiency during the interview, while conducted for purposes of determining visa eligibility, provides FMCSA with reasonable assurance that non-domiciled drivers in these visa categories possess the basic English proficiency necessary to operate a CMV safely.

FMCSA's determination that H–2A, H–2B, and E–2 visa holders are eligible for non-domiciled CDLs is based on several factors that, in combination, provide reasonable assurance of driver fitness:

1. *Labor Certification and Employer Screening:* The DOL labor certification process for the H–2A and H–2B categories requires employers to list the qualifications necessary for the position, which for CMV-related positions typically includes driving experience, clean driving records, and English proficiency. Employers then screen workers for these qualifications.

2. *Consular Adjudication:* During the visa application process, consular officers have the authority to assess whether applicants meet the qualifications for their intended employment, including the ability to request and review documentation related to driving history and occupational qualifications.

3. *Ongoing Employment Relationship:* In addition to the protocols implemented by the Department of State to vet driving records for these categories, H–2A, H–2B, and E–2 visa holders often maintain an ongoing relationship with a U.S. employer who has a direct economic interest in ensuring the driver's qualifications and safety record.

4. *Federal Oversight:* These visa categories are subject to ongoing federal oversight through multiple agencies (DOL, DHS, State Department) via the nonimmigrant status and visa renewal processes, creating multiple points of verification and accountability. In addition, as part of continuous visa vetting procedures, State constantly reviews available information on current U.S. visa holders, and revokes visas when there is an indication of a potential ineligibility or in other situations where warranted. That could include visa overstays, possible criminal activity, support for terrorism, or any other indication of a potential ineligibility under the INA.

While no single element of this process perfectly replicates the CDLIS/PDPS/DACH checks available for domestic drivers, FMCSA has determined that the totality of Federal vetting for these specific visa categories provides a reasonable functional equivalent that adequately addresses the safety gap.

Therefore, given the administrative inability for SDLAs to vet foreign driving histories, it is the combination of Federal processes applicable to H–2A, H–2B, and E–2 visa holders—including labor certification (for H–2A and H–2B visa applicants), consular

---

[10] See 90 FR 46515–16.

review, employer verification, and continuous vetting—that collectively mitigate this safety gap. For these specific categories, Federal interagency screening performs a background assessment that serves as a functional equivalent for the driver history checks required for domestic drivers, thereby allowing the agency to ensure the fitness of the drivers. Because no other category of foreign-domiciled driver is subject to this combination of labor certification, employer sponsorship, and multi-agency Federal oversight, the rule draws a necessary distinction based on the presence of multiple mechanisms that can collectively compensate for the SDLA's inability to verify foreign records. By relying on these combined Federal processes, the agency strikes the most reasonable balance: allowing non-domiciled drivers who have been federally vetted through multiple federal screening processes to obtain licensure while ensuring the exclusion of individuals with unknown driver histories who could have unsafe driving histories that would otherwise disqualify them from obtaining a CDL or would pose a significant safety risk on America's roadways.

The second safety gap addressed by this final rule is the systemic, nationwide regulatory non-compliance by SDLAs in their issuance of non-domiciled CLPs and CDLs. The majority of the SDLA errors as identified by FMCSA as part of the APR process stem from the EAD-based eligibility standard. The amended non-domiciled CLP and CDL issuance processes prescribed in this final rule will mitigate SDLA confusion and errors in issuing non-domiciled CLPs and CDLs. As discussed in greater detail in Section VI.B.3 (Annual Program Reviews), FMCSA has identified more than 30 States that failed to comply with the non-domiciled CLP and CDL regulations. These States violated FMCSA's regulations by issuing tens of thousands of non-domiciled CLPs and CDLs that exceed the expiration date of the driver's lawful presence documents; issuing non-domiciled CDLs to individuals ineligible for that credential due to their status as a citizen of Canada or Mexico not present in the United States under the DACA program; issuing non-domiciled CLPs or CDLs to lawful permanent residents of the United States, who are eligible for regular CDLs; and issuing non-domiciled CLPs or CDLs without verifying the drivers' lawful presence with the document required under 49 CFR 383.71(f)(2)(i) and 383.73(f)(3). As FMCSA noted in the IFR, when the integrity of the non-domiciled CDL process is in question, the credential itself is compromised and can no longer be trusted to verify an individual's eligibility and qualifications.

b. EADs

CPAC Foundation's Center for Regulatory Freedom and many individual commenters expressed support for the removal of existing accepted documentation, like an EAD. An individual suggested that these changes will protect the public, improve highway safety, and maintain fairness for professional drivers. The Owner-Operator Independent Drivers Association (OOIDA) wrote that they supported changes to documentation requirements, stating that improper and inconsistent protocols have led to unqualified drivers on the road.

The AFL–CIO, International Brotherhood of Electrical Workers, the Potential Development Association, and many individuals opposed the removal of existing accepted documentation and requested that FMCSA amend the rule to allow explicitly people with valid EADs to continue holding non-domiciled CDLs. An individual said that aligning CDL eligibility to EAD status preserves safety while ensuring consistency with INA 274A, and that asylum EADs are identical in format and legal force to H–2A/H–2B EADs.

An individual stated that people with EADs are by definition documented and are following an established legal process to eventual naturalization. An individual stated that the EAD, by definition, grants work authorization without restricting the type of job an individual can pursue, and that the change creates an arbitrary and unjust barrier, undermining the clear intent of the Federal Government's work authorization process. Many individuals stated that people with lawful residency have the right to work and deserve a fair opportunity. DDL stated that it is unfair to deprive people of their right to work when they have lived in this country for years, have complied with all State and Federal requirements, and have demonstrated the skills and knowledge necessary to operate safely. DDL said that these individuals have proven themselves and should not be excluded from the workforce simply because of their immigration category.

Some commenters said that commercial drivers with a valid EAD who meet State and Federal requirements should be allowed to continue driving. Washington Trucking Association wrote that many non-domiciled drivers impacted by the IFR have valid EADs, extensive U.S. driving histories, as well as safety and transportation credentials. Seven individuals expressed that having an EAD should be sufficient to qualify for a CDL, provided the applicant meets all safety and testing requirements. One individual recommended allowing drivers with EADs to continue renewing their license while their immigration status is being processed.

An individual asked FMCSA to further explain why an EAD would no longer be sufficient evidence for CDL eligibility.

FMCSA Response

FMCSA disagrees with comments arguing that the regulations should continue to permit drivers who hold an EAD to obtain a non-domiciled CLP or CDL. As stated in the IFR, EADs are not sufficient documentation to obtain a non-domiciled CLP or CDL. An EAD only serves as proof that an individual is authorized to work in the United States for a specific time period, not that the individual's safety fitness has been thoroughly vetted and are drivers with safe driving records. The individual receiving an EAD would not have been subject to the same vetting to ensure safety fitness as those in the eligible employment-based nonimmigrant statuses. Simply being authorized to work does not adequately ensure that an individual has a safe driving history and should be eligible to drive CMVs on roadways without additional vetting. Allowing for an individual with an EAD to obtain a non-domiciled CLP or CDL would continue the pre-IFR regulatory framework that allowed unvetted drivers to operate CMVs on our Nation's roadways which, as discussed throughout this final rule, is contrary to FMCSA's mission and statutory duty to promote safety and ensure safety fitness of individuals operating a CMV. Further, holding an EAD does not entitle an individual to perform any type of work they choose irrespective of safety implications or qualifications.

Critically, the agency cannot view the EAD as a valid proxy for safety fitness because its issuance involves no assessment of transportation safety. In contrast, the U.S. Department of State's adjudication of H–2A, H–2B, and E–2 visas includes specific protocols to assess driver history and qualifications. This Federal assessment serves as the functional regulatory substitute for the State-level driver history checks required for U.S.-based drivers. As SDLAs are structurally incapable of performing these checks for foreign-domiciled drivers, the agency must rely on the only available Federal substitute: the U.S. Department of State vetting

process. Since EAD issuance lacks this specific transportation safety component, accepting an EAD would require the agency to license drivers without any verifiable safety history, significantly hampering its ability to ensure fitness.

In addition to the EAD being insufficient to show that an individual has been adequately vetted, FMCSA has seen that States have had extreme difficulty appropriately issuing non-domiciled CLPs and CDLs based on EADs. As stated in response to comments earlier in this final rule, the 2025 APRs revealed a systemic collapse in State compliance regarding EAD-based eligibility. With respect to foreign-domiciled drivers, regulations in effect prior to September 29, 2025 IFR, and currently in effect, provide that States that issue non-domiciled CLPs and CDLs to foreign-domiciled drivers may only accept as valid proof of lawful presence (i) an unexpired employment authorization document (EAD) issued by the USCIS or (ii) an unexpired foreign passport accompanied by an approved I–94 form documenting the driver's most recent admittance into the United States. Further, the regulations require that States accept as valid only unexpired lawful presence documents, which also means that the State must make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver's lawful presence document(s). In other words, because FMCSA's regulations considered only unexpired lawful presence documents to be valid, States were required to ensure that the non-domiciled CLP or CDL period of validity do not exceed the expiration of the driver's lawful presence documents. Therefore, State driver's licensing agencies are required to ensure that the validity of non-domiciled CLPs or CDLs did not exceed the expiration date of drivers' lawful presence documents. In addition, States may not issue a non-domiciled CLP or CDL to citizens of Mexico or Canada, with the exception of those present in the United States under the Deferred Action for Childhood Arrivals (DACA) program. The IFR identified six States that were not compliant with non-domiciled requirements and that number has now grown to more than 30 as of this final rule. Crucially, the ability to verify an individual's status via SAVE did not prevent this collapse. For example, States issued licenses with expiration dates extending years beyond the dates verified in SAVE (e.g., California issued licenses four years past the EAD date). From FMCSA's reviews, it has observed

that front-line clerks at SDLAs cannot reliably distinguish between EAD codes and language that indicate a permissible basis for issuance of a non-domiciled CDL (C33—"Deferred Action for Childhood Arrivals") and those codes that indicate an impermissible basis (C14—"Deferred Action" or "Alien Granted Deferred Action"), as applied to drivers domiciled in Canada or Mexico.

Further, FMCSA observed that SDLAs had significant challenges interpreting various USCIS form letters, such as USCIS Form I–797C.[11] Notices of Action, when presented by holders of EADs as supporting documentation for EADs that were due to expire or had expired. EADs are not valid indefinitely; they are valid for specified periods, and may be renewed, or terminated based on various conditions being met.[12] FMCSA frequently observed that when an applicant's EAD was due to expire or had expired, the applicant would, upon applying or reapplying for a non-domiciled credential, present an accompanying Form I–797C with their application as nominal proof that the applicant's eligibility for an EAD had been extended. FMCSA found that some SDLAs, upon receiving the Form I–797C presented with the applicant's expiring or expired EAD, accepted the Form I–797C as proof that the applicant's eligibility for an EAD had been extended in fact, when in some circumstances it had not, and subsequently issued non-domiciled credentials based on a Form I–797C, instead of relying on the documentation in 49 CFR 383.71(f)(2)(i) then in effect.

FMCSA never sanctioned the Form I–797C as a substitute for an expired or expiring EAD for the purpose of non-domiciled CDL driver licensing, nor did USCIS intend for the Form I–797C to supply the basis for an SDLA to grant a non-domiciled CLP or CDL. Instead, USCIS uses the Form I–797C, to notify applicants about the receipt or rejection of an application or a petition, or to relay other important notices to an applicant.[13] The Form includes a header which states, " 'THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.' "[14] In fact, on its website, USCIS reminds state, local,

public, and private benefit granting agencies that the Form I–797C is solely a receipt to prove an applicant has submitted a request for a benefit and not a determination that USCIS has deemed the applicant eligible for an immigration benefit.[15] In other words, a CLP or CDL applicant's mere presentation of a Form I–797C, with an accompanying EAD was not proof that the applicant had been granted an extension of immigration status. Yet, during the 2025 APRs, FMCSA identified that some SDLAs, when presented with an expiring or expired EAD along with an I–797C indicating the applicant had applied for an immigration benefit (such as an extension of the applicant's immigration status), would treat the I–797C as if the applicant's application for extension in immigration status had been granted and subsequently issue the non-domiciled CDL.

This consistent failure across more than 30 States demonstrates that the issue is not merely a training deficiency, but a structural incompatibility with the administrative capabilities of an SDLA. Further, the systemic breakdown in compliant non-domiciled CLP and CDL issuance based on EADs defeats FMCSA's statutory mandate to prescribe uniform standards for the issuance of CLPs and CDLs (49 U.S.C. 31308(a)). In fact, States' varying levels of compliance with the non-domiciled CLP and CDL eligibility standards based on EADs has led to national dis-uniformity in administering the non-domiciled CDL program. Limiting eligibility strictly to the individuals in the employment-based nonimmigrant categories from the IFR is the only way to restore integrity and uniformity to the non-domiciled licensing process and create a foolproof standard because those individuals can present I–94/94As and foreign passports rather than EADs. The Form I–94 will clearly display whether an individual's nonimmigrant status is in one of the three categories allowed under this final rule (H–2A, H–2B, or E–2) without having to decipher a separate code. The simplicity of the information presented on the I–94 eliminates the need for front-line SDLA personnel to decipher codes on an EAD, which are not clearly identifiable to those without sufficient specified knowledge on what each code means. Because States have demonstrated an inability to correctly interpret those codes and process non-domiciled CLPs and CDLS based on EADs correctly, FMCSA has determined that EADs should not be treated as acceptable proof of identity and eligibility. The simplicity of the

---

[11] The Form I–797, Notice of Action exists in numerous iterations (e.g., Form I–797C is one of seven other Forms I–797) and USCIS uses it to "communicate with applicants/petitioners or convey an immigration benefit." *https://www.uscis.gov/forms/filing-guidance/form-i-797-types-and-functions* (last visited Jan. 29, 2026).

[12] 8 CFR 274a.13(b); 8 CFR 274a.14.

[13] *https://www.uscis.gov/forms/filing-guidance/form-i-797-types-and-functions* (last visited Feb. 9, 2026).

[14] *https://www.uscis.gov/forms/all-forms/form-i-797c-notice-of-action* (last visited Feb. 9, 2026).

[15] *Id.*

nonimmigrant status coding on the I–94 allows for front-line workers in SDLAs to correctly determine an individual's nonimmigrant status without having to undergo the same process of interpreting complex codes.

c. Excluded Statuses

A joint submission of the U.S. Committee for Refugees and Immigrants, Church World Service, IRC, Orel Alliance, RCUSA, and World Relief (Joint Organization comment) stated that excluding refugees, asylees, and humanitarian paroles from eligibility for non-domiciled CDLs puts these groups at risk of "financial devastation" and would severely harm the economy.

Delaware Division of Motor Vehicles wrote that FMCSA did not provide sufficient evidence as to why only H–2A, H–2B, and E–2 visa holders should be eligible for a non-domiciled CLP or CDL and the rationale for the exclusion of other categories. An individual said that other visa holders who have undergone rigorous U.S. visa vetting and whose work authorization routinely depends on demonstrated professional or managerial qualifications—such as L–1 intracompany transferees, TN professionals, H–1B specialty workers, and O–1 individuals of extraordinary ability—find themselves categorically excluded. The individual said that this exclusion lacks any safety-based explanation in the preamble or regulatory text.

Two individuals said that the IFR should include derivative spouse status which also authorizes employment such as E–2S. One individual stated that because the rule does not explicitly mention E–2S status, some SDLAs including Georgia Department of Driver Services are interpreting this as ineligibility, and rejecting CDL and CLP applications from E–2S spouses.

Numerous individuals expressed opposition to FMCSA restricting immigrants with Temporary Protected Status (TPS) from eligible categories for CDL issuance and requested that FMCSA amend the regulations to allow individuals with TPS to hold a CDL. An individual stated that there is no evidence that drivers with TPS are less safe than U.S. citizens. An individual suggested that FMCSA provide a transitional or grandfather period for current CDL holders with valid TPS. An individual stated that TPS holders undergo repeated DHS vetting, and TPS is granted only when DHS determines that returning to a person's home country would be unsafe due to war, disasters, or humanitarian crises. The individual also said that many TPS designations have existed for decades,

meaning holders have lived and worked legally in the United States long-term. Relatedly, Safety Management Inc. stated that denying TPS recipients, authorized under Federal law to pursue employment, the access to CDLs is discriminatory and not justified by safety evidence.

An individual expressed support for the restriction against asylees and asylum seekers receiving CDLs. Many individuals opposed the IFR and requested that FMCSA allow asylees and asylum seekers to qualify for non-domiciled CDLs. Two individuals provided multiple reasons to preserve the eligibility of asylum seekers including the lawful presence of asylum seekers, the need for drivers in the trucking industry, the contributions of asylum seekers who become self-sufficient due to work, and consistency with FMCSA goals. Two other individuals stated that drivers with pending asylum cases have already been vetted and cleared by U.S. authorities, and that there is no evidence that these drivers are less safe than U.S. citizens. Relatedly, Safety Management Inc. stated that denying asylum applicants authorized under Federal law to pursue employment the access to CDLs is discriminatory and not justified by safety evidence.

Another individual questioned how a person with only a temporary work visa, such as H–2A, H–2B, and E–2, is allowed to drive a commercial vehicle but an asylee who has a more permanent legal status is excluded. Many individuals explicitly opposed the policy that the C8 category is not eligible for CDLs. Six other individuals discussed the A05 category of EADs and said that it should be eligible to receive a CDL. An individual said that A05 status is lawful, stable, and federally protected. The commenter also said the rule violates proportionality and administrative fairness because equating A05 holders with undocumented or pending asylum applicants, such as the C08 category, ignores the significant legal distinctions between the two. The individual said that A05 holders should not be penalized for the misconduct of others. The individual suggested that FMCSA distinguish between approved asylees (A05) and pending asylum applicants (C08) when determining CDL eligibility. An individual suggested that FMCSA allow asylum seekers to receive a CDL on a one-year renewable basis, with annual confirmation of immigration status, CDL class, and driving record. The Joint Organization comment provided examples of how the IFR is impacting asylees that these organizations work with.

Many individuals requested that FMCSA revise the IFR so that SDLAs may continue issuing limited-duration non-domiciled CLPs/CDLs to refugees.

Many individuals requested that FMCSA allow individuals with U4U humanitarian parole status be eligible to receive a non-domiciled CDL. An individual said that those with U4U status are legally allowed to work, pay income taxes, contribute to social security and Medicare, and participate in communities. The Joint Organization comment provided examples of how the IFR is impacting humanitarian paroles under the U4U programs that these organizations work with. An individual stated that the IFR conflicts with DHS regulations because, according to DHS, the commenter is lawfully present in the United States and is authorized to work through at least April 19, 2026.

Asian Law Caucus, US Custom Harvesters, Inc., and many individuals requested that the following categories be added to the IFR: humanitarian parolees; lawful nonimmigrant statuses; E–3 visa holders; J–1 visa holders; J–2 visa holders; U-visa holders; A10; Deferred Enforced Departure; A19; I–797; Department of Labor Permanent Labor Certification; crime victim visa applicants; trafficking survivors; conditional permanent resident status; individuals with approved petitions who are waiting on visa availability; legal immigrants with significant professional experience operating heavy equipment; individuals that are legally present; and permanent residents. Two individuals suggested that FMCSA generally expand the list of immigration and residency categories eligible to obtain a CDL.

Accion Opportunity Fund suggested that FMCSA consider a tiered eligibility framework with enhanced verification for drivers outside of the H–2A/H–2B/E–2 statuses, which would uphold FMCSA's safety and integrity goals while preserving access for drivers. An individual encouraged FMCSA to define clearly which nonimmigrant categories will be eligible to ensure that applicants have sufficient notice and due process to comply. Similarly, an individual said that the rule fails to address other millions of lawful workers who hold alternative statuses and contribute to the economy and supply chain.

In addition, the individual said that in the absence of comparative crash-rate data, stakeholders cannot assess whether preventing L–1, TN, H–1B, or O–1 holders from obtaining non-domiciled credentials meaningfully advances highway safety. If FMCSA intends to maintain this narrow eligibility window, the individual said

that it should ground its distinctions in measurable safety performance metrics rather than in visa turnover characteristics or administrative convenience.

Asian Law Caucus said the IFR does not explain why other employment-based visa categories cannot now receive a non-domiciled CDL or CLP, such as visa holders under the Program Electronic Review Management process. Asian Law Caucus said these other visa categories also have requirements the IFR mentions, such as labor certification through DOL, current employment, or other specified proof of work established through the Federal visa process. Asian Law Caucus also said FMCSA did not adequately explain why employers generally are not incentivized to screen for drivers with clean driving records and the other positive characteristics given existing Federal requirements and potential repercussions for the company, including enforcement actions that FMCSA is authorized to bring.

TOSAM LLC stated that the inclusion of drivers with temporary immigration statuses, such as temporary protected status (TPS) and humanitarian parole, was "overly broad." Similarly, another individual said that a categorical visa ban is arbitrary, overbroad, and punishes people who are legally present and authorized to work.

**FMCSA Response**

FMCSA disagrees with commenters stating that eligibility for a non-domiciled CLP or CDL should extend beyond H–2A, H–2B, and E–2 visa holders. FMCSA recognizes that there is a population of current non-domiciled CDL holders who will no longer meet the eligibility standards set forth in this final rule, as well as new drivers with a different immigration status who will not be eligible. However, given the need for non-domiciled CLP and CDL holders to be vetted properly, this final rule limits individuals eligible for non-domiciled CLPs and CDLs to those maintaining lawful immigration status in one of the following employment-based nonimmigrant categories: H–2A, H–2B, or E–2, as well as certain individuals domiciled in a U.S. territory, and individuals domiciled in a State that is prohibited from issuing CLPs or CDLs because the State's CDL program is decertified.

As explained in greater detail in section, VI.B.1.a. (Eligible Nonimmigrant Statuses and Vetting), FMCSA closes a significant safety gap and prioritizes the safety of the traveling public by restricting eligibility to statuses subject to consular vetting and interagency screening. This will correct the bifurcated safety standard in which U.S.-based drivers are subject to strict safety vetting, while non-domiciled drivers with an unknown foreign driving history are allowed to obtain a non-domiciled CLP or CDL. By limiting eligibility for non-domiciled CLP or CDL holders exclusively to H–2A, H–2B, and E–2 nonimmigrant status holders, FMCSA ensures that as these individuals are subjected to increased vetting, which provides a more equivalent history check to those encountered by domestic CDL applicants. No other category of visa applicants is subject to enhanced vetting assessing driver history in foreign jurisdictions. As explained previously, the vetting that occurs through the visa application and labor certification processes for the H–2A, H–2B, and E–2 nonimmigrant categories ensure that these individuals are already approved to work specific jobs that may require acquisition of a non-domiciled CDL. Further, the required employer screening, in addition to the incentive to avoid unnecessarily repeating the lengthy job order process, helps ensure that the population of drivers being hired under one of the specified employment-based nonimmigrant categories are more likely to be drivers with safe driving records (90 FR 46516).

In addition, the U.S. Department of State's procedures for increased driver history screening and vetting of H–2A, H–2B, and E–2 visa applicants seeking to operate CMVs in the United States provide additional safety checks. In this regard, the enhanced vetting procedures ensures that applicants are capable of safe operation of a CMV, requires applicants to provide evidence to show the applicant has the ability and experience required to operate a CMV, and requires that applicants possess the basic English skills necessary to operate a CMV safely.

The U.S. Department of State's enhanced screening and vetting procedures bridges the safety gap between the differences in vetting for U.S.-domiciled and foreign-domiciled drivers for H–2A, H–2B, and E–2 visa applicants. These enhanced driver history vetting procedures are required for H–2A, H–2B, and E–2 visa applicants only, and no other category of foreign-domiciled driver is subject to them. Notably, the mere status of holding other employment-based visas, such as an H–1B or L–1, does not supply the agency with the necessary data to insure safety fitness of those drivers. Unlike the H–2A, H–2B, and E–2 categories, other visa adjudications focus strictly on professional qualifications, not enhanced vetting of driver history and safety. Consequently, possessing a valid visa in another category offers the agency no visibility into the applicant's foreign driving record. With the specific U.S. Department of State safety vetting acting as a functional proxy for driver history vetting, the agency is able to fulfill its statutory fitness mandate to a level that is more equivalent to the level established for U.S.-domiciled drivers. Therefore, because H–2A, H–2B, and E–2 visa applicants are the only categories of foreign-domiciled drivers currently subject to the U.S. Department of State's enhanced driver history screening and vetting procedures, FMCSA declines to extend non-domiciled CLP and CDL eligibility to other immigration categories.

**d. DACA**

Numerous individuals expressed opposition to FMCSA restricting DACA recipients from eligible categories and stated that DACA recipients should be able to obtain non-domiciled CDLs. Two individuals also suggested that DACA recipients with CDLs should be grandfathered into the regulations. Two individuals also requested that FMCSA grant an exemption permitting DACA recipients with EADs to obtain and hold Class B passenger-vehicle CDLs under the same conditions as other lawfully authorized individuals under 49 CFR 389.31. Two individuals stated that FMCSA failed to present data demonstrating that DACA-based CDL holders posed a distinct safety threat in comparison to other classes of drivers. An individual stated that excluding DACA recipients from the IFR without rigorous crash or performance analysis is arbitrary. The individual also recommended that FMCSA allow DACA-based CDL holders to continue renewals until a safe replacement path is created. An individual stated that in 2023 FMCSA issued guidance stating that SDLAs may issue non-domiciled CDLs to DACA recipients under certain conditions. The individual said that nothing about their lawful presence or work authorization has changed since then, and changing course now is "inconsistent, unfair, and will unnecessarily push responsible drivers out the workforce."

An individual said that DACA recipients should be allowed to obtain CDLs for three basic reasons: (1) they are legally authorized to work and are already vetted by Federal immigration authorities; (2) CDLs are governed by strict Federal tests and medical standards that apply equally to all applicants; and (3) excluding a class of

authorized workers will harm safety oversight and worsen driver shortages. Another individual said that DACA recipients are fundamentally different from many other non-domiciled applicants in that they graduated from a U.S. high school, maintain a clear record as a prerequisite for DACA renewal, and have long-term ties to U.S. communities. Because of these requirements, the individual said that DACA holders already meet or exceed the safety and integrity standards FMCSA seeks to ensure.

FMCSA Response

After considering the comments and information submitted, FMCSA determines that the final rule will remain as set forth in the IFR with respect to DACA recipients. DACA recipients are reliant on EADs and are therefore limited by the significant problems associated with that document in the non-domiciled licensing process. DACA recipients may have the ability to obtain other Federal identification documents, such as a social security card, or other photo identifications, such as a State license. However, there is no form of federally issued photo identification that can verify both their status and authorization to work outside of the EAD. Ultimately, the problems associated with SDLA's use of the EAD in the non-domiciled application process, as documented throughout this final rule, make it impracticable for FMCSA to allow for DACA recipients to be eligible for a non-domiciled CLP or CDL. As stated above, SDLAs have been unable to reliably distinguish between those codes and language on an EAD which indicated a permissible basis for issuance of a non-domiciled CDL and those that indicated an impermissible basis, which has led to improper issuance of non-domiciled CLPs and CDLs. Even if the agency limited the use of EADs to DACA recipients, the systemic inability of SDLAs to issue non-domiciled CLPs or CDLs with an EAD properly would result in the improper issuance of non-domiciled CLPs and CDLs to individuals who are not DACA recipients, but may appear to be one to a front-line SDLA clerk who cannot accurately distinguish whether an EAD code is a permissible basis for issuance of a non-domiciled CDL to a DACA recipient. This would continue the confusion surrounding EADs from the pre-IFR regulations and create the same problems with the improper issuance of non-domiciled CLPs and CDLs that the IFR and this final rule have sought to address.

In addition, DACA recipients' unique status presents a fundamental conflict

with the non-domiciled CLP and CDL issuance process. As FMCSA has made clear, CDLs are high-value, long-term credentials. DACA reflects an exercise of Executive Branch discretion that temporary and revocable in a way that the employment-based nonimmigrant statuses specifically provided by statute are not. Excluding DACA mitigates the safety risk of invalid CDLs remaining in circulation should the status of non-domiciled CDL holders change.

The arguments regarding DACA recipients are further undercut by the fact that citizens of Mexico and Canada who are present in the United States under the DACA program have never been eligible for a non-domiciled CLP or CDL under FMCSA's regulations. This distinction is critical because, according to USCIS, approximately 80 percent of DACA recipients are citizens of Mexico.[16] In this regard, 49 CFR 383.23(b)(1) states that the only drivers permitted to obtain non-domiciled CDLs are those not from ''a jurisdiction that the Administrator has determined tests drivers and issues CDLs in accordance with, or under standards similar to, the standards [adopted by FMCSA] . . . so long as that person meets the requirements of § 383.71(f).'' The regulation categorically excludes all other individuals. This necessarily includes individuals domiciled in Canada and Mexico, footnote one to section 383.23(b)(1) explains, because Mexico and Canada are jurisdictions for which the Administrator has issued an equivalency determination and entered into a reciprocity agreement. Nonetheless, FMCSA exercised its enforcement discretion in 2023 to publish guidance advising States that they may issue a non-domiciled CLP or CDL, using the procedures under 49 CFR 383.73(f)(2), to individuals who are citizens of Mexico and present in the United States under the DACA, provided that the applicants meet the requirements of 49 CFR 383.71(f)(2) and do not hold, and have never held, a Licencia Federal de Conductor issued by Mexico.[17] Since issuing that guidance, FMCSA has further exercised its enforcement discretion to recognize an exception from the regulatory prohibition for citizens of Canada. It was solely by virtue of FMCSA's non-enforcement posture, issued less than three years ago, that States were allowed

to issue non-domiciled CLPs and CDLs to Mexican and Canadian DACA recipients without receiving a finding of noncompliance. FMCSA acts well-within its authority to alter the agency's recent non-regulatory enforcement posture with respect to these drivers, particularly in light of the systemic noncompliance uncovered by the APRs. This final rule rescinds the 2023 guidance on the eligibility of Mexican DACA recipients for a non-domiciled CDL.

e. Freely Associated States

Several individual commenters requested that citizens of Freely Associated States (FAS) be admitted to the eligible categories allowed to receive a non-domiciled CDL. The Embassy of the Federated States of Micronesia (FSM) said that as drafted, the IFR does not mention the FSM, fails to reflect the agreements between the governments, and incorrectly limits opportunities for FSM citizens who are legally authorized to work in the United States. The Embassy of the Federated States of Micronesia said that an FSM citizen's stay in the United States is not limited to any period of authorized stay or duration of stay, does not require reapplication for retention, and is perpetual, therefore, the commenter said that the status of FSM citizens living in the United States is closer to lawful permanent residents than to individuals with a temporary immigration status. In addition, the Embassy of the Federated States of Micronesia and the Embassy of the Republic of the Marshall Islands to the United States of America said that FAS citizens are not required to obtain a visa to work in the United States, and therefore do not have the documentation required by the IFR to access a non-domiciled CDL. Similarly, an individual requested that States receive training on handling legal documents presented by individuals to renew or obtain a CDL because Compact of Free Association (COFA) and FAS citizens do not require a visa and do not have expiration dates on their I–94s.

The Embassy of the Republic of Palau and the Embassy of the Republic of the Marshall Islands to the United States of America said that under the IFR, 49 CFR 383.5(2) requires CDL applicants domiciled in Guam, the Commonwealth of the Northern Mariana Islands, or any of the three other U.S. territories to supply as evidence of lawful immigration status ''any of the documents specified in Table 1 of section 383.71,'' which limits proof of status for non-citizen lawful permanent residents to a ''valid, unexpired Permanent Resident Card, issued by the

---

[16] According to USCIS data, more than 80 percent of individuals present in the United States under DACA are from Mexico, as of June 20, 2025. See *https://www.uscis.gov/sites/default/files/document/data/active_daca_recipients_fy2025_q3.xlsx.*

[17] See *https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled.*

USCIS or INS." The Embassy of the Republic of Palau said that Palauan citizens do not need and are not issued a Permanent Resident Card to reside in U.S. territories lawfully. In recognition of the unique status of Palauan and other COFA citizens, they suggested that FMCSA include a new row in Table 1 of § 383.71 to address the COFA citizen population and indicate that their proof of status requirement could be satisfied by an unexpired passport along with a Form I–94/94A.

The Embassy of the Republic of Palau stated that Palauan citizens may enter and live in the United States on a habitual basis with only an unexpired passport, and that upon admission to the U.S., Palauan citizens are issued a Form I–94, but this documentation does not name a specified employment-based status. The Embassy of the Republic of Palau said that requiring such a notation would be inconsistent with the bilateral agreement that the United States has entered into with Palau, as integrated into U.S. domestic law, which does not premise entry into the United States on any employment justification. The Embassy of the Republic of Palau suggested that the evidence of lawful presence contained in 49 CFR 383.5 could be expanded to include:

"an unexpired Form I–94/94A issued by the U.S. Department of Homeland Security indicating one of the following classifications: H–2A-Temporary Agricultural Workers, H–2B-Temporary Non-Agricultural Workers, or E–2-Treaty Investors; or an acceptable Form I–94/94A under the Compact of Free Association between the United States and the nation that issued the passport. The appropriate 1–94 Classifications for Freely Associated States are in the case of the Palau: CFAIPALJ."

The Embassy of the Federated States of Micronesia suggested that the definition of "evidence of lawful immigration status" at section 383.5 could read:

"An unexpired Form l-94/94A issued by the U.S. Department of Homeland Security indicating one of the following classifications: H–2A-Temporary Agricultural Workers, H–2B-Temporary Non-Agricultural Workers, or E–2-Treaty Investors; or an acceptable Form l–94/94A, documenting the applicant's most recent admission to the United States under the Compact of Free Association between the United States and the nation that issued the passport. The appropriate 1–94 Classifications for Freely Associated States are as follows: CFA/FSM, CFA/RMI, and CFA/PAL."

The Embassy of the Republic of the Marshall Islands to the United States of America suggested the following definition:

"An unexpired Form I–94/94A issued by the U.S. Department of Homeland Security

indicating one of the following classifications: H–2A-Temporary Agricultural Workers, H–2B-Temporary Non-Agricultural Workers, or E–2-Treaty Investors; or an acceptable Form I–94/94A under the Compact of Free Association between the United States and the nation that issued the passport. The appropriate I–94 Classifications for Freely Associated States are in the case of the RMI: CFAIMJSJ."

### FMCSA Response

FMCSA understands the lawful presence status of Citizens of the FAS. This final rule does not include a specific carve-out for Citizens of the FAS. Those individuals are currently subject to an existing exemption [18] and a pending exemption application.[19] Due to their relationship with the United States through the COFAs, FMCSA will continue to address this population through those processes.

### 2. Legal Basis and Agency Authority

#### a. Congressional Authority

The Oregon Department of Transportation challenged FMCSA's statutory authority to issue the IFR given that "CDL issuance is a transportation safety function, not an immigration enforcement mechanism." An individual echoed these sentiments, stating the IFR exceeds statutory authority under the Motor Carrier Safety Act by transforming CDL regulation into immigration enforcement. Another individual reasoned that because FMCSA's authority is limited to promoting uniform safety standards and does not include enforcing immigration policy, which is the exclusive jurisdiction of DHS, the IFR exceeds FMCSA's authority.

Similarly, the Asian Law Caucus, writing that "the statutory authorities cited by FMCSA do not list or allude to 'immigration status' or 'visa category' as a basis for restricting" the issuance of CDLs, concluded that FMCSA "regulate[d] in areas beyond its purview" in issuing the IFR. A joint submission from the Attorneys General of Massachusetts, California, and 17 Other Jurisdictions [20] (joint AG comment) also questioned FMCSA's reliance on statutes related to driver testing and fitness, safety standards for operation of vehicles, and governance of the CDL program to program to exclude entire classes of drivers categorically

based on immigration status. Citing *INS* v. *Chadha,* 462 U.S. 919 (1983), three individuals asserted it held that immigration classifications must originate from Congress. Citing *FDA* v. *Brown & Williamson Tobacco Corp.,* four individuals said the Court upheld that an agency (FDA) lacked authority to regulate in an area (tobacco products) where Congress had never clearly delegated such power. Referencing the book *Over Ruled,* in which Supreme Court Justice Neil Gorsuch "warned that unchecked agency power leads to overreach and undermines democracy," another individual stated that the IFR is an example of such overreach.

Citing *West Virginia* v. *EPA,* 597 U.S. 697 (2022), multiple individuals asserted that agencies cannot develop rules of major economic and political significance without clear Congressional authorization. Citing *Massachusetts* v. *U.S. Environmental Protection Agency (EPA),* 549 U.S. 497, 532 (2007), another individual said that FMCSA does not have the statutory authority to invoke terrorism or national security concerns.

Cautioning that in the wake of the U.S. Supreme Court's decision in *Loper Bright Enterprises* v. *Raimondo,* 603 U.S. 369 (2024), agencies must adhere to Congress' language exactly to avoid the risk of legal challenges (*e.g.,* litigation brought under the Equal Access to Justice Act), an individual asserted that the statutes FMCSA cites as authority for the IFR are not applicable. Specifically, the individual stated that the statutes in question relate to the safe operation of CMVs, but FMCSA has not established a clear correlation between immigration status and safety. Accion Opportunity Fund and three individuals asserted that the agency exceeded its statutory authority by restricting, without Congressional approval, the rights of lawfully present asylees to obtain, renew, and use CDLs. Two individuals suggested the agency should rescind the IFR because it exceeds statutory authority.

Citing *Mathews* v. *Diaz,* 426 U.S. 67 (1976), two individuals asserted that only Congress possesses the plenary power to set distinctions for immigrants and agencies cannot unilaterally impose new restrictions. Citing the Supremacy Clause alongside *Arizona* v. *United States* 567 U.S. 387 (2012), *Hines* v. *Davidowitz,* 312 U.S. 52 (1941), *Gade* v. *National Solid Wastes Mgmt. Ass'n,* 505 U.S. 88 (1992), and *De Canas* v. *Bica,* 424 U.S. 351 (1976), several individuals wrote that Federal laws enacted by Congress take precedence over agency rules, meaning FMCSA cannot impose new conditions that negate those rights. Accion Opportunity Fund and two

---

[18] 89 FR 78428 (Sep. 25, 2024).

[19] 89 FR 73744 (Sep. 11, 2024).

