## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

JORGE RIVERA LUJAN, et al.,
*Petitioners*,

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION, et al.,
*Respondents*.

———————————————

On Petition for Review of a Rule of the
Federal Motor Carrier Safety Administration

———————————————

## RESPONSE TO EMERGENCY MOTION FOR
## STAY PENDING REVIEW

———————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
SIMON G. JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-1673*
  *simon.g.jerome@usdoj.gov*

## INTRODUCTION

Because of the danger large commercial vehicles pose to other drivers,
federal law has long set standards for the issuance of commercial driver's
licenses (CDLs). From the beginning, those standards have required that
States issuing CDLs obtain and review an applicant's driving history from
any State where the applicant previously held a driver's license to determine
if prior violations call into question the applicant's fitness for a CDL. States,
however, cannot review similar driving history records of aliens not domiciled
in the United States, as their driving histories are entirely or predominantly
abroad and States cannot compel the production of such records. That
presents a significant safety risk, as multiple studies have demonstrated that
past driving performance is a robust predictor of future risk.

On February 13, recognizing the risks inherent in granting CDLs to
individuals whose driving histories cannot be reviewed, the Federal Motor
Carrier Safety Administration (FMCSA) published a rule limiting eligibility
for CDLs for all but three categories of non-domiciliary aliens who undergo
vetting that adequately substitutes for the States' inability to access foreign
driving history. The Rule also changes the regulations governing the
issuance of non-domiciled CDLs to simplify state compliance with those

regulations after FMCSA reviews revealed that more than 30 jurisdictions had systemic and widespread errors in their issuance of non-domiciled CDLs.

Neither the merits nor the equities justify interim relief. The Rule is both reasonable and reasonably explained in light of the safety and administrability concerns FMCSA identified. Moreover, no petitioner has demonstrated imminent and irreparable harm traceable to the Rule, and a stay would disserve the public interest by undermining the safety benefits the Rule provides to the public. This Court should deny the motion.

## STATEMENT

1. In 1986, commercial truck drivers posed a serious threat to those traveling on the nation's highways. That year alone, crashes involving large trucks and buses accounted for 5,895 deaths in the United States. Federal Motor Carrier Safety Admin., Large Truck & Bus Crash Facts 2020, at 4 (Sept. 2022), https://perma.cc/A2C7-WE5S.

Congress addressed the problem through the Commercial Motor Vehicle Safety Act. Pub. L. 99–570, 100 Stat. 3207 (Oct. 27, 1986). As amended, the Act aims "to eliminate unsafe commercial drivers and equipment" from U.S. roads in several ways. 132 Cong. Rec. S16919 (daily

ed. Oct. 17, 1986) (statement of Sen. John C. Danforth).  To operate certain large vehicles, individuals are required to obtain one (and only one) CDL, 49 U.S.C. § 31302, and to notify their employers of any driving violations, *id.* § 31303.  Employers are prohibited from using drivers they know (or reasonably should know) are not properly credentialed.  *Id.* § 31304.  The Secretary of Transportation is required to prescribe "minimum standards for testing and ensuring the fitness of" a commercial driver, *id.* § 31305(a), and to establish an alcohol-and-drug testing program, *id.* § 31306.  And, as a condition of receiving certain federal highway funds, States must enforce the standards set by the Secretary.[1]  *Id.* § 31311(a)(1).

Generally, States may issue CDLs only to their domiciliaries.  49 U.S.C. § 31311(a)(12)(A).  The Act, however, also permits the Secretary to prescribe the conditions under which a non-domiciliary may obtain a CDL from a State.  *Id.* § 31311(a)(12)(B)(ii).  Under that authority, FMCSA in 2011 promulgated a rule creating the category of "non-domiciled commercial driver's license" for applicants domiciled outside the United States or in a State that does not issue CDLs.  *Commercial Driver's License Testing and*

---

[1] The Secretary has delegated this authority to the Federal Motor Carrier Safety Administrator.  49 U.S.C. § 113(f); 49 C.F.R. § 1.87.

