# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 26-1032**                    **September Term, 2025**

**FMCS-2025-0622**
**FMCS-91FR7044**

**Filed On:** May 5, 2026

Jorge Rivera Lujan, et al.,

       Petitioners

    v.

Federal Motor Carrier Safety Administration,
et al.,

       Respondents

-----------------------------

Consolidated with 26-1046

      **BEFORE:**   Wilkins*, Katsas, and Rao, Circuit Judges

## O R D E R

Upon consideration of the emergency motions for stay pending review, the oppositions thereto, and the replies; the motions to participate as amicus curiae and the lodged amicus briefs submitted by Teamsters California and Local Governments and Local Government Leaders; the notice of intention to participate as amicus curiae, which the court construes as a motion to participate as amicus curiae, and the amicus brief submitted by Asylum Seeker Advocacy Project, et al.; the amicus briefs submitted by Waste Pro USA and the Sikh Coalition, et al., which the court construes as including motions to participate as amicus curiae; and the unopposed motion to expedite, it is

**ORDERED** that the motions to participate as amicus curiae be granted.  The Clerk is directed to file the lodged amicus briefs.  It is

**FURTHER ORDERED** that the motions for stay be denied.  For the reasons discussed in the attached statement of Circuit Judge Katsas, joined by Circuit Judge Rao, petitioners have not satisfied the stringent requirements for a stay pending court review.  See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2025).  It is

* Circuit Judge Wilkins would grant the emergency motions for stay pending review.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

## No. 26-1032                                                        September Term, 2025

**FURTHER ORDERED** that the following briefing schedule will apply in these consolidated cases:

| | |
|---|---|
| Petitioners' Briefs | June 15, 2026 |
| Respondents' Brief | July 15, 2026 |
| Petitioners' Reply Briefs | July 29, 2026 |
| Deferred Appendix | August 5, 2026 |
| Final Briefs | August 5, 2026 |

The Clerk is directed to schedule these consolidated cases for oral argument on the first appropriate date in September 2026. The parties will be informed later of the date of oral argument and the composition of the merits panel.

The parties are advised that the court "looks with extreme disfavor on the filing of duplicative briefs in consolidated cases," see D.C. Circuit Handbook of Practice and Internal Procedures 38 (2025), and the parties are encouraged to collaborate to avoid duplication of arguments in their briefs.

The court reminds the parties that:

In cases involving direct review in this court of administrative actions, the brief of the appellant or petitioner must set forth the basis for the claim of standing. . . . The brief must include arguments and cite evidence establishing by a "substantial probability" the claim of standing.

See D.C. Cir. Rule 28(a)(7); Sierra Club v. EPA, 292 F.3d 895, 898 (D.C. Cir. 2002).

Petitioners should raise all issues and arguments in the opening brief. The court ordinarily will not consider issues and arguments raised for the first time in the reply brief.

To enhance the clarity of their briefs, the parties are urged to limit the use of abbreviations, including acronyms. While acronyms may be used for entities and statutes with widely recognized initials, briefs should not contain acronyms that are not widely known. See D.C. Circuit Handbook of Practice and Internal Procedures 43-44 (2025); Notice Regarding Use of Acronyms (D.C. Cir. Jan. 26, 2010).

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 26-1032**                                          **September Term, 2025**

Parties are strongly encouraged to hand deliver the paper copies of their briefs to the Clerk's office on the date due.  Filing by mail may delay the processing of the brief.  Additionally, counsel are reminded that if filing by mail, they must use a class of mail that is at least as expeditious as first-class mail.  See Fed. R. App. P. 25(a).  All briefs and appendices must contain the date that the case is scheduled for oral argument at the top of the cover.  See D.C. Cir. Rule 28(a)(8).

**Per Curiam**

 **FOR THE COURT:**
 Clifton B. Cislak, Clerk

 BY:    /s/
 Selena R. Gancasz
 Deputy Clerk

KATSAS, *Circuit Judge*, joined by RAO, *Circuit Judge*: These cases concern the terms on which aliens domiciled outside the United States may receive licenses to drive trucks, buses, and other commercial motor vehicles inside the United States. The regulation under review responds to (1) a longstanding concern that state licensing authorities cannot adequately review pertinent driving records and (2) recent evidence that the authorities cannot consistently decipher one of the forms used to establish license eligibility. The regulation addresses the first concern by restricting eligibility to foreign-domiciled aliens who have visas that enable consular review of driving records abroad. It addresses the second concern by requiring use of a different form that more clearly establishes eligibility requirements.

Various petitioners challenge the regulation. They seek expedition and a stay pending review. We deny a stay because the petitioners have not shown a strong likelihood of success. But we grant expedition given the lack of opposition, the importance of the questions presented, and the significant government and private interests implicated.

