ORAL ARGUMENT NOT YET SCHEDULED

No. 26-1032

(consolidated with No. 26-1046)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JORGE RIVERA LUJAN, ALEKSEI SEMENOVSKII, AMERICAN
FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES,
AFL-CIO, and AMERICAN FEDERATION OF TEACHERS,

*Petitioners,*

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION,
UNITED STATES DEPARTMENT OF TRANSPORTATION, and
UNITED STATES,

*Respondents.*

On Petition for Review of a Final Rule Issued by
the Federal Motor Carrier Safety Administration

**INITIAL BRIEF FOR PETITIONERS**

Wendy Liu
Cormac Early
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
wliu@citizen.org

*Counsel for Petitioners in No. 26-1032*

June 15, 2026

Teague Paterson
Matthew Blumin
American Federation of
State, County & Municipal
Employees, AFL-CIO
1625 L Street, NW
Washington, DC 20036
(202) 775-5900

*Counsel for Petitioner AFSCME*

Daniel McNeil
Channing Cooper
American Federation of Teachers
555 New Jersey Avenue NW
Washington, DC 20001
(202) 879-4400

*Counsel for Petitioner AFT*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Petitioners in No. 26-1032 are Jorge Rivera Lujan; Aleksei Semenovskii; American Federation of State, County & Municipal Employees, AFL-CIO; and American Federation of Teachers, AFL-CIO. Respondents are the Federal Motor Carrier Safety Administration, the United States Department of Transportation, and the United States.

The parties in the consolidated case, No. 26-1046, are petitioner Martin Luther King, Jr. County, Washington, and respondents Sean Duffy in his official capacity as Secretary of the United States Department of Transportation, the United States Department of Transportation, the Federal Motor Carrier Safety Administration, and the United States.

As of this filing, amici supporting petitioners are: City of Albany, New York; City of Albuquerque, New Mexico; City of Cambridge, Massachusetts; Montgomery County, Maryland; City of New Haven, Connecticut; City of New York, New York; City of Portland, Oregon; City

i

and County of San Francisco, California; County of Santa Clara, California; City of Seattle, Washington; Celina Benitez, Mayor, City of Mount Rainier, Maryland; Jesse Brown, Councilmember, City of Indianapolis, Indiana; Chelsea Byers, Mayor, City of West Hollywood, California; Chris Canales, Councilmember, City of El Paso, Texas; Michael Chameides, Supervisor, County of Columbia, New York; John Clark, Mayor, Town of Ridgway, Colorado; Alison Coombs, Mayor Pro Tempore and Councilmember, City of Aurora, Colorado; Christine Corrado, Councilmember, Township of Brighton, New York; Nikki Fortunato Bas, Supervisor, Alameda County, California; Brenda Gadd, Councilmember, Metropolitan Nashville and Davidson County, Tennessee; Caroline Torosis, Mayor Pro Tempore, City of Santa Monica, California; Terry Vo, Councilmember, Metropolitan Nashville and Davidson County, Tennessee; Ginny Welsch, Councilmember, Metropolitan Nashville and Davidson County, Tennessee; Robin Wilt, Councilmember, Township of Brighton, New York; Asylum Seeker Advocacy Project; National Immigration Law Center; National Employment Law Project; Teamsters California; Waste Pro USA; Sikh

ii

Coalition; California Sikh Youth Alliance; Sikh American Legal Defense and Education Fund; the Jakara Movement; and United Sikhs.

As of this filing, there are no amici supporting respondents.

### B.    Rulings Under Review

Petitioners seek review of the final rule issued on February 11, 2026, by respondent Federal Motor Carrier Safety Administration, titled *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDLs)*, published in the Federal Register on February 13, 2026, at 91 Fed. Reg. 7044.

### C.    Related Cases

The case on review has never previously been before this Court or any other court. There is one related case pending before this Court, No. 26-1046, which this Court has consolidated with this case. In addition, No. 25-1215, which is consolidated with No. 25-1224 and is being held in abeyance, involves the same parties and some similar issues, with respect to an interim final rule that preceded the final rule at issue in this case. Undersigned counsel is unaware of any other related cases pending in this Court or any other court.

/s/ *Wendy Liu*
Wendy Liu

iii

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................i

TABLE OF AUTHORITIES......................................................vi

GLOSSARY ...........................................................xiii

INTRODUCTION.......................................................... 1

JURISDICTIONAL STATEMENT .........................................2

STATUTES AND REGULATIONS .......................................3

STATEMENT OF THE ISSUES.........................................3

STATEMENT OF THE CASE ...........................................3

    Statutory Background .........................................3

    Regulatory Background ........................................ 4

    The 2025 Interim Final Rule and this Court's Stay ...........9

    Comments on the IFR........................................14

    Final Rule .................................................18

    This Litigation .............................................20

SUMMARY OF ARGUMENT ..........................................21

STANDING .............................................................23

ARGUMENT .............................................................24

I.    The Rule exceeds FMCSA's statutory authority. .........24

II.    The Rule is arbitrary and capricious. ....................24

    A. FMCSA's safety rationale is not supported by the record. ........25

        1. FMCSA relied on selective and inadequate data. ............26

        2. FMCSA did not adequately take into account evidence that the Rule will harm safety. .......................................32

    B. FMCSA's assertions on driving history and administrability do not adequately justify the Rule's restriction..............................................................................38

        1. FMCSA's driving-history rationale does not justify the Rule.............................................................................38

        2. FMCSA's state-compliance rationale does not justify the Rule.............................................................................53

    C. FMCSA failed to adequately consider the substantial reliance interests of CDL drivers, their employers, and the public. ..................................................................62

CONCLUSION ..................................................................................65

CERTIFICATE OF COMPLIANCE......................................................67

STANDING ADDENDUM

     1.    Declaration of Jane Doe

     2.    Declaration of John Doe

     3.    Declaration of Jorge Rivera Lujan

     4.    Declaration of Lauren Samet

     5.    Declaration of Aleksei Semenovskii

     6.    Declaration of Michelle Sforza

STATUTORY AND REGULATORY ADDENDUM

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Affirmed Energy, LLC v. FERC,*
166 F.4th 1070 (D.C. Cir. 2026) ....................................................65

*Alpharma, Inc. v. Leavitt,*
460 F.3d 1 (D.C. Cir. 2006) ..........................................................38

*Alpine Securities Corp. v. Financial Industry Regulatory Authority,*
121 F.4th 1314 (D.C. Cir. 2024) ....................................................23

*American Radio Relay League, Inc. v. FCC,*
524 F.3d 227 (D.C. Cir. 2008)........................................................28

*Center for Biological Diversity v. Zeldin,*
171 F.4th 356 (D.C. Cir. 2026) ......................................................23

*Cigar Ass'n of America v. FDA,*
132 F.4th 535 (D.C. Cir. 2025)................................................25, 59

*Department of Commerce v. New York,*
588 U.S. 752 (2019) ...............................................................43, 44

*District Hospital Partners, L.P. v. Burwell,*
786 F.3d 46 (D.C. Cir. 2015) .........................................................52

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ......................................................................62

*FDA v. Wages & White Lion Investors,*
604 U.S. 542 (2025) ......................................................................62

*Genuine Parts Co. v. EPA,*
890 F.3d 304 (D.C. Cir. 2018)..................................................26, 31

*Lujan v. Defenders of Wildlife,*
     504 U.S. 555 (1992) ...................................................................23

*MediNatura, Inc. v. FDA,*
     998 F.3d 931 (D.C. Cir. 2021)......................................................60

*Michigan v. EPA,*
     576 U.S. 743 (2015) ...................................................................37

*Motor Vehicle Manufacturers Ass'n of United States v. State Farm
     Mutual Automobile Insurance Co.,*
     463 U.S. 29 (1983) ................................................ 25, 37, 38, 39, 60

*National Shooting Sports Foundation, Inc. v. Jones,*
     716 F.3d 200 (D.C. Cir. 2013)......................................................44

*National TPS Alliance v. Noem,*
     166 F.4th 739 (9th Cir. 2026) (Mendoza, J., concurring) ..............45

*Owner-Operator Independent Drivers Ass'n v. FMCSA,*
     494 F.3d 188 (D.C. Cir. 2007)......................................................37

*Rivera Lujan v. FMCSA,*
     No. 25-1215, 2025 WL 3182504
     (D.C. Cir. Nov. 13, 2025) ................................. 11, 12, 13, 28, 31, 62

*Spirit Airlines, Inc. v. Department of Transportation,*
     997 F.3d 1247 (D.C. Cir. 2021)....................................................53

*United Mine Workers of America v. Mine Safety & Health
     Administration,*
     626 F.3d 84 (D.C. Cir. 2010) ......................................................32

*World Shipping Council v. Federal Maritime Commission,*
     152 F.4th 215 (D.C. Cir. 2025)....................................................43

*Yakima Valley Cablevision, Inc. v. FCC,*
     794 F.2d 737 (D.C. Cir. 1986)......................................................53

## Statutes

5 U.S.C. § 706(2) ................................................................25

28 U.S.C. § 2342(3)(A) ........................................................2

49 U.S.C. § 31301 ........................................................2, 3, 4

49 U.S.C. § 31302 .........................................................3, 47

49 U.S.C. § 31305 ..........................................................3, 4

49 U.S.C. § 31308 .........................................................4, 12

Security and Accountability for Every Port Act of 2006,
   Pub. L. 109-347, 120 Stat. 1884, 1944 (49 U.S.C. § 31100 note) ...........7

## Regulatory Materials

6 C.F.R. § 37.21 ..............................................................59

20 C.F.R. § 655.18 ...........................................................46

49 C.F.R. § 1.87 ...............................................................4

49 C.F.R. § 383.23 ....................................................6, 8, 9, 58

49 C.F.R. § 383.71(b) ..........................................................7

49 C.F.R. § 383.71(f) .................................................8, 10, 52, 59

49 C.F.R. § 383.73(b) .......................................................42, 59

49 C.F.R. § 383.73(f) ..........................................................19

49 C.F.R. § 383.73(m) .........................................................61

49 C.F.R. § 383.110 ......................................................................................4

49 C.F.R. § 383.113 ......................................................................................5

49 C.F.R. § 383.115 ......................................................................................5

49 C.F.R. § 383.117 ......................................................................................5

49 C.F.R. § 383.119 ......................................................................................5

49 C.F.R. § 383.121 ......................................................................................5

49 C.F.R. § 383.123 ......................................................................................5

49 C.F.R. § 383.133 ..................................................................................5, 50

49 C.F.R. § 383.135 ......................................................................................5

49 C.F.R. § 390.5T ......................................................................................5

49 C.F.R. § 391.1 ..........................................................................................5

49 C.F.R. § 391.11 ..............................................................................6, 48, 50

49 C.F.R. § 391.21 ......................................................................................48

49 C.F.R. § 391.23 ......................................................................................47

49 C.F.R. § 391.41 ..................................................................................6, 48

49 C.F.R. § 391.43 ..................................................................................6, 48

49 CFR part 395 ........................................................................................36

53 Fed. Reg. 27628 (July 21, 1988) ............................................................6

54 Fed. Reg. 22392 (May 23, 1989) ............................................................9

76 Fed. Reg. 26882 (May 9, 2011) ................................................. 7, 8, 9

90 Fed. Reg. 46509 (Sept. 29, 2025) ............................................ 10, 11, 26

91 Fed. Reg. 7044 (Feb. 13, 2026) ................... 2, 15, 18, 19, 25, 26, 27, 28, 29, 32, 34, 35, 37, 38, 39, 40, 42, 45, 47, 48, 50, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 63, 64, 65

**Other Authorities**

*Amendment to the Memorandum of Understanding Between the Government of the United States of America and the Government of the United Mexican States Relating to the Recognition and Validity of Commercial Driver's Licenses and Licensias Federales de Conductor* (2017), https://www.fmcsa.dot.gov/international-programs/us-mexico-cdl-mou ........................................................ 9

American Trucking Ass'n, *ATA Chief Economist Pegs Driver Shortage at Historic High* (Oct. 25, 2021), https://www.trucking.org/news-insights/ata-chief-economist-pegs-driver-shortage-historic-high ....................................................... 34

Hugh Cameron, *America Doesn't Have Enough Truck Drivers*, Newsweek (July 10, 2025), https://www.newsweek.com/america-trucking-shortage-logistics-supply-chain-2097123 ...................... 34

Department of State, *Interview by Consular Officer*, Foreign Affairs Manual, 9 FAM 504.7 (2024) .............................. 50

Department of State, *Standards for Applying INA 214(b)*, Foreign Affairs Manual, 9 FAM 302.1-2(B)(4) (2022) .................. 51

Naomi Dunn et al., National Surface Transportation Safety Center for Excellence, *Commercial Motor Vehicle Driver Risk Based on Age and Driving Experience* (2020), https://vtechworks.lib.vt.edu/server/api/core/bitstreams/a5800006-4b00-4854-bd5c-1f3e76f5d5c1/content .................................. 29, 33

Executive Order 14286, 90 Fed. Reg. 18759 (Apr. 28, 2025)...................10

FMCSA, *CMV Driving Tips – Driver Fatigue* (2015),
    https://www.fmcsa.dot.gov/safety/driver-safety/cmv-driving-tips-
    driver-fatigue...................................................................................36

FMCSA, *Crash Statistics*,
    https://ai.fmcsa.dot.gov/crashstatistics.............................. 15, 28, 55

FMCSA, *President Trump's Transportation Secretary Sean P. Duffy
    Announces Nationwide Audit of States Issuing Non-Domiciled
    Commercial Driver's Licenses* (June 27, 2025),
    https://www.fmcsa.dot.gov/newsroom/president-trumps-
    transportation-secretary-sean-p-duffy-announces-nationwide-
    audit-states..................................................................................10

J.B. Hunt, *Immigration Policy and Enforcement Impact on U.S.
    Commercial Driver Supply* (Mar. 24, 2026),
    https://www.jbhunt.com/blog/enterprise/
    immigration-policy-impact...........................................................41

Alex Lockie, *FMCSA issues Final Rule banning non-domiciled CDLs
    almost entirely*, Overdrive (Feb. 11, 2026),
    https://www.overdriveonline.com/business/article/15816996/fmcsa-
    issues-final-rule-banning-nondomiciled-cdls-almost-entirely.......14

National Academies. of Sciences, Engineering & Medicine, *Pay and
    Working Conditions in the Long-Distance Truck and Bus
    Industries: Assessing for Effects on Driver Safety and Retention*
    (2024),
    https://nap.nationalacademies.org/read/27892/chapter/7 .............33

New York Office of Temporary & Disability Assistance,
    *Employment Authorization Document Codes* (Oct. 2018),
    https://otda.ny.gov/policy/directives/2019/INF/19-INF-07-
    Attachment-4.pdf .......................................................................56

U.S. Citizenship & Immigration Service, *E-2 Treaty Investors*,
https://www.uscis.gov/working-in-the-united-states/temporary-
workers/e-2-treaty-investors ..........................................................51

U.S. Citizenship & Immigration Service, *Employment Authorization*
(Oct. 2018), https://www.uscis.gov/employment-authorization ....56

U.S. Citizenship & Immigration Service, *H-2A Temporary
Agricultural Workers*,
https://www.uscis.gov/working-in-the-united-states/temporary-
workers/h-2a-temporary-agricultural-workers .............................51

U.S. Citizenship & Immigration Service, *H-2B Temporary
Non-Agricultural Workers*,
https://www.uscis.gov/working-in-the-united-states/temporary-
workers/h-2b-temporary-non-agricultural-workers ......................51

U.S. Citizenship & Immigration Service, *Handbook for Employers
M-274* (Oct. 30, 2025), https://www.uscis.gov/i-9-central/form-i-9-
resources/handbook-for-employers-m-274/50-automatic-
extensions-of-employment-authorization-andor-employment-
authorization-documents-eads-in ................................................55

## GLOSSARY

| | |
|---|---|
| AFSCME | American Federation of State, County & Municipal Employees, AFL-CIO |
| AFT | American Federation of Teachers, AFL-CIO |
| APA | Administrative Procedure Act |
| CDL | Commercial Driver's License |
| EAD | Employment Authorization Document |
| FMCSA | Federal Motor Carrier Safety Administration |
| IFR | Interim Final Rule |
| USCIS | U.S. Citizenship and Immigration Services |

## INTRODUCTION

This case challenges a Final Rule by the Federal Motor Carrier Safety Administration (FMCSA) barring nearly all immigrants with work permits—including Deferred Action for Childhood Arrivals (DACA) recipients, asylum seekers, asylees, refugees, and people with Temporary Protected Status—from obtaining or renewing a commercial driver's license (CDL). Until the Rule, FMCSA had long permitted immigrants with Employment Authorization Documents (EADs), which show the immigrant's lawful authorization to work in the United States, to obtain and renew CDLs, thereby enabling those people to make a living driving trucks, buses, and other commercial motor vehicles. Many thousands of individuals therefore for years have been supporting themselves and their families by doing so. FMCSA's about-face puts their livelihoods at risk, with harmful impacts on the states, localities, school systems, and employers that rely on their essential work.

