**ORAL ARGUMENT NOT YET SCHEDULED**
**Case No. 26-1032**
**(consolidated with 26-1046)**

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**Jorge Rivera Lujan, et al.,**
Petitioners,

v.

**Federal Motor Carrier Safety Administration, et al.,**
Respondents.

On Petition for Review of a Final Rule of the
Federal Motor Carrier Safety Administration

**BRIEF OF *AMICI CURIAE* THE SIKH COALITION,**
**ASIAN LAW CAUCUS, SIKH AMERICAN**
**LEGAL DEFENSE AND EDUCATION FUND, CHINESE FOR**
**AFFIRMATIVE ACTION, STOP AAPI HATE, THE TEXAS CIVIL**
**RIGHTS PROJECT, SOUTH ASIAN NETWORK, SOUTH ASIAN**
**AMERICAN JUSTICE COLLABORATIVE, ASIAN AMERICAN LEGAL**
**DEFENSE AND EDUCATION FUND, ASIAN AMERICANS ADVANCING**
**JUSTICE, SOUTH ASIAN LEGAL DEFENSE FUND, TRUCKERS**
**MOVEMENT FOR JUSTICE, MEKONG NYC, JAKARA MOVEMENT,**
**AND UNITED SIKHS, IN SUPPORT OF PETITIONERS**

Sahel K. Sra

Munmeeth Kaur

The Sikh Coalition

165 Broadway, 23rd Floor

New York, NY 10006

Tel: (212) 655-3095

Katherine Zhao

Joshua Rosenthal

Asian Law Caucus

55 Columbus Ave

San Francisco, CA 94111

Tel: (415) 896-1701

*Counsel for Amici Curiae*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

**A. Parties and Amici**

Except for amici curiae, all parties and intervenors, are listed in the petition for review. Amici curiae the Sikh Coalition, Asian Law Caucus, Asian Americans Advancing Justice (AAJC), South Asian Legal Defense Fund, Truckers Movement for Justice, Chinese for Affirmative Action (CAA), Stop AAPI Hate, The Texas Civil Rights Project (TTCRP), South Asian Network, South Asian American Justice Collaborative (SAAJCO), Asian American Legal Defense and Education Fund (AALDEF), Sikh American Legal Defense and Education Fund (SALDEF), Mekong NYC, Jakara Movement, and UNITED SIKHS. None of amici have any parent corporations and no publicly held company owns 10% or greater ownership in any of amici.

**B. Rulings Under Review**

Petitioners seek review of the Federal Motor Carrier Safety Administration's final rule entitled "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)" (Docket No. FMCSA-2025-0622) and published in the Federal Register on February, 13, 2026 at 91 Fed. Reg. 7044.

**C. Related Cases**

The case on review has never previously been before this Court or any other court. There is one related case pending before this Court, No. 26-1046, which this Court has consolidated with this case. In addition, No. 25-1215, which is consolidated with No. 25-1224 and is being held in abeyance, involves the same parties and some similar issues, with respect to an interim final rule that preceded the final rule at issue in this case. Undersigned counsel is unaware of any other related cases pending in this Court or any other court.

**Statutes and Regulations**

All applicable statutes, etc., are contained in the Petitioners' briefs.


Dated: June 22, 2026          */s/ Sahel K. Sra*
                                          Sahel K. Sra

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................i

TABLE OF AUTHORITIES...................................................................................................ii

GLOSSARY...........................................................................................................................viii

STATEMENT OF INTEREST.............................................................................................ix

PRELIMINARY STATEMENT...........................................................................................1

ARGUMENT.............................................................................................................................2

**I.    The Final Rule Is Arbitrary and Capricious Because Its Purported Road-Safety Justification Is a Pretext for an Immigration-Enforcement Agenda**............................................................................................................................2

     A. *FMCSA Fails To Establish a Rational Connection Between a Driver's Noncitizen Status And Safety Outcomes*.................................................................4

     B. *The Rule Fails to Make a Rational Distinction Between the Noncitizen Categories it Excludes and the Noncitizen Categories Now Eligible for Non-Domiciled CDls*.................................................................................................6

     C. *Contemporaneous Statements by Administration Officials Confirm that the Rule Targets Noncitizens, Not Unsafe Drivers*....................................................13

     D.  *Enforcement Efforts Following the Rule's Promulgation Further Demonstrate that the Administration is More Concerned With Immigration Enforcement than Road Safety*...........................................................................................................................19

CONCLUSION.......................................................................................................................25

CERTIFICATE OF COMPLIANCE .................................................................................27

CERTIFICATE OF SERVICE ............................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of Priv. Sector Colleges & Universities v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012) ......................................................................................................12

*California v. United States Dep't of Transportation, 788 F. Supp. 3d 316 (D.R.I. 2025)*..........................................................................................................20

*California v. United States Dep't of Transportation, 808 F. Supp. 3d 291 (D.R.I. 2025)*…….....................................................................................................21

*CASA, Inc. v. Noem, 2025* WL 1907378 (D. MD. July 10, 2025) ..........................3

*Dep't of Com. v. New York*, 588 U.S. 752, 785, 785 (2019)……......................3, 4

*Dhillon v. Sommer*, No. 7:26-cv-05006, 2026 WL 1587371 (D. Nebraska Jun. 03. 2026)…….......................................................................................................23

*Dorcas Int'l Inst. of Rhode Island v. United States Citizenship & Immigr. Servs.*, No. 26-CV-132-JJM-PAS, 2026 WL 1622708 (D.R.I. June 5, 2026)......................3

*Fertilizer Inst. v. U.S. E.P.A.*, 935 F.2d 1303 (D.C. Cir. 1991).............................13

*Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012) ....................................................2, 14

*Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 612 & n.13 (5th Cir. 2021)........................................................................................4

*Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015)...........................................7

*Kumar v. Sommer*, No. 8:26-cv-166 (D. Neb. Apr. 29, 2026)...............................22

*Martin Luther King, Jr. Cnty., v. Sean Duffy, No. 26-1046 (D.C. Cir. Jun. 15, 2026)*.............................................................................................................21

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983)......................................3, 6, 14

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 122 (2022) ..........................................................................3, 4

*Rivera Lujan v. Fed. Motor Carrier Safety Admin., No. 25-1215, 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025)* ..................................................................5

*Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985)......................................................3

*Saini v. Schneider*, No. 4:26-cv-00112-RGE-SBJ (S.D. Iowa Apr. 6, 2026)..........22

*Sandhu v. Mullin*, No. 7:26-cv-5009, 2026 WL 1146643 (D. Neb. Apr. 28, 2026)...................................................................................................................22

*Singh v. Mullin*, No. 1:26-cv-00056, 2026 WL 1021846 (N.D. Iowa Apr. 15, 2026)...................................................................................................................23

*Singh v. Mullin*, No. 4:26-cv-00142-SHL-HCA (S.D. Iowa Apr. 20, 2026)...........22

*Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301 (D.C. Cir. 2001)........4

*United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977)......................................3

*Vasal v. Noem*, No. 4:26-cv-00066-SHL-WPK (S.D. Iowa Apr. 20, 2026)...........22

