**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 15, 2026**

**Nos. 26-1032, -1046**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JORGE RIVERA LUJAN, et al.,

*Petitioners*,

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION, et al.,

*Respondents*.

*(caption continued on inside cover)*

On Petitions for Review of a Rule of the Federal Motor Carrier Safety Administration

# BRIEF FOR RESPONDENTS

*Of Counsel:*

GREGORY ZERZAN
*General Counsel*

CHARLES E. ENLOE
*Assistant General Counsel*

SAMUEL G. FULLER
*Attorney*
*U.S. Department of Transportation*

REBECCA PETTIT
*Chief Counsel*
*Federal Motor Carrier Safety Administration*

BRETT A. SHUMATE
*Assistant Attorney General*

BRAD HINSHELWOOD
SIMON G. JEROME
GABRIEL I. SCHONFELD
*Attorneys, Appellate Staff*
*Civil Division, Room 7209*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1673*

MARTIN LUTHER KING, JR. COUNTY,

*Petitioner*,

v.

SEAN P. DUFFY, in his official capacity, et al.,

*Respondents*.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Except for the following amici, all parties and amici appearing in this Court are listed in the Brief for *Lujan* Petitioners: Asian Law Caucus; Asian American Legal Defense and Education Fund; Asian Americans Advancing Justice; Chinese for Affirmative Action; South Asian Network; Stop AAPI Hate; South Asian American Justice Collaborative; South Asian Legal Defense Fund; Texas Civil Rights Project; Truckers Movement for Justice; Mekong NYC; Laborers International Union of North America; the Commonwealths of Massachusetts and Virginia; the States of Arizona, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington; the District of Columbia; and 25 Members of Congress.[*]

---

[*] Representatives Adriano Espaillat, Jamie Raskin, Nanette Diaz Barragán, Gilbert R. Cisneros, Jr., Veronica Escobar, Maxwell Alejandro Frost, Jesús "Chuy" García, Robert Garcia, Sylvia R. Garcia, Adelita S. Grijalva, Raja Krishnamoorthi, Sam Liccardo, Analilia Mejia, Robert Menendez, Grace Meng, Delia C. Ramirez, Emily Randall, Luz Rivas, Linda

*Continued on next page.*

### B. Rulings Under Review

References to the ruling at issue appear in the Briefs for Petitioners.

### C. Related Cases

The consolidated cases on review have never previously been before this Court. The consolidated cases in Nos. 25-1215 and 25-1224, which are currently in abeyance, seek review of the interim final rule that preceded the final rule at issue in the instant cases. Undersigned counsel is unaware of any other related cases currently pending in this Court or in any other court.

*/s/ Simon G. Jerome*
SIMON G. JEROME

T. Sánchez, Darren Soto, Norma J. Torres, Ritchie Torres, Lori Trahan, Juan Vargas, and Nydia M. Velázquez.

## TABLE OF CONTENTS


**Page**

GLOSSARY

TABLE OF AUTHORITIES ........................................................ vi

INTRODUCTION ........................................................ 1

STATEMENT OF JURISDICTION ........................................................ 3

STATEMENT OF THE ISSUES ........................................................ 4

PERTINENT STATUTES AND REGULATIONS ........................................................ 4

STATEMENT OF THE CASE ........................................................ 4

SUMMARY OF ARGUMENT ........................................................ 16

STANDARD OF REVIEW ........................................................ 18

ARGUMENT ........................................................ 19

I. The Rule Is A Valid Exercise Of FMCSA's Statutory Authority........ 19

II. The Rule Is Neither Arbitrary Nor Capricious. ........................................ 29

A. FMCSA Reasonably Restricted CDL Eligibility Based On Vetting Concerns. ........................................................ 31

B. FMCSA Reasonably Eliminated Reliance On EADs. .................... 49

CONCLUSION ........................................................ 64

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CDL | Commercial driver's license |
| CLP | Commercial learner's permit |
| DACA | Deferred Action for Childhood Arrivals |
| EAD | Employment Authorization Document |
| FMCSA | Federal Motor Carrier Safety Administration |
| IFR | Interim final rule |
| Safety Act | Commercial Motor Vehicle Safety Act of 1986 |
| USCIS | United States Citizenship and Immigration Services |

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**


*Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*,
41 F.4th 586 (D.C. Cir. 2022) .......... 5, 19

*Affirmed Energy, LLC v. FERC*,
166 F.4th 1070 (D.C. Cir. 2026) .......... 62

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 29

*BNSF Ry. Co. v. U.S. Dep't of Transp.*,
566 F.3d 200 (D.C. Cir. 2009) .......... 19

*Defenders of Wildlife v. Zinke*,
849 F.3d 1077 (D.C. Cir. 2017) .......... 41-42

*Department of Com. v. New York*,
588 U.S. 752 (2019) .......... 62

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 16

*District Hosp. Partners v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) .......... 58, 59

*Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
777 F.3d 518 (D.C. Cir. 2015) .......... 25

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211(2016) .......... 60

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009) .......... 60

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 19, 37

*Food & Drug Admin. v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025)....................19, 38, 42, 60

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*,
146 S. Ct. 1546 (2026)....................25

*Hight v. U.S. Dep't of Homeland Sec.*,
135 F.4th 996 (D.C. Cir. 2025)....................62

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020)....................63

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................19

*Magnetsafety.org v. CPSC*,
129 F.4th 1253 (10th Cir. 2025)....................44

*Montanile v. Board of Trs. of the Nat'l Elevator Indus. Health Benefit Plan*,
577 U.S. 136 (2016)....................28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................32

*National Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013)....................43

*New Mexico Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
148 F.4th 755 (D.C. Cir. 2025)....................32, 41, 47

*North Carolina v. FERC*,
112 F.3d 1175 (D.C. Cir. 1997)....................37

*Rural Cellular Ass'n v. FCC*,
588 F.3d 1095 (D.C. Cir. 2009)....................42, 43

*Stovic v. Railroad Ret. Bd.*,
826 F.3d 500 (D.C. Cir. 2016)....................28

*United States v. Public Utils. Comm'n of Cal.*,
345 U.S. 295 (1953)........................................25

*WorldCom, Inc. v. FCC*,
238 F.3d 449 (D.C. Cir. 2001)........................................43

**Statutes:**

Commercial Motor Vehicle Safety Act of 1986,
Pub. L. No. 99-570, tit. XII, 100 Stat. 3207........................................4, 42

Motor Carrier Safety Improvement Act of 1999,
Pub. L. No. 106-159, 113 Stat. 1748........................................5

49 U.S.C. § 113........................................6

49 U.S.C. § 31302........................................5

49 U.S.C. § 31303........................................5

49 U.S.C. § 31304........................................5

49 U.S.C. § 31305........................................5, 17, 20, 25, 26

49 U.S.C. § 31306........................................5

49 U.S.C. § 31308........................................3, 15, 17, 19, 25, 28, 51

49 U.S.C. § 31311........................................3, 5, 6, 15, 17, 20, 24, 26, 37

Cal. Code Regs. tit. 13, § 26.02........................................56

Minn. Stat. § 171.27........................................57

75 Pa. Cons. Stat. § 1514........................................57

S.D. Codified Laws § 32-12-42.2........................................57

Tex. Transp. Code Ann. § 522.051 ....................................................................57

Utah Code Ann. § 53-3-413 ...........................................................................57

**Regulations:**

8 C.F.R. § 236.23 ..........................................................................................13

8 C.F.R. § 274a.12 ........................................................................................14

49 C.F.R. § 1.87 ...............................................................................................6

49 C.F.R. § 383.5 ......................................................................................11, 13

49 C.F.R. § 383.23 .....................................................................................7, 54

49 C.F.R. § 383.71 ......................................................7, 11, 13, 49, 53, 57

49 C.F.R. § 383.73 ..........................................7, 8, 12, 13, 21, 48, 49, 56, 57

49 C.F.R. § 384.307 ..........................................................................................8

**Legislative Materials:**

132 Cong. Rec. S16919 (daily ed. Oct. 17, 1986) ..............................................4

**Executive Materials:**

*Commercial Driver's Licensing Standards*,
52 Fed. Reg. 20,574 (June 1, 1987).........................................................7, 20

*Commercial Driver's License Testing and Commercial Learner's Permit Standards*,
76 Fed. Reg. 26,854 (May 9, 2011) ....................................................................6

FMCSA, U.S. Dep't of Transp.,
*Large Truck and Bus Crash Facts 2020* (Sept. 2022),
https://perma.cc/A2C7-WE5S ........................................................................4

FMCSA,
*2023 Guidance on Non-Domiciled CDL Issuance to DACA Recipients from Mexico*, https://perma.cc/BEU6-3YV7 ..................................................14

*List of States FMCSA Determined Were in Substantial Noncompliance*,
Regulations.gov, https://perma.cc/JZJ8-G8NT ..............................................8

*Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*,
91 Fed. Reg. 7044 (Feb. 13, 2026)..............................................................
8, 9, 10, 11, 12, 13, 14, 15, 21, 22, 23, 27, 29, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 42, 44, 45, 46, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62

*Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*,
90 Fed. Reg. 46,509 (Sep. 29, 2025)......................................................10, 12, 36

**Other Materials:**

Am. Transp. Rsch. Inst., *Critical Issues in the Trucking Industry – 2025* .......
..........................................................................................................41

Hugh Cameron, *America Doesn't Have Enough Truck Drivers*, Newsweek
(July 10, 2025), https://perma.cc/K385-XG8T ..........................................40, 41

Press Release, Am. Trucking Ass'ns, *ATA Chief Economist Pegs Driver Shortage at Historic High* (Oct. 25, 2021), https://perma.cc/G8FD-BWDB ...
..........................................................................................................40

## INTRODUCTION

Commercial motor vehicles, such as tractor-trailers and buses, are some of the most dangerous vehicles on America's roadways. Congress has tasked the Federal Motor Carrier Safety Administration (FMCSA) with ensuring that the individuals licensed by States to drive such vehicles are adequately trained and vetted. Federal regulations thus set uniform standards with which States must comply in issuing any commercial driver's license (CDL).

