ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 15, 2026

No. 26-1032

(consolidated with No. 26-1046)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JORGE RIVERA LUJAN, ALEKSEI SEMENOVSKII, AMERICAN
FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES,
and AMERICAN FEDERATION OF TEACHERS,

*Petitioners,*

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION,
UNITED STATES DEPARTMENT OF TRANSPORTATION, and
UNITED STATES,

*Respondents.*

On Petition for Review of a Final Rule Issued by
the Federal Motor Carrier Safety Administration

**INITIAL REPLY BRIEF FOR PETITIONERS**

Wendy Liu
Cormac Early
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
wliu@citizen.org

*Counsel for Petitioners in No. 26-1032*

July 29, 2026

Teague Paterson
Matthew Blumin
American Federation of
State, County & Municipal
Employees, AFL-CIO
1625 L Street, NW
Washington, DC 20036
(202) 775-5900

*Counsel for Petitioner American
Federation of State, County &
Municipal Employees*

Daniel McNeil
Channing Cooper
American Federation of Teachers
555 New Jersey Avenue NW
Washington, DC 20001
(202) 879-4400

*Counsel for Petitioner American
Federation of Teachers*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ....................................................................................... vi

SUMMARY OF ARGUMENT .................................................................1

ARGUMENT ........................................................................................3

I.    The Final Rule exceeds FMCSA's statutory authority ....................3

II.   The Final Rule is arbitrary and capricious......................................3

    A.    The rulemaking record does not substantiate FMCSA's purported safety justification..............................................4

        1.    FMCSA concededly lacked evidence that the excluded drivers pose a safety risk. .............................................4

        2.    FMCSA ignored evidence that the excluded drivers do not present a safety risk. .............................................6

        3.    FMCSA failed to account for the Rule's negative impact on road safety. ............................................................11

    B.    FMCSA's assertion that drivers with EADs cannot be adequately vetted does not justify the Rule. ........................14

        1.    Non-domiciled commercial drivers are subject to the same vetting as domiciled commercial drivers. ..........15

        2.    FMCSA's decision to allow other categories of immigrants to obtain CDLs undermines its reliance on vetting as the primary basis for its Rule. ....................19

    C.    Disqualifying drivers with EADs based on administrative concerns was arbitrary and capricious. ..............................23

i

1. The exclusion of DACA recipients lacks a reasoned justification.................................................................24

2. The cited administrability concerns are illusory.........27

D. FMCSA failed to consider reasonable alternatives..............31

E. FMCSA failed to adequately consider the substantial reliance interests of CDL drivers, their employers, and the public. ...............................................................................32

CONCLUSION ......................................................................................34

CERTIFICATE OF COMPLIANCE......................................................35

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*American Radio Relay League, Inc. v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008)..........................................................6

*AT&T Co. v. FCC*,
    454 F.3d 329 (D.C. Cir. 2006)......................................................29

*Bowen v. Georgetown University Hospital*,
    488 U.S. 204 (1988) ....................................................................29

*California Wilderness Coalition v. Department of Energy*,
    631 F.3d 1072 (9th Cir. 2011) .......................................................9

*Department of Commerce v. New York*,
    588 U.S. 752 (2019) ......................................................................4

*DHS v. Regents of the University of California*,
    591 U.S. 1 (2020) ..................................................................25, 32

*District Hospital Partners, L.P. v. Burwell*,
    786 F.3d 46 (D.C. Cir. 2015) .......................................................31

*FDA v. Wages & White Lion Investors, LLC*,
    604 U.S. 542 (2025) ....................................................................33

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018).....................................................10

*Level the Playing Field v. FEC*,
    232 F. Supp. 3d 130 (D.D.C. 2017)..............................................11

*Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm
    Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983) ......................................................................14

iii

*Rivera Lujan v. FMCSA*,
    2025 WL 3182504 (D.C. Cir. 2025) ....................................................5

*Spirit Airlines, Inc. v. Department of Transportation*,
    997 F.3d 1247 (D.C. Cir. 2021).......................................................32

*World Shipping Council v. Federal Maritime Comm'n*,
    152 F.4th 223 (D.C. Cir. 2025) .....................................................19

**Statutes**

8 U.S.C. § 1151 ...............................................................................20

49 U.S.C. § 31308 ...........................................................................8

49 U.S.C. § 31311 ..........................................................................17

**Regulatory Materials**

6 C.F.R. § 37.21(b)(1).....................................................................29

8 C.F.R. § 274a.13 (2016) ..............................................................30

49 C.F.R. § 383.23(b)(1) n.1..........................................................25

49 C.F.R. § 383.51(a)(6).................................................................16

49 C.F.R. § 383.51(c)................................................................ 16, 32

49 C.F.R. § 383.71(f)(1)(i) (2021) .................................................25

49 C.F.R. § 383.73(b)(3)(iv) ..........................................................16

81 Fed. Reg. 82398 (2016) ............................................................30

90 Fed. Reg. 46509 (effective Sept. 29, 2025) .............................8

91 Fed. Reg. 7044 (effective March 16, 2026)............. 3, 4, 5, 7, 8, 10, 12,
                                                    14, 15, 17, 28, 29

iv

## Other Authorities

FMCSA, *2024 Pocket Guide to Large Truck and Bus Statistics* (July 2025), https://www.fmcsa.dot.gov/safety/data-and-statistics/2024-pocket-guide-large-truck-and-bus-statistics ......... 19

FMCSA, *Demographics of the CMV Workforce* (Aug. 14, 2023), https://www.fmcsa.dot.gov/mission/advisory-committees/wotab/wotab-presentation-demographics-cmv-workforce. ...................................................................................... 19

J.B. Hunt, *Immigration Policy and Enforcement Impact on U.S. Commercial Driver Supply* (Mar. 24, 2026), https://www.jbhunt.com/blog/enterprise/immigration-policy-impact ..................................................... 18, 24