[20] The full list of jurisdictions from the joint Attorneys General comment are as follows: Massachusetts, California, Arizona, Colorado, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Minnesota, Nevada, New Mexico, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington.

individuals stated that the IFR's categorical limitation of CDLs to only those immigrants with H–2A, H–2B, and E–2 visas rewrites the statute's eligibility terms without Congressional direction. Moreover, two individuals said that excluding EAD holders, asylees, and refugees from CDL eligibility unlawfully deprives those groups of employment rights guaranteed by Congress. In addition, an individual asserted that employment status is permanent and the IFR transforms permanent status into temporary status. Citing *Utility Air Regulatory Group* v. *EPA,* 573 U.S. 302 (2014), Accion Opportunity Fund and an individual said the agency may not tailor unambiguous statutes to suit policy preferences. Citing *Loper Bright* v. *Raimondo,* two individuals stated that agency reinterpretations of law receive no judicial deference.

While agreeing that FMCSA's authorizing statute "only allows separation by classes of vehicles driven and not by point of origin or any status of immigration or entry," an individual supportive of the IFR suggested that to avoid a court challenge on this basis, "the underlying statute should be amended to explicitly allow for this." In contrast, another individual wrote that FMCSA possesses clear statutory authority to issue the IFR, reasoning that Congressional authorization to regulate non-domiciled CDLs, including to ensure the fitness of drivers, permits the IFR as a direct exercise of congressionally delegated authority. Citing the 9/11 Commission Report and a 2004 DOT management advisory, the individual asserted that identity verification and immigration status confirmation are both warranted and a reasonable interpretation of FMCSA's statutory mandate. The individual concluded that the IFR complies with *Loper Bright* v. *Raimondo* because it is "a straightforward application of unambiguous statutory authority rather than an aggressive interpretation requiring deference."

FMCSA Response

FMCSA disagrees with comments claiming that the agency acted beyond its authority in issuing the IFR. Through the CMVSA, Congress provided the agency with the authority to prescribe regulations for ensuring the fitness of a CMV operator (49 U.S.C. 31305(a)) as well as regulations on minimum uniform standards for the issuance of non-domiciled CDLs (49 U.S.C. 31308)). Under this authority, FMCSA has the discretion to define the parameters of eligibility. The agency also has broad authority to issue regulations to ensure

that CMVS are operated safely (49 U.S.C. 31136(a)(1)). Further, under 49 U.S.C. 31311(a)(12)(B)(ii), States are authorized to issue non-domiciled CDLs, but they must do so in accordance with regulations prescribed by FMCSA. The rule is both an authorized and reasonable exercise of the agency's statutory authority to regulate non-domiciled CDL issuance in the interest of highway safety. It is also consistent with the intent of 49 U.S.C. 31310(k), which explicitly provides that drivers licensed by an authority outside of the United States or foreign citizens operating CMVs in the United States are subject to the same disqualification requirements as domestic CMV drivers. Ensuring the safety of our Nation's roadways is FMCSA's mission and top priority. By aligning the final rule's eligibility requirements with the nonimmigrant statuses that undergo enhanced consular vetting and interagency screening which serves as a functional proxy for driver history vetting by the SDLAs, the agency is fulfilling its statutory obligation to ensure the fitness of all drivers who operate a CMV.

Passing the knowledge and skills tests are just two components of showing that a person is a safe and fully qualified driver. Under section 12009(a)(6) and (20) of the CMVSA (codified at 49 U.S.C. 31311(a)(6) and (16)), Congress made clear that an integral part of determining an individual's qualifications was for the State to review the individual's driver history record. Specifically, States are to request the driving record from any other State that has issued a driver's license to the individual, consult the national driver registry maintained under 49 U.S.C. Chapter 303, and give full weight and consideration to the information in deciding whether to issue the individual a CDL. The States' inability to access a single, reliable driving record for CDL applicants was, in fact, described by the agency as a "major area of concern" to be addressed in early versions of minimum standards promulgated under the Act (52 FR 20574, 20576 (June 1, 1987)). The records check has been and remains an important part of the process for determining whether an individual is qualified to operate a CMV safely. Moreover, the rule promotes uniform safety standards because it helps the agency ensure that the driver history vetting of foreign-domiciled drivers is comparable, and therefore more uniform to, the driver history vetting of U.S.-domiciled drivers.

b. Federal Law

The Mexican American Legal Defense and Educational Fund (MALDEF) and numerous individuals wrote that the IFR conflicts with EAD holders' right to work as authorized by DHS under the INA. An individual stated that excluding EAD holders from eligibility for CDLs goes against the Federal definition of "lawful presence." Similarly, an individual described the legal framework for work authorization and critiqued the IFR for nullifying the authorization that DHS has granted individuals who are in the United States lawfully. Three individuals asserted that a ban on entire groups of immigrants who already possess lawful work authorization under INA exceeds the bounds of permissible regulation. An individual asserted that under INA, refugees and asylees are eligible to adjust to lawful permanent resident status after one year of residence, effectively aligning their labor rights with those of lawful permanent residents, even before the adjustment, since Congress guaranteed them employment authorization.

Many individuals said the IFR conflicts with Federal immigration authority under DHS. Specifically, three individuals asserted that the IFR creates a conflict between Federal transportation law and existing immigration law by treating EAD holders as non-domiciled despite Federal law recognizing them as lawfully present and employable. Expressing concerns about Federal supremacy and preemption, an individual asserted that FMCSA's attempt to reclassify individuals with EADs as ineligible to work is legally impermissible. Two individuals stated that USCIS guidance says EAD holders have indefinite work authorization because their immigration status does not expire. Another individual expressed concerns that the rule undermines the Federal verification process established under SAVE, which the REAL ID Act of 2025 designates as the sole mechanism for confirming lawful presence.

An individual cited U.S. Supreme Court cases holding that it is impermissible for agencies to issue regulations that are in direct conflict with Federal law (*Arizona* v. *United States,* 567 U.S. 387 (2012); *Chamber of Commerce* v. *Whiting,* 563 U.S. 582 (2011); *U.S. Food and Drug Administration* (*FDA*) v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000)). The commenter questioned whether every Federal agency could adopt its own "immigration filters" if

FMCSA can override DHS determinations as to work authorization.

Numerous individuals stated that they are immigrants with legal status in the United States, such as pending immigration cases with valid work authorizations, and therefore are lawful CDL holders. Multiple individuals questioned why immigrants with the legal right to live and work in the United States will no longer be able to obtain a CDL. Two individuals said that barring individuals with lawful presence and work authorization from accessing CDLs contradicts the CMVSA's purpose of promoting uniform driver qualification standards.

An individual requested rescission of the IFR because it creates inter-agency conflict undermining constitutional separation of powers. Similarly, an individual suggested the agency withdraw the IFR, harmonize its regulatory definitions with DHS policy, and reaffirm CDL eligibility for all lawfully authorized drivers under TPS and EAD holder categories to preserve the integrity of the Federal licensing framework, and protect lawful workers. One individual requested that DOT align the IFR with Federal immigration law. Another individual requested a coordinated interagency approach with DHS, consistent with Executive Order (E.O.) 12866 section 6(b)(2), to restore legal coherence, to uphold humanitarian protections, and to ensure that Federal transportation policy remains aligned with the rule of law.

In contrast, America First Legal Foundation commented that the IFR promotes road safety by ensuring compliance with existing Federal regulations, such as the requirement that commercial drivers have proficiency in English, which the commenter said have been significantly underenforced for some time. The America First Legal Foundation concluded that the IFR is needed to ensure the public that commercial drivers "will be able to interact well with law enforcement, fully and quickly understand signs indicating rules of the road, and accordingly safely drive their large commercial vehicles on American roads."

Citing the Lobbying Disclosure Act of 1995, an individual stated that it requires transparency in all forms of influence and that if undisclosed contacts or quid pro quo arrangements are present, this may implicate 18 U.S.C. 201 (bribery of public officials) and 18 U.S.C. 1343 and 1346 (fraud and honest services fraud). The individual noted that *Skilling* v. *United States,* 561 U.S. 358 (2010), clarified that "honest services fraud includes situations where

officials act against the public interest in favor of private gain" and remarked that, under *Illinois Central Railroad* v. *Illinois,* 146 U.S. 387 (1892), Federal agencies must act as trustees on behalf of the public and serve the public good. Further, citing *Carter* v. *Carter Coal Co.,* 298 U.S. 238 (1936), the individual asserted that regulatory capture is present in this IFR and FMCSA is serving the interests of the motor carrier industry rather than the public, which is an abuse of delegated authority.

**FMCSA Response**

FMCSA continues to emphasize this regulatory action is consistent with authorizing statutes concerning the establishment of safety rules and that in exercising its authority to strengthen the integrity of the CDL program, the agency's actions are not in conflict with Federal immigration law. The agency's actions have been transparent, lawful, and in the public interest. As discussed above, the rule is both an authorized and reasonable exercise of the agency's statutory authority to ensure safety fitness and regulate non-domiciled CDL issuance in the public interest of highway safety. Though the rule references certain immigration statuses, it does so only insofar as they relate to helping the agency ensure safety fitness and that the driver history vetting of foreign-domiciled drivers is comparable, and therefore more uniform to, the driver history vetting of U.S.-domiciled drivers.

Regarding claims that FMCSA exceeded the bounds of permissible regulation by nullifying the lawful work authorization that DHS has granted individuals or that Congress has guaranteed to refugees and asylees after one year of residence, FMCSA believes that these claims overstate the authorization granted or guaranteed. A work authorization does not grant an individual a guaranteed right to work in any position of employment he or she chooses, regardless of whether he or she is qualified for that employment. It would be dangerous for a State to issue a CLP or CDL to an individual without ensuring that the individual had been fully vetted for a safe driving record. This danger is present, regardless of truck driving being a private economic activity, rather than a governmental function. Under the revised regulations, FMCSA ensures the fitness of non-domiciled drivers by limiting eligibility to those in specified nonimmigrant statuses who are subject to rigorous driver history checks that SDLAs are incapable of performing independently.

**c. Equal Protection and Civil Rights**

Multiple individuals critiqued the IFR for failing to provide equal protection as required under the Fourteenth Amendment to the U.S. Constitution. Many of the individuals concluded that the IFR violates equal protection requirements by discriminating against certain classes of immigrants. Likewise, three individuals asserted that the IFR is unconstitutional because it violates the Fourteenth Amendment in treating similarly situated individuals differently by allowing U.S. citizen CDL holders to continue driving while immigrant drivers with valid EADs cannot. Citing *City of Cleburne* v. *Cleburne Living Center, Inc.,* 473 U.S. 432, 439 (1985), an individual asserted that the IFR violates the Fourteenth Amendment by requiring States to treat "similarly situated individuals differently without a legitimate governmental interest."

An individual asserted that by creating two groups (U.S. citizens, lawful permanent residents, and people in certain visa categories who are eligible for CDLs; and EAD holders who are excluded from CDLs), the IFR violates equal protection principles applied to Federal actions. The individual further asserted that FMCSA has not provided a rational connection between EAD status and highway safety, provides no empirical data, and is noncompliant with the Information Quality Act. The individual cited judicial precedent in several cases where courts invalidated rules based on unsupported assumptions (*Int'l Ladies' Garment Workers' Union* v. *Donovan,* 722 F.2d 795 (D.C. Cir. 1983); *Allentown Mack Sales* v. *NLRB,* 522 U.S. 359 (1998); *Michigan* v. *EPA,* 576 U.S. 743 (2015)).

In addition, two individuals raised concerns about the IFR violating the Equal Employment Opportunity Act through discrimination on the basis of immigration status. Three individuals stated that the rule raised equal protection concerns by discriminating against lawfully present non-citizens. Citing *Ariz. Dream Act Coalition* v. *Brewer,* 855 F.3d 957 (9th Cir. 2017) and *Rodriguez* v. *P&G,* 338 F. Supp. 3d 1283, one of the individuals stated that courts have held that policies refusing to issue driver's licenses to lawfully present aliens, including DACA recipients, violate the Equal Protection Clause. Five individuals said that the IFR is discriminatory and constitutionally invalid.

The American Federation of Labor & Congress of Industrial Organizations (AFL–CIO) and numerous individuals stated that the IFR is not safety policy,

but rather discrimination based on national origin. Numerous individuals discussed that the IFR impacts immigrant or non-English speaking drivers disproportionately. Two individuals asserted that the IFR undermines the rule of law, erodes public trust in government institutions, and violates both U.S. constitutional principles and international human rights obligations by instituting administrative discrimination disguised as safety regulation. Citing *Village of Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U.S. 252 (1977), another individual said the IFR includes unconstitutional policies motivated by hidden discriminatory intent. Similarly, three individuals stated that using safety as a pretext for discrimination is impermissible, citing *Department of Commerce* v. *New York,* 139 S. Ct. 2551 (2019). Some individuals said that the IFR could be considered a discriminatory measure by limiting access to a means of livelihood for a specific population without offering alternatives.

Citing *Plyler* v. *Doe,* 457 U.S. 202 (1982), three individuals reasoned that immigration status alone is not a sufficient basis for denying access to fundamental rights without compelling justification. In terms of the IFR, the individuals asserted that justification is absent as immigration status has no connection to road safety, which is already covered by law through medical exams, skills testing, and professional qualification standards. Also citing *Plyler* v. *Doe,* three individuals said that the government cannot impose lifelong burdens on children due to their parents' immigration status.

Citing *Yick Wo* v. *Hopkins,* 118 U.S. 356 (1886), three individuals wrote that applying a neutral law in a discriminatory manner violates equal protection. Also citing *Yick Wo* v. *Hopkins,* an individual stated that by stripping lawful immigrant drivers with spotless safety records of CDLs, FMCSA is punishing their status, not their conduct, and violating equal protection principles. Similarly, an individual stated that imposing categorical restrictions without evidence that citizenship correlates with safety raises concerns of unequal protection and selective enforcement. Some individuals added that the equal employment opportunity principle provides that no person who is lawfully authorized to perform a job should be discriminated against based on citizenship or immigration status.

Several individuals asserted that the IFR raises due process concerns under the Fifth Amendment to the U.S.

Constitution. Citing *Bolling* v. *Sharpe,* 347 U.S. 497 (1954), five individuals asserted that the Fifth Amendment extends the principle of equal protection to actions of the Federal Government, including the IFR. Similarly, Safety Management Inc. and many individuals asserted that the IFR violates the Fifth Amendment by denying due process and equal protection. An individual said the IFR "serves no compelling interest related to safety" and "broadly exclude[es] EAD holders regardless of record or experience." Six individuals stated that the IFR is constitutionally indefensible because it discriminates against law-abiding immigrant drivers solely based on their immigration category. Another individual, citing *Hampton* v. *Mow Sun Wong,* 426 U.S. 88 (1976), said the Court held that a regulation barring residents from Federal employment violated the due process clause.

Numerous individuals stated that non-domiciled drivers deserve equal opportunity. Three individuals stated that laws should protect opportunity and fairness, not take them away. Six individuals specifically requested that FMCSA focus on fair treatment for all drivers.

An individual asserted that the Constitution does not limit the pursuit of happiness to U.S. citizens. Two individuals asserted that the IFR, contrary to the constitutional guarantee of due process, violates both the presumption of innocence and the presumption of good faith by replacing an evidence-based standard with a speculative assumption unsupported by verified data.

Citing *Romer* v. *Evans,* 517 U.S. 620 (1996), an individual said the IFR's provisions targeting unpopular groups fail rational basis review. Similarly, an individual asserted that when classifications are based on immigration status, the agency "must demonstrate a logical and reasonable connection between its stated goal and the means chosen" to satisfy the rational basis test. An individual stated that restrictions based on lawful presence or humanitarian status are subject to rational basis review, and in the absence of current statistical data or substantiated documentary evidence, such restrictions fail to satisfy this standard. The individual reasoned that because this is a Federal executive action rather than a Congressional classification, the deferential standard of *Mathews* v. *Diaz* does not apply, and FMCSA must still satisfy rational basis review consistent with *Plyler* v. *Doe.* In contrast, another individual, also citing *Mathews* v. *Diaz,* asserted that

"immigration status is a legal classification, not a suspect class, and government distinctions based on immigration status receive rational basis review," which the individual said the IFR easily satisfies. The individual reasoned that because Congress explicitly authorized FMCSA to establish requirements for the issuance of non-domiciled CDLs, it is permissible to base distinctions in those requirements on immigration status.

Citing *Graham* v. *Richardson,* 403 U.S. 365, 371–72 (1971), three individuals asserted that alienage classifications require strict scrutiny. One individual stated that in *Graham* v. *Richardson,* the Court found that restrictions on alienage classifications are unconstitutional unless the government proves a compelling interest and narrow tailoring and further that fiscal savings alone cannot justify discrimination against a suspect class. Citing *Foley* v. *Connelie,* 435 U.S. 291 (1978), three individuals said that truck driving is a private economic activity, not a governmental function, and therefore the governmental function exception does not apply.

Three individuals asserted the IFR violates Title VI of the Civil Rights Act of 1964 (CRA), while another individual asserted that the IFR violates Title VII of the CRA. The joint AG comment (which refers generally to the CRA but cites case law related to Title VII) and two individuals wrote that the IFR runs afoul of the CRA's prohibition on employment discrimination against immigrants. An individual asserted that the IFR excludes refugees and asylees based on their immigration status and origin, creating a direct discriminatory effect prohibited under Title VI. In addition, the individual wrote, "even facially neutral rules that result in discriminatory exclusion fall under Title VI violations," citing *Alexander* v. *Sandoval,* 532 U.S. 275 (2001). An individual commenter stated that the categorical exclusion disproportionately harms certain national-origin groups and raises concerns under Title VI's prohibition on discrimination in federally assisted programs (42 U.S.C. 2000d).

Two individuals asserted that the IFR violates the Immigration Reform and Control Act of 1986 and conflicts with Federal anti-discrimination provisions enacted by Congress because it discriminates in hiring or licensing based on citizenship or immigration status for individuals who are authorized to work. Four individuals stated that the International Covenant on Civil and Political Rights, Article 26, and the Universal Declaration of Human

Rights, Articles 2 and 23, guarantee non-discrimination in access to work and professions. Moreover, the joint AG comment stated that INA prohibits employment discrimination on the basis of citizenship against asylees and refugees.

FMCSA Response

FMCSA disagrees with comments claiming that the agency deprived the public of equal protection and due process under the Fourteenth and Fifth Amendments to the U.S. Constitution or was otherwise discriminatory in issuing the IFR, regardless of which law is applied.[21] Nor has FMCSA violated a fundamental principle of public trust or the presumptions of innocence and good faith. As discussed above, the rule is both an authorized and reasonable exercise of the agency's statutory authority to regulate non-domiciled CDL issuance in the public interest of highway safety. Ensuring the safety of our Nation's roadways is FMCSA's mission and top priority. This final rule demonstrates that the agency has narrowly tailored the regulation to the least restrictive means possible to achieve this compelling government interest in good faith and without assuming the criminal standards of guilt or innocence of any party.

Contrary to comments asserting that immigration status bears no relation to traffic safety, FMCSA notes that immigration status does have a relation to traffic safety insofar as the status affects FMCSA's ability to ensure the safety fitness of the drivers classified in that status. As discussed in section VI.B.1 of this final rule, the inability of the States to obtain driver history for non-domiciled applicants creates an unacceptable bifurcated standard in driver vetting when compared to U.S.-domiciled drivers, with non-domiciled credentials being processed without equivalent checks on the respective driver's foreign driving history. This creates a critical safety gap in FMCSA's ability to ensure the safety fitness of such drivers, as SDLAs are unable to access foreign driving histories that would identify prior unsafe behaviors,

crashes, or disqualifying offenses that would otherwise prevent licensure.

Given the administrative inability for SDLAs to vet foreign driving histories, it is the U.S. Department of State's enhanced and thorough vetting procedures for H–2A, H–2B, and E–2 visa applicants that will mitigate this safety gap. As explained in the IFR, in consulting with DOL's Office of Foreign Labor Certification, FMCSA understands that employer applications related to commercial trucking typically include some combination of the following job requirements: possess U.S. CDL or foreign CDL equivalent, related work experience (12 months to two years), clean driving record, pass drug or medical testing, and knowledge of or proficiency in English (90 FR 46516). Applicants for these commercial trucking positions associated with an H–2A, H–2B, or E–2 visa classification are then subject to the Department of State's enhanced vetting procedures to determine whether an applicant has established the requisite experience to operate a CMV safely, such that they are eligible for the requested visa classification. As described in VI.B.1.a, these procedures direct the consular officer to request evidence that would demonstrate that the driver qualifies for a CDL, and generally include requests for 10 years of driving history, past traffic violations, license suspensions and revocations, and other similar records. No other category of foreign-domiciled driver is currently subject to the same level of enhanced vetting procedures for CMV driver qualifications and safety fitness by the U.S. Department of State.

The limitation of eligibility to H–2A, H–2B, and E–2 statuses is therefore not based on the status itself, but on the existence of a parallel Federal vetting regime that mitigates the safety gap and thereby resolves the bifurcated standard and fulfills FMCSA's statutory mandate. By aligning the rule's eligibility requirements to certain employment-based nonimmigrant statuses that receive enhanced and thorough interagency screening and vetting, the agency is narrowly tailoring the regulation to the least restrictive means possible to achieve a compelling government interest—ensuring the safe operation of CMVs and driver safety fitness through vetting non-domiciled drivers at a level comparable to U.S.-domiciled drivers.

The concerns raised by commenters regarding alternatives to the final rule are addressed below in section VI.B.8.

d. Administrative Procedure Act (APA)

The Asian American Legal Defense and Education Fund and many individuals asserted that the IFR violates the APA as it is arbitrary and capricious, contrary to constitutional rights, or exceeds jurisdiction. The Asian American Legal Defense and Education Fund and an individual stated that the IFR is arbitrary and capricious because the agency considered an impermissible factor such as race or nationality or relied on information Congress did not intend for it to consider.

Similarly, citing *Marin Audubon Soc'y* v. *U.S. Federal Aviation Association,* 121 F.4th 902, 912 (D.C. Cir. 2024), and *Am. Clinical Lab. Ass'n* v. *Becerra,* 40 F.4th 616, 624 (D.C. Cir. 2022), the joint AG comment stated that agencies can only act to the extent Congress authorizes them to and relying on factors Congress did not intend them to consider violates the APA. Thus, the commenter said, FMCSA violated the APA by stating that the IFR was "issued with respect to an immigration-related function of the United States" (90 FR 46521) when FMCSA has no authority to carry out immigration-related functions, adding that FMCSA "attempted to deny that the IFR is an immigration-related rule" when defending the IFR in litigation before the D.C. Circuit. Further, citing *Dep't of Commerce* v. *New York,* 588 U.S. 752, 785 (2019), the commenter reasoned that the IFR is arbitrary and capricious because it not only is "both irrationally overinclusive and irrationally underinclusive" but also fails to connect the decision made with the explanation given.

Citing *Motor Vehicle Mfrs. Ass'n* v. *State Farm,* 463 U.S. 29 (1983), the Asian American Legal Defense and Education Fund, MALDEF, and multiple individuals said that an agency must articulate a rational connection between the facts found and the choice made, whereas FMCSA made speculative assumptions in the IFR about public safety that lacked empirical support, thus rendering the IFR arbitrary and capricious under the APA. An individual reasoned that because FMCSA's authority is limited to promoting uniform safety standards and does not include enforcing immigration policy, which is the exclusive jurisdiction of DHS, the IFR exceeds FMCSA's authority and is thus arbitrary and capricious under the APA. Another individual also critiqued the IFR as being arbitrary and capricious in violation of the APA, specifically for reversing, without grandfather

---

[21] Some commenters alleged that the IFR violated Title VI of the CRA (42 U.S.C. 2000d *et seq.*), which prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance, while others alleged violations of Title VII of the CRA (42 U.S.C. 2000e *et seq.*), which prohibits private and State and local government employers with 15 or more employees and employment agencies from discriminating on the basis of race, color, religion, national origin or sex in all aspects of an employment relationship, including hiring, discharge, compensation, assignments, and other terms, conditions and privileges of employment.

protection, EAD holders' eligibility to be issued CDLs. Five individuals said that the IFR is procedurally invalid. The Asylum Seeker Advocacy Project and an individual requested the IFR be withdrawn because it was arbitrary, with the individual noting the D.C. Circuit cited serious legal concerns when it issued an administrative stay. Another individual urged the agency to vacate and withdraw the IFR, disclose its decision-making process, and re-engage in lawful rulemaking consistent with the Constitution, the APA, and the principles of nondiscrimination.

Citing *U.S. Federal Communications Commission* v. *Fox Television Stations,* 556 U.S. 502 (2009), two individuals said the Court reiterated that agencies must provide reasoned explanations when making substantial policy changes. Similarly, citing *Judulang* v. *Holder,* 565 U.S. 42 (2011), an individual said the IFR cannot forbid certain individuals from holding CDLs based on an irrational reason such as immigration status. Citing *Cleveland Bd. of Educ.* v. *Loudermill,* 470 U.S. 532 (1985), an individual said that the agency may not arbitrarily presume misconduct or unfitness in individuals who hold lawful rights and status.

FMCSA Response

FMCSA disagrees with comments claiming that the agency was arbitrary and capricious in issuing the IFR. In both the IFR and throughout this rule, FMCSA articulated a rational basis for specifying employment-based nonimmigrant categories in the IFR and demonstrated that the rule is both an authorized and reasonable exercise of the agency's statutory authority to regulate non-domiciled CDL issuance in the interest of highway safety. By aligning the rule's eligibility requirements to certain employment-based nonimmigrant statuses that receive enhanced and thorough interagency screening, the agency is narrowly tailoring the regulation to the least restrictive means possible to achieve a compelling government interest—ensuring the safe operation of CMVs and driver safety fitness through vetting of non-domiciled drivers at a level comparable to those who are domiciled in the United States. The records check has been and remains an important part of the process for determining whether an individual is qualified to operate a CMV safely. Moreover, the rule promotes uniform safety standards because it helps the agency ensure that the driver history vetting of foreign-domiciled drivers is comparable, and therefore more uniform

to, the driver history vetting of U.S.-domiciled drivers.

Further, as discovered through the APRs, the reliance on EADs to demonstrate eligibility for a non-domiciled CDL has proven administratively unworkable and resulted in widespread regulatory non-compliance. This rule necessarily simplifies the documentation to ensure that SDLAs could accurately apply the eligibility criteria. As explained in Section VI.B.1.b, the simplicity of the nonimmigrant status coding on the I–94 allows for front-line workers in SDLAs to correctly determine an individual's nonimmigrant status without having to undergo the same process of interpreting complex codes.

e. Revocation or Denied Renewal of Credentials and Due Process

An individual asserted the IFR revokes CDLs that were legally issued under existing Federal laws. Citing *Bowen* v. *Georgetown Univ. Hospital,* 488 U.S. 204 (1988), an individual wrote that Federal agencies may not impose retroactive penalties without clear statutory authority and the agency revoking or refusing renewal of CDLs solely due to later rule changes constitutes impermissible retroactive punishment. Five individuals reasoned that the IFR violates due process requirements because it retroactively removes drivers' validly issued licenses without a fair hearing or individualized review.

An individual critiqued FMCSA's inaction in cases where States have rescinded CDLs and are not reinstating them despite the IFR having been stayed by the court. In contrast, an individual expressed outrage at the court for staying the IFR and urged the court to lift the stay so that the IFR can be enforced.

Three individuals said that under *Mathews* v. *Eldridge,* 424 U.S. 319 (1976), FMCSA's action fails the procedural due process balancing test, writing that the individual's interest in continued lawful employment is substantial, the risk of erroneous deprivation is high, and the agency's asserted interest in administrative convenience is minimal. Further, citing *Bell* v. *Burson,* 402 U.S. 535 (1971), four individuals said there is no basis to deprive a party of procedural safeguards nor to take away property rights and entitlements (*i.e.,* driver's licenses) that people had until the IFR was issued. Citing *Elrod* v. *Burns,* 427 U.S. 347 (1976), and *Winter* v. *NRDC,* 555 U.S. 7 (2008), an individual stated that the IFR causes irreparable harm to constitutional liberty and property

interests because it prevents CDL renewal and thus disrupts people's ability to work and earn money.

Citing *Cleveland Bd. of Educ.* v. *Loudermill,* another individual characterized the IFR as directing States to "tak[e] away a property interest from a non-domiciled CDL holder without giving them notice or opportunity to be heard." Similarly, an individual, citing *Alvarado* v. *Dep't of Licensing,* 371 P.3d 549 (2016), asserted that CDLs are property interests protected by procedural due process principles, requiring meaningful notice and an opportunity to be heard. Another individual asserted the IFR lacks fair administrative processes by denying individuals access to appeal or review procedures if their CDL renewal requests are automatically rejected.

FMCSA Response

With respect to the comment alleging that the rule has a retroactive application (*e.g.,* cancelling rights that were legally obtained under previous regulations), FMCSA notes that the rule itself was written to be prospective, applying to all CDL and CLP issuances on or after the effective date of the IFR. The commenters seem to be focusing on concerns with the corrective action required as part of the ongoing APRs of SDLAs that unveiled serious deficiencies in the CDL issuance processes of several States. Regarding drivers whose licenses were improperly issued, the requirement to reissue licenses pursuant to the new processes outlined in the IFR, and by extension the final rule, is not intended to penalize drivers. Rather, it is intended to ensure that all licenses determined to be improperly issued through the APR process were reissued following the standards in effect at the time of reissuance. Such standards had been strengthened to ensure the integrity of the credentials and address the very gaps that led to non-domiciled CDLs and CLPs being issued improperly on such a large scale. To permit improperly issued non-domiciled CDLs and CLPs to be reissued under the prior standards would have caused uneven application and confusion.

Further, with regard to drivers who currently hold an unexpired non-domiciled CLP or CDL that was properly issued under the pre-IFR rules, nothing in this final rule requires States to proactively revoke those licenses. However, at the next licensing transaction following the effective date of this final rule (*e.g.,* reissuance, including amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL; transfer;

renewal; or upgrade), States are required to apply the new eligibility standards.

Regarding comments asserting that CDLs are property interests protected by procedural due process principles, requiring meaningful notice and an opportunity to be heard, FMCSA notes that the agency provided meaningful notice and an opportunity to be heard through a 60-day comment period. Moreover, the authority to issue and downgrade CLPs and CDLs lies with the SDLAs.[22] Although such issuances and downgrades need to be in substantial compliance with the minimum Federal standards set forth in 49 CFR parts 383 and 384 to avoid having amounts withheld from Highway Trust Fund apportionment under 49 U.S.C. 31314, individuals who believe their credentials have been improperly denied or downgraded due to a State's error in administering the previous standard (*e.g.*, because the State had improperly issued the credential for a time period exceeding the EAD date) have the opportunity to be heard and otherwise afforded due process through established State procedures and State law.

### f. Federalism

The Oregon Department of Transportation challenged the IFR's constitutionality on the basis of its mandatory downgrade provision, which the commenter said, "effectively deputizes states to carry out federal immigration enforcement, a role that has traditionally been reserved for federal agencies." In contrast, an individual writing in support of the IFR said it "approach[es] the limits of the anticommandeering doctrine," which the commenter described citing *Printz* v. *United States,* 521 U.S. 898, 935 (1997), and *Murphy* v. *Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453, 474 (2018), but could be protected against a constitutional challenge on that grounds by "subsidizing the States to correct their deficiencies and administer the program, rather than penalize them from federal highway funds for noncompliance." Citing *S. Dakota* v. *Dole,* 483 U.S. 203, 211 (1987), and *Nat'l Fed'n of Indep. Bus.* v. *Sebelius,* 567 U.S. 519 (2012), the individual also suggested that if FMCSA does withhold funds, to avoid crossing the line from inducement to coercion of States, "the

federal funds to be withheld should be more appropriately described as punitive or else be reduced from the standard penalty fines contained within 49 U.S.C. 31314.''

Another individual expressed concerns that the rule encroached on State licensing authority, created regulatory inconsistency, and undermined federalism principles in 49 U.S.C. 31141. Further, an individual stated that the IFR is an overreach of the Federal Government and an unconstitutional use of Federal power, noting that States are capable of handling licensing.

#### FMCSA Response

FMCSA disagrees that the IFR required States to carry out Federal immigration enforcement. Though the rule references certain immigration statuses, it does so only insofar as they relate to helping the agency ensure that the driver history vetting of foreign-domiciled drivers is comparable, and therefore more uniform to, the driver history vetting of U.S.-domiciled drivers. Nor does the rule improperly commandeer States. Congress established the requirements for State participation in 49 U.S.C. 31311. That section clearly provides that to avoid having amounts withheld from apportionment under 49 U.S.C. 31314, the State must adopt and carry out a program for testing and ensuring the fitness of individuals to operate commercial motor vehicles consistent with the minimum standards prescribed by the Secretary of Transportation under 49 U.S.C. 31305(a). As described above and in section IV.B.3.a, below, this rule is both an authorized and reasonable exercise of the agency's statutory authority to regulate non-domiciled CDL issuance in the interest of highway safety.

### 3. Background of IFR

#### a. Annual Program Reviews (APRs) of SDLAs

Unitarian Universalists for Social Justice stated that the lack of transparency in the APRs used to justify the rule undermines public trust, and without transparency, stakeholders cannot determine whether the identified issues correlate with real safety risk. Unitarian Universalists for Social Justice added that without convincing data, the IFR's subtextual purpose appears to be to target immigrants by unjustly limiting their employment opportunities.

An individual said that the 2025 APRs point to systemic deficiencies at the SDLA level, including inadequate SDLA training, inconsistent application

of SAVE checks, and weak internal audits, and not problems related to the visa category of the applicant. Citing a recent report, the individual stated that weaknesses have been found in FMCSA's guidance regarding complaint handling and oversight, leading to inconsistent enforcement. Likewise, another individual stated that the issues raised by the 2025 APRs, namely the finding that some States issued non-domiciled CDLs without proper verification or timely cancellation, originate from administrative oversight, and not the drivers.

#### FMCSA Response

CMVSA,[23] as amended, established performance standards with which State[24] CDL programs must comply to avoid having amounts withheld from Highway Trust Fund apportionment under 49 U.S.C. 31314 and to avoid CDL program decertification under 49 U.S.C. 31312.[25] In this regard, States are required to be in substantial compliance with the requirements of 49 U.S.C. 31311(a) and its implementing regulations in 49 CFR part 383 and part 384, subpart B. Under 49 CFR 384.301(a), to be in substantial compliance with 49 U.S.C. 31311(a), a State must meet each and every standard of part 384, subpart B by means of "the demonstrable combined effect of its statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resource assignments (facilities, equipment, and personnel), and enforcement practices."

As part of its oversight, FMCSA conducts comprehensive APRs of State CDL programs, in accordance with 49 CFR 384.307, to verify that States are in substantial compliance. During an APR, FMCSA evaluates all aspects of the State's CDL program, including knowledge and skills testing procedures, CDL issuance processes, procedures to report convictions and withdrawals, compliance with FMCSA's physical qualification and Drug and Alcohol Clearinghouse programs, issuance of non-domiciled CDLs, and other areas.

At the conclusion of the APR, if FMCSA makes a preliminary determination that a State does not meet one or more of the minimum standards for substantial compliance under Part 384, Subpart B, FMCSA notifies the

---

[22] See, *e.g.,* 49 CFR 383.73(f)(5), requiring States to initiate established State procedures for downgrading the non-domiciled CLP or CDL upon receiving information from FMCSA, the Department of Homeland Security, the U.S. Department of State, or other Federal agency with jurisdiction that the applicant no longer has lawful immigration status in the United States in a specified category.

[23] 49 U.S.C. 31301 *et seq.*

[24] Under 49 U.S.C. 31301 and 49 CFR 383.5, the definition of "State" includes the District of Columbia. Accordingly, the term "State" throughout this letter includes the District of Columbia.

[25] 49 U.S.C. 31311(a).

State accordingly.[26] A State has 30 calendar days to respond to the preliminary determination explaining the State's corrective action or, alternatively, why FMCSA's preliminary determination is incorrect.[27] If FMCSA makes a final determination of substantial noncompliance, FMCSA may initiate the withholding of certain Federal-aid highway funds and may decertify the State's CDL program.[28]

As part of the 2025 comprehensive APRs, FMCSA conducted an in-depth review of State procedures and policies in issuing non-domiciled CLPs and CDLs. FMCSA's enhanced focus on State non-domiciled CDL issuance practices during the 2025 APR was consistent with E.O. 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers."[29] The E.O. directed FMCSA to "review non-domiciled . . . CDLs issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities" and "to take appropriate actions to improve the effectiveness of current protocols. . . ."[30] Accordingly, FMCSA conducted a thorough audit of each SDLA's procedures and policies in issuing non-domiciled CLPs and CDLs as part of the 2025 APR.

The 2025 APRs uncovered systemic procedural and computer programming errors, significant problems with staff training and quality assurance, and policies that lack sufficient management controls in the issuance of non-domiciled CLPs and CDLs by multiple SDLAs. As a result, SDLAs were discovered to have issued non-domiciled CDLs to drivers who do not qualify,[31] issued non-domiciled CDLs that extend beyond a driver's expiration of lawful presence known at the time of issuance, issued non-domiciled CDLs without first validating the drivers' eligibility under § 383.71(f)(2)(i), and engaged in other noncompliant practices. At the time the Agency published the IFR, FMCSA noted several other States apart from California issued non-domiciled CDLs in violation of the regulatory requirements. Those States were, Colorado, Pennsylvania, South Dakota,

Texas and Washington. In total, FMCSA has identified more than 30 States that have failed to comply with the non-domiciled CDL regulations.