*Commercial Learner's Permit Standards*, 76 Fed. Reg. 26,854, 26,878 (May 9, 2011). Currently, all States issue CDLs; thus, non-domiciled CDLs are issued entirely to aliens domiciled outside the United States.

The substantive requirements for non-domiciled and domiciled CDLs are largely identical. *See generally* 49 C.F.R. § 383.71 (prescribing criteria for U.S.-domiciled and non-domiciled applicants); *id.* § 383.73 (mandating State procedures for issuing CDLs, U.S.-domiciled and non-domiciled alike). This includes a requirement that States obtain the "complete driving record" of the applicant from any "State[] where the applicant was previously licensed over the past 10 years." *Id.* § 383.73(b)(3)(iv). FMCSA described States' inability to access a single, reliable driving record for applicants as a "major area[] of concern" to be addressed in early versions of minimum standards promulgated under the Act. *Commercial Driver's Licensing Standards*, 52 Fed. Reg. 20,574, 20,576 (June 1, 1987). States are also required to check the Problem Driver Pointer System, Drug and Alcohol Clearinghouse, and Commercial Driver's License Information System. 49 C.F.R. § 383.73(b)(3)(ii), (iii), (b)(10).

The requirement to check an applicant's driving history, however, is of limited effect for individuals domiciled outside the United States. Many such

applicants—including those present on parole or as asylees—will have little domestic driving history, if any, and virtually all their relevant driving history would be found abroad. States lack the means to obtain formally an applicant's foreign driving history, so that information is unavailable when assessing driver fitness. *See Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*, 91 Fed. Reg. 7044, 7048-49 (Feb. 13, 2026).

2. To ensure compliance with the Act and its implementing regulations, FMCSA undertakes annual "review[s] to determine whether … the State meets the general requirement for substantial compliance." 49 C.F.R. § 384.307(a). In 2025, FMCSA's State-by-State reviews revealed "systemic procedural and computer programming errors, significant problems with staff training and quality assurance, and policies that lack[ed] sufficient management controls." 91 Fed. Reg. at 7063. FMCSA also observed that States had significant difficulty assessing aliens' eligibility for non-domiciled CDLs using Employment Authorization Documents (EADs) issued by United States Citizenship and Immigration Services (USCIS). For example, clerks at state driver's licensing agencies regularly had difficulty distinguishing between EAD "codes" that indicated an individual's basis for

presence in the United States, and thus would frequently issue non-domiciled CDLs to ineligible individuals. *Id.* at 7052. In addition, States routinely issued or renewed CDLs using expired EADs presented with other USCIS forms indicating an applicant had sought (but not necessarily received) an extension or renewal of work authorization, resulting in many licenses being issued without valid documentation. *Id.* And States commonly issued non-domiciled CDLs with expiration dates exceeding the applicant's authorized period of lawful presence. *Id.* at 7045, 7063. All told, FMCSA "identified more than 30 States that failed to comply with the non-domiciled [CDL] regulations," *id.* at 7051; *see also List of States FMCSA Determined Were in Substantial Noncompliance*, Regulations.gov, https://perma.cc/JZJ8-G8NT, resulting in "tens of thousands non-domiciled CDLs" issued inconsistent with federal law," 91 Fed. Reg. at 7045. New York and Texas, for example, "demonstrated staggering error rates of 53 and 49 percent respectively." *Id.*

Further, FMCSA identified at least 17 fatal accidents involving 30 deaths where it could reasonably be determined that non-domiciled CDL holders were at fault in 2025—CDL holders who, FMCSA determined in consultation with USCIS, would not have been eligible under the Rule under review. 91 Fed. Reg. at 7065-67.