I

A

The Commercial Motor Vehicle Safety Act makes it unlawful to drive a commercial motor vehicle without a valid commercial driver's license (CDL). 49 U.S.C. § 31302. The Act authorizes states to issue these licenses, *id.* § 31301(3), subject to "minimum uniform standards" promulgated by the Secretary of Transportation, *id.* § 31308. The Secretary has delegated his duties under the Act to the Federal Motor Carrier Safety Administration (FMCSA). *See* 49 C.F.R. § 1.87(e)(1).

The Act generally bars states from issuing CDLs to non-domiciliaries. 49 U.S.C. § 31311(a)(12)(A). However, it

2

allows states to issue such CDLs "[u]nder regulations prescribed by" the FMCSA. *Id.* § 31311(a)(12)(B). These cases involve regulations for issuing CDLs to aliens domiciled outside the United States but lawfully present here. Such aliens must satisfy all the requirements that apply to domestic domiciliaries, which include a driving test and a check of prior driving history. 49 C.F.R. § 383.73(b). Before 2025, such aliens had to establish their lawful presence by providing either "an approved I-94 form," which documents lawful entry into the United States, or an "unexpired employment authorization document" (EAD) issued by the United States Citizenship and Immigration Services. 49 C.F.R. § 383.71(f)(2)(i) (2021). EADs list immigration codes corresponding to the basis for the holder's lawful presence in the United States. In contrast, I-94 forms convey that information in plain English.

B

In September 2025, the FMCSA published an Interim Final Rule modifying this regulatory scheme for non-domiciled aliens. *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 90 Fed. Reg. 46,509 (Sept. 29, 2025) (IFR). The IFR limited eligibility to aliens holding employment visas in the H-2A, H-2B, and E-2 programs. *See id.* at 46,515.[1] In doing so, the agency stressed that non-domiciled CDL holders were involved in "multiple fatal crashes in 2025." *Id.* at 46,514. The agency further noted its view that states could not adequately assess aliens' driving

---

[1]    The H-2A program allows aliens to serve as temporary agricultural workers in the United States. 8 U.S.C. §§ 1188(i)(2), 1101(a)(15)(H)(ii)(a). The H-2B program allows aliens to work here temporarily in non-agricultural jobs. *Id.* § 1101(a)(15)(H)(ii)(b). The E-2 program governs aliens coming to the United States to make or direct substantial investments. *Id.* § 1101(a)(15)(E)(ii).

3

records abroad because they lacked access to the relevant foreign records. *See id.*

Various affected parties petitioned for review of the IFR and sought stays. In November 2025, a divided panel of this Court stayed the IFR. The majority found three likely flaws in it. First, the FMCSA likely violated a statutory requirement to consult with the states. *Rivera Lujan v. FMCSA*, No. 25-1215, 2025 WL 3182504, at *1 (D.C. Cir. Nov. 13, 2025). Second, the FMCSA likely lacked good cause to forgo notice-and-comment procedures. *Id.* at *2. Third, the IFR was likely arbitrary because (i) the record did not suggest that drivers excluded by the IFR were more prone to accidents than other drivers and (ii) the agency unreasonably characterized the affected drivers' reliance interests and expected harms as *de minimis*. *Id.*

C

After reviewing more than 8,000 comments and consulting with the states, the FMCSA issued a Final Rule in February 2026. *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 91 Fed. Reg. 7044 (Feb. 13, 2026) (Final Rule). Like the IFR, the Final Rule limits non-domiciled CDLs to aliens lawfully present with H-2A, H-2B, or E-2 visas. *Id.* at 7047–51. Moreover, it requires proof of this status through an I-94 form rather than an EAD. *Id.* at 7051–53; *see* 49 C.F.R. §§ 383.71(f)(3)(i)(B), 383.5 (2026).

The agency offered two main justifications for these changes. First and foremost, it pointed to safety. States must assess the prior driving records of CDL applicants, yet they cannot access the foreign driving records of aliens domiciled abroad. Final Rule, 91 Fed. Reg. at 7044, 7048–50. This is troubling because "a driver's historical performance, whether measured through crashes, violations, or observable risky

4

behaviors, provides a robust basis for predicting future safety outcomes on the road." *Id.* at 7048–49. Second, the agency flagged broader concerns over state compliance with federal eligibility requirements. The FMCSA's annual compliance review revealed that the use of EADs to establish eligibility had proven difficult and "resulted in widespread regulatory non-compliance." *Id.* at 7044. In part, this stemmed from state clerks' frequent misreading of the immigration codes on EADs. *Id.* at 7045, 7051–53. To address these problems, the Final Rule established a "'bright-line' eligibility standard" limited to visa types indicating adequate vetting by other federal agencies, *id.* at 7045, as documented on an immigration form less prone to misreading than are the EADs, *id.* at 7051–53.