The Rule's exclusion of immigrants from holding CDLs exceeds FMCSA's statutory authority and is arbitrary and capricious. Although FMCSA asserts that its underlying concern is to ensure safety, FMCSA admits it has *no* evidence that the immigrants excluded by the Rule drive

1

any less safely than people whom FMCSA continues to allow to hold CDLs. And while FMCSA asserts that the Rule will improve safety by keeping drivers with unknown foreign driving records off the roads, that rationale is unsupported by the record and, importantly, cannot explain FMCSA's treatment of DACA recipients. In addition, FMCSA's assertion of administrability issues from using EADs as documentation supporting a CDL application is not supported by the record and does not justify the Rule's restriction, particularly given obvious alternatives of improved guidance or clerk training.

The Rule should be vacated.

## JURISDICTIONAL STATEMENT

FMCSA issued the challenged final rule on February 11, 2026, under the Commercial Motor Vehicle Safety Act of 1986, 49 U.S.C. § 31301, et seq., and published it in the Federal Register on February 13, 2026. Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 91 Fed. Reg. 7044 (JA__). Petitioners filed a timely petition for review of the Rule on February 12, 2026 (JA__). This Court has jurisdiction under 28 U.S.C. § 2342(3)(A).

## STATUTES AND REGULATIONS

Pertinent statutory and regulatory provisions are in the Statutory and Regulatory Addendum.

## STATEMENT OF THE ISSUES

Whether the Final Rule, which bars most immigrants lawfully authorized to work in the United States from obtaining or renewing a commercial driver's license, exceeds FMCSA's statutory authority.

Whether the Final Rule, which bars most immigrants lawfully authorized to work in the United States from obtaining or renewing a commercial driver's license, is arbitrary, capricious, or otherwise contrary to law.

## STATEMENT OF THE CASE

### Statutory Background

Pursuant to the Commercial Motor Vehicle Safety Act, a driver of a commercial motor vehicle (such as a truck or bus) must have a CDL. 49 U.S.C. § 31302; *see id.* §§ 31301(3), (4). The statute prohibits a driver operating a commercial motor vehicle from having more than "one driver's license at any time." *Id.* § 31302.

3

Although CDLs are issued by states, *see id.* § 31301(3), the Commercial Motor Vehicle Safety Act charges the Secretary of Transportation with "prescrib[ing] regulations on minimum uniform standards for the issuance of [CDLs] and [commercial] learner's permits by the States." *Id.* § 31308. For example, the Secretary is required to set "minimum standards for testing and ensuring the fitness of an individual operating a [commercial motor vehicle]." *Id.* § 31305(a). In addition, the statute requires that a person issued a CDL must "pass written and driving tests for the operation of a [commercial motor vehicle]" and certify that the person completed driver training. *Id.* § 31308(1). Those standards ensure that drivers operating commercial motor vehicles have the knowledge, skills, and training necessary to operate those vehicles safely.

**Regulatory Background**

**A.** The Secretary delegated his duties under the Commercial Motor Vehicle Safety Act to FMCSA. *See* 49 C.F.R. § 1.87(e)(1). FMCSA, in turn, promulgated regulations to ensure that all drivers with CDLs "have the knowledge and skills necessary to operate a [commercial motor vehicle] safely." *Id.* § 383.110. For instance, FMCSA regulations require CDL

4

applicants to pass tests showing knowledge in "20 general areas," including: how to safely operate commercial motor vehicles; using the controls and safety systems on commercial motor vehicles; basic operating maneuvers; operating during the night and in hazardous conditions; conducting safety inspections; and avoiding fatigued driving. *Id.* § 383.111; *see id.* §§ 383.133, 383.135. In addition, all CDL applicants are required to demonstrate "[p]re-trip vehicle inspection skills," "[b]asic vehicle control skills," and "[s]afe on-road driving skills." *Id.* § 383.113. CDL applicants seeking to drive school buses, double or triple trailers, tank vehicles, or passengers must satisfy additional requirements. *See id.* §§ 383.115–123; *see id.* §§ 383.133, 383.135. All CDL applicants must pass skills tests administered in English. *See id.* § 383.133(c)(5). All drivers consent to alcohol testing. *Id.* § 383.72.

In addition to setting requirements for driving any commercial motor vehicle, FMCSA also specified minimum qualifications, *id.* § 391.1(a), for persons who drive as or for a "motor carrier"—defined as a person who transports property or passengers by a commercial motor vehicle, *id.* § 390.5T. Motor-carrier drivers must "read and speak the English language sufficiently to converse with the general public, to

5

understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records." *Id.* § 391.11(b)(2). In addition, they must "by reason of experience, training, or both, [be able to] safely operate the type of commercial motor vehicle he/she drives," *id.* § (b)(3), and be "physically qualified to drive a commercial motor vehicle," which requires a medical certification of their physical fitness, *id.* § (b)(4); *see id.* §§ 391.41, 391.43.

**B.** In 1988, the Department of Transportation first established "minimum uniform standards for issuance of CDLs by States." Commercial Driver Testing and Licensing Standards, 53 Fed. Reg. 27628 (July 21, 1988). The agency distinguished between drivers who obtained the licenses in their state of residence, who could obtain what the agency referred to as a "CDL," and foreign drivers, who could obtain what the agency referred to as a "Nonresident CDL." *Id.* 27648–49 (49 C.F.R. § 383.5). Both types of CDLs were subject to the same knowledge, skills, testing, and qualification requirements. *Id.* 27649 (§ 383.23(b)).

In 2004, a memorandum from the Inspector General of the Department of Transportation suggested requiring all CDL applicants to demonstrate legal presence in the United States to "help prevent fraud

6

in the program and further enhance security by verifying applicants' identification."[1] Congress took up that recommendation in the Security and Accountability for Every Port Act of 2006, which required the Department to issue regulations implementing the Inspector General's recommendations regarding "legal status verification for licensed United States commercial drivers." Pub. L. 109-347, § 703(a), 120 Stat. 1884, 1944 (49 U.S.C. § 31100 note).

Accordingly, in 2011, FMCSA issued new regulations specifying the documentation an applicant would need to establish identity and lawful presence. First, the rule required applicants for a CDL to provide "proof of citizenship or lawful permanent residency," 76 Fed. Reg. 26882 (May 9, 2011) (49 C.F.R. § 383.71(b)(9)), and proof that the person was applying from their "State of domicile," *id.* (§ 383.71(b)(10)). Second, renaming a "Nonresident CDL" as a "Non-domiciled CDL," the rule required applicants for a non-domiciled CDL to show proof of lawful presence and work authorization in one of two ways: The applicant could present an unexpired EAD issued by U.S. Citizenship and Immigration Services

---

[1] Dep't of Transp. Office of the Inspector General, *Information: Need to Establish a Legal Presence Requirement for Obtaining a Commercial Driver's License* 3 (June 4, 2004), FMCSA-2025-0622-9368 (JA__).

(USCIS). *Id.* (§ 383.71(f)(2)(i)). In this way, the rule allowed asylum seekers, asylees, and refuges—immigrants with EADs showing they are authorized to work in the U.S.—to obtain non-domiciled CDLs. Alternatively, the applicant could present an unexpired foreign passport and an I-94 form documenting the applicant's most recent admittance into the United States. In this way, the rule allowed people with certain visas to obtain non-domiciled CDLs.[2]

Further, the rule limited non-domiciled CDLs to "an individual domiciled in a foreign country" that did *not* have testing and licensing standards equivalent to those in the United States. *Id.* 26878 (§§ 383.5, 383.23(b)(1)); *see id.* 26882 (§ 383.71(f)(1)(i)). If FMCSA determined that the foreign country *did* have equivalent standards, drivers holding a license from that country could lawfully drive in the United States with their foreign license and therefore did not need a non-domiciled CDL.

---

[2] Responding to a comment from the Department of Homeland Security, which "objected to the term 'Nonresident' because it is used differently for immigration purposes and could cause confusion," 76 Fed. Reg. 26858, FMCSA's final regulations replaced "Nonresident" with "Non-domiciled" to "provide greater consistency with FMCSA's authorizing statute" and "avoid confusion and eliminate any actual or perceived conflicts with [the Department of Homeland Security's] immigration programs," *id*. FMCSA thus made clear that it intended no substantive distinctions based on immigration status.

Thus, when FMCSA subsequently determined that Mexican and Canadian CDL standards were equivalent to federal CDL standards, drivers with Canadian or Mexican CDLs could drive commercial motor vehicles in the United States with their Canadian or Mexican CDLs and were no longer eligible for a non-domiciled CDL. *Id.* 26878 (§ 383.23(b)(1) n.1).[3]

Under the 2011 rule, as under the 1988 rule, all applicants for commercial driver's licenses—whether a CDL, a nonresident CDL, or a non-domiciled CDL—were required to meet the same knowledge, skills, and training requirements. *Id.* 26882 (§ 383.71(f)(2)(i)).

**The 2025 Interim Final Rule and this Court's Stay**

In April 2025, President Trump issued an Executive Order directing the Secretary of Transportation and FMCSA to "review non-domiciled [CDLs] issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities with respect to non-

---

[3] *See Amendment to the Memorandum of Understanding Between the Government of the United States of America and the Government of the United Mexican States Relating to the Recognition and Validity of Commercial Driver's Licenses and Licensias Federales de Conductor*, art. 2(3)(B) (2017), https://www.fmcsa.dot.gov/international-programs/us-mexico-cdl-mou; 54 Fed. Reg. 22392 (May 23, 1989) (Canada).

domiciled CDL issuance"; and "evaluate and take appropriate actions to improve the effectiveness of current protocols for verifying the authenticity and validity of both domestic and international commercial driving credentials." Exec. Order 14286, § 4, 90 Fed. Reg. 18759, 18760 (April 28, 2025). Two months later, the Department of Transportation launched a nationwide audit into state issuance of non-domiciled CDLs, "specifically reviewing the potential for unqualified individuals obtaining licenses and posing a hazard on our roads."[4]

On September 29, 2025, FMCSA issued an Interim Final Rule (IFR) barring nearly all categories of immigrants from obtaining or renewing non-domiciled CDLs. Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46509 (Sept. 29, 2025) (JA__). Under the IFR, only people with H-2A, H-2B, or E-2 visas could obtain or renew a non-domiciled CDL. *See* 49 C.F.R. § 383.5 (2025); *id.* § 383.71(f)(2) (2025). All others, "includ[ing] asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA)

---

[4] FMCSA, *President Trump's Transportation Secretary Sean P. Duffy Announces Nationwide Audit of States Issuing Non-Domiciled Commercial Driver's Licenses* (June 27, 2025), https://www.fmcsa.dot.gov/newsroom/president-trumps-transportation-secretary-sean-p-duffy-announces-nationwide-audit-states.

recipients," were excluded. 90 Fed. Reg. 46515 (JA__). The IFR also rescinded FMCSA's longstanding guidance that non-domiciled CDLs are available to Mexican citizens present under the DACA program and to foreign drivers with EADs. *Id.* 46517 (JA__).[5] Invoking the good-cause exception to the Administrative Procedure Act's (APA) notice-and-comment procedures, FMCSA made the IFR immediately effective, but accepted comments through November 28, 2025. *Id.* 46514–15 (JA__).

On October 20, 2025, Petitioners Jorge Rivera Lujan, Aleksei Semenovskii, American Federation of State, County & Municipal Employees, AFL-CIO (AFSCME), and American Federation of Teachers, AFL-CIO (AFT) petitioned for review of the IFR. *See Rivera Lujan v. FMCSA*, No. 25-1215. They moved for an emergency stay pending review. Martin Luther King, Jr. County, Washington (King County), also filed a petition for review, No. 25-1224, and moved to stay the IFR.

This Court consolidated the cases, granted the motions, and stayed the IFR. *Rivera Lujan v. FMCSA*, No. 25-1215, 2025 WL 3182504, at *1 (D.C. Cir. Nov. 13, 2025); *but see id.* at *3 (Henderson, J., dissenting). The

---

[5] *See* FMCSA-2025-0622-9339 (JA__) (DACA recipient guidance); FMCSA-2025-0622-9329 (JA__) (drivers with EADs guidance).

11

Court held that petitioners were likely to succeed on their procedural challenges that FMCSA did not have good cause to skip the APA's notice and comment procedures, *id.* at *2, and that FMCSA had violated the Commercial Motor Vehicle Safety Act by issuing the rule without prior 'consultation with the States,'" *id.* at *1 (quoting 49 U.S.C. § 31308). The Court stated that although "FMCSA attempted to justify the good-cause exception based on public safety," FMCSA had conceded that it did not have data showing a relationship between a driver's nation of domicile and safety outcomes, and that the data cited by FMCSA did not "show[] that the rule would produce any net safety benefit." *Id.* at *2.