**Statutes**

5 U.S.C. § 706(2)(A)................................................................................................1

8 U.S.C. § 1101(a)(15)(H)(ii)(a)..............................................................................9

8 U.S.C. § 1101(ii)(b)...............................................................................................9

8 U.S.C. § 1184(g)(1)(H)(B)....................................................................................9

8 U.S.C. § 1184(g)(10)..............................................................................................9

**Federal Regulations**

8 C.F.R. § 214.2(h)(6)(ii)(B)....................................................................................9

8 C.F.R. § 214.2(e)(17).............................................................................................11

8 C.F.R. § 214.2(e)(18).............................................................................................11

20 C.F.R. § 655.1......................................................................................................10

20 C.F.R. § 655.5......................................................................................................10

20 C.F.R. § 655.15(f).................................................................................................9

20 C.F.R. § 655.18(a)(2)...........................................................................................10

20 C.F.R. § 655.18(a)(3)...........................................................................................10

20 C.F.R. § 655.100.................................................................10

20 C.F.R. § 655.103.................................................................10

20 C.F.R. § 655.103(d)...............................................................9

20 C.F.R. § 655.121(f)..............................................................10

20 C.F.R. § 655.122(b).............................................................10

20 C.F.R. § 655.130(e)..............................................................9

49 C.F.R. § 383.71...................................................................8

49 C.F.R. § 383.133(c)(5).............................................................8

49 C.F.R. § 383.135.................................................................8

49 C.F.R. § 386.30...................................................................9

49 C.F.R. § 391.11(b)(3).............................................................8

49 C.F.R. § 391.21................................................................8, 9

49 C.F.R. § 391.43...................................................................9

**Federal Rules**

90 Fed. Reg. 18759.................................................................14

90 Fed. Reg. 18761.................................................................14

90 Fed. Reg. 46509.................................................................12

90 Fed. Reg. 46512...................................................................5

90 Fed. Reg. 46513...................................................................5

90 Fed. Reg. 46515.................................................................16

90 Fed. Reg. 46516.................................................................10

90 Fed. Reg. 46520.................................................................12

90 Fed. Reg. 8443..................................................................14

91 Fed. Reg. 7044....................................................................1

91 Fed. Reg. 7046.................................................................16

91 Fed. Reg. 7048.................................................................................................4

91 Fed. Reg. 7050.............................................................9,11,12, 13, 16

91 Fed. Reg. 7054....................................................................................7, 11

91 Fed. Reg. 7060.................................................................................................9

91 Fed. Reg. 7067.................................................................................................7

91 Fed. Reg. 7096.................................................................................................6

91 Fed. Reg. 7099...........................................................................................6, 13

**Executive Orders**

Executive Order 14159......................................................................................14

Executive Order 14286......................................................................................14

Executive Order 14287......................................................................................14

**Other Authorities**

*About Us*, FMCSA, https://www.fmcsa.dot.gov/mission/about-us (last updated
Dec. 12, 2013)....................................................................................................19

Clark Kauffman, *Iowa State Patrol's 'Operation ICE Wall' Triggers More
Litigation, Iowa Capital Dispatch (Apr. 03, 2026 at 12:56 PM),
https://iowacapitaldispatch.com/2026/04/03/iowa-state-patrols-operation-ice-wall-
triggers-more-litigation/*........................................................................22, 23

DHS (@DHSgov), X (Aug. 20, 2025, at 6:20 AM),
https://x.com/DHSgov/status/1958157078503030915....................................... 17

DHS (@DHSgov), X (Oct. 8, 2025, at 12:00 PM),
https://x.com/dhsgov/status/1976007319197712471?s=46&t=TtB-NjfkmOcriEtub

1XBQQ..................................................................................................................18

Elizabeth Weber Handwerker, *Measuring Employment in the Agricultural Sector
in the Context of the H-2A Visa Program,* LIBRARY OF CONGRESS, (Jan. 24,
2025)....................................................................................................................11

*Ice Arrests 114 in Operations Targeting Truck Drivers*, Land Line Media (Jun. 11,
2026), https://landline.media/ice-arrests-114-in-operations-targeting-truck-
drivers/............................................................................................................23, 24

*ICE Operation Highway Sentinel Arrests Over 100 Illegal Alien Truck Divers in Gavin Newsom's California*, USCIS (Dec. 23, 2025), https://www.ice.gov/news/releases/ice-operation-highway-sentinel-arrests-over-100-illegal-alien-truck-drivers-gavin;, https://www.dhs.gov/news/2025/10/06/icymi-ice-and-oklahoma-highway-patrol-arrests-91-illegal-aliens-driving-18-wheelers.......................................................24

*Illegal Alien Who Couldn't Speak English Causes Deadly Multi-Vehicle Pile Up in Tennessee under Biden-Era Work Authorization*, DHS, (Dec. 17, 2025), https://www.dhs.gov/news/2025/12/17/illegal-alien-who-couldnt-speak-english-causes-deadly-multi-vehicle-pile-tennessee........................................................17

Jacquelyn Rodriguez, *Semi-Truck Driver Charged in Multi Vehicle Crash* (Oct. 31, 2025), https://da.sbcounty.gov/2025/10/31/semi-truck-driver-charged-in-multi-vehicle-crash-that-killed-three-and-injured-multiple-victims-in-ontario/........................................................................................18

*Secretary Noem Highlights More Than 140 Illegal Alien Truck Drivers Arrested During Operation Midway Blitz,* DHS (Oct. 30, 2025), https://www.dhs.gov/news/2025/10/30/secretary-noem-highlights-more-140-illegal-alien-truck-drivers-arrested-during................................................24

Sean Duffy (@SecDuffy), X (Jun. 27, 2025 at 6:04 PM), https://x.com/SecDuffy/status/1938659714222752176..........................................16

Sean Duffy, *Privilege to Work with Secretary Kristi Noem,* Facebook (Oct. 30, 2025), https://www.facebook.com/SecDuffy/videos/its-a-privilege-to-work-with-secretary-kristi-noem-and-fight-for-the-safety-of-e/1480376093016918/........19, 20

Sean Duffy (@SecDuffy), X (Nov. 15, 2025 at 3:17 PM), https://x.com/SecDuffy/status/1989714485779542490?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1989714485779542490%7Ctwgr%5E1aeffb93462209b7426a944fd789798d44e07fce%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.ttnews.com%2Farticles%2Fduffy-fight-court-cdl.................15, 16

Sean Duffy (@SecDuffy), X (Nov. 18, 2025 at 6:11 PM), https://x.com/SecDuffy/status/1990845355387470112..................................17, 21

The White House (@WhiteHouse), X (Feb. 10, 2026 at 10:59 AM), https://x.com/WhiteHouse/status/2021252784465564096....................................18

*Trump's Transportation Secretary Sean P. Duffy Takes Emergency Action to Protect America's Roads,* Dep't of Transp. (Sept. 26, 2025),

[https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-takes-emergency-action-protect-americas](https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-takes-emergency-action-protect-americas)...........................................15

*Trump's Transportation Secretary Sean P. Duffy Puts Safety First, Finalizes Rule to Stop Unqualified Foreign Drivers from Driving Big Rigs on American Roadways*, Dep't of Transp. (Feb. 11, 2026), [https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-puts-safety-first-finalizes-rule-stop](https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-puts-safety-first-finalizes-rule-stop)....................................................15