This case involves a February 2026 final rule issued by FMCSA that makes two important changes to the regulations for issuing CDLs to applicants not domiciled in the United States, who are almost entirely aliens. The first change closes a "safety gap" between applicants domiciled in the United States and non-domiciliary aliens. Generally, before a State may issue a CDL, federal statutory law requires that the State consult the applicant's driving record, including via several domestic driving-history databases, to determine whether the driver has a history of crashes, moving violations, or other concerning behaviors. That requirement recognizes what empirical research demonstrates and what common sense suggests: that a driver's history is among the most powerful predictors of whether he or she

will drive safely in the future. As FMCSA explained, this driver-history screening is of limited utility for applicants who are aliens not domiciled in the United States, because the databases do not contain foreign driving records and States otherwise lack the ability to obtain those foreign driving records. The Rule closes this gap by precluding aliens whose driving history cannot be adequately vetted from obtaining a CDL.

The second change responds to systemic compliance failures by state driver's licensing agencies that FMCSA identified in its 2025 reviews of state compliance with federal requirements. Under prior FMCSA regulations, applicants for a non-domiciled CDL could demonstrate lawful presence in the United States by presenting an Employment Authorization Document (EAD) issued by the Department of Homeland Security (DHS). But FMCSA's annual reviews demonstrated that clerks at state agencies across the country routinely struggled to interpret EADs, leading to widespread errors in multiple aspects of the non-domiciled CDL issuance process. The Rule here thus requires that applicants for a non-domiciled CDL demonstrate lawful immigration status through an unexpired passport and Form I–94 or I–94A, which FMCSA determined would be simpler for state agencies to apply.

As a panel of this Court determined in denying a stay pending review, those straightforward but important changes are well within FMCSA's statutory authority to prescribe "minimum uniform standards" for CDL issuance, 49 U.S.C. § 31308, including for non-domiciled CDLs, *id.* § 31311(a)(12)(B). Stay Op. 5-6. Furthermore, FMCSA exercised its authority reasonably: it documented the safety and administrability concerns that motivated it to act, it addressed those concerns in a rationally tailored manner, and it gave due consideration to important aspects of the problem, including the Rule's effects on regulated parties. And as the stay panel recognized, petitioners' arguments to the contrary either misconstrue the agency's rationale for acting or seek to substitute their own judgments for FMCSA's reasonable determinations about how best to vet drivers for safety concerns and to administer the non-domiciled CDL program. Stay Op. 6-9.

The Court should deny the petitions for review.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over the petitions for review under 28 U.S.C. § 2342(3)(A). The petitions for review were timely filed under 28 U.S.C. § 2344 on February 12 and March 4, 2026.

## STATEMENT OF THE ISSUES

The issues presented are whether FMCSA's February 2026 Final Rule (1) exceeds the agency's statutory authority or (2) is arbitrary and capricious.

## PERTINENT STATUTES AND REGULATIONS

A pertinent statute is reproduced in the addendum to this brief, to supplement the statutes and regulations reproduced in the addenda to petitioners' briefs.

## STATEMENT OF THE CASE

1. In 1986, commercial truck drivers posed a serious threat to those traveling on the nation's highways. That year alone, crashes involving large trucks and buses accounted for 5,895 deaths in the United States. FMCSA, U.S. Dep't of Transp., *Large Truck and Bus Crash Facts 2020*, at 4 (Sept. 2022), https://perma.cc/A2C7-WE5S.

Congress addressed the problem through a pair of legislative enactments. First, in 1986, Congress passed the Commercial Motor Vehicle Safety Act (Safety Act). Pub. L. No. 99-570, tit. XII, 100 Stat. 3207. As amended, the Safety Act aims "to eliminate unsafe commercial drivers and equipment" from U.S. roads in several ways. 132 Cong. Rec. S16919 (daily ed. Oct. 17, 1986) (statement of Sen. John C. Danforth). To operate certain

large vehicles, individuals are required to obtain one (and only one) CDL, 49 U.S.C. § 31302, and to notify their employers of any driving violations, *id.* § 31303(a). Employers are prohibited from using drivers they know (or reasonably should know) are not properly credentialed. *Id.* § 31304. The Secretary of Transportation is required to prescribe "minimum standards for testing and ensuring the fitness of" a commercial driver, *id.* § 31305(a), and to establish an alcohol-and-drug testing program, *id.* § 31306. And, as a condition of receiving certain federal highway funds, States must enforce the standards set by the Secretary. *Id.* § 31311(a)(1).

Then, 13 years later—observing that the "rate, number, and severity of crashes involving motor carriers in the United States" remained "unacceptable," *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*, 41 F.4th 586, 588 (D.C. Cir. 2022) (quoting Motor Carrier Safety Improvement Act of 1999, Pub. L. No. 106-159, § 3(1), 113 Stat. 1748, 1749)—Congress "establish[ed] a Federal Motor Carrier Safety Administration in the Department of Transportation" in order "to improve the administration of the Federal motor carrier safety program." Motor Carrier Safety Improvement Act of 1999, § 4(1), 113 Stat. at 1749. To that end, Congress charged FMCSA with "consider[ing] the assignment and

maintenance of safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in motor carrier transportation." 49 U.S.C. § 113(b). Today, FMCSA exercises the Secretary's delegated statutory authority to set and enforce minimum standards for CDL issuance by States. *Id.* § 113(f); 49 C.F.R. § 1.87.

Under this legislative scheme, as a general matter, States may issue CDLs only to their domiciliaries. 49 U.S.C. § 31311(a)(12)(A). The Safety Act, however, also permits the Secretary to prescribe the conditions under which a non-domiciliary may obtain a CDL from a State. *Id.* § 31311(a)(12)(B)(ii). Under that authority, FMCSA promulgated a rule in 2011 creating the category of "non-domiciled commercial driver's license" for applicants domiciled outside the United States or in a State that does not issue CDLs. *Commercial Driver's License Testing and Commercial Learner's Permit Standards*, 76 Fed. Reg. 26,854, 26,878 (May 9, 2011). Currently, all States issue CDLs; thus, non-domiciled CDLs are issued almost entirely to aliens domiciled outside the United States.

Eligibility for a non-domiciled CDL does not extend to domiciliaries of Canada and Mexico because FMCSA "has … determined that the

commercial motor vehicle operator testing and licensing standards of [those] jurisdiction[s] meet" FMCSA's own standards. 49 C.F.R. § 383.71(f)(1)(i); *see also id.* § 383.23 & n.1. In other words, because a domiciliary of Mexico or Canada may obtain a CDL in those countries under standards that substantially mirror our own, she must do so rather than seeking a CDL from a U.S. State.

The substantive requirements for non-domiciled and domiciled CDLs are largely identical. *See generally* 49 C.F.R. § 383.71 (prescribing criteria for U.S.-domiciled and non-domiciled applicants); *id.* § 383.73 (mandating state procedures for issuing CDLs, U.S.-domiciled and non-domiciled alike). This includes a requirement that States obtain the "complete driving record" of the applicant from any "State[] where the applicant was previously licensed over the last 10 years." *Id.* § 383.73(b)(3)(iv). FMCSA described States' inability to access a single, reliable driving record for applicants as a "major area[] of concern" to be addressed in early versions of minimum standards promulgated under the Safety Act. *Commercial Driver's Licensing Standards*, 52 Fed. Reg. 20,574, 20,576 (June 1, 1987). States are also required by law to check other databases bearing on driver history—namely, the Problem Driver Pointer System (which tracks suspensions,

revocations, and traffic-related convictions); Drug and Alcohol Clearinghouse; and Commercial Driver's License Information System—before issuing a CDL. 49 C.F.R. § 383.73(b)(3)(ii), (iii), (b)(10).

The requirement to check an applicant's driving history is, however, of limited effect for individuals domiciled outside the United States. Many such applicants—including those present on parole or as asylees—will have little domestic driving history, if any, and virtually all their relevant driving history would be found abroad. States lack the means to obtain formally an applicant's foreign driving history, so that information is unavailable when assessing driver fitness. *See Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 91 Fed. Reg. 7044, 7048-49 (Feb. 13, 2026).

2. FMCSA undertakes annual "review[s] to determine whether" each "State meets the general requirement for substantial compliance" with the Safety Act and its implementing regulations. 49 C.F.R. § 384.307(a). In 2025, FMCSA's State-by-State reviews revealed "systemic procedural and computer programming errors, significant problems with staff training and quality assurance, and policies that lack[ed] sufficient management controls." 91 Fed. Reg. at 7063. FMCSA also observed that States had significant

difficulty assessing aliens' eligibility for non-domiciled CDLs using EADs issued by United States Citizenship and Immigration Services (USCIS). For example, clerks at state driver's licensing agencies regularly had difficulty distinguishing between EAD "codes" that indicated an individual's basis for presence in the United States and thus would frequently issue non-domiciled CDLs to ineligible individuals. *Id.* at 7052. In addition, States routinely issued or renewed CDLs using expired EADs presented with other USCIS forms indicating an applicant had sought (but not necessarily received) an extension or renewal of work authorization, resulting in many licenses being issued without valid documentation. *Id.* And States commonly issued non-domiciled CDLs with expiration dates exceeding the applicant's authorized period of lawful presence. *Id.* at 7045, 7063. All told, FMCSA "identified more than 30 States that failed to comply with the non-domiciled … CDL regulations," *id.* at 7051; *see also List of States FMCSA Determined Were in Substantial Noncompliance*, Regulations.gov, https://perma.cc/JZJ8-G8NT, resulting in "tens of thousands non-domiciled CDLs" issued inconsistent with federal law, 91 Fed. Reg. at 7045. New York and Texas, for example, "demonstrated staggering error rates of 53 and 49 percent respectively." *Id.*

Further, FMCSA identified at least 17 fatal accidents involving 30 deaths where it could reasonably be determined that non-domiciled CDL holders were at fault in 2025. 91 Fed. Reg. at 7065-67. After consultation with USCIS, FMCSA determined that those non-domiciled CDL holders likely would not have been eligible for CDLs under the Rule under review. *Id.*

3. FMCSA highlighted these concerns in promulgating an interim final rule on September 29, 2025, with immediate effect, while inviting public comment. *See Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*, 90 Fed. Reg. 46,509 (Sep. 29, 2025). This Court stayed the interim final rule pending review on November 13, 2025. Order, *Lujan v. Federal Motor Carrier Safety Admin.*, No. 25-1215 (D.C. Cir. Nov. 13, 2025) (per curiam). Subsequently, FMCSA published a final rule that addresses comments received during the notice-and-comment process and provides substantially greater explanation of FMCSA's regulatory changes, superseding the interim final rule. The Rule took effect on March 16. 91 Fed. Reg. at 7044.