David Redelmeier et al., *Roadway Crash Risks in Recent Immigrants,* 43 Accid. Anal. Prev. 2128 (Nov. 2011) ......................................... 10

USCIS, *Case Processing Times,* https://egov.uscis.gov/processing-times ......................................... 16

USCIS, *Handbook for Employers M-274* (last updated July 7, 2026), https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274 ....................................................................... 27

USCIS, *Green Card for Immediate Relatives of U.S. Citizen,* https://www.uscis.gov/green-card/green-card-eligibility/green-card-for-immediate-relatives-of-us-citizen ........................................... 20

# GLOSSARY

AFSCME    American Federation of State, County & Municipal Employees, AFL-CIO

CDL    Commercial Driver's License

EAD    Employment Authorization Document

FMCSA    Federal Motor Carrier Safety Administration

IFR    Interim Final Rule

## SUMMARY OF ARGUMENT

Since the federal government first regulated state issuance of commercial driver's licenses (CDLs) in 1988, it has allowed states to issue CDLs to noncitizens who have met training and testing requirements showing that they can safely operate commercial motor vehicles, such as trucks and school buses. That changed in September 2025, when Respondent Federal Motor Carrier Safety Administration (FMCSA) issued an Interim Final Rule (IFR) prohibiting all noncitizens with Employment Authorization Documents (EADs) from obtaining or renewing CDLs. After this Court stayed the IFR, and after a comment period, FMCSA issued essentially the same rule: the Final Rule at issue in this petition. Because of the Final Rule, approximately 194,000 experienced commercial drivers can no longer renew their CDLs and no EAD holders can obtain CDLs going forward.

The Final Rule's prohibition of work-authorized immigrants from obtaining and renewing non-domiciled CDLs—the type of CDL issued to a person authorized to work in the United States who is not a U.S. citizen or permanent resident—exceeds FMCSA's statutory authority and is arbitrary and capricious. Although FMCSA contends that a lack of access

1

to foreign driving records created a safety concern, there is no rational connection between the restriction it adopted and the facts in the record. To accomplish FMCSA's objective of excluding immigrant drivers, the Final Rule abandons the longtime use of EADs to support a CDL application. This change, justified based on purported administrability concerns, is FMCSA's *only* basis for making DACA recipients ineligible to hold CDLs. Yet FMCSA's rationale—that state licensing clerks find EADs confusing—is unsupported by data and, moreover, inadequate to support its decision. Additionally, FMCSA offers no reasoned explanation for not adopting a less draconian alternative to address its purported concerns. The agency's roughshod approach reflects that it first identified the outcome and only then sought to justify it, without due consideration to whether the record supported its decision.

The harms from this Rule are significant. Thousands of drivers are facing loss of jobs and employer-provided benefits like health care, and communities are harmed by the resulting disruption in school bus transit, waste management, road maintenance and repair, and other essential services. Particularly as balanced against its purported justifications, FMCSA's decision to proceed with the Rule's punitive ban,

undermining the serious reliance interests of nearly 200,000 CDL drivers authorized to work in this country, and others who depend on them, was arbitrary and capricious.

## ARGUMENT

### I.    The Final Rule exceeds FMCSA's statutory authority.

Petitioners hereby incorporate the arguments of Petitioner King County in No. 26-1046 and Amici Twenty-Five Members of Congress.

### II.    The Final Rule is arbitrary and capricious.

In the Final Rule, FMCSA eliminated CDL eligibility for immigrants with EADs, purportedly to "close[] a significant safety gap, and enhance[] the safety of the traveling public." Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 91 Fed. Reg. 7044, 7044 (effective March 16, 2026) (JA__). In its brief, FMCSA acknowledges that immigrant drivers now ineligible under the Final Rule have been permitted to drive commercial vehicles in the United States for decades, and FMCSA is candid that it has "never claimed" that "immigrant drivers excluded by the Rule pose a safety concern." Resp. Br. 32. Indeed, its brief makes virtually no effort to substantiate that immigrant drivers pose a safety problem. FMCSA's brief reflects the significant mismatch between the Rule's purported

3

justification and the facts in the record. That mismatch requires vacatur of the Rule as arbitrary and capricious. *See Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019) (finding that the "significant mismatch between the decision the [agency] made and the rationale [it] provided" showed a lack of reasoned decisonmaking).

### A. The rulemaking record does not substantiate FMCSA's purported safety justification.

#### 1. FMCSA concededly lacked evidence that the excluded drivers pose a safety risk.

In prohibiting CDLs for all immigrants with EADs, FMCSA asserted that the Rule "will enhance the safety of [commercial motor vehicle] operations and is likely to result in improved safety outcomes, such as the reduced frequency and/or severity of crashes or reduced frequency of violations." 91 Fed. Reg. 7098. No empirical data or analysis supported this conclusion. FMCSA admits that "the Rule does not rest on an assessment that alien drivers are categorically less safe than other drivers." Resp. Br. 30. And FMCSA admits that it had no information in its systems to "draw reliable conclusions on comparative safety performance as between domiciliary and non-domiciliary CDL holders." *Id.* at 32.

Instead, FMCSA justified the Rule by citing 17 reports of fatal crashes that likely involved a non-domiciled CDL driver—17 out of a total denominator of fatal crashes that FMCSA refuses to disclose. *See* 91 Fed. Reg. 7065. FMCSA contends that "it is beside the point what proportion of all collisions those 17 examples represent." Resp. Br. 36. But the denominator's importance is self-evident. After all, data showing that CDL holders excluded by the rule are involved in fatal crashes at a lower rate than CDL holders who are not excluded would clearly undermine the basis for FMCSA's decision. *See Rivera Lujan*, 2025 WL 3182504, at *2 (discussing the 12 crashes that FMCSA cited to support the IFR's identical restriction). Similarly, FMCSA dismisses as irrelevant the question "whether driver inexperience may have played a role in one or more of the 17", Resp. Br. 36, but driver inexperience is a known contributor to crash risk—a point made in the comments and supported by FMCSA-sponsored literature. *See* Opening Br. 29 & nn.12, 22 (citing evidence in the record). Thus, while FMCSA describes the 17 crashes as "illustrative," Resp. Br. 36 (quoting 91 Fed. Reg. 7065), there is nothing illustrative about them when they do not identify whether the driver had any foreign driving history—FMCSA's purported reason for the Rule.