Where FMCSA discovered deficiencies in an SDLA's non-domiciled CLP or CDL issuance process, FMCSA required the SDLA to complete several corrective actions as part of the APR process, in accordance with 49 CFR 384.307. The agency's stated corrective actions included, but were not limited to: immediately pausing the issuance of all new, renewed, transferred, or upgraded non-domiciled CLPs and CDLs until FMCSA provided written confirmation that an SDLA's corrective action plan was accepted and implemented; requiring the SDLA to, as soon as practicable, identify all unexpired non-domiciled CLPs and CDLs that were not issued in compliance with parts 383 and 384 and conduct an internal audit to identify all procedural and programming errors, training and quality assurance problems, insufficient policies and practices, and other issues that resulted in the issuance of any non-domiciled CLPs and CDLs that did not meet the standards of parts 383 and 384 (the scope of the audit was not limited to the issues identified in a State's APR); take immediate action to correct the deficiencies identified in SDLA's internal audit; as part of the State's audit, review all supporting documentation for all new, renewed, transferred, or upgraded non-domiciled CLP and CDL transactions to ensure compliance with parts 383 and 384 and provide FMCSA a copy of the audit findings and the number of unexpired noncompliant non-domiciled CLPs and CDLs; take immediate action to correct the deficiencies identified in the SDLA's internal audit; take immediate action to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs and reissue the licenses in accordance with parts 383 and 384, in effect at the time of reissuance; resume issuing non-domiciled CLPs and CDLs only after the State has voided or rescinded all unexpired noncompliant non-domiciled CLPs and CDLs and reissued the licenses in accordance with parts 383 and 384, in effect at the time of reissuance, and the State ensures that all statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resources assignments (facilities, equipment, and personnel), and enforcement practices meet each and every standard of subpart B of part 384 and 49 U.S.C. 31311, and FMCSA provides written confirmation that the

SDLA's corrective action plan has been accepted and implemented.

The agency required the corrective actions during the APR process as part of its oversight authority over States' CDL programs in 49 U.S.C. 313 and separate from the issuance of the non-domiciled CDL IFR. These corrective actions were designed to rectify the findings of widespread noncompliance, but further action is necessary to deter continued noncompliance, whether willful or unintentional. Insofar as commenters have complained that the pause in non-domiciled credential issuance was nontransparent or subtextual, FMCSA asserts that the agency was and is well within its statutory and regulatory authority to issue corrective actions to ensure States' compliance with each and every standard of 49 CFR part 384, subpart B and the integrity of the National CDL program. States are cognizant of their requirement to maintain compliance with 49 U.S.C. 31311, as well as FMCSA's obligation to review States' compliance with the National CDL program through the agency's APR process. That process is clearly outlined in subpart B of part 384, therefore any assertion that the APR process is nontransparent is ill-informed and should be rejected. In addition, as the letters of preliminary determination of substantial noncompliance state,[32] FMCSA conducts program reviews yearly, thus, the APR process is no surprise to the States. Further, FMCSA conducts its APRs in close cooperation with the States, as the documentation necessary to substantiate the non-domiciled credentialing issuance process, which FMCSA reviews during the APR, is solely within the possession of the States. Annual program reviews often involve onsite visits to SDLA offices to review documentation and policies, and to observe facilities, internal control mechanisms, and procedures. None of these activities can occur without prior coordination with the States.

Insofar as any allegations of subtext exist, FMCSA likewise rejects those arguments. In addition to the fact that APRs are routine and conducted annually, the agency noted earlier in this section that our enhanced focus on State non-domiciled CDL issuance practices during the 2025 APR was consistent with E.O. 14286, "Enforcing Commonsense Rules of the Road for

---

[26] 49 CFR 384.307(b). A preliminary determination of noncompliance is also known as a "finding."

[27] *Id.* at section 384.307(c).

[28] 49 U.S.C. 31314(c), 31312; *see also infra* at section VI; 49 CFR 384.307(d), 49 CFR part 384, subpart D.

[29] 90 FR 18759 (Apr. 28, 2025).

[30] *Id.* at 18759–60.

[31] For example, FMCSA is aware that numerous States have issued non-domiciled CDLs to drivers who are domiciled in Mexico, despite the fact that Mexican and Canadian drivers are not eligible for non-domiciled CDLs under 49 CFR 383.71(f).

[32] The letters of preliminary determination of substantial noncompliance from the 2025 APRs, as well as the letters of conditional determination of substantial noncompliance and final determination of substantial noncompliance for California, are in the docket for this rulemaking.

America's Truck Drivers,"[33] which directed FMCSA to "review non-domiciled . . . CDLs issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities" and "to take appropriate actions to improve the effectiveness of current protocols. . . ."[34] The APR process is a routine and vital component of FMCSA's oversight of the National CDL Program, any suggestion of subtext in its administration should be dismissed.

b. Lack of Statistical Evidence

AFSCME, the American Federation of Teachers (AFT), the Asian Law Caucus, the Asylum Seeker Advocacy Project, Inspiritus, Justice at Work PA, King County Metro, the joint AG comment, The Sikh Coalition, Teamsters California, and numerous individuals expressed concern about the lack of statistical evidence supporting the rule's safety justification and stated that FMCSA had not provided nationwide crash data showing that non-domiciled CDL holders were disproportionately responsible for crashes compared to U.S. citizen drivers. United LLC and many individuals stated that there was no correlation between a driver's immigration status and their ability to drive safely. AFT, the Asian Law Caucus, the Public Rights Project on behalf of Local Governments, and several individuals stated that FMCSA itself stated in the rule text that there was "not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States." Two individuals stated that, without such evidence, the rule appeared arbitrary under the APA. An individual cited court decisions that condemn such "evidentiary gaps."

OPM Logistics, the joint AG comment, Unitarian Universalists for Social Justice, and numerous individual commenters stated that the rule is based on a small number of incidents that were not representative of the broader population of non-domiciled CDL holders. They said that FMCSA cited only five fatal crashes involving non-domiciled CDL holders in 2025, which they considered insufficient justification for such sweeping policy changes. The National Education Association and many individuals stated that the vast majority of fatal truck crashes in the United States were caused by U.S.

citizen drivers, not non-domiciled CDL holders. The Sikh Coalition and an individual stated that, based on FMCSA's own Federal statistics and crash reports, non-domiciled CDL holders accounted for fewer than 2 two percent of all large-truck crashes nationwide, while over 98 percent of such crashes involved U.S.-domiciled CDL drivers. Unitarian Universalists for Social Justice stated that the five fatal crashes represent 0.13 percent of the 2025 fatal truck crashes, yet non-domiciled drivers comprise 3.5 to four percent of all CDL holders, which suggests these drivers are not inherently more dangerous. An individual stated that the five incidents represented only 0.002 percent of fatalities involving CDL drivers. Three individuals provided specific statistics to illustrate their point, stating that in 2023, there were 164,347 crashes involving large trucks and buses, making the five incidents involving non-domiciled drivers account for less than 0.003 percent of these crashes. Another individual stated that in 2025, there had been 2,200 deaths in truck-related accidents, and the 12 people who died as a result of actions by non-domiciled CDL holders represented 0.55 percent of fatalities in truck accidents and 0.033 percent of the total number of fatalities on U.S. roads. Two individuals stated that Federal data shows that about 70 percent of fatal truck-passenger vehicles collisions are caused by the passenger vehicle. King County Metro stated that collisions involving large trucks are significantly decreasing year over year.

An individual said that CDL holders, regardless of domicile status, have lower crash rates than non-commercial drivers. Several other commenters stated that non-domiciled CDL holders do not have higher crash rates than domiciled CDL holders. Many individuals stated that accidents can happen to anyone, unrelated to immigration status. Teamsters California remarked that non-domiciled CDL holders are highly qualified and rigorously screened, and the loss of these drivers will make communities fundamentally less safe. An individual urged FMCSA to research which demographics are responsible for the majority of truck-related accidents before finalizing such an impactful rule. An individual questioned whether there has been an increase in accidents. Another individual said the data shows there is a trend of safer driving, even with more miles driven, which begs the question of what is the "true narrative" behind the regulation, since the data is not supportive of the safety aspect.

Another individual said data is also needed on how many commercial accidents are caused by the CDL holder versus by non-commercial vehicles.

Other commenters offered support for FMCSA's rationale. OOIDA discussed that the five recent fatal crashes are likely a small sample of crashes involving non-domiciled drivers. Similarly, an individual stated that the five crashes cited by FMCSA, while seemingly small in number, were significant enough to warrant action. This commenter stated that these documented crashes represented only the fatal crashes FMCSA had identified to date and did not include non-fatal crashes involving non-domiciled CDL holders. The individual also stated that the systemic compliance failures documented through APRs demonstrated that the problem extended far beyond these five crashes, with approximately 25 percent of non-domiciled CDLs in California improperly issued and similar problems confirmed in at least five other States.

An individual stated that statistics were "notoriously understated to look pretty" and that the full extent of conflicts and violations was far greater than published. An individual also stated that data from recent years indicated that non-domiciled CDL holders had been disproportionately represented in serious traffic incidents, often due to language barriers and limited familiarity with U.S. road standards. Another individual discussed "all the available data" showing recent audits of non-domiciled drivers being taken off the road due to fake/illegal CDLs, CDLs that had expired, or CDLs with no names, as well as the "uptick in fatal crashes" involving undocumented illegal immigrants and expired non-domiciled CDL holders who could not pass a simple English proficiency test. The individual also stated that it is not possible to know the skill level of a non-domiciled driver, noting that even legal citizens are receiving CDLs with no verification of their skill level. Commending the agency for addressing many safety issues, the American Trucking Associations (ATA) also described the illegal practice of "cabotage" and stated that there has been an increase in recent years in the incidence of U.S. motor carriers illegally hiring B–1 visa drivers.

FMCSA Response

In response to commenters who cited a lack of statistical evidence in the IFR, FMCSA discussed five recent, fatal crashes involving drivers with non-domiciled CDLs as examples of the tangible impact of States failing to

---

[33] 90 FR 18759 (Apr. 28, 2025).
[34] *Id.* at 18759–60.

follow the proper procedures when issuing non-domiciled CDLs, as well as the need for stronger regulations to ensure that non-domiciled drivers present in the United States without lawful immigration status are not able to obtain CLPs and CDLs. This sample of crashes was not intended to be exhaustive or to provide the basis for a statistical analysis; rather, it was merely a discussion of crashes that had come to the agency's attention and, when combined with the widespread systemic collapse of non-domiciled issuance by SDLAs, warranted immediate action. Moreover, by focusing on statistical significance, commenters overlook the core safety issue. The necessity of this Rule stems not from a specific crash count, but from a critical safety vulnerability: the inability of SDLAs to verify foreign driving histories. This failure compromises the agency's ability to ensure the safety fitness for drivers who operate CMVs. Consequently, the statistics cited in the comments, such as the calculations that the five fatal crashes represent 0.13 percent of the 2025 fatal truck crashes or that the 12 fatalities from those crashes represented 0.55 percent of fatalities in truck accidents and 0.033 percent of the total number of fatalities on U.S. roads, are not useful metrics to evaluate the complete safety impact of this action.

Since the IFR was issued, additional fatal crashes have come to the attention of FMCSA involving holders of non-domiciled CDLs (or drivers who were improperly issued standard CDLs instead of non-domiciled CDLs), who were eligible to receive a non-domiciled CDL at the time the license was issued but would have had a substantial likelihood of being prevented from being licensed under the revised regulations.[35] However, FMCSA emphasizes that even this expanded list remains incomplete because the necessary level of detail regarding the type of CDL a driver involved in a crash held is simply not available under current crash reporting requirements. FMCSA is therefore unable to create a comprehensive list of all crashes that are within the scope described above.

A primary issue with the data is that neither the Motor Carrier Management Information System (MCMIS), nor the Fatality Analysis Reporting System (FARS), nor the Commercial Driver's License Information System (CDLIS) allow FMCSA to ascertain whether the driver's CDL was, or should have been, designated as non-domiciled. The primary purpose of MCMIS is to capture and organize data for motor carriers. Crash and inspection reports in MCMIS only include driver's license number and no additional information related to the status of the driver. Similarly, FARS captures the driver's license number, endorsements, and status (e.g., valid, suspended, revoked, expired, or canceled). CDLIS, while a more comprehensive data set of driver information, does not contain a data field for entry of this status. Instead, FMCSA had to review reports of fatal crashes that occurred in 2025 individually, cross-reference driver information from these databases along with other available information, and reach out to the SDLAs for details about each driver to determine whether each crash was in scope.

Each crash listed in this final rule and the IFR has been manually verified through the SDLA and corresponding police crash reports. Notably, FMCSA has included only those fatal crashes where it could be reasonably determined that the non-domiciled driver—operating a CMV requiring a CDL—was at fault due to the driver's action or inaction. This distinction is critical because studies indicate between 26 and 38 percent of fatal crashes involving CMVs have a driver-related factor attributed to the CMV driver.[36] Therefore, it would be erroneous to compare the fatality figures in this section with total CMV fatalities, crashes involving a CMV that do not require a CDL, or fatal CMV crashes not caused by the actions of the CMV driver. Finally, given the extraordinary limitations in obtaining exhaustive crash data for non-domiciled CDL holders, this section serves as an illustrative sample of the risks this regulatory action aims to mitigate and the crashes that would be prevented by FMCSA fulfilling its statutory obligation to ensure the fitness of all drivers who operate a CMV.

Based on this analysis, FMCSA has identified for illustrative purposes at least twelve more fatal crashes fitting this description in calendar year 2025, in addition to the five crashes already discussed in the IFR. At least 30 people were killed in the 17 crashes discussed in the IFR and here, including two of the non-domiciled drivers, and more

than 40 other people suffered non-fatal injuries as part of these 17 crashes. FMCSA consulted with USCIS and confirmed that there is a substantial likelihood none of the drivers involved in these crashes would be eligible to hold a non-domiciled CDL under the regulations adopted in this rule. Moreover, the available data highlights a significant lack of driving experience within this sample; the majority of these drivers obtained their initial CDL within the preceding two years. Despite this brief period of licensure, several of the drivers have already been convicted of traffic violations, underscoring the safety risks associated with the Agency's inability to verify foreign driving histories.

On February 3, 2025, a Cascadia Freightliner being driven by a non-domiciled CDL holder was struck by a passenger car on I–44 in Oklahoma City. Although the driver of the passenger car, who died in the crash, was found to be under the influence of alcohol, investigators also found that the CDL holder contributed to the crash by illegally parking and in a manner that blocked the lane of travel. The Freightliner driver was first issued a non-domiciled CDL in May 2024. He has convictions for improper/erratic (unsafe) lane changes and for failure to obey a traffic sign.

On February 14, 2025, a tractor-trailer driven by a driver who held a non-domiciled CDL from Colorado was involved in a multi-vehicle fatal crash in the tunnel on Interstate 80 in Green River, Wyoming. Several vehicles, including CMVs, were involved in a prior crash and traffic behind these disabled vehicles had stopped. Shortly thereafter, the tractor-trailer driven by the non-domiciled CDL driver swerved out of its lane without significantly slowing down and impacted the rear of a Dodge Ram traveling in the next lane. Additional vehicles were then impacted by those vehicles and became involved in the crash; a separate but related crash later occurred among the vehicles stopped behind the initial crash. The incident involved smoke that billowed out of both ends of the tunnel, which required temporary closure for inspection and repair.[37] In total, the incident led to three fatalities and 20 injuries.[38] The driver was first issued a

---

[35] FMCSA coordinated with federal partners in the Department of Homeland Security's U.S. Citizenship and Immigration Services and using available information, to confirm that it is likely the status of each of the drivers listed in the descriptions of the crashes in this final rule would have rendered them ineligible for a non-domiciled CLP or CDL under this final rule's requirements.

[36] See, e.g., https://rosap.ntl.bts.gov/view/dot/20428; https://rosap.ntl.bts.gov/view/dot/14276; https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2025-10/LTBCF%202022-%20508.pdf [Table 29].

[37] https://county10.com/officials-investigators-share-details-about-i-80-tunnel-crash-near-green-river-at-feb-15-press-conference-with-governor-gordon/ (accessed Dec. 16, 2025).

[38] https://www.ntsb.gov/investigations/Pages/HWY25MH004.aspx (accessed Dec. 12, 2025); https://cowboystatedaily.com/2025/02/14/huge-

Continued

non-domiciled CDL by Colorado in April 2024, and it expired in July 2025.

Another incident occurred on February 19, 2025, on Highway 374 near Green River, Wyoming, not far from the incident described above. The driver of a tractor-trailer combination unit failed to negotiate a curve in the road and collided with a passenger vehicle, killing two people and injuring another.[39] Reports indicated the driver was watching videos at the time of the crash, and he was charged with Aggravated Vehicular Homicide. He received his non-domiciled CLP in New York State in August 2024 and his non-domiciled CDL the following month, September 2024.

On March 15, 2025, a truck driven by a non-domiciled CDL holder slid on black ice in Carbon County, Wyoming and crashed into another truck, injuring the second truck's driver and killing a passenger who was resting in its sleeper berth.[40] News media reported that the non-domiciled driver told law enforcement officers he closed his eyes and did not brake as his truck spun out of control. He pleaded no contest to vehicular homicide and was sentenced to 90 days in jail, one year probation, fined, and ordered to pay court costs and fees.[41] He received a non-domiciled CLP in Washington State in January 2024 and a non-domiciled CDL in March 2024, which expired in October 2025 and was not renewed.

On July 1, 2025, the non-domiciled driver of a CMV pulling a trailer failed to stop at a stop sign in Ector County, Texas and struck the side of a passenger vehicle traveling through the intersection.[42] The driver of the passenger vehicle was pronounced dead at the scene. The CMV driver had been granted a Class A non-domiciled permit in August 2024 and a Class A non-domiciled CDL in September 2024. At the time of the crash, he had one prior conviction for failure to use a seat belt properly, as required.

A fatal head-on collision between a semi-truck and a passenger vehicle occurred on October 15, 2025 in Porter County, Indiana. The truck driver swerved left of the center line to avoid a rear-end collision with a van who had been stopped waiting to make a left-hand turn and struck a passenger car in the opposite lane head-on, killing the car's driver.[43] The semi-truck's trailer then struck the van. The truck driver previously held a standard Class A CDL issued in 2010, even though he was only eligible for a non-domiciled CDL under the rules in effect at the time. This indicates a failure of the SDLA to process the CDL application properly under the existing regulations. This driver downgraded his CDL in May 2019 and held only a standard Class D driver's license at the time of the crash, even though a CDL was required for the type of vehicle he was driving. Even so, FMCSA finds it plausible that, had he never been issued a CDL, he would not have been operating this vehicle at the time of the crash. He had previous traffic convictions for improper or erratic lane changes, failure to use a seat belt properly, driving with a disqualified license, failure to obey restricted lane, operating without equipment required by law, and failure to comply (citations, fines, or penalties).

On October 21, 2025, a driver who held a California non-domiciled CDL issued in June 2025 was involved in a fatal crash on I–10 in Ontario, California. Media reports state that the driver failed to stop, rear-ending several vehicles and colliding with others.[44] In total, the incident involved eight vehicles, including four tractor-trailers. There were three fatalities and multiple other injuries. This driver was initially issued a Class A CDL with a "K" restriction, which means the driver was only allowed to drive intrastate, in June 2025. However, six days before the crash, the SDLA removed the "K" restriction when the driver turned 21, which upgraded[45] his driving

privileges. Had the SDLA complied with the IFR (which was still in effect at the time of the upgrade and crash) or the enforcement action which required California to pause issuance of non-domiciled CDLs, it would have prevented the upgrade of his driving privileges. The driver would have been required to return to the DMV (on or after turning 21) to have the "K" restriction removed and upgrade his CDL. Upon returning for the upgrade, he would have been found ineligible to retain the non-domiciled CDL because he was not in one of the specified employment-based nonimmigrant categories, and consequently would not have been permitted to operate the CMV involved in this crash.

A single-vehicle fatality involving a non-domiciled driver occurred on November 3, 2025, when a semi-truck went off Highway 160, near Pagosa Springs, Colorado.[46] The truck driver failed to navigate a left-hand curve, crossed the road, and struck a Jersey barrier on the roadside before overturning, sliding back across the roadway, and plunging approximately 160 to 200 feet down a steep embankment. He was not wearing a seat belt and was ejected from the vehicle. Media reports indicated the truck's brakes were visibly smoking before the crash, and excessive speed was identified as a contributing factor.[47] There were runaway truck ramps located both before and after the crash site. No other vehicles or individuals were involved or injured in the incident. The driver held a non-domiciled CDL issued by New York State in September 2024, following the initial issuance of a non-domiciled CLP in August 2024.

Another semi-truck driven by a non-domiciled CDL holder jackknifed on US 20 near Brothers, Oregon on November 24, 2025. The truck blocked both lanes of travel, but there were no warning signals or devices in place when it was struck at highway speed by a passenger

*explosions-multiple-fatalities-from-fiery-crash-in-green-river-tunnel/* (accessed Dec. 12, 2025).

[39] *https://www.dot.state.wy.us/news/fatal-crash-occurs-outside-green-river-not-part-of-i-80-detour* (accessed Jan. 27, 2026).

[40] *https://cowboystatedaily.com/2025/03/18/brief-trucker-suspected-of-causing-i-80-crash-that-killed-another-trucker/* (accessed Dec. 18, 2025).

[41] *https://cowboystatedaily.com/2025/07/08/ukrainian-trucker-who-killed-another-trucker-in-crash-gets-90-days/* (accessed Dec. 18, 2025); *https://cdllife.com/2025/driver-who-admitted-he-closed-his-eyes-and-did-nothingduring-fatal-black-ice-crash-given-90-day-sentence/* (accessed Dec. 18, 2025).

[42] *https://www.msn.com/en-us/news/us/dps-odessa-man-killed-in-crash-on-302-after-driver-of-semi-fails-to-yield/ar-AA1HQZgW* (accessed Jan. 8, 2026).

[43] *https://www.dhs.gov/news/2025/10/21/criminal-illegal-alien-kills-indiana-man-after-driving-semi-truck-oncoming-traffic* (accessed Dec. 16, 2025).

[44] *https://abc7.com/post/pomona-high-school-coach-wife-among-3-killed-chain-reaction-crash-10-freeway-ontario-suspect-jashanpreet-singh-expected-court/18062397/* (accessed Dec. 15, 2025); *https://abc7.com/post/dui-charge-dropped-jashanpreet-singh-semitruck-driver-deadly-10-freeway-crash-ontario/18114192/* (accessed Dec. 15, 2025); *https://apnews.com/article/crash-jashanpreet-singh-california-ad268515fbe4ff67d9376c141e8995c5* (accessed Dec. 15, 2025).

[45] FMCSA notes that removal of any restriction, including a "K" restriction (which denotes Intrastate Only), constitutes an upgrade of the credential. Merriam-Webster online defines the term *upgrade* in part as an "improvement." See

*https://www.merriam-webster.com/dictionary/upgrade.* As an intransitive verb it means "to replace something (such as software or an electronic device) with a more useful version or alternative." See id. Removing a "K" restriction from a CDL is therefore an *upgrade* of the credential within the plain meaning of the term because removing the restriction from the CDL makes it a more useful version that can be used interstate.

[46] *https://www.cbsnews.com/colorado/news/deadly-semi-truck-crash-colorado-mountain/*, accessed Dec. 15, 2025; *https://www.denvergazette.com/outtherecolorado/2025/11/03/semi-plunges-off-notorious-colorado-pass-killing-23-year-old-driver/*, accessed Dec. 15, 2025.

[47] *https://cdllife.com/2025/runaway-semi-truck-bypassed-ramp-on-wolf-creek-pass-before-fatal-plummet-down-embankment-colorado-troopers-say/*, accessed Dec. 15, 2025.

vehicle.[48] The passenger vehicle's driver and passenger were killed, while the truck driver was uninjured. He was arrested and charged with Criminally Negligent Homicide and Reckless Endangering. This driver completed Entry Level Driver Training in July 2024 and received a California non-domiciled CDL in August 2024.

A tractor-trailer driven by a non-domiciled CDL holder collided with a locomotive at a railroad crossing in Ontario, California on December 3, 2025.[49] FMCSA's investigation showed that, despite the crossing's active warning signals (bells and lights), the CMV entered the crossing and the train struck the rear portion of its trailer. One train crew member survived but another was fatally injured. The non-domiciled CDL was issued in February 2025 by the State of California.

On December 9, 2025, a motorcoach collided with two CMVs and a passenger vehicle on Interstate 40 Westbound, in Baxter, Putnam County, Tennessee.[50] The motorcoach driver was allegedly distracted by a video playing on a cell phone at the time of the crash and failed to communicate effectively in English, failing the ELP requirement.[51] The crash resulted in one fatality and multiple additional injuries. The motorcoach driver received a Class A non-domiciled CDL permit in March 2024 and was issued a non-domiciled Class B CDL by New York State in April 2025.

A crash occurred on December 11, 2025 in Auburn, Washington, in which a Freightliner Cascadia semi-truck driven by a non-domiciled CDL holder struck a stopped passenger car from behind, crushing it against the vehicle ahead of it. The driver of the passenger vehicle was pronounced dead at the scene. According to initial court documents, troopers determined the

Cascadia driver did not make any attempt to brake or evade the stopped vehicles before crashing into the car.[52] There are also allegations that the Cascadia's electronic logbook was tampered with or falsified. The Cascadia driver received Entry Level Driver Training in November 2024 and was issued a California non-domiciled CDL in December 2024. He had a conviction for speeding in the State of Oregon in May 2025.

Ultimately, the necessity for this rule rests not on a specific crash count but on FMCSA's fundamental statutory mandate to ensure the safety fitness of all operators of CMVs. Although system limitations preclude the aggregation of comprehensive data, the fatal crashes identified in this section serve to illustrate the tangible risks mitigated by this rule. By limiting licensure to only those individuals whose driver history can be vetted, FMCSA is not only responding to a clear safety flaw but is affirmatively fulfilling its statutory requirement to ensure the safety fitness of every driver licensed to operate a CMV.

## c. Real Causes of Truck Crashes

Many individuals stated that the rule ignores the well-documented causes of truck crashes, such as fatigue, training lapse, insufficient oversight, distracted driving, impaired driving, speeding, and mechanical failures—not immigration status. An individual identified other specific factors that contributed to commercial vehicle crashes, including company pressure, inadequate supervision, and insufficient training. The individual stated that companies often prioritize productivity over safety, leading to fatigue, pressure, and increased risk of driver error, and that immigrant drivers were especially vulnerable to this dynamic because they might fear questioning a dispatcher or refusing a load. The individual stated that many Class A Entry-Level Driver Training programs focused on minimum proficiency and allowed trainees to complete programs in a matter of days, without real-world experience in high-risk environments such as mountain driving or night operations. An individual stated that the Florida Turnpike crash, which was cited in the rule, was likely a case of a driver being lazy and not wanting to travel to the next exit, rather than an issue related to language or nationality. Another individual stated that the Florida incident was ''just an accident'' that

could happen to anyone, noting that many accidents happen daily, including those involving white drivers.

## FMCSA Response

FMCSA finds these comments to be out of scope for this rulemaking. The critical issue is that statutory authority requires the agency to implement a regulatory framework that ensures CDL driver safety and fitness. FMCSA has determined that it is not logistically possible for SDLAs to perform a thorough driver history investigation for foreign-domiciled individuals. Therefore, the underlying causes of any particular crash, or even large truck crashes in general, are not relevant to FMCSA's revisions to the non-domiciled CDL issuance process. Moreover, while the agency acknowledges that many factors contribute to crashes, the specific regulatory failure addressed by this rule is the licensure of individuals who may have a history of unsafe driving that would otherwise disqualify them. If a driver causes a crash due to unsafe behaviors that were present in their unverified foreign record, that crash was preventable through proper vetting. Licensing a driver without the ability to investigate their history—as is required for domestic drivers—removes a critical layer of defense in accident prevention.

However, FMCSA does note that the agency's primary mission is roadway safety and the reduction of crashes, injuries, and fatalities involving large trucks and buses. The agency does not accept that crashes are a daily fact of life; instead, the agency strives to eliminate as many crashes as possible by strengthening its safety regulations and requiring compliance with those regulations. To that end, FMCSA has considered underlying causes of truck crashes as part of various other agency actions. For instance, the agency is currently taking action regarding CDL driver training schools that cut corners and do not provide high quality, consistent, and sufficient driver education. FMCSA has also strengthened its enforcement of English language proficiency requirements,[53] which many commenters on the IFR identified as a barrier to highway safety because a lack of familiarity with U.S. roadways and traffic laws and the inability to read and interpret signage easily leads to unsafe driving practices.

---

[48] https://www.centraloregondaily.com/news/local/dhs-semi-driver-involved-in-fatal-highway-20-crash-in-us-illegally-arrest-detainer-requested/article_183caa8a-3453-430a-bedc-9201e291c37a.html (accessed Dec. 15, 2025); https://www.dhs.gov/news/2025/12/01/ice-lodges-detainer-criminal-illegal-alien-semi-truck-driver-charged-negligent (accessed Dec. 15, 2025); https://ktvz.com/news/accidents-crashes/2025/11/26/osp-arrests-california-truck-driver-after-suv-struck-his-jackknifed-semi-on-highway-20-killing-two-people/ (accessed Dec. 15, 2025).

[49] https://www.trains.com/pro/freight/class-i/ntsb-probing-death-of-union-pacific-conductor-in-grade-crossing-incident/ (accessed Jan. 27, 2026).

[50] https://www.msn.com/en-us/autos/other/charges-pending-against-tour-bus-driver-after-deadly-crash-shuts-down-interstate-in-tn-thp-reports/ar-AA1S2nDD?ocid=BingNewsSerp (accessed Dec. 15, 2025).

[51] https://nypost.com/2025/12/11/us-news/feds-probe-if-tour-bus-driver-in-fatal-crash-was-illegally-issued-nys-drivers-license-its-outrageous/ (accessed Dec. 15, 2025).

[52] https://auburnexaminer.com/judge-sets-100000-bail-in-deadly-sr-167-crash-as-prosecutors-cite-probable-cause/ (accessed Jan. 5, 2026).

[53] See e.g., FMCSA's May 20, 2025 English Language Proficiency Policy (MC–SEE–2025–0001), available at https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2025-05/FMCSA%20ELP%20Guidance%20with%20Attachments%20Final%20%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%29_Redacted.pdf.

d. Individual Assessment vs. Collective Punishment

Many individuals stated that drivers should be evaluated based on their individual record and compliance history, rather than being subject to collective punishment based on the actions of a few or immigration status. Several individuals, stated that immigrant drivers who passed the same training, testing, and safety requirements as U.S. citizens should not be treated differently. An individual said it is wrong to punish those with officially issued permits and documents from the United States. Another individual said that CDL eligibility should be based on safety and competency criteria instead of factors unrelated to a person's ability to operate a commercial vehicle.

Multiple individuals objected to what they perceived as collective punishment of an entire group based on the actions of a few individuals, and stated that the vast majority of non-domiciled CDL holders were responsible, law-abiding drivers who should not be penalized. Unitarian Universalists for Social Justice said that the IFR is unjust and counterproductive. Multiple individuals wrote that drivers should not be penalized for administrative errors or oversight failures by SDLAs. Another individual stated that bureaucratic delays are not a driver's fault, and they should not be punished for inefficiencies in the immigration system.

FMCSA Response

Again, FMCSA highlights that this rule is not intended to be punitive, but rather to improve highway safety. There is a statutory duty to ensure a driver's fitness and investigate driver history before issuing a CDL because doing so uncovers prior unsafe behaviors that would prevent the driver from receiving a CDL. SDLAs are not able to perform a foreign driver history review for most non-domiciled drivers, thus these drivers may have a history of unsafe behavior that remains unknown due to the lack of vetting. This necessitates narrowing the pool of drivers who are eligible to receive non-domiciled drivers to those whose driver histories can be vetted as part of the consular vetting and interagency screening. Moreover, even if SDLAs were able to obtain foreign driver histories, States would face a substantial burden in evaluating those records, which would require knowledge of how traffic laws in the driver's country of domicile compare to domestic laws. Narrowing the pool of drivers eligible for non-domiciled CDLs

is the only reasonable way to ensure that SDLAs are only issuing non-domiciled CDLs to eligible applicants, because they will be able to rely on safety determinations already made by Federal agencies with the necessary experience.

FMCSA also reiterates that, based on the recent APRs and investigations into individual crashes, the SDLAs are unable to administer the existing regulations adequately. Therefore, narrowing the discretion given to the States regarding the issuance of non-domiciled CDLs is likely to lead to improved compliance and better safety outcomes.

e. Differentiation Between Class A and Class B Licenses

One individual suggested that the rule should differentiate between Class A and Class B licenses, noting that the recent FMCSA restriction arose from incidents involving Class A tractor-trailer drivers engaged in freight transport, while Class B licensing governed passenger vehicles such as school buses and coaches, which were subject to more stringent testing, supervision, and background-check requirements. An individual provided detailed analyses comparing the safety records of Class A (combination vehicles) and Class B (single-unit vehicles) operations, arguing that the rule failed to distinguish between these different risk profiles. The commenter stated that Class B operations, particularly school buses, had significantly better safety records than Class A operations. The individual cited data showing that school buses had a fatality rate of about 0.2 fatalities per 100 million vehicle-miles traveled, compared to about 1.5 fatalities per 100 million vehicle-miles traveled for cars and 1.3 to 1.7 fatal crashes per 100 million large-truck miles. The individual also stated that Class B vehicles were inherently safer because they lacked articulation points, operated at lower speeds within city limits, followed structured routes, and faced less severe weather exposure.

FMCSA Response

The statutory requirement to investigate driver history in order to ensure safety fitness prior to issuing a CDL does not differentiate between CDL classes. As previously stated, it is not possible to perform this investigation for most non-domiciled drivers. Moreover, for similar reasons to those cited above, FMCSA finds it would be impractical to maintain different standards for Class A and Class B CDL holders, as this would require SDLAs to administer two

different sets of rules. As stated above, many SDLAs have already demonstrated an inability to administer the existing regulations properly; creating a more complex regulatory system at this point in time is likely to diminish compliance even further. Therefore, FMCSA finds it appropriate to maintain one simplified, clearly defined set of rules for all non-domiciled individuals seeking CDLs, regardless of license class.

g. Comments on the Relationship Between Safety and Immigration Status

The Asian Law Caucus wrote that H–2A and H–2B visas are intended to be temporary and seasonal in nature while limited to certain geographical areas, but the IFR did not discuss how these limitations will be applicable to commercial driving. AFSCME stated that FMCSA's decision to allow workers in short-term, nonimmigrant guestworker visa programs, who have been in the United States for less time, to obtain CDLs, but not those who have been in the United States longer, like Deferred Action for Childhood Arrivals (DACA) recipients, undermines FMCSA's use of the lack of accessible driving records as a justification for the rule. AFSCME also said the statement that current State regulations do not allow for vetting of workers with driving records in foreign jurisdictions is "pretextual" because of the rule's exemption for workers in short-term, nonimmigrant guestworker visa programs, remarking that government employees are incentivized to hire safe drivers. In addition, AFSCME stated that FMCSA has not provided evidence that immigrants with lawful work authorization pose a larger threat to national security or safety, and cited studies indicating the opposite is true. AFSCME added that the IFR will not be effective in vetting CDL applicants and instead will exclude a category of people from obtaining CDLs without any evidence that they pose a threat to national security. Lastly AFSCME stated FMCSA failed to consider operations of State and local government services that could be impacted by the IFR. An individual said that there is a difference between legal and illegal migrants, with the latter posing a legitimate safety concern, while the former does not, which the individual stated the IFR did not recognize. The individual expressed support for preventing CDL issuance to illegal migrants, but not legal migrants.

FMCSA Response

FMCSA disagrees that its decision to allow workers in short-term, nonimmigrant guestworker visa programs to obtain CDLs, but not those

who have been in the United States longer undermines FMCSA's use of the lack of accessible driving records as a justification for the rule. As described above, workers in nonimmigrant employment-based statuses specifically for the purpose of driving vehicles requiring a CDL are subjected to increased scrutiny, both by employers and by relevant Federal agencies. This includes a review of prior driving history to ensure a clean driving record, experience driving commercial vehicles or the equivalent, and demonstration of English proficiency. Thus, in addition to all of FMCSA's safety regulations, foreign-domiciled individuals in an employment-based nonimmigrant status are subject to enhanced vetting at the near-equivalency as domestic-domiciled drivers. Other foreign-domiciled drivers do not receive this level of scrutiny with respect to their driving qualifications and are therefore more likely to impact highway safety negatively. This is true regardless of whether that person has legal status and work authorization.

The comment responses previously discussed the issue of DACA recipients holding non-domiciled CDLs. Most DACA recipients are citizens of Mexico and have therefore never been eligible for a non-domiciled CLP or CDL under FMCSA's regulations because Mexico is a jurisdiction for which the Administrator has issued an equivalency determination and entered into a reciprocity agreement. 49 CFR 383.23(b)(1). Only since 2023 have citizens of Mexico and Canada who are present in the United States under the DACA who satisfy specific requirements been allowed to hold non-domiciled CDLs, though that exception was only pursuant to the agency's enforcement discretion and guidance and has never been codified in regulation.[54] During this time, SDLAs have demonstrated a pattern of not being able to reliably distinguish between EAD codes and language that indicate a permissible basis for issuance of a non-domiciled CDL (C33—"Deferred Action for Childhood Arrivals") and those codes that indicate an impermissible basis (C14—"Deferred Action" or "Alien Granted Deferred Action"), leading to the improper issuance of non-domiciled CDLs to drivers domiciled in Canada or Mexico who were not DACA recipients. Ensuring that there is a "bright-line" standard and that all foreign-domiciled drivers are held to consistent

requirements is essential in promoting highway safety.

### h. Other Comments

Two individuals said that safety on the road should be the primary focus of CDL requirements, not immigration enforcement. The National Education Association stated that the IFR will negatively impact school bus service despite the lack of evidence of safety concerns for students with non-domiciled drivers, as all of the crashes cited by FMCSA involved large trucks, not buses. An individual said that there have been recent reports of individuals arrested for driving semi-trucks with no CDL at all, which the IFR would not solve. The individual also recommended auditing CDLs to ensure they were all issued properly. An individual said the IFR may reduce highway safety by potentially forcing drivers into "underground work." In addition, an individual stated studies show that hit-and-run accident rates were lower in States where immigrants have broader access to licensing. An individual suggested that all traffic violations for all vehicles should be strictly regulated instead of discriminating on the basis of identity or immigration status.