3. FMCSA highlighted these concerns in promulgating an interim final rule (IFR) on September 29, 2025, with immediate effect, while inviting public comment. *See Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*, 90 Fed. Reg. 46,509 (Sept. 29, 2025). This Court stayed the IFR pending review on November 13, 2025. *Lujan v. FMCSA*, No. 25-1215 (Nov. 13, 2025). Subsequently, FMCSA published a final rule that addresses comments received in the notice-and-comment process and provides substantially greater explanation of FMCSA's regulatory changes. The Rule takes effect March 16, 2026. 91 Fed. Reg. at 7044.

Previously, any alien domiciled outside the United States who possessed an unexpired EAD issued by USCIS was eligible to obtain a CDL, despite the States' inability to obtain that individual's foreign driving history. 49 C.F.R. § 383.71(f)(2)(i) (2021). The Rule explains that the absence of driving history information "severely limits the effectiveness of the[] vetting processes" States are ordinarily required to conduct for CDL applicants because "a driver's historical performance, whether measured through crashes, violations, or observable risky behaviors, provides a robust basis for predicting future safety outcomes on the road," 91 Fed. Reg. at 7049.

To address this concern, the Rule limits non-domiciled CDL eligibility to individuals maintaining lawful immigration status in H-2A, H-2B, and E-2 employment-based nonimmigrant categories.  49 C.F.R. §§ 383.71(f)(3)(i)(B), 383.5.  The Rule explains that as a "functional proxy for" driving-history verification by States, 91 Fed. Reg. at 7044, aliens in these categories undergo "federal vetting processes … including consular screening, labor certification requirements, and employer verification [that] provide[] sufficient assurance of driver fitness to mitigate the safety gap created by [States'] inability to access and verify the foreign driving records," *id.* at 7049-50.  The Department of State confirmed that consular adjudication of visa status for the eligible categories includes an "assess[ment of] certain factors relevant to both visa eligibility and [commercial motor vehicle] driver fitness, including … driving history, occupational qualifications, and English language proficiency." *Id.* at 7050.  Additionally, consular adjudication "generally include[s] requests for 10 years of driving history, past traffic violations, license suspensions and revocations, and other similar records," *id.* at 7060, aligning with the 10-year domestic driving history States must consult, 49 C.F.R. § 383.73(b)(3)(iv).  In turn, employers sponsoring aliens for H-2A and H-2B visas are required "to list the qualifications necessary for the

position, which for [commercial motor vehicle]-related positions typically include[] driving experience, clean driving records, and English proficiency." 91 Fed. Reg. at 7050.

Additionally, because it can take 75 days or more to sponsor a replacement for an H-2A or H-2B visa holder who becomes ineligible, employers have strong incentives to exercise diligence in screening individuals sponsored for those visas. *See* 91 Fed. Reg. at 7050; *see also* 90 Fed. Reg. at 46,516 & n.25. Finally, eligible visa holders "are subject to ongoing federal oversight through multiple agencies … via the nonimmigrant status and visa renewal processes, creating multiple points of verification and accountability." 91 Fed. Reg. at 7050. For example, the Department of State "constantly reviews available information on current U.S. visa holders, and revokes visas when there is an indication of a potential ineligibility or in other situations where warranted." *Id.*

4. Petitioners, who are two non-domiciled CDL holders and two unions representing other drivers, *see* Mot. 6-7, petitioned for review of the Rule on February 12. The following week, petitioners requested that FMCSA stay the Rule's effect. *Accord* Mot. i. FMCSA denied that request on February 19. One week later, petitioners moved for a stay pending review.

# ARGUMENT

To obtain interim relief, petitioners must show a likelihood of success on the merits, irreparable harm, and that the harm to third parties and the public interest support interim relief. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Petitioners have not met that burden.