The same petitioners now seek review of the Final Rule and a stay pending review. The stay question turns on whether (1) the aggrieved party has made a "strong showing that he is likely to succeed on the merits," (2) that party will suffer irreparable harm absent a stay, and (3) a stay is consistent with the public interest. *Nken v. Holder*, 556 U.S. 418, 425–26 (2009) (cleaned up); *see id.* at 435. If the petitioner has not shown any strong likelihood of success, then a stay is unwarranted. *See, e.g.*, *id.* at 435; *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 n.3 (D.C. Cir. 2025).

II

The claims now at issue differ from the ones that supported a stay of the IFR. In promulgating the Final Rule, the FMCSA consulted with the states and proceeded through notice-and-comment procedures. Further, as explained below, the agency clarified its safety rationale, disclaimed reliance on anecdotal crash data, considered the reliance interests of affected drivers, and abandoned its characterization of those interests as *de minimis*.

5

The petitioners contend that the Final Rule violates the Safety Act and is arbitrary. We resolve the statutory claim *de novo*, affording only respectful consideration to the agency's views on that point. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401–02 (2024). In contrast, judicial review for arbitrariness under the Administrative Procedure Act "is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the agency need only articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Applying these standards of review, we conclude that the petitioners have not shown a strong likelihood of success, and we therefore deny their motions for a stay pending review.

A

One petitioner contends that the Safety Act does not authorize the Final Rule. But the statute provides that the FMCSA "shall prescribe regulations on minimum uniform standards for the issuance of commercial drivers' licenses." 49 U.S.C. § 31308. Moreover, the further statement that "[t]he standards shall require at a minimum" that CDL applicants pass certain tests and complete certain training, *id.* § 31308(1), supports no implication that the standards cannot address other safety concerns as well. And the Act makes clear that driving history *is* a significant safety concern, in requiring the licensing state to check "all information about the driving record" of each applicant in "any other State that has issued a driver's license" to him, *id.* § 31311(a)(6), as well as driving records compiled in a federal registry, *id.* § 31311(a)(16). Furthermore, the Act prohibits states from issuing CDLs to anyone not "domiciled in the State," *id.* § 31311(a)(12)(A), except pursuant to "regulations prescribed by" the FMCSA, *id.*

6

§ 31311(a)(12)(B).  The excepting clause by its terms grants the FMCSA the power to promulgate rules with regard to non-domiciled applicants.  And nothing in the statute prevents those rules from addressing applicants' driving records.  So the contrary-to-law challenge here is unlikely to succeed.

B

All petitioners challenge the FMCSA's safety rationale as arbitrary.  They contend that foreign domiciliaries are no more prone to accidents than other drivers, despite the agency's highlighting accidents involving foreign drivers.  But the current safety rationale does not rest on that premise.  Instead, it rests on two different propositions.  First, "drivers who have a history of driving offenses are more likely to be involved in future crashes."  Final Rule, 91 Fed. Reg. at 7048.  Second, "States do not have access to foreign nations' systems" for tracking the driving records of aliens abroad.  *Id.* at 7049.  The petitioners here do not seriously contest either proposition.  And although the prior stay panel faulted the FMCSA for resting its entire safety case on possibly unrepresentative anecdotes, the agency has now clarified that the anecdotes are merely "illustrative."  *Id.* at 7065.  Rather than branding foreign drivers as uniquely dangerous, the Final Rule seeks instead to ensure that their vetting is no less rigorous than that of drivers domiciled in the United States.  Such an overall approach is unlikely to be condemned as arbitrary.

More narrowly, the petitioners contend that the Final Rule is arbitrary because the specific lines it draws are not adequately tailored to its underlying safety rationale.  This analysis sounds more like a plea for heightened constitutional scrutiny than like an application of arbitrary-and-capricious review under the APA.  To be sure, a rule may be arbitrary if it has a sufficiently "significant mismatch" with its underlying

7

rationale.  *See Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019).  But in general, agencies have "wide discretion in making line-drawing decisions … within a zone of reasonableness."  *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (cleaned up).  The lines drawn by the Final Rule may not be perfect, but we cannot say that they are likely unreasonable.

The petitioners argue that the FMCSA lacked adequate grounds for extending eligibility to foreign domiciliaries holding H-2A, H-2B, and E-2 visas.  But the agency reasonably determined that, for those visa categories, "several factors" combine to "provide reasonable assurance of driver fitness" despite the states' inability to review driver history.  Final Rule, 91 Fed. Reg. at 7050.  These factors include adjudication of visa eligibility by Department of State consular officers abroad, Department of Labor checks for H-2A and H-2B workers, checks by sponsoring employers, and continued federal oversight through visa renewals.  *See id.* at 7048–51.  The petitioners criticize individual aspects of these screening mechanisms, but we find some of the criticisms overstated.  For instance, they question whether consular officers do in fact request and review documentation related to driving history.  Yet as the FMCSA explained, "[t]he Department of State has confirmed that consular officers adjudicating such visa applications assess certain factors relevant to both visa eligibility and [commercial motor vehicle] driver fitness, including but not limited to driving history."  *Id.* at 7050.  And in any event, the FMCSA reasonably concluded that "the totality of Federal vetting for these specific visa categories provides a reasonable functional equivalent," even though "no single element of this process perfectly replicates" the driving history checks "available for domestic drivers."  *Id.*