In addition, the Court concluded that Petitioners were likely to succeed in their claim that the IFR was arbitrary and capricious, because "FMCSA does not appear to have articulated a satisfactory explanation for how the rule would promote safety." *Id.* The Court noted that "FMCSA's own data appears to indicate that the CDL holders excluded by the rule are involved in fatal crashes at a lower rate than CDL holders who are not excluded." *Id.* In addition, the Court found that "FMCSA seems to have failed to adequately consider the 'serious reliance interests' of those currently holding non-domiciled CDLs," and noted that FMCSA

12

"cited no support" for its assertion that drivers excluded by the IFR would be able to find other similar employment with de minimis costs. *Id.* The Court also explained that a stay was warranted because petitioners faced irreparable harm, there was an "important public interest in safety on the roads and highways," and there was "evidence that the rule would harm public safety by forcing [petitioner King County] to replace safer experienced drivers with less-safe new drivers." *Id.*

On November 18, 2026, FMCSA sent a letter to state licensing agencies inviting them to comment on the IFR by the November 28 comment deadline.[6] FMCSA then filed an unopposed motion to hold the consolidated petitions in abeyance pending the promulgation of a final rule. The Court granted the motion, Order, No. 25-1215 (Dec. 3, 2025), and later continued the abeyance pending disposition of this case, Order, No. 25-1215 (Feb. 20, 2026).

---

[6] FMCSA, *SDLA Comment Solicitation Letter*, FMCSA-2025-0622-7885 (Nov. 18, 2026) (JA__).

13

**Comments on the IFR**

FMCSA received 9,253 comments, including from all Petitioners in these consolidated cases.[7] Nearly 90 percent of the comments opposed the new rule.[8]

Many comments emphasized the absence of data to support FMCSA's conclusion that the Rule's exclusion of immigrants with work permits would advance road safety. For example, states highlighted that FMCSA, as it admitted, had offered *no* evidence showing a relationship between nation of domicile and driver fitness and *no* evidence showing that non-domiciled CDL holders are responsible for a disproportionate share of fatal crashes.[9] Although FMCSA had identified in the IFR five

---

[7] https://www.regulations.gov/docket/FMCSA-2025-0622.

[8] Alex Lockie, *FMCSA issues Final Rule banning non-domiciled CDLs almost entirely*, Overdrive (Feb. 11, 2026), https://www.overdriveonline.com/business/article/15816996/fmcsa-issues-final-rule-banning-nondomiciled-cdls-almost-entirely.

[9] State Attorneys Gen. Comment 4, FMCSA-2025-0622-7571 (JA__); Del. Div. of Motor Vehicles Comment 1, FMCSA-2025-0622-8020 (JA__) (noting the absence of "comparative crash-rate analysis, longitudinal data, or peer-reviewed research" and stating that "States have requested supporting data … from FMCSA; none has been provided."); Oregon Dep't of Transp. Comment 2, FMCSA-2025-0622-7550 (JA__) (analyzing five years of data on fatal crashes involving Oregon licensed drivers and finding that "zero … crashes involved a driver with a non-domicile CDL").

14

crashes that it thought *likely* involved a driver with a non-domiciled CDL, resulting in 12 fatalities, commenters pointed out that five crashes and 12 fatalities are less than a fraction of one percent of crashes and fatalities in a year.[10]

In addition, state and local government agencies, unions, an industry association, and others commented that by excluding an estimated 194,000 experienced drivers—roughly 5 percent of the CDL workforce—the IFR would exacerbate an already critical shortage of commercial vehicle drivers, including documented shortages in specific states.[11] The rule thus was likely to harm public safety by replacing more

---

[10] Maine Sec'y of State & Bureau of Motor Vehicles Comment 3, FMCSA-2025-0622-7475 (JA__) (noting that FMCSA's data "showed as of September 26, 2025 – just before the IFR's issuance – there were 2,399 fatal crashes involving citizen and noncitizen commercial drivers of large trucks and buses in 2025" (citing FMCSA, *Crash Statistics* (Sept. 26, 2025))); *see, e.g.*, King County Comment 14–15, FMCSA-2025-0622-7911 (JA__); Unitarian Universalists for Social Justice Comment 1, FMCSA-2025-0622-7223 (JA__); *see also* 91 Fed. Reg. 7064 (acknowledging "specific statistics" that "the five incidents involving non-domiciled drivers account for less than 0.003 percent of these crashes").

[11] Local Gov'ts Comment 5, 7, FMCSA-2025-0622-7894 (JA__) (citing American Trucking Ass'n report of shortage of 80,000 drivers in 2021 that "could double to 160,000 drivers in 2030"); Md. Dep't of Transp. Comment 1–2, FMCSA-2025-0622-7914 (JA__); N.Y. State Office of Temporary & Disability Assistance Comment 2, FMCSA-2025-0622-7540 (JA__); Maine Sec'y of State Comment 4–5 (JA__); Central Puget Sound

experienced drivers with proven safety records with less experienced ones,[12] and impairing state and local governments' ability to provide a wide range of public services essential to road safety—for example, highway and road maintenance and repair, utility services, disaster response, and roadway clearance during inclement weather.[13]

---

Regional Transit Authority Comment 2–3, FMCSA-2025-0622-7930 (JA\_\_); Delaware Div. of Motor Vehicles Comment 2 (JA\_\_); Amalgamated Transit Union Comment 1–2, FMCSA-2025-0622-8019 (JA\_\_); AFT Comment 2–3, FMCSA-2025-0622-7134 (JA\_\_); AFSCME Comment 2, FMCSA-2025-0622-7276 (JA\_\_); Teamsters Cal. Comment 4, FMCSA-2025-0622-7875 (JA\_\_); United Steelworkers Comment 1–2, FMCSA-2025-0622-7259 (JA\_\_); Cal. Bus Ass'n Comment 2, FMCSA-2025-0622-7929 (JA\_\_); Maine Equal Justice Comment 2, FMCSA-2025-0622-7554 (JA\_\_); Asylum Seeker Advocacy Project Comment 5, FMCSA-2025-0622-6546 (JA\_\_); *see* Samet Decl. ¶¶17–18; Sforza Decl. ¶¶2, 4, 9.

[12] Local Gov'ts Comment 9, 11 & n.54 (JA\_\_); Teamsters Cal. Comment 6–7 (JA\_\_); Amalgamated Transit Union Comment 1 (JA\_\_); Cal. Bus Ass'n Comment 1 (JA\_\_); King County Comment 11–12 (analyzing 10 years of data on preventable Metro bus accidents and finding that "the longer King County Metro can keep drivers in service, the safer the service Metro provides to King County residents and visitors") (JA\_\_); Wash. Trucking Ass'ns Comment 2, 4, FMCSA-2025-0622-7906 (JA\_\_).

[13] Local Gov'ts Comment 3–5 (JA\_\_); State Attorneys Gen. Comment 1 (JA\_\_); Md. Dep't of Transp. Comment 2 (JA\_\_); AFSCME Comment 2 (JA\_\_); AFT Comment 2 (JA\_\_); Amalgamated Transit Union Comment 2 (JA\_\_); Central Puget Sound Comment 2 (JA\_\_); Maine Comment 4–5 (JA\_\_); Teamsters Cal. Comment 4–5 (JA\_\_); United Steelworkers Comment 1–2 (JA\_\_); King County Comment 6–7 (JA\_\_); *see* Sforza Decl. ¶9.

Further, commenters explained that excluding DACA recipients from holding CDLs had no safety justification. DACA recipients have driving histories that are entirely in the United States and accessible to state licensing agencies, because to be a DACA recipient, they must have resided in the United States since they were children.[14]

The comments also explained that the IFR had devastating consequences for individual drivers and their families, as well as public and private employers, school districts, and state and local communities. Drivers who depend on CDLs for their livelihoods faced loss of employment, default on loans, closure of small businesses, and inability to cover basic expenses.[15] In addition, the restriction "would disrupt

---

[14] State Attorneys Gen. Comment 7 & n.24 (JA__) (citing requirements for DACA status); Mexican American Legal Defense and Education Fund Comment 4, FMCSA-2025-0622-7563 (JA__); AFT Comment 3 (JA__); AFSCME Comment 3 (JA__); King County Comment 13 (JA__).

[15] *See, e.g.*, Teamsters Cal. Comment 2 (JA__); Asylum Seeker Advocacy Project Comment 3–5 (JA__); U.S. Committee for Refugees & Immigrants Comment 3, FMCSA-2025-0622-7515 (JA__); Asian American Legal Defense and Education Fund Comment 4–5, FMCSA-2025-0622-7289 (JA__); Justice at Work Comment 1–2, FMCSA-2025-0622-7248 (JA__).

critical supply chains, delay production schedules, and increase costs for companies already facing workforce challenge."[16]

**Final Rule**

FMCSA issued the Final Rule on February 11, 2026, with an effective date of March 16, 2026. Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 91 Fed. Reg. 7044 (Feb. 13, 2026) (JA__). Aside from a handful of "minor changes" that are "technical in nature," the Rule is identical to the IFR. *Id.* 7091 (JA__). It imposes the same categorical restriction, specifying that non-domiciled CDLs are available only to H-2A, H-2B, and E-2 visa holders with Forms I-94/94A. Eliminating the option to rely on an EAD to establish eligibility, the Rule bars all other categories of immigrants—DACA recipients, asylum seekers, asylees, refugees, and people with Temporary Protected Status—from driving commercial motor vehicles in the United States. *See* 49 C.F.R. § 383.5 (2026) (defining "Evidence of lawful immigration

---

[16] United Steelworkers Comment 2 (JA__); *see* Teamsters Cal. Comment 5 (JA__); Local Gov'ts Comment 6–7 (JA__); Colorado Fiscal Inst. Comment 2, FMCSA-2025-0622-7264 (JA__); *see also* Waste Pro Stay Amicus Br. 2, 8–12 (Mar. 5, 2026).

status"); *id.* § 383.73(f)(3) (2026) (titled "State procedures - Applicants domiciled in a foreign jurisdiction").

FMCSA states that its primary justification for the Rule was to close a "gap in the Nation's commercial drivers licensing system" that had "manifested in two ways": first, through "the issuance of licenses to individuals whose safety fitness cannot be adequately verified" by state licensing agencies; and second, through reliance on EADs to demonstrate eligibility for CDLs, which FMCSA states "has proven administratively unworkable and resulted in widespread regulatory noncompliance." 91 Fed. Reg. 7044 (JA__). To justify the Rule, FMCSA identified 17 crashes that it stated had a substantial likelihood of involving a driver who would be ineligible for a CDL under the Rule. *Id.* 7045, 7065–67 (JA__).

Because of the Rule, "roughly 194,000 drivers" out of an estimated total of 200,000 drivers with non-domiciled CDLs will lose their licenses. *Id.* 7096. "Assuming CDLs come up for renewal at a consistent rate, approximately 8,000 non-domiciled CDLs will come up for renewal every month and … will not be renewable"—that is, each month, 8,000 CDL holders will lose their jobs, creating 8,000 vacancies that employers will

have to fill.[17] In some states, all or nearly all non-domiciled CDL holders are now ineligible under the Rule.[18]

**This Litigation**

Petitioners timely petitioned for review of the Final Rule. (JA\_\_). Petitioners Rivera Lujan and Semenovskii are drivers who, under the Rule, will be ineligible for CDLs. Petitioners AFSCME and AFT each represent members who drive commercial motor vehicles for state and local governments and who will be ineligible for CDLs under the Rule. *See infra* pp.23–24.

Petitioners moved for a stay of the Final Rule, as did King County, petitioner in the consolidated case. A panel of this Court denied the motions. Order (May 5, 2026); *see id.* (noting that Judge Wilkins would grant the motion). In a statement attached to the order, Judge Katsas, joined by Judge Rao, stated that Petitioners had not shown a strong

---

[17] State Attorneys Gen. Comment 9 (JA\_\_).

[18] Maine Sec'y of State Comment 4 (JA\_\_) (stating that 100% of Maine's non-domiciled CDL holders "will lose eligibility"); King County Comment 9 (JA\_\_) (stating that of the approximately 4,200 non-domiciled CDL drivers in Washington, "only about 26 will be eligible to renew … roughly 0.6 percent"); Md. Dep't of Transp. Comment 2 (JA\_\_) (stating that "among the 2,200 Maryland non-domiciled CDL drivers, only a handful would potentially qualify" under the rule).

likelihood of success on their claim that the Final Rule is arbitrary and capricious. The Court, however, granted expedition of the consolidated cases.

## SUMMARY OF ARGUMENT

The Final Rule prohibits nearly all categories of immigrants with work permits—DACA recipients, asylum seekers, asylees, refugees, people with Temporary Protected Status, and others lawfully authorized to work in the United States—from obtaining or renewing non-domiciled CDLs. The Rule exceeds FMCSA's statutory authority, as explained in the brief of Petitioner King County. It is also arbitrary and capricious.

First, while FMCSA professed to be regulating to improve safety, it has no data showing that the people now prohibited from holding CDLs cause more crashes than other drivers. Meanwhile, substantial evidence in the record shows that excluding almost all immigrants from the commercial driving market will *harm* safety. The record thus shows a net safety loss, not a safety benefit, from the Rule.

Second, FMCSA's contention that the prohibition is needed because the foreign driving histories of these categories of individuals is inaccessible does not apply to DACA recipients—a category of people with

21

*no* foreign driving histories but who comprise the *largest* group of impacted drivers under the Rule. The significant mismatch between the agency's rationale and its decision is a hallmark of arbitrary decisionmaking and casts doubt on the agency's true motivation.

Third, FMCSA's assertion that using EADs—work permits issued by USCIS—to show lawful work authorization has proven administratively difficult is not borne out by the factual record. And FMCSA failed to reasonably explain why addressing administrative concerns through improved state guidance or training for state licensing clerks were not workable alternatives to the Rule's blanket prohibition.

Fourth, the Rule harms the serious reliance interests of the many drivers who have held CDLs for years but are now ineligible, as well as the interests of the family members, employers, school districts, and states and localities that rely on their work. FMCSA's decision to undermine these interests in favor of a Rule with no demonstrated relationship to the agency's purported safety objective was arbitrary and capricious.

**STANDING**

As demonstrated in the attached declarations, Jorge Rivera Lujan and Aleksei Semenovskii are drivers who are ineligible for CDLs under the Rule, and who face the loss of the jobs on which they rely to provide for their families and pay for basic necessities. Rivera Lujan Decl. ¶¶ 8–9; Semenovskii Decl. ¶¶7–11; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "there is ordinarily little question" that an agency action has caused a plaintiff injury where the plaintiff "is himself an object of the action"). Indeed, as a direct result of the Rule, Mr. Semenovskii's business faces closure, and he is at risk of bankruptcy. Semenovskii Decl. ¶8; *see Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) ("A business's 'destruction in its current form' commonly qualifies as irreparable harm.").