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CDL | Commercial Driver's License |
| DACA | Deferred Action for Childhood Arrivals |
| DHS | Department of Homeland Security |
| DOL | Department of Labor |
| DOT | Department of Transportation |
| FMCSA | Federal Motor Carrier Safety Administration |
| IFR | Interim Final Rule |
| USCIS | U.S. Citizenship and Immigration Services |

**STATEMENT OF INTEREST**[1]

**The Sikh Coalition** is a nonprofit and nonpartisan organization dedicated to ensuring that members of the Sikh community in America are able to practice their faith without fear of discrimination or backlash. It defends the civil rights and civil liberties of Sikhs by providing direct legal services and advocating for legislative change, educating the public about Sikhs and Sikhi, promoting local community empowerment, and fostering civic engagement amongst Sikh Americans. The organization also educates community members about their legally recognized free-exercise rights and works with public agencies and officials to implement policies that accommodate their sincerely held beliefs. The Sikh Coalition was originally founded as an effort to combat uninformed hate violence and discrimination against Sikh Americans after September 11, 2001. The Sikh Coalition has long stood for the legal rights of Sikh truckers, including by representing plaintiffs in landmark hiring discrimination legislation, fighting for clients' rights to maintain their articles of faith while working in the trucking industry, seeking justice for drivers who experience bias-motivated assault, producing accessible "know your rights resources" in Punjabi, and more.

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici curiae* certify that no person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

**Asian Law Caucus** was founded in 1972 as the nation's first legal and civil rights organization serving low-income, immigrant, and underserved Asian American and Pacific Islander communities. The organization continues to advocate for Asian, Pacific Islander, Arab, Muslim, and other immigrants across a range of issues—including the rights of immigrant workers.

**The Sikh American Legal Defense and Education Fund** (SALDEF) is a 501c3 nonprofit organization that is dedicated to empowering Sikh Americans by building dialogue, deepening understanding, promoting civic and political participation, and upholding civil rights and religious freedom for all Americans. Sikh truckers are deeply connected to SALDEF's mission because they represent one of the most visible and vital segments of the Sikh American community and their daily experiences directly reflect the issues SALDEF works to address.

**South Asian Network** is a community rooted organization providing education & direct services to the South Asian communities for more than 36 years. A very large number of our community, particularly of Sikhi faith have lost their livelihood since after the Department of Transportation revoking their commercial driver's licenses in spite of their lawful immigration status. We are proud to join as an Amici Curiae with the Sikh Coalition asking for the vacation of DOT's rule that denies livelihood to our hardworking community.

**Chinese for Affirmative Action** (CAA) is a nonprofit organization founded in 1969 to protect the civil and political rights of Chinese Americans and to advance multiracial democracy in the United States. Today, CAA is a progressive voice in and on behalf of the broader Asian American and Pacific Islander communities. CAA provides direct services to immigrants, including job placement and limited scope immigration legal services, and advocates for policies that protect and advance immigrant rights.

**Stop AAPI Hate** is a U.S.-based coalition dedicated to ending racism and discrimination against Asian Americans and Pacific Islanders (AAPIs). Stop AAPI Hate strives to advance the multiracial movement for equity and justice by building power for AAPI communities, working in solidarity with allied communities, and advocating for comprehensive solutions that tackle the root causes of race-based hate. Given that Asian Americans are the only racial group that is majority foreign-born, anti-immigrant policies have a disproportionate impact on Asian American communities and constitute a form of systemic anti-AAPI hate.

**The South Asian American Justice Collaborative** (SAAJCO) is a national civil rights organization that fights for the civil and human rights of the South Asian diaspora in the United States through impact litigation, community engagement, and other advocacy. SAAJCO has an interest in this case because immigrant workers, including many Sikh, Punjabi, and other South Asian truck drivers, are among those

directly impacted by the challenged rule. The rule threatens to strip workers of the ability to remain in their professions and support their families, while using immigration status as a proxy for safety. For SAAJCO, this case also fits within a broader concern we are seeing across immigration and civil rights work: policies that invoke safety, security, or administrative justifications while placing immigrant communities under heightened exclusion, surveillance, and economic pressure.

**The Asian American Legal Defense and Education Fund** (AALDEF), founded in 1974, is a New York City-based national organization that promotes the civil rights of Asian Americans. Through litigation, advocacy, and education, AALDEF focuses on critical issues affecting Asian Americans, including workers' rights, immigrants' rights, voting rights, and racial justice. Through its Economic Justice program, AALDEF works to ensure that all workers—regardless of immigration status—are paid fairly, work in safe conditions, and can advocate for better workplaces without fear of retaliation, discrimination, stereotyping, or harassment.

**The Texas Civil Rights Project** (TCRP) is a Texas-based nonprofit that boldly serves the movement for justice in and out of the courts, using litigation, policy, and advocacy tools to advance the civil rights of all Texans. TCRP works to further its vision of a Texas in which all communities can thrive, which includes protecting the civil, constitutional, and labor rights of immigrant workers. The

government's discriminatory policy regarding commercial driver's licenses stripped over 6,400 Texans of their ability to provide for their families and support their communities. In service of its mission, TCRP joins this amicus brief to defend the rights of immigrant commercial drivers in Texas and their families.

**Asian Americans Advancing Justice** (Advancing Justice-AAJC) is a nonprofit, nonpartisan organization that seeks to create an equitable society for all. Advancing Justice-AAJC works to further civil and human rights and empower Asian American communities through organization, education, advocacy, and litigation. Advancing Justice-AAJC is a leading expert on issues of importance to the Asian American community, including immigrant rights, racial profiling, and national security.

**The South Asian Legal Defense Fund** was established to use the power of law, narrative, and community in defending and advancing the full dignity and rights of South Asian people in the United States of America.

**Truckers Movement for Justice** is a cross border grass roots labor organization that is engaged in organizing all segments of truck drivers, O/O, company, and small fleets across the trucking industry to fight back against the horrific working conditions that have existed in the industry over the last 45 years. We stand in solidarity with both immigrant drivers as well as citizen drivers to be

part of an industry that places value on well-trained drivers alongside providing good working conditions.

**Mekong NYC** is a social justice organization that aims to uplift and build power within the Southeast Asian refugee and immigrant community in the Bronx and throughout New York City. We do this through community organizing and movement-building, centering healing through arts and culture, and creating a strong safety net rooted in community power. As the U.S. government continues to attack immigrant communities nationally, we are committed to defending the safety and dignity of the Southeast Asian community as well as the broader immigrant community.

**Jakara Movement** is a Punjabi Sikh community organization headquartered in Fresno, California, with chapters and programming across 15 counties throughout California and a national reach through its chapters. Central to our community's identity and economic survival is the trucking industry. Punjabi Sikh men and women have driven commercial vehicles across America's highways for generations, building livelihoods that sustain families and anchor our community's presence in the Central Valley and beyond. The FMCSA's Final Rule strikes at the heart of this legacy: by targeting immigrant drivers based on immigration status rather than any evidence of unsafe driving, it strips lawfully present members of our community of their ability to work and provide for their families. Jakara Movement

joins this brief because the Rule does not make roads safer, but rather it makes our communities less secure, less economically stable, and more vulnerable to the anti-immigrant enforcement campaigns that have increasingly used commercial driver inspections as a pretext for immigration arrests.