Previously, many aliens domiciled outside the United States who possessed an unexpired EAD issued by USCIS were eligible to obtain a

CDL, despite the States' inability to obtain that individual's foreign driving history. 49 C.F.R. § 383.71(f)(2)(i) (2021). The Rule explains that the absence of driving history information "severely limits the effectiveness of [the] vetting processes" States are ordinarily required to conduct for CDL applicants because "a driver's historical performance, whether measured through crashes, violations, or observable risky behaviors, provides a robust basis for predicting future safety outcomes on the road," 91 Fed. Reg. at 7048-49.

To address this concern, the Rule limits non-domiciled CDL eligibility to individuals maintaining lawful status in H–2A, H–2B, and E–2 employment-based nonimmigrant categories. 49 C.F.R. §§ 383.5, 383.71(f)(3)(i)(B). The Rule explains that as a "functional proxy for" driving-history verification by States, 91 Fed. Reg. at 7044, aliens in these categories undergo "federal vetting processes … including consular screening, labor certification requirements, and employer verification" that "provide[] sufficient assurance of driver fitness to mitigate the safety gap created by [States'] inability to access and verify the foreign driving records," *id.* at 7049-50. The Department of State confirmed that consular adjudication of visa status for the eligible categories includes an "assess[ment of] certain

factors relevant to both visa eligibility and [commercial motor vehicle] driver fitness, including … driving history, occupational qualifications, and English language proficiency." *Id.* at 7050. Additionally, consular adjudication "generally include[s] requests for 10 years of driving history, past traffic violations, license suspensions and revocations, and other similar records," *id.* at 7060, aligning with the 10-year domestic driving history States must consult, 49 C.F.R. § 383.73(b)(3)(iv). In turn, employers sponsoring aliens for H–2A and H–2B visas are required "to list the qualifications necessary for the position, which for [commercial motor vehicle]-related positions typically include[] driving experience, clean driving records, and English proficiency." 91 Fed. Reg. at 7050.

Additionally, because it can take 75 days or more to sponsor a replacement for an H–2A or H–2B visa holder who becomes ineligible, employers have strong incentives to exercise diligence when screening individuals sponsored for those visas. *See* 91 Fed. Reg. at 7050; *see also* 90 Fed. Reg. at 46,516 & n.25. Finally, eligible visa holders "are subject to ongoing federal oversight through multiple agencies … via the nonimmigrant status and visa renewal processes, creating multiple points of verification and accountability." 91 Fed. Reg. at 7050. For example, the Department of State

"constantly reviews available information on current U.S. visa holders, and revokes visas when there is an indication of a potential ineligibility or in other situations where warranted." *Id.*

Under the Rule, a non-domiciled alien must demonstrate his eligibility to obtain a CDL by means of an unexpired foreign passport and an I–94 form showing the alien's lawful status in one of the three eligible visa categories. 49 C.F.R. §§ 383.5, 383.73(f)(2)(iv). It is no longer permissible, in other words, for a CDL applicant to demonstrate eligibility by means of an EAD because, as FMCSA explained, the agency "has seen that States have had extreme difficulty appropriately issuing non-domiciled … CDLs based on EADs." 91 Fed. Reg. at 7052; *see supra* pp. 8-9 (detailing clerks' struggles to properly interpret codes shown on, and the validity of, EADs).

Under the regulations previously in effect, a DACA recipient could obtain a non-domiciled CDL if DHS had granted the applicant work authorization. *See* 49 C.F.R. § 383.71(f)(2)(i) (2021) (permitting a non-domiciled CDL to issue upon, *inter alia*, the applicant's presentation of an EAD); 8 C.F.R. § 236.23(a)(4) ("Related work authorization … , if approved in DHS's discretion, will be issued, subject to DHS's discretion, for the period of the associated grant of Deferred Action for Childhood Arrivals

[(DACA)]."); *id.* § 274a.12(c)(33). In 2023, FMCSA exercised its enforcement discretion to include DACA recipients from Mexico and Canada among those eligible for a non-domiciled CDL, 91 Fed. Reg. at 7055; FMCSA, *2023 Guidance on Non-Domiciled CDL Issuance to DACA Recipients from Mexico*, https://perma.cc/BEU6-3YV7, even though Mexican and Canadian DACA recipients ordinarily would have been ineligible due to the categorical bar on CDL issuance to domiciliaries of those countries, *see supra* pp. 6-7 (describing 49 C.F.R. § 383.71(f)(1)(i) and 49 C.F.R. § 383.23 n.1).

FMCSA explained that the shift from using EADs to using I–94s would result in excluding DACA recipients from eligibility for non-domiciled CDLs because "DACA recipients are reliant on EADs and are therefore limited by the significant problems associated with that document in the non-domiciled licensing process." 91 Fed. Reg. at 7055. Because front-line clerks at state driver's licensing agencies could not reliably ascertain eligibility for a non-domiciled CDL based on an EAD, *see supra* pp. 8-9, grandfathering in DACA recipients would simply "continue the confusion surrounding EADs from the pre-[interim final rule (IFR)] regulations and create the same problems with the improper issuance of non-domiciled [commercial learner's

permits (CLPs)] and CDLs that the IFR and this final rule … sought to address." 91 Fed. Reg. at 7055.

4. Petitioners, who are two non-domiciled CDL holders, two unions representing other drivers, and one county in Washington State, petitioned for review of the Rule on February 12 and March 4. Soon thereafter, petitioners moved for a stay pending review.

A divided panel of the Court denied a stay on May 5 based on petitioners' failure to show a likelihood of success on their claims that the Rule exceeded FMCSA's statutory authority or was arbitrary or capricious. With respect to the statutory authority claim, the panel observed that the agency possesses twin authorities to "prescribe regulations on minimum uniform standards for the issuance of commercial drivers' licenses" and to "prescribe[]" further "regulations" governing non-domiciled CDLs specifically, Stay Op. 5-6 (first quoting 49 U.S.C. § 31308; and then quoting *id.* § 31311(a)(12)(B)), and that there was "no implication" in the statutory text "that the standards" promulgated by the agency "cannot address other safety concerns" than those enumerated in the Safety Act, including the driving histories of non-domiciliaries, *id.*

With respect to petitioners' arbitrary-and-capricious claims, the stay panel determined it was likely reasonable for FMCSA to have denied CDL eligibility to non-domiciliary aliens given their generally inaccessible driving histories, while preserving eligibility for a limited class of visa holders for whom alternative vetting would provide sufficient assurances of driving safety. Stay Op. 6-7. Furthermore, the panel concluded that the Rule's exclusion of DACA recipients was likely reasonable as well, given that those individuals generally do not possess I–94 forms and in light of the state-level difficulties in using EADs instead of I–94 forms to verify eligibility. Stay Op. 8-9. Finally, the panel held that FMCSA had likely adequately addressed the reliance interests of parties affected by the Rule, particularly in light of the "considerable flexibility" afforded to it by the APA. Stay Op. 9 (quoting *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32 (2020)).

## SUMMARY OF ARGUMENT

As relevant here, the Rule effects two changes: it removes CDL eligibility for all non-domiciled aliens except those holding H–2A, H–2B, and E–2 visas, and it eliminates the use of EADs to establish that eligibility. These changes are justified, in turn, by four straightforward facts. First,

driving history is highly probative of future driving safety. Second, foreign driving history is impossible for domestic licensing agencies to obtain. Third, alternative vetting and oversight mechanisms applicable exclusively to the three visa categories listed, taken in conjunction, provide an adequate alternative for a driving-history check. And fourth, States' track record of interpreting EADs—including in conjunction with other federal immigration-related documents—poses insurmountable obstacles to their continued use.

I. Merely to recite the foregoing makes plain that the Rule is a permissible exercise of FMCSA's authorities to "prescribe regulations on minimum uniform standards for the issuance of commercial drivers' licenses," 49 U.S.C. § 31308, including "for … ensuring the fitness of an individual operating a commercial motor vehicle," *id.* § 31305(a), and the agency's (unrestricted) power to set the conditions under which non-domiciled CDLs may be issued, *id.* § 31311(a)(12)(B). To avoid that conclusion, petitioners attempt to impose atextual limitations on FMCSA's regulatory authorities. Those attempts are unconvincing, not least because the statutory text is unambiguous.

II. FMCSA rationally exercised those statutory authorities when it adopted the Rule. There existed ample evidence of the factual premises described above—*i.e.*, that foreign driving history is relevant but unobtainable, that alternative vetting and oversight suffices to replace such history for H–2A, H–2B, and E–2 visa holders, and that EADs are not a reliable means of verifying current lawful status—and FMCSA reasonably responded to that body of evidence through the Rule's eligibility and documentation provisions.

Petitioners' disagreement is largely grounded in a characterization of the Rule as based on a rationale the agency never espoused; to wit, that aliens are inherently less safe drivers. That is not, and never has been, the agency's justification. Elsewhere, petitioners nitpick individual aspects of the reasons the agency gave, or else insist that these circumstances demand a different regulatory intervention. But none of those quibbles rises to the level of showing unreasoned agency action. The petitions for review should be denied.

**STANDARD OF REVIEW**

This Court analyzes petitioners' challenges to the Final Rule under "the familiar standards set forth in the [Administrative Procedure Act

(APA)]." *BNSF Ry. Co. v. U.S. Dep't of Transp.*, 566 F.3d 200, 203 (D.C. Cir. 2009). Under that framework, questions of law, including the agency's statutory authority to act, are subject to de novo judicial review. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024). When an agency exercises delegated authority, in turn, the Court asks only whether the resulting decision was "reasonable and reasonably explained." *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*, 41 F.4th 586, 595 (D.C. Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)); *see Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025) (explaining that an agency determination be upheld if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (alterations in original) (quotation omitted)).

## ARGUMENT

### I. The Rule Is A Valid Exercise Of FMCSA's Statutory Authority.

A. FMCSA is broadly empowered to "prescribe regulations on minimum uniform standards for the issuance of" CDLs to all applicants, domiciliaries and non-domiciliaries alike, 49 U.S.C. § 31308, including

"minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle," *id.* § 31305(a). In addition, although the general statutory default is that States may only issue CDLs to individuals "domiciled in the State," *id.* § 31311(a)(12)(A), Congress has provided an exception for issuing CDLs to non-domiciliaries subject to "regulations prescribed by the Secretary," *id.* § 31311(a)(12)(B). *See* Stay Op. 6 (noting that § 31311(a)(12)(B) "by its terms grants the FMCSA the power to promulgate rules with regard to non-domiciled applicants"). When promulgating regulations under these statutory authorities, as with discharging all the responsibilities Congress has entrusted to it, FMCSA must "consider the assignment and maintenance of safety as the highest priority." *Id.* § 113(b).