Although FMCSA says that the agency need not commission its own studies, *see id.* at 37, it does need some basis in the record for making a significant change. Here, because the agency lacks meaningful data to support its significant change to a longstanding regulatory scheme, the Rule is arbitrary and capricious. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ( "It is not consonant with the purpose of a rulemaking proceeding to promulgate rules on the basis of inadequate data" (citation omitted)).

### 2. FMCSA ignored evidence that the excluded drivers do not present a safety risk.

Not only did FMCSA lack evidence that non-domiciled CDL drivers pose a greater risk than other commercial drivers, it acted in the face of evidence in the record showing that non-domiciled drivers do *not* present a greater safety risk. For example, an analysis from Oregon of six years of fatal crash data of Oregon-licensed drivers found *zero* crashes involving a non-domiciled CDL driver.[1] States similarly commented that they knew of no data showing that drivers with non-domiciled CDLs were

---

[1] Oregon Dep't of Transp. Comment 2, FMCSA-2025-0622-7550 (JA__)

less safe than others.[2] And a Canadian study of over 4 million people found that "immigrant motorists were hospitalized in crashes 45% *less* often than long-time resident drivers, suggesting that immigrant drivers are in fact involved in fewer crashes and much less fatal ones as well."[3]

FMCSA did not specifically address this evidence in the Rule, instead asserting that commenters "have not provided alternative comprehensive sources of data." 91 Fed. Reg. 7071. But as Petitioners have explained, the absence of perfect data is not an excuse for FMCSA's failure to engage with the data that do exist. *See* Opening Br. 31–32. And, in any event, both the Oregon analysis and Canadian study did analyze alternative sources of data.

Having failed to address in the Final Rule the evidence provided in comments, FMCSA in its brief discounts Oregon's analysis on the basis that FMCSA could not independently verify it because Oregon had not submitted the underlying data. Resp. Br. 33. But FMCSA did not ask

---

[2] *See* Md. Dep't of Transp. Comment 2, FMCSA-2025-0622-7914 (JA__); Del. Div. of Motor Vehicles Comment 1, FMCSA-2025-0622-8020 (JA__).

[3] Maine Equal Justice Comment 6, FMCSA-2025-0622-7554 (JA__).

Oregon for that information, and it offers no reason to assume that Oregon mis-tallied its crash statistics. FMCSA's brief also complains that Oregon's data did not "capture non-fatal crashes," *id.*, but FMCSA discussed only fatal crashes in the IFR that served as the basis for comments, *see* 90 Fed. Reg. 46509, 46514 (describing 5 fatal crashes); *see also* 91 Fed. Reg. 7065 (citing 17 fatal crashes in Final Rule). And as Oregon explained, the "short time for comment" provided by FMCSA prevented the state from analyzing other crashes.[4]

FMCSA's brief also attempts to justify the agency's disregard of the Oregon analysis in the Final Rule by asserting that Oregon's data do not shed light on the safety of drivers with licenses from other states. Resp. Br. 33–34. But comments submitted by other states likewise explained that no "real-world evidence" supports FMCSA's conclusion that the drivers it excluded from holding CDLs present a safety risk.[5] And although 49 U.S.C. § 31308 required FMCSA to consult with the states

---

[4] Oregon Dep't of Transp. Comment 2.

[5] Del. Div. of Motor Vehicles Comment 1 (JA__); Md. Dep't of Transp. Comment 2 (JA__); *see* State Attorneys Gen. Comment 4, FMCSA-2025-0622-7571 (stating that FMCSA "has *no* evidence that the … new CDL and CLP eligibility restrictions would provide any additional public safety benefits") (JA__).

before issuing a rule about CDL issuance, FMCSA did not do so. *See* FMCSA Letter to State Driver's Licensing Agencies (Nov. 18, 2025), FMCSA-2025-0622-7885 (inviting states to submit comments by Nov. 28, 2025) (JA__); *see also Calif. Wilderness Coal. v. Dep't of Energy*, 631 F.3d 1072, 1093 (9th Cir. 2011) ("Consultation requires an exchange of information and opinions before the agency makes a decision. This requirement is distinct from the opportunity to offer comments on the agency's decision."). Had it complied with the consultation requirement, FMCSA could have had a meaningful back-and-forth with the states about state data and analyses. *See* Br. of Mass. et al. 23–24 (discussing FMCSA's lack of consultation with the states); *see also id.* at 33a (recent study from California Department of Motor Vehicles showing that "temporary legally resident immigrants are involved in 20% fewer crashes overall, and 25% fewer fatal crashes, than US citizens on a per licensed driver basis").

As to the 2011 Canadian study that FMCSA dismisses as "off-base," Resp. Br. 34, that study conducted the comparative analysis that FMCSA says it lacked and found that immigrant drivers are involved in fewer

9

crashes than long-term resident drivers.[6] FMCSA faults the study for examining hospital records, but those records identified "road crashes leading to a hospital admission with motor vehicle trauma," allowing for analysis of "the risk of a motor vehicle crash."[7] And, again, FMCSA's complaint that the study focused on "serious" crashes is wholly consistent with FMCSA's approach, where it culled through records looking for fatal crashes. *See* 91 Fed. Reg. 7065. FMCSA also faults the study's age, but it offers no basis to think that time has undermined the study's findings, and FMCSA itself relies on an older study. *See* 91 Fed. Reg. 7048 n.9 (citing 2007 study).