The Sikh Coalition submitted a comment that provided a history of non-domiciled CDLs and argued that there is a critical need for them in the United States. An individual stated that the rescinded 2019 guidance requiring proper legal documentation was effective and recognized that people authorized to work in the United States should be allowed to work, adding that FMCSA has not provided evidence that the policy caused safety problems, which the individual stated it did not. However, OOIDA stated that the 2019 guidance should have never been issued and went beyond Congressional intent of the CMVSA. OOIDA said the combination of non-domiciled CDL regulation, guidance, and lack of oversight for SDLAs resulted in improperly licensed foreign drivers flooding U.S. highways. Citing studies indicating increasing issuance of non-domiciled CDLs, OOIDA stated that this pattern is indicative of systemic, nationwide non-compliance by SDLAs in administering non-domiciled CDL procedures which necessitated DOT action. An individual remarked that data supporting the categorical exclusion of non-domiciled groups would help determine whether any groups could qualify under a more targeted regulatory approach.

### FMCSA Response

FMCSA reiterates that this rulemaking action concerns strengthening the integrity of the non-domicile CLP and CDL process. The Agency acknowledges that this rule will affect various sectors of the transportation industry, including passenger transportation such as school buses. However, the rule does not have retroactive effect, therefore school bus service providers will have time to plan for a potential reduction in available drivers as non-domiciled CDLs expire and are not renewed.

Regarding instances in which individuals who do not hold CDLs have been arrested for driving vehicle requiring a CDL, this is a problem FMCSA is unable to prevent entirely, whether the drivers are domiciled or not. Such individuals are potentially subject to State criminal penalties, in addition to any civil liability resulting from crashes or other damage while the unlicensed individual was driving. FMCSA is not a law enforcement agency; rather, it relies on State and local law enforcement to enforce these traffic laws and State courts to handle civil litigation. However, FMCSA may separately assess civil penalties against individuals who operate CMVs without a CDL, as set out in Appendix B to 49 CFR part 386, as well as against motor carriers who employ such individuals.

In response to the commenter who cited a reduction in hit-and-run incidents in jurisdictions where immigrants have broader access to licensing, FMCSA notes that this rule does not prohibit non-domiciled individuals from obtaining any license to operate motor vehicles. It merely prohibits certain of these individuals (*i.e.,* those who are not in a nonimmigrant category with an employment-based need for a CDL and who are not subject to enhanced vetting) from obtaining a specific type of license necessary to operate vehicles weighing over 26,000 pounds.

While some commenters stated that there is a critical need for non-domiciled CDLs and that the rescinded 2019 guidance requiring proper legal documentation was effective, FMCSA disagrees. That 2019 guidance, which this rule rescinds in section IX.B.2. below, explained in part that a foreign driver holding an EAD or an unexpired foreign passport accompanied by an approved Form I–94 may obtain a non-domiciled CDL. In authorizing non-domiciled CDLs, Congress did not intend for them to become a crutch for the industry; rather, they were to be the exception to the rule that CDL holders be domiciled in a State. FMCSA finds

---

[54] See *https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled.*

that the 2019 guidance was not effective, hence its rescission. FMCSA agrees with OOIDA that there has been a pattern indicative of systemic, nationwide non-compliance by SDLAs in administering non-domiciled CDL procedures, which was a major factor in the agency promulgating this rule. While one individual sought data supporting the categorical exclusion of non-domiciled groups, as FMCSA has explained, based on existing limitations it is a near impossibility to obtain the data, and FMCSA explains the rational for categorically excluding foreign-domiciled drivers without a verifiable driver history throughout this final rule.

### 4. Justification for the IFR

#### a. "Good Cause" Exception

Accion Opportunity Fund, AFL–CIO, Asian Law Caucus, Citizens Rulemaking Alliance, International Brotherhood of Electrical Workers, MALDEF, the joint AG comment, and numerous individuals stated that FMCSA improperly invoked the "good cause" exception under the APA to bypass the notice-and-comment requirements. They stated that the APA requires agencies to provide notice of proposed rulemaking (NPRM) and an opportunity for public comment before a rule becomes effective, unless the agency finds "good cause" that notice and public procedure are "impracticable, unnecessary, or contrary to the public interest." The Citizens Rulemaking Alliance and multiple individuals stated that courts have consistently held that the "good cause" exception should be "narrowly construed and only reluctantly countenanced," and is limited to emergency situations or when delay would cause "real harm."

Citizens Rulemaking Alliance, Maryland Department of Transportation Motor Vehicle Administration, the joint AG comment, and multiple individual commenters stated that FMCSA's justification for invoking the "good cause" exception was insufficient. They stated that FMCSA cited five fatal crashes involving non-domiciled CDL holders, systemic documentation issues identified through APRs, and a potential surge in applications during a comment period. The commenters stated that these justifications did not constitute an emergency or imminent hazard that would justify bypassing notice-and-comment procedures. Asian Law Caucus, Citizens Rulemaking Alliance, and Maine Secretary of State stated that FMCSA's claim that providing notice would lead to a "surge" in applications was speculative and unsupported by evidence. They, along with an

individual, stated that FMCSA could have used less drastic measures to address its concerns while still following the APA's notice-and-comment requirements. Suggestions included issuing an NPRM with a short comment period, implementing temporary enforcement priorities, or using existing compliance mechanisms to address state-level problems.

Conversely, SBTC and three individuals supported FMCSA's use of the "good cause" exception. They stated that the exception was properly invoked due to the imminent safety risks demonstrated by recent crashes and the need to prevent further harm. SBTC agreed that FMCSA has provided sufficient evidence to support its good cause exception and asserted that it is unreasonable to assume that the large truck fatality incidents provided by FMCSA are the only incidents involving non-domiciled CDL holders. SBTC further stated that it would be unreasonable to expect FMCSA to have pre-IFR data readily available from the States because they would have to both supply the data and admit to issuing CDLs unlawfully. SBTC provided additional accident/fatality information from its own review of NHTSA accident data in support of the IFR. An individual stated that the justification for the "good cause" exception is reasonable, but sufficient data has not been provided by FMCSA to support it.

#### FMCSA Response

FMCSA found good cause to issue the IFR without prior notice and comment and to make it effective immediately based on a determination that notice and public comment were both contrary to the public interest and impracticable. As discussed in Section VI.A of the IFR, it was necessary to implement immediately strict standards concerning the issuance and renewal of non-domiciled CLPs and CDLs to address a recently discovered, two-front crisis that constituted an imminent hazard to public safety and a direct threat to national security. The dangerous consequences of having overly broad eligibility requirements combined with a systemic breakdown in State implementation were illustrated by the five fatal crashes highlighted in the IFR. These crashes, which were not meant to be an exhaustive list, involved drivers who either held non-domiciled CDLs issued in accordance with existing regulations or who were mistakenly issued a standard CDL instead of a non-domiciled CDL. Most of the crashes described there would have been prevented had the IFR been in place. Furthermore, providing advance notice

through an NPRM was impracticable and contrary to the public interest because it would have actively subverted the rule's purpose by creating a foreseeable and concentrated surge in applications that would have exacerbated the current safety crisis. As explained in the IFR, this risk of a concentrated surge was not speculative; rather, it was borne out by data drawn from another recent change in CDL licensing standards, which showed a surge in applications for CDLs in the months immediately preceding the compliance date for those changes to levels that were approximately twice as high as the same time period in the previous year (90 FR 46514–46515).

By issuing an IFR that set forth the nature and substance of the rule with sufficient detail to put the public on notice, explained the legal authority and rationale for the regulation, and provided a 60-day comment period, FMCSA has satisfied the notice-and-comment procedures for this final rule.[55] The public availed itself of the opportunity to provide comments (with over 8,000 received) and FMCSA has carefully considered those comments in writing this final rule. Thus, while FMCSA maintains that its IFR was properly issued under the good cause exceptions in 5 U.S.C. 553(b)(B) and 5 U.S.C. 553(d)(3), the Agency finds it appropriate to utilize the standard 30-day delay in the effective date for the final rule. Stakeholders have been on notice since publication of the IFR that these rules are being amended, numerous States have paused issuance of non-domiciled CDLs while the IFR is stayed and the final rule is pending, and there is no longer the same risk of a surge in applicants trying to obtain or renew a non-domiciled CDL in advance of the rule change. Therefore, the process by which this final rule has been issued has cured any alleged failure under the APA's notice-and-comment requirements.

#### b. Insufficient Data and Lack of Justification

AFT, the Asian American Legal Defense and Education Fund, the Asylum Seeker Advocacy Project, the Potential Development Association and many individuals, stated that FMCSA failed to provide sufficient evidence to support its claim that the rule enhances safety. AFT, The Asian American Legal Defense and Education Fund, The Asylum Seeker Advocacy Project, and the Maine Secretary of State stated that

---

[55] 5 U.S.C. 553(b) and (c); see also *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania*, 591 U.S. 657, 683–84 (2020).

FMCSA ignored the rigorous safety requirements already embedded in CDLs, such as the mandatory skills and knowledge tests, medical certification, and disqualification of drivers with serious traffic violations. They stated that these existing requirements ensure all CDL holders are thoroughly vetted for safety, regardless of their immigration status. AFT stated that rather than considering the efficacy of these measures, FMCSA arbitrarily aims at certain statuses without provided any rational, nondiscriminatory connection between these targeted groups and road safety.

The Asian American Legal Defense and Education Fund, Asian Law Caucus, Delaware Division of Motor Vehicles, Oregon Department of Transportation, Maine Equal Justice, King County Metro, New York State Office of Temporary and Disability Assistance, and several individuals stated that FMCSA cited only five fatal crashes involving non-domiciled CDL holders in 2025, which represented a small fraction of the total fatal crashes involving commercial vehicles. They stated that this limited data did not demonstrate a systemic safety issue that would justify the rule's restrictions. The joint AG comment stated that this lack of evidence is sufficient alone to render the IFR arbitrary, capricious, and unlawful. The joint AG comment added that FMCSA's own data indicates that CDL holders that will be excluded under the IFR have lower rates of fatal crashes than drivers who will not be impacted by the new restrictions. Oregon Department of Transportation stated that anecdotal examples are insufficient to justify the conclusion that current eligibility standards are overly broad or that non-domiciled drivers inherently pose a greater risk. Delaware Division of Motor Vehicles suggested that, without statistically valid evidence, States cannot assess necessity or proportionality of the policy change. Delaware Division of Motor Vehicles suggested that FMCSA commission a study or ongoing data collection to better compare crash rates, violations, and driving behavior between non-domiciled and domiciled CDL holders.

The Asian American Legal Defense and Education Fund, the Asian Law Caucus, and multiple individuals stated that the rule is arbitrary and capricious because FMCSA failed to establish a rational connection between the facts found and the policy choices made. They stated that FMCSA did not provide evidence that restricting CDL eligibility based on immigration status would enhance safety. An individual

stated that under *Motor Vehicle Mfrs. Ass'n* v. *State Farm,* an agency must articulate a rational connection between the facts found and the choice made, and FMCSA failed to do so.

Maryland Department of Transportation Motor Vehicle Administration stated that they are interested in understanding what information FMCSA has received and analyzed to determine this population of drivers presents an increased safety risk. Maryland Department of Transportation Motor Vehicle Administration said that they are unaware of any data which indicates that non-domiciled drivers are less safe than other CDL drivers, given that the testing, and now, training processes are identical. If there is research indicating an increased risk on the roads with this population, Maryland Department of Transportation Motor Vehicle Administration said they are interested to work with FMCSA on potential solutions as they work to eliminate fatalities and serious injuries on roadways. Similarly, the Public Rights Project on behalf of Local Governments suggested that FMCSA consider collecting additional data to better understand the problem facing it, such as from States, employers, or other entities that could report data about crashes. The Potential Development Association and an individual requested that FMCSA conduct and publish comprehensive data comparing crash rates among all CDL holders, both domestic and non-domiciled, before implementing such restrictions.

*FMCSA Response*

In response to comments about insufficient data to justify the rule, FMCSA has discussed the data limitations above. As explained in section VI.B.3.b, the systems with crash data available to FMCSA do not contain information regarding whether a license was a non-domiciled CLP or CDL. Producing the data the commenters seek is not possible with currently available tools, and the commenters have not provided alternative comprehensive sources of data that FMCSA could consider or rely on for the type of analysis requested by commenters. However, as laid out throughout the final rule, it is FMCSA's conclusion based on subject matter expertise that there are clear safety benefits of restricting unvetted drivers from operating CMVs on the Nation's highways.

*c. Contradictions in FMCSA's Justification*

AFT, the Asian Law Caucus, the Asylum Seeker Advocacy Project, and the joint AG comment stated that FMCSA's justification for the rule contained contradictions. They said that FMCSA claimed the rule is necessary because States could not verify the driving histories of individuals from foreign jurisdictions, yet the rule allowed H–2A, H–2B, and E–2 visa holders to obtain CDLs despite potentially having driving histories that exist predominantly in foreign jurisdictions. MALDEF stated that the agency failed to consider that the driving histories of many excluded immigrants are as accessible as those of the immigrants who can still obtain non-domiciled CDLs and CLPs under the IFR. The Asian Law Caucus stated that the IFR's reliance on the inability of States to compel foreign jurisdictions to produce an applicant's driving history in some circumstances does not justify its exclusion of almost 200,000 drivers in all circumstances, especially when there are alternatives to vet applicants of these permits and licenses. Washington Trucking Associations stated that limiting eligibility to only three visa categories without clearly demonstrating a safety-related justification risks undermining the effectiveness and durability of the rule. AFT stated that FMCSA's rule excluded DACA recipients, who came to the United States as young children and learned to drive in the United States, while allowing temporary workers with H–2A and H–2B visas who would have driving histories that exist predominantly in foreign jurisdictions.

*FMCSA Response*

As discussed throughout this final rule, the limitation to certain categories of visa holders is designed to increase and ensure proper vetting of driver history. These categories of drivers are sponsored by employers who scrutinize the applicant's employment history and driving record, as well as by other Federal agencies during the employment authorization and application for entry process. Drivers who are not sponsored for entry and employment in the United States specifically for the purpose of driving CMVs do not receive this level of scrutiny, and there is no practical way for SDLAs to perform this rigorous level of review for foreign nationals who are not individually sponsored for employment requiring a CDL or who otherwise are not subject to the U.S. Department of State's enhanced vetting.

As previously discussed, most DACA recipients are citizens of Mexico who have therefore never been eligible for a non-domiciled CLP or CDL under FMCSA's regulations because Mexico is a jurisdiction for which the Administrator has issued an equivalency determination and entered into a reciprocity agreement. 49 CFR 383.23(b)(1). It has only been since 2023 that citizens of Mexico and Canada who are present in the United States under the DACA who satisfy specific requirements have been allowed to hold non-domiciled CDLs, though that exception was only pursuant to the agency's enforcement discretion and guidance and has never been codified in regulation.[56] Therefore, FMCSA acts well-within its authority to alter the agency's recent non-regulatory enforcement posture with respect to these drivers, particularly in light of the systemic noncompliance uncovered by the APRs.

### d. Immediate Effective Date of IFR

Real Women in Trucking stated that the immediate effective date of the IFR was justified, as any delay would risk a spike in fraudulent applications. An individual also said the immediate effective date was justified because systemic breakdown in non-domiciled CDL issuance, combined with multiple preventable fatalities, constitutes an emergency. Another individual said that historical precedent, such as *United States* v. *Dean*, 604 F.3d 1275 (2010), allows the rule to proceed with good cause and become effective immediately. An individual recommended that the IFR be applied retroactively, since refugee work permits were issued for five years under the Biden administration. An individual said there should be a 30-day grace period, after which all non-domiciled CDL licenses should be revoked.

Many individuals recommended implementing a transition period, for example delaying the effective date of the IFR by one to five years, to prevent disruptions. Punjab Trans Inc., RKL Express Inc., and some individuals also stated there should be a transition plan and at minimum a grace period to protect existing legal operators. An individual stated that FMCSA is obligated to provide a transition period to mitigate harm and cited a court decision that held that sudden policy changes without sufficient justification are arbitrary. Another individual stated that the immediate effective date has

created widespread confusion and instability, as well as burden on SDLAs and businesses. An individual recommended providing support mechanisms for drivers who have invested time and resources into their profession. An individual recommended that during a transition period, new licenses should not be issued, but existing licenses should be renewed. An individual said that a more controlled implementation of regulations would give trucking companies enough time to replace drivers that no longer qualify for a CDL.

An individual recommended suspending the effective date of the IFR until a proper rulemaking process, as legally mandated, is completed. Another individual requested that FMCSA withdraw or stay the IFR and proceed via an evidence-based notice of proposed rulemaking focused on verification, training, and SDLA compliance. Two individuals also requested a judicial stay of enforcement pending full judicial review. An individual requested that non-domiciled CDLs remain active until a final decision on the IFR is made by the courts. An individual recommended allowing drivers to keep using their valid CDLs until their original expiration date in order to both protect the livelihood of drivers and the Nation's supply chain. An individual urged FMCSA to delay the effective date of the rule until guidance is issued and workers are guaranteed due process. Two individuals recommended establishing a transition period allowing existing CDL holders to continue working until their immigration status or work authorization is decided. Delaware Division of Motor Vehicles stated that immediate compliance expectations create major operational and legal challenges for SDLAs. In addition, Delaware Division of Motor Vehicles said that the IFR imposes significant administrative, programming, documentation-retention, SAVE-query, and in-person renewal requirements without an implementation window. The Delaware Division of Motor Vehicles requested clarification on the emergency justification and recommended a reasonable phase-in period. An individual recommended that enforcement be phased to give States time to update systems. Similarly, another individual stated that States under corrective action plans face administrative burden, and requested FMCSA consider a phased compliance timeline and clarification guidance to

avoid unfair cancellation of CDLs while the IFR is under review.

### FMCSA Response

Under 5 U.S.C. 553(d)(3), an agency is permitted to make a rule effective immediately upon publication, for good cause. For the reasons explained above in section VI.B.4.a, FMCSA found good cause to make the IFR effective immediately based on a determination that notice and public procedure were both contrary to the public interest and impracticable.

FMCSA believes it was in the public's interest to take immediate action to address the inconsistencies and failures discovered through its recent APRs of various States that demonstrated acute systemic problems across the country in the non-domiciled CDL issuance processes. Notably, FMCSA discovered that approximately one in four non-domiciled CDLs issued in California were not compliant with the requirements in 49 CFR parts 383 and 384. It was therefore in the public's safety interest to ensure that drivers would not be permitted to take advantage of the deficiencies or the overly broad eligibility requirements that permit such a large number of drivers with unknown driver safety records to obtain CDLs and CLPs. FMCSA noted that California issued approximately 3,820 non-domiciled CDLs and CLPs in June 2025 alone and that, extrapolating from the 2025 APR finding in June, this could have led to the issuance of potentially over 1,000 improperly issued credentials for each month following a proposed rule up until the rule would have been finalized.

FMCSA also emphasizes that many of the commenters who noted their inability to renew their CDL after publication of the IFR would likely have experienced the same issue in the absence of the rule. During the APR process, if FMCSA determines that existing non-domiciled CLPs and CDLs, issued before the September 29, 2025 effective date of the IFR, failed to comply with the FMCSRs in effect at the time of issuance, FMCSA could require, as part of the State's corrective action plan, that the SDLA revoke those credentials and reissue them only if reissuance would be appropriate under the current standards (which means the pre-IFR standards, due to the stay order pending review of the IFR that was granted by the D.C. Circuit). However, many States have been required to pause issuance of all non-domiciled CDLs as part of the corrective action plan for the deficiencies discovered under the APR and others have

[56] See *https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled*.

voluntarily paused issuance of all non-domiciled CDLs to conduct internal audits of their issuance procedures and processes apart from FMCSA's APR process. The public should not blame the issuance of the IFR for States' required or proactive steps to restore integrity to their non-domiciled credentialing process. Nor should the time and effort the States need to invest to fix their broken processes be attributed to the IFR.

Finally, FMCSA notes that the IFR was ultimately stayed by the D.C. Circuit, and the revised regulations have not been in effect since November 10, 2025. For the reasons described above in Section VI.B.4.a., FMCSA has determined not to give this rule an immediate effective date. Therefore, the issue of an immediate effective date is moot and is no longer an issue at this stage in the rulemaking process. In response to commenters who sought rescission of the IFR and continued issuance of non-domiciled CDLs, FMCSA notes that the IFR is not currently in effect and the agency has carefully reviewed the comments received during the comment process. Under the IFR, and now under this final rule, the agency did not completely prohibit issuance of non-domiciled CDLs but has instead narrowed the categories of foreign-domiciled individuals who are eligible to receive these licenses. U.S. nationals who live in jurisdictions that do not issue CDLs remain eligible to receive non-domiciled CDLs in any State that issues such licenses.

FMCSA does not find phased enforcement to be a practicable approach. The CDL program is intended to be consistent across States, and the safety concerns raised throughout this rule are clear. States are not required to issue non-domiciled CDLs, so they are free to pause issuance for any length of time if they need additional time to update systems and implement procedures.

e. Public Participation and Requests To Extend the Comment Period

Three individuals requested extending the comment period. Citizens Rulemaking Alliance requested that FMCSA convert the IFR to an NPRM with at least a 60- or 90-day comment period and 30-day effective date. Citizens Rulemaking Alliance elaborated that the sweeping policy changes introduced by the IFR necessitate public comment opportunity. Similarly, six individuals requested the IFR either be withdrawn or reissued as an NPRM. Three individuals also recommended holding

listening sessions and public hearings. An individual requested a supplemental notice and comment period on non-urgent sections of the IFR. Three individuals requested that implementation of the IFR be suspended pending a full notice and comment process.

Teamsters California, the joint AG comment, and an individual asserted that FMCSA issued the IFR without giving the public notice and an opportunity to comment, as required by the APA. Teamsters California stated that through public consultation, FMCSA would have been better able to assess the alleged need for and potential harm caused by the IFR. Relatedly, an individual stated that the lack of notice-and-comment period denied the public any opportunity to contribute crucial data, experience, and legal analysis before the IFR became law. Two individuals stated the lack of a proper notice-and-comment period undermines public trust and violates the principles of fair administrative process. An individual said that conducting a notice-and-comment period would help ensure the IFR is grounded in reality. Another individual stated the lack of due process leaves drivers and States scrambling to comply while bearing administrative burden.

FMCSA Response

FMCSA provided ample opportunity for public comment by providing a 60-day comment period, which is a standard comment period for many rules and which was adequate for the public to express their views on a rule of this length and complexity. FMCSA does not believe it is necessary to increase public participation in other ways, such as by providing a public hearing. As noted above, the public availed itself of the opportunity to provide comments (with over 8,000 received) and FMCSA has carefully considered those comments in writing this final rule.

5. Implementation

a. Documentation Requirements

Another individual requested FMCSA reconsider requiring an unexpired passport. The South Carolina Department of Motor Vehicles recommended FMCSA clarify how I–797s for green card holders play into the commercial credential issuance process and if they should be considered when reviewing immigration documents or completing a SAVE inquiry.

CPAC Foundation's Center for Regulatory Freedom wrote that requiring an unexpired passport and

Form I–94/94A establishes a necessary chain of verification. America First Legal Foundation wrote that the revised registration requirements ensure lawful admission, verifiable status, and a documented, job-specific basis for holding a CDL. Washington Trucking Associations wrote that they supported efforts to strengthen SDLA vetting procedures, but citizenship and immigration status is a protected status in some States therefore establishing Federal requirements for SDLAs to review supporting documentation preempts these State prohibitions.

An anonymous commenter said that people who enter illegally do not have an I–94 form so illegal CDL holders should be easily identified. The individual said that work permit categories should be sufficient to identify a person's status. An individual said that form I–94 is clear evidence of lawful presence, consistent with the requirements of both DHS and FMCSA prior to this rule. Real Women in Trucking expressed support for the use of the I–94/94A form and said that it ensures lawful entry and employment purpose. Five individuals suggested that FMCSA add I–94s with "Admitted as Refugee with Asylum Granted" to the list of acceptable forms in lieu of an unexpired passport.

An individual stated that the IFR's definition of "foreign jurisdiction" excludes U.S. territories, such as Guam or Puerto Rico, but the documents in Table 1 include only State-issued documents, and recommended that FMCSA explicitly list acceptable documents for residents of U.S. territories, which issue their own credentials and ID cards, in order to prevent applicants from being wrongfully denied.

FMCSA Response

As mentioned in the IFR and the comment response above, EADs are not sufficient for the non-domiciled licensing process for a variety of issues. The only standard documents that can prove identification and lawful status in an approved employment-based nonimmigrant status are the Form I–94/94A and unexpired foreign passport. The other options presented by commenters are impracticable because they are either not federally issued documents, still rely on the EAD, or do not show the required proof that an applicant has been vetted under the process outlined above.

In addition, the concerns raised in the comment regarding citizens of U.S. territories being wrongfully denied non-domiciled CLPs and CDLs are incorrect. The citizens of U.S. territories have

access to acceptable documentation under Table 1 and have always been required to provide such documentation to obtain a non-domiciled CLP or CDL.

b. Expiration Date for Non-Domiciled CLPs and CDLs

Real Women in Trucking stated that the one-year expiration date prevents abuse. The Oklahoma Department of Public Safety expressed support for the expiration date requirement. CPAC Foundation's Center for Regulatory Freedom said that the expiration date requirement will curtail the ability of foreign nationals to establish indefinite, undocumented tenure. Four individuals expressed support for the expiration date requirement because it improves integrity.

The South Carolina Department of Motor Vehicles stated that the South Carolina Code of Laws prohibits the issuance of a driver's license for less than one year, which conflicts with the proposed requirement that that a non-domiciled CDL must not exceed the applicant's ''admit until'' date or one year, whichever is sooner. The South Carolina Department of Motor Vehicles added that the South Carolina General Assembly is considering a bill that would amend this requirement. The American Association of Motor Vehicle Administrators (AAMVA) stated that the requirement for the expiration data to match the expiration date of Form 1–94/1–94A or one year, whichever is sooner, conflicts with REAL ID requirements, such as that requiring States to use SAVE verification to determine the appropriate expiration date for credentials issued to those with temporary lawful status. AAMVA requested clarification on how States should reconcile differences between the FMCSA requirement and REAL ID requirements and also requested the agency coordinate with DHS on the issue. AAMVA suggested using the SAVE response to meet both sets of requirements and suggested revisions to the rule text to accommodate this. AAMVA also recommended enhancing SAVE to provide clear responses on eligibility based on the three visa categories eligible for non-domiciled CDLs under the IFR.

The Potential Development Association recommended directly linking the duration of the non-domiciled CDL to the duration of the applicant's legal status documents, with a maximum duration of one year, in order to ensure the CDL holder continues to meet work status requirements and enable monitoring of driver qualifications through a regular review mechanism. Accion Opportunity Fund recommended extending CDL duration to match the applicant's Federal work authorization, with online check-ins or safety audits to ensure continued compliance, noting that a one-year duration imposes unnecessary burden on drivers and states. Washington Trucking Association wrote that CDL and CLP expiration should be directly tied to verified employment authorization, and there is not a strong safety justification for yearly renewal requirements.

An individual recommended requiring all States to tie expiration dates to the expiration date of the applicant's legal status and provide a process for extending licenses when legal status is renewed. An individual recommended tying the CDL expiration date to the earlier of the EAD/SAVE date or one year. Many individuals recommended tying the expiration date to the EAD and medical certification expiration date. Another individual recommended tying the expiration date to the earlier of the EAD or Form 1–94 date. An individual recommended tying the expiration date to the earlier of the applicant's legal status duration or one to two years. An individual recommended allowing renewal of CDLs up until the expiration of the holder's EAD or work permit. Several individual commenters recommended expiration dates to match visa or permit duration. Three individuals recommended setting the expiration date at one year to enhance oversight. Another individual recommended setting the expiration date to one or two years. An individual expressed opposition to the expiration date requirement and recommended reverting to prior requirements or renewing driver's licenses annually. An individual stated that a five-year CDL expiration date with SAVE verification would save drivers time and resources.

The Asian Law Caucus wrote that FMCSA did not explain the requirement for matching expiration date in the IFR, leaving the public to guess as to the rationale, which is arbitrary and capricious. The Asian Law Caucus also wrote that the IFR does not explain why the one-year period of validity allows consistency and reduces confusion but another time period such as two years would not offer the same benefit. An individual remarked that the IFR will take at least one year to be fully effective, as there could be drivers who under the new rule still have valid licenses for a year, since there is no provision to revoke those drivers' licenses. Some individuals stated that the expiration date tied to duration of the applicant's work authorization results in drivers temporarily losing their ability to work due to administrative delays or renewal processes for their work permits, conflicting with human rights and the principle of equality. Many individuals stated that the difference between expiration dates on their CDL and EAD is an error on the SDLA's part, and they should not be punished for it.

FMCSA Response

The maximum one-year period of validity for a non-domiciled CLP or CDL ensures that individuals are subject to the review of their nonimmigrant status at least once per year, or sooner, based on their I–94/94A expiration date. The eligibility status of foreign-domiciled drivers may change suddenly based on a variety of factors. While this final rule requires SDLAs to revoke non-domiciled CLPs and CDLs if they become aware that an individual's status changes such that they no longer are in an allowable nonimmigrant category, this rule does not establish a formal process for notifying SDLAs of such a change and it is possible that an SDLA may not be aware of such a change in status for a variety of reasons. This would result in a driver that is no longer eligible for a non-domiciled CLP or CDL potentially driving with a license that looks to be valid on its face but is no longer a properly issued license. Given the possibility that a change in status may occur without the SDLA's knowledge in such a situation, it is necessary to verify an individual's lawful status on a regular basis of no longer than one-year to ensure that all non-domiciled CLP and CDL holders are actually eligible to be operating CMVs. This addresses the safety gap created when non-domiciled licenses are not reviewed for years at a time, resulting in ineligible drivers operating CMVs and putting the public at risk. The expiration date requirements mitigate the safety risk of invalid CDLs remaining in circulation should the status of thousands of non-domiciled CDL holders suddenly change based on potential administrative or judicial changes to an individual's status.

FMCSA is also aware of some confusion about the one-year maximum period of validity and adds language for the sake of clarity in the regulatory text of this final rule to state explicitly that no non-domiciled CLP or CDL may be issued for a period longer than one year, regardless of the expiration date on the documentation provided during the application process.

FMCSA does not believe the concern about the expiration date provision conflicting with REAL ID requirements is warranted. The regulations at 6 CFR

37.21 state that ''States shall not issue a temporary or limited-term driver's license or identification card . . . [f]or a time period longer than the expiration of the applicant's authorized stay in the United States, or, if there is no expiration date, for a period longer than one year.'' In addition, ''States must verify the information presented to establish lawful status through SAVE, or another method approved by DHS.'' These requirements are not conflict with the provisions in this final rule.

### c. Verification of Status and Use of SAVE by SDLAs

An individual specifically stated that subjecting drivers to a full SAVE query and two-person review every time they need a replacement card imposes unnecessary burden and recommended instead a streamlined pathway of accepting proof of identify and a signed affidavit, with a full SAVE query only when fraud is suspected. The individual also said the ''substantial compliance'' benchmark in 49 CFR 384.301 (q) lacks any quantifiable metric, leading to uncertainty in how SDLAs will be assessed by FMCSA.

The Oklahoma Department of Public Safety and three individuals expressed support for the requirement to confirm lawful immigration status in the specified category. An individual urged FMCSA to remove improperly issued or unsafe licenses and strengthen the verification process for all CDL holders. The Potential Development Association recommended requiring a two-person verification process for reviewing an applicant's background investigation. AAMVA requested that FMCSA clarify that all States will be required to modify their existing non-domiciled credential designs to include the word ''non-domiciled'' on the face of the credential before resuming issuance, noting such a change may take several months to implement. An individual stated that grouping all drivers into a generalized category, such as ''non-domiciled'' or ''temporary'' does not reflect legal distinctions under Federal law, and results in confusion and unnecessary barriers. Another individual stated that FMCSA should require the highest standard of identification and security screening for drivers involved in the transport of critical domestic supplies to reduce the risk of attacks.

CPAC Foundation's Center for Regulatory Freedom, the Oklahoma Department of Public Safety, the Potential Development Association, Real Women in Trucking, United LLC, Solo Flight Transport, and many individuals expressed support for SAVE requirements. The National Association

for Pupil Transportation, the National School Transportation Association, and the New Jersey School Bus Contractors Association (NJSBCA) urged FMCSA to provide guidance on the proper use of SAVE. NJSBCA recommended FMCSA work with DHS and U.S. Department of Justice on uniformity in verification procedures and to streamline process and address implementation challenges.

The South Carolina Department of Motor Vehicles stated they have discontinued the issuance of non-domiciled CDLs in response to the IFR, but added that previously they consistently conducted SAVE queries as a verification measure, and if the individual did not have a positive SAVE result, they were never issued a credential. AAMVA requested clarification on how to treat SAVE query results of ''Institute Additional Verification'' or other results that require additional steps. AAMVA asked if it would be appropriate to issue a temporary credential pending additional verification, or if SDLAs are required to deny the application pending additional verification. AAMVA also asked if FMCSA is aware of the timeline for additional verification and the impacts it may have. Accion Opportunity Fund recommended that FMCSA reassess SAVE verification to permit State discretion, alternative verification methods, and a formal appeals mechanism, noting that there have been documented SAVE data errors and processing delays. Accion Opportunity Fund also recommended requiring SDLAs to log and publicly report SAVE ''tentative non-confirmation'' and delay rates and creating a Federal-State audit and training program to improve data accuracy and reduce wrongful denials.

An individual stated that the requirement for a separate SAVE query may silo information technology (IT) workflows and recommended a unified SAVE-query workflow to streamline operations and ensure consistency. The individual also stated FMCSA did not offer guidance on what to do when SAVE is temporarily unavailable or returns an ''initial validation'' response, and recommended allowing an unexpired Form I–94 and foreign passport in such a situation, provided the query is performed again after system restoration The individual also recommended implementing an automated SAVE response workflow that auto-escalates ineligibility flags and logs responses in a tamper-evident audit trail. An individual recommended improving SAVE verification instead of excluding entire groups of people from receiving CDLs. Three individuals warned that the SAVE system is known

to produce errors and mismatches, creating administrative and operational problems and resulting in qualified applicants being wrongfully denied. An individual urged FMCSA to make it easier for SDLAs to understand how to handle SAVE mismatches, keep track of applicants who change their immigration status, and make sure all SDLAs follow the same steps.

Another individual stated that the SAVE process is often applied inconsistently and urged FMCSA to ensure stronger training, oversight, and accountability for SDLA staff. Another individual requested that FMCSA improve the accuracy and efficiency of the SAVE system to reduce delays and errors. The National School Transportation Association requested ''a path forward in the utilization of [SAVE] as the national immigration status verification method.'' The individual reasoned FMCSA could work with DHS to prioritize CDL-related SAVE checks.

### FMCSA Response

Commenter concerns about the burdens on SDLAs created by the updated non-domiciled CLP and CDL issuance process fail to consider the safety impacts of the updates. Requiring a SAVE query to verify an applicant's lawful status ensures that SDLAs are not relying solely on physical documentation in the non-domiciled licensing process. Given the frequency at which an individual's regulatory basis to hold a non-domiciled CDL may change, it would be improper to rely solely on physical documents that were issued months or years prior to the application. SAVE is currently the best option available to verify an individual's immigration status. FMCSA would allow the use of AAMVA's Verification of Lawful Status (VLS) as a means to query SAVE if the State can ensure that VLS is the functional equivalent of, and is merely a pass-through for, SAVE (i.e., because a query made through VLS automatically queries SAVE's Application Programming Interface, which returns a response with the same data that would have been returned under an SDLA's direct query to SAVE).

In order to fix the systemic problems in the non-domiciled CLP and CDL issuance process discovered by FMCSA through the APR process, there must be an established method to verify an applicant's status and ensure that the documentation provided is accurate. Requiring anything less would promote the same issuance problems that have resulted in tens of thousands of

improperly issued non-domiciled CLPs and CDLs nationwide.

d. Renewals

Potential Development Association, Real Women in Trucking, United, LLC, and several individuals expressed support for in-person renewals. An individual stated that in-person renewal addresses integrity concerns, while Real Women in Trucking stated that it eliminates mail fraud. CPAC Foundation's Center for Regulatory Freedom wrote that the in-person renewal requirement will curtail the ability of foreign nationals to establish indefinite, undocumented tenure.

An individual stated that in-person renewals impose significant travel burdens on rural drivers and that without remote-renewal or limited-waiver allowance, compliance will be both impractical and inequitable. The individual, along with Accion Opportunity Fund, said that the final rule should permit remote renewals via videoconference or through designated third-party centers. Similarly, another individual said that in-person renewals will be difficult for drivers engaged in interstate transportation. The Delaware Division of Motor Vehicles and an individual said that in-person renewal places undue burden on the logistics industry, which is already suffering from a chronic driver shortage. An individual said that mail-in renewals with valid EAD, Social Security number (SSN), and State-issued Real ID should be allowed.

An individual asked if all States will be required to run a report and verify that currently operating drivers have appeared in person and brought proper documentation to maintain their status. Another individual said that, instead of cancelling CDLs, FMCSA should eliminate CDLs at the time of renewal if proper documentation is not provided. Eight individuals suggested that renewals should be limited to one year at a time.

FMCSA Response

Providing the required documents annually for in-person renewals is also necessary to ensure that applicants can prove their identity, prove their lawful status, and be subjected to a thorough review of both. While this in-person process may represent a burden for applicants, the findings of the State APRs show that this is necessary. The automatic renewal process and mailing of licenses has resulted in a number of improperly issued licenses. In-person renewals ensure that documentation is reviewed and verified in SAVE prior to

the issuance of a new non-domiciled CLP or CDL. The burden of this process is outweighed by the safety benefit of significantly reducing the risk of issuing improper non-domiciled CLPs or CDLs under the current automatic mailing process.

e. Document Retention

The Potential Development Association, Real Women in Trucking, and an individual expressed support for the document retention requirement. An individual stated that despite the two-year personally identifiable information (PII)-retention requirement, data security and privacy safeguards appeared to be absent from the IFR and recommended incorporating baseline Federal standards and mandating annual third-party security audits of PII systems with breach reporting to FMCSA. Another individual recommended requiring SDLAs to document SAVE checks and record language-proficiency assessments.