## I. Petitioners Are Not Likely to Succeed on the Merits

### A. The Rule Reasonably Restricts the Eligibility of Individuals Whose Driving History Cannot be Assessed

The Rule primarily addresses a safety gap identified by FMCSA, which is charged with establishing and enforcing nationwide standards for CDL issuance. From the beginning of federal oversight of CDL issuance, the need to review a CDL applicant's driving history has been recognized as a critical safety need, as the States' inability to access a single, reliable driving record for applicants was recognized as a "major area[] of concern." 52 Fed. Reg. at 20,576. An applicant's driving history is crucial because, as FMCSA explained, multiple studies conducted over decades have demonstrated that "a driver's historical performance, whether measured through crashes, violations, or observable risky behaviors, provides a robust basis for predicting future safety outcomes on the road." 91 Fed. Reg. at 7048-49; *see*

*id.* at 7098-99 (describing study showing reckless driving citations translating to 325 percent higher risk of future crashes). For example, an FMCSA literature review found that "drivers with prior crash involvement" were "87 percent more likely to be involved in a future crash," *id.* at 7048, while an industry study repeated on multiple occasions over the last two decades found that "reckless driving violations and past crashes" are among the "top five stable predictors of crash risk," *id.*

FMCSA also explained that it is impossible for States to review the foreign driving histories of many non-domiciled CDL applicants because those records are inaccessible. 91 Fed. Reg. at 7049. Consequently, "nondomiciled applicants have been subject to a lower level of scrutiny in the … CDL application process than U.S.-domiciled individuals." *Id.* at 7048. "This regulatory blind spot permits individuals with potentially poor safety records or permanently disqualifying convictions to obtain non-domiciled CDLs, placing all roadway users at risk." *Id.* at 7089. Thus, FMCSA determined that limiting the eligibility of classes of potential applicants whose driving history cannot be ascertained "closes a significant safety gap and prioritizes the safety of the traveling public," *id.*, and "is likely to result in improved safety outcomes," *id.* at 7098. FMCSA further determined that

certain classes of non-immigrant visa holders go through "federal vetting processes" that "provide[] sufficient assurance of driver fitness to mitigate the" otherwise present "safety gap" and thus that individuals in those categories should remain eligible for non-domiciled CDLs. *Id.* at 7049-50.

In reaching this conclusion, FMCSA explained that the databases available do not "allow FMCSA to ascertain" whether a driver involved in a particular fatal crash or other incident "was, or should have been, designated as non-domiciled," and that in the face of this uncertainty the need for the Rule followed from the "critical safety vulnerability" created by "the inability of [States] to verify foreign driver histories." 91 Fed. Reg. at 7065; *accord, e.g.*, *id.* at 7067 ("Licensing a driver without the ability to investigate their history . . . removes a critical layer of defense in accident prevention.").

Petitioners' arguments rest primarily on a mischaracterization of the Rule as "premised on the notion that immigrant drivers" *per se* "pose a safety hazard." Mot. 8. As discussed, that is not the case. Instead, States cannot assess with the same degree of confidence a non-domiciled applicant's safety because those individuals—who are all aliens—tend to have driving histories outside the reach of States. As FMCSA explained, there is ample evidence that driving history is a strong indicator of future safety.

Petitioners do not dispute or even engage with the evidence that driving history is a strong predictor of future safety. They instead emphasize the unavailability of data comparing the crash rates of individuals with non-domiciled CDLs to analogous other CDL holders. Mot. 8-10. But because of the inherent limitations of present data, the absence of definitive evidence runs both ways: petitioners likewise cannot identify evidence FMCSA overlooked that demonstrates that non-domiciled CDL holders are safer than other CDL holders, and FMCSA was not obligated "to conduct or commission [its] own empirical or statistical studies" before acting. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021). Instead, "[i]n the face of 'serious uncertainties,'" FMCSA is free to assess the appropriate margin of safety the regulations should adopt, so long as FMCSA "explain[s] the evidence which is available, and offer[s] a rational connection between the facts found and the choice made," *North Carolina v. FERC*, 112 F.3d 1175, 1190 (D.C. Cir. 1997) (quotation and alteration omitted). FMCSA did so here.[2]