8

The petitioners further argue that the safety rationale does not apply to beneficiaries of the immigration program known as Deferred Action for Childhood Arrivals (DACA). It affords immigration benefits to certain aliens who unlawfully entered the United States as children and have lived here since then. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 8–9 (2020). Among the benefits are deferred removal from the United States and authorization to work here in the meantime. *See id.* Given their circumstances, DACA beneficiaries likely hold EADs but not I-94 forms. So the requirement to verify eligibility through an I-94 form effectively disqualifies DACA recipients from receiving CDLs, even though they likely lack any foreign driving history.

The FMCSA grappled with this concern and reasonably explained its position. To begin with, allowing DACA recipients to use EADs to document eligibility would present substantial administrability and compliance problems. State licensing clerks "cannot accurately distinguish whether an EAD code is a permissible basis for issuance of a non-domiciled CDL to a DACA recipient." Final Rule, 91 Fed. Reg. at 7055. In particular, clerks mistake DACA coding for other codes that indicate different statuses like "Deferred Action" or "Alien Granted Deferred Action." *Id.* at 7069. This would "create the same problems with the improper issuance of non-domiciled … CDLs" that the Final Rule sought to prevent. *Id.* at 7055, 7069. Some of these mistakes—like issuing the wrong category of license to an alien—would implicate primarily compliance concerns. But others—like issuing CDLs to non-DACA "Deferred Action" aliens with potentially significant foreign driving histories—would implicate the safety concerns at the core of the Final Rule. On top of all that, the agency reasonably explained its view that DACA beneficiaries can claim only very limited reliance interests in the specific context of CDLs: More than 80 percent

9

of such beneficiaries are citizens of Mexico, whose reciprocal licensing agreement with the United States makes these individuals legally ineligible for a non-domiciled CDL issued within the United States. *Id.* at 7055, 7092; *see* 49 C.F.R. §§ 383.71(f)(1)(i), 383.23(a)(2), (b)(1) & n.1. And they began receiving CDLs only in 2023, when the FMCSA announced that it would no longer enforce this eligibility limitation against DACA beneficiaries. *See* Final Rule, 91 Fed. Reg. at 7055. So although DACA recipients present a sympathetic set of circumstances, we cannot conclude that the FMCSA likely acted arbitrarily in declining to carve them out of an otherwise reasonable regulation requiring use of the I-94 form.[2]

Finally, the petitioners fault the FMCSA for failing to adequately consider non-domiciled drivers' reliance interests. But as explained above, the agency did address at some length the distinct reliance considerations involving DACA beneficiaries. And more generally, the FMCSA stated that it has "not taken the decision to alter eligibility criteria lightly," but concluded that public safety outweighed the "private reliance interests." Final Rule, 91 Fed. Reg. at 7083. This explanation likely suffices, for an agency "has considerable flexibility in carrying out its responsibility" to balance competing interests in making difficult policy judgments. *Regents*, 591 U.S. at 31–32; *see Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1088 (D.C. Cir. 2026) ("It falls to the

---

[2] One distinct administrability concern involves the issuance of CDLs for terms extending beyond expiration of the relevant visa. The parties dispute whether pre-existing regulations so limited the permissible term of a CDL. We need not consider that issue because the safety and administrability concerns addressed above suffice to show that the FMCSA permissibly declined to create a special carveout for DACA beneficiaries.

10

agency to decide whether any reliance interests are outweighed by other factors.").[3]

### III

Although we deny a stay pending review, we nonetheless grant the petitioners' alternative request for expedition. As our analysis above has made clear, the legal questions presented here are at least fairly contestable, and the cases implicate important governmental and private interests. Moreover, the government does not oppose expedition. So we grant it, as set forth in the accompanying order.

*So ordered.*

---

[3] One petitioner contends that the Final Rule is pretext for an anti-immigrant agenda. Courts approach claims of pretext skeptically because probing the Executive's "motivation represents a substantial intrusion into the workings of another branch of Government." *See Dep't of Com.*, 588 U.S. at 781 (cleaned up). Here, in light of the agency's reasonable safety rationale, the claim of pretext appears unsupported by the record "and, without more, [is] insufficient to upset the presumption that public officials have properly discharged their official duties." *Hight v. DHS*, 135 F.4th 996, 1008 (D.C. Cir. 2025) (cleaned up).