Petitioners AFSCME and AFT have standing on behalf of their members. *Cf. Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 374 (D.C. Cir. 2026) (listing associational standing requirements). AFSCME and AFT each represent numerous members who drive CMVs for state and local governments and who are ineligible for CDLs under the Rule. Sforza Decl. ¶¶3–8; Samet Decl. ¶¶12–16; John Doe Decl. ¶¶4–5, 9–12,

15; Jane Doe Decl. ¶¶3–6, 9. Those members face loss of their jobs and the ability to provide for their families, as well as loss of employer-provided benefits like health insurance. Sforza Decl. ¶¶5–8; Samet Decl. ¶¶15–16, 18; John Doe Decl. ¶¶11–16; Jane Doe Decl. ¶¶5–12. In addition, the interests that AFSCME and AFT seek to protect—the ability of their members to continue holding CDLs—are germane to the purposes of their organizations, each of which exists to protect the economic and labor interests of their members. *See* Samet Decl. ¶7; Sforza Decl. ¶¶1–2. Neither the APA claims raised nor the relief sought here requires the participation of individual members.

## ARGUMENT

### I.   The Rule exceeds FMCSA's statutory authority.

Petitioners incorporate by reference the arguments regarding the agency's lack of statutory authority made in the brief of Petitioner King County in No. 26-1046.

### II.   The Rule is arbitrary and capricious.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

24

§ 706(2). An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.*

Here, the Rule, which reverses a longstanding FMCSA rule allowing immigrants with work permits to obtain and renew a non-domiciled CDL, is arbitrary and capricious.

### A. FMCSA's safety rationale is not supported by the record.

The Final Rule is arbitrary and capricious because FMCSA's assertion that it "is likely to result in improved safety outcomes, such as the reduced frequency and/or severity of crashes or reduced frequency of violations," 91 Fed. Reg. 7098, is not supported by the record. *See Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 540 (D.C. Cir. 2025) (stating that

"agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence" (quoting *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018))).

### 1.    FMCSA relied on selective and inadequate data.

FMCSA has offered no evidence showing that the people excluded by the Rule operate commercial motor vehicles less safely than other drivers. In fact, FMCSA disclaims the availability of data that would enable comparison of the safety outcomes of now-ineligible CDL drivers to that of other drivers, including the largest category of drivers: those with (domiciled) standard CDLs. *See* 91 Fed. Reg. 7065, 7071; *id.* 7099 (stating that "[t]he necessary level of detail regarding the type of CDL held by the drivers involved in these crashes is not available"); *see also* 90 Fed. Reg. 46520 (IFR stating that "[t]here is not sufficient evidence … to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations").

Instead, trying to find empirical evidence to support its assertion that the immigrant drivers excluded by the Rule pose a safety concern,

26

FCMSA identified 17 crashes in 2025 that involved drivers with a "substantial likelihood" of falling into the now-excluded categories. 91 Fed. Reg. 7065. To compile this list, FMCSA admits, it set out to identify *only* crashes involving drivers with non-domiciled CDLs. *Id.* Specifically, FMCSA "review[ed] reports of fatal crashes that occurred in 2025 individually, cross-reference[d] driver information from these databases along with other available information, and reach[ed] out to the [state licensing agencies] for details about each driver to determine whether each crash was in scope," *id.*—that is, whether the driver had a non-domiciled CDL—and then asked the Department of Homeland Security for information about the driver's immigration category, *id.* 7065 n.35. In other words, FMCSA apparently perused reports of *thousands* of "fatal crashes that occurred in 2025," *id.* 7065,[19] and identified only 17 that *likely* involved a driver now excluded under the Rule.

These 17 instances do not support the Rule's restriction. To start, FMCSA's approach—starting with its conclusion (that the people

---

[19] *See* State Attorneys Gen. Comment 7 n.25 (JA__) (noting that "FMCSA statistics for calendar year 2025 states that there have been 3,136 fatal crashes involving large trucks and buses through October 31, 2025").

27

ineligible under the Rule are less safe) and then cherry-picking examples to support it—is not reasoned decisionmaking. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237–38 (D.C. Cir. 2008) (stating that "there is no APA precedent allowing an agency to cherry-pick a study on which it has chosen to rely in part").

Further, while FMCSA chose not to disclose the total number of crashes on the lists it reviewed, it has published statistics showing approximately 4,000 fatal large truck and bus crashes every year.[20] That FMCSA found only 17 instances when it set out to review reports of crashes pulled from its databases indicates that "CDL holders excluded by the rule are involved in fatal crashes at a lower rate than CDL holders who are not excluded." *Rivera Lujan*, 2025 WL 3182504, at *2 (discussing the 12 crashes that FMCSA cited to support the IFR's identical restriction). Thus, FMCSA's own data shows that non-domiciled CDL holders account for approximately "five percent of the 3.8 million active interstate CDL holders," 91 Fed. Reg. 7098, but a fraction of one percent

---

[20] FMCSA, *Crash Statistics*, https://ai.fmcsa.dot.gov/CrashStatistics?tab=Driver&type=&report_id=36&crash_type_id=1&datasource_id=2&time_period_id=2&report_date=2023&vehicle_type=1&state=AllStates&domicile=ALL&measure_id=1&operation_id=nul, *cited in* State Attorneys Gen. Comment 7 n.22 (JA__).

of the total number of fatal commercial vehicle crashes, *see id.* 7064–65. FMCSA waves away these statistics, calling the 17 instances an "illustrative sample." *Id.* 7065. But the "sample" is not illustrative when FMCSA provides no denominator showing the total number of crashes it reviewed.

The 17 crashes are not representative for another reason: As FMCSA "highlights," it found "a significant lack of driving experience within th[e] sample" of seventeen. *Id.* But in a non-sequitur, FMCSA connects the recency of their obtaining CDLs with the agency's "inability to verify foreign driving histories." *Id.* Nothing in its discussion, however, suggests that these drivers had *any* foreign driving history. The more obvious takeaway from the small sample is that *newer* drivers are involved in more crashes than experienced ones—a point made in the comments,[21] supported by FMCSA-sponsored studies in the record,[22] and equally applicable to immigrant and non-immigrant drivers.

---

[21] *See supra* n.12 (citing comments).

[22] FMCSA, *Driver Issues: Commercial Motor Vehicle Safety Literature Review* 9 (June 2007), FMCSA-2025-0622-9322 (JA__) (identifying drivers who are "inexperienced" or "not familiar with … service requirements" as a "safety performance decrement"); *see* Naomi Dunn et al., Nat'l Center for Surface Transp. Safety Excellence,

While FMCSA relied on 17 instances that it was not even certain involved a non-domiciled CDL driver with an EAD, the rulemaking record contained evidence that non-domiciled CDL drivers with EADs do *not* pose a greater safety risk than other drivers. For example, the Oregon Department of Motor Vehicles informed FMCSA that its analysis of "nearly six years of data" found that "for fatal crashes involving a Commercial Motor Vehicle and an Oregon licensed driver, 0% involved a driver with a non-domiciled CDL, while 100% involved a driver with a standard CDL."[23] Similarly, the Maryland Department of Transportation informed FMCSA that it was "not aware of any data which indicates that non-domiciled drivers are less safe than other CDL drivers, given that the testing, and now, training processes are identical."[24] The Delaware Division of Motor Vehicles commented that states had "requested

---

*Commercial Motor Vehicle Driver Risk Based on Age and Driving Experience* (2020), https://vtechworks.lib.vt.edu/server/api/core/bitstreams/a5800006-4b00-4854-bd5c-1f3e76f5d5c1/content, *cited in* Local Gov'ts Comment 11 (JA__) & Teamsters Cal. Comment 7 n.6 (JA__).

[23] Oregon Dep't of Transp. Comment 2 (JA__).

[24] Md. Dep't of Transp. Comment 2 (JA__).

supporting data … from FMCSA," but "none has been provided."[25] In addition, a Canadian study, brought to FMCSA's attention by commenters, found that immigrant drivers "are less prone to be drivers in serious motor vehicle crashes."[26] And if FMCSA reviewed reports of crash data and found only 17 instances of drivers who would now be excluded by the Rule, then "FMCSA's own data indicates that the CDL holders who are excluded … are involved in fatal crashes at a lower rate than drivers who will not be affected by the … new restrictions."[27]

An agency cannot "ignore evidence contradicting its position." *Genuine Parts*, 890 F.3d at 312 (citation omitted). Yet FMCSA failed to acknowledge the comments providing data inconsistent with its own

---

[25] Del. Div. of Motor Vehicles Comment 1 (JA__); *see* State Attorneys Gen. Comment 6 ("FMSCA offers no facts suggesting that non-domiciled CDL holders are responsible for a disproportionate portion of these fatal crashes.") (JA__).

[26] David A. Redelmeir et al., *Roadway crash risks in recent immigrants*, Accid. Anal Prev., Nov. 2011, No. 43(6), *cited in* Maine Equal Justice Comment 6 n.11 (JA__) & Asian American Legal Defense & Education Fund Comment 3, FMCSA-2025-0622-7289 (JA__).

[27] State Attorneys Gen. Comment 4 (JA__); *see Rivera Lujan*, 2025 WL 3182504, at *2 (noting that the IFR "document[ed] five fatal crashes" in 2025, but that there were an estimated "2,399 fatal crashes … as of September 26, 2025" and stating that "according to the FMCSA's own data, non-domiciled CDL holders account for approximately 5 percent of all CDL holders but only about 0.2 percent of fatal crashes").

31

conclusion, and it dismissed comments noting FMCSA's lack of data on the basis that the commenters did not provide "comprehensive sources of data." 91 Fed. Reg. 7071. At the same time, FMCSA acknowledged that it too lacked data "with currently available tools," but was instead relying on its "subject matter expertise." *Id*. The agency's invocation of "expertise," however, is no response, where it concedes that it lacks data, *id*., and commenters have offered contrary information. *See United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010) (stating that "[c]onclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice").

### 2. FMCSA did not adequately take into account evidence that the Rule will harm safety.

While FMCSA, by its own admission, lacks evidence showing a safety benefit from the Rule, substantial evidence shows that the Rule will *harm* safety. Local governments and others commented that the Rule will increase accidents and decrease safety by replacing experienced non-domiciled CDL drivers with less experienced drivers, diminishing the available pool of drivers for services essential to public safety, and requiring longer hours and increased fatigue for drivers eligible for CDLs

32

under the Rule.[28] To start, the "turnover" required by replacing the now-ineligible drivers "introduces additional risk, as new drivers are less familiar with company equipment, routes, and safety culture—factors well-documented to influence increased crash risk."[29] And replacing experienced drivers with strong safety records with less experienced drivers, or drivers with less recent experience, is of significant concern because "newly trained drivers are involved in more accidents, on average, than their more experienced colleagues."[30] Studies in the record confirmed the safety harms from drivers with less experience or drivers who are less familiar with their routes,[31] but FMCSA did not resolve these concerns.

---

[28] *See supra* n.12 (citing comments); *see also* Wash. Trucking Ass'ns Comment 2 (JA__) (stating that hiring less experienced drivers "may inadvertently impact the safety performance of numerous motor carriers across the industry").

[29] Wash. Trucking Ass'ns Comment 4 (JA__) (citing Nat'l Acads. of Scis., Eng'g & Med., *Pay and Working Conditions in the Long-Distance Truck and Bus Industries: Assessing for Effects on Driver Safety and Retention* 85–88 (2024), https://nap.nationalacademies.org/read/27892/chapter/7).

[30] Local Gov'ts Comment 9 (JA__) (citing Dunn et al., *supra* n.22, at 37); *see also supra* n.12 (citing comments).

[31] FMCSA, *Driver Issues: Commercial Motor Vehicle Safety Literature Review* 9 (June 2007), FMCSA-2025-0622-9322 (JA__)

Instead, FMCSA disputes that inexperienced drivers will replace the experienced ones that it has now displaced. Focusing on freight drivers, FMCSA asserts that "there are experienced drivers who have been sidelined or working at a reduced capacity … who are ready and willing to come back into the market or increase their workload" by increasing hours, for example. 91 Fed. Reg. 7079. FMCSA's assumption, however, that experienced CDL drivers will pick up the slack when nearly 200,000 drivers lose their licenses is not supported by the record.

The record shows persistent shortages of truck drivers, including industry estimates projecting a shortage of 160,000 drivers by 2030.[32]

---

(identifying drivers who are "inexperienced" or "not familiar with … service requirements" as a "safety performance decrement"); Am. Transp. Research Inst., *Predicting Truck Crash Involvement: 2022 Update* 8 (Oct. 2022), FMCSA-2025-0622-9362 (JA__) (identifying "unfamiliarity with the roadway" as one of "the most common associated factors recorded for both fatal and injury crashes" (citing FMCSA, *Large Truck Crash Causation Study* (2006)).

[32] Am. Trucking Ass'n, *ATA Chief Economist Pegs Driver Shortage at Historic High* (Oct. 25, 2021), https://www.trucking.org/news-insights/ata-chief-economist-pegs-driver-shortage-historic-high, *cited in* Local Gov'ts Comment 7 n.29 (JA__); *see* Hugh Cameron, *America Doesn't Have Enough Truck Drivers*, Newsweek (July 10, 2025), https://www.newsweek.com/america-trucking-shortage-logistics-supply-chain-2097123 (discussing a 2025 industry report showing that "[t]he industry has faced a persistent shortage that is expected to grow to 162,000 drivers by 2030"), *cited in* Teamsters Cal. Comment 5 n.3 (JA__);

Indeed, a source on which FMCSA relies states that "find[ing] and retain[ing] qualified drivers" is a top concern for motor carriers.[33] Thus, if retired drivers wanted to return to driving, or drivers working at reduced capacity wanted to drive more hours, the opportunity to do so has long existed. FMCSA fails to explain why the Rule will prompt drivers to return or take on more hours now, when they had not done so before.

FMCSA's premise that existing freight drivers can increase their workload to cover the shortfall, 91 Fed. Reg. 7082, also overlooks the well-documented evidence of safety harms from increased hours. As evidence in the record, including FMCSA-sponsored studies, demonstrated, driving longer hours increases driver fatigue, resulting in more crashes.[34]

---

Colorado Fiscal Inst. Comment 2 (JA__) (citing 2025 industry estimates of a shortage of "between 60,000 and 80,000 drivers").

Additional comments confirmed the existing shortages of CDL workers, including documented shortages in specific sectors and states. *See supra* n.11.

[33] Am. Transp. Research. Inst., *Critical Issues in the Industry – 2025* 24 (Oct. 2025), FMCSA-2025-0622-9364 (JA__).