**UNITED SIKHS** is an international humanitarian aid and civil and human rights advocacy organization dedicated to protecting civil liberties. For more than two decades, UNITED SIKHS has provided legal services, policy advocacy, and community support to individuals and families across the United States, including the thousands of members of the minority Sikh community who form a vital part of the transportation and trucking industries. In the past year, UNITED SIKHS has worked directly with commercial drivers affected by the challenged rule and has witnessed its devastating impact on individuals, families, and communities across States like Texas, New York, Indiana, California, Illinois, Florida and others. The rule imposes severe consequences on workers who were not afforded a meaningful opportunity to demonstrate their safe driving records. It harms families and U.S.-citizen children and spouses who depend on the income of affected commercial drivers, and excludes otherwise qualified drivers based on categorical assumptions entirely unsupported by evidence. The drivers we represent are lawfully authorized to live and work in the United States. Based on our experience, there is no discernible or rational nexus between their immigration classifications and their ability to

physically operate commercial vehicles. In fact, they have built their lives, careers, and families around the commercial driving industry until now by maintaining the necessary licenses, complying with all applicable state and federal requirements, and maintaining safe driving records while contributing to the nation's economy and supply chain. Yet the challenged rule threatens their ability to continue working as commercial drivers, often without meaningful notice or an individualized reassessment of skill, and based on a sweeping assumption that they, as recent lawful arrivals, are less safe drivers solely by virtue of their immigration classification. Because the agency failed to provide empirical data or a reasoned explanation connecting immigration status to highway safety, this rule represents an arbitrary deprivation of livelihood rather than evidence-based rule-making.

## PRELIMINARY STATEMENT

Amici Curiae—labor, community, and legal services organizations—submit this brief in support of Petitioners' challenge to the final rule, 91 Fed. Reg. 7044 (Feb. 13, 2026) ("the Rule" or "Final Rule") issued by the Federal Motor Carrier Safety Administration ("FMCSA") of the U.S. Department of Transportation ("DOT"), which categorically prevents entire classes of lawfully eligible and lawfully present noncitizens from obtaining, maintaining, or renewing non-domiciled commercial driver's licenses ("CDL"), based solely on immigration status.

This Court should vacate the Rule for being arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Noncitizens have built careers as commercial drivers and have long contributed to the nation's economy through the trucking industry. FMCSA's alleged rationale for the Rule—to enhance commercial motor vehicle safety—is a pretext to target noncitizen truck drivers and force them out of the industry. Although FMCSA claims that its Rule is a necessary safety measure, it identifies no evidence that immigration status bears any meaningful relationship to roadway safety. Indeed, this Court previously stayed a functionally identical rule because FMCSA failed to show any net safety benefit to excluding drivers based on their immigration status—and FMCSA has provided no additional evidence since.

1

The Rule's arbitrary line-drawing undermines FMCSA's stated rationale; specifically, the Rule fails to make a rational distinction between the noncitizen categories now eligible for non-domiciled CDLs and those excluded from eligibility. The Rule was also enacted amid a series of executive actions and public statements portraying noncitizens as threats to public safety and linking commercial-driver licensing to the Administration's immigration-enforcement agenda, further revealing its true purpose of targeting noncitizen drivers. Subsequent enforcement efforts by multiple law enforcement agencies reinforce that conclusion. Since the Rule's promulgation, federal and state authorities have increasingly used commercial-driver inspections and licensing enforcement as vehicles for immigration arrests, again demonstrating that the administration is more concerned with immigration enforcement than enacting safety regulations. Accordingly, this Court should vacate the Rule.

## ARGUMENT

I. **The Final Rule Is Arbitrary and Capricious Because Its Purported Road-Safety Justification Is a Pretext for an Immigration-Enforcement Agenda**

Under the Administrative Procedure Act ("APA"), agency actions are "arbitrary" or "capricious" if it is not "the product of reasoned decision-making." *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012). Agency action is also arbitrary and capricious when it relies on impermissible factors or information Congress did

2

not intend the agency to consider. *See, e.g.*, *Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Race and nationality are such impermissible considerations. *See, e.g.*, *Dorcas Int'l Inst. of Rhode Island v. United States Citizenship & Immigr. Servs.*, No. 26-CV-132-JJM-PAS, 2026 WL 1622708, at *50 (D.R.I. June 5, 2026) (holding goal to reduce the number of non-white immigrants would render an agency decision arbitrary and capricious); *CASA, Inc. v. Noem*, 2025 WL 1907378, at *22 (D. MD. July 10, 2025) (same). "An agency decision prompted by personal animus would run afoul of the requirement that agencies act in a reasoned, nonarbitrary manner." *Robbins v. Reagan*, 780 F.2d 37, 50 n.20 (D.C. Cir. 1985).

In reviewing agency actions, courts need not simply accept an agency's stated rationale at face value. As the Supreme Court has explained, courts are "not required to exhibit a naiveté from which ordinary citizens are free," and they may reject an agency's explanation where there is a "disconnect between the decision made and the explanation given." *Dep't of Com. v. New York*, 588 U.S. 752, 785, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)). Although review of agency action is generally limited to the administrative record, *id.* at 780, courts can also consider public statements by government officials when evaluating the agency's stated rationale. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.,*

*Occupational Safety & Health Admin.*, 595 U.S. 109, 122 (2022) (Gorsuch, J., concurring) (relying on a retweet by the White House Chief of Staff) (quoting *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 612 & n.13 (5th Cir. 2021)); *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 312 (D.C. Cir. 2001).

Here, although FMCSA repeatedly invokes highway safety as its justification, the arbitrary line-drawing within the Rule itself, coupled with the government's rhetoric and enforcement efforts, reveal a different objective: targeting noncitizen truck drivers. Because immigration status and animus toward noncitizens are not permissible factors for FMCSA to consider in regulating commercial-driver licensing, the Rule is arbitrary and capricious and must be vacated. *See Dep't of Comm. v. New York*, 588 U.S. 752, 780–85 (2019) (affirming district court decision setting aside agency action that was based on pretextual rationale).

A. *FMCSA Fails To Establish a Rational Connection Between a Driver's Noncitizen Status And Safety Outcomes*

The Rule specifies that non-domiciled CDLs are available only to H-2A, H-2B, and E-2 visa holders, thereby excluding all others, including asylum seekers, asylees, Deferred Action for Childhood Arrivals ("DACA") recipients, refugees, and people with temporary protected status. *See* 91 Fed. Reg. 7048. But FMCSA

identifies no evidence that these three immigration classifications correlate with safer driving behavior, or that the excluded categories pose a greater safety risk. The agency's inability to establish any meaningful connection between immigration status and roadway safety underscores the Rule's pretextual nature.

This Court stayed an Interim Final Rule ("IFR") that restricted licenses on the basis of immigration status, in part because the agency presented no evidence of systemic risk. *Rivera Lujan v. Fed. Motor Carrier Safety Admin.*, No. 25-1215, 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025). The IFR also failed to provide evidence that particular immigration statuses presented a safety risk. As this Court noted, "according to the FMCSA's own data, non-domiciled CDL holders account for approximately 5 percent of all CDL holders but only about 0.2 percent of fatal crashes," and FMCSA did "not appear to have shown that the rule would produce any net safety benefit." *Rivera Lujan*, 2025 WL 3182504, at *2. To distract from this complete vacuum of rationale, FMCSA cited five accidents from 2025 and attributed them to the drivers' foreignness. *See* 90 Fed. Reg. 46512-13 (Sept. 29, 2025). Accordingly, this Court stayed the IFR as likely arbitrary and capricious. *Rivera Lujan*, 2025 WL 3182504, at *2.