The Rule's provision limiting eligibility for non-domiciled CDLs to H–2A, H–2B, and E–2 visa holders fits comfortably within the foregoing authorities. From the beginning of federal oversight of CDL issuance, a CDL applicant's driving history has been considered a critical indicator of safety, as the States' inability to access a single, reliable driving record for applicants was recognized as a "major area[] of concern." 52 Fed. Reg. at 20,576; *see also* 49 U.S.C. § 31311(a)(6) (imposing a statutory obligation on

States to consult a CDL applicant's driving history); 49 C.F.R. § 383.73(b)(3)(iv) (requiring a State to obtain an applicant's "complete driving record" from any "State[] where the applicant was previously licensed over the past 10 years"). An applicant's driving history is crucial because, as FMCSA explained, multiple studies conducted over decades have demonstrated that "a driver's historical performance, whether measured through crashes, violations, or observable risky behaviors, provides a robust basis for predicting future safety outcomes on the road." 91 Fed. Reg. at 7048-49; *see id.* at 7098-99 (describing study showing reckless driving citations translating to 325% higher risk of future crashes). For example, an FMCSA literature review found that "drivers with prior crash involvement" were "87 percent more likely to be involved in a future crash," *id.* at 7048, while an industry study repeated on multiple occasions over the last two decades found that "reckless driving violations and past crashes" are among the "top five stable predictors of crash risk," *id.*

Despite the evident importance of an applicant's driving record to future driving performance, it is impossible for States to review the foreign driving histories of many non-domiciled CDL applicants because those records are inaccessible to state driver's licensing agencies, unlike the

histories of U.S.-domiciled applicants. At the baseline, "States do not have access to foreign nations' systems" for tracking driving history. 91 Fed. Reg. at 7049. Nor do States have access to the relevant information through systems maintained and updated domestically. None of those databases—the Commercial Driver's License Information System, the Problem Driver Pointer System, and the Drug & Alcohol Clearinghouse—is updated with information from foreign countries. *Id.* Consequently, "nondomiciled applicants have" as a group "been subject to a lower level of scrutiny in the … CDL application process than U.S.-domiciled individuals." *Id.* at 7048. That lower level of scrutiny, in turn, "effectively shielded unsafe driving behaviors"—"such as[] driving a motor vehicle … while under the influence of alcohol or a controlled substance, leaving the scene of an accident, … reckless driving, [or] causing a fatality through negligent operation of a CMV"—"that would have disqualified these drivers from obtaining a … CDL, simply because they occurred outside the review of FMCSA or" State licensing agencies. *Id.* at 7049.

Taken together, these two realities of the commercial driving landscape—the importance of driving history and the inaccessibility of foreign driving records—created, in FMCSA's view, a "significant safety

gap" that put highway users at heightened risk of collisions with unvetted dangerous drivers. 91 Fed. Reg. at 7048; *see also id.* at 7065 (describing States' inability to verify foreign driver histories as a "critical safety vulnerability"). The agency also determined, however, that that gap was meaningfully bridged for three classes of nonimmigrant visa holders—holders of H–2A, H–2B, and E–2 visas—because individuals in those categories "undergo enhanced consular vetting and interagency screening which serves as a functional proxy for driver history vetting by" state agencies, *id.* at 7044, in conjunction with the fact that their employers have strong incentives to vet their employees (*i.e.*, the non-domiciliary CDL holders) with particular rigor, *id.* at 7054.

In sum, the Rule's eligibility provision reflects FMCSA's assessment that the risk of issuing CDLs to non-domiciliary aliens is too high because of the general inaccessibility of their driving records, but that that risk is acceptably mitigated by alternative vetting and assurance mechanisms applicable exclusively to H–2A, H–2B, and E–2 visa holders. The provision is thus a permissible exercise of the agency's authority to prescribe regulations governing non-domiciled CDL issuance in furtherance of highway safety.

B. Petitioners do not dispute that driving history is a crucial predictor of future safety outcomes or that foreign driving records are generally inaccessible to licensing agencies in the United States.[1] They nevertheless argue that the Rule exceeds FMCSA's statutory authority because it regulates on the basis of classes of visa holders, and because FMCSA is purportedly barred from "mak[ing] categorical judgments" in promulgating CDL regulations. King County Br. 25. Not so.

Most glaringly, the cited provisions themselves contain no limitation to "individualized assessments of driver and vehicle safety." King County Br. 26. In fact, FMCSA's authority to "prescribe[]" "regulations" under which a State may issue non-domiciled CDLs is not subject to any textual limitation on how those regulations differentiate between and among applicants. 49 U.S.C. § 31311(a)(12)(B); *see* Stay Op. 6 ("The excepting clause by its terms grants the FMCSA the power to promulgate rules with regard to nondomiciled applicants. And nothing in the statute prevents those rules from addressing applicants' driving records."). Nor do the provisions authorizing FMCSA to "prescribe regulations on minimum uniform

[1] Each group of petitioners has incorporated the other's arguments in full. King County Br. 43; Lujan Br. 24, 45 n.46. Accordingly, this brief refers in text to "petitioners'" arguments, without distinction.

standards for the issuance of commercial drivers' licenses," 49 U.S.C. § 31308, and to "prescribe regulations on minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle," *id.* § 31305(a), speak to whether those regulations must classify on an individual or categorical basis. Because the law's text is plain, the Court should refuse petitioners' "attempt[] to graft [an] atextual gloss[]" on it.[2] *Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 525 (D.C. Cir. 2015).

The statutory context does not suggest such a limitation, either. Petitioners contend that because Congress "specif[ied] … discrete commands involving individualized safety standards," King County Br. 27, it must be true that FMCSA may not regulate according to classes of applicants. *See also id.* at 28 (referring to "testing individual driver safety"); *id.* at 29 ("each individual applicant's qualifications to drive a commercial

[2] For the same reason, petitioners' discussion of legislative history, King County Br. 36-39—not only of the laws cited here, but also of bills that have not even passed the chamber in which they were introduced, *id.* at 42 (citing H.R. 5688, 119th Cong. (2025))—misses the mark by an even wider margin. *See FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1558-59 (2026) ("[S]tatutory interpretation must … be driven by 'analysis of the statute' rather than 'psychoanalysis of Congress.' (quoting *United States v. Public Utils. Comm'n of Cal.*, 345 U.S. 295, 319 (1953) (Jackson, J., concurring))).

vehicle"). But the salient point regarding "individuals" is merely that Congress sought to ensure that each individual who obtains a CDL is "fit[]" to do so, 49 U.S.C. § 31305(a)—not that FMCSA is prohibited from looking to characteristics generally shared by individuals in the same group. Once again, the plain text of the relevant statutes contains no indication that where a group shares such a characteristic—here, generally inaccessible driving records—FMCSA may not act to exclude that group from eligibility when prescribing "minimum standards" for CDL fitness. Rather, if anything, the statutory context favors FMCSA—for Congress authorized issuance of non-domiciled CDLs only on terms FMCSA might set, *see id.* § 31311(a)(12)(B), implicitly recognizing that non-domiciled applicants raise unique considerations as a class.

Despite insisting that FMCSA's authority to regulate non-domiciled CDL issuance does not extend to categorical eligibility rules, petitioners concede that some categorical rules—like a minimum age requirement or a "bar to persons who have committed past bad acts or driven under the influence"—might indeed be appropriate. King County Br. 31. That concession dooms petitioners' argument, because non-domiciliary status, like age, entails categorical safety-related ramifications. The point is not that

non-domiciliaries are inherently riskier drivers. *Cf. id.* (alleging that FMCSA espoused a "population[-]level correlation between immigration status and driving safety"). As the stay panel recognized, the Rule's "safety rationale does not rest on that premise," Stay Op. 6; instead, it rests on States' "inability to obtain driver history for non-domiciled applicants," which may—absent alternative assurances of safety—result in "individuals with potentially poor safety records or permanently disqualifying convictions … obtain[ing] non-domiciled CDLs," thereby "placing all roadway users at risk." 91 Fed. Reg. at 7049, 7089.

Petitioners' remaining statutory-authority arguments also lack merit. Petitioners' supposition that Congress did not "give the agency free-ranging authority to regulate with respect to driver[] history," King County Br. 33, misses the point—Congress plainly *did* authorize FMCSA to establish minimum safety standards for CDL applicants, *see supra* pp. 19-23, and that authorization does not exclude categorical assessments of driving history where relevant, Stay Op. 6 ("[N]othing in the statute prevents those rules from addressing applicants' driving records."). Likewise, the statute does not restrict FMCSA to considering only particular types of safety-related considerations, *cf.* King County Br. 27; to the contrary, Congress has granted

the agency broad authority "to address safety," *id.*, without respect to the manner in which safety concerns might best be addressed. As the stay panel recognized, the statutory directive that FMCSA's standards must "'require at a minimum' that CDL applicants pass certain tests and complete certain training, supports no implication that the standards cannot address other safety concerns as well." Stay Op. 5 (quoting 49 U.S.C. § 31308(1)). Nor does any provision of federal law prohibit interagency consultation of the type petitioners consider problematic. King County Br. 34-35. Furthermore, even assuming petitioners' musings (*id.*) about the "cooperative federalism" Congress purportedly enshrined in this legislation bear weight, *but see* *Stovic v. Railroad Ret. Bd.*, 826 F.3d 500, 505 (D.C. Cir. 2016) ("[V]ague notions of a statute's 'basic purpose' are inadequate to overcome the words of its text regarding the *specific* issue under consideration." (quoting *Montanile v. Board of Trs. of the Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 150 (2016))), the Rule does not disserve a federalist scheme. The States remain responsible for implementing the Rule, just as they do other CDL eligibility standards.[3] And finally, the Rule does not conflict with

[3] Similarly, FMCSA complied with any obligation it had to "consult the States" here. King County Br. 34; *see* JA__ (FMCSA-2025-0622-7885) (soliciting States' views on the interim final rule).

any identified provision of the Immigration and Nationality Act—for the fact that States must now issue CDLs only to non-domiciliary aliens in three visa-holding categories in no way affects an employer's obligation to "verify the employment authorization status of prospective employees." King County Br. 36 (quoting *Arizona v. United States*, 567 U.S. 387, 404 (2012)).