An agency acts arbitrarily when it "ignore[s] evidence that undercuts its judgment," "minimize[s] such evidence without adequate explanation," or offers "[c]onclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018) (citations

---

[6] David Redelmeir et al., *Roadway crash risks in recent immigrants*, 43 Accid. Anal Prev. 2128 (Nov. 2011), *cited in* Maine Equal Justice Comment 6 n.11 (JA__) & Asian American Legal Defense & Education Fund Comment 3, FMCSA-2025-0622-7289 (JA__).

[7] Redelmeier et al., *supra* n.6, at 2129.

omitted); *see Level the Playing Field v. FEC*, 232 F. Supp. 3d 130, 148 (D.D.C. 2017) (stating that it is not "reasoned decision-making" where the agency "appears to have stuck its head in the sand and ignored the evidence and [the action it took] may be undermining the stated purpose of its regulations and the [statute]"). Thus, here, FMCSA acted arbitrarily and capriciously by disregarding evidence that undermined its position.

### 3. FMCSA failed to account for the Rule's negative impact on road safety.

As Petitioners have explained, the Rule harms road safety by forcing out qualified, experienced drivers with proven safety records. *See* Opening Br. 32–37. FMCSA does not dispute that replacing the 194,000 drivers that the Rule makes ineligible with less experienced drivers, or increasing driver fatigue for the drivers who pick up the slack, would present a safety risk.[8]

---

[8] FMCSA's amici focus on the safety of "illegal immigrant" drivers. Br. of Florida et al. 3–10. The Final Rule, however, makes no change with respect to those immigrants, who had never been eligible for CDLs under the prior rule. And FMCSA has not justified its decision to exclude immigrants with lawful work authorization based on safety concerns about people unauthorized to be in the U.S.

Instead, FMCSA asserts that the market will adjust to the "change in capacity," Resp. Br. 39 (quoting 91 Fed. Reg. 7097), because the Rule "did not immediately strip licenses" from drivers, who can operate vehicles until their licenses expire, *id.* That assertion ignores that "[a]ssuming CDLs come up for renewal at a consistent rate, approximately 8,000 non-domiciled CDLs will come up for renewal every month."[9] Thus, while the Rule's impact will increase over time, it is also immediate. *See* Br. of Mass. et al. 19 (noting that Massachusetts had to call the National Guard to serve as short-term drivers for school buses, and stating that "[u]nduly limiting who can serve in these vital positions—without heed for a driver's safety record—will jeopardize children who daily depend upon school buses"); *see also* Waste Pro Br. 3–10 (explaining the Rule's disruption to sanitation services and the impracticalities of replacing the now-ineligible drivers).

Moreover, FMCSA's assumption that other experienced drivers will pick up the slack after 194,000 drivers are disqualified fails to appreciate the persistent shortage of CDL drivers in the U.S. *See* Opening Br. 34–35 & nn.11, 32 (citing the record); *see also, e.g.*, Local Gov'ts Br. 3–6; Br.

---

[9] State Attorneys Gen. Comment 9 (JA__).

of Mass. et al. 18–20; Teamsters Cal. Br. 7. FMCSA disputes the existence of a shortage as to freight drivers, noting a report finding that "the Driver Shortage" is not in the "top 10" list of issues in the trucking industry. Resp. Br. 41. That same report, though, places "Driver Shortage" as the 12th most critical issue in the industry and a continued concern.[10] Moreover, FMCSA offers no response to the shortages of other types of commercial drivers, such as school bus drivers, snowplow operators, and delivery drivers. *See* Opening Br. 36–37 ("Fewer experienced CDL drivers 'to apply deicers, plow snow, and manage debris will further increase these crashes, injuries, and fatalities.'" (quoting Local Gov't Comment 9 (JA__))); Local Gov'ts Br. 3–4.

FMCSA asserts that it is "entitled to deference" on its evaluation of the market. Resp. Br. 41. A reasoned rulemaking, though, would consider the harmful safety impacts of the exclusion of 194,000 experienced drivers. FMCSA's failure to consider these consequences shows that it "entirely failed to consider an important aspect of the problem." *Motor*

---

[10] Am. Transp. Research. Inst., *Critical Issues in the Industry – 2025*, at 24 (Oct. 2025), FMCSA-2025-0622-9364 (JA__).

*Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983).

### B. FMCSA's assertion that drivers with EADs cannot be adequately vetted does not justify the Rule.

Without presenting evidence that work-authorized drivers with EADs have posed a greater risk than any other drivers, FMCSA asserts that the primary justification for the Rule is that drivers with EADs cannot be adequately vetted for safety fitness because they have unknown foreign driving histories. Even putting aside the lack of evidence that existing vetting for non-domiciled CDLs harmed road safety, this assertion fails to justify the Rule. Both non-domiciled and domiciled drivers are subject to the same knowledge and fitness requirements, and FMCSA's focus on access to foreign driving histories does not withstand scrutiny.[11]

---

[11] FMCSA wisely appears to have abandoned its contention that lack of access to "concurrent driving record[s] outside the United States," 91 Fed. Reg. 7048, justifies the Rule. FMCSA had no evidence that asylees and refugees, for example, travel back and forth between the United States and the countries from which they fled. *See* Opening Br. 40.

14

### 1. Non-domiciled commercial drivers are subject to the same vetting as domiciled commercial drivers.

The lack of evidence that non-domiciled drivers make roads less safe, *see supra* II.A, is not surprising because they are subject to the same requirements and vetting as domiciled drivers. To start, as Petitioners explained, all CDL applicants—domiciled and non-domiciled—must satisfy extensive training, knowledge, skills, testing, and qualification requirements to obtain a CDL in this country. Opening. Br. 4–6 (discussing regulatory requirements).

FMCSA asserts that, because "past driving history is a powerful predictor of future driving safety," inaccessible foreign records result in "'an unacceptable bifurcated standard'" in driving vetting, Resp. Br. 42 (quoting 91 Fed. Reg. 7044), because "U.S.-based drivers are subject to strict vetting, while non-domiciled drivers with an unknown foreign driving history are allowed to obtain a non-domiciled CLP or CDL," 91 Fed. Reg. 7054. The standard, though, is the same for both domiciled and non-domiciled drivers. Even before the Final Rule, FMCSA required state licensing agencies to conduct the same "strict vetting" for all applicants (domiciled and non-domiciled), including through training, skills and knowledge-based tests, and qualification requirements, and by

15

requesting the "complete driving record from all States where the applicant was previously licensed over the last 10 years." 49 C.F.R. § 383.73(b)(3)(iv).