AAMVA urged FMCSA to clarify the mechanisms and protocols for data collection, retention, and sharing, specifically: data elements that will be shared between Federal agencies and States; security and privacy protections that will govern the sharing of immigration status information; whether States are required to report information about non-domiciled CDL holders to Federal agencies and, if so, what information must be reported and how frequently; and the mechanism by which data will be reported from the agencies to the States and vice versa. AAMVA recommended that FMCSA develop a standardized data sharing agreement. AAMVA also requested clarification on the two-year retention requirement, specifically: when would the two-year period begin; which specific documents must be retained; and would documentation related to SAVE queries and responses have to be retained for audit purposes and, if so, how long and in what format. AAMVA recommended that FMCSA clearly state that CDL Program Implementation grant funding may be used for maintenance of records. The joint AG comment called the IFR's document retention requirement "legally unsupported and unwarranted."

FMCSA Response

The document retention requirement is necessary to address the problems in the APRs with determining whether non-domiciled CLPs and CDLs were issued properly. States are not required to issue non-domiciled CLPs or CDLs, but those that choose to do so must ensure that nonimmigrant individuals

seeking these credentials are in a proper lawful status that shows they have been adequately vetted. This will ensure a heightened level of safety for non-domiciled CMV drivers on our roadways. The increased burden on the States to query SAVE and to retain records is necessary to ensure that greater care is taken by States in properly issuing these credentials and that there is greater accountability and oversight through the recordkeeping requirements. Moreover, this increased burden may be offset by the fewer numbers of credentials that would be issued under the more restrictive eligibility requirements.

f. Mandatory Downgrade

The Potential Development Association expressed support for the mandatory downgrade provision. In contrast, an individual wrote that the downgrade provision, as is, violates due process under the Fifth and Fourteenth Amendments. The individual requested FMCSA incorporate revisions to require that non-domiciled CDL holders be personally notified of their change in status and an opportunity to be heard prior to being downgraded. Relatedly, an individual recommended that FMCSA clarify how notification that the holder no longer meets eligibility requirements will be transmitted. The individual also requested that the driver be given notice and the opportunity to appeal before the downgrade becomes final. The Oregon Department of Transportation expressed concern that by invoking an immigration exception via a mandatory downgrade requirement, FMCSA effectively deputizes States to carry out Federal immigration enforcement in circumvention of the agency's statutory mandate and constitutional authority. The Oregon Department of Transportation stated that this undermines rulemaking transparency and accountability as well as the economic stability of lawful non-domiciled CDL holders. An individual recommended that FMCSA authorize driver-initiated updates accompanied by a SAVE re-query and document review, enabling SDLAs to amend the license before its expiration rather than downgrading and forcing the individual to restart the application process.

AAMVA requested clarification on and asked specific questions on the mechanisms, format, and timeline for the notification that a credential holder no longer has lawful immigration status in a specified category. In addition, AAMVA requested FMCSA apply consistent terminology regarding expected actions and AAMVA requested

that FMCSA clarify that States are not required to conduct ongoing independent monitoring of immigration status for existing non-domiciled CDL holders. AAMVA also requested clarification on whether FMCSA expects to leverage the APR process to inform individual State corrective action plans associated with all already-issued licenses and whether State-initiated corrective action plans will be denied if they do not include correction of program errors based on the new criteria. AAMVA also requested clarification on whether States would be required to identify and take action proactively against a driver who holds a non-domiciled CDL that was properly issued under the previous regulations but would not qualify under the new standards, noting this would be a substantial undertaking. AAMVA also requested clarification on whether an administrative transaction would trigger the application of the new eligibility requirements even if no change in the driver's immigration status has occurred. AAMVA also requested clarification on the timeline for downgrade actions, and how to treat a credential holder that provides updated documentation showing continued eligibility before the downgrade is completed.

The South Carolina Department of Motor Vehicles requested FMCSA specify how SDLAs will be notified of changes in lawful immigration status to initiate the downgrade process and recommended implementing automation to achieve this. ATA stated that the IFR paired with audits of SDLA practices for non-domiciled and standard CDLs helps preserve the integrity of the CDL credential. However, ATA requested that FMCSA establish a mechanism to inform motor carriers promptly when a non-domiciled driver's legitimately issued CDL has been downgraded and to provide advance notice to drivers to allow time to prepare for staffing changes. ATA also suggested that FMCSA revisit the minimum information required on a driver's motor vehicle record to indicate whether the CDL is a non-domiciled credential.

## FMCSA Response

FMCSA disagrees with comments arguing that the mandatory downgrade provision violates the due process principles in the Fifth and Fourteenth Amendments of the Constitution. Under the final rule, if a State receives information from FMCSA, DHS, the U.S. Department of State, or other Federal agency with jurisdiction that a non-domiciled CLP or CDL holder licensed

in that State no longer holds lawful nonimmigrant status in a category established in this rule, or if the non-domiciled CLP or CDL holder violates any terms of their immigration status, the SDLA will be required to initiate established State procedures for downgrading the non-domiciled CLP or CDL. The final rule gives SDLAs a 30-day timeline for completing the downgrade to allow States sufficient time to comply with State-based procedural due process requirements. States should already have such due process procedures in place since FMCSA similarly requires States to initiate CDL downgrade proceedings for drivers who are prohibited from operating a commercial motor vehicle due to drug and alcohol program violations or due to a lapse in medical certification (49 CFR 383.73(o) and (q)). Further, drivers are able to avail themselves of the due process proceedings associated with the underlying action taken by DHS, the U.S. Department of State, or other Federal agency with jurisdiction, that resulted in a change in immigration status.

FMCSA also disagrees with arguments stating that the final rule effectively deputizes States to carry out Federal immigration enforcement. This argument is without merit. The final rule requires States to comply with the issuance standards for non-domiciled CLPs and CLPs, not carry out immigration enforcement. While an individual's immigration status determines, among other things, their eligibility for a non-domiciled CLP or CDL, the reverse is not true. An individual's ineligibility for a non-domiciled CDL does not impact their immigration status or work authorization. Nothing in this final rule requires States to engage in border control activities, the removal of individuals unlawfully present in the United States, or the adjudication of an individual's immigration status.

Finally, FMCSA clarifies that the final rule does not require SDLAs to identify and take action proactively against a driver who holds a non-domiciled CDL that was properly issued under the previous regulations but would not qualify under the new standards. The final rule requires SDLAs to apply the new standards at the time the next licensing transaction occurs after the effective date of the final rule.

### f. General Implementation Comments

Oklahoma Department of Public Safety and six individuals stated that there were issues with State compliance with existing regulations for issuing

non-domiciled CDLs. They stated that some States had issued CDLs with expiration dates that exceeded the expiration dates of EADs, failed to label non-domiciled CDLs properly, or issued CDLs to individuals who did not meet eligibility requirements. The Oklahoma Department of Public Safety stated that Oklahoma Highway Patrol had encountered many illegal aliens operating CMVs with facially valid CDL or CLPs issued under the authority of the current rules and provided examples of recent arrests. The Oklahoma Department of Public Safety also stated that some States were failing to adhere to the requirement that "'Non-domiciled' must be conspicuously and unmistakably displayed" on the CDL/CLP and provided examples of CDLs issued by New York and California that lacked this label. The Asian Law Caucus stated that the IFR's discussion of State implementation issues is misleading. The Asian Law Caucus stated that the IFR states that FMCSA's APR has demonstrated that approximately one in four non-domiciled CDLs California issued were not compliant with the requirements in 49 CFR parts 383 and 384. Yet, FMCSA's September 26, 2025 letter to California relied heavily on 25 examples where the expiration dates of a CDL did not match the expiration date of the driver's lawful presence document, according to the commenter. At the time of the letter, the Asian Law Caucus said that there was no requirement in 49 CFR parts 383 and 384 that these dates match, and FMCSA's letter "tellingly" cites no authority for this position.

The Citizens Rulemaking Alliance suggested that FMCSA should address State compliance issues through existing enforcement mechanisms rather than by restricting CDL eligibility based on immigration status. The Citizens Rulemaking Alliance stated that FMCSA could deploy the CDL compliance regime—up to and including decertification findings and withholding of Federal-aid highway funds—coupled with immediate corrective action plans and targeted enforcement guidance, without immediately revising national eligibility criteria via an IFR. An individual stated that if FMCSA had concerns about eligibility, the agency should have coordinated with SDLAs before allowing them to issue CDLs, rather than punishing drivers who had invested thousands of dollars in training and testing.

An individual stated that the SDLAs are not thoroughly reviewing application materials from CDL applicants and recommended that all State agencies have access to every

applicant's immigration status in order to prevent fraud. An individual discussed that SDLAs and FMCSA have previously been unresponsive to requests for information from drivers and unhelpful in the CDL renewal process, yet when the IFR was published, they took action immediately to cancel CDLs.

AAMVA submitted detailed comments requesting clarification on numerous implementation issues, including: downgrade requirements and timing for non-domiciled CDLs; audit and compliance requirements for previously issued credentials; Federal agency coordination and notification procedures; SAVE system usage and I–94 documentation requirements; testing versus issuance pause procedures; implementation timeline and technical assistance needs; and data sharing and tracking mechanisms. Three individuals expressed concern about inconsistent implementation across States, with some States potentially interpreting "domicile" differently, leading to confusion and potential discrimination. An individual requested that FMCSA provide clear Federal guidance to States to prevent confusion or discrimination against compliant drivers. AAMVA and an individual stated that the rule created confusion regarding how States should handle out-of-State transfers, renewals, and other transactions for non-domiciled CDL holders. AAMVA also requested that FMCSA clarify the definition of "issuing" and related transactions to avoid overly broad interpretations that could create excessive burdens for simple administrative corrections.

## FMCSA Response

FMCSA disagrees that under the pre-IFR regulations, SDLAs were not required to ensure the expiration date of the non-domiciled CLP or CDL did not exceed the driver's lawful presence. The regulatory universe of non-domiciled CLPs and CDLs is premised on the basic notion that a non-domiciled driver's commercial motor vehicle driving privileges cannot extend beyond that driver's lawful presence in the United States. Moreover, FMCSA's IFR and this final rule amend 49 CFR parts 383 and 384 to underscore existing substantive rules governing the period of validity for non-domiciled CLPs and CDLs, not to create new rules on non-domiciled CLP and CDL periods of validity that did not exist prior to FMCSA's publication of the IFR.

Section 31308 of title 49 of the U.S. Code is the statutory basis for the part 383 minimum standards for CDL expiration dates. It governs State issuance of CLPs and CDLs and permits FMCSA to issue regulations that compel all CDLs and CLPs to contain "the dates between which the license or learner's permit is valid." Pursuant to this statutory authority, FMCSA issued regulations requiring that CLPs and CDLs issued by the States "must contain . . . the date of issuance and the date of expiration of the license." Under 49 CFR 383.73(a)(3) and 383.73(b)(9), FMCSA mandates that CLPs be valid for no more than one year from the date of issuance, while CDLs may not be valid for more than eight years from the date of issuance. However, these rules merely provide a regulatory ceiling for CLP and CDL expiration generally. States must follow additional procedures prior to issuing non-domiciled CLPs and CDLs. These additional rules further restrict the period of validity for such credentials.

The pre-IFR regulations obligated the States to require applicants to present an unexpired employment authorization document issued by USCIS or an unexpired foreign passport accompanied by an approved I–94 form documenting the applicant's most recent admittance into the United States prior to issuing a non-domiciled CLP or CDL. Regulations must be read in harmony to avoid redundancy and surplusage. The requirements regarding verification of lawful presence in sections 383.73(f)(3) and 383.71(f)(2)(i) would have been rendered meaningless if a SDLA may issue a non-domiciled CLP or CDL that expires after the expiration of the driver's lawful presence document. In other words, the mandate to present an unexpired EAD or foreign passport would be irrelevant and inconsequential. Similarly, there would be no reason to verify lawful presence as § 383.73(f)(3) required. Further, permitting States to issue non-domiciled CLPs and CDLs to individuals in a manner that permits them to continue operating CMVs without being lawfully present in the United States is illogical, unreasonable, and contrary to the fundamental purpose of FMCSA's regulations establishing legal presence requirements for all CLP and CDL applicants: to ensure CLP and CDL drivers, including non-domiciled drivers, operate commercial motor vehicles while lawfully present in the United States.

FMCSA agrees that there have been numerous instances of States issuing non-domiciled CDLs with expiration dates that exceeded the expiration dates of the holders' EADs, failing to label non-domiciled CDLs properly, and issuing CDLs to individuals who did not meet eligibility requirements. FMCSA cited these concerns in the IFR and has, since publication of the IFR, identified even greater levels of systematic noncompliance. Given the statutory requirement to vet driver history, FMCSA does not believe alternative enforcement mechanisms would be appropriate for this program, as the necessary level of effort and oversight would be unduly burdensome for both FMCSA and the States.

In response to comments about States failing to follow the FMCSRs and not thoroughly reviewing application materials from CDL applicants, FMCSA agrees that this was a major impetus for issuing the IFR and this final rule. FMCSA has demonstrable evidence that States have been erroneously issuing non-domiciled CDLs to individuals who are not eligible to hold them, such as Canadian and Mexican drivers, as well as issuing standard CDLs to drivers who should have been issued non-domiciled CDLs under the prior regulations. This provides strong justification for FMCSA to implement a clearer, stricter system with increased documentation requirements, so SDLAs can improve compliance levels and FMCSA investigators can more easily verify such compliance.

FMCSA will continue to coordinate with AAMVA and the States following this final rule to address other concerns regarding implementation. The agency may also publish additional guidance as necessary.

## 6. Economic Analysis

### a. Methodology and Adequacy of the Regulatory Impact Analysis

Accion Opportunity Fund suggested that an impact assessment should be disaggregated by visa category, fleet size, region, and industry sector and that FMCSA should publish semi-annual metrics on CDL issuance, renewals, and small-fleet business outcomes for at least five years post-implementation. An individual also requested guidance on implementation and support for affected drivers and carriers, along with continued monitoring following changes to assess their effectiveness.

Three individuals expressed concern that the regulatory impact analysis (RIA) failed to analyze rate increases, cost of replacement training, impacts to schools and municipal systems, tax revenue losses potentially totaling $1 billion, and inflationary effects. An individual commented that the economic analysis relies on a per-hour personnel rate derived from an undisclosed composite of wages. Multiple individuals urged FMCSA to evaluate the rule's economic

and workforce impact, or more specifically to perform a full cost-benefit analysis in accordance with E.O. 12866, "Regulatory Planning and Review." An individual asserted that FMCSA did not comply with E.O. 12866, the Unfunded Mandates Reform Act of 1995 (UMRA), or OMB Circular A–4.

Maine Immigrants' Rights Coalition and a joint submission by Public Rights Project on behalf of Local Governments said that FMCSA failed to provide data demonstrating that the selected category of non-citizens is more likely to be involved in fatal crashes. An individual stated that without a baseline safety analysis comparing crash rates by domicile status, neither stakeholders nor FMCSA can gauge how many crashes the rulemaking might prevent. The individual requested that visa-based restrictions be tied to a data-driven study demonstrating safety improvements for visa holders relative to excluded categories. Three individuals expressed concern that replacing the qualified workforce with inexperienced drivers puts public safety at risk. Real Women in Trucking and an individual stated that FMCSA's break-even analysis demonstrates that preventing even 0.085 crashes annually generates net benefits that justify the costs of the IFR.

FMCSA Response

As stated in the RIA below, the agency has met its requirements under E.O. 12866, UMRA, RFA, and OMB Circular A–4. FMCSA developed an RIA in accordance with E.O. 12866, has provided additional detail on the impact to motor carriers and drivers that could result from this rule, provided more information regarding the CDL composite wage rate, and more detail surrounding underlying assumptions in the analysis. Lastly, FMCSA disagrees that this rule would result in less qualified or inexperienced drivers taking to the road. As discussed in the regulatory analysis section below, there are experienced drivers that have been sidelined or working at a reduced capacity during the ongoing freight recession who are ready and willing to come back into the market or increase their workload (e.g., decrease deadhead miles or increase hours within the HOS regulations).

b. Impacts to States and SDLAs

The Maine Immigrants' Rights Coalition, the joint AG comment, The National Education Association, and several individuals said that the IFR creates administrative burdens and delays for States or SDLAs. Two individuals remarked that States have

long accepted EADs as lawful proof of work authorization for issuing CDLs, and that new administrative processes and training will need to be implemented at new costs for compliance with the IFR. The individuals added that the changes in administration of non-domiciled CDLs require States to rewrite procedures on short notice, causing disruption and disorganization. Relatedly, AAMVA and AFSCME stated that the burden estimates for implementation cost failed to account for costs associated with updating legacy systems, procurement, training, legal review, opportunity costs, and additional verification through SAVE. An individual stated that the increased administrative burden may strain State resources and lead to delays in processing applications. Some individuals expressed concern that the IFR would cost SDLAs $3.2 million in taxpayer funds to implement in first year costs alone. Some individuals said that this money could be spent on existing and new data-driven initiatives aimed at improving highway safety.

Two individuals described funding risks for States due to non-compliance at the State level, including a reduction in State revenue from licensing fees, fuel taxes, and registration income. One individual stated that a CDL driver contributes on average $8,000 to $12,000 per year in Federal and State taxes, and excluding even 20,000 drivers would result in a $160 to million annual tax loss. Two other individuals raised the issue of increased cost of social services and assistance, which on average total $1,500 to $2,000 per month for a family that loses income and translates to hundreds of millions of dollars for the tens of thousands of families impacted by the IFR.

Public Rights Project on behalf of Local Governments stated that the IFR will impact core local government services supported by CDL holders, including: public transit and school bus services; highway and road maintenance and repair; response to inclement weather; utilities services; and disaster response, mitigation, and recovery. Public Rights Project on behalf of Local Governments cited a 2022 survey by the American Public Transportation Association that found that 96 percent of transit agencies faced workforce shortages, with 84 percent of agencies reporting impacts on service, adding that the IFR will exacerbate existing shortages and reliability issues. Public Rights Project on behalf of Local Governments remarked that local governments operate on fixed budgets and therefore are limited in their ability to address the effects of the IFR through

increased expenditures. Public Rights Project on behalf of Local Governments reasoned that compliance with the IFR may require governments to redirect funding from other critical services.

The Hawaii Department of Transportation expressed concern that the IFR negatively impacts sectors of Hawaii's CDL market that service students and disabled veterans. Relatedly, King County Metro stated the IFR will negatively impact transit options available to the public at a time when transit agencies nationwide have been struggling to rebuild their workforces. King County Metro discussed that impacts to public transit staffing presents complementary issues pertaining to safety, budget, and reliability and costs of service. The commenter wrote that up to 100 current King County Metro employees work in job classifications that sometimes require a CDL (50 percent of those being bus drivers) and will be ineligible to renew their licenses under the rule. King County Metro expressed concern that the $60,000 investment made by the county to train four replacement bus operators at $15,000 per driver will be permanently lost now that those individuals are ineligible to take the CDL exam. In addition, King County Metro discussed investments of $75,000 for training for drivers with recently revoked licenses and $675,000 for current CDL holders who will be unable to renew.

AFT, National Education Association, USW, and two individuals stated that the IFR will negatively impact public schools and students by exacerbating driver shortages. The National Education Association stated that approximately 50 percent of U.S. schoolchildren, or 23.5 million students, rely on school bus services, but remarked that school districts struggle to recruit drivers given annual average pay as low as $39,000 in some regions. Central Puget Sound Regional Transit Authority commented that a loss of operators risks bus operators not being able to run all routes or provide the needed bus frequency, which results in both a decrease in service that customers rely on and an increase in uncertainty.

FMCSA Response

FMCSA agrees with commenters that the rulemaking will result in some program adjustment costs to States, which could include changing the credential that is issued to ensure that "non-domiciled" is conspicuously and unmistakably displayed on the face of the CLP or CDL, and ensuring that SDLA employees are properly issuing

non-domiciled CDLs and retaining appropriate records. To the extent that States are already in compliance with the SAVE query requirement (*i.e.,* running a SAVE query or a functional equivalent that is merely as pass-through to SAVE, to verify lawful permanent residence prior to issuing a non-domiciled CDL), they would not experience additional costs to comply with that component of the regulation. These costs, as well as the ongoing cost for retaining documentation have been accounted for in the RIA. Moreover, SDLAs are able to apply for and use CDLPI grants to come into or maintain compliance with the requirements of this rule. FMCSA also notes that while each transaction involving a non-domiciled CDL applicant could be longer, there will be fewer transactions, and FMCSA does not expect this rule to result in delays in service at the SDLAs in the aggregate. Further, due to the systemic noncompliance and enforcement action resulting from the nationwide APR, many States are working to update their license issuance policies and procedures. FMCSA has been working closely with SDLAs regarding issuances of non-domiciled CDL holders and will continue to do so as this final rule is implemented.

FMCSA disagrees with the estimates of tax revenue decrease and increase in social services costs stated by the commenters. These individuals will still be able to procure employment in non-CDL requiring roles, in which case, they will continue to pay State and Federal taxes and will not be dependent on social services. The analysis highlights a few different occupations that are likely alternatives for these individuals. With regards to fuel taxes, FMCSA does not anticipate a decrease in miles driven, and so does not agree that there would be a decrease in fuel taxes collected.

FMCSA understands that certain geographic areas or CDL sectors might employ non-domiciled CDL holders at a higher rate than other areas or sectors. This fact is not sufficient to negate the necessity of this rulemaking. A CDL, once obtained, can be used to transport vehicles of the specific group regardless of the purpose or sector. For instance, a Class B CDL with a Passenger and School bus endorsement can be used to drive school buses, passenger vehicles, and straight trucks regardless of a Class B CDL. As previously stated, the lack of available driving history information for non-domiciled applicants severely limits the effectiveness of State vetting processes. This inability to obtain driver history for non-domiciled applicants creates an unacceptable bifurcated

standard in driver vetting. Further, he non-domiciled CDL credentials were never meant to be permanent documents, but to have an expiration date based on the individual's employment authorization. As such, school districts should have been aware that these drivers might be unable to continue holding a CDL based on their employment authorization restrictions.

### c. Impacts to Drivers

Amalgamated Transit Union, Representative Josh Harder, Inspiritus, Maine Immigrants' Right Coalition, New York State Office of Temporary and Disability Assistance, a joint submission by Public Rights Project on behalf of Local Governments, Teamsters California, and some individuals stated that the IFR threatens the livelihoods of the approximately 200,000 workers who rely on their CDLs to provide for themselves and their families. Maine Immigrants' Right Coalition and three individuals stated that the IFR risks the loss of economic and financial livelihoods for lawful businesses and drivers. The New York State Office of Temporary and Disability Assistance remarked that foreign-born drivers account for nearly one in six U.S. truck drivers, many of whom own small businesses. An individual wrote that FMCSA should not prevent legal immigrants from filling CDL-dependent roles and should avoid creating additional burdens. Another individual said there will not be a negative impact on legitimate labor, and labor markets will adjust.

Potential Development Association and three individuals said that the IFR effectively nullified the investments made by thousands of non-domiciled drivers in training, licensing, and career development while leaving drivers unemployed and unable to repay debts. Three individuals described how the rule will create hardships in ability to make payments on CMVs, potentially leading to defaults totaling three to five billion dollars on vehicle loans. An individual stated drivers may pay $3,500 to $8,000 for training programs and invest $80,000 to $150,000 to purchase or lease a truck. Another individual remarked that each family-owned truck under financing at monthly payments of $2,000 to $3,000 risks losing both business and housing. Seven individuals also provided specific cost data related to their mortgages, truck payments, and other loans. An individual stated that FMCSA's reasoning that the impacts of the IFR to drivers who lose eligibility are de minimis is arbitrary and capricious and ignores real-world consequences.

Relatedly, the Asian Law Caucus wrote that the cost of the IFR to drivers is not de minimis but instead would result in decreased wage opportunities, foregone investments in CDL training, and foregone investments in equipment and contracts. The Asian Law Caucus stated that FMCSA's failure to discuss these reliance interests and to show adequately how it arrived at the IFR's de minimis impact on drivers is improper and illegal. Furthermore, the Asian Law Caucus expressed concern that the IFR also fails to provide guidance to small and large carriers as well as State agencies in implementing substantive changes.

### FMCSA Response

FMCSA acknowledges that drivers have invested time and resources into obtaining a CDL credential as a CDL is indeed a valuable asset. However, the non-domiciled CDL credentials were never meant to be permanent documents for foreign-domiciled drivers, but to have an expiration date based on the individual's employment authorization. To the extent that individuals took on long-term loans for vehicles or other investments, they should have been aware that their CDL credential was not a permanent right, but a privilege with a limited term and subject to a sudden change in status. The individuals were responsible for weighing these risks when entering into loans or contracts. FMCSA steers policy based on safety, and not the sunk costs that have been incurred by individuals. Further, drivers that are no longer eligible to hold a CDL at the time of renewal will be able to operate until the expiration date on their license (up-to five years from the date of issuance) and will still be able to work in positions not requiring a CDL following expiration of their CDL. Therefore, FMCSA does not expect that these drivers would be unemployed with no ability to earn a living and sustain a family, but would seek alternative employment either within or outside the transportation sector. As discussed in analysis section below, within the transportation and materials moving industry, Bureau of Labor Statistics (BLS) data shows that alternative employment options range from $27 to $35 per hour for wages and benefits.

### d. Impacts to Motor Carriers

Three individuals stated the IFR will harm small and mid-sized carriers, owner-operators, and logistics-dependent industries. An individual stated that American trucking professionals disagree with FMCSA's claim that there will be a limited

economic impact on the freight market and motor carriers. The individual discussed findings by industry analysts regarding increasing costs of turnover observed in 2024, with the estimated cost of losing just one driver reaching $12,799. An individual stated that the IFR will disproportionately affect small businesses, including family-owned and minority-owned businesses, and stimulate a market monopolization by a few large trucking corporations. Relatedly, another individual remarked that reducing competition in the CDL labor market lowers wages and strengthens dominance of large companies. Representative Josh Harder said that the IFR will destroy American businesses that employ members of the Sikh and Punjabi communities, as 150,000 Sikh Americans work in the trucking industry nationwide.

FMCSA Response

FMCSA acknowledges, but disagrees with, the commenters concern regarding friction in the motor carrier industry and the magnitude of the impact of replacing drivers who are no longer eligible to hold a CDL. The non-domiciled CDL credentials were never meant to be permanent documents, but to have an expiration date based on the individual's employment authorization. As such, motor carriers should have been aware that these drivers might be unable to continue holding a CDL based on their employment authorization restrictions. Further, employment turnover and churn are well-documented features of the CMV industry. The 2025 update to the American Transportation Research Institute's (ATRI) Analysis of the Operational Costs of Trucking reports that the average driver turnover rate, weighted by sector representation was 48 percent in 2024.[57] Driver turnover in the truckload sector ranges from 44.3 percent to 72.1 percent depending on the size of the carrier. The OOIDA foundation finds that while driver churn affects large truckload carriers to a greater extent than small carriers, it is endemic to the entire industry, and something that carriers have been managing for many years.[58] The American Public Transportation Association reports that 59 percent of departures happen within the first two years of employment.[59] Given the industry norm regarding movement of drivers and the constant need for hiring, FMCSA considers motor carriers to be well equipped to handle any driver replacement necessitated by this rule. Further, the five-year attribution will assist in mitigating any impacts to motor carriers. While this exit from the market might come earlier than anticipated in some instances, the non-domiciled CDL credentials were always meant to be temporary with expiration dates based on the individual's employment authorization. At most, this rule would result in a temporal shift in impact related to that subset of non-domiciled CDL holders that would not have looked for alternative employment in the baseline at an earlier date.

e. Impacts to Supply Chain

AFSCME, Asylum Seeker Advocacy Project, Colorado Fiscal Institute, Representative Josh Harder, Justice at Work PA, National Education Association, United Steelworkers, and numerous individuals described the harm of driver shortages to motor carriers, industry, supply chain, or schools. Accion Opportunity Fund, a joint submission by Public Rights Project on behalf of Local Governments, and numerous individuals suggested the IFR will impact supply chains and drive higher prices for food, medicine, and construction materials, accelerating inflation. An individual cited a BLS finding that over 72 percent of U.S. freight is moved by truck. Another individual described how past shocks show how slowly and unevenly markets adjust, refuting FMCSA's claim that "markets will adjust." An individual stated this will lead to spot rate increase and increase in consumer costs.

The Colorado Fiscal Institute estimated that Colorado's expanded access to driver's licenses regardless of immigration status saves $127 million in insurance premiums every year because more people are insured, adding that licensing non-domiciled drivers could increase revenue for insurance companies by $360 million annually. The Colorado Fiscal Institute also stated that transportation and warehousing is a $25 billion industry across Colorado, with 6.7 percent of that industry's workforce being made up of immigrant workers who are responsible for more than $1.6 billion in gross domestic product. An individual stated that the loss of drivers creates revenue losses and congestion at ports, impacting supply chains. The individual estimated the monthly freight revenue losses totaling approximately $1.18 billion per month if 10 percent of excluded drivers are removed, based on the following impacts to the supply chain: $337.5 million for dry van operations; $562.5 million for reefer operations; and $281.25 million for reefer spoilage, assuming 50 percent delayed reefer loads.

Maine Equal Justice wrote that Maine residents rely on truck transport for more than 80 percent of their material goods, meaning CDL drivers are responsible for delivering essential goods like food and heating oil. Maine Equal Justice discussed that while one out of 16 workers are employed in trucking and logistics jobs and more than 5,300 companies employ drivers and other transportation workers across the State, as of May 2025 Maine faces an estimated driver shortage of 1,100 workers to meet existing demands. Maine Equal Justice estimated the IFR will remove up to 200 Maine drivers from the road. Maine Equal Justice added that Maine also faces a school bus driver shortage of 80 drivers, and that the State's trucking industry annually pays $163 million in tolls and taxes. California Bus Association discussed that in 2024 the U.S. motorcoach industry generated: $158 billion in total economic impact, supporting 885,000 jobs nationwide across transportation, tourism, and hospitality sectors; $11.9 billion in impact in California alone; and $39.8 billion in direct spending from group travel, supporting more than 500,000 jobs in food service, lodging, and retail. California Bus Association added that removing non-domiciled CDL holders could lead to a ripple effect on tourism, hospitality, and local economies. California Bus Association stated that the private motorcoach sector is facing a 21.4 percent shortfall in driver availability, with public transit agencies reporting 71 percent have cut or delayed service because of operator shortages.

Relatedly, Amalgamated Transit Union stated the IFR fails to account for impacts to workers other than drivers such as mechanics, dispatchers, and road supervisors. Amalgamated Transit Union also expressed concern that a shortage of CDL holders limits the growth of the intercity bus industry and could negatively impact student attendance and extracurricular participation. Teamsters California asserted that FMCSA failed to address other significant costs to consumers, businesses, and unions. Teamsters California discussed that labor unions will be required to represent these

[57] ATRI, Analysis of the Operational Cost of Trucking: 2025 Update, p. 48, available for download at *https://truckingresearch.org/about-atri/atri-research/operational-costs-of-trucking/.*

[58] *https://www.ooida.com/wp-content/uploads/2025/04/The-Churn-A-Brief-Look-at-the-Roots-of-High-Driver-Turnover-in-U.S.-Trucking.pdf.*

[59] *https://www.apta.com/wp-content/uploads/APTA-Transit-Workforce-Shortage-Report.pdf.*

drivers when they lose their licenses and jobs, resulting in arbitrations or negotiations costing thousands of dollars, which is not addressed in the IFR RIA. International Brotherhood of Electrical Workers, AFL–CIO stated that the IFR will negatively impact the reliability of the electrical grid by reducing the number of CDL holders qualified to construct, maintain, and repair national infrastructure. International Brotherhood of Electrical Workers, AFL–CIO reasoned that this limits national emergency preparedness at and exacerbates the recent supply shortage of skilled electricians. Accion Opportunity Fund discussed that driver shortages will harm agriculture and harvest logistics due to short harvest windows for crops and ports and drayage. Accion Opportunity Fund stated this will lead to capacity loss, longer dwell times, higher demurrage, and increases in prices. Accion Opportunity Fund estimated $250 million in small business working capital tied to current non-domiciled truckers will be in jeopardy.

An individual questioned why the IFR considered the $15.7 million ''cost of a fatal crash,'' but not the cost of tripling the driver shortage. Another individual discussed that the driver shortage reached approximately 78,800 positions in 2022, with projections reaching up to 160,000 by 2028 even as 237,600 job openings for heavy and tractor-trailer truck drivers are estimated to be available annually between 2024 and 2034. Kilban Logistics LLC and many individuals stated that the notion that there was a shortage of truck drivers in the United States was a myth, perpetuated by large trucking companies and industry associations to justify hiring foreign drivers at lower wages. DD 214 Transport LLC and six individuals expressed that there are plenty of qualified American drivers available but that they are unwilling to accept poor working conditions and inadequate compensation. OOIDA stated that the trucking industry is at overcapacity and that the industry has been exploiting cheap labor on the basis of false ''driver shortage'' claims, instead highlighting the driver turnover that plagues the industry, which could be mitigated by the IFR by ensuring that only well-trained, qualified individuals can earn a commercial license.

### FMCSA Response

FMCSA disagrees with the commenters' assertions that the rule would exacerbate the purported driver shortage and subsequent disruptions to supply chains. Following the COVID–19 pandemic boom, the industry found itself with ''too many trucks chasing too few loads, forcing rates down and squeezing profit margins across the country.'' [60] Carriers have been parking trucks to lower operating costs, operating at low profit margins, and exiting the industry.[61][62] The commenters' suggestion that this rule will result in negative impacts to the supply chain does not comport with the reality of the freight recession that motor carriers have been shouldering for the past three years. There are drivers who are underutilized and facing increasing dead-head miles at the expense of their bottom line.[63] Multiple outlets have reported how the current conditions in the freight market have resulted in layoffs, market exits, and bankruptcies.[64][65] Many commenters referencing the driver shortage echoed previously published data from ATA. However, ATA has pivoted away from the ''driver shortage'' narrative, reflecting current freight market realities. This shift is underscored by the issue's recent departure from the top ten list in the ATRI Critical Issues in the Trucking Industry report—for the first time in the 21-year history of the report.[66][67] Capacity in the freight market has contracted over the past three years as the industry began a downturn in April 2022; however, those drivers that have reduced their mileage or exited the market remain eligible to hold a CDL creating a layer of latent capacity. FMCSA does not agree that this rule will result in a shortage of drivers. Instead, based on the numerous

[60] https://otrsolutions.com/what-truckers-need-to-know-about-the-freight-recession/.

[61] ATRI Operational Cost of Trucking, p. 54, available for download at https://truckingresearch.org/about-atri/atri-research/operational-costs-of-trucking/.

[62] FMCSA 2024 Pocket Guide to Large Truck and Bus Statistics. Table 1–8. Available at: https://www.fmcsa.dot.gov/safety/data-and-statistics/commercial-motor-vehicle-facts.

[63] ATRI, Analysis of the Operational Cost of Trucking: 2025 Update, available for download at https://truckingresearch.org/about-atri/atri-research/operational-costs-of-trucking/.

[64] ATRI, Critical Issues in Trucking–2025. Available at: https://truckingresearch.org/wp-content/uploads/2025/10/ATRI-Top-Industry-Issues-2025.pdf.

[65] Commercial Carrier Journal, Carrier failures have ''declined mostly steadily, but they are still higher than seen before the pandemic'' (Apr. 26, 2024). Available at: https://www.ccjdigital.com/business/article/15669400/carrier-failures-declining-still-high#:~:text=Looking%20at%20Federal%20Motor%20Carrier,did%20i mmediately%20before%20the%20pandemic.%E2%80%9D.

[66] https://www.overdriveonline.com/channel-19/article/15771074/how-dots-duffy-destroyed-the-driver-shortage-narrative.

[67] https://truckingresearch.org/2025/10/critical-issues-in-the-trucking-industry-2025/.

reports of underutilization and lay-offs cited previously, FMCSA anticipates that there are available, experienced drivers who will be willing to increase their workload or able to step back into the market after being sidelined throughout the freight recession. The large quantitative impacts stemming from supply chain disruptions discussed by commenters assume that the industry will be unable to meet existing demands in the freight market. FMCSA disagrees with these assertions based on the evidence cited above.

The Colorado Fiscal Institute's comments related to insurance premiums are outside the scope of this rulemaking. This rule will not impact the ability of drivers to obtain insurance.

### f. Failure To Consider Reliance Interests

Maine Equal Justice, the joint AG comment, and three individuals stated that FMCSA failed to consider the reliance interests of CDL holders, their employers, and training providers who had invested time and resources based on the previous policy. The joint AG comment stated that FMCSA's failure to consider these serious reliance interests in promulgating an IFR that effectively strips these CDL holders of their licenses as soon as they come up for renewal, or when States are notified of a purported change in immigration status, renders the IFR arbitrary, capricious, and unlawful. In addition, the joint submission stated that the IFR cites no data that supports its assertions that individuals will be able to find similar employment or that their costs would be merely de minimis. Further, the joint submission said that FMCSA's claim that transition costs resulting from the loss of a CDL will be merely ''de minimis'' is contradicted by FMCSA's statement that ''[a] non-domiciled CDL is a high-value economic credential.''

Other commenters focused on the magnitude of the previously invested time and resources. Potential Development Association and three individuals said that the IFR effectively nullified the investments made by thousands of non-domiciled drivers in training, licensing, and career development while leaving drivers unemployed and unable to repay debts. Three individuals described how the rule will create hardships in ability to make payments on CMVs, potentially leading to defaults totaling three to five billion dollars on vehicle loans. An individual stated drivers may pay $3,500 to $8,000 for training programs and invest $80,000 to $150,000 to purchase or lease a truck. Another individual remarked that each family-

owned truck under financing at monthly payments of $2,000 to $3,000 risks losing both business and housing. Justice at Work and some individuals discussed specific payments ranging from $3,500 to nearly $15,000 spent to obtain CDLs. Seven individuals also provided specific cost data related to their mortgages, truck payments, and other loans. An individual stated that FMCSA's reasoning that the impacts of the IFR to drivers who lose eligibility are de minimis is arbitrary and capricious and ignores real-world consequences. Relatedly, the Asian Law Caucus wrote that the cost of the IFR to drivers is not de minimis but instead would result in decreased wage opportunities, foregone investments in CDL training, and foregone investments in equipment and contracts. The Asian Law Caucus stated that FMCSA's failure to discuss these reliance interests and to show adequately how it arrived at the IFR's de minimis impact on drivers is improper and illegal.