---

[2] Petitioners urge that the 17 specific fatal crashes FMCSA identified may be better explained by driver inexperience. Mot. 11. But FMCSA did not rely on the "specific crash count" as justification for the Rule; in any event, FMCSA's point was that drivers who are "convicted of traffic

*Continued on next page.*

Petitioners likewise miss the point in observing (Mot. 10-11) that *other* requirements, such as testing and training requirements, are the same for both non-domiciled CDL holders and other CDL holders. As FMCSA explained, past driving history is a powerful predictor of future driving safety, which is precisely why FMCSA believed the previous system created "an unacceptable bifurcated standard in driver vetting." 91 Fed. Reg. at 7044. Indeed, on petitioners' theory, the existence of other requirements would mean driving history checks are of no value even for domiciled CDL holders. But the importance of those checks is precisely why Congress mandated that a State consult driving history from other States before issuing a CDL. 100 Stat. at 3207–180.

Petitioners also fault FMCSA for failing to consider assertions that the Rule would exacerbate a CDL driver shortage, Mot. 12, but FMCSA explained that it found such a conclusion unconvincing, noting evidence that existing drivers "are underutilized and facing increasing dead-head miles at the expense of their bottom line" and that "available, experienced drivers" could reenter the market after an ongoing "freight recession." 91 Fed. Reg.

---

violations" shortly after licensure may well have had a history of such violations before licensure. 91 Fed. Reg. at 7065.

at 7082. That sort of reasonable predictive judgment easily passes muster. *See Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).

Finally, petitioners' assertions of a purported mismatch between this rationale and the Rule (Mot. 16-23) are meritless. To begin, FMCSA explained that the exclusion of Deferred Action for Childhood Arrivals (DACA) recipients from eligibility (Mot. 16-17) was not premised on lack of access to driver history information, but instead for administrability reasons discussed below. *See infra* pp. 17-23. As for petitioners' arguments that FMCSA should not have continued to permit H-2A, H-2B, and E-2 visa holders to obtain CDLs, Mot. 20-21, FMCSA reasonably explained that those individuals are not similarly situated to the classes of aliens now excluded from eligibility. For those visa categories, "several factors…, in combination, provide reasonable assurance of driver fitness" despite States' inability to review driver history: "labor certification and employer screening," "consular adjudication," "ongoing employment relationship," and "federal oversight." 91 Fed. Reg. at 7050; *accord* Mot. 21. Petitioners assert that "FMCSA does not state that [consular officers] in fact" "request and review documentation related to driving history," Mot. 22, but that is incorrect: "[t]he Department of State has confirmed that consular officers adjudicating such visa

applications assess certain factors relevant to both visa eligibility and CMV driver fitness, including but not limited to driving history, occupational qualifications, and English language proficiency, 91 Fed. Reg. at 7050, and moreover generally have available "10 years of driving history," *id.* at 7060, matching the 10-year domestic driving history States must consult.

Petitioners otherwise critique individual aspects of these screening mechanisms (Mot. 21-22), but their slice-and-dice approach misses the fundamental point that FMCSA reasonably "determined that the totality of Federal vetting for these specific visa categories provides a reasonable functional equivalent," even though "[n]o single element of this process perfectly replicates" the driver history checks "available for domestic drivers." 91 Fed. Reg. at 7051. Nor do petitioners advance their case by asserting (Mot. 23) that some employers vet drivers before hiring them; assuming that is true, many CDL holders operate independently with no employer vetting (like the two named individuals here, *see* Lujan Decl. ¶ 1; Semenovskii Decl. ¶ 1), and petitioners do not contend that *all* employers conduct vetting remotely comparable to the federal vetting FMCSA describes. Finally, petitioners' claim that the Rule is overinclusive because it denies eligibility to some individuals who might have domestic driving

records accessible to States, or who might lack foreign driving records, does not render the Rule arbitrary. Mot. 19. It was reasonable for FMCSA to conclude that *as a class*, aliens excluded from CDL eligibility are likely to share the characteristics described. *See Magnetsafety.org v. CPSC*, 129 F.4th 1253, 1264-65 (10th Cir. 2025) (upholding a rule based on likely group characteristics as reasonable).