[34] FMCSA, *Commercial Driver Safety Risk Factors* 2 (June 2020), FMCSA-2025-0622-9349 (JA__) ("Fatigue has been shown to be a particularly prevalent factor in work-related crashes through reduced alertness and impaired cognitive function, reaction time, and

For this reason, FMCSA regulations limit the number of hours drivers may drive. *See* 49 CFR part 395. Thus, if FMCSA's assumption were correct that the remaining CDL drivers will drive more, then there would be a risk of increased fatigue and stress for those drivers, harming driver and community safety, as comments explained.[35]

Further, FMCSA does not address the safety harms from reducing the number of available CDL drivers who do not drive freight. Local governments explained that the Rule's significant reduction of available CDL workers needed to maintain and clear roads will harm road safety, increasing the number of crashes. For example, "[o]n average (based on 2019–2023 data), freezing precipitation each year causes 19,942 crashes,

---

performance capabilities …."); *id.* at 142 (JA__) (stating that "fatigue has been shown to be the principal cause in 13–31 percent of truck crashes"); Am. Transp. Research Inst., *Predicting Truck Crash Involvement* 8 (JA__) (identifying "driver fatigue" as one of "the most common associated factors recorded for both fatal and injury crashes" (citing FMCSA, *Large Truck Causation Study* (2006))); FMCSA, *Large Truck Crash Causation Study – Analysis Brief* 3 (July 2007) (JA__) (identifying "fatigue" as a top 10 factor for large truck crashes), attached to Josh Kloepper Comment, FMCSA-2025-0622-7246; *see also* FMCSA, *CMV Driving Tips – Driver Fatigue* (2015), https://www.fmcsa.dot.gov/safety/driver-safety/cmv-driving-tips-driver-fatigue.

[35] *See* Teamsters Cal. Comment 6 (JA__); Local Gov'ts Comment 9 (JA__); King County Comment 7 (JA__); Maine Equal Justice Comment 3 (JA__).

36

injures 34,206 people, and kills 407 people."[36] Fewer experienced CDL drivers "to apply deicers, plow snow, and manage debris will further increase these crashes, injuries, and fatalities."[37] Although FMCSA acknowledged these comments, 91 Fed. Reg. 7079, it did not address the safety harms raised in them, *see id.* 7079–80. *See Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 210 (D.C. Cir. 2007) (stating that "an agency's action is 'arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem'" (quoting *State Farm*, 463 U.S. at 43)); *see also Michigan v. EPA*, 576 U.S. 743, 750–53 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.").

*    *    *    *

The absence of empirical data supporting FMCSA's position that the excluded drivers are less safe than others, as well as evidence of the harmful impact that the Rule will have on safety, shows that FMCSA

---

[36] Local Gov't Comment 8–9 (JA__) (citing Fed. Highway Admin., *How Do Weather Events Affect Roads?*, https://ops.fhwa.dot.gov/weather/roadimpact.htm).

[37] *Id.* at 9.

37

failed to articulate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 52 (citation omitted).

## B. FMCSA's assertions on driving history and administrability do not adequately justify the Rule's restriction.

FMCSA asserts that the Rule "closes a critical safety gap" created by (1) issuing CDLs to drivers "whose safety fitness cannot be adequately verified" by state agencies because they have foreign driving history; and (2) issuing CDLs to people with EADs, which FMCSA asserts "has proven administratively unworkable and resulted in widespread regulatory non-compliance." 91 Fed. Reg. 7044. These assertions do not reasonably explain the Rule. *See Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) ("The 'agency must cogently explain why it has exercised its discretion in a given manner,' and that explanation must be 'sufficient to enable us to conclude that the agency's action was the product of reasoned decisionmaking.'" (quoting *State Farm*, 463 U.S. at 48, 52)).

### 1. FMCSA's driving-history rationale does not justify the Rule.

FMCSA asserts that the "primary purpose of … this final rule is to ensure that all [commercial motor vehicle] drivers are subject to sufficient vetting to ensure that non-domiciled drivers are as safe as

38

practicable." 91 Fed. Reg. 7089. But the assertion that inaccessible "information about a foreign-domiciled applicants' driver history in the foreign country of domicile," *id.* 7049, impedes the ability of state licensing agencies "to 'ensure the fitness' of [commercial motor vehicle] operators," *id.* 7045, has no rational connection to the facts in the record and does not reasonably justify the restriction FMCSA adopted. *See State Farm*, 463 U.S. at 43 (an agency acts arbitrarily and capriciously when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

**a.** FMCSA's conclusion that lack of access to foreign records "effectively shielded unsafe driving behaviors, which may have included serious violations or fatal crashes," 91 Fed. Reg. 7044, is unsupported by facts in the administrative record. FMCSA cites *no* factual evidence that the people it now excludes from commercial driving exhibited "unsafe driving behaviors," *id.*, in other countries.

Moreover, FMCSA's purported concern about driver fitness ignores the many requirements in place to ensure that all drivers receiving CDLs, regardless of their country of domicile, can safely operate

39

commercial motor vehicles in the United States: Applicants must demonstrate English-language proficiency; they must demonstrate 30 different vehicle inspection, control, and driving skills; they must demonstrate their knowledge in 20 general areas; and drivers for motor carriers must meet additional qualifications and requirements. *See supra* pp.4–6 (citing regulations).

**b.** Focusing on inaccessible foreign records, FMCSA asserts that state licensing agencies "would not receive notifications of serious traffic violations that occur in a foreign country during the validity of the non-domiciled CDL." 91 Fed. Reg. 7048. But it provides no support for its assumption that the people excluded by the Rule—for example, asylum seekers, asylees, refugees, and people with Temporary Protected Status—are going back and forth to their country of domicile, from which they fled persecution or a humanitarian crisis, to operate commercial motor vehicles (or do anything else). And it did not address why U.S.-domiciled drivers, who might be more likely to return to the United States after driving abroad, would not pose a similar or even greater risk.

**c.** Reflecting the mismatch between its stated rationale and the Rule, FMCSA's asserted concern with inaccessible foreign records—its

40

primary rationale for the Rule—does not apply to the largest group of people it now excludes from obtaining or renewing CDLs: the 42,000 DACA recipient CDL drivers, who comprise approximately 21 percent of drivers impacted by the Rule.[38] DACA recipients have *exclusively* U.S. driving histories because, to apply for DACA status, an individual must have come to the United States as a child and have continuously resided here since 2007.[39] Their driving histories, then, are entirely accessible to state licensing agencies.

In addition to DACA recipients, many other drivers now excluded by the Rule have years-long U.S. driving histories, as the administrative record shows. The Maine Secretary of State explained that "[n]oncitizens with an EAD typically have been living in the U.S. long-term with legal statuses such as pending permanent residency or asylum applications or Temporary Protected Statuses" and "often have years of driving history

---

[38] *See* J.B. Hunt, *Immigration Policy and Enforcement Impact on U.S. Commercial Driver Supply* (Mar. 24, 2026), https://www.jbhunt.com/blog/enterprise/immigration-policy-impact.

[39] *See supra* p.17 & n.14 (requirements for DACA status); *see also, e.g.*, Rivera Lujan Decl. ¶4 (12-year driving history); Rafael Tavarez Comment, FMCSA-2025-0622-7208 (JA__) (stating that "there's no foreign driving record to look for because this is the only country [I] know and [I] call home").

in the U.S. that can be verified" by state licensing agencies.[40] And many non-domiciled drivers may have no pertinent driving history at all, and thus no foreign driving record on which to "predict[] future safety outcomes on the road." 91 Fed. Reg. 7049; *cf.* 49 C.F.R. § 383.73(b) (setting no minimum years of driving experience for an initial CDL). For example, Petitioner Semenovskii was a lawyer (not a truck driver) in Russia, his country of domicile, before he fled to the United States seeking asylum.[41]

Further, the noncitizen drivers that the Rule allows to have CDLs—people with H-2A, H-2B, and E-2 visas—are *more* likely than the people now ineligible under the Rule to have commercial driving histories that are "predominantly or entirely foreign-based."[42] As 19 state attorneys general explained, for example, because E-2 treaty investors "may enter

---

[40] Maine Sec'y of State Comment 2 (JA__); *see, e.g.*, Juan Gutierrez Ponce Comment, FMCSA-2025-0622-3293 (JA__) (24 years); Carmelo Otero Comment, FMCSA-2025-0622-3254 (JA__) (20 years); Anonymous Comment, FMCSA-2025-0622-6487 (JA__) (20 years); Gurpreet Singh Comment, FMCSA-2025-0622-5935 (JA__) (11 years); Gursharanjit Sohal Comment, FMCSA-2025-0622-4513 (JA__) (11 years); *see also* John Doe Decl. ¶3 (10 years); Semenovskii Decl. ¶4 (5 years).

[41] *See* Aleksei Semenovskii Comment 1 (JA__).

[42] *See* State Attorneys Gen. Comment 7 (JA__).

the United States 'solely to develop and direct the investment enterprise,' they are more likely to *not* have prior accessible U.S. driving history."[43] And because H-2A and H-2B workers are temporary or seasonal workers who must return to their country of domicile, they are likely to *continue* operating commercial motor vehicles in their home countries (and have foreign driving records) when they are not in the United States,[44] unlike the asylees, refugees and others excluded under the Rule who are not likely to return to the country from which they fled (to drive or do anything else). Conversely, H-2A and H-2B visa holders are *less* likely to have U.S. driving records than "asylees, refugees, and DACA recipients, who can stay in the United States all year."[45] There is thus a "significant mismatch between the decision the [agency] made and the rationale [it] provided." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019); *see World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 223 (D.C. Cir.

---

[43] *Id.* at 7 n.25 (JA__).

[44] *See* Asian Law Caucus Comment 8–9 (JA__) (describing the H-2A and H-2B programs); Maine Sec'y of State Comment 3 (JA__) (stating that "vetting the driver history of … H-2A and H-B2 visa holders … is more out of reach than for holders of EADs").

[45] Central Puget Sound Comment 5 (JA__); *see* Asylum Seekers Advocacy Project Comment 6–7 (JA__); AFSCME Comment 3 (JA__).

2025) (discussing arbitrariness of the "seeming discrepancy in the reach of the [r]ule given its underlying rationale"). This disconnect between the agency's rationale and the Rule casts doubt on whether foreign driving records were really the agency's true regulatory concern. *See Dep't of Com.*, 588 U.S. at 785 ("We cannot ignore the disconnect between the decision made and the explanation given.").

To be sure, "agencies have 'wide discretion in making line-drawing decisions … within a zone of reasonableness.'" Katsas Statement 7 (quoting *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (cleaned up)). The problem here, though, is not "whether [the agency's] numbers are precisely right," but rather that the line that FMCSA decided to draw—excluding most categories of immigrants, regardless of whether they actually have foreign driving history—has *no* reasonable "relationship to the underlying regulatory concerns" that FMCSA identified. *Nat'l Shooting Sports Found.*, 716 F.3d at 214 (citations omitted). "[W]hile the APA *does not* license courts to second-guess policy judgments duly entrusted to the executive branch, it *does* require [courts] to police the bounds of reasoned agency decision-making and to set aside actions founded on implausible and illegitimate

44

justifications." *Nat'l TPS All. v. Noem*, 166 F.4th 739, 771 (9th Cir. 2026) (Mendoza, J., concurring).[46]

**d.** FMCSA's foreign driving history rationale is also undercut by its decision to allow CDLs for temporary or seasonal workers (H-2A and H-2B visaholders) and foreign treaty investors (E-2 visaholders). FMCSA states that "the totality of federal vetting processes applicable to these visa categories … provides sufficient assurance of driver fitness to mitigate the safety gap created by the … inability to access and verify the foreign driving records." 91 Fed. Reg. 7049–50. Specifically, FMCSA cites the "combination" of: (1) labor certification by Department of Labor for H-2A and H-2B visas and employer screening; (2) consular adjudication during the visa application process; (3) an ongoing relationship with a U.S. employer with a "direct economic interest" in the driver's qualifications and safety; and (4) "ongoing federal oversight through multiple agencies … via the nonimmigrant status and visa renewal processes." *Id.* 7050.

---

[46] Petitioners incorporate by reference the further arguments in part IV of the brief of Petitioner King County.

The vetting processes FMCSA cites do not support FMCSA's conclusion that its purported foreign driving history concern is mitigated for H-2A, H-2B, and E-2 visaholders. First, the Department of Labor certification process that FMCSA cites does not apply to people with E-2 visas. And facts in the record show that the Department of Labor does not know who the H-2A or H-2B workers are prior to certifying an employer's application, much less whether the workers receiving the visas are actually safe drivers.[47] Further, FMCSA has not shown that drivers hired under the H-2A and H-2B programs are vetted differently or are more likely than any others to have safe driving records. Indeed, federal regulations require H-2A and H-2B drivers to have the *same* qualifications as any other commercial driver—including the newly excluded drivers. *See* 20 C.F.R. § 655.18(a)(2) (H-2B job qualifications and requirements); *id.* § 655.122(a)(2) (H-2A job qualifications and requirements). Although a commenter raised this disconnect,[48] FMCSA did not resolve it.

---

[47] Asian Law Caucus Comment 9 n.16 (JA__).

[48] *Id.* at 9 (JA__).

46

Second, FMCSA states that employers hiring H-2A, H-2B, and E-2 drivers are incentivized to screen for "job requirements" like "possess[ing] U.S. CDL or foreign CDL equivalent, related work experience (12 months to two years), [a] clean driving record, [the ability to] pass drug or medical testing, and knowledge of or proficiency in English." 91 Fed. Reg. 7050. The same is true, though, for employers hiring drivers generally, and democratically accountable state and local governments who employ AFSCME and AFT members with non-domiciled CDLs.[49] All people operating a commercial motor vehicle must hold a CDL. 49 U.S.C. § 31302. By regulation, motor carriers are required to review three years of driving history for *all* CDL drivers (U.S.-domiciled and foreign-domiciled). 49 C.F.R. § 391.23(a). And "industry best practices encourage good-faith efforts to obtain and evaluate at least three years of prior driving experience, whether gained domestically or abroad," and industry employers "already follow these enhanced verification practices to help

---

[49] *See* Teamsters Cal. Comment 6 (JA__) (discussing vetting by employers of Teamsters drivers); Central Puget Sound Comment 6 (screening process for bus operators) (JA__); AFSCME Comment 3 (JA__); Asian Law Caucus Comment 10 (JA__).

47

ensure the quality and compliance of their drivers."[50] Federal regulations require all drivers for motor carriers (U.S.-domiciled and foreign-domiciled) to: certify their relevant work experience (§ 391.21); satisfy minimum qualification requirements, including English proficiency (§ 383.133(c)(5)), the ability to safely operate commercial motor vehicles (§ 391.11(b)(3)), and medical and physical fitness to drive (§§ 391.11(b)(4), 391.41, 391.43); and consent to alcohol testing (§ 383.72). All employers are thus incentivized to hire drivers who meet these requirements—not just employers of people with H-2A, H-2B, and E-2 visas.

Third, FMCSA asserts that H-2A, H-2B, and E-2 visaholders are "subject to ongoing federal oversight through multiple agencies ([Department of Labor], [Department of Homeland Security], State Department) via the nonimmigrant status and visa renewal processes." 91 Fed. Reg. 7050. FMCSA does not, however, identify any purported oversight process by the Department of Labor and Department of Homeland Security, or explain why those processes provide "enhanced" vetting of H-2A, H-2B, and E-2 visa holders. As to the State Department,

---

[50] Wash. Trucking Ass'ns Comment 4 (JA__).