Even after receiving 8,010 comments, many of which were critical, the Rule is nearly identical to the stayed IFR. FMCSA itself concedes this point,

characterizing the final rule as "reaffirming the changes made in the IFR." 91 Fed. Reg. at 7096. FMCSA feebly attempts to supplement safety data in the final rule. Instead of 5, it names 17 crashes involving non-domiciled CDL holders in 2025, still representing only 0.46 percent of all fatal large truck and bus crashes that year (a modest improvement from the 0.2 percent statistic this Court noted in its order staying the IFR). FMCSA acknowledges, and again dismisses, the lack of empirical evidence, pleading that "data limitations in existing crash reporting requirements do not provide the granular detail required to estimate quantitatively the risk associated with non-domiciled CDL holders." 91 Fed. Reg. at 7099.

But an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Unable to do so, the Rule, just like the IFR, still disqualifies 194,000 noncitizen drivers based on an arbitrary factor that FMCSA cannot link to safety: immigration status.

B. *The Rule Fails to Make a Rational Distinction Between the Noncitizen Categories it Excludes and the Noncitizen Categories Now Eligible for Non-Domiciled CDLs*

Lacking empirical support, FMCSA maintains that the Rule serves a safety function because it "limit[s] licensure to only those individuals whose driver history

can be vetted." 91 Fed. Reg. at 7067. Specifically, the Rule limits non-domiciled CDLs to H-2A, H-2B and E-2 visas because these visa requirements allegedly "ensure that [they] are already approved to work specific jobs that may require acquisition of a non-domiciled CDL." 91 Fed. Reg. at 7054. But nowhere does FMCSA explain how holders of these visa categories are safer drivers than the noncitizens excluded under the Rule. That evidentiary vacuum is fatal to its reasoning.

An agency's actions are arbitrary and capricious if they are not "reasonably explained." *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015). FMCSA's reasoning does not pass muster for several reasons: (1) immigration vetting of H-2A, H-2B, and E-2 visas are shared by the very groups it excludes; (2) the H-2A and H-2B programs are poor proxies for CDL safety; and (3) the agency does not bother explaining its inclusion of the E-2 category at all.

FMCSA's vetting rationale fails at the outset because the agency never explains why the immigration-related screening associated with H-2A, H-2B, and E-2 visas is meaningfully different from the screening imposed on the categories it excludes. Asylum seekers, refugees, DACA recipients, and many other noncitizens may not lawfully work in the United States unless they first obtain employment authorization from U.S. Citizenship and Immigration Services ("USCIS"). Those

7

individuals are therefore subject to federal review and authorization before entering the workforce, just as H-2A, H-2B, and E-2 workers are. And regardless of immigration category, any applicant seeking a commercial driver's license must satisfy the same federally prescribed CDL requirements, including identity verification, medical certification, mandatory entry-level driver training where applicable, and passage of the required knowledge and skills examinations. *See* 49 C.F.R. §§ 383.71 (certify their relevant work experience); 383.135 (satisfy knowledge and skills test); 391.21 (satisfy minimum qualification requirements, including English proficiency); 383.133(c)(5)) (the ability to safely operate commercial motor vehicles); and 391.11(b)(3)) (medical and physical fitness to drive).

FMCSA nowhere explains why a worker who has been granted employment authorization by USCIS and who has met every federal CDL qualification is less safe or less qualified than a H-2A, H-2B, or E-2 worker who has met those same requirements. Its explanation thus defies logic: if rigorous federal vetting is the criterion, the excluded groups already satisfy it.

Nor did FMCSA adequately explain why employers generally are not incentivized to screen for drivers with clean driving records and the other characteristics purportedly relayed by the Department of Labor ("DOL")—such as the ability to pass drug or medical tests and related work experience, 91 Fed. Reg. at

8

7050, 7060. Existing federal requirements and potential repercussions for the company, including enforcement actions that FMCSA is authorized to bring, would amply encourage such screening. *See, e.g.*, 49 C.F.R. 391.21 (background information needed for driver applications for employment); 49 C.F.R. 391.43 (required medical and physical exams); 49 C.F.R. 386.30 (motor carrier liability for action of employees).

FMCSA's reliance on employer incentives in the H-2A and H-2B process are undermined by how those programs actually operate. By statute and regulation, H-2A and H-2B employment is limited to temporary or seasonal work, with H-2A restricted to agricultural labor and H-2B subject to numerical caps and other limitations. 8 U.S.C. 1101(a)(15)(H)(ii)(a), (ii)(b), 1184(g)(1)(B), (g)(10)[1]; 20 C.F.R. 655.103(d); 8 C.F.R. 214.2(h)(6)(ii)(B). Both programs limit job opportunities to particular geographic areas, except in select circumstances. *See* 20 C.F.R. 655.130(e) (H-2A program); 20 C.F.R. 655.15(f) (similar for H-2B program). But nowhere does the Rule posit that commercial driving is only limited to certain times of the year, in certain sectors or select geographic areas. Nor does FMCSA explain how the temporary and geographically limited nature of H-2A and H-2B visas bears on safety for commercial driving contexts.

---

[1] Additional information on the H-2B cap and those exempt from the cap can be found here: https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers.

Moreover, FMCSA relies, as evidence of screening, on a job-order process that is actually designed to recruit U.S. workers, including asylees, refugees, and other noncitizens whom the Rule excludes. Under both programs, the qualifications listed in job orders submitted by employers must be "consistent with the normal and accepted qualifications required by employers that do not use H-2A workers in the same or comparable occupation and crops." 20 C.F.R. 655.122(b) (H-2A program); 20 C.F.R. 655.18(a)(2) (similar for H-2B program); 90 Fed. Reg. at 46516 n.25. That is because job orders in these programs are first and foremost a means to recruit workers in the U.S. for the job opportunity. *See* 20 C.F.R. 655.121(f); 20 C.F.R. 655.18(a)(3). The programs require employers to demonstrate that there are no able, willing, and qualified workers in the U.S. who are interested in the job opportunity before they may hire H-2A or H-2B workers. 20 C.F.R. 655.100; 20 C.F.R. 655.1. Critically, workers in the U.S. are defined to include those with valid immigration status, such as refugees, asylees, and other categories excluded under the Rule. 20 C.F.R. 655.103 (definition of U.S. worker); 20 C.F.R. 655.5 (same). In other words, the population of drivers being hired under the H-2A and H-2B programs are no more likely to be drivers with safe driving records because the qualifications of these drivers are required by Federal regulations to be consistent with those of U.S. drivers and because the employer screening process FMCSA mentions is primarily a means to screen U.S. drivers, including those the Rule now excludes.