## II. The Rule Is Neither Arbitrary Nor Capricious.

FMCSA reasonably exercised the statutory authorities described above when it promulgated, in the Rule, two distinct provisions challenged here. One provision restricts non-domiciled CDL eligibility to H–2A, H–2B, and E–2 visa holders. 91 Fed. Reg. at 7044-45. The other alters the documentation required to demonstrate eligibility for a non-domiciled CDL, requiring that individuals show an unexpired passport and I–94 form to demonstrate their eligibility. *Id.* at 7045. Those different provisions rest, in turn, on different rationales. The eligibility provision is based on the fact that States are generally unable to obtain driving histories for foreign-domiciled applicants, while creating an exception for categories of visa holders for which FMCSA has determined that alternative vetting mechanisms provide a "functional proxy." 91 Fed. Reg. at 7050. The documentation provision, by contrast, is a reaction by FMCSA to large-scale

problems identified in recent reviews of state compliance with federal regulations, which revealed that States systematically struggled to use EADs—the documentation previously accepted as sufficient—in a uniform manner.

In large part, petitioners' arguments that the agency acted arbitrarily misstate the reason the agency acted or confuse one provision's rationale for the other's. Those arguments are meritless. With respect to the eligibility provision, the Rule does not rest on an assessment that alien drivers are categorically less safe than other drivers, but instead on the uncontested premise that States have no means of accessing their foreign driving history. Similarly, petitioners' focus on DACA recipients largely ignores FMCSA's explanation that their ineligibility for non-domiciled CDLs stems not from a claim about the accessibility of their driving history, but instead because DACA recipients lack the documentation FMCSA has determined should be required to demonstrate eligibility for a non-domiciled CDL. And as to that documentation requirement, petitioners have no meaningful response to FMCSA's extensive evidence of the States' difficulties in using EADs in issuing compliant non-domiciled CDLs. Petitioners' other arguments—which focus largely on factual disagreements with FMCSA's

determinations—likewise fail, as the record evidence provides ample basis for FMCSA's determinations.

### A. FMCSA Reasonably Restricted CDL Eligibility Based On Vetting Concerns.

1. FMCSA documented and analyzed considerable evidence of the "safety gap" that prompted it to limit non-domiciliary aliens' eligibility to obtain CDLs. The agency relied on several statistical analyses that clearly demonstrate the relevance of prior driving performance to future driving safety. 91 Fed. Reg. at 7048-49. FMCSA also documented state driver's licensing agencies' general inability to obtain foreign driving histories—*i.e.*, essential indicators of an applicant's prior driving performance—for non-domiciliary aliens. *Id.* at 7049. After examining this evidence, FMCSA explained that it was promulgating the eligibility provision to advance highway safety. *E.g.*, *id.* at 7051 ("[T]he agency strikes the most reasonable balance: allowing non-domiciled drivers who have been federally vetted through multiple federal screening processes to obtain licensure while ensuring the exclusion of individuals with unknown driver histories who could have unsafe driving histories that would otherwise disqualify them from obtaining a CDL or would pose a significant safety risk on America's roadways."). That conclusion easily satisfies the "narrow" standard of

arbitrary-and-capricious review. *New Mexico Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 148 F.4th 755, 764 (D.C. Cir. 2025) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

2. a. Petitioners' arguments rest primarily on a misunderstanding of the rationale for the eligibility provision. FMCSA has never claimed that "immigrant drivers excluded by the Rule pose a safety concern" simply by virtue of being foreigners. Lujan Br. 26. In fact, FMCSA explained that it could not draw reliable conclusions on comparative safety performance as between domiciliary and non-domiciliary CDL holders because the agency's crash-data systems lacked the information necessary to do so. *See* 91 Fed. Reg. at 7067; *see also id.* at 7065 (describing "extraordinary limitations in obtaining exhaustive crash data for non-domiciled CDL holders" and explaining that "neither the Motor Carrier Management Information System (MCMIS), nor the Fatality Analysis Reporting System (FARS), nor the Commercial Driver's License Information System … allow[s] FMCSA to ascertain whether the driver's CDL was, or should have been, designated as non-domiciled"); *id.* at 7071 ("Producing the data the commenters seek is not possible with currently available tools[.]").

Petitioners' suggestion that FMCSA overlooked evidence that non-domiciliary aliens are in fact safer drivers than U.S. drivers, Lujan Br. 30-31, has no grounding in the evidence petitioners cite. Petitioners' lead source, a comment letter from the Oregon Department of Transportation, is neither a detailed study nor definitive on the point: "It *might be* that holders of non-domicile[d] CDLs perform better, or comparably, in rates of crashes, serious injury crashes, and/or fatal crashes." JA__ (FMCSA-2025-0622-7550, at 2) (emphasis added). Nor did Oregon include the underlying data on which it based that statement (or its analysis thereof), leaving FMCSA without the ability to verify Oregon's conclusions or how the State arrived at them. *See* 91 Fed. Reg. at 7071. And even if Oregon had provided that data, the resulting comparison would be of limited utility. Oregon claimed to have examined six years of its own data concerning fatal crashes "involving Oregon[-]licensed drivers." JA__ (FMCSA-2025-0622-7550, at 2). In other words, Oregon's data apparently would not capture non-fatal crashes, would not capture crashes involving two drivers licensed outside Oregon, and would in any event provide a window into only one of 50 States—a single State whose non-domiciled CDL issuance accounts for approximately 0.6% of such credentials that are currently active. *See* JA__ (FMCSA-2025-0622-8095, at

4) ("Oregon has issued 1,426 non-domiciled CLPs or CDLs that remain unexpired"); 91 Fed. Reg. at 7095 (estimating a present combined total of 220,000 non-domiciled CDLs and CLPs). Petitioners' citation to a Canadian study is similarly off-base, *see* Lujan Br. 31, for that study—published 15 years ago—looked only at medical (not driving) records from a single Canadian province concerning "serious" crashes that involved immigrant drivers who were eligible to hold non-commercial licenses. Donald A. Redelmeier et al., *Roadway Crash Risks in Recent Immigrants*, 43 Accident Analysis & Prevention 2128, 2128 (2011). Finally, the comments petitioners highlight from Maryland and Delaware did not offer data of their own. They merely informed the agency that those two States were similarly situated to the agency itself: that is, not in possession of useful comparative data. *See* Lujan Br. 30-31, 31 n.25. It was thus entirely reasonable for FMCSA to explain that "commenters ha[d] not provided alternative comprehensive sources of data that FMCSA could consider or rely on for the type of [comparative] analysis requested by commenters." 91 Fed. Reg. at 7071.

FMCSA repeatedly made clear that it justified the Rule on a different basis—the verifiability of an applicant's driving record—not immigrant status *per se*. 91 Fed. Reg. at 7048 ("[N]on-domiciled CLPs and CDLs have

been issued to individuals whose safety fitness cannot be adequately verified … .”); *id.* (“[N]ondomiciled applicants have been subject to a lower level of scrutiny in the CLP and CDL application process than U.S.-domiciled individuals due to the severe limits on vetting their driving history.”); *id.* at 7060 (“[I]mmigration status does have a relation to traffic safety *insofar as the status affects FMCSA's ability to ensure the safety fitness of the drivers classified in that status*.” (emphasis added)); *id.* (“The limitation of eligibility to H–2A, H–2B, and E–2 statuses is therefore not based on the status itself, but on the existence of a parallel Federal vetting regime that mitigates the safety gap and thereby resolves the bifurcated standard and fulfills FMCSA's statutory mandate.”). As the stay panel recognized, the Rule thus “does not rest” on the premise that foreign domiciliaries are inherently more dangerous drivers but “seeks instead to ensure that their vetting is no less rigorous than that of drivers domiciled in the United States,” Stay Op. 6, and thereby to restore a “critical layer of defense in accident prevention,” 91 Fed. Reg. at 7067.

Petitioners' focus on the 17 fatal collisions the agency cited in the Rule, all of which involved individuals who would likely be ineligible under the new criteria, is therefore misplaced. Lujan Br. 26-32 (discussing 91 Fed. Reg. at

7065-67); *see also* 90 Fed. Reg. at 46,512-13. Again, FMCSA did not cite those incidents to establish that "the people ineligible under the Rule are less safe [drivers]," *cf.* Lujan Br. 27-28, it instead sought to provide an "illustrative sample of the risks this regulatory action aims to mitigate and the crashes that would be prevented by FMCSA fulfilling its statutory obligation to ensure the fitness of all drivers who operate a" commercial motor vehicle. 91 Fed. Reg. at 7065; *id.* ("This sample of crashes was not intended to be exhaustive or to provide the basis for a statistical analysis; rather, it was merely a discussion of crashes that had come to the agency's attention and, when combined with the widespread systemic collapse of non-domiciled issuance by [state licensing agencies], warranted immediate action."); *see* Stay Op. 6 ("[T]he agency has now clarified that the anecdotes are merely 'illustrative.'" (quoting 91 Fed. Reg. at 7065)). By extension, it is beside the point what proportion of all collisions those 17 examples represent, Lujan Br. 28-29, or whether driver inexperience may have played a role in one or more of the 17, Lujan Br. 29.

Petitioners' only direct response to the rationale FMCSA actually relied on in promulgating the Rule is to fault the agency for "cit[ing] no factual evidence that the people it now excludes from commercial driving

exhibited 'unsafe driving behaviors' in other countries." Lujan Br. 39 (emphasis and citation omitted). The critique is an ironic one, for the very reason the agency promulgated the Rule is its inability to obtain "evidence" of "unsafe driving behaviors"—in other words, driving records—from "other countries." But more to the point, the APA did not obligate FMCSA "to conduct or commission [its] own empirical or statistical studies" before regulating, despite the data-availability limitations it faced. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021). Rather, "[i]n the face of 'serious uncertainties,'" FMCSA was free to assess the appropriate margin of safety the regulations should adopt, so long as it "explain[ed] the evidence which is available, and offer[ed] a rational connection between the facts found and the choice made." *North Carolina v. FERC*, 112 F.3d 1175, 1190 (D.C. Cir. 1997) (alteration and quotation omitted). FMCSA did so here, by adopting the entirely reasonable position—shared by Congress, 49 U.S.C. § 31311(a)(6), and buttressed by ample evidence, 91 Fed. Reg. at 7048-49—that individuals with verified driving histories pose a lower risk of collisions than do those with unknown histories, because those with unknown histories may have poor driving records known to indicate a significantly greater risk of future crash involvement. *See id.* at 7098-99.