Nonetheless, FMCSA worries that an immigrant's *foreign* record may show a driving history "that would otherwise disqualify them from obtaining a CDL or would pose a significant safety risk." Resp. Br. 31. But FMCSA treats older safety violations—of all drivers—as less concerning than more recent ones. For example, FMCSA allows drivers with serious traffic violations to regain eligibility for a CDL120 days after a disqualifying violation, *see* 49 C.F.R. § 383.51(c), and allows states to reinstate drivers disqualified for offenses as serious as vehicular manslaughter after ten years, *id.* § 383.51(a)(6). Yet people with EADs have necessarily been in the United States for more than 120 days.[12]

---

[12] Processing times for EAD applications generally far exceed 120 days—for example, 19 months for a refugee. *See* USCIS, *Case Processing Times*, https://egov.uscis.gov/processing-times. And asylum seekers must have been in the U.S. for longer than 150 days before even applying for an EAD. *See* 8 C.F.R. § 208.7(a)(1)(i).

16

Moreover, noncitizens with EADs often have years of driving history *in the U.S.* that can be verified by state licensing agencies.[13]

FMCSA's reliance on 49 U.S.C. § 31311(a)(6) and literature cited in the Rule do not support its theory. *See* Resp. Br. 37 (citing 91 Fed. Reg. 7048–49). Section 31311(a)(6) requires a state issuing or a renewing a CDL to "request from any other State that has issued a driver's license to the individual all information about the driving record of the individual." *Id.* That provision applies equally to non-domiciled and domiciled applicants: Domestic driving records are required for both, and foreign records are required for neither. And none of the literature addresses the safety impact of access to foreign driving records. One study that FMCSA cites found increased crash risk from "prior moving violations *in the last three years*," 91 Fed. Reg. 7048 n.8 (emphasis added)—and thus highlights the unreasonable overbreadth of the Rule, which applies to people regardless of how long they have lived in the United States.

---

[13] *See* Maine Sec'y of State Comment 2, FMCSA-2025-0622-7475 (JA__); *see also infra* n.16 (collecting examples in comments).

17

FMCSA admits that its decision to exclude DACA recipients (approximately 21 percent of the impacted drivers)[14]—all of whom, by definition, came to the United States before they were old enough to drive and thus have exclusively verifiable U.S. records[15]—cannot be explained by lack of access to foreign driving records. *See* Resp. Br. 52. Similarly, many other immigrant drivers with EADs left their countries of origin years or decades ago and, therefore, have years of verifiable U.S. driving history.[16] FMCSA's response that it is "speculation" whether "certain groups of aliens are more or less likely to have driving histories here or abroad," Resp. Br. 43, highlights that the agency lacked a factual record adequate to support its decision.

---

[14] *See* J.B. Hunt, *Immigration Policy and Enforcement Impact on U.S. Commercial Driver Supply* (Mar. 24, 2026), https://www.jbhunt.com/blog/enterprise/immigration-policy-impact.

[15] *See* State Attorneys Gen. Comment 7 & n.24 (citing requirements for DACA status) (JA__).

[16] Maine Sec'y of State Comment 2 (JA__); *see, e.g.*, Juan Gutierrez Ponce Comment, FMCSA-2025-0622-3293 (24 years) (JA__); Carmelo Otero Comment, FMCSA-2025-0622-3254 (20 years) (JA__); Anonymous Comment, FMCSA-2025-0622-6487 (20 years) (JA__); Gurpreet Singh Comment, FMCSA-2025-0622-5935 (11 years) (JA__); Gursharanjit Sohal Comment, FMCSA-2025-0622-4513 (11 years) (JA__); *see also* John Doe Decl. ¶3 (10 years); Semenovskii Decl. ¶4 (5 years).

18

## 2. FMCSA's decision to allow other categories of immigrants to obtain CDLs undermines its reliance on vetting as the primary basis for its Rule.

While FMCSA's primary justification for the Rule is lack of access to foreign driving records, the Rule retains CDL eligibility for both domiciled drivers with foreign driving histories and various categories of non-domiciled drivers whom it assumes continue to drive abroad. The "discrepancy in the reach of the [r]ule given its underlying rationale" evidences arbitrary and capricious decisionmaking. *World Shipping Council v. Federal Maritime Comm'n*, 152 F.4th 215, 223 (D.C. Cir. 2025*)*.

First, according to FMCSA's statistics, the 194,000 immigrant drivers made ineligible by the Rule constitute approximately one-third of the total U.S. population of foreign-born CDL drivers, who include permanent residents and naturalized citizens.[17] A foreign spouse of a

---

[17] FMCSA's 2023 data reflect that immigrants—defined as people not born in the U.S.—represent 15.7 percent of the CDL workforce. *See* FMCSA, *Demographics of the CMV Workforce* 18 (Aug. 14, 2023), https://www.fmcsa.dot.gov/mission/advisory-committees/wotab/wotab-presentation-demographics-cmv-workforce. FMCSA estimates that, in 2023, there were approximately 3.8 million interstate CDL drivers. FMCSA, *2024 Pocket Guide to Large Truck and Bus Statistics* 7 (July 2025), https://www.fmcsa.dot.gov/safety/data-and-statistics/2024-pocket-guide-large-truck-and-bus-statistics. Thus, FMCSA's data show an estimated total of 596,600 immigrant CDL drivers.