Citing *DHS* v. *Regents of the University of California,* 140 S. Ct. 1891 (2020), MALDEF and six individuals said that agencies must consider the reliance interests of individuals who structured their lives and investments based on existing legal frameworks. Citing *Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211 (2016), two individuals said the IFR ignores employers' reliance interests developed under prior rules. Two individuals added that the IFR is arbitrary and capricious because it disregards that commercial drivers and trainees have already invested substantial resources in CDL training, truck purchases, and financing. Commenting that courts have ruled that agencies must consider reliance interests and provide fair transition periods to satisfy the APA, an individual concluded that the IFR ignores reliance interests because it lacks grandfathering provisions. An individual stated that the IFR violates the APA because it "failed to provide a transition period." Similarly, the Potential Development Association asserted that the IFR does not provide adequate transitional relief or appeal channels for EAD holders who have already legitimately obtained their CDLs or have invested significant time and resources in training. Relatedly, MALDEF challenged the IFR's assertion that most drivers who lose their CDL as a result of the IFR will find work in other sectors like construction, saying the IFR "provides no explanation, let alone evidence, why these drivers will successfully transition to other sectors."

## FMCSA Response

Several commenters have argued that FMCSA failed to consider the reliance interests of individuals who structured their lives and investments based on existing legal frameworks as well as the reliance interests of employers that invested time and resources based on the previous rule. FMCSA recognizes the serious economic reliance interests at stake. The agency understands that many foreign-domiciled drivers have invested time in training and capital in equipment based on the prior regulatory framework. We have not taken the decision to alter eligibility criteria lightly. However, the agency must weigh these private reliance interests against the public's reliance on a safe and securely vetted commercial driver workforce and its statutory obligation to ensure driver fitness. While the economic disruption to these drivers is regrettable, it is necessary to ensure that the CDL credential retains its integrity as a certification of safety fitness and an identified safety gap is remedied.

Moreover, the temporary nature of the legal presence documents that formed the basis of non-domiciled CLP and CDL eligibility under FMCSA's pre-IFR regulations belie the commenters' argument. As explained in the IFR, FMCSA interprets the agency's pre-IFR regulations to require SDLAs to ensure that the expiration date of non-domiciled CLPs and CDLs do not exceed the expiration date of the driver's lawful presence known at the time of issuance. FMCSA's regulations in this regard are consistent with DHS's REAL ID regulations, which also prohibit States from issuing limited term driver's licenses and identification cards that exceed the applicant's legal presence (6 CFR 37.21). Further, some States have codified a similar requirement in their laws (see *e.g.,* Cal. Code Regs. tit. 13, § 26.02(c)). It is well established that the lawful presence documents required for an applicant to be eligible for a non-domiciled CLP or CDL under FMCSA's pre-IFR regulations (*i.e.,* an unexpired EAD or unexpired foreign passport accompanied by an approved I–94 form documenting the applicant's most recent admittance into the United States) are not permanent credentials. Rather, these lawful presence documents are based on an applicant's temporary legal status, which is subject to adjudication by DHS. Further, under DHS regulations, EADs are subject to expiration, termination, or revocation for a number of reasons (see *e.g.,* 8 CFR 274a.14 (Termination of employment authorization)). Consequently, non-domiciled CLP and CDL drivers, as well

as their employers, have long borne, and voluntarily accepted, the risk that a driver who previously held a non-domiciled CLP or CDL would become ineligible for the permit or license upon the expiration or termination of the lawful presence documents required under the pre-IFR regulations. To the extent that individuals took on long-term loans for vehicles or other investments, they should have been aware that their CDL credential was not a permanent right, but a privilege with a limited term and subject to a sudden change in status. The individuals were responsible for weighing these risks when entering into loans or contracts. FMCSA steers policy based on safety, and not the sunk costs that have been incurred by individuals. Further, drivers that are no longer eligible to hold a CDL at the time of renewal will be able to operate until the expiration date on their license (up-to five years from the date of issuance) and will still be able to work in positions not requiring a CDL after their credential expires. Therefore, FMCSA does not expect that these drivers would be unemployed with no ability to earn a living and sustain a family, but would seek alternative employment either within or outside the transportation sector. As discussed in analysis section below, within the transportation and materials moving industry, BLS data shows that alternative employment options range from $27 to $35 per hour for wages and benefits.

Further, as FMCSA's 2025 APRs demonstrated, many non-domiciled CDL holders have been improperly issued licenses under the existing regulations. These individuals have no reliance interests because they were not eligible from the outset. To the extent that an individual who was otherwise previously eligible is prevented from upgrading or renewing a CDL because of errors made by the SDLA, this is an issue between the individual and the licensing State. Moreover, for all individuals—whether domiciled or not—the ability to hold a CDL is a privilege and not a right. This is particularly true for non-domiciled CDL holders, who should be on notice that their licenses are subject to additional terms and conditions and will not necessarily be renewed upon expiration. Neither the IFR nor this final rule are stripping non-domiciled CDL holders' licenses retroactively; rather these individuals will be ineligible for renewal or upgrade, which was always a possibility even absent the rule.

Most individuals who are ineligible for renewal will, contrary to one commenter's assertion, have a transition

period from when this rule becomes effective until the date of the CDL's expiration. This transition period could be up to five years and will be well known to the motor carrier or individual in advance. The individuals whose CDLs must be cancelled prior to the expiration date shown on the credential are not ineligible due to this rule, but rather due to audits that showed that they never should have been issued a non-domiciled CDL in the first place.

As far as training providers are concerned, FMCSA stresses that the training standards set forth in the regulations (49 CFR 380 subpart F) are the exact same regardless of whether the trainee is US domiciled or not. Training providers that developed a business model focused on EAD holders can provide the same excellent training to CLP and CDL applicants that are eligible to obtain a CDL under this rule.

## 7. Other Comments on Procedural Matters

### a. State Consultation

The Asian Law Caucus, The Maine Secretary of State, the joint AG comment, and Teamsters California expressed concern that FMCSA did not, as 49 U.S.C. 31308 requires, consult with the States before amending the regulations that govern eligibility for and issuance of CDLs. The joint AG comment wrote that bypassing consultation with the States disregards their "knowledge and experience in having administered CDL programs for decades." The Maine Secretary of State, the joint AG comment, and Teamsters California asserted that FMCSA's inability to justify its lack of consultation with the States is one reason the D.C. Circuit stayed the IFR. The Asian Law Caucus and the joint AG comment said FMCSA failed to consult with the States despite acknowledging in the IFR that it was required to do so under the CMVSA. Both commenters objected to FMCSA's assertion that consultation was "not practicable," citing the CMVSA's lack of an exception to the requirement, with the Asian Law Caucus adding that failure to consult with the States is at odds with FMCSA having consulted with other government agencies such as the U.S. Department of Labor (DOL) before issuing the IFR, and the joint AG comment referencing past rules in which FMCSA "affirmed that rulemaking pursuant to § 31305 requires consultation with the States."

#### FMCSA Response

In the IFR, FMCSA found good cause to forego consultation with the States. Such consultation is not required under 49 U.S.C. 31305(a), which the agency cited as statutory authority, and was not practicable under section 6(b) of E.O. 13132. However, in its order staying the IFR, the D.C. Circuit cited a separate State consultation requirement in 49 U.S.C. 31308 as, in part, reason for granting the stay. During the comment period for the IFR, FMCSA sent consultation letters to each of the States and received comments from eight State agencies and SDLAs, AAMVA, and 19 State attorneys general. Thus, to the extent that State consultation is required prior to issuance of this final rule, this requirement has now been satisfied.

In addition to this direct consultation, FMCSA held a call with SDLAs on October 2, 2025 to discuss the now stayed IFR and answer questions that were submitted in the days following its issuance. There was a CDL Roundtable Virtual Meeting on November 4, 2025, where FMCSA discussed the subject with SDLAs. FMCSA Field Offices participate in routine meetings with SDLAs to discuss various topics as well as conduct APRs where an in-depth review of CDL issuance is conducted by FMCSA and results discussed with the SDLA.

### b. Other Consultation

An individual urged FMCSA to disclose stakeholder meetings and correspondence in compliance with E.O. 12866. Another individual asserted that FMCSA failed to comply with interagency coordination requirements in E.O. 12866; the individual noted that the IFR introduces a definition of lawful presence that directly affects the responsibilities of DHS and states that FMCSA has provided no evidence that it sought or obtained DHS concurrence prior to publication. An individual stated that a coordinated interagency approach with DHS is needed to ensure federal transportation policy remains aligned with the law. Asian Law Caucus stated that the IFR states that FMCSA consulted with DOL's Office of Foreign Labor Certification (OFLC) in restricting those eligible for non-domiciled CLPs and CDLs to H–2A, H–2B, and E–2 visa holders, but FMCSA failed to include information from its consultation with OFLC in the rulemaking docket to allow meaningful input. Asian Law Caucus requested an additional opportunity to comment after the OFLC information is provided.

#### FMCSA Response

Through the IFR and this final rule, FMCSA has been fully transparent about the coordination that it engaged in during the rulemaking process. The agency coordinated regularly with Federal partners and incorporated their expertise into the IFR. FMCSA continued to work with other agencies between the IFR and this final rule to provide as much updated information as possible, including the enhanced vetting procedures from the U.S. Department of State.

### c. E.O. 14192

Oregon Department of Transportation stated that FMCSA claims the rulemaking is exempt from the regulatory cost and repeal requirements of E.O. 14192 by classifying it as an "immigration-related function." However, Oregon Department of Transportation said that if the rule is not based on safety data, and FMCSA lacks immigration enforcement authority, then the agency cannot reasonably claim either a safety or immigration basis for the rule.

#### FMCSA Response

As stated above, this final rule is based solely on safety and the associated authorities that FMCSA operates under. The determination that the IFR was issued with respect to an immigration-related function was limited to the scope of E.O. 14192 and the exemption from its requirements. This determination does not rely on immigration authority.

### d. Regulatory Flexibility Act

An individual asserted that 90 percent of trucking companies in the U.S. are small businesses, many of which are immigrant-owned or immigrant-dependent. The individual stated that the burden of the IFR will fall disproportionately on small operators and stated that FMCSA has violated the Regulatory Flexibility Act (RFA) because no initial or final regulatory flexibility analysis was conducted. Accion Opportunity Fund stated that FMCSA did not publish a comprehensive small entity analysis under the RFA. Two individuals noted that an RFA analysis was not completed and requested that FMCSA complete one. An individual noted that the FMCSA failed to consider alternatives as required under the RFA.

#### FMCSA Response

As discussed in the IFR, FMCSA asserted that it was not required to conduct a regulatory flexibility analysis under the RFA.[68] This final rule contains an updated discussion of the agency's requirements under the RFA. Based on the rationale below, FMCSA

---

[68] 90 FR 46521.

certifies that this action will not have a significant economic impact on a substantial number of small entities, and therefore no regulatory flexibility analysis is required. In addition, as stated in the regulatory analysis below, the agency has met its requirements under E.O. 12866, UMRA, and OMB Circular A–4.

### e. Information Collection

The joint AG comment stated that FMCSA's information collection is not "necessary for the proper performance of the functions of the agency" per the Paperwork Reduction Act (PRA) because the agency lacks statutory authority over immigration, as even FMCSA admits there is no evidence linking immigration status to CDL driver safety. The joint submission said requiring SDLAs to retain and produce immigration documents and SAVE query results duplicates DHS responsibilities and is unnecessary for the proper performance of FMCSA's functions. In addition, the joint submission said the IFR does not "reduce[] to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency" per the PRA. Rather, it places considerable burden on SDLAs, as it contains no limitation on documents and requires that SDLAs provide documents on a 48-hour turnaround. The joint submission said FMCSA provides no explanation for the new requirement, especially given existing regulations that already mandate APRs and information sharing. An individual asserted that the small entity impacts and PRA impacts are understated. SBTC stated that: (1) the proposed information collection is necessary; (2) they do not contest the accuracy of the estimated burden; (3) they have no suggestions on ways for FMCSA to enhance the quality, usefulness, or clarity of the collected information; and (4) they can offer no information on ways the burden could be minimized without reducing the quality of the collected information.

### FMCSA Response

The information collection requirements in the IFR and the final rule are necessary. FMCSA has extensive authority over the CDL issuance process and the review of State licensing programs. As discussed above, the APRs highlighted a lack of available information at the State-level regarding non-domiciled CLPs and CDLs that were issued and the documentation that was provided during the application process for those non-domiciled CLPs and CLDs. This led to difficulties for the agency during the APR process. It became clear

during the APR process that the prior information collection and retention requirements were not sufficient to ensure FMCSA has the ability to review non-domiciled CLP and CDL issuance by SDLAs in a reasonable timeframe. The requirement for SDLAs to retain copies of the information relied on during the non-domiciled application process is not only a minor burden, but it also ensures that FMCSA has access to the necessary information during the APR process and other audits in the future. The requirement for producing those copies within 48 hours of a request from FMCSA ensures that the agency has adequate access to the records. The information collection is neither duplicative nor unlimited. It requires copies to be made of the two specific identification documents used in the application process for a non-domiciled CLP or CDL, both of which must already be inspected by the SDLA, and a copy of the required SAVE query. Commenters do not provide a citation to a specific, currently approved information collection containing a duplicative requirement for retention of these documents.

### f. Privacy

The joint AG comment stated that, although FMCSA claims the rule does not involve collecting PII, it requires SDLAs to retain and share immigration documents (*e.g.*, passports and I–94s) that contain PII. The joint submission said FMCSA's failure to comply with the statutory requirement to assess the privacy impact of the PII collection was arbitrary and capricious. The joint submission and Asian Law Caucus said FMCSA provided no opportunity to review the supporting Privacy Impact Analysis despite stating that it would be available for review in the docket.

### FMCSA Response

The IFR and final rule do not involve any new collection of PII because the prior regulations already allowed for the use of a passport and I–94/94A during the application process. The only change made to the document requirements was removal of the EAD as an approved option. This revision does not result in a new collection of PII that would necessitate a PIA. In addition, because the SDLAs are already charged with protecting the PII that they collect during the licensing process, they should already have adequate system security features in place to guard against improper access to or release of PII.

FMCSA inadvertently stated that a PIA was in the docket, however the rest

of the privacy discussion in the IFR made clear why a PIA was not prepared.

### 8. Alternatives

#### a. Alternatives to Employment-Based Nonimmigrant Status

Citizens Rulemaking Alliance, Potential Development Association, and three individuals, stated that FMCSA failed to consider reasonable alternatives to the rule that would have been less restrictive while still addressing safety concerns. An individual suggested that FMCSA could have strengthened the SAVE verification system rather than implementing blanket restrictions based on immigration status.

An individual recommended that FMCSA focus on systemic safety improvements rather than driver removal, suggesting that the agency prioritize solutions that target unsafe driving and deficient training across the entire industry.

Numerous individuals suggested a more individualized approach to assessing driver safety, in contrast to restrictions based on immigration status, with some suggesting approaches like individualized renewal processes, appeal processes for drivers, or other testing as described below. Representative Josh Harder suggested that FMCSA pause issuance of new CDLs to ensure applicants have valid work authorization. The City of Manteca and numerous individuals suggested improved background checks as an alternative to the IFR. The Potential Development Association recommended an enhanced background investigation (in addition to SAVE verification) to include Form I–94 or a valid EAD, clean criminal history from the United States and their country of origin, clean driving record, and notarized reference letters. Numerous individuals supported a review of CDL holders' driving records. Many individuals suggested verification of addresses/residency. Numerous individuals supported retesting existing CDL applicants or audits to verify compliance in lieu of the IFR. Several individuals supported recertification or re-verification of legal status for CDL holders (with some suggesting this could occur on an annual basis or at license renewal). Three individuals suggested additional or improved medical testing for CDL holders. Accion Opportunity Fund requested adding reporting, auditing, and data-sharing requirements into any revised rule to collect and publish metrics on CDL issuance, renewals, and SAVE-related errors. Some individuals suggested that drivers could obtain

additional certifications for their CDL, instead of prohibiting them altogether. It also suggested improving communication and training programs.

Washington Trucking Associations urged FMCSA to strengthen the CDL program through a holistic, evidence-based approach rather than relying on narrow employment definitions. Rather than relying on the IFR's narrow definition of permissible employment categories, Washington Trucking Associations said FMCSA should base eligibility standards on research-supported indicators that more accurately reflect a driver's likelihood of safe performance. Washington Trucking Associations suggested targeting high-risk behaviors and violations; considering a one-year non-commercial driving experience requirement for new entrants; enhancing Entry-Level Driver Training oversight and removing non-compliant schools; and modernizing data systems to prevent multi-State fraud and close gaps in carrier safety ratings.

Many individuals suggested improved training, stricter skills testing, or mandatory training periods for CDLs in lieu of the IFR. An individual requested that the IFR clarify whether non-domiciled CDL holders remain eligible for special endorsements (*e.g.*, hazardous materials or Transportation Worker Identification Credential) or retain cross-border privileges under the North American Free Trade Agreement and the United States-Mexico-Canada Agreement. An individual suggested that the final rule should explicitly require any organization conducting commercial driver examinations to collect and validate the same documentation and complete the same SAVE checks as the SDLA. An individual stated that by placing restrictions on an EAD holder's ability to drive a commercial vehicle, FMCSA is improperly attempting to re-classify the scope of Federal work authorization, which the commenter stated is a function that belongs exclusively to immigration agencies. An individual recommended support programs for low-income individuals and education resources to help individuals understand the requirements.

Multiple individuals suggested that FMCSA should focus on removing drivers with poor safety records or who obtained their licenses illegally rather than targeting drivers based on immigration status. An individual suggested increasing the standards for everyone, reasoning that a person does not have to be foreign to be a bad driver. Three individuals expressed willingness to undergo additional testing or verification to demonstrate their qualifications and commitment to safety. An individual stated that the IFR addresses safety and security gaps, but that it is incomplete, and should focus on data-driven improvements.

Easy CDL Trucking School recommended that instead of targeting the immigrant population, FMCSA should reinstate the old CDL exam to the version that was revised in recent years to help with the driver shortage. An individual wrote that they agree with improving safety and integrity but suggested that FMCSA include clear provisions protecting individuals with work authorization.

An individual recommended implementing a dedicated vetting process for asylees using SAVE verification. An individual recommended requiring SDLAs to verify EAD validity electronically with SAVE. Another individual recommending allowing renewals for EAD holders verified through SAVE. Another individual recommended allowing drivers with valid EADs and legal work authorization to continue operating, as long as their documents are verified through SAVE and regularly updated. Another individual recommended more frequent, targeted compliance checks focused on high-error rate jurisdictions and credential processing procedures.

An individual stated that those who attended CDL school, passed exams and English proficiency tests with success, and are in normal immigration proceedings with USCIS should have their CDLs issued again by SDLAs.

Another individual suggested going back to the 50-mile radius limit within U.S. borders for non-domiciled CDL holders, stating that this would improve safety, increase wages for drivers, and limit drug and human trafficking.

An individual stated that having a green card or passport does not guarantee that a driver will be safe on the road. They said that only drivers with legal status in the United States who can prove their knowledge and skills should qualify for a CDL. Another individual stated that primary residency should be a minimum requirement. The California Bus Association wrote that drivers should be evaluated based on competence, performance, and safety compliance and not immigration status. Three individuals said that CDL holding should be based on points, not on immigration status.

STR Bros LLC and multiple individuals suggested that instead of a blanket restriction on non-domiciled CDLs, the agency should implement more targeted measures to address safety concerns, including enhanced English language testing, additional safety checks, or focusing enforcement on drivers with poor safety records. Multiple individuals wrote that instead of restricting non-domiciled CDLs, FMCSA should prioritize auditing trucking schools, State Departments of Motor Vehicles (DMVs), and drivers at weigh stations to ensure proper qualification and compliance. Multiple individuals suggested that drivers should be evaluated based on their individual driving records, safety performance, and compliance history, rather than their immigration status. Golden Rolls Trucking Inc. and five individuals proposed that FMCSA concentrate on addressing issues such as hours-of-service violations, ELD manipulation, and other safety-related behaviors rather than targeting drivers based on their immigration status. ETA Trans Inc., Roadking Freightline, and multiple individuals wrote that enforcing stricter training requirements, implementing more rigorous testing procedures, and improving the quality of CDL training programs nationwide would be more effective approaches to addressing safety concerns. Five individuals also expressed support for stricter retesting requirements. Relatedly, four individuals stated that FMCSA should improve CDL training requirements for all drivers if the true concern is safety. Five individuals wrote that issues with how certain States issued non-domiciled CDLs could be addressed by improving verification systems. Prime Transport and multiple individuals recommended implementing English proficiency tests.

Multiple individuals suggested ending the issuance of non-domiciled CDLs altogether to address deflating wages and safety concerns. Many individuals stated that the IFR did not go far enough in restricting eligibility, and that only U.S. citizens and green card holders should be able to hold a CDL.

## FMCSA Response

FMCSA has already taken the action in many of the areas suggested as alternative approaches. Some commenters mention taking actions that are not in the scope of this rulemaking, which the agency does not believe are appropriate for this final rule to address. FMCSA disagrees with individuals who stated that FMCSA failed to consider reasonable alternatives to the rule that would have been less restrictive. As discussed below in X.A., the agency specifically considered a range of options and determined that there are no alternatives that would be reasonable

for the States to implement and administer.

FMCSA does not agree with commenters that non-domiciled CLPs and CDLs should not be issued at all and has sought a framework that balances the need for adequate vetting of a driver's safety fitness while still allowing access to non-domiciled CLPs and CDLs for some individuals. In addition, the agency is not restricting non-domiciled licenses further or and reiterates that the final rule does not apply retroactively.

One commenter believed strengthening SAVE was an option, however, SAVE is not a system administered by DOT. Therefore, FMCSA has no control over the development or maintenance of the system. If this commenter intended to say that FMCSA could ensure States use SAVE more effectively, the States have already demonstrated that they are not capable of doing so on a large scale, as highlighted by the findings from the APRs. Because relying on more effective use of Save by SDLAs is not practicable based on the issues with relying solely on SAVE, more restrictive regulations limiting and clarifying the scope of individuals eligible for non-domiciled CLPs and CDLs are necessary to ensure roadway safety by not allowing ineligible drivers to operate CMVs.

FMCSA notes that this rulemaking is a systemic safety improvement. Moreover, it is part of a constellation of actions the agency has taken, and continues to undertake, that focus on systemic safety improvements.

### b. Additional Oversight of SDLAs

AWM Associates, LLC, Representative Josh Harder, the City of Manteca, Safety Management Inc., and numerous individuals suggested better enforcement would be the most effective way of achieving the goals set out in the IFR. The City of Manteca expressed support for ensuring proper issuance of CDLs by SDLAs. AWM Associates, LLC and numerous individuals described issues with State CDL office implementation. NJSBCA requested development of a re-certification process for States' non-domiciled CDL programs to verify compliance with Federal requirements. NJSBCA asked for a verification framework to ensure expedited review of compliance for non-domiciled CDLs or CLPs for essential service providers such as school bus drivers. Accion Opportunity Fund suggested that instead of the IFR, State non-compliance would be better addressed with Federal technical assistance to upgrade SDLA data systems and for digital document retention and SAVE integration; staff training with non-compliance penalties; and multilingual outreach materials to educate small carriers and drivers on compliance. Accion Opportunity Fund suggested a targeted grant or technical assistance program to help with these upgrades for SDLAs, which vary widely in capacity and technology. ATA said further strengthening Federal and State oversight of all CDL training, testing, and issuance is a crucial step to help identify and correct improper licensing practices, ensure verification of Federal qualifications before issuance, and support the removal of noncompliant training providers.

ATA also urged FMCSA to improve tracking of the number of new CDLs issued annually on a State-by-State basis, including non-domiciled CDLs. An individual recommended addressing operational gaps with fallback measures, measurable benchmarks, and harmonized workflows, all of which would help SDLAs implement the new standards effectively.

### FMCSA Response

FMCSA continues to review SDLA implementation through the APR process. In addition, the agency will continue to utilize its oversight authorities and support mechanisms, such as grants, to support SDLAs in implementing the requirements in this final rule to the extent practicable.

### c. Additional Enforcement Measures

Numerous individuals suggested that stricter penalties for violations would be a more effective approach for addressing safety. Martin Luther King County requested that FMCSA more actively enforce pre-existing CDL requirements. An individual stated that if a person obtained a fraudulent CDL, they along with the entity that issued them the license, should be prosecuted. An individual wrote that individuals, including those in law enforcement, that allow foreign persons to drive with illegal licenses should be held accountable. Similarly, an individual stated that accountability belongs to the agency that issued the CDL improperly, but not with law abiding drivers. An individual wrote that non-domiciled CDLs should not be banned, but that the government should investigate fake licenses and suspend all work authorized licenses in California.

### FMCSA Response

FMCSA has already been engaged in enforcement of the non-domiciled regulations through the APR process, as discussed above in VI.A.3.a. The agency will continue to enforce the FMCSRs to promote safety.

### d. Safe Driving History and Grandfathering

Several individuals expressed that the IFR will negatively impact individuals who have been driving safely for years and who have obtained their licenses through proper legal channels. Two individuals wrote that they support the focus on improving safety but stated that there are many drivers who have not broken any rules and need CDLs to support themselves and their families. The Asian Law Caucus, the Joint Organization comment, and numerous individuals provided personal anecdotes or discussed that many non-domiciled drivers have worked for years without violations, have worked for years without tickets, have not been in any accidents, have a history of clean inspections, do not have criminal records, or are experienced professionals with previous driving experience in other countries before working in the United States. Numerous individuals expressed concern that drivers impacted by the IFR follow the rules and care about safety. The California Bus Association stated that revoking or restricting the ability of non-domiciled CDL holders to work ignores documented histories of safe operation. Four individuals reasoned that not all immigrants are violators or irresponsible drivers.

Many individuals requested that FMCSA grandfather in existing CDL holders, or people who are in the process of obtaining their CDLs. An individual stated that adding this protection for existing non-domiciled CDL holders, at least for the duration of their current license term, balances security with fairness and prevents needless harm to hard-working individuals. Two individuals said that drivers that have held a CDL for more than 2 years with a clean record must be allowed to renew their licenses. An individual suggested that drivers with clean safety records and neither drug nor alcohol violations should be temporarily grandfathered and required to pass expedited, standardized re-testing within 6 months. An individual requested clarification regarding grandfathering for current non-domiciled CDL holders.

### FMCSA Response

Grandfathering existing non-domiciled CLP and CDL holders would contradict the purpose of this rule. These drivers obtained their licenses under the prior regulations and their safety fitness was not adequately

verified by SDLAs as they would be under the enhanced procedures for the employment-based nonimmigrant statuses included in this final rule. Allowing those individuals to retain their non-domiciled CLPs and CDLs would continue to allow unvetted drivers to operate CMVs, which is the exact problem this rule is intended to address.

In addition, the recommended provisions or exceptions for drivers with clean driving records would unduly burden and complicate the administration of the CDL regulations in a system that was already failing to administer the less complicated approach properly. This rule closes a critical safety gap in FMCSA's regulations and necessarily narrows the eligibility to those employment-based nonimmigrant categories that can be appropriately vetted without creating an unworkable framework for the SDLAs.

Finally, a non-domiciled CDL is inextricably tethered to the holder's underlying temporary immigration status. That status is, by definition, finite, revocable, and subject to change at the discretion of federal immigration authorities. The agency cannot be held to grandfather a population of drivers whose very eligibility was conditional from the moment of issuance. To find otherwise would be to convert a temporary regulatory privilege into a permanent right.

### 9. Other General Comments

#### a. English Language Proficiency (ELP)

Numerous individuals discussed that the IFR disproportionately impacts non-English speaking drivers. Some individuals expressed concern about non-domiciled drivers' inability to read and understand English. Multiple individuals described situations where drivers missed important safety warnings, speed limits, weight restrictions, and construction zone notifications because they could not comprehend the highway signs. Five individual commenters mentioned that this inability to understand signs led to dangerous situations, including wrong-way driving and illegal maneuvers. Similarly, America First Legal Foundation and two individuals described incidents where drivers took routes prohibited for trucks, attempted dangerous U-turns, or failed to slow down in construction zones because they could not read the warning signs. Three individuals stated that they had personally intervened to prevent accidents caused by non-domiciled drivers who misunderstood signage.

Six individuals mentioned communication barriers as a significant safety concern. Five individuals described situations where non-domiciled drivers were unable to communicate with law enforcement, emergency responders, shippers, receivers, and other drivers. Three individuals shared experiences of non-domiciled drivers using translation apps or requiring interpreters for basic interactions, which they viewed as inadequate for emergency situations. Two individuals expressed concern that in emergency situations, these communication barriers could prevent timely response or coordination.

Representative Josh Harder, Taj motors, and many individuals suggested that FMCSA should pursue increased ELP testing rather than restrictions based on immigration status to address the goals of the IFR. Numerous individuals suggested specific ELP tests like International English Language Testing System or Test of English as a Foreign Language. AWM Associates, LLC stated that 49 CFR 383.133(c)(5) requires CDL skills tests to be conducted in English. Two individuals said that when licenses come up for renewal, the driver should be required to pass an English test. An individual stated that enforcement of English language requirements in 49 CFR 391.11(b)(2) has varied widely across States. AWM Associates, LLC stated that the issue of drivers lacking English proficiency stems from non-compliance by States and FMCSA in following the FMCSRs.

#### FMCSA Response

Commenters correctly point to the ELP requirement in 49 CFR 391.11(b)(2) and the requirement in 49 CFR 383.133(c)(5) for CDL skills tests to be conducted in English. The ELP requirement in 49 CFR 391.11(b)(2) has been in place for decades and interstate drivers, regardless of their nationality, have been required to meet those requirements. As stated above, the enhanced screening and vetting procedures from the U.S. Department of State require "that applicants can read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records." This requirement ensures that non-domiciled drivers can meet the driver qualification requirements of § 391.11(b)(2) and possess the basic English skills necessary to operate a CMV safely.

In addition, FMCSA has taken actions outside of this rulemaking to address

the ELP requirement in § 391.11(b)(2). In May 2025, FMCSA issued a new internal policy memo and a guidance question on ELP to clarify the enforcement of ELP violations.[69]

#### b. Training and Testing Requirements

ATA stated that FMCSA's safety monitoring, auditing, and enforcement actions need to increase to address limitations in the Training Provider Registry (TPR) to shield prospective drivers and the public from fraudulent and non-compliant training entities.

An individual elaborated stating that the requirements for truck driving schools do not ensure safe drivers because schools just teach students to pass the test without offering any real-world experience. Similarly, another individual expressed concern that critical checks in schools are often skipped and large companies without proper oversight increase safety risks. Another individual wrote that CDL driving schools should be investigated for corruption. An individual stated that some Class A training programs have been shortened to meet industry demand, often preparing students for the test but not for real-world scenarios such as mountain driving, winter weather, jackknife risks, or backing long trailers.

#### FMCSA Response

These comments on training and testing requirements are not within the scope of the rulemaking because they do not impact the scope of drivers eligible for non-domiciled CLPs and CDLs under the IFR and final rule. FMCSA does however want to highlight for commenters that the agency is taking other actions on these concerns and has specifically taken enforcement actions against nearly 6,700 training providers for not meeting the Entry Level Driver Training standards found in the FMCSRs, and is considering other actions to strengthen training and testing standards and provide greater oversight of CDL schools and testing facilities.

#### c. General Safety

ADK TRANS LLC and many individuals expressed that the rule prevents crashes and saves lives by ensuring only qualified drivers operate CMVs. Multiple individuals mentioned that the rule restores integrity to the CDL issuance process and protects the public from unqualified drivers. One

---

[69] See FMCSA–DQ–391.11–FAQ001(2025–05–22), available at *https://www.fmcsa.dot.gov/regulations/what-should-motor-carrier-do-assess-cmv-drivers-english-language-proficiency-elp-during.*

individual stated that the rule will ensure that the higher standards for obtaining a CLP or CDL, compared to a regular license, are acknowledged since obtaining such credentials requires extensive training, expenses, and passing certain tests to ensure proper use relative to the higher risk. Two individuals expressed that the rule will reduce the number of crashes involving CMVs. America First Legal Foundation and six individuals mentioned specific fatal crashes that could have been prevented if stricter CDL requirements had been in place earlier. America First Legal Foundation stated that States are violating Federal law by not enforcing critical CDL and CLP standards and the rule will reduce Americans' risk of injury on roadways by reducing the number of noncompliant drivers of large trucks.

CPAC Foundation's Center for Regulatory Freedom said the decision to narrow non-domiciled CLP and CDL eligibility to only those law-abiding citizens with lawful immigration status will improve the overall safety of America's roadways and further strengthen the Federal Government's larger efforts to identify and apprehend threats to the national security of the United States.

Five individuals described witnessing non-domiciled drivers engaging in reckless driving behaviors, including speeding, tailgating, improper lane changes, and aggressive driving. Six individuals said reckless behavior resulted in near-misses and hazardous situations, particularly in construction zones or adverse weather conditions. Several individuals expressed concern that non-domiciled drivers lack proper training and qualifications to operate commercial vehicles safely in the United States. Seven individuals believe non-domiciled drivers have an inadequate understanding of U.S. traffic laws, insufficient experience with American roadway conditions, and limited familiarity with industry standards and practices. Six individuals expressed concern that some drivers received minimal training before being placed in charge of large CMVs. Two individuals mentioned "CDL mills" that allegedly provided inadequate training to non-domiciled drivers, focusing only on helping them pass licensing tests rather than developing comprehensive skills.

FMCSA Response

As discussed throughout the comment responses above the primary purpose of the IFR and this final rule is to ensure that all CMV drivers are subject to sufficient vetting to ensure that non-

domiciled drivers are as safe as practicable before allowing them to operate CMVs on our roadways. This rule rectifies a bifurcated safety standard that currently subjects domestic and foreign drivers to different standards, which compromises public safety. While domestic driving records are obtained through established systems (outlined earlier in this final rule), no comparable, credible, or standardized source of foreign driving data exists for non-domiciled applicants. SDLAs are fundamentally incapable of performing the driver's record checks required by 49 CFR 383.73(b)(3) for foreign nationals. Consequently, non-domiciled applicants are effectively vetted against a materially lower standard, with their foreign driving histories—including disqualifying offenses or crashes—remaining entirely unknown. This regulatory blind spot permits individuals with potentially poor safety records or permanently disqualifying convictions to obtain non-domiciled CDLs, placing all roadway users at risk. Heightened interagency Federal vetting is therefore the only mechanism available to approximate the domestic safety standard and mitigate the risk of licensing unverified foreign-domiciled drivers.

The employment-based nonimmigrant categories that are eligible for a non-domiciled CLP or CDL under this final rule are the only nonimmigrant statuses that have vetting of an individual's safety risk associated with driving a CMV sufficiently similar to the requirements for U.S.- domiciled applicants. The relevant vetting that occurred through the visa application and labor certification processes for the eligible nonimmigrant status holders were thoroughly detailed in the IFR.[70] In addition to the thorough vetting process detailed in the IFR, the U.S. Department of State has recently implemented enhanced vetting processes for non-domiciled drivers entering the United States, as discussed in the responses to comments above. The enhanced vetting procedures ensure that individuals seeking entry to the United States under these employment-based nonimmigrant categories for the purposes of driving a CMV can meet ELP requirements, show proof that they can properly operate a CMV, and meet other requirements under the FMCSRs (such as not having a disqualifying conviction on their driving record). These additional steps in the vetting and verification process for non-domiciled individuals ensure that the

employment-based nonimmigrant categories allowed to obtain non-domiciled CLPs and CDLs under this final rule are subject to the most stringent standards possible, just as their U.S. domiciled counterparts.

No additional nonimmigrant categories will be allowed to obtain a non-domiciled CLP or CDL under this final rule. The limited scope of nonimmigrant categories subject to the heightened vetting processes limits the scope of individuals who can be given a non-domiciled credential with a sufficient degree of confidence in their ability to drive safely on the Nation's roadways. Commenters were unable to present any process comparable to the vetting process for individuals seeking H–2A, H–2B, and E–2 nonimmigrant statuses laid out in the IFR for any other nonimmigrant status, and further fail to present anything comparable to the heightened vetting procedures that have since been implemented by the U.S. Department of State. Without evidence of a comparable process for any other nonimmigrant categories, FMCSA cannot include any other categories of nonimmigrants as eligible for non-domiciled CLPs and CDLs while ensuring the same level of safety granted by the U.S. Department of State vetting. The comments submitted on the IFR do not present any practicable alternative that can adequately account for the lack of driving history for non-domiciled drivers.

d. General Support/Opposition

The California Bus Association, the Sikh Coalition, and numerous individuals expressed concern that the IFR will unfairly strip non-domiciled drivers who lawfully obtained their CDLs of their ability to work due to the mistakes of other immigrants. The American Federation of Labor & Congress of Industrial Organizations (AFL–CIO) and numerous individuals stated that the IFR is not safety policy, but rather discrimination based on national origin. An individual remarked that changing the rules now unjustly penalizes people who have built their lives and careers under the previous standards. Some individuals said that the IFR could be considered a discriminatory measure by limiting access to a means of livelihood for a specific population without offering alternatives.

Numerous individuals expressed concern that the IFR infringes on human rights or the rights of vulnerable communities. An individual stated that legal work is everyone's right. Numerous individuals remarked that non-domiciled drivers have proven their

---

[70] See 90 FR 46515–46516.

commitment or dedication to serving the country. AFL–CIO and multiple individuals stated that these drivers are hardworking, law-abiding individuals who contribute to communities and keep goods moving across America. The Sikh American Legal Defense and Education Fund (SALDEF) remarked that the IFR will prevent many qualified individuals from getting their licenses. Two individuals expressed concern that immigrants willing to work for the good of the country will be forced to leave as a result of the IFR. Numerous individuals stated that they did not come to the United States to receive handouts, special treatment, or other financial support from the Federal Government. Numerous individuals provided personal anecdotes discussing that they came to the United States to save themselves and their families from war or political persecution in other countries. Justice at Work stated that the IFR will make it more difficult for the vulnerable population of immigrant drivers to rebuild their lives in recovering from unstable and oppressive circumstances.

Numerous individuals expressed concern that the IFR creates unnecessary barriers for current and future non-domiciled CDL holders without improving safety. Specifically, one individual discussed that the IFR may create hardship for individuals with limited income, education, or resources trying to become drivers. Multiple individuals stated that the IFR equates lawfully present immigrants that follow all legal procedures with illegal immigrants or criminals.