## B. FMCSA Reasonably Determined that Altering Documentation Requirements Would Aid State Compliance

The Rule also revises the documentation States can use to satisfy the regulations' longstanding requirement that CDL applicants demonstrate lawful presence. Under the prior regulations, to confirm lawful presence, applicants could present either an unexpired EAD or an I-94 form and unexpired passport. 49 C.F.R. § 383.71(f)(2)(i) (2024); *see id.* § 383.73(f)(3) (2024). As FMCSA explained, reviews of state compliance with the prior regulations revealed widespread issues among front-line licensing clerks in interpreting EADs that resulted in error rates in certain States as high as 50 percent of all non-domiciled CDLs issued. *Supra* pp. 5-6. Clerks struggled to interpret immigration codes used on EADs—including codes denoting DACA recipients as compared to other forms of deferred action—and

routinely issued or renewed CDLs using expired EADs in conjunction with other USCIS forms that indicated an applicant had sought (but not necessarily received) an EAD extension or renewal.  91 Fed. Reg. at 7052.  And States commonly issued non-domiciled CDLs with expiration dates exceeding the applicant's authorized period of lawful presence.  *Id.* at 7045, 7063.

Because of the widespread compliance issues attending the use of EADs, the Rule no longer accepts EADs to establish lawful presence.  The Rule instead requires that States confirm lawful status using Form I-94/94A, which clearly identifies an applicant's visa category and the term for which she has been admitted to the United States, thus eliminating the need for clerks to decipher immigration codes.  91 Fed. Reg. at 7052-53, 7061, 7074, 7091.  Replacing the prior "complex framework" with a "bright-line eligibility standard" is designed to "eliminate[] the burden on [States] to interpret complex immigration codes" and improve consistency.  *Id.* at 7045; *see id.* at 7052 (emphasizing FMCSA's "statutory mandate to prescribe uniform standards for the issuance of … CDLs"); *id.* at 7061 (noting "simplicity of the [I-94's] nonimmigrant status coding").

Petitioners also misunderstand or mischaracterize the Rule's effect. As discussed, FMCSA limited the categories of visa holders eligible for non-domiciled CDLs because of concerns about vetting those applicants. Put otherwise, it was inaccessible driving history, not States' licensing deficiencies *per se*, that "pose[d] a safety concern" requiring FMCSA's intervention. Mot. 14-15. The only group whose ineligibility under the Rule depends entirely on FMCSA's revised documentation requirements are DACA recipients. As a threshold matter, as FMCSA explained, approximately 80 percent of DACA recipients are citizens of Mexico, who are categorically ineligible for non-domiciled CDLs. *See* 91 Fed. Reg. at 7055. FMCSA was well within its discretion to resume enforcing that longstanding regulatory prohibition. *See id.* And on the merits, FMCSA explained that DACA recipients generally lack I-94/94A forms, and thus would be unable to meet the documentation requirements. 91 Fed. Reg. at 7055. And FMCSA further explained that creating an exception to those requirements for DACA recipients would simply replicate the problems of administration States experienced with EADs, including confusion distinguishing between the EAD code for DACA and other forms of deferred action. *Id.* at 7055, 7069, 7099.