FMCSA asserts that it "constantly reviews available information on current U.S. visa holders, and revokes visas … where warranted." *Id.* That process, however, applies equally to *all* people with visas in the United States—including those excluded under the Rule.[51] And people with EADs, now excluded under the Rule, are subject to ongoing oversight from a federal agency.[52]

Fourth, FMCSA states that "consular officers adjudicating [H-2A, H-2B, and E-2] visa applications assess certain factors relevant to both visa eligibility and CMV driver fitness, including but not limited to driving history, occupational qualifications, and English language proficiency." *Id.* Again, as to driving history, DACA recipients' driving history is wholly domestic, and other EAD holders may have no foreign history of driving a commercial vehicle at all.[53] As to English proficiency,

---

[51] *See* Asian Law Caucus Comment 10 (JA__) (identifying "U and T visa holders" excluded by the Rule).

[52] *See* Central Puget Sound Comment 5 (JA__) (stating that "asylees, refugees, DACA recipients, and other immigrant groups also must obtain proof of work authorization from a federal agency and must also fulfill background check and CDL requirements before working any job requiring a CDL").

[53] *See supra* pp.41–42 (citing comments).

49

federal regulations require *all* CDL drivers to be proficient in English,[54] whereas there are "consular sections where officers interview in a language other than English," Dep't of State, *Interview by Consular Officer*, Foreign Affairs Manual, 9 FAM 504.7 (2024). And all must satisfy the same occupational qualifications as U.S.-domiciled drivers, including knowledge and skills testing.[55]

Fifth, FMCSA asserts that State Department procedures "enable the review of evidence that would demonstrate that the driver qualifies for a CDL, which generally includes requests for 10 years of driving history" and other records. 91 Fed. Reg. 7050. As a preliminary matter, FMCSA did not mention the consular process in the IFR, and the public had no opportunity to comment on it. And FMCSA does not identify how often consular officers in fact request and review this evidence in "determin[ing] under section 214(b) of the Immigration and Nationality Act of 1952 … whether the applicant qualifies for the visa classification sought." *Id.* FMCSA does not explain, for example, why consular officers would review and request driving histories in examining whether an

---

[54] *See* 49 C.F.R. §§ 383.133(c)(5), 391.11(b)(2).

[55] *See supra* pp.4–6 (discussing regulatory requirements).

applicant meets the requirements for a treaty investor E-2 visa classification.[56] Driving history is not a requirement for H-2A, H-2B, or E-2 visas.[57] In any event, a preference for review of driving history does not explain the exclusion of the many CDL drivers who have safely driven with CDLs for many years and whose driving histories are accessible to state agencies.[58]

Petitioners do not argue that people holding H-2A, H-2B, or E-2 visas should not be permitted to hold CDLs. Rather, the point is that FMCSA is relying on flawed distinctions and unsupported factual assertions to deprive nearly 200,000 individuals of the ability to pursue

---

[56] *See* Dep't of State, *Standards for Applying INA 214(b)*, Foreign Affairs Manual, 9 FAM 302.1-2(B)(4) (2022) (illustrating as an example that "failure to make a substantial investment results in a 214(b) denial of a treaty investor visa since that is the requirement of the E-2 visa classification").

[57] *See* USCIS, *H-2B Temporary Non-Agricultural Workers*, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers (JA__); USCIS, *H-2A Temporary Agricultural Workers*, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2a-temporary-agricultural-workers; USCIS, *E-2 Treaty Investors*, https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-2-treaty-investors.

[58] *See supra* p.41–42 & nn.39–40 (citing examples).

the jobs that have enabled them to support themselves, their families, and their communities.

**e.** FMCSA also failed to consider "significant and viable and obvious alternatives" to address any concern about foreign driving records. *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C Cir. 2015) (citation omitted). For example, the agency could have required applicants to present their foreign driving records to state licensing agencies. FMCSA responds that doing so would place a "substantial burden" on states because they cannot "evaluat[e] those records." 91 Fed. Reg. 7068. But FMCSA does not explain why the people reviewing those records in the vetting processes it cites can evaluate the records but state clerks cannot (or cannot be trained to do so). FMCSA's own regulations assume that state licensing agencies can review foreign driving records. *See* 49 C.F.R. § 383.71(f)(2)(ii) (requiring non-domiciled CDL holders to "notify the State which issued" the CDL of adverse actions against their driving privileges in foreign jurisdictions).

Similarly, FMCSA does not explain why restricting CDLs to applicants with a clean driving record in their country of domicile would not adequately address its concern, or restricting CDLs to people who

have driven in the U.S. for a minimum number of years, or at least allowing renewal for existing CDL drivers with clean driving records.[59] FMCSA's failure to consider "responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives" was arbitrary and capricious. *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (citation omitted); *id.* (noting that "[t]he failure of an agency to consider obvious alternatives has led uniformly to reversal" (quoting *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986))).

### 2.    FMCSA's state-compliance rationale does not justify the Rule.

The Rule accomplishes its restriction by imposing a "'bright-line' eligibility standard" that rejects EADs as documentation supporting a non-domiciled CDL application. 91 Fed. Reg. 7045. FMCSA asserts that "States have had extreme difficulty appropriately issuing non-domiciled CLPs and CDLs based on EADs," *id.* 7052, and that excluding EADs "eliminates the burden on [state licensing agencies] to interpret complex

---

[59] Asian Law Caucus Comment 4 (JA__) ("Certain States … require those applying for non-domiciled CDLs to first hold a regular driver's license issued by a U.S. State for at least one year.").

immigration codes," *id.* 7045. These purported administrability issues do not justify FMCSA's bright-line rejection of EADs.

**a.** Purported state administration issues with EADs has nothing to do with driver fitness or safety, as FMCSA appears to agree. *See* FMCSA Stay Resp. 19 (Mar. 9, 2026) (noting that it was "not States' licensing deficiencies *per se* that posed a safety concern" (cleaned up)). FMCSA identifies no issues in the states' administration of the processes in place to ensure driver fitness and safety—knowledge, training, and testing requirements to operate commercial motor vehicles. *See supra* pp.4–6 (collecting requirements).

In addition, FMCSA's data do not reflect any connection between EAD administrability and safety outcomes. For example, FMCSA states that it found that "New York … demonstrated staggering error rates of 53 … percent" in "noncompliant non-domiciled CDLs." 91 Fed. Reg. 7045. But FMCSA's noncompliance finding, which New York is contesting,[60] was largely based on alleged errors in setting expiration dates for non-

---

[60] *State of New York v. U.S. Dep't of Transp.*, No. 26-1097 (2d Cir.).

54

domiciled CDLs.[61] The supposed limitation on expiration dates that FMCSA faults New York for failing to implement did not appear on the face of the then-applicable regulations, and FMCSA had never before attempted to enforce it. *See infra* pp.58–59. And FMCSA does not claim that New York's alleged administrative errors gave rise to any safety impact. Indeed, New York has one of the lowest fatal crash rates in the country, according to FMCSA's crash statistics.[62]

**b.** FMCSA's conclusion that EADs are so "complex" that state licensing clerks cannot properly read them, 91 Fed. Reg. 7053, 7061, is not supported by the factual record. EADs resemble and are no more complex than driver's licenses.[63] The EAD code that FMCSA claims is excessively complex consists of three alphanumeric characters displayed

---

[61] *See* FMCSA-2025-0622-8066, at 3–4 (JA__) (of 200 records sampled in New York, FMCSA asserted that 107 CDLs were noncompliant, with 101 issued with a purportedly wrong expiration date).

[62] FMCSA, *Crash Statistics*, https://ai.fmcsa.dot.gov/crashstatistics/ CMV/CrashRate?state= (New York has a fatal crash rate of "0.105" per 100 million total vehicle miles traveled, placing it as the state with the 8th lowest fatal crash rate).

[63] USCIS, *Handbook for Employers* M-274 § 5.0 (Oct. 30, 2025), https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/50-automatic-extensions-of-employment-authorization-andor-employment-authorization-documents-eads-in.

clearly on the face of the EAD card directly under the word "Category": for example, "A03" for a refugee; "A05" for an asylee; "C33" for a DACA recipient.[64]

FMCSA's inadequate reasoning about alleged failures in state administration is particularly egregious in the case of DACA recipients, because FMCSA's concern about confusing EAD codes is the *only* reason offered for excluding DACA recipients from obtaining or renewing CDLs. *See* 91 Fed. Reg. 7055. Specifically, FMCSA states that clerks confuse the code for DACA recipients ("C33") with the one for a different deferred action status ("C14" for "Deferred Action" or "Alien Granted Deferred Action"). *Id.* 7045. The data that FMCSA cites, though—its audits of state CDL programs—do not identify improper CDL issuance based on misreading EAD codes.[65]

---

[64] *See* USCIS, *Employment Authorization* (Oct. 30, 2025), https://www.uscis.gov/employment-authorization (listing EAD codes under "Form I-765 Category"); *see also* N.Y. State Office of Temporary & Disability Assistance, *Employment Authorization Document Codes* (Oct. 2018), https://otda.ny.gov/policy/directives/2019/INF/19-INF-07-Attachment-4.pdf.

[65] *See, e.g.*, FMCSA-2025-0622-0463, at 11–13 (California) (JA__); FMCSA-2025-0622-8095, at 5–6 (Oregon) (JA__); FMCSA-2025-0622-4012, at 7–9 (Colorado) (JA__).

56

Instead, FMCSA's assertion of confusing EAD codes seems to be a concern that states improperly issued CDLs to Mexican citizens who were not DACA recipients. FMCSA asserts that Mexican citizens were ineligible for CDLs under the prior regulations. *See* 91 Fed. Reg. 7055. But the data do not show the "widespread regulatory noncompliance" that FMCSA asserts, *id.* 7044: In its 2025 state audits, FMCSA found only 71 instances of Mexican citizens who were not DACA recipients receiving CDLs, out of a total sample of 2,029 driver records that it reviewed (approximately 3.5 percent).[66] Just three states accounted for more than half of those instances.[67]

Further, FMCSA's assertion of noncompliance is based on a reading of prior regulations that the agency only recently communicated to states. The regulations did not say that *Mexican citizens* were ineligible for non-domiciled CDLs. Rather, because FMCSA deems Mexican CDLs to satisfy U.S. standards and drivers with a Mexican CDL may lawfully

---

[66] *See* FMCSA List of States, FMCSA-2025-0622-8110 (JA__) (collecting FMCSA's audit findings).

[67] *See* FMCSA-2025-0622-0463, at 4 (JA__) (California; 11 instances); FMCSA-2025-0622-8095, at 4 (JA__) (Oregon; 8 instances); FMCSA-2025-0622-4012, at 4 (JA__) (Colorado; 18 instances).

57

drive commercial motor vehicles in the United States,[68] *Mexican CDL holders* are ineligible for a U.S. CDL, to enforce the prohibition on holding more than one CDL. 49 C.F.R. § 383.23(b)(1) n.1 (stating that "a driver *holding a commercial driver's license*" issued by Mexico is ineligible for a non-domiciled CDL (emphasis added)). Thus, consistent with the prior regulation, FMCSA's guidance permitting Mexican-citizen DACA recipients to apply for non-domiciled CDLs stated that they were eligible for those licenses so long as they did not hold a Mexican CDL.[69] Here, FMCSA has not identified how many, if any, of those 71 licenses were improperly issued to drivers with a Mexican CDL.

**c.** FMCSA also claimed widespread state noncompliance because states failed to set the expiration date on the CDL before or on the date of the expiration date of the EAD. 91 Fed. Reg. 7045. But the pre-IFR regulations did not include an expiration-date matching requirement. With respect to expiration dates, they required only that states "[m]ake the CDL valid for no more than 8 years from the date of issuance." 49

---

[68] *See supra* n.3 (citing CDL reciprocity agreement between the Untied States and Mexico).

[69] FMCSA-2025-0622-9339 (JA__) (DACA recipient guidance).

C.F.R. § 383.73(b)(9), (f) (as revised 2022); *see* 49 C.F.R. § 383.71(f) (as revised 2021). By contrast, the regulations for REAL ID driver's licenses explicitly include a matching expiration-date requirement. *See* 6 C.F.R. § 37.21(b)(1) ("States shall not issue a temporary or limited-term driver's license or identification card … [f]or a time period longer than the expiration of the applicant's authorized stay in the United States"). FMCSA's assertion of a "systemic collapse in State compliance," 91 Fed. Reg. 7052, then, rests on the assumption that states should have implemented a matching requirement that its prior regulations did not impose and that FMCSA did not announce before it faulted states for failing to adopt it. Reliance "on a false factual premise … constitute[s] arbitrary agency action." *Cigar Ass'n of Am.*, 132 F.4th at 540. At the same time, the record shows that the vast majority of states *were* matching the dates: Of the states for which FMCSA provided data, FMCSA found three or fewer instances of CDL expiration dates exceeding the EAD period in half of those states.[70]

---

[70] Six states had zero instances. *See* FMCSA-2025-0622-8065, at 4 (JA__) (Rhode Island); FMCSA-2025-0622-8095, at 4 (JA__) (Oregon); FMCSA-2025-0622-8061, at 4 (JA__) (North Dakota); FMCSA-2025-

**d.** "When taking action, an agency must consider alternatives 'within the ambit of the existing standard.'" *MediNatura, Inc. v. FDA*, 998 F.3d 931, 943 (D.C. Cir. 2021) (quoting *State Farm*, 463 U.S. at 51). Here, to the extent that FMCSA correctly identified administrative concerns, the obvious alternative to blanket rejection of EADs was better guidance to states or improved clerk training. But although FMCSA purported to consider "less restrictive, potentially feasible, alternatives," 91 Fed. Reg. 7099; *see id.* 7086–87, it did not address why improved guidance or training was not a reasonable administrative solution to its administrative concern. And while FMCSA dismisses its administrability concern as "not merely a training deficiency" because it found "consistent failure across more than 30 States," *id.* 7052, FMCSA's data does not support its assertion of state failures, as explained above.

---

0622-8092, at 4 (JA__) (Maryland); FMCSA-2025-0622-8054, at 3–4 (JA__) (Maine); FMCSA-2025-0622-8057, at 4 (JA__) (Delaware).

Six more states had between one and three instances. *See* FMCSA-2025-0622-8068, at 5 (JA__) (Pennsylvania; 2 instances of 150 records sampled); FMCSA-2025-0622-4009, at 6–7 (JA__) (Washington; 1 of 125); FMCSA-2025-0622-8060, at 4 (JA__) (Ohio; 3 of 125); FMCSA-2025-0622-8093, at 3 (JA__) (New Jersey; 2 of 129); FMCSA-2025-0622-8059, at 4 (JA__) (District of Columbia; 3 of 32); FMCSA-2025-0622-8064, at 4 (JA__) (Michigan; 2 of 75).