10

The Rule also cites "the incentive to avoid unnecessarily repeating the lengthy job order process" as a reason an employer would want to screen a prospective employee's driver safety record. 91 Fed. Reg. at 7050, 7054. This reasoning does not withstand scrutiny. Employers often do not know the identities of prospective H-2A or H-2B workers during the job-order process. As explained above, the job-order process is designed to recruit U.S. workers, and employers may seek certification for H-2A and H-2B positions without identifying specific foreign workers. Thus, the Rule's premise that employers have a strong incentive to scrutinize a prospective driver's safety record to avoid repeating the job-order process is questionable. That incentive is further diminished because employers frequently receive DOL certification and DHS approval for more H-2A or H-2B workers than they ultimately hire. *See, e.g.*, Elizabeth Weber Handwerker, *Measuring Employment in the Agricultural Sector in the Context of the H-2A Visa Program*, Library of Congress (Jan. 24, 2025), https://www.congress.gov/crs-product/R48368 (noting employers do not always hire as many workers on H-2A visas as DOL certifies or USCIS approves).

Finally, FMCSA's inclusion of the E-2 category is independently arbitrary. Employees that qualify for E-2 visa classification must either be engaged in duties of an executive or supervisory character or have special qualifications—defined as "skills and/or aptitudes" that "are essential to the successful or efficient operation,"

including consideration of whether "the skills and qualifications are readily available in the United States." 8 C.F.R. 214.2(e)(17)-(18). Despite commenters raising these concerns,[2] FMCSA offered no explanation for how applicants for non-domiciled CDLs would be able to qualify for E-2 visas to justify its inclusion, especially since the agency notes elsewhere that drivers with CDLs can easily transition to other jobs. 90 Fed. Reg. at 46520.

The Rule failed to respond to timely comments presenting these logical inconsistencies, including that federal regulations require H-2A and H-2B drivers to have the same qualifications as any other commercial driver, such as those now excluded, and that employers generally are incentivized to screen for drivers with clean driving records and other characteristics DOL relayed.[3] "[T]he agency's failure to address these comments, or at best its attempt to address them in a conclusory manner, is fatal to its defense." *Ass'n of Priv. Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012) (internal quotation marks omitted).

Beyond these arguments, the Final Rule points to the consular adjudication process and purported Federal oversight as a basis for distinguishing these

---

[2] *See, e.g.*, Asian Law Caucus Comment 9 (JA__).
[3] As another example, despite commenters noting that the PERM program shares many similar characteristics as H-2A and H-2B visa holders, *see* Asian Law Caucus Comment 9-10 (JA__), FMCSA does not meaningfully respond to why PERM visa holders are excluded under the rule. *See generally* 90 Fed. Reg. 46509 (no mention of PERM program in FMCSA's responses).

categories, but the public lacked notice to provide comment on this purported rationale. 91 Fed Reg. at 7050.

Indeed, nowhere does the Interim Final Rule mention the word "consular," much less describe the "consular adjudication" process or the Department of State's "enhanced vetting" protocols upon which the Final Rule now heavily relies for its line-drawing. *See* 91 Fed. Reg. at 7099 (basing line-drawing decision on "the U.S. Department of State's enhanced vetting protocols"). Nor does the IFR mention "Federal oversight" or discuss how H-2A, H-2B, and E-2 visa holders are "subject to ongoing federal oversight."[4] *Id.* Had the IFR included information regarding these two factors, amici would have offered "new and different" comments or potential alternatives. The purposes of notice and comment were therefore not adequately served here. *Fertilizer Inst. v. U.S. E.P.A.*, 935 F.2d 1303, 1311 (D.C. Cir. 1991).

Amici do not argue that individuals with H-2A, H-2B, or E-2 visas should no longer be permitted to hold CDLs. Instead, we contend that when FMCSA relies on flawed distinctions and a failure to properly allow or consider public comments to deprive nearly 200,000 people of the ability to pursue their livelihoods, the agency needed to justify its decision-making in a reasoned and coherent manner. Because FMCSA failed to do so, its Rule must be vacated.

---

[4] The Final Rule does not discuss what "ongoing Federal oversight" these visa holders are subject to besides a bare assertion of "multiple points of verification and accountability," 91 Fed. Reg. at 7050, which casts further doubt on whether FMCSA engaged in reasoned decision-making.

C. *Contemporaneous Statements by Administration Officials Confirm that the Rule Targets Noncitizens, Not Unsafe Drivers*

The government's rhetoric surrounding both the IFR and the Rule confirms that the challenged rulemaking is not the product of reasoned decision-making, but is instead driven by hostility toward noncitizens. This context matters because an agency acts arbitrarily and capriciously when it relies on assumptions, stereotypes, or unsupported generalizations rather than evidence and reasoned decision-making. *See Fox*, 684 F.3d at 74-75; *State Farm*, 463 U.S. at 43. Here, the statements accompanying the Rule repeatedly frame noncitizens as a danger to public safety while failing to identify evidence that such drivers, as a class, pose a unique risk to road safety.

On his first day in office, President Trump issued Executive Order 14159, "Protecting the American People Against Invasion," which characterized recent immigration as an "invasion" and alleged that noncitizens are "committing vile and heinous acts against innocent Americans." 90 Fed. Reg. 8443 (Jan. 29, 2025). A later executive order directed the Secretary of Transportation to scrutinize non-domiciled CDLs. Executive Order 14286, 90 Fed. Reg. 18759 (April 28, 2025); *see also* Executive Order 14287 90 Fed. Reg. 18761 ("Protecting American Communities from Criminal Aliens").

Against this backdrop, Secretary of Transportation Sean Duffy justified the IFR and the Rule by repeatedly referring to "dangerous foreign drivers" and "unqualified foreign drivers," as posing "a direct threat to the safety of every family on the road." *Trump's Transportation Secretary Sean P. Duffy Takes Emergency Action to Protect America's Roads,* Dep't of Transp. (Sept. 26, 2025), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-takes-emergency-action-protect-americas; *Trump's Transportation Secretary Sean P. Duffy Puts Safety First, Finalizes Rule to Stop Unqualified Foreign Drivers from Driving Big Rigs on American Roadways*, Dep't of Transp. (Feb. 11, 2026), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-puts-safety-first-finalizes-rule-stop; Sean Duffy (@SecDuffy), X (Nov. 15, 2025 at 3:17 PM), https://x.com/SecDuffy/status/1989714485779542490?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1989714485779542490%7Ctwgr%5E1aeffb93462209b7426a944fd789798d44e07fce%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.ttnews.com%2Farticles%2Fduffy-fight-court-cdl.

Yet neither the IFR nor the Final Rule identifies data demonstrating that drivers holding the disfavored noncitizen statuses are more likely to cause crashes, violate safety regulations, or otherwise pose greater risks than similarly situated

drivers. Instead of providing evidence connecting noncitizen status to roadway safety, *see* Section A, supra at 4–6, FMCSA relied on broad characterizations of noncitizens as dangerous. *See id.*; 91 Fed. Reg. at 7046, 7050; 90 Fed. Reg. at 46515.