Petitioners also contend that FMCSA should not have promulgated the Rule because its harms purportedly outweigh its benefits. Lujan Br. 32-37. But the appropriate balance falls to the agency, not to petitioners, to strike. *See Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025) ("[R]eviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency."). And petitioners cannot establish that the agency ignored the evidence they think undercuts the Rule, at any rate.

Petitioners' chief contention is that the eligibility provision will reduce the number of experienced commercial drivers, leading to the entry of less experienced drivers into the industry, additional strain on the drivers who remain, and an impairment to communities that rely on services provided by CDL holders. Lujan Br. 32-37. FMCSA explained why it found those arguments unavailing, however—in particular, because carriers were "struggling with excess capacity" amid a "freight recession [that] began in 2022" and continues now, 91 Fed. Reg. at 7097-98; *see also id.* at 7079 ("FMCSA disagrees that this rule would result in less qualified or inexperienced drivers taking to the road. … [T]here are experienced drivers that have been sidelined or working at a reduced capacity during the ongoing

freight recession who are ready and willing to come back into the market or increase their workload (*e.g.,* decrease deadhead miles or increase hours within the [hours-of-service] regulations)."); *id.* at 7098 (citing 2024 letter from transportation and logistics company JB Hunt stating that "more than 30 months into this unprecedented freight recession marked by too much industry capacity, we continue to be challenged . . . across our organization").

Petitioners respond that "[t]he record shows persistent shortages of truck drivers," meaning that FMCSA wrongly concluded "that experienced CDL drivers will pick up the slack when nearly 200,000 drivers lose their licenses." Lujan Br. 34. But petitioners do not acknowledge that the Rule's entry into effect did not immediately strip licenses from current non-domiciled CDL holders. Instead, existing CDL holders may continue to operate their vehicles until their current credentials expire—a period of "up to five years," 91 Fed. Reg. at 7096-97—so that the Rule's effects will be felt over time. And FMCSA explained that during that period, "the market will respond to this change in capacity as it has in the past, with drivers and carriers responding to market signals and ensuring that freight is delivered." *Id.* at 7097.

Petitioners suggest that FMCSA's evaluation of market conditions was erroneous, but their cited evidence is both unpersuasive and adequately addressed in the Rule. First, petitioners cite a 2021 press release from the American Trucking Associations identifying a then-"current driver shortage" of 80,000, predicted to potentially surpass 160,000 in 2030. Lujan Br. 34 n.32; Press Release, Am. Trucking Ass'ns, *ATA Chief Economist Pegs Driver Shortage at Historic High* (Oct. 25, 2021), https://perma.cc/G8FD-BWDB; *see* JA__ (FMCSA-2025-0622-7894, at 7 n.29). That five-year-old prediction has not aged well. As FMCSA noted in the Rule, several indices of trucking volume "collectively show a spike in demand from 2020 to 2021 that has trended downward thereafter" because "a record influx of motor carriers and drivers enter[ed] the market to meet the increased demand." 91 Fed. Reg. at 7097.

Then, petitioners cite a 2025 Newsweek article alleging a "nationwide shortage of truckers." Lujan Br. 34 n.32; Hugh Cameron, *America Doesn't Have Enough Truck Drivers*, Newsweek (July 10, 2025), https://perma.cc/K385-XG8T; *see* JA__ (FMCSA-2025-0622-7875, at 5 n.3). The report identified in the article as the basis of the article's headline is a "survey of 521 professionals in the transport and shipping sector" by an

website called "Tech.co." Cameron, *supra*. Because the underlying data is inaccessible, FMCSA has no means of evaluating how representative that single survey is. And the asserted results of that survey are inconsistent with other evidence on which FMCSA relied. As petitioners highlight (Lujan Br. 35 n.33), FMCSA cited a 2025 report by the American Transportation Research Institute detailing concerns facing motor carriers. But that report does not say, as petitioners suggest, that motor carriers remain concerned about finding and retaining qualified drivers because there are too few drivers available; to the contrary, the report states that "the Driver Shortage has now fallen out of the top 10" of concerns "for the first time in the survey's 21-year history." Am. Transp. Rsch. Inst., *Critical Issues in the Trucking Industry – 2025*, at 24; *see* JA__ (FMCSA-2025-0622-9364). Petitioners' sources are, on the whole, hardly compelling evidence that FMCSA erred in its assessment of the likely effects of the Rule. In any event, even assuming the factual landscape were mixed, FMCSA's evaluation of the competing evidence and its predictive judgment about how the market would respond to the Rule would be entitled to deference. *New Mexico Cattle Growers' Ass'n*, 148 F.4th at 767 (citing *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1089

(D.C. Cir. 2017)); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).

Similarly, petitioners' claim that the agency need not look to driving history in light of other testing and qualification criteria for CDL applicants, Lujan Br. 39-40, is an impermissible attempt to substitute their policy judgment for that of the agency. *Wages & White Lion Invs.*, 604 U.S. at 567. Even so, petitioners' assessment is flawed. As FMCSA explained, past driving history is a powerful predictor of future driving safety, which is precisely why FMCSA believed the previous system created "an unacceptable bifurcated standard in driver vetting." 91 Fed. Reg. at 7044; *id.* at 7049 (explaining that that bifurcated standard "effectively shielded unsafe driving behaviors … that would have disqualified [non-domiciled] drivers from obtaining a CLP or CDL, simply because they occurred outside the review of FMCSA or the [States]"). Indeed, on petitioners' theory, the existence of other requirements would mean driving history checks are of no value even for domiciled CDL holders. But the importance of those checks is precisely why Congress mandated that a State consult driving history from other States before issuing a CDL. Safety Act § 12009(a)(6), 100 Stat. at 3207–180.

b. Petitioners' criticisms of the eligibility provision's scope also lack merit.

To begin, FMCSA explained that the exclusion of DACA recipients from eligibility (Lujan Br. 40-41) was not premised on lack of access to driver-history information, but instead on administrability reasons, which are discussed below. *See infra* pp. 49-52. Moreover, petitioners' assertions that the eligibility provision is both under- and overinclusive continue to "sound[] more like a plea for heightened constitutional scrutiny than like an application of arbitrary-and-capricious review under the APA." Stay Op. 6. FMCSA's central rationale—that non-domiciliary aliens' foreign driving history falls outside the reach of domestic licensing agencies—remains sound despite petitioners' speculation that certain groups of aliens are more or less likely to have driving histories here or abroad. Lujan Br. 41-42; *National Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214-15 (D.C. Cir. 2013) ("An agency has 'wide discretion' in making line-drawing decisions and 'the relevant question is whether the agency's numbers are within a zone of reasonableness, not whether its numbers are precisely right.'" (alteration omitted) (quoting *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001)); *see Rural Cellular Ass'n*, 588 F.3d at 1105 ("The 'arbitrary and

capricious' standard is particularly deferential in matters implicating predictive judgments … ."); *Magnetsafety.org v. CPSC*, 129 F.4th 1253, 1264-65 (10th Cir. 2025) (upholding a rule based on likely group characteristics as reasonable).

Petitioners also argue that FMCSA erred in concluding that H–2A, H–2B, and E–2 visa holders should be allowed to acquire non-domiciled CDLs. Lujan Br. 46-52. FMCSA explained that although States likewise cannot access the foreign driving histories of individuals in those visa categories, "several factors … , in combination, provide reasonable assurance of driver fitness" despite States' inability to review driver history. 91 Fed. Reg. at 7050; *accord* Lujan Br. 45. First, in seeking to sponsor employees for H–2A and H–2B visas, employers are required "to list" in a submission to the Department of Labor "the qualifications necessary for the position, which for [commercial motor vehicle]-related positions typically includes driving experience, clean driving records, and English proficiency." 91 Fed. Reg. at 7050. Employers then screen for those requirements, "help[ing to] ensure that the population of drivers being hired under one of the specified employment-based nonimmigrant categories are more likely to be drivers with safe driving records." *Id.* at 7054. Second, when an individual applies

for a visa, "consular officers have the authority to assess whether applicants meet the qualifications for their intended employment, including the ability to request and review documentation related to driving history and occupational qualifications." *Id.* at 7050. "The review assists in uncovering incidents of dangerous driver behaviors similar to what would be revealed by" a State's review of domestic driving history. *Id.* Third, "H–2A, H–2B, and E–2 visa holders often maintain an ongoing relationship with a U.S. employer who has a direct economic interest in ensuring the driver's qualifications and safety record" so as to avoid repeating the (potentially lengthy) certification process. *Id.* And fourth, visa holders in these three categories "are subject to ongoing federal oversight through multiple agencies … via the nonimmigrant status and visa renewal processes, creating multiple points of verification and accountability." *Id.*; *see supra* pp. 11-13. All told, these measures collectively mitigate the otherwise-present safety gap resulting from States' inability to verify foreign driving histories, and strike a reasonable balance between "the need for adequate vetting of a driver's safety fitness" and "access to non-domiciled CLPs and CDLs for some individuals." 91 Fed. Reg. at 7087. Moreover, because "no other category of foreign-domiciled driver" apart from H–2A, H–2B, and E–2 visa

holders "is subject to this combination of labor certification, employer sponsorship, and multiagency Federal oversight," *id.* at 7051, FMCSA reasonably limited CDL eligibility to these classes of applicants.

At the outset, petitioners' objection to the continued eligibility of those categories of visa holders is difficult to parse. Petitioners disclaim any argument "that people holding H–2A, H–2B, or E–2 visas should not be permitted to hold CDLs." Lujan Br. 51. But if petitioners are correct that FMCSA was mistaken in its assessment of the effectiveness of the alternative vetting and oversight mechanisms identified as a substitute for state review of driving history, the solution would be to treat those categories of aliens identically to the other aliens the agency has determined should not be eligible for non-domiciled CDLs, not to open the floodgates to insufficiently vetted drivers.