U.S. citizen, for example, is immediately eligible for permanent resident status, *see* 8 U.S.C. § 1151(b)(2)(A)(i),[18] and thus for a CDL, even if the spouse has an extensive foreign driving history and no domestic driving experience. FMCSA failed to acknowledge that discrepancy, much less to explain why the Rule permits two-thirds of the population of CDL drivers who were domiciled abroad to hold CDLs, when those drivers are equally as likely as the drivers excluded by the Rule to have foreign driving histories (and more likely to travel back to their countries of origin).[19]

Second, the Final Rule allows three groups of temporary immigrant workers to hold CDLs: people with H-2A, H-2B, and E-2 visas. While FMCSA says that concern about lack of access to driving records is "mitigate[d]" for these groups, Resp. Br. 45, drivers who are *temporarily* in the U.S. are *more* likely to have foreign driving records, including recent records, than the immigrant groups now prohibited from holding

---

[18] *See also* USCIS, *Green Card for Immediate Relatives of U.S. Citizen* (last updated Jan. 30, 2026), https://www.uscis.gov/green-card/green-card-eligibility/green-card-for-immediate-relatives-of-us-citizen.

[19] *See* American Federation of State, County & Municipal Employees (AFSCME) Comment 3, FMCSA-2025-0622-7276 (JA__).

CDLs.[20] And many of the screening processes that FMCSA cites to explain why these categories of visa holders may continue to drive commercial vehicles in the United States also apply to people excluded by the Rule. *See* Opening Br. 46–51. Thus, FMCSA's reasons for continuing to allow these groups to hold CDLs do not support disqualifying EAD holders.

FMCSA responds with the non-sequitur that "independent contractors" do not have employers. Resp. Br. 47. Of course, not all EAD drivers are independent contractors, rather than employees. And FMCSA does not actually suggest that employers of immigrant drivers who currently reside in the United States vet their drivers less thoroughly than employers of H-2A, H-2B, and E-2 visa holders. Likewise, independent contractors, such as owner-operators Petitioners Rivera Lujan and Semenovskii, drive on behalf of companies that are incentivized to screen for safe drivers. And democratically accountable state and local governments, who also have strong incentives for careful

---

[20] *See* State Attorneys Gen. Comment 7 (JA__); Maine Sec'y of State Comment 2–3 (JA__); Central Puget Sound Comment 5, FMCSA-2025-0622-7930 (JA__); Asylum Seekers Advocacy Project Comment 6–7, FMCSA-2025-0622-6546 (JA__); AFSCME Comment 3 (JA__).

screening, employ many of the now-ineligible drivers,[21] including public employee members of Petitioners AFSCME and American Federation of Teachers.

FMCSA also asserts that the lines it drew—allowing CDLs for H-2A, H-2B, and E-2 visa holders but excluding other work-authorized noncitizens—is based on the "totality" of the processes for the allowed groups. Resp. Br. 48. FMCSA, however, does not appear to dispute most of the problems that Petitioners identified with those processes— including, for example, that the Department of Labor (DOL) process does not apply to E-2 visa holders and does not ensure that the people with H-2A and H-2B visas are safe drivers. *See* Opening Br. 46. And as to the two problems identified by Petitioners to which FMCSA did respond— FMCSA's reliance on the consular process and "ongoing federal oversight" by two agencies—FMCSA's responses do not justify its decision to exclude other work-authorized immigrants, who are also subject to ongoing federal oversight (as they renew their immigration

---

[21] *See, e.g.*, Central Puget Sound Comment 6 (describing the screening process for bus operators) (JA__).

documents), and other visa holders (who also undergo consular interviews).

In sum, FMCSA did not engage in line-drawing that was "within a zone of reasonableness" but not "precisely right." Resp. Br. 43 (citation omitted). Rather, while justifying the exclusion of drivers with EADs based on lack of access to their foreign driving records, FMCSA continues to permit the majority of the population of CDL drivers who have been or are domiciled abroad to hold CDLs. Even grading generously, a rule that ignores the substantial majority of the purported problem without explanation calls into question the agency's objective and is not within any "zone of reasonableness."

## C. Disqualifying drivers with EADs based on administrative concerns was arbitrary and capricious.

The Rule accomplishes its exclusion of most work-authorized immigrants from CDLs by disallowing EADs as documentation to support a non-domiciled CDL application. FMCSA justifies this change based on a purported concern with state administrability, asserting that state licensing clerks purportedly "struggle[] to interpret" EADs and that there are "widespread compliance issues attending the use of EADs." Resp. Br. 50. Importantly, FMCSA concedes that "driver safety was not

directly implicated by the change." *Id.* at 51. And it could not contend otherwise, for the record shows no connection between safety outcomes and the administrability concerns it cites. *See* Opening Br. 55 & n.62 (noting that New York, which FMCSA asserts was noncompliant, has one of the lowest fatal crash rates in the country). FMCSA's reliance on administrability concerns to make immigrants with EADs ineligible for a CDL, is arbitrary and capricious.

### 1.    The exclusion of DACA recipients lacks a reasoned justification.

FMCSA's purported administrability concern is its *only* basis for disqualifying from commercial driving the approximately 42,000 DACA recipients who, as of last year, held CDLs.[22] None of FMCSA's arguments for excluding DACA recipients justifies its decision.

FMCSA claims that it was reasonable for FMCSA to prohibit CDLs for DACA recipients because, as to DACA recipients from Mexico (but not elsewhere), it was "solely by virtue of FMCSA's nonenforcement posture" that DACA recipients were allowed CDLs under the prior regulations. Resp. Br. 53 (quoting 91 Fed Reg. 7055). But an agency's decision to

---

[22] *See* J.B. Hunt, *supra* n.14 (estimating impacted drivers).