Numerous individuals stated that non-domiciled drivers deserve equal opportunity. Three individuals stated that laws should protect opportunity and fairness, not take them away. An individual stated that imposing categorical restrictions without evidence that citizenship correlates with safety raises concerns of unequal protection and selective enforcement. Five individuals stated that the IFR should not come at the cost of experienced, responsible professionals. Six individuals specifically requested that FMCSA focus on fair treatment for all drivers. One individual requested that DOT align the IFR with Federal immigration law.

Numerous individuals stated that they are immigrants with legal status in the United States, such as pending immigration cases with valid work authorizations, and therefore are lawful CDL holders. Multiple individuals questioned why immigrants with the legal right to live and work in the United States will no longer be able to obtain a CDL. The Joint Organization comment and numerous individuals added that granting CDL renewal for individuals with legal work authorization is a matter of economic stability and public interest. Numerous individuals provided personal anecdotes or discussed that many non-domiciled CDL drivers have waited for years for their immigration cases to be heard in court. One individual remarked that the IFR punishes non-domiciled drivers for an immigration process outside of their control. Another individual reasoned that the options proposed in the IFR for non-domiciled drivers to obtain a green card, U.S. passport, or specific employment-based visas are unrealistic for most individuals due to timing and accessibility issues.

Numerous individuals discussed that they completed CDL training or passed required testing in the United States. Many individuals stated that they speak English, which supports their ability to understand road signs, follow traffic laws, or communicate with law enforcement.

The American Federation of State, County and Municipal Employees (AFSCME), the Asian Law Caucus, Justice at Work, the Joint Organization comment, and numerous individuals expressed concern that the IFR would threaten the livelihoods and well-being of legal CDL holders. Numerous individuals stated that the IFR would lead to financial hardship for non-domiciled drivers. Numerous individuals also discussed that non-domiciled drivers support essential industries, or that they need their CDLs to survive. Numerous individuals stated that trucking is their only source of income.

Relatedly, three individuals expressed concern that the IFR could push non-domiciled drivers to pursue work lacking in regulatory oversight. Numerous individuals requested that FMCSA not take away jobs.

SALDEF and numerous individuals expressed general concern that the IFR will subject thousands of families to serious difficulties or leave them without income. Numerous individuals also stated that the IFR could leave drivers and their families homeless. Numerous other individuals expressed concern that the IFR will subject families to poverty or hunger. AFSCME, the Asian Law Caucus, and numerous individuals provided personal anecdotes or discussed that CDLs allow non-domiciled drivers to support their families. A joint comment between organizations supporting immigrants stated that, on top of existing U.S. Citizenship and Immigration Services (USCIS) delays in processing work authorizations, the IFR will worsen the ability of impacted drivers to provide for their families. Justice at Work and numerous individuals provided personal anecdotes or discussed that many non-domiciled CDL drivers are the sole providers for their families. Many individuals expressed concern that they and their children rely on a family member's CDL for income, which in turn supports housing, food, or stability.

Many individuals stated that the IFR will harm or impact the ability of non-domiciled individuals to provide for U.S. citizen children. Numerous individuals discussed that the income earned from non-domiciled CDLs pays for their children's education. One individual stated that the IFR undermines efforts in the school transportation sector to integrate immigrants into their communities through driving and to ensure children have a safe and reliable way to get to school. Another individual added that not being able to afford education expenses could reduce the number of future doctors, engineers, scientists, and professionals available to serve America. Multiple individuals also discussed that some non-domiciled drivers use their CDL income to pay for childcare or activities for their kids, such as sports programs. An individual expressed concern that their family will be forced to leave the country because of a lack of work, which would cause enormous stress for their children. Another individual expressed concern that a lack of work for non-domiciled drivers could contribute to other mental health issues like depression, anxiety, and post-traumatic stress disorder for both children and spouses. Numerous individuals expressed concern that without a CDL, they will not be able to cover healthcare expenses or medical bills for their families. Relatedly, eight individuals stated that the income from a non-domiciled CDL helps to support their elderly parents.

Multiple individuals expressed general concern regarding the ability of non-domiciled CDL holders to afford payments without a job. Relatedly, some individuals expressed concern that the IFR will take away non-domiciled drivers' ability to live with dignity, independence, or safety. USW and some individuals discussed that the income or work from CDLs allows non-domiciled drivers to contribute to the economy. Multiple individuals also stated that they want or have worked to integrate into American society. Numerous individuals expressed

concern that without the ability to work, non-domiciled CDL holders will not be able to cover basic expenses such as rent and living costs. Some individuals provided personal anecdotes or discussed that many non-domiciled drivers consistently pay their mortgages and credit obligations. Six individuals stated that inability to meet these financial obligations could lead to increased foreclosures of homes.

Another individual stated the IFR will also impact their ability to make other payments, including for: utilities, mobile service and internet, clothing, household goods, electronics, groceries, car loans and maintenance, and fuel. Numerous individuals provided specific cost data totaling several thousand dollars per month or year for expenses such as taxes, mortgages or homeowners' association fees, personal vehicles, childcare, and family education. One individual stated that the income from their CDL provides the means to afford the legal fees related to their immigration case and residency application. Numerous individuals requested that non-domiciled drivers be able to continue to work, contribute to the economy, or build a better future.

Multiple individuals questioned what they are supposed to do or where they should go without their CDLs. One individual expressed concern that they will have to change their profession and start from scratch. Another individual stated there are no other jobs to help them pay their bills. Multiple individuals discussed that they take pride in or love their professions as commercial drivers. Relatedly, six individuals discussed that the IFR will take away the lifestyle that trucking provides.

Multiple individuals expressed concern that the IFR will have real consequences for ordinary people. USW and numerous individuals also discussed that the IFR has left non-domiciled drivers feeling depressed, stressed, or scared. The Sikh Coalition stated that the IFR presents cascading harm at multiple levels of society, depriving individual drivers and families of their livelihoods while creating confusion, increasing the well-documented strain on remaining drivers, and undermining public safety. They discussed that Sikh truck drivers have faced a surge in harassment following the issuance of the IFR, undermining drivers' sense of safety and belonging. An individual expressed concern how the IFR may affect religious minorities.

Dev Trucking, MMAB Trans Inc., and numerous individuals, expressed general opposition to the IFR. The National Education Association stated the IFR is discriminatory, arbitrary, and capricious. Multiple individuals called for the IFR to be withdrawn, arguing that it will have negative impacts. TOSAM LLC and several individuals asked FMCSA to reconsider the IFR and better examine the consequences of its implementation.

STR Bros LLC and multiple individuals stated that the rule unfairly targets individuals who are legally present and authorized to work in the United States. Multiple individuals said that these drivers have valid work permits, paid taxes, and follow all applicable laws and regulations.

Multiple individuals addressed the safety rationale behind the IFR, questioning whether immigration status is a valid indicator of driving safety. An individual wrote that they are not opposed to tighter regulations but some businesses rely on truckers.

Multiple individuals expressed the need for the IFR, citing concerns about fraud and lack of integrity in the CDL issuance process for non-domiciled drivers.

Two individuals suggested that a comprehensive audit of all non-domiciled CDLs should be conducted to verify their legitimacy. An individual further stated that this review of non-domiciled licenses is needed to improve safety on the roads. Two individuals expressed frustration that they had to comply with strict requirements to obtain and maintain their CDLs while they perceived others were circumventing the system.

Three individuals expressed concern that the non-domiciled CDL program was being used to exploit foreign labor, driving down wages in the trucking industry. An individual described scenarios where non-domiciled drivers were being pressured to violate safety regulations due to their vulnerable status.

An individual also expressed concern that the IFR could create inconsistent standards across States. Similarly, an individual wrote that if States do not have the same standards, unqualified applicants will flock to States with lower standards.

While commending FMCSA's efforts, ATA supported a holistic approach to CDL credentialing and CMV safety. The commenter suggested that additional targeted reforms will further reinforce CDL testing and issuance standards and strengthen the broader safety framework around commercial driver qualification and vetting.

An individual stated that by restricting eligibility for non-domiciled CDLs to lawful employment-based nonimmigrant categories and mandating SAVE verification, FMCSA is restoring the credibility of a credential that underpins the safety of every road in America.

FMCSA Response

Again, as discussed throughout the comment responses above, the primary purpose of the IFR and this final rule is to ensure that all CMV drivers are subject to sufficient vetting to ensure that non-domiciled drivers are as safe as practicable before allowing them to operate CMVs on our roadways. FMCSA has detailed in the comment responses above why this final rule is necessary to achieve the agency's goal of safety. The individual concerns and impacts raised in these comments do not outweigh the safety benefits that will be realized under this final rule.

VII. Changes From the IFR

FMCSA makes minor changes from the IFR. Most of the changes are technical in nature and are intended to increase clarity. First, the agency revises the definition for *evidence of lawful immigration status* to require an unexpired Admit Until Date on a Form I–94/94A instead of requiring an unexpired Form I–94/94A. This technical change reflects language used by DHS when referring to the period of validity for a Form I–94/94A.

The second revision made in this final rule is the addition of clarifying language to 49 CFR 383.73(f)(2)(iv) that provides that a State must never issue a non-domiciled CLP or CDL with a period of validity longer than one year. This change is also a technical revision to increase clarity and ensure that there is no confusion regarding the maximum validity period for a non-domiciled CLP or CDL. In addition, FMCSA corrects a cross-reference to paragraph (1)(ii) of the definition of *evidence of lawful immigration status* in section 383.73(f)(5). There was a typographical error in the definition cross-referencing paragraph (1)(iii) in the IFR.

Paragraph (f)(6) of section 383.73 is revised to clarify that every non-domiciled CLP or CDL issuance (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transfer, renewal, or upgrade be conducted in-person only and that issuance, transfer, renewal, or upgrade by mail or electronic means is not allowed. This additional language further clarifies what was plainly stated in the IFR regarding the in-person requirements for the non-domiciled licensing process.

The heading of section 383.73(m)(2) and text of section 384.212(a)(1)(i) are

revised to reference retention in addition to document verification. In addition, section 383.212(a)(1)(ii) is deleted and paragraph (iii) is renumbered to (ii). These changes reflect a clarification of the documentation verification and retention requirements in these sections while removing the duplicative paragraph at section 383.212(a)(1)(ii). These changes do not alter any of the regulatory requirements.

In addition, FMCSA makes a clarifying edit to the parenthetical that follows issue, issuing, and issuance in various sections amended by the IFR. The parenthetical in the IFR included amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL. The agency adds reinstating to that list to ensure complete clarity to the regulated public in the list of actions considered to be issuance of a non-domiciled CLP or CDL. This change does not add a substantially new regulatory requirement from the IFR since a reinstatement would likely be the same as an upgrade, reissuance, or one of the categories of actions in the parenthetical for issuance under the IFR.

Finally, FMCSA updates the dates in sections 383.73(f)(3)(ii)(A) and 384.301(q) to the effective date of this final rule.

## VIII. International Impacts

Motor carriers and drivers are subject to the laws and regulations of the countries where they operate, unless an international agreement states otherwise. Drivers and carriers should be aware of the regulatory differences between nations in which they operate.

This rule will not impact drivers domiciled in Canada or Mexico. FMCSA has previously determined that CDLs issued by Canadian Provinces and Territories in conformity with the Canadian National Safety Code and "Licencias Federales de Conductor" issued by the United Mexican States are in accordance with the standards of 49 CFR part 383. Under these reciprocity determinations, drivers that live in Canada and Mexico would operate in the United States with the license issued by their country of domicile. Therefore, under the single license provision of section 383.21, a driver holding a CDL issued under the Canadian National Safety Code or a "Licencia Federal de Conductor" issued by Mexico is prohibited from obtaining a non-domiciled CDL, or any other type of driver's license, from a State or other jurisdiction in the United States.

## IX. Section-by-Section Analysis

This section-by-section analysis describes the changes to the regulatory text in numerical order.

### A. Regulatory Provisions

#### Section 383.5    Definitions

FMCSA amends the definition for *evidence of lawful immigration status* by revising paragraph (1)(ii) to require "an unexpired Admit Until Date" on a Form I–94/94A instead of requiring "an unexpired Form I–94/94A."

#### Section 383.73    State Procedures

FMCSA revises paragraph (f)(2)(iv) to add language which provides that a State must never issue a non-domiciled CLP or CDL with a period of validity longer than 1 year. In addition, in paragraph (f)(5), the agency replaces a cross-reference to paragraph (1)(iii) of the definition of evidence of lawful immigration status with a cross reference to paragraph (1)(ii).

Paragraph (f)(6) of § 383.73 is revised to clarify that every non-domiciled CLP or CDL issuance (which includes amending, correcting, reprinting, *reinstating,* or otherwise duplicating a previously issued CLP or CDL), transfer, renewal, or upgrade be conducted in-person only and that issuance, transfer, renewal, or upgrade by mail or electronic means is not allowed.

The heading of § 383.73(m)(2) is revised to reference retention in addition to document verification.

The word "reinstating" is added to the parentheticals after "issue," "issuing," or "issuance," as appropriate in paragraphs (f)(3)(ii)(A), (f)(3)(ii)(B), (f)(5), (m)(2), (m)(2)(i), (m)(2)(ii), an (m)(2)(iii). The effective date in paragraph (f)(3)(ii)(A) is revised to match the effective date of this final rule.

#### Section 384.212    Domicile Requirement

FMCSA revises paragraph (a)(1)(i) to reference retention in addition to document verification. In addition, paragraph (a)(1)(ii) is removed and paragraph (a)(1) (iii) is redesignated as (a)(1)(ii). The word "reinstating," is added to the parenthetical after "issuing" in paragraph (a)(1)(i).

#### Section 384.301    Substantial Compliance-General Requirements

Paragraph (q) is amended by adding the word "reinstating," is to the parenthetical after "issuing" and the effective date is revised to match the effective date of this final rule.

### B. Guidance Statements and Interpretations

This final rule amends a regulation that has associated guidance statements. Such guidance statements do not have the force and effect of law, are strictly advisory, and are not meant to bind the public in any way. Conformity with guidance statements is voluntary. Guidance is intended only to provide information to the public regarding existing requirements under the law or FMCSA policies. A guidance statement does not alter the substance of a regulation. The guidance and interpretation(s) that follow were rescinded via an interim final rule (IFR) published on September 29, 2025 (90 FR 46509, 46517), but remained in effect due to a stay order issued by the U.S. Court of Appeals for the District of Columbia on November 13, 2025. The stay paused the effective date of the IFR, which reinstated the guidance below.

Therefore, FMCSA now re-rescinds the following guidance:

1. FMCSA–CDL–383.23–FAQ001(2023–05–08):[71]

FMCSA rescinds this guidance document, which refers to individuals present under the DACA immigration policy as citizens of Mexico. It is no longer applicable under the new requirements to provide evidence of legal status.

2. FMCSA–CDL–383.23–Q1:[72]

FMCSA rescinds this guidance document, which refers to foreign drivers with employment authorization documents. Foreign drivers must meet the new requirements in this rule to obtain non-domiciled CLPs and CDLs and the rest of the guidance is unnecessary as it is simply a restatement of what is already explained in footnote 1 to 49 CFR 383.23.

3. Nomenclature for Non-Domiciled CLPs and CDLs

In addition, some SDLAs were operating under informal guidance previously issued by FMCSA that permitted States to refer to their non-domiciled credentials under different nomenclature. FMCSA notes that during the 2025 APRs, SDLA use of these disparate terms generated confusion for some SDLAs because it made it difficult to determine whether the State did in fact issue non-domiciled credentials in the first place. This final rule

---

[71] https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled.

[72] https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-foreign-driver-employment-authorization-document-obtain.

supersedes any past guidance on this issue and clarifies that sections 383.73(f)(2)(ii) and 383.153(c) require that the word "non-domiciled" appear across a CLP or CDL and must "be conspicuously and unmistakably displayed" on the face of the CLP or CDL when a State issues a non-domiciled CLP or CDL. States may not use other nomenclature (such as "limited term" or "temporary") as a substitute for "non-domiciled," use restriction codes that require the examination of fine print on the back of the license as a substitute for "non-domiciled" on the face of the credential, or use any other alternatives to conspicuously and unmistakably displaying "non-domiciled" on the face of the CDL or CLP.

## X. Regulatory Analyses

### A. E.O. 12866 (Regulatory Planning and Review), and DOT Regulatory Policies and Procedures

OMB has determined that this rulemaking is a significant regulatory action under E.O. 12866 (58 FR 51735), Regulatory Planning and Review, because of the substantial Congressional and public interest concerning issuance of non-domiciled CLPs and CDLs. The rulemaking is also significant under DOT Order 2100.6B, Policies and Procedures for Rulemakings.[73]

This final rule amends the Federal regulations for SDLAs issuing commercial driving credentials to foreign-domiciled individuals. Through this rulemaking, FMCSA restores the integrity of the CDL issuance processes by significantly limiting the authority for SDLAs to issue and renew non-domiciled CLPs and CDLs to individuals domiciled in a foreign jurisdiction.

The analysis below discusses the affected entities, the need for the regulation, and the costs, benefits, and transfers that may result from this final rule. FMCSA has not made significant changes to the RIA that was prepared for the IFR. This RIA provides additional detail on the impact to motor carriers and drivers that could result from the rule, provides more information regarding the CDL composite wage rate, and more detail surrounding underlying analysis inputs. Most notably, as discussed below, FMCSA found evidence suggesting that most foreign-domiciled CDLs were likely issued with five-year expiration dates and updated this assumption from the two-year expiration date in the IFR. The analysis

includes additional crashes that have been identified since the publication of the IFR.

### Analysis Inputs

#### Baseline

OMB circular A–4 instructs agencies to identify a baseline, or an assessment of the way the world would look absent the rulemaking such that the costs and benefits of the rulemaking can be defined in comparison to the clearly identified baseline. The choice of baseline is not always simple, and in this case takes careful consideration. The IFR assumed the current environment at the time to be the baseline. That is to say, that the acute systemic problems regarding non-domiciled CDL issuance across the country had not been addressed, and would not have been addressed absent the IFR. Since that time, and as discussed above, many States have been required to pause issuance of all non-domiciled CDLs as part of the corrective action plan for the deficiencies discovered under the APR and others have voluntarily paused issuance of all non-domiciled CDLs to conduct internal audits of their issuance procedures and processes apart from FMCSA's APR process. The question then becomes whether the baseline should now be the current, post-IFR world where some States are no longer issuing non-domiciled CDLs. FMCSA believes that the States are working diligently to restore integrity to their programs, and other States are waiting to see what actions FMCSA takes in the coming months. This has also been documented in industry publications.[74] FMCSA thus considers, absent this rulemaking, any pause in non-domiciled CDL issuance to be temporary, with the future reverting back to the pre-IFR standards for issuance. This rule sets out a clearly defined standard for non-domiciled CDL issuance that will remain in effect unless changed by a future rulemaking. Therefore, in order to provide a clear picture of the impact of this policy change, FMCSA has concluded that it is appropriate to use the pre-IFR baseline and estimates the following costs and benefits accordingly.

#### Wage Rates

FMCSA computes its estimates of labor costs using data gathered from several sources. Labor costs are comprised of wages, fringe benefits, and overhead. Fringe benefits include paid

leave, bonuses and overtime pay, health and other types of insurance, retirement plans, and legally required benefits (Social Security, Medicare, unemployment insurance, and workers compensation insurance). Overhead includes any expenses to a firm associated with labor that are not part of employees' compensation; this typically includes many types of fixed costs of managing a body of employees, such as management and human resource staff salaries or payroll services. The economic costs of labor to a firm should include the costs of all forms of compensation and labor related expenses.

FMCSA used the driver wage rate to represent the value of the drivers' time that, in the absence of the rule, would have been spent gainfully employed and performing duties as a CMV driver. The source for driver wages is the median hourly wage data (May 2024) from DOL, BLS, Occupational Employment Statistics (OES).[75] The CMV driver wage is a weighted average of three occupational codes that require a CDL: 53–3032 Heavy and Tractor-Trailer Truck Drivers, 53–3051 Bus Drivers, School, and 53–3052, Bus Drivers, Transit and Intercity. BLS does not publish data on fringe benefits for specific occupations, but it does for the broad industry groups in its Employer Costs for Employee Compensation release. To calculate the fringe benefits rate, this analysis uses an average hourly wage of $32.71 and average hourly benefits of $14.99 for private industry workers in "transportation and warehousing"[76] to estimate that fringe benefits are equal to 45.83 percent ($14.99 ÷ $32.71) of wages.[77]

[73] Available at https://www.transportation.gov/regulations/dot-order-21006b-policies-and-procedures-rulemakings (Mar. 10, 2025).

[74] https://www.overdriveonline.com/regulations/article/15814539/new-jersey-resumes-nondomiciled-cdl-issuance-after-fmcsa-crackdownZ.

[75] DOL, BLS. Occupational Employment Statistics (OES), National, May 2024, available at: https://www.bls.gov/oes/tables.htm (accessed Aug. 27, 2025).

[76] DOL, BLS. Table 4: Employer Costs for Employee Compensation for private industry workers by occupational and industry group, December 2024, available at: https://www.bls.gov/news.release/archives/ecec_03142025.htm (accessed Sep. 9, 2025).

[77] FMCSA's standard approach to accounting for the opportunity cost of drivers' time considers hourly base wage plus fringe benefits, but exclusive of overhead, representing the value to the driver of his or her forgone best alternative (i.e., in the absence of this rule it is assumed these individuals would be working during that time and as such, the analysis values that time at the same amount that they accept in exchange for it, that is, their base wage plus fringe benefits). Including an overhead rate as a component element of the driver wage rate, over and above the base wage and fringe benefits, for the purposes of evaluating the opportunity cost to drivers does not accurately reflect the value as incident upon the driver (because the value of the overhead component of wage rates is not incident upon, nor received as compensation by, the driver, as are base wages and fringe benefits).

TABLE 1—CDL HOLDER COMPOSITE HOURLY MEDIAN WAGE RATE AND FRINGE BENEFITS

| Occupation (SOC code) | Employment | Hourly median wage | Fringe benefits rate (%) | Median hourly base wage + fringe benefits |
|---|---|---|---|---|
| Heavy and Tractor-Trailer Truck Drivers (53–3032) ....................................... | 2,070,480 | $27.62 | 45.83 | $39.19 |
| Bus Drivers, School (53–3051) ............................................................................ | 387,920 | 22.62 | | |
| Bus Drivers, Transit and Intercity (53–3052) ..................................................... | 148,980 | 27.61 | | |
| CDL Holder Composite Wage ............................................................................... | .................... | 26.88 | | |

Current CDL holders that will no longer be eligible for a CDL will likely look for employment in other occupations. The following table provides an overview of median hourly wage rates for some occupations that are in transportation or transportation-adjacent industries for which CDL holders would generally have the necessary skills to be successful, and therefore could be alternatives to positions requiring a CDL, which shows a weighted median wage rate of $21.62 and a loaded composite wage rate of $31.53. FMCSA presents this information for illustrative purposes only and is not suggesting that this is the maximum wage available to non-domiciled CDL holders.

TABLE 2—HOURLY MEDIAN WAGE AND FRINGE BENEFITS FOR NON-CDL REQUIRING OCCUPATIONS

| Occupation (SOC code) | Employment | Hourly median wage | Fringe benefits rate (%) | Median hourly base wage + fringe benefits |
|---|---|---|---|---|
| Shipping, Receiving, and Inventory Clerks (43–5071) ........................................ | 4,900 | $21.74 | 45.83 | $31.53 |
| Agricultural Equipment Operators (45–2091) ..................................................... | 420 | 23.88 | | |
| Construction Equipment Operators (47–2070) ................................................... | 3,420 | 24.30 | | |
| Light Truck Drivers (53–3033) ............................................................................. | 49,890 | 21.65 | | |
| Cleaners of Vehicles and Equipment (53–7061) ................................................ | 3,760 | 18.56 | | |
| Laborers and Freight, Stock, and Material Movers, Hand (53–7062) ............. | 107,290 | 21.62 | | |
| Tank Car, Truck, and Ship Loaders (53–7121) ................................................. | 250 | 20.68 | | |
| Composite Non-CDL Holder Wage ...................................................................... | .................... | 21.62 | | |

FMCSA used the wage rate for employees in office and administrative support to represent the value of the SDLA employees' time that, in the absence of the rule, would have been spent performing other duties and responsibilities. The source for SDLA employees' wages is the median hourly wage data (May 2024) from the BLS' OES. To calculate the fringe benefits rate, this analysis uses an average hourly wage of $25.56 and average hourly benefits of $18.95 for State and local government workers in "office and administrative support" to estimate that fringe benefits are equal to 74.14 percent ($18.95 ÷ $25.56) of wages. FMCSA uses the Census Bureau's Service Annual Survey (SAS) Table 5 data to calculate overhead expenses and their ratio to gross annual payroll expenses for the North American Industry Classification System (NAICS) 484 (Truck Transportation) and NAICS 485 (Transit and Ground Passenger) industries.[78]

FMCSA reviewed SAS data from 2013 through 2021, finding 2015 to be the most appropriate baseline from which to estimate industry overhead rates. While it is typically preferable to use the most recent information, data from 2020 was an anomalous year with especially high overhead rates, likely due to the COVID–19 pandemic and subsequent business disruptions. For the 2018 and 2019 SAS tables, Census greatly reduced the number of expenses published in Table 5.

Based on the assigned expense categories as overhead, FMCSA followed two steps to calculate the overhead rate. First, FMCSA added together the seven overhead expense categories (expensed purchases of software; data processing and other purchased computer services; purchased repairs and maintenance to buildings, structures, and offices; lease and rental payments for land, buildings, structures, store spaces, and offices;

purchased advertising and promotional services; purchased professional and technical services; and cost of insurance). FMCSA then divided the sum of the overhead expense categories by gross annual payroll. Following this approach including only the seven expense categories most focused on firm fixed expenses, the 2015 overhead expenses in truck transportation would be $13.0 billion.[79] Dividing the $13.0 billion overhead by $62 billion gross annual payroll gives a 21 percent overhead rate for NAICS 484. The 2015 overhead expenses in passenger and ground transportation would be $3.1 billion. Dividing the $3.1 billion overhead by the $13 million gross annual payroll gives a 23 percent overhead rate for NAICS 485. FMCSA then combined the expense and payroll categories for both industries to calculate an average transportation industry overhead rate of 21 percent for use in this analysis.

[78] See SAS Table 5, available at: *https://www.census.gov/programs-surveys/sas/data/tables.html* (accessed: Sept. 10, 2025).

[79] The seven expense categories included in this overhead estimate are: "Expensed purchases of software" ($321 million), "Data processing and other purchased computer services" ($320 million), "Purchased repairs and maintenance to buildings, structures, and offices" ($541 million), "Lease and rental payments for land, buildings, structures, store spaces, and offices" ($3,067 million), "Purchased advertising and promotional services" ($507 million), "Purchased professional and technical services" ($1,782 million), and "Cost of insurance" ($6,535 million).

Table 3—SDLA Hourly Median Wage Rate, Fringe Benefits, and Overhead Rates

| BLS occupation code | Occupation | Hourly median wage | Fringe benefits rate (%) | Overhead rate (%) | Median hourly base wage + fringe benefits | Median base wage + fringe benefits + overhead |
|---|---|---|---|---|---|---|
| 43–1011 ...................... | First-Line Supervisors of Office and Administrative Support Workers. | $31.80 | 74.14 | 21 | $55.38 | $62.05 |

### Average SDLA Fee for License Renewal

FMCSA reviewed fees for CDL renewal across all 51 (50 States and the District of Columbia) jurisdictions and found that renewal fees range from $5 to $164.50. The average renewal fee is $55.28, and FMCSA uses an estimate of $55 to represent the renewal fee paid by non-domiciled CDL applicants.

### Crash Costs

FMCSA uses crash cost values to assess and estimate the safety benefits of various regulatory initiatives. FMCSA publishes its methodology for calculating crash costs for fatal, injury, and non-injury crashes on its website.[80] The values below incorporate the most recent crash data from the National Highway Traffic Safety Administration, from calendar year 2023, inflated to 2024 values based on the Consumer Price Index for All Urban Consumers.

Table 4—CMV Crash Cost, by Crash Type

[In 2024 dollars]

| Crash type | CMV crash costs |
|---|---|
| Cost per non injury crash ..... | $52,864 |
| Cost per injury crash ............. | 400,025 |
| Cost per fatal crash .............. | 15,739,682 |

### Driver Turnover and Churn Rates

Employment turnover and churn are well-documented features of the CMV industry. The 2025 update to ATRI's Analysis of the Operational Costs of Trucking reports that the average driver turnover rate, weighted by sector representation was 48 percent in 2024.[81] Driver turnover in the truckload sector ranges from 44.3 percent to 72.1 percent depending on the size of the carrier. The

OOIDA foundation finds that while driver churn affects large truckload carriers to a greater extent than small carriers, it is endemic to the entire industry, and something that carriers have been managing for many years.[82] ATA published data showing the over-the-road for-hire truck driver turnover for large truckload carriers ranged from 81 to 90 percent between 2016 and 2020.[83] For small truckload carriers, the turnover ranged from 69 to 79 percent. Other sources also highlight these industry trends with Tenstreet reporting that about 30 percent of drivers leave their carrier after 3 months, and only roughly 40 percent stay with that carrier for an entire year.[84] Outside of the private truckload carriers, many drivers routinely move from carrier to carrier or exit the market based on various factors. This phenomenon is not confined to the trucking industry. The American Public Transportation Association reports that 59 percent of departures happen within the first two years of employment.[85]

### Non-Domiciled CDL Expiration Date and Attrition Rate

Properly issued non-domiciled CDLs contain an expiration date in-line with the documentation provided to the SDLA (e.g., EAD). During the APR process FMCSA reviewed thousands of non-domiciled CDL credentials and found that properly issued non-domiciled CDLs have expiration rates up-to five years [86] following the date of

issuance. As such, FMCSA estimates that drivers who will no longer be eligible for a non-domiciled CDL will exit the market over the course of the next five years when their license comes up for renewal.

### Affected Entities

#### SDLAs

This final rule will impact the SDLAs in 47 States that issued non-domiciled CDLs prior to the publication of the IFR (AL, MS, TN, and WV do not issue non-domiciled CDLs).

#### Drivers

This final rule will impact current and prospective non-domiciled CDL holders. Drivers will be required to provide additional documentation, and in some cases will no longer be eligible for a non-domiciled CDL. FMCSA gathered information on current CLP and CDL holders during the APRs discussed earlier in the preamble and estimates that there are approximately 200,000 non-domiciled CDL holders, and approximately 20,000 non-domiciled CLP holders. Upon renewal, some number of these individuals will no longer be eligible for a non-domiciled CDL and will have their credential downgraded. In an effort to determine the number of drivers that will still be eligible for non-domiciled CDLs, FMCSA spoke with other Government agencies and reviewed data from SDLAs and other on-line resources. Approximately 500 to 600 individuals receive a H–2B status with the intent to operate a CMV each year. This nonimmigrant classification can be granted for up to the period of time authorized on the temporary labor certification and may be extended for qualifying employment in increments of

---

[80] Available at *https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2024-12/FMC-PRE-240812-001-Federal%20Motor%20Carrier%20Safety%20Administraction%20Crash%20Cost%20Methdology%20Report-2024_0.pdf.*

[81] ATRI, Analysis of the Operational Cost of Trucking: 2025 Update, Page 48, available for download at *https://truckingresearch.org/about-atri/atri-research/operational-costs-of-trucking/.*

[82] *https://www.ooida.com/wp-content/uploads/2025/04/The-Churn-A-Brief-Look-at-the-Roots-of-High-Driver-Turnover-in-U.S.-Trucking.pdf.*

[83] *https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2021-07/MCSAC%20Truck%20Driver%20Market%20Update%20-%20July%202021.pdf.*

[84] Tenstreet, Q1 Insights on Recruiting and Retention, page 10. Available at: *https://www.tenstreet.com/wp-content/uploads/2023/05/Tenstreet-Q1-Recruiting-and-Retention-eBook.pdf.*

[85] *https://www.apta.com/wp-content/uploads/APTA-Transit-Workforce-Shortage-Report.pdf.*

[86] FMCSA acknowledges that this is a significant change from the IFR. However, this is consistent with the September 27, 2023 USCIS Policy Alert that extended the maximum validity period for EADs from many statuses from 1 or 2 years to 5 years. See *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20230927-*

*EmploymentAuthorizationValidity.pdf.* USCIS issued a Dec. 4, 2025 Policy Alert that superseded the 2023 policy (see *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20251204-EmploymentAuthorizationValidity.pdf*); however, FMCSA believes that the majority of the non-domiciled CDLs and CLPs relevant to this analysis were issued during the time that the 2023 policy was in effect.

up to 1 year.[87] FMCSA thus assumes that 500 to 600 individuals will seek a non-domiciled CDL, including renewals or extensions, each year. FMCSA does not have clear estimates of the number of H–2A workers that intend to operate a CMV because it is often incidental to the work they are doing. The Office of Homeland Security Statistics yearbook estimates that approximately 27,240 H–2A visas were issued to individuals from countries other than Canada and Mexico in 2023.[88] This represents an upper bound in that it is highly unlikely that all of these individuals would seek a CDL. The BLS reports employment based on industry and occupational code. In 2024, BLS estimates that there were approximately 15,000 heavy and tractor-trailer truck drivers in the agricultural industry.[89] Many of these drivers are U.S. citizens and would not seek a non-domiciled CDL. FMCSA makes the simplifying assumption that ⅓ of these individuals hold H–2A status, are not domiciled in either Canada or Mexico, and will be applying for non-domiciled CDLs each year. FMCSA was unable to find data specific to the number of E–2 visa holders that would apply for a non-domiciled CDL but estimates that the number would not exceed 300 drivers. Including the individuals in all applicable nonimmigrant categories (H–2A, H–2B, and E–2) FMCSA estimates that SDLAs will issue approximately 6,000 non-domiciled CDLs per year. The remaining roughly 194,000 current non-domiciled CDL holders will exit the freight market, which is discussed in more detail in the cost section.

### Motor Carriers

This final rule will impact motor carriers that currently, or intend to, employ non-domiciled CDL holders that are no longer eligible to receive a credential. There are approximately 785,000 for-hire and private motor carriers. Assuming that each impacted motor carrier employs one non-domiciled CDL holder, a maximum of 194,000 (or 25 percent) could be impacted by this rulemaking.[90] To be clear, the maximum of 194,000 is an extreme upper bound estimate based on an assumption that no single motor carrier employs more than one non-

domiciled CDL holder. Therefore, it is extremely unlikely that 25 percent of motor carriers will be impacted by this rule.

### Need for the Regulation

This final rule builds on and makes minor revisions to the regulatory changes in the IFR published on September 29, 2025 titled, "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)" (90 FR 46509). In reaffirming the changes made in the IFR and making some revisions for clarity, this final rule rectifies a critical safety gap in the Nation's commercial drivers licensing system that has manifested in two ways: (1) the issuance of licenses to individuals whose safety fitness cannot be adequately verified by SDLAs; and (2) the reliance on Employment Authorization Documents (EAD), which has proven administratively unworkable and resulted in widespread regulatory non-compliance.

### Costs

This final rule will require States and their SDLAs to verify additional documentation, utilize SAVE, and retain copies of the verified documents in their records. FMCSA anticipates that States will issue fewer non-domiciled CDLs, but that each credential will require additional time to verify and retain documents. Currently, States are not required to pay transaction fees to query SAVE, and FMCSA does not estimate a fee impact for that transaction, nor does it believe that the additional queries resulting from this rule would have more than a de minimis impact on the cost of operating the SAVE system. Lastly, States that choose to issue non-domiciled CDLs and CLPs will be required to pause issuance of those CDLs and CLPs until they can ensure compliance with the updated regulations. FMCSA anticipates that States will incur costs in the process of realigning their non-domiciled CDL program issuance with the standards set forth in this final rule. However, SDLAs are able to apply for and use CDLPI grants to come into or maintain compliance with the requirements of this rule.

FMCSA estimates that verifying and retaining additional documentation and running a SAVE query will require approximately 15 minutes of time per query for SDLA personnel. FMCSA estimates that the total cost, across all impacted SDLAs, will total approximately $93,075 per year (6,000 applicants × $62.05 wage rate × 15 minutes). During the APRs FMCSA determined that some States were

already running SAVE queries as part of their business process. To the extent that States were already in compliance with this requirement (i.e., running a SAVE query or a functional equivalent that is merely a pass-through to SAVE to verify lawful permanent residence), they would not experience additional costs to comply with this regulation.

Each SDLA has developed a process that is unique to their State, and as such, will incur different costs to adjust their program. Some program adjustments could include reprograming the IT system to interpret SAVE results in alignment with the new standards, changing the credential that is issued to ensure that "non-domiciled" is conspicuously and unmistakably displayed on the face of the CLP or CDL, and ensuring that SDLA employees are properly issuing non-domiciled CDLs and retaining appropriate records. FMCSA is unable to estimate a specific cost for each SDLA due to the variance in current non-domiciled CDL issuance (e.g., many SDLA systems already issue credentials with "non-domiciled" displayed on the face of the credential and some SDLAs were already retaining appropriate records to document the issuance process). FMCSA has previously estimated costs of approximately $70,000 (in 2024 dollars) to develop an interface between the Drug and Alcohol Clearinghouse and the SDLA IT system.[91] This would likely overestimate the cost of reprograming State IT systems to interpret SAVE results because SDLAs are already interfacing with SAVE for purposes of REAL ID and this change will represent an adjustment to the existing interface. It is, however, a reasonable estimate of the average impact for States to align their non-domiciled CDL program with the standards set forth in this rule (inclusive of IT system upgrades, credential updates, and ensuring staff are properly issuing credentials). FMCSA thus assumes that each of the 47 affected SDLAs will incur costs of $70,000 in the first year of the analysis, on average, resulting in total first year costs for program realignment of $3.3 million (47 SDLAs × $70,000 = $3,290,000).