Petitioners do not dispute the reasonableness of either the longstanding requirement that States confirm lawful presence or the requirement that the validity period of a non-domiciled CDL should not exceed the authorized period of lawful status, and FMCSA is generally free to decide how States can best comply with those rules. They argue that FMCSA should have considered directing States to use a particular USCIS system, known as "SAVE," to verify the validity period of an EAD, Mot. 15-16, but as FMCSA explained, the annual reviews demonstrated that States were already using SAVE but had "demonstrated that they are not capable of doing so on a large scale." 91 Fed. Reg. at 7087. FMCSA reasonably determined that the simplicity I-94 forms provide would better help States comply with the regulations. Petitioners also take out of context (Mot. 15) FMCSA's statements that "SAVE is not a system administered by DOT," which came in response to a comment suggesting FMCSA itself make improvements to SAVE. 91 Fed. Reg. at 7087.

Petitioners separately contend that no compliance problem existed because FMCSA's prior regulations did not require that a CDL's expiration date match the individual's period of lawful presence. Mot. 13-14. That is mistaken in multiple respects. As discussed above, the compliance issues

regarding the use of EADs went beyond the mismatch between CDL expiration dates and the duration of lawful presence alone. 91 Fed. Reg. at 7045; *see id.* at 7051. Petitioners do not engage with many aspects of the systemic issues FMCSA identified or its determination that simplified processes would make compliance easier for the States.

Moreover, given that petitioners do not dispute the reasonableness of the Rule's express requirement that CDL expiration dates not exceed the duration of lawful status, 91 Fed. Reg. at 7102 (new 49 C.F.R. § 383.73(f)(2)(iv)), the salient question is whether FMCSA reasonably determined that States could more effectively implement that requirement by using I-94/94A forms and unexpired passports. FMCSA's annual reviews provided ample support for that conclusion, which would hold even if petitioners were correct that the prior regulations did not already contain this requirement. FMCSA identified multiple States that routinely issued CDLs with expiration dates exceeding lawful presence even when *state* law contained the same requirement. For example, California law contained this requirement, *see* Cal. Code Regs. tit. 13, § 26.02(c), but FMCSA's review discovered "a non-compliance rate of approximately 25 percent among reviewed non-domiciled files" in California, 91 Fed. Reg. at 7045. Similarly,

Texas, South Dakota, Utah, Minnesota, and Pennsylvania were found to be noncompliant despite materially identical state-law requirements.  Tex. Transp. § 522.051(f); S.D. Codified Laws § 32-12-42.2; Utah Code Ann. § 53-3-413(3)(b)(i); Minn. Stat. § 171.27(d); 75 Pa. Con. Stat. § 1514(e).

In any event, petitioners are wrong to assert that the prior regulations contained no requirement of this type.  As a matter of plain text, an alien applying for a non-domiciled CDL was required to present *unexpired* proof of lawful presence.  49 C.F.R. § 383.71(f)(2)(i) (2024); *id.* § 383.73(f)(3) (2025). Because non-domiciled-CDL eligibility hinged on the applicant's lawful presence, it followed that a credential issued for a period in which the applicant did not demonstrate lawful presence was improper.  91 Fed. Reg. at 7052, 7078.  And, as noted, many States understood this requirement (either as a matter of federal regulation, State law, or both), and struggled to comply using EADs.

Finally, as the Rule itself makes express, the need to confirm driver history justifies the restriction of non-domiciled-CDL eligibility to the specified categories of aliens; the only group excluded from eligibility solely based on the new documentation requirements is DACA recipients.  Thus,

even if petitioners were likely to succeed on this issue, any relief should be correspondingly limited.

## C.    Petitioners' Remaining Arguments Fail

Petitioners' remaining arguments fare no better.  They insist that FMCSA acted arbitrarily in failing to consider various alternative interventions, but these arguments are little more than a repackaging of petitioners' policy disagreements with the Rule.  For example, petitioners' suggestions that FMCSA should have required reissuance of overlong CDLs with new expiration dates, Mot. 14-15, "improved clerk training," Mot. 18, 19, or "requir[ed] the driver to surrender their foreign license," Mot. 19, fail entirely to grapple with the primary problem the Rule identified—the inaccessibility of foreign driving records.  91 Fed. Reg. at 7048-49.  Nor can petitioners' training-based suggestions be squared with FMCSA's conclusion that the "consistent failure" to comply with the regulations "across more than 30 States demonstrates … the issue is not merely a training deficiency," *id.* at 7052.  Furthermore, petitioners' proposal to remedy State-level administrability problems posed by the use of EADs by continuing to use EADs is an altogether unworkable proposal in light of the comprehensive problems FMCSA observed.