Moreover, if expiration dates were its concern, FMCSA fails to explain why it did not instead require states to reissue existing non-domiciled CDLs with new expiration dates and use the period of authorized presence as the expiration date going forward. Indeed, the Rule contemplates that approach for the remaining people who can hold non-domiciled CDLs. *See* 49 C.F.R. § 383.73. FMCSA also could require state agencies to verify the EAD's validity period using USCIS's Systematic Alien Verification for Entitlements system, as comments suggested.[71] FMCSA's response was that States "are not capable" of using that system "more effectively," and relying on it "is not practicable." *Id*. 7087. But the Rule requires states to query that system when issuing non-domiciled CDLs. *See* 49 C.F.R. § 383.73(m)(2)(ii). And FMCSA has no adequate answer to why it is not likewise a viable alternative for applicants with EADs.

---

[71] *See* Am. Ass'n of Motor Vehicle Admin. Comment 5, FMCSA-2025-0622-7240 (JA__); *see also* 91 Fed. Reg. 7086 (identifying other comments).

**C.    FMCSA failed to adequately consider the substantial reliance interests of CDL drivers, their employers, and the public.**

An agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate … when … its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see FDA v. Wages & White Lion Inv.*, 604 U.S. 542, 568 (2025). Here, the Rule undermines the serious reliance interests of the approximately 200,000 people who previously held but now cannot renew their CDLs, and the employers that relied on their work to serve the public.

There can be no serious dispute that the Rule harms "the 'serious reliance interests' of those currently holding non-domiciled CDLs." *Rivera Lujan v. FMCSA*, 2025 WL 3182504, at *2 (addressing IFR).[72] Yet FMCSA cavalierly dismisses the impact on drivers, stating that they "should have been aware that their CDL credential was not a permanent

---

[72] *See, e.g.*, Maine Sec'y of State Comment 3 (JA__); Teamsters Cal. Comment 1–4 (JA__); Maine Equal Justice Comment 2, 5 (JA__); U.S. Committee for Refugees & Immigrants Comment 4–8 (JA__); Asylum Seekers Advocacy Project Comment 3–5 (JA__); Maine Immigrant Rights Coalition Comment 2 (JA__); State Attorneys Gen. Comment 8–10 (JA__).

right." 91 Fed. Reg. 7080. Drivers, however, reasonably relied on the prior longstanding rule and guidance, which had been in place for years, allowing them to obtain and renew their non-domiciled CDLs upon completion of the many requirements to do so.

Although FMCSA pays lip service to "the serious economic reliance interests at stake" for these drivers, it goes on to question the economic harms to drivers excluded from the CDL market, stating that they have "alternative employment options" that do not require a CDL. *Id.* 7083. But FMCSA cites no facts to support the availability of that alternative employment, let alone at the wage rates it identifies. *See id.* 7094.

Employers, educational institutions, and state and local governments also reasonably relied on FMCSA's long-standing regulation and policy allowing immigrants with EADs to apply for non-domiciled CDLs, investing resources in training CDL drivers now excluded by the Rule and relying on them to fill the shortages in school-bus drivers and other sectors requiring CDL workers.[73] For example,

---

[73] *See, e.g.*, State Attorneys Gen. Comment 8–10 (JA__); Local Gov't's Comment 5–6 (JA__); Maine Immigrants' Rights Coalition Comment 2 (JA__); Maine Equal Justice Comment 3–4 (JA__); AFSCME Comment 2–3 (JA__); *see* Local Gov'ts Stay Amicus Br. 5–6 (Mar. 5, 2026).

King County commented that it had invested $675,000 in training approximately 45 bus drivers that are now ineligible under the Rule.[74] Motor carriers and industry employers, too, relied on drivers now excluded by the Rule for their operations, investing substantial resources to recruit, hire, and train them.[75]

FMCSA does not address these reliance interests, other than to say that employers (like impacted drivers) should have realized that a CDL was not a permanent right and understood the risk in hiring drivers with non-domiciled CDLs. 91 Fed. Reg. 7083. Again, though, that assertion fails to appreciate that employers (like drivers) reasonably relied on FMCSA's longstanding rule and guidance allowing immigrants with work permits to hold CDLs. And the implicit suggestion that states, localities, and private companies should have declined to hire non-domiciled CDL drivers despite the longstanding driver shortage, *see supra* nn.11 & 32, is unreasonable.

---

[74] King County Comment 10 (JA__).

[75] *See, e.g.*, Wash. Trucking Ass'ns Comment 4–5 (JA__); Waste Pro Stay Amicus Br. 2–8.

To be sure, as Judge Katsas stated, "[i]t falls to the agency to decide whether any reliance interests are outweighed by other factors." Katsas Statement 9–10 (quoting *Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1088 (D.C. Cir. 2026)). At the same time, though, the agency must "'explain[] its good reasons' for moving forward" despite the significant reliance interests at stake. *Affirmed Energy*, 166 F.4th at 1087. And here, FMCSA's assertion that the Rule is needed "to ensure that the CDL credential retains its integrity as a certification of safety fitness and an identified safety gap is remedied," 91 Fed. Reg. 7083, cannot outweigh those interests—and displace less harsh alternatives—when FMCSA has failed to show that the Rule will advance safety.

In short, FMCSA's decision to move forward with the Rule despite the serious reliance interests of the many drivers and others impacted—thereby destroying their livelihoods and harming employers, school districts, and essential public services throughout the country—was arbitrary and capricious.

## CONCLUSION

This Court should vacate the Final Rule.

65

Respectfully submitted,

/s/ *Wendy Liu*

Teague Paterson
Matthew Blumin
American Federation of
  State, County &
  Municipal Employees,
  AFL-CIO
1625 L Street NW
Washington, DC 20036
(202) 775-5900

*Counsel for Petitioner AFSCME*

Daniel McNeil
Channing Cooper
American Federation of Teachers,
  AFL-CIO
555 New Jersey Avenue NW
Washington, DC 20001
(202) 879-4400

*Counsel for Petitioner AFT*

Wendy Liu
Cormac Early
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
wliu@citizen.org

*Counsel for All Petitioners in*
No. 26-1032

June 15, 2026

66

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by the Federal Rules of Appellate Procedure and this Court's rules, this document contains 12,813 words, as calculated by Microsoft Word 365.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word 365.

/s/ *Wendy Liu*
Wendy Liu

# STANDING ADDENDUM

# INDEX

1        Declaration of Jane Doe

2        Declaration of John Doe

1        Declaration of Jorge Rivera Lujan

2        Declaration of Lauren Samet

3        Declaration of Aleksei Semenovskii

4        Declaration of Michelle Sforza

# ADDENDUM 1

**Declaration of Jane Doe**

I, Jane Doe, declare:

1.      I am over eighteen years old and fully competent to make this declaration. I have personal knowledge of the factual statements contained herein.

2.      I am an individual residing in the United States and am authorized to work in the United States under Temporary Protected Status (TPS).

3.      For the last three years, I have been employed as a school bus operator with a public school district in Florida.  I am a member of the American Federation of Teachers (AFT).

4.      In my position, I am responsible for the safe transportation, loading, and unloading of students to and from school and related activities. I am entrusted with the safety of children every day and I take that responsibility very seriously.

5.      I am required to hold a valid Commercial Driver's License (CDL) to drive a school bus. I have maintained a CDL from the State of Florida since 2023. I have completed the state and employer-required

background checks, knowledge and skills tests, safety trainings, and certifications. I pursued CDL training and testing because I wanted to make a stable living with benefits as a public school bus driver. Since obtaining my CDL, I have also maintained a clean driving record.

6.    In January 2026, I went to the Florida Department of Highway Safety and Motor Vehicles to renew my CDL. I was told by the agent that, because a new federal rule that prohibits states from issuing CDLs to TPS holders, my CDL could not be renewed. My CDL has since expired, and, because of the federal rule, I am not able to renew it.

7.    Because I no longer have a CDL, my employer removed me from my bus route and transferred me temporarily to a non-driving position as a bus monitor. That position pays significantly less and provides far fewer opportunities to earn additional income.  I take a lot of pride driving a school bus. I love my job and my students. I worked hard to obtain my CDL and build experience in this role.

8.    As a bus driver who earns wages on an hourly basis, I had opportunities under the collective bargaining agreement to increase my earnings with additional work. Drivers can pick up mid-day routes, field

trips, and other extra assignments that increase their income, including overtime. The assignments are based on seniority (length of service). Those additional assignments have made a meaningful difference in my income and ability to provide for my family. As a bus monitor, I do not have the same access to these opportunities, because monitors are assigned to fewer routes. It is my understanding that the school district currently has a surplus of monitors competing for a limited number of assignments. Because I have been placed as a monitor without any seniority, I am at the bottom of the list for any extra assignments to earn additional pay.

9.    I have been informed that there is no guarantee that I will have continued employment at the start of the next school year if I cannot regain my CDL. I also understand that monitor positions are being reduced. Because I have no seniority in that classification, I may lose my job altogether.

10.    I am a single mother and the sole source of income for my family. I rely entirely on my wages and benefits to pay rent, utilities, food, medical expenses, and other basic needs for myself and my child. If I lose

my job entirely, I do not know how I will support my family. The loss of my CDL has caused me significant stress, anxiety, and uncertainty about my future.

11.    I am signing this declaration under the name Jane Doe because I am worried about retaliation against me if I use my real name. I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2026

/s/ Jane Doe

_____

Jane Doe

# ADDENDUM 2

# DECLARATION OF JOHN DOE

I, John Doe, declare as follows:

1. I am a state employee who works for the Highway Maintenance Department of a State department of transportation, and my job is to service and maintain roadways across the State.

2. I was born in Guatemala, and I have an Employment Authorization Document (EAD) issued to me by United States Customs and Immigrations Service (USCIS) that expires in April 2029.

3. I first received my Non-Domiciled Commercial Driver's License (CDL) in 2016. I studied hard, invested thousands of dollars in classes and exam fees, and successfully passed the written and driving exams in English. Each year when I received a new work permit, I also updated my CDL at the Department of Motor Vehicles (DMV) for my State.

4. I began working at Highway Maintenance in January 2022, as a Highway Maintenance Worker, and later reached the status of Highway Maintenance Worker-1. A CDL is required for that job.

5. When I began working at Highway Maintenance, I became a member of my local union, which is an affiliate of the American

Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"). All members of my local union are members of AFSCME. I pay my voluntary union membership dues to my local union, a portion of which is remitted to AFSCME, every month.

6. Highway Maintenance is responsible for repairing and maintaining the roadways across the State so that they are operational and safe. We repair potholes and damaged guard rails, mow roadsides and medians, and remove obstructions from the roads. We also respond to emergency situations when there are chemical or debris spills on the roads, when there are car accidents or cars hit wild game, or when there is inclement weather. From the end of November to the middle of April each year, one of our principal duties is to plow and remove snow or brine streets and highways so that they do not freeze.

7. I normally work from 6:30 a.m. to 3:00 p.m., Monday through Friday, but during the winter months when snow clearing is of maximum importance, Highway Maintenance Workers are required to work 12-hour shifts. These hours are mandatory overtime, and if it snows over the weekend, those are required workdays too.

8.    At the beginning of the winter season, Highway Maintenance Workers can also sign up as volunteers to work in other counties if they need extra snow support.  In my State, our communities rely on Highway Maintenance to keep our roads clear and safe, so all residents can get to work, run their businesses, visit elderly family, and take their kids to school.  I am incredibly proud of the work I have done to keep my State's communities safe and running.

9.    When I went to the DMV in November 2025 to renew my CDL, I was told that due to a new federal law from September 2025, the DMV could not reissue my CDL.  I was shocked and devastated—my first thought was that I was going to lose my job and health insurance.

10.    One week later, I went to another DMV location to again try to renew my CDL.  I thought that there must have been a mistake. However, I was once again told that due to a new federal law from September 2025, they could not renew my license.  I began to realize that I was about to lose my CDL license, and it broke my heart—I could only think of my job and how my family would pay the bills and keep my health insurance, which I get through my job, if I became unemployed.  I

currently have a knee injury that I need physical therapy to treat, and I need my health insurance.

11. After I was unable to renew my CDL, my bosses contacted me to discuss that my CDL was about to expire. Without my CDL, I could not perform the essential duties of my job—from using the industrial mower to driving the large snowplows, my job required that I have a CDL. My bosses explained that without a CDL, I had to give up my position as a Highway Maintenance Worker-1, but they offered to rehire me as a Trainee Laborer in the hopes that would give me enough time to renew my CDL. Trainee Laborer is a lower ranked position that has worse pay and benefits.

12. In January 2026, my CDL expired. The entire time I had my CDL I had a clean driving record, no tickets, and I have no criminal record.

13. Before my CDL expired, as a Highway Maintenance Worker-1, under my union contract, I earned seniority, had yearly wage increases, and I was eligible for special bonuses for volunteering to do snow removal work in other counties. But now, because I cannot renew my CDL, I am no longer eligible for these bonuses, and I lost my seniority

because I was reclassified as a Trainee Laborer and am effectively a new employee.

14.    In addition to being a worse job, my position as a Trainee Laborer is also temporary.  When I was rehired as a Trainee, my bosses told me that I had until April 2026 to get my CDL renewed, or else I would be terminated. Now, I cannot renew my CDL due to the rule just passed by the federal government in 2026 saying that CDLs cannot be issued to workers like me anywhere in the country.  But I urgently need to renew my CDL to keep my job.

15.    If the federal government's final rule about Non-Domiciled CDLs goes into effect, I will not be able to renew my CDL.  And if I cannot renew my CDL before April, then I will be fired. Without a CDL, I will not be able to continue my career in highway maintenance.

16.    I cannot put into words how devastating losing my job would be if the final federal rule is not stopped.  My family relies on my financial contributions and benefits.  My wife, who is a United States citizen, works caring for the elderly in a retirement home, and we have an 11-year-old daughter and two adult children that live with us and who depend on us.

17.   I know many people who work in other civil service jobs who need their CDLs to do their jobs, and I worry about what will happen to their families if they cannot renew their CDLs under this final rule from the federal government.  And there is so much emotional trauma from having everything you worked so hard to achieve—going through everything "the right way"—only to have it taken from you. I have dedicated the last four years of my life to working hard to keep my community, my fellow State residents, safe by keeping their roads safe. I take pride in this public service work, and now I can't do it like I used to and am in danger of not being able to do it at all.  This rule hurts me, my family, and my community by getting in the way of the critical public service I have dedicated my working life to providing.

18.   I am signing this declaration under the name John Doe because I am worried about retaliation against me if I use my real name.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February __24__, 2026

_____/s/ John Doe_____

John Doe

6

# ADDENDUM 3

# DECLARATION OF JORGE RIVERA LUJAN

I, Jorge Rivera Lujan, declare as follows:

1. I am a commercial truck driver and the own-operator of my business, Rivera Bros Transportation LLC, a Utah-based trucking company that transports general freight.

2. I have lived in the United States since I was two years old. I am currently a Deferred Action for Childhood Arrivals (DACA) recipient.

3. I currently hold a non-domiciled Commercial Driver's License (CDL), issued by the State of Utah, that expires on November 25, 2026.

4. I have held a non-domiciled CDL for the past 12 years.

5. Rivera Bros Transportation is my only source of income.

6. On September 20, 2025, I went to the Utah Department of Motor Vehicles (DMV) to renew my non-domiciled CDL. The DMV representative told me that I could not renew my license because the Federal Motor Carrier Safety Administration had required Utah to pause issuance of non-domiciled CDLs. I then learned that FMCSA had issued a rule on September 29, 2025, under which I was no longer eligible for a CDL.