The government's reliance on isolated accidents further underscores the absence of reasoned decision-making underlying the Rule. Despite the thousands of crashes involving large trucks and buses each year, government officials repeatedly spotlighted isolated incidents involving noncitizen drivers, and they have used those incidents to amplify inflammatory anti-immigrant narratives. For instance, Secretary Duffy said that, "Just look at the recent crashes by these drivers, which killed a dozen of innocent Americans. This is a CRISIS that requires immediate action. We won't stop fighting to keep dangerous, unqualified truck drivers off the road." Sean Duffy (@SecDuffy), X (Nov. 15, 2025 at 3:17 PM), https://x.com/SecDuffy/status/1989714485779542490?ref_src=twsrc%5Etfw%7Ct wcamp%5Etweetembed%7Ctwterm%5E1989714485779542490%7Ctwgr%5E1ae ffb93462209b7426a944fd789798d44e07fce%7Ctwcon%5Es1_&ref_url=https%3 A%2F%2Fwww.ttnews.com%2Farticles%2Fduffy-fight-court-cdl.

While discussing commercial drivers, Secretary Duffy has lamented that "[t]he Biden administration allowed millions of foreigners to flood our country. Under @POTUS, those days are over." Sean Duffy (@SecDuffy), X (Jun. 27, 2025

at 6:04 PM), https://x.com/SecDuffy/status/1938659714222752176. He has claimed that "[w]e are suffering from the consequences of the Biden administration's open border policies . . . There are 200,000 CDLs right now in America[] and 194,000 wouldn't qualify for commercial driver's licenses UNDER OUR CRACKDOWN. . ." Sean Duffy (@SecDuffy), X (Nov. 18, 2025 at 6:11 PM), https://x.com/SecDuffy/status/1990845355387470112.

Following a December 2025 crash in Tennessee involving a Chinese national, Secretary Duffy also stated that, "[i]t's not just that Joe Biden let millions of migrants flood into our country illegally. His administration doled out the documentation these unqualified foreigner drivers needed to obtain trucking licenses and operate 40-ton missiles on the highway." *Illegal Alien Who Couldn't Speak English Causes Deadly Multi-Vehicle Pile Up in Tennessee under Biden-Era Work Authorization*, DHS, (Dec. 17, 2025), https://www.dhs.gov/news/2025/12/17/illegal-alien-who-couldnt-speak-english-causes-deadly-multi-vehicle-pile-tennessee.

After an August 2025 crash in Florida involving Harjinder Singh, a Sikh, the Department of Homeland Security ("DHS") posted it would work with DOT "to root out and prevent illegal aliens from obtaining these licenses from sanctuary jurisdictions that put American drivers and passengers in danger." DHS (@DHSgov), X (Aug. 20, 2025, at 6:20 AM),

https://x.com/DHSgov/status/1958157078503030915. DHS doubled down and used Singh's name and image on X (formerly Twitter) to villainize Sikh truck drivers. DHS (@DHSgov), X (Oct. 8, 2025, at 12:00 PM), https://x.com/dhsgov/status/1976007319197712471?s=46&t=TtB-NjfkmOcriEtub 1XBQQ (image of X post below).



Similarly, following a fatal crash involving Jashanpreet Singh in California, White House messaging repeatedly made the false claim that Singh was under the influence—even though toxicology reports from months ago showed otherwise. The White House (@WhiteHouse), X (Feb. 10, 2026 at 10:59 AM), https://x.com/WhiteHouse/status/2021252784465564096; *but see* Jacquelyn Rodriguez, *Semi-Truck Driver Charged in Multi Vehicle Crash* (Oct. 31, 2025),

https://da.sbcounty.gov/2025/10/31/semi-truck-driver-charged-in-multi-vehicle-crash-that-killed-three-and-injured-multiple-victims-in-ontario/.

Viewed together, these statements demonstrate more than mere political rhetoric. They show that the agency approached the rulemaking process with a preconceived belief that noncitizens are inherently dangerous drivers and then sought to justify restrictions on that basis. Rather than grounding the Rule in evidence showing that the excluded immigration categories are associated with poorer safety outcomes, the agency repeatedly relied on inflammatory immigration-enforcement narratives, anecdotal incidents, and unsupported generalizations. The result is a Rule that draws sweeping distinctions based on immigration status without a reasoned explanation for why those distinctions advance roadway safety. That mismatch between the agency's asserted rationale and the evidence before it provides further evidence that the Rule is arbitrary and capricious.

D. *Enforcement Efforts Following the Rule's Promulgation Further Demonstrate that the Administration is More Concerned With Immigration Enforcement than Road Safety*

FMCSA's mission is to promote roadway safety by reducing commercial motor vehicle crashes, injuries, and fatalities—not to enforce the nation's immigration laws. *See About Us*, FMCSA, https://www.fmcsa.dot.gov/mission/about-us (last updated Dec. 12, 2013). However, Secretary Duffy is neither obscuring his position nor hiding the ball; he

has been unabashedly supportive of using his agency's resources to advance and carry out DHS's objectives. *See* Sean Duffy, *Privilege to Work with Secretary Kristi Noem,* Facebook (Oct. 30, 2025), https://www.facebook.com/SecDuffy/videos/its-a-privilege-to-work-with-secretary-kristi-noem-and-fight-for-the-safety-of-e/1480376093016918/ (In October 2025, Duffy asserted that, "It's a privilege to work with [former DHS] Secretary Kristi Noem and fight for the safety of every American on our roads. The days of illegals driving big rigs are numbered.").

In fact, over a year ago and prior to both the IFR and Final Rule, the U.S. District Court for the District of Rhode Island issued a preliminary injunction preventing DOT from making immigration enforcement a condition for receipt of federal transportation funding. In so holding, the court concluded that, "[t]he Government does not cite to any plausible connection between cooperating with ICE enforcement and the congressionally approved purposes of the Department of Transportation. Under the [government's] position, the Executive would be allowed to place any conditions it chose on congressionally appropriated funds, even when it would be entirely unrelated to the Department's purpose. Such is not how the three equal branches of government are allowed to operate under our Constitution." *California v. United States Dep't of Transportation*, 788 F. Supp. 3d 316, 323 (D.R.I. 2025). The court later granted summary judgment in favor of plaintiffs, holding that DOT had exceeded their statutory authority:

> Had Congress wished to try to make federal transportation funding contingent on cooperation with federal civil immigration enforcement, it could certainly have attempted to do so. Absent any clear indication of such an attempt, the Court declines to find that DOT was vested with the sweeping power it asserts in setting a condition that is so obviously unrelated to the grant programs it administers.

*California v. United States Dep't of Transportation*, 808 F. Supp. 3d 291, 308 (D.R.I. 2025).

The U.S. District Court's conclusion highlights the same defect present here. Secretary Duffy has repeatedly sought to intertwine transportation policy with immigration enforcement despite the lack of any mandate for DOT to do so. The Rule reflects that same impulse. While discussing commercial drivers, Secretary Duffy has focused on immigration policies to justify FMCSA's "crackdown" on the 200,000 CDL holders the Rule excludes. *See, e.g.*, Sean Duffy (@SecDuffy), X (Nov. 18, 2025 at 6:11 PM), https://x.com/SecDuffy/status/1990845355387470112.