In any event, FMCSA reasonably determined that the totality of federal vetting processes applicable exclusively to these categories of aliens provide adequate alternative assurances of safety despite the States' inability to review foreign driving history. Petitioners may believe that those alternative measures collectively add little to otherwise-present testing and qualification criteria, Lujan Br. 46 ("[F]ederal regulations require H–2A and

H–2B drivers to have the same qualifications as any other commercial driver."); Lujan Br. 50 ("[F]ederal regulations require *all* CDL drivers to be proficient in English … . And all must satisfy the same occupational qualifications as U.S.-domiciled drivers, including knowledge and skills testing." (footnote and citation omitted)); *see also* Lujan Br. 39-40 ("FMCSA's purported concern about driver fitness ignores the many requirements in place to ensure that all drivers … can safely operate commercial motor vehicles … ."), or that those employing non-domiciled CDL holders domestically have similar incentives to screen drivers, Lujan Br. 47-48, but the APA does not mandate that the agency agree. *New Mexico Cattle Growers' Ass'n*, 148 F.4th at 767. That is particularly true in light of the fact that many CDL holders—indeed, like both of the named petitioners in the *Lujan* suit—operate as independent contractors, and thus do not have an employer who would conduct vetting. *See* Lujan Decl. ¶ 1; Semenovskii Decl. ¶ 1. Petitioners do not contend, moreover, that *all* employers conduct vetting remotely comparable to the federal vetting FMCSA describes. In sum, it was reasonable for the agency to conclude that the additional vetting and oversight measures it identified served as an effective substitute for the inability to access foreign driving records.

Petitioners' critiques of individual aspects of these screening mechanisms (Lujan Br. 46-51) miss their mark.[4] To start, FMCSA expressly disclaimed reliance on any "single element of th[e vetting and oversight] process," 91 Fed. Reg. at 7050, explaining instead that the "totality of federal vetting processes applicable … provides sufficient assurance of driver fitness to mitigate the safety gap created by the [States'] inability to access and verify the foreign driving records," *id.* at 7049-50. In any event, petitioners' critiques are misguided in important respects. First, petitioners insinuate that consular vetting does not include a review of driving history. Lujan Br. 50-51. But that assertion is irreconcilable with the record: the Department of State confirmed, to the contrary, that its consular adjudications "generally include requests for 10 years of driving history, past traffic violations, license suspensions and revocations, and other similar records," 91 Fed. Reg. at 7060, which aligns with the 10-year check of domestic driving history States must conduct, *see* 49 C.F.R. § 383.73(b)(3)(iv). Crucially, moreover, "[n]o

---

[4] In the same vein, petitioners err in arguing that some aspects of the vetting and oversight procedures applicable to H–2A, H–2B, and E–2 visa holders also apply to other visa categories. Lujan Br. 49. The point is that the "the totality of Federal vetting for these specific visa categories provides a reasonable functional equivalent" for driving history, 91 Fed. Reg. at 7050, and petitioners do not argue that *all* nonimmigrant visa holders are subject to an identical set of measures.

other category of foreign-domiciled driver is currently subject to the same level of enhanced vetting procedures for [commercial motor vehicle] driver qualifications and safety fitness by the" Department of State. 91 Fed. Reg. at 7060. Second, petitioners suggest that the Department of Labor and Department of Homeland Security play no role in "ongoing federal oversight" of aliens, Lujan Br. 48 (quoting 91 Fed. Reg. at 7050), based simply on the fact that FMCSA did not explain in detail what form that role takes. But the answer should be obvious, at least in part: labor certifications expire, necessitating the Department of Labor's periodic reinvolvement, and the Department of Homeland Security works in close concert with the Department of State on issues related to visa processing and renewal.

**B. FMCSA Reasonably Eliminated Reliance On EADs.**

1. In addition to limiting the classes of non-domiciliary aliens eligible to obtain a CDL, the Rule also revises which types of documentation States can use to satisfy the regulations' longstanding requirement that CDL applicants demonstrate lawful presence. Under the prior regulations, to confirm lawful presence, applicants could present either an unexpired EAD or an I–94 form together with an unexpired foreign passport. 49 C.F.R. § 383.71(f)(2)(i) (2024); *see id.* § 383.73(f)(3) (2024). Evidence FMCSA

obtained during its 2025 reviews of state compliance with those regulations, however, "revealed a systemic collapse in State compliance regarding EAD-based eligibility." 91 Fed. Reg. at 7052. In particular, front-line licensing clerks struggled to interpret immigration codes used on EADs accurately—including codes distinguishing DACA recipients from individuals receiving other forms of deferred action—and routinely issued or renewed CDLs using expired EADs in conjunction with other USCIS forms that indicated an applicant had sought (but not necessarily received) an EAD extension or renewal. *Id.* at 7052. And States commonly issued non-domiciled CDLs with expiration dates exceeding the applicant's authorized period of lawful presence. *Id.* at 7045, 7063. As a result, "[m]ore than 30 States … issued tens of thousands of non-domiciled CDLs contrary to Federal regulations," with "staggering error rates" in individual States as high as 53, 49, and 25% respectively in New York, Texas, and California. 91 Fed. Reg. at 7045; *supra* pp. 8-9.

Because of the widespread compliance issues attending the use of EADs, the Rule no longer allows States to accept EADs to establish lawful presence. The Rule instead requires that States confirm lawful immigration status using Form I–94/94A, which clearly identifies an applicant's visa

category and the term for which she has been admitted to the United States, thus eliminating the need for clerks to decipher immigration codes. 91 Fed. Reg. at 7052-53, 7061, 7074, 7091. Replacing the prior "complex framework" with a "'bright-line' eligibility standard" is designed to "eliminate[] the burden on [States] to interpret complex immigration codes" and improve consistency. *Id.* at 7045; *see id.* at 7052 (emphasizing FMCSA's "statutory mandate to prescribe uniform standards for the issuance of … CDLs"); *id.* at 7061 (noting "simplicity of the [I–94's] nonimmigrant status coding").

2. To the extent petitioners mean to undercut the legitimacy of the Rule's documentation provision by describing it as having "nothing to do with driver fitness or safety," Lujan Br. 54-55, such an insinuation is mistaken. Congress charged FMCSA with prescribing and enforcing "minimum *uniform* standards" for the issuance of CDLs, 49 U.S.C. § 31308 (emphasis added), and "States' varying levels of compliance with the non-domiciled CLP and CDL eligibility standards based on EADs … led to national dis-uniformity in administering the non-domiciled CDL program," 91 Fed. Reg. at 7052. The agency thus had a cognizable interest in re-establishing the uniformity called for by federal law, even if driver safety was not directly implicated by the change.

Petitioners correctly note (Lujan Br. 56) that the only group whose ineligibility under the Rule depends entirely on FMCSA's revised documentation requirements—as opposed to the driver-history rationale described above, *supra* pp. 31-32—are DACA recipients. But petitioners are wrong to suggest that the Rule's exclusion of DACA recipients was unreasonable. FMCSA reasonably explained that DACA recipients lack I–94/94A forms, and thus would be unable to meet the documentation requirements imposed by the Rule. 91 Fed. Reg. at 7055. FMCSA further explained that creating an exception to those requirements for DACA recipients "would continue the confusion surrounding EADs from the pre-IFR regulations and create the same problems with the improper issuance of non-domiciled CLPs and CDLs that the IFR and this final rule … sought to address," *id.* —confusion that, it bears repeating, led to more than 30 States issuing tens of thousands of non-compliant licenses—including confusion distinguishing between the EAD code for DACA and other forms of deferred action. *Id.* at 7055, 7069, 7099; *supra* pp. 8-9.

Moreover, as FMCSA explained, the change in acceptable documentation would be dispositive as to only a small subset of DACA recipients. Approximately 80% of DACA recipients are citizens of Mexico,

and "citizens of Mexico and Canada who are present in the United States under the DACA program have never been eligible for a non-domiciled CLP or CDL under FMCSA's regulations." *See* 91 Fed. Reg. at 7055; *supra* pp. 6-7. "It was solely by virtue of FMCSA's nonenforcement posture" as to that requirement, which the agency adopted less than three years before the Rule's publication, "that States were allowed to issue non-domiciled CLPs and CDLs to Mexican and Canadian DACA recipients without receiving a finding of noncompliance." 91 Fed. Reg. at 7055. The Rule rescinds that policy of enforcement discretion. *Id.* FMCSA was well within its discretion to resume enforcing its longstanding regulatory prohibition, and petitioners do not seriously dispute that the agency acted within its authority in doing so.

Petitioners misread the governing regulations in asserting (Lujan Br. 58) that only individuals who actually hold a Mexican (or Canadian) CDL are prohibited from receiving a non-domiciled CDL under FMCSA's regulations. Before as now, an "applicant [who] is domiciled in a foreign jurisdiction" could only obtain a non-domiciled CDL if the "Administrator ha[d] not determined that the commercial motor vehicle operator testing and licensing standards of that jurisdiction meet the standards contained in subparts G and H of this part." 49 C.F.R. § 383.71(f)(1)(i) (2021). Put more plainly, if

FMCSA "ha[d] … determined" that the foreign jurisdiction's standards were equivalent to U.S. federal standards, the applicant could not obtain a non-domiciled CDL in the United States—because that individual could instead obtain a CDL in her country of domicile. For Mexico and Canada, that has been the case since 1991 and 1988, respectively. *See* 49 C.F.R. § 383.23 n.1.

Separately, petitioners deny that the use of EADs should pose administrability problems, given that in their view EADs "are no more complex than driver's licenses." Lujan Br. 55. The record contains ample evidence for FMCSA's contrary conclusion. FMCSA's annual reviews showed that state driver's licensing clerks routinely misinterpreted EAD codes, including by mistaking one code denoting certain Mexican citizens who were not DACA recipients, and thus categorically ineligible for a non-domiciled CDL—"C14," meaning "Deferred Action" or "Alien Granted Deferred Action"—for the code "C33," which indicated "Deferred Action for Childhood Arrivals," *i.e.*, DACA recipients. 91 Fed. Reg. at 7069, 7099.

Nor are petitioners correct to argue that the codes used on EADs were the "only" reason those documents proved problematic. Lujan Br. 56 (emphasis omitted). FMCSA also documented a problematic tendency of state agencies to accept other USCIS forms in conjunction with EADs to

issue CDLs after the applicant's work authorization had expired, 91 Fed. Reg. at 7052 ("FMCSA found that some [state agencies], upon receiving the Form I–797C presented with the applicant's expiring or expired EAD, accepted the Form I–797C as proof that the applicant's eligibility for an EAD had been extended in fact, when in some circumstances it had not, and subsequently issued non-domiciled credentials based on a Form I–797C, instead of relying on the documentation in 49 [C.F.R. §] 383.71(f)(2)(i) then in effect."), even where those forms prominently stated, in all capitals, that they did "not grant any immigration status or benefit," *id.* at 7053. In light of that fact, FMCSA reasonably determined that the only way to remedy the resulting "systemic collapse in State compliance regarding EAD-based eligibility" was therefore to cease using EADs altogether. *Id.* at 7052.