24

rescind a non-enforcement policy is subject to the Administrative Procedure Act's arbitrary and capricious standard. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 28–30 (2020). And FMCSA provides no reasoned explanation for changing its policy. In any event, FMCSA is wrong that the prior regulations prohibited Mexican-citizen DACA recipients from holding non-domiciled CDLs. The regulation that FMCSA cites provided that, if the applicant's domiciled country did not have testing and licensing standards equivalent to those in the U.S., that person "must obtain" a non-domiciled CDL to drive a commercial vehicle in the U.S. 49 C.F.R. § 383.71(f)(1) (2021). That regulation did not, however, prohibit citizens of a country with equivalent standards (Mexico and Canada) from obtaining a non-domiciled CDL. To the extent that the regulations prohibited Mexican citizens from holding a CDL in the U.S., the prohibition applied only to "*a driver holding a commercial driver's license*" issued by Mexico, 49 C.F.R. § 383.23(b)(1) n.1 (emphasis added), because that driver was permitted to drive in the U.S. with their Mexican license—a point that FMCSA reiterated in its state audits.[23] Thus, consistent with the prior regulation, FMCSA's guidance permitting

---

[23] *See, e.g.*, FMCSA-2025-0622-4010, at 4 (Texas) (JA__).

Mexican-citizen DACA recipients to apply for non-domiciled CDLs stated that they were eligible for those licenses so long as they did not hold a Mexican CDL.[24]

FMCSA asserts that allowing CDLs for DACA recipients, but not other immigrants with EADs, would confuse state licensing clerks, resulting in states issuing noncompliant CDLs. *See* Resp. Br. 52. FMCSA asserts that state clerks "routinely misinterpreted" EAD codes for DACA recipients, leading them improperly to issue CDLs to Mexican citizens who were not DACA recipients. Resp. Br. 54. The audit data, though, showed only approximately 70 instances out of over 2,000 records sampled—a 0.03 error rate. *See* Opening Br. 57.[25] FMCSA does not respond to this fact.

---

[24] FMCSA-2025-0622-9339 (DACA recipient guidance) (JA__).

[25] *See also infra* n.27 (collecting state audit data). In more than half the states where FMCSA found errors, there were only between 1 and 3 instances. *See* FMCSA-2025-0622-8063 (Minnesota; 3 of 75) (JA__); FMCSA-2025-0622-8094 (North Carolina; 2 of 50) (JA__); FMCSA-2025-0622-8060 (Ohio; 1 of 125) (JA__); FMCSA-2025-0622-8067 (Oklahoma; 1 of 50) (JA__); FMCSA-2025-0622-8065 (Rhode Island; 1 of 50) (JA__); FMCSA-2025-0622-8096 (Utah; 3 of 55) (JA__); FMCSA-2025-0622-4009 (Washington; 1 of 125) (JA__).

### 2.    The cited administrability concerns are illusory.

More generally, FMCSA's administrability argument is not supported by the record. The EADs that FMCSA declares confusing to state clerks look like driver's licenses and have just one category code, clearly stated under the word "Category":



*See* USCIS, Handbook for Employers M-274 § 13.1.4.[26] And aside from the 0.03 purported error rate relative to Mexican CDL holders, *none* of the audit letters on which FMCSA relies found a state noncompliant for misinterpreting EAD codes.[27] Indeed, although Petitioners explained

---

[26]    https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274.

[27]    *See* FMCSA-2025-0622-4009–12 (Washington, Texas, South Dakota, Colorado) (JA__); FMCSA-2025-0622-8053–55 (Indiana, Maine, Iowa) (JA__); FMCSA-2025-0622-8057–61 (Delaware, Vermont, District of Columbia, Ohio, North Dakota) (JA__); FMCSA-2025-0622-8063–68 (Minnesota, Michigan, Rhode Island, New York, Oklahoma, Pennsylvania) (JA__); FMCSA-2025-0622-8092–96 (Maryland, New

that the data do not identify improper CDL issuance based on misreading EAD codes, *see* Opening Br. 56 & n.65, FMCSA offers no response.

Similarly, FMCSA asserts widespread state noncompliance because states failed to set a CDL expiration date before or on the date of the EAD expiration date. *See* 91 Fed. Reg. 7045. First, the record shows, and FMCSA does not dispute, that the vast majority of states *were* matching the dates. *See* Opening Br. 59 & n.70. Second, FMCSA's conclusion, currently being challenged in court,[28] that nonmatching expiration dates did not comply with the then-applicable federal regulations rests on the agency's theory that the state should have adopted a practice that was not stated in the regulations and that FMCSA never announced before it faulted states for failing to adopt it. *See* Opening Br. 58–59.[29] FMCSA's brief repeats its new interpretation

---

Jersey, North Carolina, Oregon, Utah) (JA__); FMCSA-2025-0622-0463, -8056, -8062 (California) (JA__; JA__; JA__).

[28] *See Cal. Dep't of Motor Vehicles v. Dep't of Transp.*, No. 26-1027 (D.C. Cir. filed Feb. 4, 2026); *New York v. Dep't of Transp.*, No. 26-1097 (2d Cir. filed Apr. 24, 2026).

[29] *See* Letter from NY Dep't of Motor Vehicles to FMCSA (Mar. 23, 2026) (explaining that, in FMCSA's prior audits, it had *never* found the state noncompliant from mismatched expiration dates), *available at* Opening Br. App'x A37, *New York v. Dep't of Transp.*, No. 26-1097 (2d Cir.).

of the regulatory text, but it does not dispute that matching expiration dates were not stated in the regulations for CDLs, unlike the regulations for REAL IDs. *See* 6 C.F.R. § 37.21(b)(1). And FMCSA's point that six states independently require matching hardly translates to "consistent failure across more than 30 States" to comply with federal regulations. 91 Fed. Reg. 7052.

Third, regardless of whether FMCSA's newly adopted interpretation of its longstanding regulation was reasonable, it was arbitrary and capricious to strip thousands of drivers of their CDLs on the basis that states had not previously complied with that new interpretation. *See AT&T Co. v. FCC*, 454 F.3d 329, 332 (D.C. Cir. 2006) (stating that "judicial hackles" are raised when "an agency alters an established rule defining permissible conduct which has been generally recognized and relied on throughout the industry that it regulates" (citation omitted)); *cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (cautioning against retroactive rulemaking).