This final rule will also result in costs to non-domiciled CDL drivers as they will now be required to renew their license in person every year, which increases the amount of time needed to renew the license. Previously, some drivers were likely able to renew online or via mail and had expiration dates beyond a one-year timeframe, up to five

[87] See *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers.*

[88] Available at *https://ohss.dhs.gov/topics/immigration/yearbook/2023/table25.*

[89] Available at *https://data.bls.gov/projections/nationalMatrix?queryParams=111000&ioType=i.*

[90] FMCSA Pocket Guide to Large Truck and Bus Statistics. Available at: *https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2025-09/FMCSA%20Pocket%20Guide%202024-v6%20508%20.pdf.*

[91] Controlled Substances and Alcohol Testing 86 FR 55718.

years. FMCSA assumes that non-domiciled CDL holders will renew their license at the time of expiration printed on their existing credential such that only ⅕ of drivers will incur a renewal cost in the first year, ⅖ of drivers in the second year, and so forth. Beginning in the fifth year, all 6,000 non-domiciled CDL holders will be renewing in person each year. FMCSA further assumes that renewal on-line or via mail requires about one hour of time, and that in-person renewal requires approximately four hours. The additional time allows for commuting to and from the SDLA and any appointment delays and wait times associated with in-person service. Consequently, the change in renewal impact is based on the period of validity for the credential and the difference in time associated with in-person renewal. Individuals with a one-year validity period will experience an increase of three hours each year, while individuals with a five-year validity period will see an annual average increase of 3.8 hours $(4 \text{ hours} - (1 \text{ hour} \div 5 \text{ years}) = 3.8)$ The average increase across all validity periods is 3.54 hours (4 hour in-person renewal minus 0.46 average annual renewal time across all validity periods). In the first year of the analysis period, only ⅕ of the 6,000 non-domiciled CDLs holders will renew their licenses, at a cost of $166,636 $(6,000 \times \frac{1}{5} \times \$39.19 \times 3.54 \text{ hours})$. FMCSA estimates that in the fifth year of the analysis period, all 6,000 non-domiciled CDL holders will renew their license in person, resulting in total annual costs of $833,179 (6,000 applicants × $39.19 × 3.54 hours).

FMCSA anticipates that drivers who will no longer be eligible for a non-domiciled CDL will be able to find similar employment in other sectors or occupations within the transportation sector (*e.g.,* construction, driving vehicles that do not require a CDL, etc.). As discussed above, turnover has been an integral component in the industry for many years, and drivers are constantly looking for different opportunities. FMCSA anticipates, based on well-documented historical trends, that many of these non-domiciled CDL holders would have been looking for new employment opportunities regardless of this final rule, particularly given the temporary nature of non-domiciled CDLs. Those drivers that would have continued driving a vehicle requiring a CDL will experience an opportunity cost as they transition to their next best alternative. That cost can be represented as the difference in wage between the CDL holder ($39.19) and the next best

available opportunity ($31.53). FMCSA notes that some of this wage differential likely accounts for the challenges inherent to long haul trucking and transit and intercity bus service such as limited home time and long work days. For an individual driver, the representative annual impact would be approximately $16,000 (($39.19 − $31.53) × 2,080 working hours per year). FMCSA does not expect individual drivers to experience prolonged unemployment as a result of the final rule due to the interconnected nature of CDL-holding occupations with adjacent industries that employ individuals in the occupations considered among the next best available opportunities. In addition, with up to five years before the expiration of NDCDLs, individuals have ample time to proactively locate employment that does not require a CDL, whether in the occupations FMCSA considered or in other career paths. FMCSA stresses that the majority of these drivers are likely to have left the industry regardless of this rule given the high rate of churn inherent to the industry and that this impact is provided to demonstrate that, regardless of the ability to continue to hold a CDL, these individuals will still have opportunities to be gainfully employed. This estimate is included for illustrative purposes, but FMCSA does not consider it to be a cost of the final rule.

Motor carriers that currently employ non-domiciled CDL holders will have ample time to adjust to the change as the drivers will be aware if their license will not be renewed under the standards set forth in this final rule. Further, non-domiciled CDL credentials were never meant to be permanent documents, but to have an expiration date based on the length of the individual's employment authorization. As such, motor carriers should have been aware that these drivers might have been unable to continue holding a CDL based on the individual's employment authorization. Lastly, given the industry norm regarding movement of drivers and the constant need for hiring, FMCSA considers motor carriers to be well equipped to handle any driver replacement necessitated by this rule. Further, the five-year attrition will assist in mitigating any impacts to motor carriers. While this exit from the market might come earlier than anticipated in some instances, the non-domiciled CDL credentials were always meant to be temporary with expiration dates based on the individual's employment authorization. At most, this rule would result in a temporal shift in impact

related to that subset of non-domiciled CDL holders that would not have looked for alternative employment within five years but, given the high rate of churn in the industry, would have sought alternative employment at a later date.

Regarding potential economic impacts within the freight market, FMCSA looked at data during and after the COVID–19 pandemic to understand how the market may react to a reduction in CDL holders and found that the freight market tends to be flexible and responsive to external factors. During the COVID–19 pandemic the industry saw a historic increase in spot market rates, followed by a record influx of motor carriers and drivers entering the market to meet the increased demand.[92] In 2021 there was a nearly 20 percent increase in the number of interstate motor carriers and a 6 percent increase in the number of interstate CDL drivers.[93] Since that time, the rates have fallen, as have load volumes and the number of motor carriers.[94][95] This market fluctuation is also evidenced by the Cass Shipment Index, the Cass Truckload Line Haul Index, and the BLS General Freight Long-Distance Truckload Employment figures which collectively show a spike in demand from 2020 to 2021 that has trended downward thereafter.[96] There are roughly 200,000 non-domiciled CDL holders, which is approximately five percent of the 3.8 million active interstate CDL holders in 2024. FMCSA anticipates that these drivers will exit the market over approximately five years as their credentials come up for renewal, and that the market will respond to this change in capacity as it has in the past, with drivers and carriers responding to market signals and ensuring that freight is delivered.

Current conditions in the freight market are conducive to just this type of adjustment. Carriers have been struggling with excess capacity since the freight recession began in 2022. Some

---

[92] Available at *https://www.bts.gov/freight-indicators#spot-rates.*

[93] Data available from MCMIS.

[94] Bureau of Transportation Statistics. Truck Spot Rates Jan 2015–Oct 2023. Available at: *https://www.bts.gov/browse-statistical-products-and-data/info-gallery/truck-spot-rates-jan-2015-oct-2023.*

[95] FMCSA 2024 Pocket Guide to Large Truck and Bus Statistics. Table 1–8. Available at: *https://www.fmcsa.dot.gov/safety/data-and-statistics/commercial-motor-vehicle-facts.*

[96] Cass Shipment Index: *https://www.cassinfo.com/freight-audit-payment/cass-transportation-indexes/cass-freight-index* Cass Truckload Line Haul Index: *https://www.cassinfo.com/freight-audit-payment/cass-transportation-indexes/truckload-linehaul-index* BLS General Freight Long-Distance Truckload Employment: *https://data.bls.gov/dataViewer/view/timeseries/CES4348412101.*

describing the "Great Freight Recession [as] defined not by a dramatic crash but by its grinding duration." [97] JB Hunt, in a 2024 letter to their shareholders and employees, stated that "more than 30 months into this unprecedented freight recession marked by too much industry capacity, we continue to be challenged . . . across our organization." [98] Further, drivers have increased their dead-head miles, and trucks have been sidelined as the freight recession has continued. [99]

Available unemployment data from BLS on the broader Transportation and Utilities sector also supports this assumption. BLS does not directly track the unemployment rate of CDL holders, however, it publishes data on the broader Transportation and Utilities sector, reporting a 4.4 percent unemployment rate, or 371,000 unemployed persons in the sector as of November 2025. [100] While this is not the sole sector in which CDL holders are employed, it is the closest official proxy available and suggests that the labor supply is not constrained to ensure that the periodic attrition over five years of non-domiciled CDL holders impacted by the final rule is likely to overburden the CDL holder labor supply. Therefore, due to the prolonged five-year period of attrition, motor carriers will have time to adjust their hiring based on the requirements set forth in this final rule, including by marketing available positions to drivers with the proper qualifications to obtain a CDL, many of whom have been sidelined in recent years due to the freight recession.

*Transfers*

Drivers who previously paid the renewal fee at the end of the validity will now pay that fee annually. As discussed above, the average renewal fee is $55, and will now be paid annually instead of at the end of the validity period, which results in an average increase across all validity periods of approximately $29.88 per year. FMCSA anticipates that one-fifth of the 6,000, or 1,200, will be required to renew in the first year of the analysis at a cost of $35,860. FMCSA anticipates that by the fifth year of the analysis period, drivers will incur additional fees of approximately $179,300 per year (6,000 drivers × $29.88). Fees are considered transfer payments, or monetary payments from one group to another that do not affect the total resources available to society, and therefore do not represent actual costs or benefits of the rule.

*Quantified Costs and Transfers*

As shown in the table below, FMCSA estimates that a quantified portion of the 10-year costs of the rulemaking (excluding transfers) is approximately $9.5 million discounted at three percent and $8.1 million discounted at seven percent. quantified annualized impacts range from $1.4 million discounted at three percent to $1.2 million discounted at seven percent.

### Table 5—Quantified Costs and Transfers

[In 2024 dollars]

| Analysis year | Quantified state cost | Quantified driver cost | Total transfers | Quantified cost (excluding transfers) | Quantified cost (discounted at 3 percent) | Quantified cost (discounted at 7 percent) |
|---|---|---|---|---|---|---|
| 1 | $3,383,075 | $166,636 | $165,000 | $3,549,711 | $3,446,321 | $3,317,487 |
| 2 | 93,075 | 333,272 | 165,000 | 426,347 | 401,873 | 372,388 |
| 3 | 93,075 | 499,908 | 165,000 | 592,983 | 542,663 | 484,050 |
| 4 | 93,075 | 666,544 | 165,000 | 759,619 | 674,911 | 579,509 |
| 5 | 93,075 | 833,179 | 165,000 | 926,254 | 798,995 | 660,407 |
| 6 | 93,075 | 833,179 | 165,000 | 926,254 | 775,723 | 617,202 |
| 7 | 93,075 | 833,179 | 165,000 | 926,254 | 753,130 | 576,825 |
| 8 | 93,075 | 833,179 | 165,000 | 926,254 | 731,194 | 539,088 |
| 9 | 93,075 | 833,179 | 165,000 | 926,254 | 709,897 | 503,821 |
| 10 | 93,075 | 833,179 | 165,000 | 926,254 | 689,220 | 470,861 |
| Total | 930,750 | 6,665,435 | 1,650,000 | 10,886,185 | 9,523,927 | 8,121,638 |
| Annualized | | | | | 1,355,993 | 1,156,339 |

*Benefits*

FMCSA anticipates that restoring the integrity of non-domiciled CDL license issuance and limiting non-domiciled CDL issuance to those who have gone through thorough vetting will enhance the safety of CMV operations and is likely to result in improved safety outcomes, such as the reduced frequency and/or severity of crashes or reduced frequency of violations. Driving history has consistently been shown to be a strong predictor of future driving safety outcomes. In the *Safety Performance of Passenger Carrier Drivers* report, prior crash involvement and past out-of-service violations were both found to increase the likelihood of a driver being involved in future crashes significantly, even after controlling for demographic characteristics and crash type. [101] The report focuses on passenger carrier drivers with findings suggesting that the following factors are significantly related to the likelihood of a crash occurrence: driver weight, height, sex, and employment stability as well as previous driver and vehicle violations and past crashes. ATRI has published similar findings for the truck transportation industry in their report, *Predicting Truck Crash Involvement*. Repeated multiple times since 2005, the top five stable predictors of crash risk include reckless driving violations and past crashes. [102] Similarly, the *Commercial Driver Safety Risk Factors* study found that prior moving violations in the last three years were

[97] *https://tanktransport.com/2025/08/great-freight-recession-2025/*.

[98] *https://investor.jbhunt.com/~/media/Files/J/jb-hunt-ir/documents/annual-reports/annual-report-2024.pdf*.

[99] ATRI Marginal Cost of Trucking, p. 54, available for download at *https://truckingresearch.org/about-atri/atri-research/operational-costs-of-trucking/*.

[100] Bureau of Labor Statistics, Unemployment rate and unemployed persons data. Available at *https://data.bls.gov/dataViewer/view/timeseries/* LNU04032236 and *https://data.bls.gov/dataViewer/view/timeseries/LNU03032236*, respectively (accessed January 7, 2026).

[101] *https://rosap.ntl.bts.gov/view/dot/7*.

[102] *https://truckingresearch.org/2022/10/predicting-truck-crash-involvement-2022-update/*.

associated with increased crash and moving violation risk.[103] Finally, an FMCSA commissioned report titled *Driver Issues: Commercial Motor Vehicle Safety Literature Review* examined published literature on commercial motor vehicle safety that utilized MCMIS and CDLIS data, and concluded that drivers with prior crash involvement were 87 percent more likely to be involved in a future crash. Results also showed that drivers who had been cited for reckless driving violations and improper turn violations were, respectively, 325 percent and 105 percent more likely to be involved in future crashes.[104] Together, these findings underscore a consistent conclusion across studies: a driver's historical performance, whether measured through crashes, violations, or observable risky behaviors, provides a robust basis for predicting future safety outcomes on the road. Given this research, FMCSA finds it imperative that all drivers able to obtain a CDL credential undergo thorough vetting procedures.

In addition to the thorough vetting process detailed in the IFR, the U.S. Department of State has developed procedures for increased screening and vetting of visa applicants seeking to operate CMVs in the United States under the eligible nonimmigrant statuses in the IFR.[105] These enhanced screening and vetting procedures help close the gap between the differences in vetting for U.S.-domiciled and non-domiciled drivers for these statuses, by ensuring that individuals seeking entry to the United States under these employment-based nonimmigrant categories for the purposes of driving a CMV can meet English language proficiency requirements, show proof that they can properly operate a CMV, and meet other requirements under the FMCSR. These additional steps in the vetting and verification process for non-domiciled individuals ensure that visa applicants in the employment-based nonimmigrant categories allowed to obtain non-domiciled CLPs and CDLs under this final rule are subject to sufficient vetting to ensure that non-domiciled drivers are as safe as

practicable before allowing them to operate CMVs on our roadways.

As discussed previously, data limitations in existing crash reporting requirements do not provide the granular detail required to estimate quantitatively the risk associated with non-domiciled CDL holders.

As is discussed in detail in the preamble above, FMCSA has identified 17 fatal crashes over the course of 2025 in which the CMV driver responsible for the crash held a non-domiciled CDL that would likely not have been issued under this final rule. It is important to note that these crashes do not represent the total universe of crashes, or the total universe of fatal crashes, caused by non-domiciled CDL holders. The necessary level of detail regarding the type of CDL held by the drivers involved in these crashes is not available. For example, in the FARS data for fatal crashes, only the status of the CDL and compliance with any required endorsements are recorded. FMCSA could not query either MCMIS or FARS to ascertain the number of crashes that would be within scope, and instead independently investigated and verified significant crash reports through the SDLAs and with the Police Accident Reports that occurred in 2025 and cross-referenced driver information from MCMIS to determine that at least 17 fatal crashes, resulting in 30 fatalities, were caused by the actions of non-domiciled CDL holders who not would be eligible to hold a non-domiciled CDL under the regulations adopted in this rule. Therefore, FMCSA is of the opinion that this rule would reduce the crash risk associated with such fatal crashes that the benefits of the final rule are likely to exceed its costs, including costs discussed above that are unquantified, but that are not expected to be large.

Alternatives

FMCSA considered further limiting non-domiciled CDL issuance to US citizens and lawful permanent residents. This would have been more restrictive than the final rule and removed an approximate 6,000 more CDL holders from the pool of potential CMV drivers. This rule determines which foreign-domiciled drivers are excepted by aligning FMCSA's fitness determination with the U.S. Department of State's enhanced vetting protocols. By limiting eligibility to H–2A, H–2B, and E–2 nonimmigrant status holders, FMCSA ensures that non-domiciled drivers undergo rigorous driver history checks that SDLAs are incapable of performing independently. This ensures all drivers on U.S. roadways satisfy a comparable standard of background and

driver history vetting. For these reasons, FMCSA determined that the less burdensome final rule balances safety and costs in a more appropriate way to reach the objective.

FMCSA also discussed less restrictive, potentially feasible, alternatives, such as adjustments to SAVE vetting and adjustments to eligibility for a non-domiciled CDL. However, SAVE is not administered by FMCSA and the agency does not have control over development or maintenance of the system. Regarding DACA recipients and other EAD holders, this rule replaces a complex framework with a "bright-line" eligibility standard. SDLAs have demonstrated a pattern of not being able to reliably distinguish between EAD codes and language that indicate a permissible basis for issuance of a non-domiciled CDL (C33—"Deferred Action for Childhood Arrivals") and those codes that indicate an impermissible basis (C14—"Deferred Action" or "Alien Granted Deferred Action"), leading to the improper issuance of non-domiciled CDLs to drivers domiciled in Canada or Mexico who were not DACA recipients. To restore system integrity, FMCSA determined that the final rule approach requiring an unexpired foreign passport and an I–94 corresponding to a specific employment-based nonimmigrant status strikes the right balance between safety and costs. This objective standard eliminates the burden on SDLAs to interpret complex immigration codes and ensures that eligibility is restricted to statuses subject to consular vetting and interagency screening.

*B. E.O. 14192 (Unleashing Prosperity Through Deregulation)*

E.O. 14192, Unleashing Prosperity Through Deregulation, issued on January 31, 2025 (90 FR 9065), requires that, for every new regulation issued by an agency, at least 10 prior regulations be identified for elimination, and that the cost of planned regulations be prudently managed and controlled through a budgeting process. Final implementation guidance addressing the requirements of E.O. 14192 was issued by OMB on March 26, 2025. This rule does not meet the definition of "rule" or "regulation" as defined in section 5 of E.O. 14192, because it is issued with respect to an immigration-related function of the United States per section 5(a) of E.O. 14192.

---

[103] Commercial Driver Safety Risk Factors (CDSRF) available at: *https://rosap.ntl.bts.gov/view/dot/49620.*

[104] Driver Issues: Commercial Motor Vehicle Safety Literature Review available at: *https://rosap.ntl.bts.gov/view/dot/11259.*

[105] While the vetting procedures are an internal U.S. Department of State document, FMCSA has thoroughly reviewed these vetting procedures. The agency also coordinated with U.S. Department of State to provide relevant summaries from that document in the discussion for this final rule.

## C. Congressional Review Act

This rule is not a *major rule* as defined under the Congressional Review Act (5 U.S.C. 801–808).'' [106]

## D. Regulatory Flexibility Act (Small Entities)

The Regulatory Flexibility Act (RFA, 5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996,[107] requires Federal agencies to consider the effects of the regulatory action on small business and other small entities and to minimize any significant economic impact for any rule subject to notice-and-comment rulemaking under the APA unless the agency head certifies that the rule will not have a significant economic impact on a substantial number of small entities.

This rule has the potential to impact States, drivers, and motor carriers. Under the standards of the RFA, as amended, States are not small entities because they do not meet the definition of a *small entity* in section 601 of the RFA. Specifically, States are not small governmental jurisdictions under section 601(5) of the RFA, both because State government is not among the various levels of government listed in section 601(5), and because, even if this were the case, no State, including the District of Columbia, has a population of less than 50,000, which is the criterion to be a small governmental jurisdiction under section 601(5) of the RFA.

CDL holders are not considered small entities because they do not meet the definition of a small entity in Section 601 of the RFA. Specifically, drivers are considered neither a small business under Section 601(3) of the RFA, nor are they considered a small organization under Section 601(4) of the RFA. Therefore, this rule would not impact a substantial number of small entities.

Motor carriers that employ non-domiciled CDL holders as drivers could be impacted by this rule as these drivers exit the market over the course of the next five years. There are approximately 785,000 for-hire and private motor carriers, of which a maximum of 194,000 (or 25 percent) could be impacted by this rulemaking. To be

clear, the maximum of 194,000 is an extreme upper bound estimate based on an assumption that no single motor carrier employs more than one non-domiciled CDL holder. Therefore it is extremely unlikely that 25 percent of motor carriers will be impacted by this rule. FMCSA does not know the number of small motor carriers that employ non-domiciled CDL holders who will no longer be eligible for a CDL. Considering that the majority of motor carriers are considered small based on SBA size standards, it is safe to assume that the majority of impacted motor carriers would also be small. As discussed in the regulatory analysis section, FMCSA anticipates that motor carriers will have some time to adjust to the change as the drivers will be aware if their license will not be renewed under the standards set forth in this final rule. In addition, high turnover and churn rates are well-documented features of the industry, with many drivers leaving their carrier within 12 months of being hired, such that the impact of finding a replacement driver on any specific motor carrier is likely to already be incorporated into their business model and incurred regardless of this rulemaking. Given the industry norm regarding movement of drivers, constant need for hiring, and BLS data indicating a 4.4 percent unemployment rate in the Transportation and Utilities sector as of November 2025, FMCSA considers motor carriers to be well equipped to handle any driver replacement necessitated by this final rule. Further, the five-year attribution will assist in mitigating any impacts to motor carriers.

For these reasons, FMCSA certifies that this action will not have a significant economic impact on a substantial number of small entities.

## E. Assistance for Small Entities

In accordance with section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121, 110 Stat. 857), FMCSA wants to assist small entities in understanding this final rule so they can better evaluate its effects on themselves and participate in the rulemaking initiative. If the final rule will affect your small business, organization, or governmental jurisdiction and you have questions concerning its provisions or options for compliance, please consult the person listed under **FOR FURTHER INFORMATION CONTACT.**

Small businesses may send comments on the actions of Federal employees who enforce or otherwise determine compliance with Federal regulations to the Small Business Administration's Small Business and Agriculture

Regulatory Enforcement Ombudsman (Office of the National Ombudsman, see *https://www.sba.gov/about-sba/oversight-advocacy/office-national-ombudsman*) and the Regional Small Business Regulatory Fairness Boards. The Ombudsman evaluates these actions annually and rates each agency's responsiveness to small business. If you wish to comment on actions by employees of FMCSA, call 1–888–REG–FAIR (1–888–734–3247). DOT has a policy regarding the rights of small entities to regulatory enforcement fairness and an explicit policy against retaliation for exercising these rights.

## F. Unfunded Mandates Reform Act of 1995

UMRA (2 U.S.C. 1531–1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. The Act addresses actions that may result in the expenditure by a State, local, or Tribal government, in the aggregate, or by the private sector of $206 million (which is the value equivalent of $100 million in 1995, adjusted for inflation to 2024 levels) or more in any one year. Though this final rule would not result in such an expenditure, and the analytical requirements of UMRA do not apply as a result, FMCSA discusses the effects of this rule elsewhere in this preamble.

## G. Paperwork Reduction Act

This final rule contains information collection requirements under the PRA (44 U.S.C. 3501–3520). As defined in 5 CFR 1320.3(c), *collection of information* comprises reporting, recordkeeping, monitoring, posting, labeling, and other similar actions. The title and description of the information collection, a description of those who must collect the information, and an estimate of the total annual burden follow. The estimate covers the time for reviewing instructions, searching existing sources of data, gathering and maintaining the data needed, and completing and reviewing the collection.

*Title:* Non-Domiciled Commercial Driver's License Records.

*OMB Control Number:* 2126–0087.

*Summary of the Information Collection:* This information collection request (ICR) covers the collection and retention of the documentation provided to a SDLA during the application process for a non-domiciled CLP or CDL.

*Need for Information:* The licensed drivers in the United States deserve reasonable assurances that their fellow motorists are properly qualified to drive the vehicles they operate. Under

---

[106] A *major rule* means any rule that OMB finds has resulted in or is likely to result in (a) an annual effect on the economy of $100 million or more; (b) a major increase in costs or prices for consumers, individual industries, geographic regions, Federal, State, or local government agencies; or (c) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets (5 U.S.C. 804 (2)).

[107] Public Law 104–121, 110 Stat. 857, (Mar. 29, 1996).

CMVSA (49 U.S.C. 31301 *et seq.*), as amended, FMCSA established the CDL program and the performance standards with which State CDL programs must comply. The CDL regulations in 49 CFR part 383 prescribe uniform minimum standards for testing and ensuring the fitness of individuals who operating commercial motor vehicles (CMVs), and State compliance with the CDL program is addressed in part 384. In particular, States that issue non-domiciled CDLs must do so in accordance with sections 383.71, 383.73 and 384.212.

This collection is intended to ensure that States retain all documents involved in the licensing process for non-domiciled CLP and CDL holders for a period of no less than two years from the date of issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL. If States do not retain this documentation, FMCSA is severely hindered in its efforts to ensure compliance with the regulatory requirements because States are unable to determine accurately the number of non-domiciled CLPs and CDLs they have issued, or to prove to FMCSA officials that such CLPs and CDLs were properly issued.

*Proposed Use of Information:* State officials use the information collected from non-domiciled CDL applicants to determine whether an individual is eligible to receive a non-domiciled CDL and to prevent unqualified, and/or disqualified CLP and CDL holders and applicants from operating CMVs on the Nation's highways. During State CDL compliance reviews, FMCSA officials review this information to ensure that the provisions of the regulations are being carried out. Without the aforementioned requirements, there would be no uniform control over driver licensing practices to prevent uncertified and/or disqualified foreign drivers from being issued a non-domiciled CLP or CDL. Failure to collect this information would render the regulations unenforceable.

*Description of the Respondents:* SDLAs issuing non-domiciled CDLs.

*Number of Respondents:* 51.[108]

*Frequency of Response:* Ongoing.

*Burden of Response:* 6,000 responses. The associated cost burden is $93,075.

*Estimate of Total Annual Burden:* 1,500 hours.

In accordance with 44 U.S.C. 3507(d), FMCSA published a Notice in the **Federal Register** on January 30, 2026, stating that FMCSA will submit the information collection to OIRA at OMB for approval. (91 FR XXXX) Directions on submitting comments on the information collection summarized above can be found in that January 30 notice. FMCSA addressed comments on the information collection, submitted in response to the IFR, in section 7.e. of the comment discussion, earlier in this final rule. There are no changes to the information collection in response to comments.

OMB approved this information collection in September 2025, and it is currently set to expire on February 28, 2026.

*H. E.O. 13132 (Federalism)*

FMCSA has analyzed this rule in accordance with the principles and criteria of E.O. 13132, Federalism, and has determined that it does not have federalism implications. E.O. 13132 applies to "policies that have federalism implications," defined as regulations and other actions that have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government" (Sec. 1(a)). The key concept here is "substantial direct effects on the States." Section 3(b) of the E.O. provides that "[n]ational action limiting the policymaking discretion of the States shall be taken only where there is constitutional and statutory authority for the action and the national activity is appropriate in light of the presence of a problem of national significance."

The rule amends a single aspect of the CDL program authorized by the CMVSA (49 U.S.C. chapter 313). States have been required to issue all CDLs in accordance with Federal standards for decades and have been required to issue all CLPs in accordance with Federal standards since 2011. Moreover, the CDL program does not have preemptive effect; it is voluntary, and States may withdraw at any time, though doing so will result in the loss of certain Federal-aid highway funds pursuant to 49 U.S.C. 31314. Because this IFR makes only a modest change to requirements already imposed on participating States, FMCSA has determined that it does not have substantial direct effects on the States, on the relationship between the Federal and State governments, or on the distribution of power and responsibilities among the various levels of government.

Nonetheless, FMCSA recognizes that this rule has an impact on the States and their commercial driver licensing operations. Most notably, it requires all States that issue non-domiciled CLPs and CDLs to amend their existing procedures. The agency continually works with the States to identify CDL program deficiencies that need to be addressed, and it was mostly through these APRs that systemic deficiencies with the non-domiciled CLP and CDL issuance process were identified. Therefore, States that issue non-domiciled CLPs and CDLs were generally already on notice prior to publication of the IFR that FMCSA was scrutinizing this aspect of the CDL program. While FMCSA finds that the rule will not impose substantial direct compliance costs on State and local governments, in keeping with the spirit of Section 6(b) of E.O. 13132, FMCSA sought and received input from States after the publication of the IFR, which was used in developing this final rule.

*I. Privacy*

The Consolidated Appropriations Act, 2005,[109] requires agencies to assess the privacy impact of a regulation that will affect the privacy of individuals. This rule would not require any new collection of PII.

The Privacy Act (5 U.S.C. 552a) applies only to Federal agencies and any non-Federal agency that receives records contained in a system of records from a Federal agency for use in a matching program. This rule does not impact a system of records.

The E-Government Act of 2002,[110] requires Federal agencies to conduct a PIA for new or substantially changed technology that collects, maintains, or disseminates information in an identifiable form. No new or substantially changed technology will collect, maintain, or disseminate information as a result of this rule. Accordingly, FMCSA has not conducted a PIA.

FMCSA will complete a Privacy Threshold Assessment (PTA) to evaluate the risks and effects the rulemaking might have on collecting, storing, and sharing personally identifiable information. The PTA will be submitted to FMCSA's Privacy Officer for review and preliminary adjudication and to DOT's Privacy Officer for review and final adjudication.

---

[108] Although not all of the 51 jurisdictions identified as respondents currently issue non-domiciled CLPs and CDLs, FMCSA has determined it is appropriate for all possible jurisdictions be included in this information collection to ensure that it considers the impacts on all possible jurisdictions and allow for the possibility that all jurisdictions choose to issue non-domiciled CLPs and CDLs in the future.

[109] Public Law 108–447, 118 Stat. 2809, 3268, note following 5 U.S.C. 552a (Dec. 4, 2014).

[110] Public Law 107–347, sec. 208, 116 Stat. 2899, 2921 (Dec. 17, 2002).

*J. E.O. 13175 (Indian Tribal Governments)*

This rule does not have Tribal implications under E.O. 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*K. National Environmental Policy Act of 1969*

FMCSA analyzed this final rule pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. 4321 *et seq.*). FMCSA believes this final rule will not have a reasonably foreseeable significant effect on the quality of the human environment. This action falls under a published categorical exclusion and is thus excluded from further analysis and documentation in an environmental assessment or environmental impact statement under DOT Order 5610.1D,[111] Subpart B, paragraph (e)(6)(s)(7), and (e)(6)(t)(2), which cover regulations pertaining to requirements for State-issued commercial license documentation and having the appropriate laws, regulations, programs, policies, procedures and information systems concerning the qualification and licensing of persons who apply for a CDL, and persons who are issued a CDL.

List of Subjects

*49 CFR Part 383*

Administrative practice and procedure, Alcohol abuse, Drug abuse, Highway safety, Motor carriers.

*49 CFR Part 384*

Administrative practice and procedure, Alcohol abuse, Drug abuse, Highway safety, Motor carriers.

Accordingly, FMCSA amends 49 CFR parts 383 and 384 as follows:

## PART 383—COMMERCIAL DRIVER'S LICENSE STANDARDS; REQUIREMENTS AND PENALTIES

■ 1. The authority citation for part 383 continues to read as follows:

**Authority:** 49 U.S.C. 521, 31136, 31301 *et seq.*, and 31502; secs. 214 and 215 of Pub. L. 106–159, 113 Stat. 1748, 1766, 1767; sec. 1012(b) of Pub. L. 107–56, 115 Stat. 272, 297, sec. 4140 of Pub. L. 109–59, 119 Stat. 1144, 1746; sec. 32934 of Pub. L. 112–141, 126 Stat.

405, 830; sec. 23019 of Pub. L. 117–58, 135 Stat. 429, 777; and 49 CFR 1.87.

■ 2. Amend § 383.5 by revising paragraph (1)(ii) in the definition for "Evidence of lawful immigration status" to read as follows:

§ 383.5   Definitions.

\*   \*   \*   \*   \*

*Evidence of lawful immigration status* for purposes of subpart B of this part, means:

(1) \* \* \*

(ii) A Form I–94/94A issued by the U.S. Department of Homeland Security with an unexpired Admit Until Date indicating one of the following classifications: H–2A–Temporary Agricultural Workers, H–2B–Temporary Non-Agricultural Workers, or E–2–Treaty Investors.

\*   \*   \*   \*   \*

■ 3. Amend § 383.73 by revising paragraphs (f)(2)(iv), (f)(3)(ii), (f)(5), (f)(6), and (m)(2) to read as follows:

§ 383.73   State procedures.

\*   \*   \*   \*   \*

(f) \* \* \*

(2) \* \* \*

(iv) For applicants domiciled in a foreign jurisdiction, the State must ensure that the period of validity of the non-domiciled CLP or CDL does not exceed the Admit Until Date or expiration date on the applicant's I–94/A or 1 year, whichever is sooner. In any case (including where the applicant's I–94/A contains no end date or is marked "D/S" to show it is valid for the duration of status) a State must not issue a non-domiciled CLP or CDL with a period of validity longer than 1 year.

(3) \* \* \*

(ii) *Applicants domiciled in a foreign jurisdiction.* (A) Beginning March 16, 2026, the State must not issue (which includes amending, correcting, reprinting, reinstating, or otherwise duplicating a previously issued CLP or CDL), transfer, renew, or upgrade a non-domiciled CLP or CDL unless, at the time of the transaction, the applicant provides *evidence of lawful immigration status* as defined under § 383.5. Applicants for a non-domiciled CLP or CDL who do not provide evidence of lawful immigration status as required under § 383.71(f)(3)(i)(B) are not eligible for a non-domiciled CLP or CDL.

(B) States must comply with the document verification requirements for applicants domiciled in a foreign jurisdiction set forth in § 383.73(m)(2) before issuing (which includes amending, correcting, reprinting, reinstating, or otherwise duplicating a previously issued CLP or CDL),

transferring, renewing, or upgrading a non-domiciled CLP or CDL.

(C) States are prohibited from granting non-domiciled CLP or CDL privileges on a temporary or interim basis pending review and validation of an applicant's evidence of lawful immigration status.

\*   \*   \*   \*   \*

(5) *Downgrade.* If after issuing (which includes amending, correcting, reprinting, reinstating, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL, the State receives information from FMCSA, the Department of Homeland Security, the U.S. Department of State, or other Federal agency with jurisdiction that the applicant no longer has lawful immigration status in the United States in a category specified in paragraph (1)(ii) of the definition of *Evidence of lawful immigration status* in § 383.5 of this part, the State must initiate established State procedures for downgrading the non-domiciled CLP or CDL. The downgrade must be completed and recorded on the CDLIS driver record within 30 days of the State's receipt of such information. As used in this paragraph, the term "downgrade" means the State's removal of the CLP or CDL privilege from the driver's license, as set forth in paragraph (4) the definition of *CDL downgrade* in § 383.5.

(6) *Non-domiciled CDL renewal.* States must require every non-domiciled CLP or CDL issuance (which includes amending, correcting, reprinting, reinstating, or otherwise duplicating a previously issued CLP or CDL), transfer, renewal, or upgrade be conducted in-person only and must not permit issuance, transfer, renewal, or upgrade by mail or electronic means.

\*   \*   \*   \*   \*

(m) \* \* \*

(2) *Document verification and retention for applicants domiciled in a foreign jurisdiction.* States must verify evidence of lawful immigration status for applicants domiciled in a foreign jurisdiction before initial issuance and before any subsequent issuance (which includes amending, correcting, reprinting, reinstating, or otherwise duplicating a previously issued CLP or CDL), transfer, renewal, or upgrade of a non-domiciled CLP or CDL.

(i) For offices with only one staff member, all documents must be processed or verified by a supervisor before issuing (which includes amending, correcting, reprinting, reinstating, or otherwise duplicating a previously issued CLP or CDL),

---

[111] Available at *https://www.transportation.gov/mission/dots-procedures-considering-environmental-impacts.*

transferring, renewing, or upgrading a non-domiciled CLP or CDL.

(ii) In reviewing the evidence of lawful immigration status an applicant domiciled in a foreign jurisdiction (except an applicant domiciled in Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa or the Commonwealth of the Northern Mariana Islands), the State must query the Systematic Alien Verification for Entitlements (SAVE) system (administered by U.S. Citizenship and Immigration Services). If the SAVE final response, including additional verification if needed, does not confirm the applicant's claim to be in lawful immigration status in a category specified in paragraph (1)(ii) of the definition of *evidence of lawful immigration status* in § 383.5 of this part, the State must not issue (which includes amend, correct, reprint, reinstating, or otherwise duplicate a previously issued CLP or CDL), transfer, renew, or upgrade a non-domiciled CLP or CDL, and must initiate downgrade procedures in accordance with paragraph (f)(5) of this section if the applicant holds an unexpired non-domiciled CLP or CDL.

(iii) The State must retain copies of all documents involved in the licensing process, including documents provided by the applicant to prove lawful immigration status and documents showing the results of any SAVE query to verify an applicant's lawful immigration status, and a supervisor must verify them within one business day of issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, reinstating, or upgrading a non-domiciled CLP or CDL. The State must retain the documents for no less than 2 years from the date of issuing (which includes amending, correcting, reprinting, reinstating, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL.

\* \* \* \* \*

## PART 384—STATE COMPLIANCE WITH COMMERCIAL DRIVER'S LICENSE PROGRAM

■ 4. The authority citation for part 384 continues to read as follows:

**Authority:** 49 U.S.C. 31136, 31301, *et seq.*, and 31502; secs. 103 and 215 of Pub. L. 106–159, 113 Stat. 1748, 1753, 1767; sec. 32934 of Pub. L. 112–141, 126 Stat. 405, 830; sec. 5524 of Pub. L. 114–94, 129 Stat. 1312, 1560; and 49 CFR 1.87.

■ 5. Amend § 384.212 by revising paragraph (a)(1) to read as follows:

### § 384.212  Domicile requirement.

(a) \* \* \*

(1) For applicants domiciled in a foreign jurisdiction, the State must:

(i) Comply with the document verification and retention requirements set forth in § 383.73(m)(2) before issuing (which includes amending, correcting, reprinting, reinstating, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL; and

(ii) Provide copies of all documents involved in the licensing process to FMCSA within 48 hours after request.

\* \* \* \* \*

■ 6. Amend § 383.301 by revising paragraph (q) to read as follows:

### § 384.301  Substantial compliance-general requirements.

\* \* \* \* \*

(q) A State must come into substantial compliance with the requirements of subpart B of this part and part 383 of this chapter related to non-domiciled CLPs and CDLs, effective March 16, 2026, prior to issuing (which includes amending, correcting, reprinting, reinstating, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL.

Issued under authority delegated in 49 CFR 1.87.

**Derek Barrs,**
*Administrator.*

[FR Doc. 2026–02965 Filed 2–11–26; 4:15 pm]

**BILLING CODE 4910–EX–P**