Nor did FMCSA err in its consideration of the reliance interests the Rule affects. Mot. 23-25. FMCSA addressed the "serious economic reliance interests at stake" but concluded those were outweighed by the need "to ensure that the CDL credential retains its integrity as a certification of safety fitness and an identified safety gap is remedied." 91 Fed. Reg. at 7083; *see id.* at 7083-84, 7096-97 (addressing these issues at length). That conclusion was reasonable, particularly because affected CDL holders will have up to five years to adjust before their current CDLs expire, *id.* at 7083-84. *See Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1088 (D.C. Cir. 2026) ("It falls to the agency to decide whether any reliance interests are outweighed by other factors."). Plainly FMCSA did not characterize the costs to affected CDL holders as "de minimis" in undertaking that analysis. Mot. 24. And contrary to petitioners' contentions, FMCSA's identification of seven transportation-related occupations as potential "alternatives to positions requiring a CDL," and provision of wage data for those occupations from the Bureau of Labor Statistics to assess the median cost to an affected driver transitioning away from CDL-requiring work, was sufficient. 91 Fed. Reg. at 7094. FMCSA need not provide current job postings to assess those possibilities. *See* Mot. 24 (faulting failure to cite "available jobs").

## II. The Balance of Harms and Public Interest Also Preclude a Stay

A stay of the Rule would work significant harm to the government and the public. As a baseline matter, an order prohibiting the government from complying with its statutory mandate to ensure safe operation of commercial motor vehicles inflicts *per se* irreparable harm. *Trump v. CASA, Inc.*, 606 U.S. 831, 860-61 (2025). Furthermore, the Rule is designed to protect all highway users. Depriving them of the Rule's indirect protections also inflicts irreparable harm and disserves the public interest—not least because a stay might encourage the same surge in applications FMCSA sought to avoid by promulgating an interim final rule. *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 4 (2025) (Kavanaugh, J., concurring) (noting that a court should also consider "harms to the third parties who otherwise would *benefit* from the challenged government action" (citation omitted)).

The broad-based harms of a stay outweigh the harms petitioners have claimed. The named individual petitioners recently renewed their CDLs, which now expire in September, Semenovskii Decl. ¶ 6, and November, Lujan Decl. ¶ 3, and thus cannot show harm "of such imminence that there is a 'clear and present' need for equitable relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation omitted).

The union petitioners assert standing based on declarations from just one member of each union, but each individual alleges that their CDL expired after they were unable to renew them in January and November, respectively. Jane Doe Decl. ¶ 6; John Doe Decl. ¶ 9. But those expirations—and the pseudonymous union members' asserted inability to renew their CDLs in the intervening months—cannot be attributed to the Rule, which has not yet taken effect. Nor can the unions premise standing or irreparable injury on their assertion that they have other members, not identified here, facing imminent injury. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497-99 (2009); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (injury must be "certain and great" for interim relief). That is particularly so because the Rule is prospective only; individuals who currently hold CDLs may do so until they expire, such that "[m]ost individuals who are ineligible for renewal will … have a transition period from when th[e] rule becomes effective until the date of the CDL's expiration." 91 Fed. Reg. at 7083-84.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion for stay pending review.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD

 */s/ Simon G. Jerome*
SIMON G. JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-1673*
  *simon.g.jerome@usdoj.gov*

MARCH 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing response complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the response contains 5,190 words. The response complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point CenturyExpd BT typeface.

*/s/ Simon G. Jerome*
SIMON G. JEROME