1

7.     I was one of the petitioners who challenged FMCSA's September 29, 2025, rule in federal court. After the United States Court of Appeals for the District of Columbia Circuit put FMCSA's rule on hold, and after repeatedly going to the Utah DMV before my CDL expired, I was able to extend my non-domiciled CDL for a period of one year, to November 25, 2026.

8.     I know that FMCSA issued a new rule in February 2026 that would again make it impossible for me to renew my non-domiciled CDL.

9.     My livelihood depends on having a CDL so that I can drive trucks for my business. If I am not able to renew my CDL before it expires next November, I will not be able to continue my career as a truck driver. The loss of a CDL would threaten my ability to provide for my family, and to pay my housing and grocery bills.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 23, 2026                    _____

                                                                    Jorge Rivera Lujan

# ADDENDUM 4

## Declaration of Lauren Samet

I, Lauren Samet, declare:

1.      I am over eighteen years old and fully competent to make this declaration. I base the facts in this declaration on my own personal knowledge, on business records of the American Federation of Teachers (AFT), and on publicly available records.

2.      I am the Director of the Paraprofessionals and School-Related Personnel (PSRP) Department at AFT. I have served in this role since August 2018.

3.      In my role as Director of the AFT PSRP Department, I engage in the day-to-day supervision of all matters for the AFT that support our paraprofessional and school-related personnel members, and I serve as a core member of the AFT management team.

4.      Headquartered in Washington, D.C, AFT is a national labor union representing approximately 1.8 million members who work in every U.S. state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands. The AFT is affiliated with approximately 3,500 local unions throughout the United States.

1

5.     Six divisions within AFT represent the broad spectrum of AFT's membership: pre-K through 12th-grade teachers; paraprofessionals and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; nurses and other healthcare professionals; and retirees.

6.     Membership in AFT is usually established by either joining an AFT-affiliated local union, an AFT-affiliated council of locals, or, in some cases, a statewide AFT affiliate. Membership in an AFT affiliate automatically confers membership in the AFT. Most AFT locals are organized around a specific employer, such as a school district, a hospital, or a municipality, and require that members be employed by that employer to receive the full privileges of union membership.

7.     AFT's mission is to champion fairness; democracy; economic opportunity; and high-quality public education, healthcare, and public services, in part by advancing the labor interests of its members and would-be members. AFT advances these principles through community engagement, organizing, collective bargaining, and policy and legal advocacy, and especially through the work our members do.

2

8.    Consistent with its mission, AFT is committed to advancing high-quality public education and ensuring access to such education for all children. AFT members working in public education include teachers, paraprofessionals, school office staff, and school bus drivers, each of whom support students and school communities.

9.    AFT has a longstanding history of championing fairness and economic opportunity for workers. Central to this mission is safeguarding the economic security of AFT's members. AFT promotes economic opportunity by advocating for better working conditions – including fair wages, benefits, and job security – supporting economic justice initiatives that reduce inequality, and promoting workforce development programs that foster upward mobility and financial stability for workers.

10. AFT's commitment to economic opportunity and the protection of workers' livelihoods extends to immigrant workers. Although AFT does not collect citizenship information about its members, I am aware that its members include lawfully present noncitizens.

3

11.    Historically, and as a practice, AFT has advocated on behalf of its members before all branches of the federal government, particularly when policy changes adversely impact members. AFT members rely on the organization to represent their interests at the federal level, including in the legislative branch, where AFT advocates for legislation that protects and advances those interests. In addition, AFT engages directly with federal agencies in the executive branch to advance its mission and protect its members' rights. AFT also acts on behalf of its members in the judicial branch by participating in litigation and filing amicus briefs in cases that affect its members' interests.

12.    AFT, through its affiliates, represents approximately 13,500 workers in the U.S. transportation industry, including school bus drivers, maintenance drivers, civil engineers, and inspectors. Many of these workers are required to hold a Commercial Driver's License (CDL) or Commercial Learning Permit (CLP) as a condition of their employment.

13.    For example, in Florida, AFT affiliate Orange Education Support Professionals Association is the exclusive bargaining representative for bus drivers employed by Orange County Public

4

Schools, and AFT affiliate St. Johns Education Support Professionals Association represents bus drivers employed by the St. Johns County School District. Florida law requires school bus drivers to hold a valid CDL with a passenger endorsement as a condition of employment. Fla. Stat. § 1012.45. Consistent with this requirement, the collective bargaining agreement covering Orange County Public Schools bus drivers provides that failure to maintain a required CDL may result in disciplinary action, and the agreement covering St. Johns County School District bus drivers likewise requires maintenance of a valid CDL and provides that suspension or revocation of the CDL constitutes grounds for discipline, up to and including discharge.

14.    On February 11, 2026, the Federal Motor Carrier Safety Administration's (FMCSA) issued a final rule that prohibits states from issuing non-domiciled CDLs and CLPs to most immigrant categories except for H-2A, H-2B, and E-2 visa holders. This rule reaffirms FMCSA's interim final rule of September 29, 2025.

15.    The rule will have a devastating impact on AFT members who are DACA recipients, asylees, asylum seekers, and people with

5

temporary protective status, and whose employment requires a CDL. AFT members in these categories will not be able to maintain the CDLs their jobs require under the new rule. Without a valid CDL, these members cannot continue working in their current positions and are likely to lose their jobs, losing the wages and benefits on which they rely to support themselves and their families.

16.    Many of AFT's members who require CDLs as a condition of employment are school bus drivers, some of whom I know fall within the new rule's restricted categories. Through my work with AFT and its members, I am aware that school bus drivers play critical roles in ensuring students' access to public education. By transporting students safely and reliably each day to school, they make regular attendance possible and thereby enable students to obtain the educational opportunities public schools provide. This role is especially critical for students with disabilities and other diverse needs who rely on public school transportation to travel longer distances for specialized schooling, as well as for students from low-income families whose parents may lack reliable access to a vehicle, have other caregiving responsibilities, or work

6

jobs that are not flexible enough to allow them time to transport their children to and from school.

17. K-12 public school districts throughout the U.S. are struggling to recruit and retain qualified drivers. As a result, school districts have had to either cut, shorten, or remove bus routes. Reduced and unstable bus services cause school delays, disrupt learning time, and contribute to absenteeism. When transportation services are reduced or unreliable, students risk losing access to critical school resources—such as extracurricular programs and meals—and experience higher rates of tardiness and absenteeism. Chronic absenteeism is associated with poorer academic performance and negative social and emotional outcomes not only for the students who are often late but also for their classmates.

18. The rule directly threatens the economic security of AFT members in the excluded categories and further strains school transportation systems that students rely on to access public education— core concerns at the heart of AFT's mission to champion fairness, expand

7

economic opportunity, safeguard workers' livelihoods, and advance high-quality public education through the work of its members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 25, 2026

Lauren Samet (Feb 25, 2026 13:01:36 EST)

Lauren Samet

# ADDENDUM 5

## DECLARATION OF ALEKSEI SEMENOVSKII

I, Aleksei Semenovskii, declare as follows:

1.    I am a commercial truck driver and the owner-operator of a business called SEOLAEXPRESS LLC, a Pennsylvania-based trucking company that transports general freight.

2.    I am an asylum seeker. After facing unjust persecution and threats to my life in Russia, where I worked as a lawyer, I fled to the United States in 2019. I filed an asylum application in 2019. My family and I had our asylum interview on February 12, 2026. Because United States Citizenship and Immigration Services (USCIS) has placed an indefinite administrative hold on all applications for asylum under Form I-589, including my application, I do not know when any further action will be taken on my asylum application.

3.    I have a USCIS Employment Authorization Document (EAD), authorizing me to work in the United States.

4.    I have held a non-domiciled Commercial Driver's License (CDL) issued by the Commonwealth of Pennsylvania since September 2020. I was eligible to earn a non-domiciled CDL under the federal

1

regulations in effect throughout the time that I have been a truck driver. I have no citations or accidents on my CDL record.

5. I never drove trucks or other commercial vehicles when I lived in Russia, or at any time before coming to the United States in 2019.

6. My current CDL will expire on September 25, 2026.

7. I started SEOLAEXPRESS LLC in January 2023. I must hold a non-domiciled CDL to drive trucks for my business.

8. SEOLAEXPRESS LLC is my only source of income. Without a CDL, I will no longer be able to continue my career as a truck driver. As a result, I will be forced to close my business and will lose all the work that went into it; will be at risk of defaulting on the loans on my truck, trailer, and personal vehicles; and will lose my main ability to provide for my wife and daughter.

9. Without the ability to work as a truck driver, I will struggle to find a career to support my family. I suffered a severe workplace injury in 2022 that led to permanent physical damage to my leg. If I can no longer work as a truck driver, my injuries will severely hamper my search for alternative work.

10.     The Federal Motor Carrier Safety Administration issued a new rule on February 11, 2026, under which I am no longer eligible for a non-domiciled CDL. I understand that the rule takes effect on March 16, 2026.

11.     Since coming to this country in 2019, I have worked relentlessly to build a better future for my family. I have worked days and nights, and have lived in my truck, away from my family, just to survive. I have always obeyed the rules, operating legally, paying my taxes, and avoiding any road safety violations or accidents. All I want is the ability to work honestly and support my family without asking for assistance. The prospect of losing everything my family and I have worked so hard to build if FMCSA's new rule goes into effect has taken an immense emotional toll on me and my family. It is unbearable for me as a father to see my daughter living with fear, knowing how hard I have worked to give her stability and hope.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 13, 2026

_____
Aleksei Semenovskii

3

# ADDENDUM 6

## DECLARATION OF MICHELLE SFORZA

I, Michelle Sforza, declare as follows:

1.     I am the Associate Director of the Organizing and Field Services Department ("OFS") of the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME International"). I have worked for AFSCME International for over 25 years.  In my role as Associate Director of OFS, I help oversee the organizing and field services staff that support the needs of AFSCME International's subordinate bodies ("AFSCME Affiliates"). On any given day, I am responsible for overseeing AFSCME International's response to the developing needs of AFSCME Affiliates, which are broad and far reaching, but which for me often focus on evaluating legislative opportunities for promoting pro-worker policies, conducting strategic research in support of organizing campaigns, and helping provide other organizing and field support for labor relations matters, including but not limited to collective bargaining negotiations.   Under the AFSCME International Constitution, AFSCME Affiliates include councils, locals, or in some cases, associations. All members of AFSCME Affiliates are members of both the AFSCME Affiliate and AFSCME International, and pay voluntary membership dues, a portion of which are remitted to the

1

AFSCME Affiliate and a portion to AFSCME International; these members are referred to in this declaration generally as "AFSCME members."

2. AFSCME International, through AFSCME Affiliates, represents 1.4 million AFSCME members in the United States, including thousands of members who need Commercial Driver's Licenses (CDLs) and Commercial Learning Permits (CLPs) to provide essential services to states, cities, and localities every day. AFSCME members drive buses for school districts and public transit, dispose of wastewater and refuse in specialized vehicles, maintain and repair roadways and highways, and keep streets clean and safe with street sweepers and snowplows.

3. AFSCME International, through AFSCME Affiliates, represents workers across the country that need CDLs and CLPs to perform their essential duties, including non-domiciled CDLs and CLPs. A non-exhaustive survey of AFSCME Affiliate collective bargaining agreements reflects more than 360 agreements that have specific provisions that address CDLs held by AFSCME-represented employees.

2

4. A small sampling of employers where an AFSCME Affiliate represents employees that are required to possess a CDL to perform their duties includes:

a. The District of Columbia Water and Sewer Authority, which distributes drinking water and collects and treats wastewater for more than 700,000 residents and 25.95 million annual visitors in the District of Columbia;

b. The State of Illinois Department of Central Management Services, which employs, among other job classifications, correctional transportation officers that play critical roles in keeping Illinois communities safe;

c. The Nevada Department of Transportation, which depends on several classes of Highway Maintenance Workers to operate specialized highway maintenance and construction equipment to restore and maintain the integrity of roadway surfaces for the benefit of all Nevadans, including restoring drainage systems and preventing erosion, as well as repairing roadway guardrails, markers, guide posts, and fences;

3

d. AC Transit and Sacramento Regional Transit in California, which provide public transit in the greater San Francisco and Sacramento areas; and

e. The Columbus City School District in Ohio, which employs bus drivers who transport children to school and on field trips.

5. On February 11, 2026, the Federal Motor Carrier Safety Administration (FMSCA) issued a Final Rule that prohibits states from issuing non-domiciled CDLs to immigrant categories except for H-2A, H-2B, and E-2 visa holders. The Final Rule threatens irreparable harm to AFSCME members who will be deprived of their CDLs, thus jeopardizing their job security and, by extension, their livelihoods and other job-related benefits like health insurance coverage and retirement benefits, which AFSCME members receive under the terms of their collective bargaining agreements.

6. Cities, counties, and states across the country rely on the work of AFSCME-represented employees with non-domiciled CDLs. These employees need CDLs to perform their public service jobs, including many whose work is to keep our roadways safe and operational.

4

7. For example, AFSCME members who are employees of the Washington State Department of Transportation (WSDOT) have had to take extended unpaid leaves of absence because they could not renew their non-domiciled CDLs with the Washington State Department of Licensing. The AFSCME affiliate representing these workers, the Washington Federation of State Employees, AFSCME Council 28, has negotiated with these members' employers an understanding that any such employee may return to her old position, in a full-pay status, if she can attain once again a non-domiciled CDL. However, these AFSCME members will be ineligible to obtain a new CDL if the Final Rule takes effect, threatening their job security and ability to provide for themselves and their families.

8. In Pennsylvania, another AFSCME affiliate, AFSCME Council 13, represents a TPS holder who works for the Pennsylvania Department of Transportation (PennDOT) as an equipment operator. He is a state employee who went through the extensive vetting process to earn his CDL in 2020, a license he needs to perform his essential duties— these duties include emergency accident response, snow and ice removal, overall road maintenance, and driving heavy load trucks and

5

construction equipment. When other counties need snow plowing assistance, he has volunteered as an additional equipment operator to commute to other counties in need and worked overtime so that all roadways in Pennsylvania are safe and commutable. Under the Final Rule, this PennDOT employee would not be able to renew his CDL. Beyond the financial ramifications of potentially losing employment, this individual also has a life-threatening illness that he manages using his employer-provided health insurance, and he has expressed to AFSCME staff that he does not know how he could survive without his health insurance, let alone his job, to provide the means to secure the medication he needs to live.

9.     The FMCSA Final Rule also threatens state and local governments' ability to provide essential public services in addition to keeping our roadways safe and operational, such as transportation of inmates between correctional facilities and courthouses and transportation of schoolchildren on school buses. AFSCME members proudly perform these essential public services as part of their required job duties.

6

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on February __25__, 2026

Michelle Sforza