Rather than focusing on commercial-driver qualifications or roadway safety, the agency has impermissibly treated immigration status as a transportation concern and used FMCSA's regulatory authority to advance broader immigration-enforcement objectives when these objectives exceed the agency's statutory mandate. *See* Brief for Petitioner Martin Luther King at 25–36, *Martin Luther King, Jr. Cnty., v. Sean Duffy*, No. 26-1046 (D.C. Cir. Jun. 15, 2026). Not surprisingly, around the same time that FMCSA promulgated the IFR, ICE conducted Operation ICE Wall, a nationwide dragnet operation in cooperation with state agencies to arrest

and detain non-domiciled CDL holders. The operation relies on state officers to detain noncitizen truck drivers during routine weigh-station inspections or traffic-enforcement encounters and prolong those stops while awaiting ICE agents, who then arrest the drivers upon arrival. *See, e.g.,* Clark Kauffman, *Iowa State Patrol's 'Operation ICE Wall' Triggers More Litigation*, Iowa Capital Dispatch (Apr. 03, 2026 at 12:56 PM), https://iowacapitaldispatch.com/2026/04/03/iowa-state-patrols-operation-ice-wall-triggers-more-litigation/.

ICE publicly claims to target "illegal aliens" and individuals with serious criminal convictions, but these operations have disproportionately affected non-domiciled CDL holders with otherwise valid licenses and work authorizations. *See, e.g., Sandhu v. Mullin*, No. 7:26-cv-5009, 2026 WL 1146643, at *3–*5 (D. Neb. Apr. 28, 2026) (granting habeas and immediate release to Sikh non-domiciled truck driver detained at Iowa weigh station in February 2026); *Kumar v. Sommer*, No. 8:26-cv-166 (D. Neb. Apr. 29, 2026) (granting habeas to non-domiciled South Asian truck driver detained at Iowa weigh station on February 11, 2026); *Saini v. Schneider*, No. 4:26-cv-00112-RGE-SBJ (S.D. Iowa Apr. 6, 2026) (granting habeas to a non-domiciled South Asian truck driver detained at Iowa weigh station on February 11, 2026); *Vasal v. Noem*, No. 4:26-cv-00066-SHL-WPK (S.D. Iowa Apr. 20, 2026) (granting habeas to a non-domiciled South Asian truck driver detained in Iowa while driving his truck on February 11, 2026); *Singh v. Mullin*, No. 4:26-cv-

00142-SHL-HCA (S.D. Iowa Apr. 20, 2026) (granting habeas for a non-domiciled Sikh truck driver detained at Iowa weigh station on February 11, 2026); *Singh v. Mullin*, No. 1:26-cv-00056, 2026 WL 1021846 (N.D. Iowa Apr. 15, 2026) (granting habeas to a non-domiciled Sikh truck driver detained at Iowa weigh station in March 2026).

For instance, on February 17, 2026, ICE, coordinating with the Iowa Department of Public Safety (Iowa DPS), arrested Prabjot Singh Dhillon, a driver from India, at an Iowa weigh station as part of Operation ICE Wall. That morning, Mr. Dhillon was hauling poultry when he pulled into a weigh station for a routine inspection. He presented a valid non-domiciled CDL. The officer identified a minor registration issue with Mr. Dhillon's employer, which was resolved within minutes, yet the officer kept Mr. Dhillon at the scale and called ICE. Over an hour into the inspection, ICE agents arrived and arrested Mr. Dhillon—without a warrant, without a lawful basis, and without due process. *Dhillon v. Sommer*, No. 7:26-cv-05006, 2026 WL 1587371 (D. Nebraska Jun. 03. 2026); *see also* Clark Kauffman, *Iowa State Patrol's 'Operation ICE Wall' Triggers More Litigation*, Iowa Capital Dispatch (Apr. 03, 2026 at 12:56 PM), https://iowacapitaldispatch.com/2026/04/03/iowa-state-patrols-operation-ice-wall-triggers-more-litigation/ (describing the similar arrests of multiple other individuals in Iowa as part of Operation Ice Wall).

During the week of May 11, 2026, ICE agents also arrested dozens of truck drivers as part of Operation Checkmate in Arizona. *Ice Arrests 114 in Operations Targeting Truck Drivers*, Land Line Media (Jun. 11, 2026), https://landline.media/ice-arrests-114-in-operations-targeting-truck-drivers/. That same week, ICE partnered with South Carolina law enforcement to make 114 arrests in operations targeting "fraudulent truck drivers." *Id.* And DHS's press releases showed 337 arrests of migrant truck drivers and CDL holders in Indiana, California and Oklahoma from October to December 2025. *Secretary Noem Highlights More Than 140 Illegal Alien Truck Drivers Arrested During Operation Midway Blitz*, DHS (Oct. 30, 2025), https://www.dhs.gov/news/2025/10/30/secretary-noem-highlights-more-140-illegal-alien-truck-drivers-arrested-during; *ICE Operation Highway Sentinel Arrests Over 100 Illegal Alien Truck Divers in Gavin Newsom's California*, USCIS (Dec. 23, 2025), https://www.ice.gov/news/releases/ice-operation-highway-sentinel-arrests-over-100-illegal-alien-truck-drivers-gavin; *ICYMI: ICE and Oklahoma Highway Patrol Arrests 91 Illegal Aliens Driving 18-Wheelers on Highways in Successful Three Day Action on I-40*, DHS (Oct. 06, 2025), https://www.dhs.gov/news/2025/10/06/icymi-ice-and-oklahoma-highway-patrol-arrests-91-illegal-aliens-driving-18-wheelers.

In sum, DOT's Final Rule and related initiatives all underscore a consistent pattern: DOT has repeatedly aligned commercial-vehicle policy with immigration-enforcement objectives that fall outside FMCSA's statutory safety mission. That alignment further confirms the Rule was not truly enacted as a roadway-safety measure, but it is part of a broader effort to target noncitizen truck drivers.

## CONCLUSION

Taken together, the Rule's arbitrary line-drawing, the absence of concrete safety data, the repeated invocation of anti-immigrant themes by agency officials, and the subsequent immigration-enforcement campaigns targeting truck drivers reveal a substantial disconnect between FMCSA's stated rationale and its actual objective. What the Rule accomplishes is not improved roadway safety, but the exclusion of broad categories of noncitizens from the trucking industry. Because immigration status and animus toward noncitizens are not permissible factors for FMCSA to consider in regulating commercial-driver licensing, the Rule is arbitrary and capricious and must be vacated.

Respectfully submitted,

Dated: June 22, 2026

*/s/ Sahel K. Sra*

Sahel K. Sra
Munmeeth Kaur
The Sikh Coalition

165 Broadway, 23rd Floor
New York, NY 10006
Tel: (212) 655-3095
sahel@sikhcoalition.org
munmeeth@sikhcoalition.org

Katherine Zhao
Joshua Rosenthal
Asian Law Caucus
55 Columbus Ave
San Francisco, CA 94111
Tel: (415) 896-1701
katherinez@asianlawcaucus.org
joshr@asianlawcaucus.org

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this Brief of *Amici Curiae* complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1), it contains 5084 words.

I further certify this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with 14-point Times New Roman font in Microsoft Word.

Respectfully submitted,

Dated: June 22, 2026

*/s/ Sahel K. Sra*
Sahel K. Sra
*Counsel for Amici Curiae*

# CERTIFICATE OF SERVICE

I certify that on June 22, 2026, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the District of Columbia by using the appellate CM/ECF system. I certify that the foregoing document is being served on this day to all counsel of record registered to receive a Notice of Electronic Filing generated by CM/ECF.

*/s/ Sahel K. Sra*
Sahel K. Sra
*Counsel for Amici Curiae*