Petitioners separately contend that no compliance problem existed because FMCSA's prior regulations did not require that a CDL's expiration date match the individual's period of lawful presence. Lujan Br. 58-59. That is a non-sequitur, and in any event mistaken.

It is a non-sequitur because, even if petitioners were correct about what the previous regulations required, they do not dispute the reasonableness of the Rule's express requirement that CDL expiration dates

not exceed the duration of lawful status. 91 Fed. Reg. at 7102 (new 49 C.F.R. § 383.73(f)(2)(iv)); *see* Stay Op. 9 n.2 (declining to address the expiration-date issue because "the safety and administrability concerns addressed above suffice to show that the FMCSA permissibly declined to create a special carveout" from its new documentation requirements "for DACA beneficiaries"). Whether that requirement is new (as petitioners contend) or has always been present (as FMCSA explained, 91 Fed. Reg. at 7052, 7078), the salient question *now* is whether FMCSA reasonably determined that States could more effectively implement that requirement by using I–94/94A forms and unexpired foreign passports rather than EADs. FMCSA's annual reviews provided ample support for that conclusion even if petitioners were correct about the prior content of the regulations: FMCSA identified multiple States that routinely issued CDLs with expiration dates exceeding lawful presence even when *state* law contained the same requirement. For example, California law contained this requirement, *see* Cal. Code Regs. tit. 13, § 26.02(c), but FMCSA's review discovered "a non-compliance rate of approximately 25 percent among reviewed non-domiciled files" in California, 91 Fed. Reg. at 7045. Similarly, Texas, South Dakota, Utah, Minnesota, and Pennsylvania were found to be noncompliant despite materially identical

state-law requirements. Tex. Transp. Code Ann. § 522.051(f); S.D. Codified Laws § 32-12-42.2; Utah Code Ann. § 53-3-413(3)(b)(i); Minn. Stat. § 171.27(d); 75 Pa. Cons. Stat. § 1514(e).

In any event, petitioners are wrong to assert that the prior regulations contained no requirement of this type. As a matter of plain text, an alien applying for a non-domiciled CDL was required to present *unexpired* proof of lawful presence. 49 C.F.R. § 383.71(f)(2)(i) (2024); *id.* § 383.73(f)(3) (2025). Because non-domiciled-CDL eligibility hinged on the applicant's lawful presence, it followed that a credential issued for a period in which the applicant did not demonstrate lawful presence was improper. 91 Fed. Reg. at 7052, 7078. As noted, many States understood this requirement (either as a matter of federal regulation, state law, or both) and struggled to comply using EADs. And finally, even if petitioners were correct about the mismatch issue in general, as discussed above, the compliance issues regarding the use of EADs went beyond the mismatch between CDL expiration dates and the duration of lawful presence alone. *Id.* at 7045; *see id.* at 7051. Petitioners do not engage with many aspects of the systemic issues FMCSA identified or its overall determination that simplified processes would make compliance easier for the States.

*　　　*　　　*

Petitioners' remaining arguments against the Rule fall flat.

*Contra* petitioners, FMCSA did not "fail[] to consider 'significant and viable and obvious alternatives'" to its chosen intervention. *District Hosp. Partners v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015). Several of the alternatives petitioners now propose, in fact, come nowhere close to being "obvious" replacements for the Rule. Petitioners suggest that instead of restricting CDL eligibility, FMCSA might instead have "required applicants to present their foreign driving records." Lujan Br. 52. But there exists a self-evident risk that those records could be incomplete, falsified, or in a language or format the States lack the ability to interpret. Moreover, petitioners themselves cite from the portion of the Rule explaining that even if foreign records could be obtained, interpreting them accurately would impose a "substantial burden" on States that the agency was loath to create. 91 Fed. Reg. at 7068; *see* Lujan Br. 52. It also stands to reason that Department of State staff are better placed than domestic DMV clerks to analyze foreign driving records, *cf.* Lujan Br. 52, given that agency's comparative advantage in international issues. *See* 91 Fed. Reg. at 7050, 7068. Petitioners also suggest that FMCSA might have "restrict[ed] CDLs

to applicants with a clean driving record in their country of domicile." Lujan Br. 52. But how any State would enforce such a restriction, petitioners do not say; again, the very point of the Rule's eligibility provision is a recognition that States *cannot* verify foreign driving history.

On the other hand, FMCSA *did* consider the other alternatives petitioners now suggest. *District Hosp. Partners*, 786 F.3d at 59. The agency explained that grandfathering in drivers with domestic driving records would disserve the purpose of the Rule because those drivers were insufficiently vetted, even if some drivers might have operated safely during the time they possessed a U.S.-issued non-domiciled CDL. 91 Fed. Reg. at 7087-88; *see* Lujan Br. 52-53. Likewise, FMCSA declined to treat "improved guidance or training" for state-agency staff as sufficient, Lujan Br. 60, reasoning that the scope and consistency of the issues "across more than 30 States demonstrates that the issue is not merely a training deficiency," 91 Fed. Reg. at 7052. For similar reasons, requiring States to use USCIS's Systematic Alien Verification for Entitlements system as the sole method of addressing the systemic non-compliance associated with accepting EADs, Lujan Br. 61, was impracticable, as States *already* use that system and had

"already demonstrated that they are not capable of" effective compliance using the system "on a large scale," 91 Fed. Reg. at 7087.

FMCSA also afforded due consideration to reliance interests affected by the Rule. *But see* Lujan Br. 62-65. At the threshold, petitioners misstate the law—an agency is not required to "provide 'a more detailed justification than what would suffice for a new policy'" where reliance interests are at stake. Lujan Br. 62 (quoting *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)). The rule is instead the opposite. *Wages & White Lion Invs.*, 604 U.S. at 570 (citing *Fox Television*, 556 U.S. at 515) ("*Nor* must [the agency] 'provide a more detailed justification… .'" (emphasis added)). All that is required is that the agency "be cognizant" of relevant reliance interests and "take[ them] into account." *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)).

FMCSA adequately discharged that obligation here. With respect to CDL holders who are now ineligible to renew their credentials, FMCSA estimated that approximately 194,000 drivers would exit the freight market, 91 Fed. Reg. at 7096, but that those individuals would "be able to find similar employment in other sectors or occupations within the transportation sector"

at an approximate annual salary impact of $16,000,[5] *id.* at 7097. Crucially, the effect on now-ineligible drivers is not immediate, for the Rule's modifications operate only prospectively. *Id.* at 7083-84. Consequently, affected drivers will have up to five years to adjust. FMCSA further stressed that "the high rate of churn inherent to the industry" meant that many drivers would have exited the industry regardless. *Id.* Considerable evidence supports the existence of such turnover: FMCSA cited research from the American Transportation Research Institute, the Owner-Operator Independent Drivers Association, and the American Public Transportation Association, including one finding that "59 percent of departures happen within the first two years of employment," *id.* at 7095.

FMCSA also underscored that affected drivers "should have been aware that their CDL credential was not a permanent right, but a privilege with a limited term and subject to a sudden change in status," *id.* at 7080, meaning that drivers and employers have "long borne, and voluntarily

---

[5] FMCSA computed this figure using data from the Bureau of Labor Statistics and relying on "median hourly wage rates for some occupations that are in transportation or transportation-adjacent industries for which CDL holders would generally have the necessary skills to be successful, and therefore could be alternatives to positions requiring a CDL." 91 Fed. Reg. at 7094. *Cf.* Lujan Br. 63 ("FMCSA cites no facts to support the availability of … alternative employment, let alone at the wage rates it identifies.").

accepted, the risk" of future ineligibility," *id.* at 7083. Even so, FMCSA emphasized that it "ha[d] not taken the decision to alter eligibility criteria lightly." *Id.*; *see* Stay Op. 9. So too did FMCSA consider the likely effects of the Rule on motor carriers who employ affected drivers—and, by extension, the "educational institutions, and state and local governments" who rely on those carriers. 91 Fed. Reg. at 7097; *see* Lujan Br. 63-64. There can be little doubt, then, that FMCSA was "cognizant of the reliance interests its decision might upset and explain[ed] its good reasons for moving forward anyway." *Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1087-88 (D.C. Cir. 2026) (quotation omitted).

Finally, petitioners speculate that FMCSA offered safety as a pretextual explanation for the Rule. King County Br. 43-51. But "[c]ourts approach claims of pretext skeptically because probing the Executive's 'motivation represents a substantial intrusion into the workings of another branch of Government.'" Stay Op. 10 n.3 (quoting *Department of Com. v. New York*, 588 U.S. 752, 781 (2019)). Because the record reveals a neutral, bona fide rationale for the Rule, petitioners' bald conjecture that the Rule is pretextual is "insufficient to upset the presumption that public officials have properly discharged their official duties," *Hight v. U.S. Dep't of Homeland*

*Sec.*, 135 F.4th 996, 1008 (D.C. Cir. 2025) (quotation omitted); *see also* *Department of Com.*, 588 U.S. at 781. To the extent petitioners instead mean to argue that the agency's mind was insufficiently open to the possibility of abandoning the Rule, *see* King County Br. 46 ("Throughout the rulemaking process, FMCSA was irrationally committed to the … hypothesis that noncitizens pose a threat to road safety."), such a claim is not viable under the APA, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020) ("[L]ike the procedures that we have held invalid, the open-mindedness test violates the general proposition that courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." (quotation omitted)).

## CONCLUSION

For the foregoing reasons, the petitions for review should be denied.

Respectfully submitted,


BRETT A. SHUMATE
*Assistant Attorney General*

BRAD HINSHELWOOD

*/s/ Simon G. Jerome*
SIMON G. JEROME
GABRIEL I. SCHONFELD
*Attorneys, Appellate Staff*
*Civil Division, Room 7209*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1673*
*simon.g.jerome@usdoj.gov*

*Of Counsel:*

GREGORY ZERZAN
*General Counsel*

CHARLES E. ENLOE
*Assistant General Counsel*

SAMUEL G. FULLER
*Attorney*
*U.S. Department of Transportation*

REBECCA PETTIT
*Chief Counsel*
*Federal Motor Carrier Safety Administration*


July 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,729 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Simon G. Jerome*
SIMON G. JEROME

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Simon G. Jerome*
SIMON G. JEROME