FMCSA also asserts that its administrability concerns are supported by instances where states accepted a Form I-797C with an "expiring or expired" EAD. Resp. Br. 55. But FMCSA found fewer than

29

20 such instances, out of more than 2,000 records sampled[30]—hardly a "systematic collapse in State compliance." *Id.* (quoting 91 Fed Reg. 7052). Moreover, the instances are likely *not* non-compliance: Under the regulations in effect during FMCSA's audits, an EAD "that has expired on its face is considered unexpired when combined with a Notice of Action (Form I–797C)," demonstrating the EAD's "[a]utomatic extension" that the Department of Homeland Security put in place to address its persistent processing backlog. 8 C.F.R. § 274a.13 (2015). And the Department of Homeland Security expressly stated that "[a]n individual may choose to present the Form I–797C to a DMV, depending on state DMV rules, in combination with his or her expired EAD that has been automatically extended pursuant to this rule." 81 Fed. Reg. 82398, 82462 (2016). Thus, FMCSA's concern appears to be based on its misunderstanding of the applicable regulatory scheme.

---

[30] *See* FMCSA-2025-0622-4012 (Colorado; 1 of 99 records sampled) (JA__); FMCSA-2025-0622-8059 (District of Columbia; 2 of 32) (JA__); FMCSA-2025-0622-8054 (Maine; 3 of 25) (JA__); FMCSA-2025-0622-8060 (Ohio; 3 of 125) (JA__); FMCSA-2025-0622-4010 (Texas; 8 of 123) (JA__).

**D.    FMCSA failed to consider reasonable alternatives.**

Instead of barring most immigrants with lawful work authorization from obtaining or renewing CDLs, FMCSA could have adopted any number of less drastic alternatives to address its purported safety concerns (if those concerns were substantiated). FMCSA's failure to consider "significant and viable and obvious alternatives" to the wholesale exclusion of immigrants with EADs was arbitrary and capricious. *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (citation omitted).

For example, FMCSA could have allowed current CDL holders to continue to be eligible for renewal, and it could have limited new CDLs to applicants who have had U.S. driving records for a specified minimum period of time. *See* Opening Br. 52–53. FMCSA's basis for rejecting these and other options is make-weight. For instance, FMCSA rejected the possibility of grandfathering in drivers who operated safely with a U.S. non-domiciled CDL on the ground that it "would disserve the purpose of the Rule because those drivers were insufficiently vetted." Resp. Br. 59. But the purpose of vetting is to screen out drivers who may not be able to safely drive a commercial vehicle in the United States, and allowing

31

drivers who have demonstrated the ability to drive safely to continue to drive is fully consistent with the agency's safety mission and its treatment of other commercial drivers. *See* 49 C.F.R. § 383.51(c) (allowing drivers with disqualifying offenses to regain eligibility for a CDL after the passage of time). The mantra "vetting" is not a "reasoned explanation" rejecting that alternative. *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (citation omitted).

Moreover, as to the purported administrability concerns, FMCSA does not respond *at all* to why its interest in matching expiration dates could not be accommodated by requiring states to reissue existing non-domiciled CDLs with new expiration dates. And as to its rejection of other alternatives—such as improved state guidance or clerk training—FMCSA's response that there was widespread noncompliance "across more than 30 states" is not responsive (and not supported by the record).

**E.    FMCSA failed to adequately consider the substantial reliance interests of CDL drivers, their employers, and the public.**

"When an agency changes course, as [FMCSA] did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into accoun.'" *Regents*, 591 U.S. at

30 (citation omitted). Although FMCSA quibbles over the precise articulation of an agency's responsibility, Resp. Br. 60, the law is clear that the agency must not only "display awareness that it is changing position," but also "offer 'good reasons for the new policy.'" *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 570 (2025) (emphasis removed). Here, the Rule indisputably threatens the livelihoods of individual drivers, disrupts essential services like public transportation, school bus service, road maintenance, and waste management, and fractures supply chains. *See* Congressmembers Br. 32–34; Br. of Mass. et al. 18–21; Local Gov'ts Br. 6–11; Waste Pro Br. 4–10; Teamsters Cal. Br. 6–20; Br. of Asylum Seeker Advocacy Project et al. 5–10.

FMCSA's response that "affected drivers will have up to five years to adjust" grossly mischaracterizes the record. Resp. Br. 61. Because thousands of CDLs come up for renewal every month, *thousands* of drivers have already lost their CDLs. Many consequent harms thus have already come to pass. *See* Br. of Mass. et al. 18–21; Waste Pro Br. 5–6.

FMCSA bizarrely suggests that consideration of reliance interests is diminished because impacted drivers and their employers "should have been aware" that their licenses were not a "permanent right" because

33

both CDLs and EADs have expiration dates. Resp. Br. 61. Expiration dates gave drivers no basis to think that FMCSA would strip immigrants with EADs of the ability—going back to the first federal CDL regulations in 1988, *see* Opening Br. 6—to drive commercial vehicles in the United States.

## CONCLUSION

This Court should grant the petition and vacate the Final Rule.

Respectfully submitted,

/s/ *Wendy Liu*

Teague Paterson
Matthew Blumin
American Federation of
  State, County &
  Municipal Employees,
  AFL-CIO
1625 L Street NW
Washington, DC 20036
(202) 775-5900

*Counsel for Petitioner American
Federation of State, County &
Municipal Employees*

Wendy Liu
Cormac Early
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
wliu@citizen.org

*Counsel for All Petitioners in*
No. 26-1032

Daniel McNeil
Channing Cooper
American Federation of Teachers,
  AFL-CIO
555 New Jersey Avenue NW
Washington, DC 20001
(202) 879-4400

*Counsel for Petitioner American
Federation of Teachers*

July 29, 2026

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by the Federal Rules of Appellate Procedure and this Court's rules, this document contains 6,453 words, as calculated by Microsoft Word 365.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word 365.

/s/ *Wendy Liu*
Wendy Liu