ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 15, 2026

Nos. 26-1032, 26-1046

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JORGE RIVERA LUJAN, ALEKSEI SEMENOVSKII, AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO, and AMERICAN FEDERATION OF TEACHERS,

*Petitioners,*

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION, and UNITED STATES,

*Respondents.*

*(caption continued on inside cover)*

On Petitions for Review of a Final Rule Issued by the Federal Motor Carrier Safety Administration

# JOINT APPENDIX
# VOLUME II

Wendy Liu
Cormac Early
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
wliu@citizen.org

*Counsel for Petitioners in No. 26-1032*

August 5, 2026

Teague Paterson
Matthew Blumin
American Federation of
State, County & Municipal
Employees, AFL-CIO
1625 L Street, NW
Washington, DC 20036
(202) 775-5900

*Counsel for Petitioner AFSCME*

Daniel McNeil
Channing Cooper
American Federation of Teachers
555 New Jersey Avenue NW
Washington, DC 20001
(202) 879-4400

*Counsel for Petitioner AFT*

---

MARTIN LUTHER KING, JR. COUNTY,
*Petitioner,*

v.

SEAN DUFFY IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF TRANSPORTATION; THE U.S. DEPARTMENT OF TRANSPORTATION; THE FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION; THE UNITED STATES,
*Respondents.*

---

# INDEX



| Vol. | Docket No. | Title | Page |
|---|---|---|---|
| I | | Final Rule, Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 91 Fed. Reg. 7044 (effective Mar. 16, 2026) | JA0001 |
| I | | Interim Final Rule, Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46509 (effective Sept. 29, 2025) | JA0061 |
| II | FMCSA-2025-0622-1652 | Comment from Aleksei Semenovskii | JA0079 |
| II | FMCSA-2025-0622-0463 | U.S. DOT/FMCSA - Letter to California - 2025 Annual Program Review Finding | JA0092 |
| II | FMCSA-2025-0622-3254 | Comment from Carmelo Otero | JA0108 |
| II | FMCSA-2025-0622-3293 | Comment from Juan Gutierrez Ponce | JA0110 |
| II | FMCSA-2025-0622-4009 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Washington | JA0112 |
| II | FMCSA-2025-0622-4010 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Texas | JA0122 |

| Vol. | Docket No. | Title | Page |
|---|---|---|---|
| II | FMCSA-2025-0622-4011 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - South Dakota | JA0142 |
| II | FMCSA-2025-0622-4012 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Colorado | JA0151 |
| II | FMCSA-2025-0622-4513 | Comment from Gursharanjit Sohal | JA0162 |
| II | FMCSA-2025-0622-5935 | Comment from Raman Singh | JA0164 |
| II | FMCSA-2025-0622-6487 | Comment from Anonymous | JA0166 |
| II | FMCSA-2025-0622-6546 | Comment from Asylum Seeker Advocacy Project | JA0168 |
| II | FMCSA-2025-0622-7134 | Comment from AFT | JA0176 |
| II | FMCSA-2025-0622-7208 | Comment from Rafael Tavarez | JA0180 |
| II | FMCSA-2025-0622-7223 | Comment from Unitarian Universalists for Social Justice | JA0182 |
| II | FMCSA-2025-0622-7240 | Comment from The American Association of Motor Vehicle Administrators (AAMVA) | JA0183 |
| II | FMCSA-2025-0622-7246 | Comment from Josh Kloepper, attaching FMCSA, Large Truck Crash Causation Study – Analysis Brief (July 2007) | JA0194 |

| Vol. | Docket No. | Title | Page |
|---|---|---|---|
| II | FMCSA-2025-0622-7248 | Comment from Justice at Work PA | JA0200 |
| II | FMCSA-2025-0622-7259 | Comment from United Steelworkers (USW) | JA0202 |
| II | FMCSA-2025-0622-7264 | Comment from Colorado Fiscal Institute | JA0205 |
| II | FMCSA-2025-0622-7276 | Comment from AFSCME | JA0208 |
| II | FMCSA-2025-0622-7289 | Comment from Asian American Legal Defense and Education Fund | JA0212 |
| II | FMCSA-2025-0622-7475 | Comment from Maine Secretary of State Department | JA0217 |
| II | FMCSA-2025-0622-7515 | Comment from U.S. Committee for Refugees and Immigrants, Church World Service, IRC, Orel Alliance, RCUSA, World Relief | JA0222 |
| II | FMCSA-2025-0622-7540 | Comment from New York State Office of Temporary and Disability Assistance | JA0230 |
| II | FMCSA-2025-0622-7550 | Comment from Oregon Department of Transportation - Driver and Motor Vehicle Services Division | JA0233 |
| II | FMCSA-2025-0622-7554 | Comment from Maine Equal Justice | JA0236 |

| Vol. | Docket No. | Title | Page |
|---|---|---|---|
| II | FMCSA-2025-0622-7563 | Comment from MALDEF (Mexican American Legal Defense and Educational Fund) | JA0243 |
| II | FMCSA-2025-0622-7571 | Comment from Massachusetts, California, and 17 Other Jurisdictions | JA0249 |
| II | FMCSA-2025-0622-7616 | Comment from Asian Law Caucus | JA0266 |
| II | FMCSA-2025-0622-7875 | Comment from Teamsters California | JA0277 |
| II | FMCSA-2025-0622-7885 | FMCSA SDLA Comment Solicitation Letter, Nov 18, 2025 | JA0286 |
| II | FMCSA-2025-0622-7894 | Comment from Public Rights Project on behalf of Local Governments | JA0287 |
| II | FMCSA-2025-0622-7906 | Comment from Washington Trucking Associations | JA0301 |
| II | FMCSA-2025-0622-7911 | Comment from Martin Luther King County, by and through its Metro Transit Department | JA0308 |
| III | FMCSA-2025-0622-7914 | Comment from Maryland Department of Transportation (MDOT) Motor Vehicle Administration (MVA) | JA0325 |
| III | FMCSA-2025-0622-7929 | Comment from California Bus Association | JA0328 |

| Vol. | Docket No. | Title | Page |
|---|---|---|---|
| III | FMCSA-2025-0622-7930 | Comment from Central Puget Sound Regional Transit Authority | JA0331 |
| III | FMCSA-2025-0622-8019 | Comment from Amalgamated Transit Union | JA0337 |
| III | FMCSA-2025-0622-8020 | Comment from Delaware Division of Motor Vehicles | JA0339 |
| III | FMCSA-2025-0622-8053 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Indiana | JA0342 |
| III | FMCSA-2025-0622-8054 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Maine | JA0353 |
| III | FMCSA-2025-0622-8055 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Iowa | JA0361 |
| III | FMCSA-2025-0622-8056 | U.S. DOT/FMCSA - Conditional Determination - California | JA0371 |
| III | FMCSA-2025-0622-8057 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Delaware | JA0383 |
| III | FMCSA-2025-0622-8058 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Vermont | JA0392 |
| III | FMCSA-2025-0622-8059 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - District of Columbia | JA0402 |

| Vol. | Docket No. | Title | Page |
|---|---|---|---|
| III | FMCSA-2025-0622-8060 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Ohio | JA0411 |
| III | FMCSA-2025-0622-8061 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - North Dakota | JA0421 |
| III | FMCSA-2025-0622-8062 | U.S. DOT/FMCSA - Final Determination of Substantial Noncompliance - California | JA0428 |
| III | FMCSA-2025-0622-8063 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Minnesota | JA0438 |
| III | FMCSA-2025-0622-8064 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Michigan | JA0450 |
| III | FMCSA-2025-0622-8065 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Rhode Island | JA0458 |
| III | FMCSA-2025-0622-8066 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - New York | JA0465 |
| III | FMCSA-2025-0622-8067 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Oklahoma | JA0485 |

| Vol. | Docket No. | Title | Page |
|---|---|---|---|
| III | FMCSA-2025-0622-8068 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Pennsylvania | JA0493 |
| III | FMCSA-2025-0622-8092 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Maryland | JA0502 |
| III | FMCSA-2025-0622-8093 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - New Jersey | JA0510 |
| III | FMCSA-2025-0622-8094 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - North Carolina | JA0517 |
| III | FMCSA-2025-0622-8095 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Oregon | JA0530 |
| III | FMCSA-2025-0622-8096 | U.S. DOT/FMCSA - Preliminary Determination of Noncompliance - Utah | JA0539 |
| III | FMCSA-2025-0622-8110 | U.S. DOT/FMCSA - List of States FMCSA Determined Were in Substantial Noncompliance | JA0551 |
| IV | FMCSA-2025-0622-9322 | U.S. DOT/FMCSA - Driver Issues: Commercial Motor Vehicle Safety Literature Review, June 2007 | JA0556 |

| Vol. | Docket No. | Title | Page |
|---|---|---|---|
| IV | FMCSA-2025-0622-9329 | U.S. DOT/FMCSA - May a foreign driver with an employment authorization document obtain a CDL to operate a CMV in the United States, March 8, 2019 | JA0775 |
| IV | FMCSA-2025-0622-9339 | U.S. DOT/FMCSA - May a State Driver's Licensing Agency (SDLA) issue a non-domiciled CLP or CDL to an individual who is present in the United States under the Deferred Action for Childhood Arrivals (DACA) immigration policy as a citizen of Mexico, May 8, 2023 | JA0778 |
| V | FMCSA-2025-0622-9349 | U.S. DOT/FMCSA - Commercial Driver Safety Risk Factors, June 2020 | JA0781 |
| VI | FMCSA-2025-0622-9362 | ATRI - Predicting Truck Crash Involvement: 2022 Update, October 2022 | JA1012 |
| VI | FMCSA-2025-0622-9364 | ATRI - Critical Issues in the Trucking Industry - 2025, October 2025 | JA1075 |
| VI | FMCSA-2025-0622-9368 | U.S. DOT/OIG - Management Advisory to the Deputy Secretary of Transportation: Need to Establish a Legal Presence | JA1105 |

**Comment on FMCSA Interim Final Rule — Docket No. FMCSA-2025-0622-0001 & FMCSA-2025-0622-1050**

**I respectfully submit this comment opposing FMCSA's Interim Final Rule on non-domiciled Commercial Driver's Licenses (CDLs).**

I am a 40-year-old lawful immigrant living with my wife and daughter in Southampton, Pennsylvania. In May 2019, we came to the United States after I faced unjust persecution and threats to my life in Russia. We filed for asylum in November 2019, and for nearly six years, we have waited for our interview with USCIS. During this long process, our lawful presence has been continuously confirmed by Employment Authorization Documents.

Like many new Americans, I had to start over. In Russia, I was a lawyer and a high school professor. In America, I worked hard to build a new life in trucking. In September 2020, I earned my non-domiciled CDL and began driving to support my family. From 2020 until today, I gradually invested in my small business—purchasing two semi-trucks and two trailers. To do this, I took out loans, which I continue to pay off while working hard to keep my business running. I established my own trucking authority, paid my taxes faithfully, and built a strong reputation with brokers and customers.

I have driven safely for years as a commercial driver, with no violations, no accidents, and no citations on my CDL record. I take the responsibility of operating a commercial motor vehicle very seriously because I know that every mile I drive, I am responsible for the lives of others.

On October 25, 2022, while delivering a load to a Louisiana DOT site, I suffered a severe workplace injury. A DOT worker negligently pushed a section of the load onto me, crushing my left leg and leaving it badly broken. At the same time, I sustained a deep laceration to my forehead and a serious brain concussion. Doctors informed me that my leg injury will cause permanent complications and severe arthritis for life. To this day, I am still limping and cannot remain on my feet for more than an hour without pain. Despite these lasting injuries, I fought to recover and returned to work as soon as I could—because trucking is the only way I can support my family and continue contributing to America's supply chain.

This new rule has also taken an emotional toll on my family. My 13-year-old daughter has been deeply affected and fell into depression when she learned what might happen. She was so afraid that our family would be ruined that she wept for three days. It is unbearable for me as a father to see her live with this fear, knowing how hard I have worked to give her stability and hope.

Now, the FMCSA Interim Final Rule (IFR) on non-domiciled CDLs threatens to strip me of my license—not because of any unsafe behavior or violation, but simply because of my immigration category. This is devastating. If my CDL is downgraded, I will lose my business, default on my loans, and fail to provide for my wife and daughter. After years of lawful presence, heavy investment, and even sacrificing my health and future mobility in the line of duty, this feels like punishment for being an immigrant rather than recognition of my record as a safe, responsible, and law-abiding driver.

I am not alone. An estimated 200,000 other lawful immigrant drivers face the same fate. Many of us have proven ourselves to be safe and professional drivers who strengthen—not weaken—road safety and America's supply chain.

I respectfully ask for your support in reviewing FMCSA's IFR and ensuring that lawful immigrant drivers like me are judged on our safety record and compliance, not our paperwork category.

Thank you for your time and attention.

**Legal Reasoning Memorandum**

Re: Federal Motor Carrier Safety Administration's Interim Final Rule (IFR) Commercial Driver's License Standards: Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, Docket No. FMCSA-2025-0622-0001 and Commercial Driver's License Standards: Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses; Correction, Docket No. FMCSA-2025-0622-1050.

**I. Introduction**

This memorandum examines the legality and constitutionality of FMCSA's Interim Final Rule (IFR) restricting non-domiciled CDL issuance. The IFR is discriminatory, exceeds FMCSA's statutory authority, and undermines constitutional protections.

**II. FMCSA's Statutory Authority**

FMCSA derives authority under 49 U.S.C. §§ 31131–31149, which establishes its mission to reduce crashes, injuries, and fatalities involving commercial vehicles. CDL regulations (49 CFR Parts 383 and 384) were created to promote uniform safety standards, not to enforce immigration policy.

By tying CDL eligibility to immigration categories unrelated to safety, FMCSA:

- Exceeds its delegated powers under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(C).

- Acts in an arbitrary and capricious manner under APA § 706(2)(A), disregarding relevant safety considerations.

- Intrudes into DHS's exclusive jurisdiction: Drivers with valid Employment Authorization Documents (EADs) have already been vetted and approved by DHS to lawfully live and work in the United States.

FMCSA has no statutory authority to override DHS's determinations.

Case law:

- Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29 (1983).

- FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000).

**III. FMCSA Lacks Authority to Override DHS Work Authorization**

Once DHS issues an Employment Authorization Document (EAD), it has conclusively determined that the individual is lawfully present and authorized to work in the United States. This determination rests solely within DHS's congressionally delegated authority.

FMCSA, however, has attempted to second-guess that determination by declaring drivers with valid EADs ineligible for CDL retention. In doing so, FMCSA:

- Exceeds its statutory mission, which is limited to safety regulation.

- Assumes an immigration enforcement role it was never granted by Congress.

- Conflicts with federal supremacy, because immigration and work authorization are matters of exclusive federal authority, not within FMCSA's discretion.

Case law:

- Arizona v. United States, 567 U.S. 387 (2012).

- Hines v. Davidowitz, 312 U.S. 52 (1941).

**Thus, FMCSA's IFR is likely ultra vires (beyond its legal power).**

**IV. Federal Supremacy and Preemption**

Immigration regulation and work authorization are areas of exclusive federal authority. Once DHS issues an EAD, the individual's lawful presence and right to work are settled federal determinations.

FMCSA's attempt to reclassify such individuals as ineligible to hold CDLs is legally impermissible.

Case law:

- Arizona v. United States, 567 U.S. 387 (2012).

- Hines v. Davidowitz, 312 U.S. 52 (1941).

- De Canas v. Bica, 424 U.S. 351 (1976).

**V. FMCSA's Contradictory Safety Justification**

FMCSA asserts: "Restoring the integrity of non-domiciled CDL license issuance will enhance the safety of CMV operations and is likely to result in improved safety outcomes."

Yet, in the same rulemaking, FMCSA admits: "There is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States."

These two statements cannot be reconciled. On one hand, FMCSA claims the IFR is necessary for safety. On the other, it concedes that no empirical evidence exists linking domicile to crash frequency, crash severity, or violations. A rule that rests on speculation rather than fact is arbitrary and capricious under the APA. See State Farm, 463 U.S. at 43, 52.

**VI. FMCSA's National Security Argument Exceeds Its Authority**

FMCSA further asserts that issuance of non-domiciled CLPs and CDLs has "national security implications" because "individuals with malicious intent could gain authorized control of CMVs … **and carry out a terrorist attack."**

**This rationale lies outside FMCSA's statutory mandate.**

- Highway safety: FMCSA's authority is limited to ensuring CMV safety. See 49 U.S.C. § 31136; §§ 31305, 31308.

- National security: DHS and its components (TSA, CBP, ICE) hold exclusive responsibility for terrorism prevention and vetting foreign nationals.

By invoking terrorism concerns without statutory authority or supporting evidence, FMCSA exceeds its role **and engages in ultra vires rulemaking.** See Massachusetts v. EPA, 549 U.S. 497, 532 (2007).

**VII. Equal Protection and Non-Discrimination**

- Constitutional protection: The Fifth Amendment's Due Process Clause incorporates Equal Protection (Bolling v. Sharpe, 347 U.S. 497 (1954)).

- Strict Scrutiny Rule (Graham v. Richardson, 403 U.S. 365 (1971)). Alienage classifications are inherently suspect and presumed unconstitutional unless narrowly tailored to a compelling interest.

**- Governmental Function Exception (Foley v. Connelie, 435 U.S. 291 (1978)). Exception applies only to core governmental functions (e.g., police). Truck driving is a private commercial activity, not a governmental function.**

- Children's Harm (Plyler v. Doe, 457 U.S. 202 (1982)). Punishing children for parents' immigration status is unconstitutional. The IFR harms families economically and imposes long-term hardship on children of immigrant drivers.

**VIII. Section-By-Section Analysis**

A. Regulatory Provisions

- Section 383.5 — Definitions: FMCSA adds a definition of evidence of lawful immigration status.

- Section 383.71 — Driver Application and Certification Procedures: FMCSA revises paragraph (f).

- Section 383.73 — State Procedures: FMCSA amends and adds multiple subsections.

- Section 384.212 — Domicile Requirement: FMCSA adds new paragraphs (a)(1) and (2).

- Section 384.301 — Substantial Compliance—General Requirements: FMCSA adds new paragraph (q).

B. Guidance Statements and Interpretations

This IFR amends a regulation that has associated guidance statements. Such guidance statements do not have the force and effect of law, are strictly advisory, and are not meant to bind the public in any way. Conformity with guidance statements is voluntary. Guidance is intended only to provide information to the public regarding existing requirements under the law or FMCSA policies. A guidance statement does not alter the substance of a regulation.

**Legal Analysis**

**FMCSA admits here that guidance is not binding and cannot alter the substance of a regulation. To the extent FMCSA relies on guidance to justify exclusions in the IFR, such reliance is unlawful. Immigration classifications rest solely with DHS under federal law, and cannot be redefined through nonbinding guidance issued by FMCSA. See Perez v. Mortgage Bankers Ass'n, 575 U.S. 92, 96 (2015).**

**IX. Arbitrary Punishment of Innocent Conduct**

FMCSA's IFR penalizes lawful immigrant drivers with spotless safety records. These drivers are stripped of their licenses solely due to immigration status, not unsafe behavior.

- Yick Wo v. Hopkins, 118 U.S. 356 (1886). A law neutral on its face but applied in a discriminatory way violates Equal Protection.

- Equal protection prohibits disparate treatment of similarly situated individuals. Lawful immigrant CDL drivers and citizen CDL drivers with identical records are treated differently solely due to status.

**- Punishing status rather than conduct is irrational and unconstitutional.**

**X. Conflict with Safety Objectives**

- Safety record ignored: Drivers with strong safety histories are penalized for status, not performance.

- Supply chain harm: The U.S. driver shortage will worsen, increasing fatigue and highway risks.

- Economic destabilization: Loan defaults and bankruptcies will ripple through immigrant communities.

**XI. FMCSA's Exclusion of EAD Holders Is Ultra Vires and Discriminatory**

The IFR unlawfully redefines CDL eligibility by rejecting Employment Authorization Documents (EADs) as sufficient proof of lawful presence. FMCSA asserts that "an EAD only serves as proof that an individual is authorized to work in the United States for a specific time period, not that the individual entered the United States legally."

**1. Ultra Vires Action Beyond Statutory Mandate**

Congress delegated authority over immigration status and work authorization exclusively to DHS.

When USCIS issues an EAD, it conclusively determines that the individual is lawfully present and authorized to work. FMCSA lacks statutory authority to override or second-guess DHS's determinations. See Arizona v. United States, 567 U.S. 387 (2012).

**2. Lack of Safety Evidence**

**FMCSA admits it cannot demonstrate "a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes." Nevertheless, it disqualifies entire categories of lawful workers—refugees, asylees, asylum seekers and DACA recipients—without evidence that they pose safety risks. See State Farm, 463 U.S. at 43, 52.**

**3. Equal Protection Violation**

The categorical exclusion of EAD holders creates an alienage classification subject to strict scrutiny.

FMCSA cannot establish a compelling interest in discriminating against lawful immigrant drivers who have already been authorized to work by DHS. See Graham v. Richardson, 403 U.S. 365 (1971).

**4. Preemption and Federal Supremacy**

**By redefining immigration categories and excluding DHS-authorized workers, FMCSA intrudes on matters of exclusive federal control. See Hines v. Davidowitz, 312 U.S. 52 (1941).**

Conclusion: FMCSA's exclusion of EAD holders is unlawful on multiple grounds.

**XII. FMCSA De Facto Ignores Severe Economic and Human Impacts**

FMCSA acknowledges that drivers who lose eligibility will be displaced but dismisses this impact as "de minimis." The Agency asserts that affected drivers may find similar employment in other sectors.

This reasoning is arbitrary and capricious. By labeling the loss of careers and livelihoods as "de minimis," FMCSA de facto ignores the real-world consequences.

Families face bankruptcies, loan defaults, and instability. Children are directly harmed — a concern recognized in Plyler v. Doe, 457 U.S. 202 (1982).

Moreover, forcing trained CDL holders out of trucking will worsen the driver shortage and highway safety. Under State Farm, 463 U.S. at 43, an agency that disregards significant impacts acts arbitrarily.

**XIII. Conclusion**

**The FMCSA Interim Final Rule is:**

1. Beyond statutory authority (APA § 706(2)(C)), because FMCSA has no legal power to override DHS work authorizations, assert national security authority, or redefine immigration categories.

2. Arbitrary and capricious (APA § 706(2)(A)), because FMCSA itself admits no evidence supports its safety claims, relies instead on speculation, and de facto ignores the severe economic and human impacts of displacing lawful immigrant drivers from their chosen profession.

3. Inconsistent with federal supremacy, conflicting with DHS's exclusive authority over immigration and work authorization.

4. Discriminatory in effect, targeting lawful immigrants, including refugees, asylees, asylum seekers and DACA recipients, and harming families in violation of Equal Protection principles (Graham, Plyler, Yick Wo).

**Proposed Alternative to FMCSA's Interim Final Rule on Non-Domiciled CDLs**

**Instead of excluding all lawful immigrant drivers with Employment Authorization Documents (EADs), FMCSA should adopt a rule that:**

1. **Recognizes DHS authority. Accept DHS-issued Employment Authorization Documents (EADs) as sufficient proof of lawful presence and work authorization for CDL eligibility, consistent with federal supremacy and immigration law.**

2. **Focuses on safety behavior. Condition CDL issuance and renewal on safety-related factors such as driving history, hours-of-service compliance, and drug/alcohol testing results — not immigration category.**

3. **Enhances verification. Require states to electronically verify EAD validity in real time through DHS's SAVE system (Systematic Alien Verification for Entitlements), ensuring only current and valid EAD holders obtain or retain CDLs.**

4. **Targets high-risk conduct. Strengthen enforcement of existing safety standards (speeding, distracted driving, fatigue/HOS violations, DUI) through increased audits and data sharing, instead of immigration-based disqualification.**

5. **Implements periodic revalidation. Require lawful immigrant drivers with time-limited EADs to revalidate their CDL upon EAD renewal. This ensures that every CDL holder maintains lawful work authorization without blanket discrimination.**

---

**Why This Proposal Meets FMCSA's Mission**

- **Keeps FMCSA within its statutory authority (safety regulation, not immigration enforcement).**
- **Respects DHS's role as the sole authority on immigration and work authorization.**
- **Improves road safety by focusing on the actual causes of crashes (fatigue, distraction, DUI, speeding).**
- **Prevents unjust economic harm to lawful immigrant drivers and their families.**
- **Avoids worsening the driver shortage, which itself is a safety risk.**

**Part III – Fatal Crash Appendix**
Fifteen Recent Fatal Crashes Caused by Citizen CDL Drivers (2022–2025, Verified Entries) This appendix documents 15 fatal truck crashes caused by U.S. citizen CDL drivers between 2022 and 2025. The pattern is clear: the real causes of deadly crashes are driver behavior—fatigue, distraction, speeding, DUI, and work-zone violations—not immigration status. Removing safe, law-abiding non-domiciled CDL holders will not improve safety.

**A. National Context & Statistical Baseline**
• In recent years, the U.S. has recorded approximately 5,000–6,000 deaths annually in crashes involving large trucks (e.g., 5,821 in 2021; 5,936 in 2022; 5,472 in 2023).
• Fatalities have trended upward over the past decade (brief dip in 2020), which means effective policy must target conduct (fatigue management, distraction, speed control, and work-zone compliance).
• Against this baseline, five isolated crashes involving non-domiciled drivers are not evidence that immigration status predicts crash risk. If states mis-issued any CDLs, the remedy is better issuance audits—not blanket status bars.

B. Fifteen Recent Fatal Crashes (Verified with Driver Names & Full URLs)
1) Jacob McDonald — Etna Township, OH (I-70), Nov 14, 2023. Inattentive driving; 6 killed. Sentenced to 18 months (2025).
Source http://www.wosu.org/news/2025-06-30/man-sentenced-to-18-months-in-prison-for-2023-licking-county-crash-that-killed-6-people
2) Richard Allen Holden — Jefferson Co., MO (I-55 work zone), Sept 28, 2025. 3 killed; charged with involuntary manslaughter.
Source: https://www.ksdk.com/article/news/crime/tractor-trailer-driver-charged-in-fatal-i-55-crash/63-42b51b05-85f6-4c1c-b3ce-9f1160a67625
3) James Edward Glendon — Webberville, MI (I-96), Nov 2, 2024. 4 killed; eight charges filed (2025).
Source: https://www.lansingstatejournal.com/story/news/2025/09/26/trucker-charged-2024-crash-i96-near-lansing-that-killed-4/86352751007/
4) Lincoln Smith — Albany, OR (I-5), May 18, 2023. 7 farmworkers killed; sentenced to 48 years (2025).
Source: https://apnews.com/article/9be61b3b06fa7a08529c2816da571994
5) Jerry Hernandez — Bastrop Co., TX (SH-21 school bus), Mar 22, 2024. 2 killed; sentenced to 18 years (2025). Source: https://www.kut.org/crime-justice/2025-09-18/2024-fatal-school-bus-crash-hays-cisd-tx-tom-green-elementary-concrete-truck-driver-sentencing
6) Dieuson Leron — Indianapolis, IN (I-465 work zone), July 25, 2024. 9-year-old victim; charged with reckless homicide (2025).

Source: https://www.wrtv.com/news/wrtv-investigates/semi-truck-driver-charged-with-reckless-homicide-in-crash-that-killed-boy-9
7) Wayne Lamont McNeil — Durham, NC (NC-147), Oct 3, 2024. Pleaded guilty; 1 day in jail (2025).
Source: https://www.newsobserver.com/news/local/article312323633.html
8) Sarbjeet Parmar — Yellowstone Co., MT (I-90), Dec 22, 2024. Negligent homicide + 5 endangerment counts (2025).
Sources: https://www.kulr8.com/montana/billings-truck-driver-charged-with-negligent-homicide-for-december-2024-crash/article_10d58071-6c7a-42f5-9751-d733429477b1.html , https://www.ktvq.com/news/crime-watch/commercial-truck-driver-involved-in-fatal-yellowstone-county-crash-charged-with-negligent-homicide
9) Jimmy Roberts — Horry Co., SC (SC-22), Aug 27, 2025. Cited too fast for conditions; 2 killed. Source: https://www.wmbfnews.com/2025/08/27/dump-truck-driver-cited-after-deadly-fiery-crash-horry-county-troopers-say/
10) Alexis Osmani Gonzalez-Companioni — Kaufman Co., TX (I-20), June 29, 2025. Admitted he fell asleep; 5 killed; indicted. Sources: https://www.wfaa.com/article/news/crime/truck-driver-indicted-fatal-i-20-north-texas-crash-killed-five/287-11c024ad-2ef2-4665-a80f-07fc3f8c1c6b , https://www.kltv.com/2025/08/01/kaufman-county-grand-jury-indicts-truck-driver-accused-i-20-wreck-that-killed-5/
11) Cedric Jerome Fontenot — Vidor/Beaumont, TX (I-10), 2022 crash; sentence Sept 2025. Manslaughter; 10 years' probation + 6 months jail (deferred). Sources: https://www.12newsnow.com/article/news/crime/beaumont-truck-driver-gets-10-years-probation-in-2022-wreck-that-killed-vidor-man/502-b3eac7c8-6cd0-4a87-87a7-1e4a9d9b2b9d, https://kfdm.com/news/local/man-charged-in-deadly-crash-in-beaumont-posts-100000-bond
12) Reed Davenport — York Co., PA (I-83 work zone), Apr 17, 2024. Third-degree murder, DUI; 3 workers killed.
Sources: https://www.yorkdispatch.com/story/news/crime/2025/06/03/driver-set-to-face-trial-in-fatal-i-83-construction-zone-crash/83994586007/ , https://www.ydr.com/story/news/crime/2025/04/17/driver-was-dui-lacked-sleep-in-fatal-i-83-crash-in-york-county-police/83136221007/ , https://www.wgal.com/article/york-county-preliminary-hearing-for-man-charged-with-hitting-killing-construction-workers/64948849
13) Dawood Hussain — York Co., PA (I-83), Oct 9, 2023. Homicide by vehicle charge; case advanced (2025).
Source: https://www.fox43.com/article/news/local/york-county/baltimore-man-charged-with-homicide-fatal-2023-york-county-crash/521-f9c06751-6c59-4eaf-a327-41ac91f42cc6

14) Danny Glen Tiner — Chandler, AZ (I-10), Jan 12, 2023. Distracted by TikTok; 5 killed; 22.5-year sentence (Aug 2024).
Source: https://maricopacountyattorney.org/CivicAlerts.asp?AID=1109
15) Walter J. Montejo — Columbia, MO (I-70), Aug 5, 2024. Crossed median; 2 killed; involuntary manslaughter charges.
Sources: https://www.columbiatribune.com/story/news/crime/2024/08/08/tractor-trailer-driver-charged-fatal-missouri-i70-crash/74718736007/ , https://abc17news.com/news/crime/2025/09/30/man-accused-in-deadly-2024-i-70-pleads-guilty-to-lower-charges/

**C. Why Five Isolated Cases Don't Prove the Rule**
• Scale: Five incidents cannot justify a class-wide deprivation when thousands of large-truck crash deaths occur each year.
• Causation: FMCSA's cited problems are conduct-based (prior citations, HOS issues) or issuance errors. These call for targeted enforcement and audits—not status-based bans.
• Safety backfire: Removing ~200,000 trained drivers worsens shortages, pushing remaining drivers to work longer hours and increasing fatigue, a top crash factor.

**D. Policy Point**
The right solution is behavior-focused safety enforcement (speeding, DUI, fatigue/HOS, distraction) and accurate state CDL issuance. Targeting people by immigration status does not improve safety and may make roads more dangerous by increasing fatigue and bringing in less experienced replacements.

Respectfully submitted,
Aleksei Semenovskii
Southampton, PA

**U.S. Department**
**of Transportation**

**Federal Motor Carrier**
**Safety Administration**

**1200 New Jersey Ave, SE**
**Washington, DC 20590**

September 26, 2025

The Honorable Gavin Newsom
Governor of California
1021 O Street, Suite 9000
Sacramento, CA 95814

Mr. Steve Gordon, Director
California Department of Motor Vehicles
2415 1st Avenue
Mail Station F101
Sacramento, CA 95818

Dear Governor Newsom and Mr. Gordon:

The U.S. Department of Transportation's Federal Motor Carrier Safety Administration ("FMCSA" or "Agency") is required by statute to ensure that all States comply with the commercial driver's license (CDL) regulations.[1] In August 2025, FMCSA initiated an Annual Program Review of the California Department of Motor Vehicles (DMV) CDL program in accordance with 49 U.S.C. § 31311 and 49 CFR 384.307. During the 2025 Annual Program Review, FMCSA obtained evidence of systemic policy, procedural, and programming errors in California's issuance of non-domiciled commercial learner's permits (CLPs) and CDLs—that is, CLPs and CDLs issued to drivers who are not domiciled within California. In this regard, FMCSA found that the DMV issued non-domiciled CDLs that extend beyond expiration of drivers' lawful presence in the United States, issued non-domiciled CDLs to drivers who were not eligible, and issued non-domiciled CDLs without first validating the drivers' lawful presence. Therefore, in accordance with 49 CFR 384.307(b), this letter constitutes FMCSA's preliminary determination that California has failed to meet the requirement for substantial compliance with the standards for issuing non-domiciled CLPs and CDLs.[2] California must take immediate

---

[1] 49 U.S.C. § 31311; *see also* 49 CFR part 384, subparts B and C.

[2] FMCSA notes that California issues non-domiciled CLPs and CDLs as "limited term" CLPs and CDLs. However, this preliminary determination uses the term "non-domiciled" CLPs and CDLs to ensure consistent terminology with Federal regulations.

corrective action, as set forth in section IV below, to address the deficiencies identified in this letter. The State's failure to do so may result in FMCSA initiating the withholding of certain Federal-aid highway funds and decertifying the State's CDL Program.

## I. Background

The Commercial Motor Vehicle Safety Act of 1986,[3] as amended, established performance standards with which State CDL programs must comply to avoid having amounts withheld from Highway Trust Fund apportionment under 49 U.S.C. § 31314 and to avoid CDL program decertification under 49 U.S.C. § 31312.[4] In this regard, States are required to be in substantial compliance with the requirements of 49 U.S.C. § 31311(a) and its implementing regulations in 49 CFR part 383 and part 384, subpart B. Under 49 CFR 384.301(a), to be in substantial compliance with 49 U.S.C. § 31311(a), a State must meet each and every standard of part 384, subpart B by means of "the demonstrable combined effect of its statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resource assignments (facilities, equipment, and personnel), and enforcement practices."

As part of its oversight, FMCSA conducts comprehensive Annual Program Reviews (APRs) of State CDL programs, in accordance with 49 CFR 384.307, to verify that States are in substantial compliance. During an APR, FMCSA evaluates all aspects of the States' CDL program, including knowledge and skills testing procedures, CDL issuance processes, procedures to report convictions and withdrawals, compliance with FMCSA's physical qualification and Drug and Alcohol Clearinghouse programs, issuance of non-domiciled CDLs, and other areas.

At the conclusion of the APR, if FMCSA makes a preliminary determination that a State does not meet one or more of the minimum standards for substantial compliance under part 384, subpart B, FMCSA will notify the State accordingly.[5] As explained more fully in section V below, the State will have 30 calendar days to respond to the preliminary determination explaining the State's corrective action or, alternatively, why FMCSA's preliminary determination is incorrect.[6] If FMCSA makes a final determination of substantial noncompliance, FMCSA may initiate the withholding of certain Federal-aid highway funds and may decertify the State's CDL Program.[7]

As part of the 2025 comprehensive APRs, FMCSA conducted an in-depth review of State procedures and policies in issuing non-domiciled CLPs and CDLs. FMCSA's focus on State non-domiciled CDL issuance practices during the 2025 APR was consistent with Executive Order 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers."[8] The Executive Order directed FMCSA to "review non-domiciled [ ] CDLs issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities" and "to take

---

[3] 49 U.S.C. 31301 *et seq*.
[4] 49 U.S.C. 31311(a).
[5] 49 CFR 384.307(b). A preliminary determination of noncompliance is also known as a "finding."
[6] *Id*. at § 384.307(c).
[7] 49 U.S.C. §§ 31314(c), 31312; *see also infra* at section VI; 49 CFR 384.307(d), 49 CFR part 384, subpart D.
[8] 90 Fed. Reg. 18759 (Apr. 28, 2025).

appropriate actions to improve the effectiveness of current protocols….”[9] Accordingly, FMCSA conducted a thorough audit of the California DMV’s procedures and policies in issuing non-domiciled CLPs and CDLs as part of the 2025 APR.

## II. Statutory and Regulatory Requirements for Issuing Non-Domiciled CLPs and CDLs

Under 49 U.S.C. § 31311(a)(12)(B)(ii), States are authorized to issue non-domiciled CDLs, but they must do so in accordance with regulations prescribed by FMCSA. The Agency’s regulations provide that States that issue non-domiciled CLPs and CDLs may only accept as valid proof of lawful presence (i) an unexpired employment authorization document (EAD) issued by the United States Customs and Immigration Service (USCIS) or (ii) an unexpired foreign passport accompanied by an approved I-94 form documenting the driver’s most recent admittance into the United States.[10] In addition, State procedures for issuing, renewing, or upgrading a non-domiciled CLP and CDL must, at a minimum, be identical to those pertaining to any other CLP or CDL.[11]

The requirement that States accept as valid only *unexpired* lawful presence documents also means that the State must make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver’s lawful presence document(s). In other words, because FMCSA’s regulations consider only unexpired lawful presence documents to be valid, the DMV is required to ensure that the non-domiciled CLP or CDL period of validity *does not exceed* the expiration of the driver’s lawful presence documents. Therefore, State driver’s licensing agencies must ensure that the validity of non-domiciled CLPs or CDLs do not exceed the expiration date of drivers’ lawful presence documents.

In addition, States may not issue a non-domiciled CLP or CDL to citizens of Mexico. In this regard, FMCSA has determined that the United Mexican States issues Licencias Federales de Conductor (Mexican CDLs) in accordance with standards that are consistent with 49 CFR part 383.[12] Citizens of Mexico are authorized to operate a CMV in the United States with a Mexican CDL and, therefore, are prohibited from obtaining a non-domiciled CDL. FMCSA issued guidance stating that citizens of Mexico who are present in the United States under the Deferred Action for Childhood Arrivals (DACA) program are excepted from the prohibition.[13] Accordingly, issuing a non-domiciled CDL to a citizen of Mexico who is not present under the DACA program violates parts 383 and 384.

---

[9] *Id*. at 18759-60.
[10] 49 CFR 383.71(f)(2)(i), 383.73(f)(3), 384.201, 384.212(b).
[11] *Id*. at § 383.73(f)(2).
[12] 49 CFR 383.23, footnote 1; 383.71(f)(1)(i); and 383.73(f)(1).
[13] *See* FMCSA, Office of Registration, CDL-383.23-FAQ001 (May 8, 2023), https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled.

## III. 2025 Annual Program Review

FMCSA initiated California's APR in August 2025 (2025 APR) in accordance with 49 U.S.C. § 31311 and 49 CFR 384.307. On June 23, 2025, the DMV informed FMCSA that its records reflect that more than 62,000 drivers hold an unexpired non-domiciled CLP or CDL issued by the California DMV, as of June 1, 2025.

During the 2025 APR, FMCSA sampled approximately 145 records of drivers issued a non-domiciled CDL by the DMV between June and August 2025. Approximately 26 percent of the driver records sampled failed to comply with requirements in 49 CFR parts 383 and 384.[14] Even more concerning is the fact that, for three of the transactions, the DMV was unable to provide documentation showing that it validated the drivers' lawful presence documents before issuing a non-domiciled CDL. Consequently, based on the documentation provided, it appears that the DMV issued a non-domiciled CDL to three drivers without validating their lawful presence.[15]

The 2025 APR uncovered evidence of systemic policy, procedural, and programming errors. In this regard, of the driver records sampled, FMCSA found 29 transactions where the DMV issued non-domiciled CDLs that exceeded the expiration date of the driver's lawful presence documents. Through discussions with DMV staff during the 2025 APR, FMCSA learned that this error occurs for several reasons. One reason is that if the expiration date of a driver's lawful presence document is not electronically populated in the DMV's driver record, and an employee does not notice and correct this error, the DMV's systems will issue a non-domiciled CDL that exceeds the expiration date of the lawful presence documents. In addition, DMV officials speculated that employee error in handling attachments to the application might also result in the same expiration date error. In some instances, these errors cause the DMV's system to erroneously calculate the expiration date of the non-domiciled CDL based on the driver's date of birth, rather than the expiration date of lawful presence documents.[16]

Another recurring error discovered during the 2025 APR is the DMV's repeated issuance of non-domiciled CDLs to citizens of Mexico who are not present in the United States under the DACA program. As explained in greater detail in section III(b) below, of the driver records sampled, FMCSA found 11 transactions where the DMV issued a non-domiciled CDL to a citizen of Mexico who is not present under DACA.

In addition, through FMCSA's review of the DMV's training manuals as well as discussions with DMV personnel during the 2025 APR, the Agency discovered the DMV continues issuing "temporary" CLPs and CDLs, and that the DMV trains its employees to do so. In this regard, the DMV issues temporary credentials to drivers pending final determination of the driver's

---

[14] As set forth in sections III(a), III(b), and III(c), 38 of the 145 records sampled failed to comply with FMCSA's regulations.

[15] *See infra* "JTM," sec. III(a)(6); "CPS," sec. III(a)(24); and "AOA," sec. III(a)(26).

[16] FMCSA also identified five additional transactions where the DMV's system defaulted to calculating the non-domiciled CDL's expiration date from the driver's date of birth; though the license validity did not exceed the driver's lawful presence. FMCSA has not included these transactions in the list of noncompliant transactions; though they indicate the problem with the DMV's system.

eligibility for a commercial credential. Further, the DMV is not reporting issuance of these credentials to the Commercial Driver's License Information System (CDLIS) as required in 49 CFR 384.212 and 384.225. As discussed in section III(d) below, this repeated error poses two problems. First, issuing a temporary CDL before validating a driver's lawful presence increases the risk that a driver who is unlawfully present in the United States will be issued a non-domiciled CDL. In addition, by failing to report the temporary CDL issuance to CDLIS, enforcement personnel and other State driver's licensing agencies performing a CDLIS check of a driver will not see that the driver holds (or held) a temporary CDL. This deprives enforcement personnel and State driver's licensing agencies of vital information about a driver's CDL status and history. FMCSA cited this violation during the 2024 APR and believes it continues to occur.

During the 2025 APR, the DMV was unable to provide evidence of sufficient management controls to prevent these errors or catch them if they occur. Further, the DMV has not programmed its systems with sufficient measures to handle exceptions or with "stop procedures" to prevent errors from occurring. The repeated errors discovered during the 2025 APR indicate a systemic breakdown in the DMV's issuance process for non-domiciled CLPs and CDLs. The transactions illustrating these compliance issues are discussed in greater detail below and documentation for each is provided in Appendix 1.

**a. Finding: 49 CFR 384.212—The California DMV issued non-domiciled CLPs or CDLs with an expiration date that exceeded the expiration of the driver's lawful presence documents.**

During the 2025 APR, FMCSA discovered that 29 of the 145 driver records sampled showed that the DMV issued a non-domiciled CLP or CDL for a period of validity that exceeded the driver's lawful presence document(s). Four of the 29 transactions are also noncompliant because the DMV issued non-domiciled CDLs to citizens of Mexico who are not present under DACA, and those 4 transactions are listed separately in section III(b). The remaining 25 transactions at issue are described below.

1. On June 27, 2025, the DMV issued a non-domiciled CDL with an expiration date of June 16, 2030 to a driver with the initials "MOC" who is a citizen of Mexico present in the United States under the DACA program. At the time the transaction occurred, MOC's EAD credential showed an expiration date of April 23, 2022. During the 2025 APR, a query report from USCIS' online verification service, Systematic Alien Verification for Entitlements (SAVE),[17] conducted on August 27, 2025, showed that MOC's EAD expires on April 21, 2026. However, the DMV issued a non-domiciled CDL with an expiration date of June 16, 2030, more than *four years* after the EAD expires.

[17] "SAVE is a service by USCIS that helps Federal, State, and local benefit-issuing agencies, institutions, and licensing agencies determine the immigration status of benefit applicants, so only those entitled to benefits receive them." U.S. CITIZENSHIP AND IMMIGR. SERVS., *Guide to Understanding SAVE Verification Responses* (April 2022), https://www.uscis.gov/sites/default/files/document/guides/SAVE-Guide%20to%20Understanding%20SAVE%20Verification%20Responses.pdf.

2. On June 16, 2025, the DMV issued a non-domiciled CDL with an expiration date of July 9, 2030 to a driver with the initials "JK" who is a citizen of South Korea. During the 2025 APR, a SAVE query, conducted on August 20, 2025, showed that JK's EAD is set to expire on November 2, 2025. The DMV was unable to present any evidence during the 2025 APR showing that it validated JK's lawful presence before issuing a non-domiciled CDL. In addition, though JK's EAD is valid through November 2, 2025, the DMV issued a non-domiciled CDL with an expiration date of July 9, 2030, more than *four years* after the EAD's expiration date.

3. On August 18, 2025, the DMV issued a non-domiciled CDL with an expiration date of February 10, 2031 to a driver with the initials "JHB" who is a citizen of Mexico present in the United States under the DACA program. At the time the transaction occurred, JHB's EAD credential showed an expiration date of April 23, 2027. The DMV provided FMCSA with a copy of a SAVE query report initiated on June 5, 2025 that also showed an EAD expiration date of April 23, 2027, and during the 2025 APR, a SAVE query, conducted on September 2, 2025, confirmed this date. However, the DMV issued a non-domiciled CDL with an expiration date of February 10, 2031, more than *three years* after the EAD expires.

4. On June 2, 2025, the DMV issued a non-domiciled CDL with an expiration date of July 10, 2030 to a driver with the initials "MS" who is a citizen of India. At the time the transaction occurred, MS's EAD credential showed an expiration date of December 29, 2022. However, the DMV issued a non-domiciled CDL with an expiration date of July 10, 2030. During the 2025 APR, the DMV queried SAVE and provided FMCSA with a copy of the report showing that MS's EAD expires on March 5, 2027. The non-domiciled CDL expires more than *three years* after MS's lawful presence document is set to expire.

5. On June 2, 2025, the DMV issued a non-domiciled CDL with an expiration date of June 2, 2030 to a driver with the initials "EMR" who is a citizen of Mexico present in the United States under the DACA program. At the time the transaction occurred, EMR's EAD credential showed an expiration date of July 24, 2015. During the 2025 APR, a SAVE query, conducted on August 27, 2025, showed that EMR's EAD expires on July 21, 2027. However, the DMV issued a non-domiciled CDL with an expiration date of June 2, 2030, approximately *three years* after the EAD expires.

6. On June 6, 2025, the DMV issued a non-domiciled CDL with an expiration date of June 3, 2030 to a driver with the initials "JTM" who is a citizen of Mexico present in the United States under the DACA program. At the time the transaction occurred, JTM's EAD credential showed an expiration date of May 24, 2023. During the 2025 APR, a query of SAVE, conducted on August 19, 2025, showed that JTM's EAD is set to expire on April 23, 2027. This transaction presents several areas of noncompliance with the most concerning being that the DMV was unable to present any evidence during the APR showing that it validated JTM's lawful presence before issuing a non-domiciled CDL. In addition, while FMCSA learned during the APR that JTM's EAD is valid through April

23, 2027, the DMV issued a non-domiciled CDL with an expiration date of June 3, 2030, *nearly three years* after the EAD's expiration date.

7. On June 20, 2025, the DMV issued a non-domiciled CDL with an expiration date of July 24, 2029 to a driver with the initials "SL" who is a citizen of India. At the time the transaction occurred, SL's EAD credential showed an expiration date of October 22, 2028, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL. However, the DMV issued a non-domiciled CDL with an expiration date of July 24, 2029, approximately *nine months* after the EAD's expiration date.

8. On June 19, 2025, the DMV issued a non-domiciled CDL with an expiration date of April 15, 2030 to a driver with the initials "DM" who is a citizen of Kazakhstan. At the time the transaction occurred, DM's EAD credential showed an expiration date of July 9, 2029, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL. Further, the DMV's record showed clearly that DM's lawful presence document expired on July 9, 2029. However, the DMV issued a non-domiciled CDL with an expiration date of April 15, 2030, nearly *nine months* after the EAD expires.

9. On June 2, 2025, the DMV issued a non-domiciled CDL with an expiration date of November 27, 2029 to a driver with the initials "PND" who is a citizen of Brazil. At the time the transaction occurred, PND's EAD credential showed an expiration date of March 29, 2029. The DMV provided FMCSA with a copy of a SAVE query report initiated on December 18, 2024 that also showed an EAD expiration date of March 29, 2029, and during the 2025 APR, a SAVE query, conducted on September 2, 2025, confirmed this date. However, the DMV issued a non-domiciled CDL with an expiration date of November 27, 2029, approximately *eight months* after the EAD expires. Even more troubling, the DMV issued PND a non-domiciled CDL that includes passenger[18] and school bus[19] endorsements well beyond the driver's lawful presence.

10. On June 23, 2025, the DMV issued a non-domiciled CDL with an expiration date of July 3, 2030 to a driver with the initials "NS" who is a citizen of India. At the time the transaction occurred, NS's EAD credential showed an expiration date of November 18, 2029, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL. Further, the DMV's record showed clearly that NS's lawful presence document expired on November 18, 2029. However, the DMV issued a non-domiciled CDL with an expiration date of July 3, 2030, nearly *eight months* after the EAD expires.

11. On June 2, 2025, the DMV issued a non-domiciled CDL with an expiration date of June 25, 2030 to a driver with the initials "EBT" who is a citizen of El Salvador. At the time the transaction occurred, EBT's EAD credential showed an expiration date of

---

[18] A passenger endorsement allows a driver to operate a commercial motor vehicle designed to transport 16 or more passengers, including the driver. 49 CFR 383.5 (definition of "commercial motor vehicle"), 383.91, 383.93.
[19] A school bus endorsement allows a driver to operate a commercial motor vehicle to transport pre-primary, primary, or secondary school students from home to school, from school to home, or to and from school-sponsored events. 49 CFR 383.5 (definition of "school bus"), 383.91. 383.93.

January 13, 2024. During the 2025 APR, a SAVE query, conducted on August 25, 2025, showed that EBT's EAD is set to expire on December 15, 2029. The DMV was unable to present any evidence during the APR showing that it validated EBT's lawful presence before issuing a non-domiciled CDL. In addition, while EBT's EAD is valid through December 15, 2029, the DMV issued a non-domiciled CDL with an expiration date of June 25, 2030, approximately *six months* after the EAD's expiration date.

12. On July 21, 2025, the DMV issued a non-domiciled CDL with an expiration date of June 29, 2030 to a driver with the initials "FLD" who is a citizen of Guatemala. At the time the transaction occurred, FLD's EAD credential showed an expiration date of January 22, 2030, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL. However, the DMV issued a non-domiciled CDL with an expiration date of June 29, 2030, more than *five months* after the EAD expires.

13. On June 24, 2025, the DMV issued a non-domiciled CDL with an expiration date of February 1, 2030 to a driver with the initials "YS" who is a citizen of China. At the time the transaction occurred, YS's EAD credential showed an expiration date of September 19, 2029, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL.[20] Further, the DMV's record showed clearly that YS's lawful presence document expired on September 19, 2029. However, the DMV issued a non-domiciled CDL with an expiration date of February 1, 2030, approximately *five months* after the EAD expires.

14. On June 11, 2025, the DMV issued a non-domiciled CDL with an expiration date of July 22, 2029 to a driver with the initials "EBB" who is a citizen of San Marino. At the time the transaction occurred, EBB's EAD credential showed an expiration date of March 10, 2029. The DMV provided FMCSA with a copy of a query report from SAVE, initiated on December 26, 2024, that showed an EAD expiration date of March 13, 2029. While there is a three-day discrepancy in the EAD expiration date shown on the face of the credential and in SAVE, the DMV issued a non-domiciled CDL with an expiration date of July 22, 2029, which exceeds both EAD expiration dates by more than *four months*.

15. On June 3, 2025, the DMV issued a non-domiciled CDL with an expiration date of June 6, 2030 to a driver with the initials "JNG" who is a citizen of Mexico present in the United States under the DACA program. At the time the transaction occurred, JNG's EAD credential showed an expiration date of March 4, 2024. During the 2025 APR, a SAVE query, conducted on September 2, 2025, showed that JNG's EAD expires on January 30, 2026. However, the DMV issued a non-domiciled CDL with an expiration date of June 6, 2030, approximately *four months* after the EAD expires.

16. On June 2, 2025, the DMV issued a non-domiciled CDL with an expiration date of September 9, 2029 to a driver with the initials "GS" who is a citizen of India. At the time

[20] The DMV provided FMCSA a copy of the back of YS's EAD card. However, YS's name and the EAD expiration date are also printed on the back of the card.

the transaction occurred, GS's EAD credential showed an expiration date of April 28, 2029. During the 2025 APR, a SAVE query, conducted on August 25, 2025, confirmed that GS's EAD expires on April 28, 2029. However, the DMV issued a non-domiciled CDL with an expiration date of September 9, 2029, more than *four months* after the EAD expires.

17. On June 23, 2025, the DMV issued a non-domiciled CDL with an expiration date of February 25, 2030 to a driver with the initials "NV" who is a citizen of India. At the time the transaction occurred, NV's EAD credential showed an expiration date of November 25, 2029, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL. Further, the DMV's record showed clearly that NV's lawful presence document expired on November 25, 2029. However, the DMV issued a non-domiciled CDL with an expiration date of February 25, 2030, *three months* after the EAD expires.

18. On June 4, 2025, the DMV issued a non-domiciled CDL with an expiration date of March 22, 2030 to a driver with the initials "CC" who is a citizen of Somalia. At the time the transaction occurred, CC's EAD credential showed an expiration date of January 19, 2030. During the 2025 APR, the DMV queried SAVE and provided FMCSA with a copy of the report showing that CC's EAD expires on January 19, 2030. However, the DMV issued a non-domiciled CDL with an expiration date of March 22, 2030, more than *two months* after the EAD expires.

19. On June 24, 2025, the DMV issued a non-domiciled CDL with an expiration date of February 2, 2030 to a driver with the initials "QC" who is a citizen of China. At the time the transaction occurred, QC's EAD credential showed an expiration date of December 12, 2029, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL. Further, the DMV's record showed that QC's lawful presence document expired on December 12, 2029. However, the DMV issued a non-domiciled CDL with an expiration date of February 2, 2030, nearly *two months* after the EAD expires. Further, the DMV issued the non-domiciled CDL with a passenger endorsement well beyond the driver's lawful presence.

20. On June 27, 2025, the DMV issued a non-domiciled CDL with an expiration date of March 14, 2030 to a driver with the initials "BS" who is a citizen of India. At the time the transaction occurred, BS's EAD credential showed an expiration date of September 20, 2021. A SAVE query run by the DMV on March 6, 2025 showed that BS's EAD expires on January 10, 2030. However, the DMV issued a non-domiciled CDL with an expiration date of March 14, 2030, more than *two months* after the EAD expires.

21. On June 10, 2025, the DMV issued a non-domiciled CDL with an expiration date of February 10, 2030 to a driver with the initials "DD" who is a citizen of Russia. At the time the transaction occurred, DD's EAD credential showed an expiration date of February 3, 2030, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL. However, the DMV issued a non-domiciled CDL with an expiration date of February 10, 2030. While the period of validity of the non-domiciled CDL was only

seven days longer than the driver's lawful presence document, the DMV's record showed that DD's lawful presence document expired on February 3, 2030.

22. On June 2, 2025, the DMV issued a non-domiciled CDL with an expiration date of July 11, 2030 to a driver with the initials "JS" who is a citizen of India. At the time the transaction occurred, JS's EAD credential showed an expiration date of June 10, 2022. However, the DMV issued a non-domiciled CDL with an expiration date of July 11, 2030. The DMV was unable to provide FMCSA with any documentation to support the July 11, 2030 expiration date.

23. On June 30, 2025, the DMV issued a non-domiciled CDL with an expiration date of January 10, 2027 to a driver with the initials "CPS" who is a citizen of Nicaragua. At the time the transaction occurred, CPS's EAD credential showed an expiration date of July 10, 2025, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL. The DMV queried SAVE during the 2025 APR on August 15, 2025, and the query report shows that CPS's EAD was extended to January 1, 2027. However, the DMV provided no evidence that, at the time it issued the non-domiciled CDL with an expiration date of January 10, 2027, it had confirmation that CPS's EAD was extended to January 1, 2027. Even more troubling, the DMV issued CPS a non-domiciled CDL that includes passenger and school bus endorsements beyond the driver's lawful presence.

24. On June 23, 2025, the DMV issued a non-domiciled CDL with an expiration date of September 1, 2028 to a driver with the initials "CY" who is a citizen of China. At the time the transaction occurred, CY's I-94 showed an entry date of July 23, 2022 and an "admit until date" of January 22, 2023. CY also provided a Chinese passport with a June 2029 expiration date and a B-1 Visa with an expiration date of July 7, 2032. The DMV queried SAVE on June 23, 2025, and the query report indicated that CY had an EAD that expired on July 9, 2025 and that CY had a pending application for asylum. However, the DMV issued a non-domiciled CDL with an expiration date of September 1, 2028, more than three years beyond the expiration date of CY's EAD indicated on the SAVE query report. While CY presented an unexpired foreign passport and a Form I-94, the DMV was required to ensure the period of CDL validity did not exceed CY's EAD expiration when it issued the CDL.

25. On June 18, 2025, the DMV renewed and issued a non-domiciled CDL with an expiration date of September 9, 2026 to a driver with the initials "AOA" who is a citizen of El Salvador. AOA's EAD showed a March 9, 2025 expiration date. The DMV queried SAVE, and the query report showed that AOA's EAD expires on September 9, 2026. While the DMV's June 18, 2025 renewal of AOA's non-domiciled CDL did not reveal noncompliance with respect to that transaction, FMCSA's review of records presented by the DMV call into question the preceding renewal of AOA's non-domiciled CDL, which occurred on December 21, 2020. During that transaction, AOA presented an EAD with an

expiration date no later than March 9, 2025;[21] however, on December 21, 2020, the DMV issued a non-domiciled CDL with an expiration date of June 16, 2025, more than *three months* after the EAD in effect at the time expired.

**b. Finding: 49 CFR 384.212—The California DMV issued non-domiciled CLPs or CDLs to citizens of Mexico.**

During the 2025 APR, FMCSA discovered that 11 of the 145 driver records sampled showed that the DMV issued a non-domiciled CLP or CDL to a driver who, as a citizen of Mexico who is not present in the United States under the DACA program, was ineligible to receive a non-domiciled CDL. As noted in section III(a) above, 4 of the 11 transactions also showed that the DMV issued a non-domiciled CLP or CDL for a period of validity that exceeded the driver's lawful presence document. The transactions at issue are set forth below.

1. On June 2, 2025, the DMV issued a non-domiciled CDL with an expiration date of May 18, 2027 to a driver with the initials "EDP" who is a citizen of Mexico. At the time the transaction occurred, EDP's EAD credential showed an expiration date of June 4, 2025. However, the DMV issued a non-domiciled CDL with an expiration date of May 18, 2027, almost *two years* after the EAD expires. The DMV did not provide FMCSA with any documentation supporting the May 18, 2027 expiration date or showing that EDP is present in the United States under DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

2. On June 30, 2025, the DMV issued a non-domiciled CDL with an expiration date of August 28, 2030 to a driver with the initials "DAH" who is a citizen of Mexico. At the time the transaction occurred, DAH's EAD credential showed an expiration date of December 3, 2028 and showed that the driver was from Mexico, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL. However, the DMV issued a non-domiciled CDL with an expiration date of August 28, 2030, more than *eighteen months* after the EAD's expiration date. In addition, the DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

3. One June 13, 2025, the DMV issued a non-domiciled CDL with an expiration date of June 24, 2029 to a driver with the initials "ACC" who is a citizen of Mexico. At the time the transaction occurred, ACC's EAD credential, as well as a SAVE query report the DMV obtained prior to issuing the non-domiciled CDL, showed the driver was from Mexico. Further, ACC's EAD and a SAVE query report provided by the DMV dated December 2023 shows an expiration date of October 26, 2028. While a SAVE query report generated on August 20, 2025 as part of the 2025 APR shows that ACC currently has indefinite lawful presence with pending permanent residency, the DMV has not provided any evidence that ACC's indefinite lawful presence was known at the time the

[21] The DMV provided FMCSA with a copy of AOA's EAD showing that it was issued on September 9, 2023 and expired on March 9, 2025. Because the DMV renewed AOA's non-domiciled CDL on December 21, 2020, it is likely that AOA's EAD in effect in 2020 had an expiration date earlier than March 9, 2025.

DMV issued a non-domiciled CDL with an expiration date of June 24, 2029, approximately *eight months* after the expiration date shown on the EAD and the December 2023 SAVE query report. In addition, the DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

4. On June 10, 2025, the DMV issued a non-domiciled CDL with an expiration date of July 4, 2030 to a driver with the initials "GOC" who is a citizen of Mexico. At the time the transaction occurred, GOC's EAD credential showed the driver was from Mexico. In addition, GOC's EAD showed an expiration date of October 20, 2028, which the DMV also confirmed in SAVE prior to issuing the non-domiciled CDL. The DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico. However, the DMV issued a non-domiciled CDL with an expiration date of July 4, 2030, approximately *four months* after the EAD expires to a driver who was not eligible for a non-domiciled CDL.

5. On June 2, 2025, the DMV issued a non-domiciled CDL with an expiration date of August 1, 2029 to a driver with the initials "JAB" who is a citizen of Mexico. At the time the transaction occurred, JAB's EAD credential showed the driver was from Mexico. The DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.[22]

6. On June 12, 2025, the DMV issued a non-domiciled CDL with an expiration date of August 2, 2029 to a driver with the initials "DBD" who is a citizen of Mexico. At the time the transaction occurred, DBD's EAD credential as well as the SAVE query result, which the DMV obtained before issuing the non-domiciled CDL, showed the driver was from Mexico. The DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

7. On June 6, 2025, the DMV issued a non-domiciled CDL with an expiration date of August 18, 2028 to a driver with the initials "CCS" who is a citizen of Mexico. At the time the transaction occurred, CCS's EAD credential showed the driver was from Mexico. The DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

8. On June 4, 2025, the DMV issued a non-domiciled CDL with an expiration date of June 11, 2027 to a driver with the initials "RGS" who is a citizen of Mexico. At the time the transaction occurred, RGS's EAD credential showed the driver was from Mexico. The DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

[22] There is a slight inconsistency in the spelling of JAB's last name between the driver's EAD and the SAVE query report. However, the driver's date of birth and EAD card number are consistent on both documents. With no evidence to the contrary, FMCSA concluded that both documents pertain to the same driver.

9. On June 30, 2025, the DMV issued a non-domiciled CDL with an expiration date of December 9, 2025 to a driver with the initials "AMZ" who is a citizen of Mexico. At the time the transaction occurred, AMZ's passport and visa showed the driver was from Mexico. The DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico. Further, the DMV issued AMZ a non-domiciled CDL that includes a passenger endorsement when the driver was not eligible for a non-domiciled CDL.

10. One June 23, 2025, the DMV issued a non-domiciled CDL with an expiration date of October 11, 2025 to a driver with the initials "IMR" who is a citizen of Mexico. At the time the transaction occurred, IMR's EAD credential, as well as a SAVE query report the DMV obtained prior to issuing the non-domiciled CDL, showed the driver was from Mexico. The DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

11. One June 17, 2025, the DMV issued a non-domiciled CDL with an expiration date of July 23, 2028 to a driver with the initials "RMN" who is a citizen of Mexico. At the time the transaction occurred, RMN's EAD credential, as well as a SAVE query report the DMV obtained prior to issuing the non-domiciled CDL, showed the driver was from Mexico. The DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

12. One June 10, 2025, the DMV issued a non-domiciled CDL with an expiration date of November 12, 2028 to a driver with the initials "JRR" who is a citizen of Mexico. At the time the transaction occurred, JRR's EAD credential and a SAVE query report initiated by the DMV showed the driver was from Mexico. The DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

**c. Finding: 49 CFR 384.212—Other anomalies regarding lawful presence.**

In addition to the findings cited in Section III(a), FMCSA noted anther transaction with significant anomalies surrounding lawful presence documentation. This transaction is set forth below.

1. On June 2, 2025, the DMV issued a non-domiciled CDL with an expiration date of June 1, 2030 to a driver with the initials "ASV" who is a citizen of Honduras. ASV's EAD presented at the time of the transaction displayed an expiration date of May 14, 2021. The DMV was unable to present any evidence that it validated ASV's lawful presence before issuing a non-domiciled CDL. During the 2025 APR, a query of SAVE, conducted on August 19, 2025, showed that ASV now has indefinite lawful presence. However, despite the DMV having a record of an expired EAD, there is no indication the DMV ever queried SAVE or otherwise validated ASV's lawful presence before issuing a non-domiciled CDL.

**d. Updated Finding (2024): 49 CFR 384.225—Issuance of "temporary" or "interim" non-domiciled CDLs.**

Through the review of the DMV's training manuals and discussions with DMV personnel during the 2025 APR, FMCSA learned that the DMV continues to issue "temporary" non-domiciled CLPs and CDLs to drivers. This problem is two-fold. First, the DMV issues the temporary CLPs or CDLs before validating of the driver's lawful presence. This continuing practice greatly increases the risk that the DMV will unknowingly issue a non-domiciled CLP or CDL to a driver who is not lawfully present in the United States in violation of 49 CFR 384.212.

Second, the DMV is not reporting issuance of these credentials to CDLIS in violation of 49 CFR 384.225. As noted above, this repeated error is particularly problematic because when enforcement personnel or other State driver's licensing agencies perform a CDLIS check of a driver issued a temporary CDL, CDLIS will not reflect whether the driver holds (or held) a temporary CDL. This practice leaves enforcement personnel and State driver's licensing agencies with incomplete information about a driver's CDL status and history, thus confusing and frustrating roadside enforcement efforts.

FMCSA cited this violation during the 2024 APR and has no evidence or indication that the DMV has ceased this practice. Accordingly, FMCSA is updating the 2024 finding to reiterate that the DMV has not resolved the violation.

## IV. Required Corrective Action

As noted above, approximately 62,000 drivers hold an unexpired CLP or CDL issued by the California DMV. In light of the systemic errors and deficiencies in the DMV's issuance of non-domiciled CLPs and CDLs uncovered by the 2025 APR, FMCSA determines that California must take the following actions:

- Immediately pause issuing non-domiciled CLPs and CDLs;
- As soon as practicable, identify all unexpired non-domiciled CDLs that were not issued in compliance with parts 383 and 384;
- Conduct an internal audit to identify all procedural and programming errors; training and quality assurance problems; insufficient policies and practices; and other issues that have resulted in widespread noncompliance in issuing non-domiciled CLPs and CDLs;
- Notify FMCSA of the audit findings and the number of unexpired noncompliant non-domiciled CDLs;
- Take immediate action to correct the deficiencies identified in the DMV's internal audit and in this letter;
- Take immediate action to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs and reissue the licenses in accordance with parts 383 and 384 in effect at the time of the reissuance;
- Resume issuing non-domiciled CLPs and CDLs only after the State ensures that all statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resource assignments (facilities, equipment, and personnel),

and enforcement practices meet each and every standard of subpart B of part 384 and 49 U.S.C. § 31311.

## V. Responding to this Preliminary Determination

The procedural regulations applicable to this action are found at 49 CFR 384.307. Within 30 calendar days, the State must respond to this preliminary determination. The State's response must explain what corrective action it either has implemented or intends to implement to correct the deficiencies cited. The required corrective actions are set forth in section IV of this preliminary determination. The State must provide documentation of corrective action as required by FMCSA. In addition, the corrective actions may be implemented on a schedule mutually agreed upon by FMCSA and the State. Upon request by the State, an informal conference will be provided during this time.

Alternatively, the State's response may explain why FMCSA's preliminary determination is incorrect and may include any additional documentation the State wishes FMCSA to consider.

After reviewing a timely response to the preliminary determination by the State, FMCSA will notify the State of the final determination. In making its final determination, FMCSA will take into consideration the corrective action either implemented or planned to be implemented in accordance with the mutually agreed upon schedule.

## VI. Potential Penalties for a Final Determination of Substantial Noncompliance

If FMCSA issues a final determination of substantial noncompliance, the Agency may withhold up to four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds beginning in Fiscal Year (FY) 2027 that would otherwise be apportioned to California under 23 U.S.C. § 104(b)(1) and (2).[23] Accordingly, upon a final determination of substantial noncompliance, California risks losing up to approximately $158,000,000 for FY 2027.[24] Further, if the substantial noncompliance persists beyond the first fiscal year, FMCSA may withhold up to eight percent of these funds; therefore, California risks losing up to approximately $316,000,000 in the second and subsequent FY(s) of noncompliance.[25] Once funds are withheld following a substantial noncompliance determination, they are no longer available for apportionment to California.[26]

In addition, if FMCSA issues a final determination of substantial noncompliance, the Agency may decertify California's CDL Program. Decertification of California's CDL program would prohibit the State from issuing, renewing, transferring, or upgrading CLPs and CDLs until such time as FMCSA determines that the DMV is in substantial compliance with 49 U.S.C. § 31311 and 49 CFR part 384, subpart B.[27]

[23] 49 U.S.C. § 31314(c)(1); 49 CFR 384.401(a).
[24] FMCSA estimates this amount based on FY 2026 funding levels.
[25] 49 U.S.C. § 31314(c)(2); 49 CFR 384.401(b).
[26] 49 U.S.C. § 31314(d); 49 CFR 384.403.
[27] 49 U.S.C. § 31312(a); 49 CFR 384.405(a).

## VII. Conclusion

The 2025 APR uncovered that more than one in four of the non-domiciled CLP and CDL issuances FMCSA sampled failed to comply with parts 383 and 384 because the DMV issued non-domiciled CDLs to drivers who were not eligible, issued non-domiciled CDLs that extend beyond a driver's lawful presence, and issued non-domiciled CDLs without first validating the drivers' lawful presence. This is an unacceptable deviation from FMCSA's regulations when issuing credentials to operate commercial motor vehicles. The DMV must take immediate corrective action to audit its non-domiciled CDL program, correct the deficiencies that FMCSA identified above, and any deficiencies identified through the State's internal audit, and void or rescind and reissue all non-domiciled CLPs and CDLs that failed to comply with Federal regulations at the time of issuance, renewal, transfer, or upgrade.

The State of California is an important partner in FMCSA's mission to reduce crashes, injuries and fatalities involving large trucks and buses, and the Agency makes this preliminary determination to help California come into substantial compliance. I note with appreciation the highly cooperative and professional approach that DMV staff took during this review, and especially appreciate the hospitable arrangements for two onsite meetings spanning multiple days each and on short notice. To continue in that spirit of partnership towards our common safety goals, my staff stands ready to assist the DMV in resolving these serious issues.

Please note that this letter addresses noncompliance with the DMV's issuance of non-domiciled CDLs only. FMCSA will separately address areas of noncompliance unrelated to non-domiciled CDLs. If you or your staff need additional information or assistance, please contact Philip Thomas, Deputy Associate Administrator for Safety, at philip.thomas@dot.gov.

Sincerely,

Jesse Elison
Chief Counsel

An official website of the United States Government.

Back to Document Comments (/document/FMCSA-2025-0622-0001/comment)

Share

PUBLIC SUBMISSION

# Comment from Carmelo Otero

Posted by the **Federal Motor Carrier Safety Administration** on Oct 23, 2025

Docket (/docket/FMCSA-2025-0622) / Document (FMCSA-2025-0622-0001) (/document/FMCSA-2025-0622-0001) / Comment

Comment

To whoever recieves this message, I am a beneficiary of the CDL drivers license, I have been driving trucks for 20 years, and my family depends on that license. it would be devastating to me and my family if they do not renew my license because of the new regulation. I understand that there should be more control on the road, however I do not believe we should all be punished because of one or two people's mistakes.

**Comment ID**

FMCSA-2025-0622-3254

**Tracking Number**

mh2-idq3-0f2h

Give Feedback

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Oct 22, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government.

Back to Document Comments (/document/FMCSA-2025-0622-0001/comment?filter=FMCSA-2025-0622-3293%20)

Share

PUBLIC SUBMISSION

# Comment from Juan Gutierrez Ponce

Posted by the **Federal Motor Carrier Safety Administration** on Oct 24, 2025

Docket (/docket/FMCSA-2025-0622) / Document (FMCSA-2025-0622-0001) (/document/FMCSA-2025-0622-0001) / Comment

Comment

My name is Juan Gutiérrez, I am from El Salvador and I have TPS. I also have had a CDL since 2002 for more than 20 years and it has been the support for my family of 2 minor daughters. If this new law goes into effect in Virginia, I will be left without a job and I don't know what I will do... I will lose my home, my family's right to health care etc... Please, I ask for consideration for the working class.

**Comment ID**

FMCSA-2025-0622-3293

**Tracking Number**

mh3-y8n6-33mn

Give Feedback

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Oct 23, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

**U.S. Department of Transportation**

**Federal Motor Carrier Safety Administration**

**1200 New Jersey Ave, SE**
**Washington, DC 20590**

October 23, 2025

Via Electronic Mail and USPS
The Honorable Bob Ferguson
Governor of Washington
P.O. Box 40002
Olympia, WA 98504-0002

Mr. Marcus J. Glasper, Director
Washington State Department of Licensing
P.O. Box 9020
Olympia, WA 98507-9020

Dear Governor Ferguson and Mr. Glasper:

The U.S. Department of Transportation's Federal Motor Carrier Safety Administration ("FMCSA" or "Agency") is required by statute to ensure that all States comply with the commercial driver's license (CDL) regulations.[1] In September 2025, FMCSA initiated an Annual Program Review (APR) of the Washington Department of Licensing's (WADOL) CDL program in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. During the 2025 Annual Program Review, FMCSA obtained evidence of systemic training, procedural, and programming errors in Washington's issuance of non-domiciled commercial learner's permits (CLPs) and CDLs—that is, CLPs and CDLs issued to drivers who are not domiciled within Washington. In this regard, FMCSA found that WADOL issued regular CLPs and CDLs to drivers who should have been issued non-domiciled CLPs and CDLs, issued non-domiciled CDLs to drivers for whom WADOL was unable to provide evidence of eligibility, and, in at least one instance, issued a non-domiciled CDL that extended beyond expiration of driver's lawful presence in the United States. Therefore, in accordance with 49 CFR § 384.307(b), this letter constitutes FMCSA's preliminary determination that Washington has failed to meet the requirement for substantial compliance with the standards for issuing non-domiciled CLPs and CDLs. Washington must take immediate corrective action, as set forth in section IV below, to address the deficiencies identified in this letter. The State's failure to do so may result in FMCSA initiating the withholding of certain Federal-aid highway funds and decertifying the State's CDL Program.

---

[1] 49 U.S.C. § 31311; *see also* 49 CFR Part 384, Subparts B and C.

## I. Background

The Commercial Motor Vehicle Safety Act of 1986,[2] as amended, established performance standards with which State CDL programs must comply to avoid having amounts withheld from Highway Trust Fund apportionment under 49 U.S.C. § 31314 and to avoid CDL program decertification under 49 U.S.C. § 31312.[3] In this regard, States are required to be in substantial compliance with the requirements of 49 U.S.C. § 31311(a) and its implementing regulations in 49 CFR Part 383 and Part 384, Subpart B. Under 49 CFR 384.301(a), to be in substantial compliance with 49 U.S.C. § 31311(a), a State must meet each and every standard of Part 384, Subpart B by means of "the demonstrable combined effect of its statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resource assignments (facilities, equipment, and personnel), and enforcement practices."

As part of its oversight, FMCSA conducts comprehensive APRs of State CDL programs, in accordance with 49 CFR § 384.307, to verify that States are in substantial compliance. During an APR, FMCSA evaluates all aspects of the State's CDL program, including knowledge and skills testing procedures, CDL issuance processes, procedures to report convictions and withdrawals, compliance with FMCSA's physical qualification and Drug and Alcohol Clearinghouse programs, issuance of non-domiciled CDLs, and other areas.

At the conclusion of the APR, if FMCSA makes a preliminary determination that a State does not meet one or more of the minimum standards for substantial compliance under Part 384, Subpart B, FMCSA will notify the State accordingly.[4] As explained more fully in section V below, the State will have 30 calendar days to respond to the preliminary determination explaining the State's corrective action or, alternatively, why FMCSA's preliminary determination is incorrect.[5] If FMCSA makes a final determination of substantial noncompliance, FMCSA may initiate the withholding of certain Federal-aid highway funds and may decertify the State's CDL program.[6]

As part of the 2025 comprehensive APRs, FMCSA conducted an in-depth review of State procedures and policies in issuing non-domiciled CLPs and CDLs. FMCSA's focus on State non-domiciled CDL issuance practices during the 2025 APR was consistent with Executive Order 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers."[7] The Executive Order directed FMCSA to "review non-domiciled [ ] CDLs issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities" and "to take appropriate actions to improve the effectiveness of current protocols…."[8] Accordingly, FMCSA conducted a thorough audit of WADOL's procedures and policies in issuing non-domiciled CLPs and CDLs as part of the 2025 APR.

---

[2] 49 U.S.C. 31301 *et seq.*
[3] 49 U.S.C. 31311(a).
[4] 49 CFR § 384.307(b). A preliminary determination of noncompliance is also known as a "finding."
[5] *Id.* at § 384.307(c).
[6] 49 U.S.C. §§ 31314(c), 31312; *see also infra* at section VI; 49 CFR § 384.307(d), 49 CFR Part 384, Subpart D.
[7] 90 Fed. Reg. 18759 (Apr. 28, 2025).
[8] Executive Order 14286 at 2; 90 Fed. Reg. 18759-60.

## II. Statutory and Regulatory Requirements for Issuing Non-Domiciled CLPs and CDLs

Under 49 U.S.C. § 31311(a)(12)(B)(ii), States are authorized to issue non-domiciled CDLs, but they must do so in accordance with regulations prescribed by FMCSA. The Agency's regulations in effect at the time of the 2025 APR[9] provided that States that issue non-domiciled CLPs and CDLs may only accept as valid proof of lawful presence (i) an unexpired employment authorization document (EAD) issued by the United States Customs and Immigration Service (USCIS) or (ii) an unexpired foreign passport accompanied by an approved I-94 form documenting the driver's most recent admittance into the United States.[10] In addition, State procedures for issuing, renewing, or upgrading a non-domiciled CLP and CDL must, at a minimum, be identical to those pertaining to any other CLP or CDL.[11]

Regulations in effect prior to September 29, 2025, required that States accept as valid only *unexpired* lawful presence documents, which also meant that the State must make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver's lawful presence document(s). In other words, because FMCSA's regulations considered only unexpired lawful presence documents to be valid, WADOL was required to ensure that the non-domiciled CLP or CDL period of validity *did not exceed* the expiration of the driver's lawful presence documents. Therefore, State driver's licensing agencies were required to ensure that the validity of non-domiciled CLPs or CDLs did not exceed the expiration date of drivers' lawful presence documents.

In addition, States may not issue a non-domiciled CLP or CDL to citizens of Mexico. In this regard, FMCSA has determined that the United Mexican States issues Licencias Federales de Conductor (Mexican CDLs) in accordance with standards that are consistent with 49 CFR Part 383.[12] Citizens of Mexico are authorized to operate a CMV in the United States with a Mexican CDL and, therefore, are prohibited from obtaining a non-domiciled CDL. FMCSA issued guidance, which is now rescinded, stating that citizens of Mexico who are present in the United States under the Deferred Action for Childhood Arrivals (DACA) program are excepted from the prohibition.[13] Though FMCSA rescinded the guidance as part of the September 29, 2025 rulemaking, prior to that date, States were permitted to issue a non-domiciled CLP or CDL to citizens of Mexico *only* if they were present in the United States under the DACA program.

## III. 2025 Annual Program Review

FMCSA initiated Washington's APR in September 2025 (2025 APR) in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. WADOL informed FMCSA that its records reflect that

---

[9] On September 29, 2025, FMCSA issued an interim final rule (IFR) amending Federal regulations in 49 CFR Parts 383 and 384 applicable to State Driver's Licensing Agencies (SDLAs). These changes significantly limit the authority for SDLAs to issue and renew non-domiciled CLPs and CDLs. *See* Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 90 Fed. Reg. 46509 (Sep. 29, 2025). However, because the 2025 APR was conducted prior to publication of the IFR, the regulations cited in this preliminary determination of noncompliance reflect the pre-IFR text of parts 383 and 384, specifically the 2024 edition of Title 49.

[10] 49 CFR § 383.71(f)(2)(i), 383.73(f)(3), 384.201, 384.212(b) (2024).

[11] *Id.* at § 383.73(f)(2) (2024).

[12] 49 CFR §§ 383.23, footnote 1; 383.71(f)(1)(i); and 383.73(f)(1) (2024)

[13] *See* https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled.

more than 5,000 drivers currently hold an unexpired non-domiciled CLP or CDL issued by WADOL.

During the 2025 APR, FMCSA sampled approximately 125 records of drivers issued a non-domiciled CLP or CDL between June 1, 2025 and June 30, 2025 by WADOL. Approximately 10 percent of the driver records sampled failed to comply with requirements in 49 CFR Parts 383 and 384. Even more concerning is the fact that WADOL officials admitted that an internal review uncovered that an additional 685 non-domiciled drivers were issued a regular CLP or CDL when they should have been issued a non-domiciled CLP or CDL.[14]

The 2025 APR obtained evidence of systemic training, procedural, and programming errors. In this regard, WADOL officials explained that several factors led to 685 non-domiciled drivers being issued a regular CLP or CDL when they should have been issued a non-domiciled CLP or CDL. In accordance with FMCSA's regulations, only U.S. citizens or lawful permanent residents are eligible for a regular CLP or CDL. In most of the 685 transactions, WADOL personnel accepted and used the wrong documentation as evidence that the driver was a lawful permanent resident eligible for a regular CLP or CDL. Under Table 1 to 49 CFR § 383.71, States may only accept a valid, unexpired Permanent Resident Card, issued by USCIS or the former United States Immigration and Naturalization Service (INS) as evidence that a driver is a lawful permanent resident and therefore eligible for a regular CDL.[15] However, WADOL stated that in a majority of the 685 transactions at issue, WADOL personnel erroneously believed that other documents (e.g., an EAD) indicated that the driver was a lawful permanent resident and issued the driver a regular CDL. WADOL further stated that in other transactions, WADOL personnel failed to select the non-domiciled toggle in WADOL's Driver Record and Integrated Vehicle Enterprise System (DRIVES), which resulted in a regular CLP or CDL being issued. WADOL characterized other transactions as "training issues" that resulted in non-domiciled drivers being issued regular CLPs and CDLs.

In addition to the 685 current non-domiciled drivers who hold a regular CLP or CDL, FMCSA also discovered that six of the 125 driver records sampled included transactions where WADOL issued a regular CLP or CDL to a non-domiciled driver. These transactions, which date back several years, are further evidence that WADOL's erroneous issuance of regular CLPs and CDLs to drivers who should have been issued a non-domiciled CLP or CDL is a longstanding problem. These transactions are described in section III(a) below.

FMCSA also found other areas of noncompliance during the 2025 APR. FMCSA found one transaction in the sampled records where WADOL issued a non-domiciled CDL that exceeded the expiration date of the driver's lawful presence document, as well as one transaction where WADOL issued a non-domiciled CDL to a citizen of Mexico who was not present in the United States under the DACA program. FMCSA also found five transactions that had other significant anomalies surrounding lawful presence documentation.

[14] WADOL officials stated that of the 685 non-domiciled drivers erroneously issued a regular CDL, 65 drivers moved out of state, leaving 620 non-domiciled drivers who currently hold a regular CDL in Washington.

[15] Before its abolishment, the INS oversaw the immigration process, enforcement, and border patrol activities for 70 years until Congress passed the Homeland Security Act of 2002. *See* 6 U.S.C. §§ 271, 291. On March 1, 2003, USCIS assumed responsibility for the immigration service functions of the Federal government.

During the 2025 APR, WADOL was unable to provide evidence of sufficient management controls to prevent these errors or catch them if they occur. Further, WADOL has not programmed its systems, such as DRIVES, with sufficient measures to prevent errors. The errors discovered during the 2025 APR indicate a systemic breakdown in WADOL's issuance process for non-domiciled CLPs and CDLs. The transactions illustrating these compliance issues are discussed in greater detail below. FMCSA will provide electronic documentation for each transaction through the State Compliance Records Enterprise (SCORE) system.

**a. Finding: 49 CFR § 384.212—WADOL issued regular CLPs and CDLs to non-domiciled drivers.**

As discussed above, WADOL officials explained that 685 drivers were issued regular CLPs and CDLs when they should have been issued non-domiciled CLPs and CDLs. However, despite repeated requests from FMCSA, WADOL has not provided a list of 685 drivers at issue. In addition to the 685 drivers WADOL reported, FMCSA found that six of the 125 driver records sampled include prior transactions where WADOL issued a non-domiciled driver a regular CLP or CDL. Further, during FMCSA's investigation of a fatal crash that occurred on August 12, 2025 near Fort Pierce, Florida, the agency became aware of another non-domiciled driver to whom WADOL erroneously issued a regular CLP and CDL. These transactions are described below.

1. On July 29, 2025, WADOL erroneously issued a regular CDL to a non-domiciled driver with the initials "AG" instead of a non-domiciled CDL despite the fact that WADOL previously issued non-domiciled CLPs to AG. AG's citizenship is not recorded in the documents from DRIVES that WADOL provided during the 2025 APR. The expiration date for the CDL, which AG continues to hold, is August 13, 2028. In addition, AG is also listed in section III(b) below because WADOL issued a CDL that exceeds AG's lawful presence.

2. On February 5, 2024, WADOL erroneously issued a regular CLP to a non-domiciled driver with the initials "VC," who is a citizen of Ukraine, instead of a non-domiciled CLP. Subsequently, WADOL issued a non-domiciled CDL to VC on June 23, 2025 with an expiration date of October 11, 2026.

3. On January 5, 2023, WADOL erroneously issued a regular CLP to a non-domiciled driver with the initials "HK," who is a citizen of Ukraine, instead of a non-domiciled CLP. Subsequently, WADOL issued a non-domiciled CDL to HK in February 2023. The expiration date of HK's current non-domiciled CDL is April 9, 2029.

4. On July 22, 2022, WADOL erroneously issued a regular CLP to a non-domiciled driver with the initials "PF," who is a citizen of Mexico, instead of a non-domiciled CLP. WADOL's error occurred even though it had issued a non-domiciled CLP to PF roughly a month prior, on June 27, 2022. WADOL began renewing non-domiciled CDLs for PF in August 2022, and the expiration date of PF's current non-domiciled CDL is May 4, 2027. In addition, PF is also listed in section III(c) because WADOL issued a non-domiciled

CDL when the driver was ineligible as a citizen of Mexico who is not present in the United States under the DACA program.

5. On January 9, 2021, WADOL erroneously issued a regular CLP to a non-domiciled driver with the initials "SS" instead of a non-domiciled CLP. SS's citizenship is not recorded in the documents from DRIVES that WADOL provided during the 2025 APR. WADOL corrected the CLP at renewal and issued SS a non-domiciled CLP on March 17, 2021. WADOL then erroneously issued SS a regular CDL on May 4, 2021 instead of a non-domiciled CDL. WADOL corrected the CDL at renewal and issued SS a non-domiciled CDL that expires on November 8, 2028.

6. On March 2, 2018, WADOL erroneously issued a regular Class B CLP to a non-domiciled driver with the initials "XW" instead of a non-domiciled Class B CLP. XW's citizenship is not recorded in the documents from DRIVES that WADOL provided during the 2025 APR. Starting in April 2018, WADOL began issuing and renewing non-domiciled Class B CDLs for XW. However, on June 11, 2020, when XW sought to upgrade to a Class A license, WADOL erroneously issued a regular Class A CLP despite the fact that XW held a non-domiciled Class B CDL at the time. XW currently holds a non-domiciled Class B CDL that expires on October 16, 2029.

7. During FMCSA's investigation of a crash that occurred on August 12, 2025 near Fort Pierce, Florida that resulted in three fatalities, FMCSA uncovered that WADOL erroneously issued a regular CLP and CDL to a non-domiciled driver with the initials "HS" who was involved in the crash. In this regard, WADOL informed FMCSA that when HS applied for a CLP, WADOL personnel checked the driver's EAD but failed to select the non-domiciled toggle. WADOL explained that this resulted in HS being issued a regular CLP and later, a regular CDL.

**b. Finding: 49 CFR § 384.212—WADOL issued a non-domiciled CDL with an expiration date that exceeded the expiration of the driver's lawful presence document.**

During the 2025 APR, FMCSA discovered that WADOL issued a non-domiciled CDL for a period of validity that exceeded the driver's lawful presence document. The transaction at issue is described below.

1. On July 29, 2025, WADOL erroneously issued a regular CDL with an expiration date of August 13, 2028 to a non-domiciled driver with the initials "AG," also listed in section III(a) above. During the transaction, the driver presented an EAD with an expiration date of March 18, 2027. However, WADOL issued a CDL with an expiration date of August 13, 2028, *17 months* after the expiration of AG's lawful status.

**c. Finding: 49 CFR § 384.212—WADOL issued a non-domiciled CDL to a citizen of Mexico.**

During the 2025 APR, FMCSA discovered that WADOL issued a non-domiciled CDL to a driver who, as a citizen of Mexico who was not present in the United States under the DACA

program, was ineligible to receive a non-domiciled CDL. The transaction at issue is described below.

1. On April 14, 2022, WADOL erroneously issued a non-domiciled CLP to a driver with the initials "PF" who is a citizen of Mexico, also listed in section III(a) above. WADOL most recently issued PF a non-domiciled CDL on June 13, 2025 with a expiration date of May 4, 2027. WADOL provided no evidence that PF was present in the United States under the DACA program at the time, without which the driver was ineligible for a non-domiciled CDL as a citizen of Mexico.

**d. Finding: 49 CFR § 384.212—Other anomalies regarding lawful presence.**

In addition to the findings cited in Section III(a), FMCSA noted several other transactions with significant anomalies surrounding lawful presence documentation. These transactions are described below.

1. On June 27, 2025, WADOL issued a non-domiciled CDL with an expiration date of November 12, 2028 to a driver with the initials "VK" who is a citizen of Ukraine. While WADOL's records indicate that VK presented a foreign passport, WADOL was unable to present any evidence that the driver presented an approved I-94 form documenting the driver' most recent admittance into the United States, as required under 49 CFR § 383.71(f) at the time the transaction occurred. Further, there is no indication that WADOL queried VLS or otherwise validated VK's lawful presence before issuing a non-domiciled CDL.

2. On June 21, 2025, WADOL issued a non-domiciled CLP with an expiration date of December 17, 2025 to a driver with the initials "JL" who is a citizen of the Marshall Islands. While WADOL's records indicate that JL presented an unexpired foreign passport, WADOL was unable to present any evidence that the driver presented an approved I-94 form documenting the driver' most recent admittance into the United States, as required under 49 CFR § 383.71(f) at the time the transaction occurred. Further, there is no indication that WADOL queried VLS or otherwise validated JL's lawful presence before issuing a non-domiciled CLP.

3. On June 17, 2025, WADOL issued a non-domiciled CDL with an expiration date of December 9, 2026 to a driver with the initials "PC." PC's citizenship is not recorded in the documents from DRIVES that WADOL provided during the 2025 APR. While DRIVES shows that PC presented an EAD with an *expiration* date of December 9, 2026, DRIVES also shows PC's EAD *issuance* date as March 9, 2026, which appears to be an erroneous entry. This error is especially concerning because it shows that WADOL's DRIVES system does not have sufficient stop procedures or other measures to prevent simple mistakes by personnel such as entering lawful presence document issuance dates that occur in the future.

4. On June 13, 2025, WADOL renewed a non-domiciled CDL with an expiration date of January 4, 2027 held by a driver with the initials "NA" who is a citizen of Afghanistan. At the time the transaction occurred, WADOL personnel recorded in DRIVES that NA

presented an EAD with an issuance date of July 14, 2023 and an expiration date of January 4, 2027. However, approximately 8 months earlier, on October 11, 2024, when WADOL initially issued the non-domiciled CDL, WADOL personnel recorded in DRIVES that NA's EAD was issued on July 3, 2023 and expired on July 2, 2025. During the 2025 APR, WADOL was unable to why its personnel recorded two different issuance dates for NA's EAD and two expiration dates that differ by approximately 18 months. Further, WADOL was unable to produce any documentation showing that NA's EAD was extended from July 2, 2025 to January 4, 2027. While such documentation would explain the conflicting EAD expiration dates, it would not explain the conflicting EAD issuance dates recorded in DRIVES.

5. On June 10, 2025, WADOL issued a non-domiciled CDL with an expiration date of April 18, 2028 to a driver with the initials "AS" who is a citizen of Ukraine. While DRIVES shows that AS presented a foreign passport with an *expiration* date of April 18, 2028, DRIVES also shows AS's passport *issuance* date as April 18, 2028, which appears to be an erroneous entry. This error further illustrates that WADOL's DRIVES system does not have sufficient stop procedures or other measures to prevent simple mistakes by personnel such as erroneously entering lawful presence document issuance dates that occur in the future.

## IV. Required Corrective Action

As noted above, approximately 5,000 drivers hold an unexpired non-domiciled CLP or CDL issued by WADOL. In light of the systemic errors and deficiencies in WADOL's issuance of non-domiciled CLPs and CDLs uncovered by the 2025 APR, FMCSA determines that Washington must take the following actions:

- Immediately pause issuing non-domiciled CLPs and CDLs, as required in FMCSA's September 29, 2025, interim final rule;
- As soon as practicable, identify all unexpired non-domiciled CLPs and CDLs that were not issued in compliance with 49 CFR Parts 383 and 384;
- Immediately provide FMCSA a written report about WADOL's investigation into the transactions that resulted in driver "HS," who was involved in the August 12, 2025 fatal crash in Florida, being issued a regular CLP and CDL;
- Immediately provide FMCSA a list of the 685 drivers WADOL erroneously issued regular CLPs or CDLs when they should have issued non-domiciled CLPs or CDLs, including the drivers' CDL number, name, and date of birth;
- Immediately provide FMCSA any and all documentation associated with the issuance of the regular CLPs or CDL to 685 drivers who should have been issued non-domiciled CLPs or CDLs;
- Immediately provide FMCSA a written report of WADOL's internal audit of their regular CDLs issued since 2018;
- Immediately provide FMCSA an electronic list of the 392 non-domiciled CLP or CDL transactions that occurred in June 2025 (the list from which FMCSA selected its random sample during the on-site non-domiciled CDL review);

- Conduct an internal audit to identify *all* procedural and programming errors; training and quality assurance problems; insufficient policies and practices; and other issues that have resulted in widespread noncompliance in issuing non-domiciled CLPs and CDLs and noncompliance in issuing regular CLPs and CDLs to drivers who should have been issued non-domiciled CLPs and CDLs;
- Notify FMCSA of the audit findings and the number of unexpired noncompliant non-domiciled CDLs;
- Take immediate action to correct the deficiencies identified in WADOL's internal audit and in this letter;
- Take immediate action to void or rescind and reissue all unexpired noncompliant non-domiciled CLPs and CDLs, as well as all regular CLPs and CDLs that should have been issued as non-domiciled CLPs and CDLs, in accordance with Parts 383 and 384, as amended on September 29, 2025;
- Resume issuing non-domiciled CLPs and CDLs only after the State ensures that all statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resources assignments (facilities, equipment, and personnel), and enforcement practices meet each and every standard of Subpart B of Part 384 and 49 U.S.C. § 31311.

## V. Responding to this Preliminary Determination

The procedural regulations applicable to this action are found at 49 CFR § 384.307. Within 30 calendar days, the State must respond to this preliminary determination. The State's response must explain what corrective action it either has implemented or intends to implement to correct the deficiencies cited. The required corrective actions are set forth in section IV of this preliminary determination. The State must provide documentation of corrective action as required by FMCSA. In addition, the corrective actions may be implemented on a schedule mutually agreed upon by FMCSA and the State. Upon request by the State, an informal conference will be provided during this time.

Alternatively, the State's response may explain why FMCSA's preliminary determination is incorrect and may include any additional documentation the State wishes FMCSA to consider.

After reviewing a timely response to the preliminary determination by the State, FMCSA will notify the State of the final determination. In making its final determination, FMCSA will take into consideration the corrective action either implemented or planned to be implemented in accordance with the mutually agreed upon schedule.

## VI. Potential Penalties for a Final Determination of Substantial Noncompliance

If FMCSA issues a final determination of substantial noncompliance, the Agency may withhold up to four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds beginning in Fiscal Year (FY) 2027 that would otherwise be apportioned to Washington under 23 U.S.C. § 104(b)(1) and (2).[16] Accordingly, upon a final determination of substantial noncompliance, Washington risks losing up to approximately

[16] 49 U.S.C. § 31314(c)(1); 49 CFR § 384.401(a).

$31,350,000 for FY 2027.[17] Further, if the substantial noncompliance persists beyond the first fiscal year, FMCSA may withhold up to eight percent of these funds; therefore, Washington risks losing up to approximately $62,700,000 in the second and subsequent FY(s) of noncompliance.[18] Once funds are withheld following a substantial noncompliance determination, they are no longer available for apportionment to Washington.[19]

In addition, if FMCSA issues a final determination of substantial noncompliance, the Agency may decertify Washington's CDL Program. Decertification of Washington's CDL program would prohibit the State from issuing, renewing, transferring, or upgrading CLPs and CDLs until such time as FMCSA determines that WADOL is in substantial compliance with 49 U.S.C. § 31311 and 49 CFR Part 384, Subpart B.[20]

**VII. Conclusion**

The 2025 APR uncovered significant areas of noncompliance in WADOL's issuance of non-domiciled CDLs. This is an unacceptable deviation from FMCSA's regulations when issuing credentials to operate commercial motor vehicles. WADOL must take immediate corrective action to audit its non-domiciled CDL program, correct the deficiencies that FMCSA identified above, and any deficiencies identified through the State's internal audit, and void or rescind and reissue all non-domiciled CLPs and CDLs that failed to comply with Federal regulations at the time of issuance, renewal, transfer, or upgrade.

The State of Washington is an important partner in FMCSA's mission to reduce crashes, injuries and fatalities involving large trucks and buses, and the Agency makes this preliminary determination to help Washington come into substantial compliance. To continue in that spirit of partnership towards our common safety goals, my staff stands ready to assist WADOL in resolving these serious issues.

Please note that this letter addresses noncompliance with WADOL's issuance of non-domiciled CDLs only. FMCSA will separately address areas of noncompliance unrelated to non-domiciled CDLs. If you or your staff need additional information or assistance, please contact Philip Thomas, Deputy Associate Administrator for Safety, at philip.thomas@dot.gov.

Sincerely,

Jesse Elison
Chief Counsel

---

[17] FMCSA estimates this amount based on FY 2026 funding levels.
[18] 49 U.S.C. § 31314(c)(2); 49 CFR § 384.401(b).
[19] 49 U.S.C. § 31314(d); 49 CFR § 384.403.
[20] 49 U.S.C. § 31312(a); 49 CFR § 384.405(a).

**U.S. Department of Transportation**

**Federal Motor Carrier Safety Administration**

**1200 New Jersey Ave, SE
Washington, DC 20590**

October 23, 2025

<u>Via Electronic Mail and UPS</u>
The Honorable Greg Abbott
Governor of Texas
Office of the Governor
State Insurance Building
1100 San Jacinto
Austin, Texas 78701

Colonel Freeman F. Martin
Director
Texas Department of Public Safety
5805 North Lamar Blvd
Austin, TX 78752-4431

Dear Governor Abbott and Colonel Martin:

The U.S. Department of Transportation's Federal Motor Carrier Safety Administration ("FMCSA" or "Agency") is required by statute to ensure that all States comply with the commercial driver's license (CDL) regulations.[1] In August 2025, FMCSA initiated an Annual Program Review (APR) of the Texas Department of Public Safety's (DPS) CDL program in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. During the 2025 Annual Program Review, FMCSA obtained evidence of systemic policy, procedural, and programming errors in Texas's issuance of non-domiciled commercial learner's permits (CLPs) and CDLs—that is, CLPs and CDLs issued to drivers who are not domiciled within Texas. In this regard, FMCSA found that DPS issued non-domiciled CDLs that extend beyond expiration of drivers' lawful presence in the United States and issued non-domiciled CDLs to drivers who were not eligible. Therefore, in accordance with 49 CFR § 384.307(b), this letter constitutes FMCSA's preliminary determination that Texas has failed to meet the requirement for substantial compliance with the standards for issuing non-domiciled CLPs and CDLs. Texas must take immediate corrective action, as set forth in section IV below, to address the deficiencies identified in this letter. The State's failure to do so may result in FMCSA initiating the withholding of certain Federal-aid highway funds and decertifying the State's CDL program.

---

[1] 49 U.S.C. § 31311; *see also* 49 CFR Part 384, Subparts B and C.

## I. Background

The Commercial Motor Vehicle Safety Act of 1986,[2] as amended, established performance standards with which State CDL programs must comply to avoid having amounts withheld from Highway Trust Fund apportionment under 49 U.S.C. § 31314 and to avoid CDL program decertification under 49 U.S.C. § 31312.[3] In this regard, States are required to be in substantial compliance with the requirements of 49 U.S.C. § 31311(a) and its implementing regulations in 49 CFR Part 383 and Part 384, Subpart B. Under 49 CFR § 384.301(a), to be in substantial compliance with 49 U.S.C. § 31311(a), a State must meet each and every standard of Part 384, Subpart B by means of "the demonstrable combined effect of its statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resource assignments (facilities, equipment, and personnel), and enforcement practices."

As part of its oversight, FMCSA conducts comprehensive APRs of State CDL programs, in accordance with 49 CFR § 384.307, to verify that States are in substantial compliance. During an APR, FMCSA evaluates all aspects of the States' CDL program, including knowledge and skills testing procedures, CDL issuance processes, procedures to report convictions and withdrawals, compliance with FMCSA's physical qualification and Drug and Alcohol Clearinghouse programs, issuance of non-domiciled CDLs, and other areas.

At the conclusion of the APR, if FMCSA makes a preliminary determination that a State does not meet one or more of the minimum standards for substantial compliance under Part 384, Subpart B, FMCSA will notify the State accordingly.[4] As explained more fully in section V below, the State will have 30 calendar days to respond to the preliminary determination explaining the State's corrective action or, alternatively, why FMCSA's preliminary determination is incorrect.[5] If FMCSA makes a final determination of substantial noncompliance, FMCSA may initiate the withholding of certain Federal-aid highway funds and may decertify the State's CDL program.[6]

As part of the 2025 comprehensive APRs (2025 APRs), FMCSA conducted an in-depth review of State procedures and policies in issuing non-domiciled CLPs and CDLs. FMCSA's focus on State non-domiciled CDL issuance practices during the 2025 APR was consistent with Executive Order 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers."[7] The Executive Order directed FMCSA to "review non-domiciled [ ] CDLs issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities" and "to take appropriate actions to improve the effectiveness of current protocols…."[8] Accordingly, FMCSA conducted a thorough audit of the Texas DPS's procedures and policies in issuing non-domiciled CLPs and CDLs as part of the 2025 APR.

---

[2] 49 U.S.C. 31301 *et seq.*
[3] 49 U.S.C. 31311(a).
[4] 49 CFR § 384.307(b). A preliminary determination of noncompliance is also known as a "finding."
[5] *Id.* at § 384.307(c).
[6] 49 U.S.C. §§ 31314(c), 31312; *see also infra* at section VI; 49 CFR § 384.307(d), 49 CFR Part 384, Subpart D.
[7] 90 Fed. Reg. 18759 (Apr. 28, 2025).
[8] Executive Order 14286 at 2; 90 Fed. Reg. 18759-60.

## II. Statutory and Regulatory Requirements for Issuing Non-Domiciled CLPs and CDLs

Under 49 U.S.C. § 31311(a)(12)(B)(ii), States are authorized to issue non-domiciled CDLs, but they must do so in accordance with regulations prescribed by FMCSA. The Agency's regulations in effect at the time of the 2025 APR[9] provided that States that issue non-domiciled CLPs and CDLs may only accept as valid proof of lawful presence (i) an unexpired employment authorization document (EAD) issued by the United States Customs and Immigration Service (USCIS), or (ii) an unexpired foreign passport accompanied by an approved I-94 form documenting the driver's most recent admittance into the United States.[10] In addition, State procedures for issuing, renewing, or upgrading a non-domiciled CLP and CDL must, at a minimum, be identical to those pertaining to any other CLP or CDL.[11]

Regulations in effect prior to September 29, 2025, required that States accept as valid only *unexpired* lawful presence documents, which also meant that the State must make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver's lawful presence document(s). In other words, because FMCSA's regulations considered only unexpired lawful presence documents to be valid, DPS was required to ensure that the non-domiciled CLP or CDL period of validity *did not exceed* the expiration of the driver's lawful presence documents. Therefore, State driver's licensing agencies were required to ensure that the validity of non-domiciled CLPs or CDLs did not exceed the expiration date of drivers' lawful presence documents.

In addition, States may not issue a non-domiciled CLP or CDL to citizens of Mexico. In this regard, FMCSA has determined that the United Mexican States issues Licencias Federales de Conductor (Mexican CDLs) in accordance with standards that are consistent with 49 CFR Part 383.[12] Citizens of Mexico are authorized to operate a commercial motor vehicle in the United States with a Mexican CDL and, therefore, are prohibited from obtaining a non-domiciled CDL. FMCSA issued guidance, which is now rescinded, stating that citizens of Mexico who are present in the United States under the Deferred Action for Childhood Arrivals (DACA) program are excepted from the prohibition.[13] Though FMCSA rescinded the guidance as part of the September 29, 2025 rulemaking, prior to that date, States were permitted to issue a non-domiciled CLP or CDL to citizens of Mexico *only* if they were present in the United States under the DACA program.

[9] On September 29, 2025, FMCSA issued an interim final rule (IFR) amending Federal regulations in 49 CFR Parts 383 and 384 applicable to State Driver's Licensing Agencies (SDLAs). These changes significantly limit the authority for SDLAs to issue and renew non-domiciled CLPs and CDLs. *See Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*, 90 Fed. Reg. 46509 (Sept. 29, 2025). However, because the 2025 APR was conducted prior to publication of the IFR, the regulations cited in this preliminary determination of noncompliance reflect the pre-IFR text of Parts 383 and 384, specifically the 2024 edition of Title 49.
[10] 49 CFR §§ 383.71(f)(2)(i), 383.73(f)(3), 384.201, 384.212(b) (2024).
[11] *Id.* at § 383.73(f)(2) (2024).
[12] 49 CFR §§ 383.23, footnote 1; 383.71(f)(1)(i); and 383.73(f)(1) (2024).
[13] *See* https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled.

## III. 2025 Annual Program Review

FMCSA initiated Texas's 2025 APR during August 2025 in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. DPS informed FMCSA that its records reflect that more than 9,600 drivers hold an unexpired non-domiciled CLP or CDL issued by the Texas DPS, as of September 2025. FMCSA understands that DPS issues non-domiciled CDLs as REAL ID-compliant documents.

During the 2025 APR, FMCSA sampled 123 records of drivers issued a non-domiciled CDL by DPS between June 2024 and August 2025. 60 of the 123 driver records sampled—approximately 49 percent—failed to comply with requirements in 49 CFR Parts 383 and 384.

The 2025 APR uncovered evidence of systemic policy, procedural, and programming errors. In this regard, of the driver records sampled, FMCSA found 60 driver records where DPS issued non-domiciled CDLs that exceeded the expiration date of the driver's lawful presence documents. FMCSA learned through discussions with DPS staff during the 2025 APR that this error occurs because DPS's Driver License System (DLS) defaults to a 5- or 8-year expiration date for CDLs, depending on whether the CDL includes a hazardous materials endorsement.[14] DPS staff further explained that this happens when DLS does not properly populate information about a driver's lawful presence expiration received from the American Association of Motor Vehicle Administrators' system Verification of Lawful Status[15] (VLS), which pulls the information from the U.S. Citizenship and Immigration Services' (USCIS) online verification service, Systematic Alien Verification for Entitlements[16] (SAVE). When information about a driver's lawful presence does not populate automatically and the DLS defaults, DPS's personnel must use a multi-step process to manually change the expiration date of non-domiciled CLPs and CDLs to match the expiration of the driver's lawful presence documents. FMCSA found that DPS's personnel failed to follow this manual process in 56 of the 123 driver records sampled.

Another recurring error discovered during the 2025 APR is DPS's repeated issuance of non-domiciled CDLs to individuals with significant anomalies in their lawful presence documentation. As explained in greater detail in section III(b) below, of the driver records sampled, FMCSA found 3 transactions where DPS issued a non-domiciled CDL to a driver despite receiving a SAVE report from USCIS indicating the driver had pending employment authorization and one transaction where DPS relied on documentation not permitted under FMCSA's regulations in effect at the time the transaction occurred.

During the 2025 APR, DPS was unable to provide evidence of sufficient management controls to prevent these errors or catch them if they occur. Further, DPS has not programmed its systems with sufficient "stop procedures" to prevent errors from occurring. The repeated errors

---

[14] Under 49 CFR § 383.141(d), CDLs with a hazardous materials endorsement must be renewed every 5 years.

[15] VLS allows the transactions to be integrated with other transactions passed through AAMVA. *See* https://www.aamva.org/technology/systems/verification-systems/vls.

[16] "SAVE is a service by USCIS that helps Federal, State, and local benefit-issuing agencies, institutions, and licensing agencies determine the immigration status of benefit applicants, so only those entitled to benefits receive them." U.S. CITIZENSHIP AND IMMIGR. SERVS., *Guide to Understanding SAVE Verification Responses* (April 2022), https://www.uscis.gov/sites/default/files/document/guides/SAVE-Guide%20to%20Understanding%20SAVE%20Verification%20Responses.pdf.

discovered during the 2025 APR indicate a systemic breakdown in DPS's issuance process for non-domiciled CLPs and CDLs. The transactions illustrating these compliance issues are discussed in greater detail below and documentation for each will be provided electronically through the State Compliance Records Enterprise (SCORE) system.

**a. Finding: 49 CFR § 384.212—The Texas DPS issued non-domiciled CLPs or CDLs with an expiration date that exceeded the expiration of the driver's lawful presence documents.**

During the 2025 APR, FMCSA discovered that 60 of the 123 driver records sampled showed that DPS issued a non-domiciled CLP or CDL for a period of validity that exceeded the driver's lawful presence document(s). The 60 driver records at issue are described below.

1. On June 3, 2024, DPS issued a non-domiciled CDL with an expiration date of July 24, 2032 to a driver with the initials "JQ" who is a citizen of El Salvador. At the time the transaction occurred, JQ's EAD credential showed an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on March 9, 2025. However, DPS issued a non-domiciled CDL with an expiration date of July 24, 2032, more than *seven years* after the EAD's expiration date.

2. On August 13, 2024, DPS issued a non-domiciled CDL with an expiration date of September 6, 2032 to a driver with the initials "AVS" who is a citizen of Cuba. At the time the transaction occurred, AVS failed to present either an EAD or Form I-94, but instead presented a Form I-797 Notice of Approval for an EAD that, when issued, would show an expiration date of August 1, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD, when issued, was set to expire on August 1, 2025. However, DPS issued a non-domiciled CDL with an expiration date of September 6, 2032. Although DPS caught this mistake, notified AVS of the incorrect expiration date on their non-domiciled CDL on April 10, 2025, and provided a corrected CDL, it lacked sufficient controls to prevent a mistake that went uncorrected for nearly eight months.

3. On August 28, 2024, DPS issued a non-domiciled CDL with an expiration date of September 23, 2032 to a driver with the initials "II" who is a citizen of Ukraine. At the time the transaction occurred, II presented an EAD credential and Form I-94 showing an expiration date of February 1, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on February 1, 2025. However, DPS issued a non-domiciled CDL with an expiration date of September 23, 2032, more than *seven years* after the EAD's and Form I-94's expiration date.

4. On July 29, 2024, DPS issued a non-domiciled CDL with an expiration date of December 4, 2032 to a driver with the initials "JR" who is a citizen of El Salvador. At the

time the transaction occurred, JR's EAD credential showed an expiration date of June 30, 2024, though JR presented a Form I-797 Notice of Action from USCIS stating the EAD was automatically extended through March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on March 9, 2025. However, DPS issued a non-domiciled CDL with an expiration date of December 4, 2032, more than *seven years* after the EAD's expiration date. DPS provided further information indicating that it subsequently reissued the non-domiciled CDL on May 12, 2025 with a September 9, 2026 expiration date.[17]

5. On August 2, 2024, DPS issued a non-domiciled CDL with an expiration date of June 12, 2033 to a driver with the initials "JPE" who is a citizen of El Salvador. At the time the transaction occurred, JPE's EAD credential showed an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on March 9, 2025. However, DPS issued a non-domiciled CDL with an expiration date of June 12, 2033, more than *eight years* after the EAD's expiration date.

6. On August 16, 2024, DPS issued a non-domiciled CDL with an expiration date of October 14, 2032 to a driver with the initials "VEC" who is a citizen of Cuba. At the time the transaction occurred, VEC presented an EAD credential and Form I-94 each showing an expiration date of June 6, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on June 6, 2025. However, DPS issued a non-domiciled CDL with an expiration date of October 14, 2032, more than *seven years* after the EAD's expiration date.

7. On August 16, 2024 DPS issued a non-domiciled CDL with an expiration date of December 12, 2032 to a driver with the initials "AS" who is a citizen of Ukraine. At the time the transaction occurred, AS's EAD credential showed an expiration date of November 4, 2024. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that AS's EAD was set to expire on April 19, 2025. However, DPS issued a non-domiciled CDL with an expiration date of December 12, 2032, nearly *eight years* after the EAD's expiration date. Although DPS later caught this error, notified AS of the incorrect expiration date on their non-domiciled CDL on March 11, 2025, and provided a corrected CDL, it lacked sufficient controls to prevent a mistake that went uncorrected for nearly seven months.

---

[17] On January 17, 2025, USCIS issued a Federal Register Notice extending the designation of El Salvador for Temporary Protected Status (TPS) for 18 months, beginning on March 10, 2025 and ending on September 9, 2026. The Notice explains that individuals granted TPS under El Salvador's designation were eligible for new EADs with a September 9, 2026 expiration date and provided that, due to predicted processing delays, the validity of certain expiring EADs would be automatically extended through March 9, 2026. The Notice further provides instructions for SDLAs attempting to confirm an applicant's employment authorization using the SAVE tool. *See Extension of the Designation of El Salvador for Temporary Protected Status*, 90 Fed. Reg. 5953, 5961 (Jan. 17, 2025).

8. On August 16, 2024, DPS issued a non-domiciled CDL with an expiration date of November 3, 2032 to a driver with the initials "KGF" who is a citizen of Honduras. At the time the transaction occurred, KGF presented an expired EAD credential with an expiration date of August 11, 2024. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that AS's EAD was set to expire on July 29, 2026. However, DPS issued a non-domiciled CDL with an expiration date of November 3, 2032, more than *six years* after the EAD's expiration date. Although DPS later caught this error and provided a corrected CDL with an expiration date of July 29, 2026, it lacked sufficient controls to prevent the mistake.

9. On August 21, 2024, DPS issued a non-domiciled CDL with an expiration date of April 9, 2033 to a driver with the initials "BOR" who is a citizen of El Salvador. At the time the transaction occurred, BOR presented an EAD credential with an expiration date of July 15, 2026 and a Form I-797 Approval Notice reporting a decision to defer action under the DACA program. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on July 15, 2026, and confirmed they are present in the United States under the DACA program. However, DPS issued a non-domiciled CDL with an expiration date of April 9, 2033, more than *six years* after the EAD's expiration date.

10. On August 28, 2024, DPS issued a non-domiciled CDL with an expiration date of October 18, 2032 to a driver with the initials "JTC" who is a citizen of El Salvador. At the time the transaction occurred, JTC's EAD credential showed an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on March 9, 2025. However, DPS issued a non-domiciled CDL with an expiration date of October 18, 2032, more than *seven years* after the EAD's expiration date. FMCSA notes that, after DPS requested additional evidence of the driver's lawful status from the driver on February 9, 2025, it updated JTC's non-domiciled CDL expiration date to April 23, 2025. However, the expiration date of the updated non-domiciled CDL still exceeds JTC's EAD expiration date.

11. On September 6, 2024, DPS issued a non-domiciled CDL with an expiration date of April 20, 2033 to a driver with the initials "MR" who is a citizen of Cuba. At the time the transaction occurred, MR's EAD credential showed an expiration date of December 16, 2024. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on June 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of April 20, 2033, nearly *seven years* after the EAD's expiration date.

12. On September 20, 2024, DPS issued a non-domiciled CDL with an expiration date of June 18, 2033 to a driver with the initials "MJA" who is a citizen of Angola. At the time the transaction occurred, MJA's EAD credential showed an expiration date of March 26,

2029. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on March 26, 2029. However, DPS issued a non-domiciled CDL with an expiration date of June 18, 2033, nearly *four years* after the EAD's expiration date.

13. On September 25, 2024 DPS issued a non-domiciled CDL with an expiration date of November 10, 2032 to a driver with the initials "CJM" who is a citizen of South Africa. At the time the transaction occurred, CJM's Form I-94 showed an expiration date of January 15, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's Form I-94 was set to expire on February 14, 2025. However, DPS issued a non-domiciled CDL with an expiration date of November 10, 2032, nearly *eight years* after the Form I-94's expiration date. Although DPS caught and corrected CJM's non-domiciled CDL expiration date to match the I-94 provided at the time of the transaction the same day, it lacked sufficient controls to prevent the mistake.

14. On September 27, 2024, DPS issued a non-domiciled CDL with an expiration date of November 15, 2032 to a driver with the initials "JAV" who is a citizen of Colombia. At the time the transaction occurred, JAV's EAD credential showed an expiration date of February 27, 2029. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on February 27, 2029. However, DPS issued a non-domiciled CDL with an expiration date of November 15, 2032, nearly *three years* after the EAD's expiration date.

15. On October 11, 2024, DPS issued a non-domiciled CDL with an expiration date of June 17, 2033 to a driver with the initials "LMR" who is a citizen of Honduras. At the time the transaction occurred, LMR's EAD credential showed an expiration date of July 5, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on July 5, 2025. However, DPS issued a non-domiciled CDL with an expiration date of June 17, 2033, nearly *eight years* after the EAD's expiration date. Although DPS caught and corrected the non-domiciled CDL expiration date the same day, it lacked sufficient controls to prevent the mistake.

16. On November 5, 2024, DPS issued a non-domiciled CDL with an expiration date of November 18, 2032 to a driver with the initials "AG" who is a citizen of Cuba. At the time the transaction occurred, AG's EAD credential showed an expiration date of September 30, 2029. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on September 30, 2029. However, DPS issued a non-domiciled CDL with an expiration date of November 18, 2032, more than *three years* after the EAD's expiration date.

17. On November 13, 2024, DPS issued a non-domiciled CDL with an expiration date of January 22, 2033 to a driver with the initials "EAM" who is a citizen of Mexico present in the United States under the DACA program. At the time the transaction occurred, EAM presented an expired EAD credential which showed an expiration date of November 7, 2024, and a Form I-797 Approval Notice reporting a decision to defer action under the DACA program. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on August 2, 2026, and confirmed that they were present in the United States under the DACA program. However, DPS issued a non-domiciled CDL with an expiration date of January 22, 2033, nearly *seven years* after the EAD's expiration date.

18. On August 1, 2024, DPS issued a non-domiciled CDL with an expiration date of June 7, 2033 to a driver with the initials "SD" who is a citizen of Ukraine. At the time the transaction occurred, SD presented an unexpired foreign passport and a Form I-797A, noting approval of Form I-94 application, and displaying an expiration date of September 18, 2026. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver held Temporary Protected Status that was set to expire on April 19, 2025, and instructed that DPS review the documents presented for accuracy. The VLS report also confirmed that SD's employment authorization was set to expire on September 18, 2026. However, DPS issued a non-domiciled CDL with an expiration date of June 7, 2033, nearly *seven years* after the expiration of SD's employment authorization. After first issuing this non-domiciled CDL, DPS later issued a corrective notice to SD which contained a new credential with an expiration date of September 18, 2026. Although DPS caught and corrected this mistake the same day, it lacked sufficient controls to prevent the mistake.

19. On December 18, 2024, DPS issued a non-domiciled CDL with an expiration date of July 13, 2033 to a driver with the initials "JAM" who is a citizen of Guatemala. At the time the transaction occurred, JAM presented an expired EAD credential and Form I-797C Notice of Action, containing no relevant authorization dates, but noting that their application for employment authorization was pending. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on June 5, 2026. However, DPS issued a non-domiciled CDL with an expiration date of July 13, 2033, more than *seven years* after the EAD's expiration date.

20. On January 7, 2024, DPS issued a non-domiciled CDL with an expiration date of November 9, 2033 to a driver with the initials "RC" who is a citizen of Cuba. At the time the transaction occurred, RC's EAD credential showed an expiration date of December 12, 2029. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on December 12, 2029. However, DPS issued a non-domiciled CDL with an expiration date of November 9, 2033, nearly *four years* after the EAD's expiration date.

21. On January 13, 2025, DPS issued a non-domiciled CDL with an expiration date of October 10, 2033 to a driver with the initials "MFR" who is a citizen of Honduras. At the time the transaction occurred, MFR's EAD credential showed an expiration date of November 7, 2029. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on July 5, 2025. However, DPS issued a non-domiciled CDL with an expiration date of October 10, 2033, nearly *four years* after the EAD's expiration date.

22. On January 27, 2025, DPS issued a non-domiciled CDL with an expiration date of June 17, 2033 to a driver with the initials "LEG" who is a citizen of Venezuela. At the time the transaction occurred, LEG's EAD credential showed an expiration date of December 6, 2028. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on December 6, 2028. However, DPS issued a non-domiciled CDL with an expiration date of June 17, 2033, nearly *five years* after the EAD's expiration date.

23. On January 29, 2025, DPS issued a non-domiciled CDL with an expiration date of August 5, 2033 to a driver with the initials "AHD" who is a citizen of Cuba. At the time the transaction occurred, AHD's EAD credential showed an expiration date of January 21, 2029. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on January 21, 2029. However, DPS issued a non-domiciled CDL with an expiration date of August 5, 2033, more than *four years* after the EAD's expiration date.

24. On February 7, 2025, DPS issued a non-domiciled CDL with an expiration date of April 21, 2033 to a driver with the initials "ORP" who is a citizen of El Salvador. At the time the transaction occurred, ORP's EAD credential showed an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of April 21, 2033, more than *eight years* after the EAD's expiration date. After first issuing this non-domiciled CDL, DPS later issued a new credential with a corrected expiration date of September 9, 2026. Although DPS caught and corrected this mistake the same day, it lacked sufficient controls to prevent the mistake.

25. On February 14, 2025, DPS issued a non-domiciled CDL with an expiration date of February 9, 2034 to a driver with the initials "HEP" who is a citizen of El Salvador. At the time the transaction occurred, HEP's EAD credential showed an expiration date of March 9, 2025. HEP also provided a Form I-797C Notice of Action, containing no relevant authorization dates, but noting that HEP's application for employment authorization was pending. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver was lawfully present in the United

States but contained no specific dates to verify if the EAD expiration dates matched SAVE. However, DPS issued a non-domiciled CDL with an expiration date of February 9, 2034, nearly *nine years* after the EAD's expiration date. After first issuing this non-domiciled CDL, DPS later issued a corrective notice to HEP which contained a new credential with a modified expiration date of September 9, 2026. Although DPS caught and corrected this mistake the same day, it lacked sufficient controls to prevent the mistake.

26. On February 19, 2025, DPS issued a non-domiciled CDL with an expiration date of December 22, 2033 to a driver with the initials "EC" who is a citizen of Cuba. At the time the transaction occurred, EC's EAD credential showed an expiration date of January 14, 2030. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on January 14, 2030. However, DPS issued a non-domiciled CDL with an expiration date of December 22, 2033, nearly *four years* after the EAD's expiration date.

27. On February 20, 2025, DPS issued a non-domiciled CDL with an expiration date of May 27, 2033 to a driver with the initials "DER" who is a citizen of Cuba. At the time the transaction occurred, DER's EAD credential showed an expiration date of January 8, 2030. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on January 8, 2030. However, DPS issued a non-domiciled CDL with an expiration date of May 27, 2033, more than *three years* after the EAD's expiration date.

28. On February 26, 2025, DPS issued a non-domiciled CDL with an expiration date of February 28, 2033 to a driver with the initials "CHC" who is a citizen of El Salvador. At the time the transaction occurred, CHC's EAD credential showed an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of February 28, 2033, more than *six years* after the EAD's expiration date.

29. On February 28, 2025, DPS issued a non-domiciled CDL with an expiration date of August 8, 2033 to a driver with the initials "ER" who is a citizen of Cuba. At the time the transaction occurred, ER's EAD credential showed an expiration El Salvador of February 10, 2030. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on February 10, 2030. However, DPS issued a non-domiciled CDL with an expiration date of August 8, 2033, more than *three years* after the EAD's expiration date.

30. On March 3, 2025, DPS issued a non-domiciled CDL with an expiration date of April 13, 2033 to a driver with the initials "JER" who is a citizen of El Salvador. At the time the transaction occurred, JER's EAD credential showed an expiration date of March 9, 2025.

DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of April 13, 2033, more than *six years* after the EAD's expiration date.

31. On March 6, 2025, DPS issued a non-domiciled CDL with an expiration date of May 21, 2033 to a driver with the initials "VMV" who is a citizen of El Salvador. At the time the transaction occurred, VMV's EAD credential showed an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of May 21, 2033, more than *six years* after the EAD's expiration date.

32. On March 7, 2025, DPS issued a non-domiciled CDL with an expiration date of October 28, 2033 to a driver with the initials "JAR" who is a citizen of El Salvador. At the time the transaction occurred, JAR's EAD credential showed an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of October 28, 2033, more than *seven years* after the EAD's expiration date.

33. On March 11, 2025, DPS issued a non-domiciled CDL with an expiration date of April 23, 2033 to a driver with the initials "JFM" who is a citizen of El Salvador. At the time the transaction occurred, JFM presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of April 23, 2033, more than *six years* after the EAD's expiration date.

34. On March 12, 2025, DPS issued a non-domiciled CDL with an expiration date of October 25, 2033 to a driver with the initials "JMV" who is a citizen of El Salvador. At the time the transaction occurred, JMV presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of October 25, 2033, more than *seven years* after the EAD's expiration date.

35. On March 13, 2025, DPS issued a non-domiciled CDL with an expiration date of June 29, 2033 to a driver with the initials "DCH" who is a citizen of Cuba. At the time the transaction occurred, DCH's EAD credential showed an expiration date of April 12, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS

report showed that the driver's EAD was set to expire on October 4, 2026. However, DPS issued a non-domiciled CDL with an expiration date of June 29, 2033, nearly *seven years* after the EAD's expiration date.

36. On March 13, 2025, DPS issued a non-domiciled CDL with an expiration date of January 20, 2034 to a driver with the initials "JJG" who is a citizen of El Salvador. At the time the transaction occurred, JJG's EAD credential showed an expiration date of December 6, 2029. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on December 6, 2029. However, DPS issued a non-domiciled CDL with an expiration date of January 20, 2034, more than *four years* after the EAD's expiration date.

37. On March 17, 2025, DPS issued a non-domiciled CDL with an expiration date of March 3, 2034 to a driver with the initials "JCB" who is a citizen of El Salvador. At the time the transaction occurred, JCB presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of March 3, 2034, more than *seven years* after the EAD's expiration date.

38. On March 18, 2025, DPS issued a non-domiciled CDL with an expiration date of July 12, 2033 to a driver with the initials "SW" who is a citizen of Afghanistan. At the time the transaction occurred, SW presented an expired EAD credential with an expiration date of June 20, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on June 20, 2025. However, DPS issued a non-domiciled CDL with an expiration date of July 12, 2033, more than *seven years* after the EAD's expiration date.

39. On March 19, 2025, DPS issued a non-domiciled CDL with an expiration date of May 28, 2033 to a driver with the initials "JAP" who is a citizen of El Salvador. At the time the transaction occurred, JAP presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of May 28, 2033, nearly *seven years* after the EAD's expiration date.

40. On March 27, 2025, DPS issued a non-domiciled CDL with an expiration date of January 13, 2034 to a driver with the initials "CCA" who is a citizen of El Salvador. At the time the transaction occurred, CCA presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026.

However, DPS issued a non-domiciled CDL with an expiration date of January 13, 2034, more than *seven years* after the EAD's expiration date.

41. On April 10, 2025, DPS issued a non-domiciled CDL with an expiration date of March 4, 2034 to a driver with the initials "MMA" who is a citizen of El Salvador. At the time the transaction occurred, MMA presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of March 4, 2034, more than *seven years* after the EAD's expiration date.

42. On April 17, 2025, DPS issued a non-domiciled CDL with an expiration date of January 25, 2034 to a driver with the initials "AMC" who is a citizen of Cuba. At the time the transaction occurred, AMC's EAD credential showed an expiration date of May 15, 2029. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on May 15, 2029. However, DPS issued a non-domiciled CDL with an expiration date of January 25, 2034, nearly *five years* after the EAD's expiration date.

43. On April 24, 2025, DPS issued a non-domiciled CDL with an expiration date of August 26, 2033 to a driver with the initials "OGR" who is a citizen of Cuba. At the time the transaction occurred, OGR's EAD credential showed an expiration date of February 14, 2030. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on February 14, 2030. However, DPS issued a non-domiciled CDL with an expiration date of August 26, 2033, more than *three years* after the EAD's expiration date.

44. On April 24, 2025, DPS issued a non-domiciled CDL with an expiration date of April 20, 2034 to a driver with the initials "JVS" who is a citizen of El Salvador. At the time the transaction occurred, JVS presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of April 20, 2034, more than *seven years* after the EAD's expiration date.

45. On May 6, 2025, DPS issued a non-domiciled CDL with an expiration date of March 2, 2034 to a driver with the initials "RYH" who is a citizen of El Salvador. At the time the transaction occurred, RYH presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of March 2, 2034, more than *seven years* after the EAD's expiration date.

46. On May 15, 2025, DPS issued a non-domiciled CDL with an expiration date of January 10, 2034 to a driver with the initials "CAM" who is a citizen of El Salvador. At the time the transaction occurred, CAM presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of January 10, 2034, more than *seven years* after the EAD's expiration date.

47. On May 16, 2025, DPS issued a non-domiciled CDL with an expiration date of July 28, 2033 to a driver with the initials "OHP" who is a citizen of El Salvador. At the time the transaction occurred, OHP presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of July 28, 2033, nearly *seven years* after the EAD's expiration date.

48. On May 19, 2025, DPS issued a non-domiciled CDL with an expiration date of January 10, 2027 to a driver with the initials "NTL" who is a citizen of Cuba. At the time the transaction occurred, NTL presented an EAD credential with an expiration date of July 19, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on July 19, 2025. However, DPS issued a non-domiciled CDL with an expiration date of January 10, 2027, nearly *two years* after the EAD's expiration date.

49. On June 2, 2025, DPS issued a non-domiciled CDL with an expiration date of July 3, 2033 to a driver with the initials "JSS" who is a citizen of El Salvador. At the time the transaction occurred, JSS presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of July 3, 2033, nearly *seven years* after the EAD's expiration date.

50. On June 3, 2025, DPS issued a non-domiciled CDL with an expiration date of October 6, 2033 to a driver with the initials "GAC" who is a citizen of Guatemala. At the time the transaction occurred, GAC presented an EAD credential with an expiration date of April 23, 2027. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on April 23, 2027. However, DPS issued a non-domiciled CDL with an expiration date of October 6, 2033, more than *six years* after the EAD's expiration date.

51. On June 4, 2025, DPS issued a non-domiciled CDL with an expiration date of August 28, 2033 to a driver with the initials "YRC" who is a citizen of Cuba. At the time the

transaction occurred, YRC presented a Form I-797 notice showing that their application for EAD was approved with an expiration date of May 27, 2030. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on May 27, 2030. However, DPS issued a non-domiciled CDL with an expiration date of August 28, 2033, more than *three years* after the EAD's expiration date.

52. On June 6, 2025, DPS issued a non-domiciled CDL with an expiration date of July 11, 2033 to a driver with the initials "JGN" who is a citizen of South Africa. At the time the transaction occurred, JGN presented a Form I-94 showing an expiration date of December 1, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on December 1, 2025. However, DPS issued a non-domiciled CDL with an expiration date of July 11, 2033, nearly *eight years* after the EAD's expiration date.

53. On June 20, 2025, DPS issued a non-domiciled CDL with an expiration date of January 29, 2034 to a driver with the initials "CEM" who is a citizen of Honduras. At the time the transaction occurred, CEM presented an EAD credential showing an expiration date of June 5, 2026. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on June 5, 2026. However, DPS issued a non-domiciled CDL with an expiration date of January 29, 2034, nearly *eight years* after the EAD's expiration date.

54. On June 23, 2025, DPS issued a non-domiciled CDL with an expiration date of July 21, 2033 to a driver with the initials "EAC" who is a citizen of El Salvador. At the time the transaction occurred, EAC presented an expired EAD credential with an expiration date of March 9, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report showed that the driver's EAD was set to expire on September 9, 2026. However, DPS issued a non-domiciled CDL with an expiration date of July 21, 2033, nearly *seven years* after the EAD's expiration date.

55. On August 7, 2025, DPS issued a non-domiciled CDL with an expiration date of January 1, 2034 to a driver with the initials "MKS" who is a citizen of Afghanistan. At the time the transaction occurred, MKS's EAD credential showed an expiration date of September 6, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on September 6, 2025. However, DPS issued a non-domiciled CDL with an expiration date of January 1, 2034, more than *eight years* after the EAD's expiration date.

56. On August 7, 2025, DPS issued a non-domiciled CDL with an expiration date of October 10, 2033 to a driver with the initials "DF" who is a citizen of Cuba. At the time the transaction occurred, DF's EAD credential showed an expiration date of July 25,

2026. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on July 25, 2026. However, DPS issued a non-domiciled CDL with an expiration date of October 10, 2033, more than *seven years* after the EAD's expiration date.

**b. Finding: 49 CFR § 384.212—Other anomalies regarding lawful presence.**

In addition to the findings cited in Section III(a), FMCSA noted four transactions with significant anomalies surrounding lawful presence documentation. These transactions are set forth below.

1. On July 25, 2025, DPS issued a non-domiciled CDL with an expiration date of September 20, 2033 to a driver with the initials "NDP" who is a citizen of the Philippines. While NDP presented an unexpired foreign passport, in accordance with FMCSA's regulations in effect at the time the transaction occurred, DPS accepted additional documents not permitted under the regulations, such as a Form I-797C Notice of Action demonstrating a pending application for employment authorization, and a document from the U.S. Department of State demonstrating NDP's lawful presence in the United States under a J-2 visa. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report provided that NDP was lawfully present in the United States for "duration of stay," but provided no specific expiration date. However, despite failing to confirm the expiration date of NDP's lawful presence, DPS still issued a non-domiciled CDL. Even more troubling is the fact that DPS issued a non-domiciled CDL with passenger and school bus endorsements.

2. On July 31, 2025, DPS issued a non-domiciled CDL with an expiration date of July 21, 2026 to a driver with the initials "RDM" who is a citizen of Cuba. At the time the transaction occurred, RDM presented an EAD credential with an expiration date of January 14, 2026. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD was set to expire on January 14, 2026, but further reported that RDM was not authorized for employment because their EAD application was pending. However, despite confirming RDM's EAD application was pending , DPS still issued a non-domiciled CDL.

3. On August 6, 2025, DPS issued a non-domiciled CDL with an expiration date of April 30, 2034 to a driver with the initials "RAR" who is a citizen of Cuba. At the time the transaction occurred, RAR presented an EAD credential with an expiration date of August 14, 2025. The DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that the DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD will expire on August 14, 2025, but further reported that RAR was not authorized for employment because their EAD application was pending. However, despite confirming RAR's EAD application was pending, DPS still issued a non-domiciled CDL.

4. On August 7, 2025, DPS issued a non-domiciled CDL with an expiration date of December 29, 2033 to a driver with the initials "NCR" who is a citizen of Cuba. At the time the transaction occurred, NCR presented an expired EAD credential with an expiration date of May 10, 2025. DPS provided FMCSA a copy of the VLS query report, which displayed data pulled from SAVE, that DPS obtained at the time the transaction occurred. The VLS report confirmed that the driver's EAD expired on May 10, 2025, but further reported that NCR was not authorized for employment because their EAD application was pending. However, despite confirming NCR's EAD application was pending, DPS still issued a non-domiciled CDL.

**c. Finding: 49 CFR § 384.212— DPS issued a regular CDL to a non-domiciled driver.**

During FMCSA's investigation of a crash that occurred in March 2025 near Austin, Texas that involved five fatalities, the Agency became aware of a non-domiciled driver with the initials "SWA" to whom DPS erroneously issued a regular CDL. In this transaction, SWA surrendered a non-domiciled CDL issued by Florida and presented an EAD with an expiration date of October 20, 2022. DPS queried VLS, which displayed data pulled from SAVE, and confirmed that the driver's EAD expired on October 20, 2022. The VLS query further reported that SWA had "indefinite" employment authorization due to the driver's immigration status as a refugee. DPS personnel erroneously determined that SWA's indefinite employment authorization associated with the driver's refugee status entitled the driver to a regular CDL rather than a non-domiciled CDL. DPS's error in this regard resulted in SWA being issued a regular CDL when the driver was not eligible.

## IV. Required Corrective Action

As noted above, approximately 9,600 drivers hold an unexpired non-domiciled CLP or CDL issued by the Texas DPS. In light of the systemic errors and deficiencies in DPS's issuance of non-domiciled CLPs and CDLs uncovered by the 2025 APR, FMCSA determines that Texas must take the following actions:

- Immediately pause issuing non-domiciled CLPs and CDLs, as required in FMCSA's September 29, 2025, interim final rule;
- As soon as practicable, identify all unexpired non-domiciled CLPs and CDLs that were not issued in compliance with Parts 383 and 384;
- Conduct an internal audit to identify all procedural and programming errors; training and quality assurance problems; insufficient policies and practices; and other issues that have resulted in widespread noncompliance in issuing non-domiciled CLPs and CDLs and noncompliance in issuing regular CLPs and CDLs to drivers who should have been issued non-domiciled CLPs and CDLs;
- Identify all drivers DPS erroneously issued regular CLPs or CDLs when they should have issued non-domiciled CLPs or CDLs, and provide FMCSA a list of the drivers including the drivers' CDL number, name, and date of birth;
- Notify FMCSA of the audit findings and the number of unexpired noncompliant non-domiciled CLPs and CDLs;
- Take immediate action to correct the deficiencies identified in DPS's internal audit and in this letter;

- Take immediate action to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs, as well as all regular CLPs and CDLs that should have been issued as non-domiciled CLPs and CDLs, and reissue the licenses in accordance with Parts 383 and 384, as amended on September 29, 2025;
- Resume issuing non-domiciled CLPs and CDLs in accordance with Parts 383 and 384, as amended on September 29, 2025, only after the State ensures that all statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resources assignments (facilities, equipment, and personnel), and enforcement practices meet each and every standard of Subpart B of Part 384 and 49 U.S.C. § 31311.

## V. Responding to this Preliminary Determination

The procedural regulations applicable to this action are found at 49 CFR § 384.307. Within 30 calendar days, the State must respond to this preliminary determination. The State's response must explain what corrective action it either has implemented or intends to implement to correct the deficiencies cited. The required corrective actions are set forth in section IV of this preliminary determination. The State must provide documentation of corrective action as required by FMCSA. In addition, the corrective actions may be implemented on a schedule mutually agreed upon by FMCSA and the State. Upon request by the State, an informal conference will be provided during this time.

Alternatively, the State's response may explain why FMCSA's preliminary determination is incorrect and may include any additional documentation the State wishes FMCSA to consider.

After reviewing a timely response to the preliminary determination by the State, FMCSA will notify the State of the final determination. In making its final determination, FMCSA will take into consideration the corrective action either implemented or planned to be implemented in accordance with the mutually agreed upon schedule.

## VI. Potential Penalties for a Final Determination of Substantial Noncompliance

If FMCSA issues a final determination of substantial noncompliance, the Agency may withhold up to four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds beginning in Fiscal Year (FY) 2027 that would otherwise be apportioned to Texas under 23 U.S.C. § 104(b)(1) and (2).[18] Accordingly, upon a final determination of substantial noncompliance, Texas risks losing up to approximately $182,500,000 for FY 2027.[19] Further, if the substantial noncompliance persists beyond the first fiscal year, FMCSA may withhold up to eight percent of these funds; therefore, Texas risks losing up to approximately $365,000,000 in the second and subsequent FY(s) of noncompliance.[20] Once funds are withheld following a substantial noncompliance determination, they are no longer available for apportionment to Texas.[21]

---

[18] 49 U.S.C. § 31314(c)(1); 49 CFR § 384.401(a).
[19] FMCSA estimates this amount based on FY 2026 funding levels.
[20] 49 U.S.C. § 31314(c)(2); 49 CFR § 384.401(b).
[21] 49 U.S.C. § 31314(d); 49 CFR § 384.403.

In addition, if FMCSA issues a final determination of substantial noncompliance, the Agency may decertify Texas's CDL program. Decertification of Texas's CDL program would prohibit the State from issuing, renewing, transferring, or upgrading CLPs and CDLs until such time as FMCSA determines that DPS is in substantial compliance with 49 U.S.C. § 31311 and 49 CFR Part 384, Subpart B.[22]

## VII. Conclusion

The 2025 APR uncovered significant areas of noncompliance in DPS's issuance of non-domiciled CDLs. This is an unacceptable deviation from FMCSA's regulations when issuing credentials to operate commercial motor vehicles. DPS must take immediate corrective action to audit its non-domiciled CDL program, correct the deficiencies that FMCSA identified above, and any deficiencies identified through the State's internal audit, and void or rescind and reissue all non-domiciled CLPs and CDLs that failed to comply with Federal regulations at the time of issuance, renewal, transfer, or upgrade.

The State of Texas is an important partner in FMCSA's mission to reduce crashes, injuries and fatalities involving large trucks and buses, and the Agency makes this preliminary determination to help Texas come into substantial compliance. To continue in that spirit of partnership towards our common safety goals, my staff stands ready to assist DPS in resolving these serious issues.

Please note that this letter addresses noncompliance with DPS's issuance of non-domiciled CDLs only. FMCSA will separately address areas of noncompliance unrelated to non-domiciled CDLs. If you or your staff need additional information or assistance, please contact Philip Thomas, Deputy Associate Administrator for Safety, at philip.thomas@dot.gov.

Sincerely,

Jesse Elison
Chief Counsel

---

[22] 49 U.S.C. § 31312(a); 49 CFR § 384.405(a).

U.S. Department
of Transportation

Federal Motor Carrier
Safety Administration

1200 New Jersey Ave, SE
Washington, DC 20590

October 23, 2025

The Honorable Larry Rhoden
Governor of South Dakota
500 East Capitol Avenue
Pierre, SD 57501

Mr. Robert Perry, Secretary
South Dakota Department of Public Safety
Central Driver Licensing Office
118 West Capitol Avenue
Pierre, SD 57501

Dear Governor Rhoden and Mr. Perry:

The U.S. Department of Transportation's Federal Motor Carrier Safety Administration ("FMCSA" or "Agency") is required by statute to ensure that all States comply with the commercial driver's license (CDL) regulations.[1] In July 2025, FMCSA initiated an Annual Program Review (APR) of the South Dakota Department of Public Safety (DPS) CDL program in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. During the 2025 Annual Program Review, FMCSA obtained evidence of policy, procedural, and programming errors in South Dakota's issuance of non-domiciled commercial learner's permits (CLPs) and CDLs—that is, CLPs and CDLs issued to drivers who are not domiciled within South Dakota. In this regard, FMCSA found that DPS issued non-domiciled CDLs to drivers who were not eligible and issued non-domiciled CDLs that extend beyond expiration of drivers' lawful presence in the United States. Therefore, in accordance with 49 CFR § 384.307(b), this letter constitutes FMCSA's preliminary determination that South Dakota has failed to meet the requirement for substantial compliance with the standards for issuing non-domiciled CLPs and CDLs. South Dakota must take immediate corrective action, as set forth in section IV below, to address the deficiencies identified in this letter. The State's failure to do so may result in FMCSA initiating the withholding of certain Federal-aid highway funds and decertifying the State's CDL program.

## I. Background

The Commercial Motor Vehicle Safety Act of 1986,[2] as amended, established performance standards with which State CDL programs must comply to avoid having amounts withheld from

[1] 49 U.S.C. § 31311; *see also* 49 CFR Part 384, Subparts B and C.

[2] 49 U.S.C. 31301 *et seq.*

Highway Trust Fund apportionment under 49 U.S.C. § 31314 and to avoid CDL program decertification under 49 U.S.C. § 31312.[3] In this regard, States are required to be in substantial compliance with the requirements of 49 U.S.C. § 31311(a) and its implementing regulations in 49 CFR Part 383 and Part 384, Subpart B. Under 49 CFR § 384.301(a), to be in substantial compliance with 49 U.S.C. § 31311(a), a State must meet each and every standard of Part 384, Subpart B by means of "the demonstrable combined effect of its statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resource assignments (facilities, equipment, and personnel), and enforcement practices."

As part of its oversight, FMCSA conducts comprehensive APRs of State CDL programs, in accordance with 49 CFR § 384.307, to verify that States are in substantial compliance. During an APR, FMCSA evaluates all aspects of the States' CDL program, including knowledge and skills testing procedures, CDL issuance processes, procedures to report convictions and withdrawals, compliance with FMCSA's physical qualification and Drug and Alcohol Clearinghouse programs, issuance of non-domiciled CDLs, and other areas.

At the conclusion of the APR, if FMCSA makes a preliminary determination that a State does not meet one or more of the minimum standards for substantial compliance under Part 384, Subpart B, FMCSA will notify the State accordingly.[4] As explained more fully in section V below, the State will have 30 calendar days to respond to the preliminary determination explaining the State's corrective action or, alternatively, why FMCSA's preliminary determination is incorrect.[5] If FMCSA makes a final determination of substantial noncompliance, FMCSA may initiate the withholding of certain Federal-aid highway funds and may decertify the State's CDL program.[6]

As part of the 2025 comprehensive APRs (2025 APRs), FMCSA conducted an in-depth review of State procedures and policies in issuing non-domiciled CLPs and CDLs. FMCSA's focus on State non-domiciled CDL issuance practices during the 2025 APR was consistent with Executive Order 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers."[7] The Executive Order directed FMCSA to "review non-domiciled [ ] CDLs issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities" and "to take appropriate actions to improve the effectiveness of current protocols…."[8] Accordingly, FMCSA conducted a thorough audit of the South Dakota DPS's procedures and policies in issuing non-domiciled CLPs and CDLs as part of the 2025 APR.

---

[3] 49 U.S.C. 31311(a).

[4] 49 CFR § 384.307(b). A preliminary determination of noncompliance is also known as a "finding."

[5] *Id.* at § 384.307(c).

[6] 49 U.S.C. §§ 31314(c), 31312; *see also infra* at section VI; 49 CFR § 384.307(d), 49 CFR Part 384, Subpart D.

[7] 90 Fed. Reg. 18759 (Apr. 28, 2025).

[8] *Id.* at 18759-60.

## II. Statutory and Regulatory Requirements for Issuing Non-Domiciled CLPs and CDLs

Under 49 U.S.C. § 31311(a)(12)(B)(ii), States are authorized to issue non-domiciled CDLs, but they must do so in accordance with regulations prescribed by FMCSA. The Agency's regulations in effect at the time of the 2025 APR[9] provided that States that issue non-domiciled CLPs and CDLs may only accept as valid proof of lawful presence (i) an unexpired employment authorization document (EAD) issued by the United States Customs and Immigration Service (USCIS) or (ii) an unexpired foreign passport accompanied by an approved I-94 form documenting the driver's most recent admittance into the United States.[10] In addition, State procedures for issuing, renewing, or upgrading a non-domiciled CLP and CDL must, at a minimum, be identical to those pertaining to any other CLP or CDL.[11]

Regulations in effect prior to September 29, 2025, required that States accept as valid only *unexpired* lawful presence documents, which also meant that the State must make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver's lawful presence document(s). In other words, because FMCSA's regulations considered only unexpired lawful presence documents to be valid, DPS was required to ensure that the non-domiciled CLP or CDL period of validity *did not exceed* the expiration of the driver's lawful presence documents. Therefore, State driver's licensing agencies were required to ensure that the validity of non-domiciled CLPs or CDLs did not exceed the expiration date of drivers' lawful presence documents.

In addition, States may not issue a non-domiciled CLP or CDL to citizens of Canada. In this regard, FMCSA has determined that the Canadian Provinces and Territories issue CDLs in accordance with standards that are consistent with 49 CFR Part 383.[12] Citizens of Canada are authorized to operate a commercial motor vehicle in the United States with a Canadian CDL and, therefore, are prohibited from obtaining a non-domiciled CDL. Similar reciprocity exists for CDLs issued by Mexico to its citizens. FMCSA has only issued one exception to the prohibition on citizens of Canada and Mexico obtaining non-domiciled CDLs. In now-rescinded guidance, FMCSA stated that citizens of Mexico who are present in the United States under the Deferred Action for Childhood Arrivals (DACA) program are excepted from the prohibition.[13] While guidance was in effect, States were permitted to issue a non-domiciled CLP or CDL to citizens

---

[9] On September 29, 2025, FMCSA issued an interim final rule (IFR) amending Federal regulations in 49 CFR Parts 383 and 384 applicable to State Driver's Licensing Agencies (SDLAs). These changes significantly limit the authority for SDLAs to issue and renew non-domiciled CLPs and CDLs. *See* Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 90 Fed. Reg. 46509 (Sept. 29, 2025). However, because the 2025 APR was conducted prior to publication of the IFR, the regulations cited in this preliminary determination of noncompliance reflect the pre-IFR text of parts 383 and 384, specifically the 2024 edition of Title 49.

[10] 49 CFR §§ 383.71(f)(2)(i), 383.73(f)(3), 384.201, 384.212(b).

[11] *Id.* at § 383.73(f)(2).

[12] The Canadian Provinces and Territories issue CDLs in conformity with the Canadian National Safety Code. Since December 29, 1988, FMCSA has determined that the Canadian National Safety Code is in accordance with the standards set forth in 49 CFR Part 383. *See* 49 CFR §§ 383.23, fn. 1; 383.71(f)(1)(i); and 383.73(f)(1).

[13] *See* https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled.

of Canada or Mexico *only* if they were present in the United States under the DACA program. FMCSA has not identified any other exceptions to this general prohibition.

## III. 2025 Annual Program Review

FMCSA initiated South Dakota's 2025 APR during July 2025 in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. In August 2025, DPS informed FMCSA that, as of August 4, 2025, its records reflect that the State has issued 185 non-domiciled CLPs or CDLs. During the 2025 APR, FMCSA sampled 51 records of drivers issued a non-domiciled CDL by DPS. Approximately 12 percent of the driver records sampled failed to comply with requirements in 49 CFR Parts 383 and 384.[14]

The 2025 APR uncovered evidence of policy, procedural, and programming errors. As explained in greater detail in section III(a) below, of the driver records sampled, FMCSA found three transactions where DPS issued non-domiciled CDLs that exceeded the expiration date of the driver's lawful presence documents. DPS staff further explained that DPS issued the licenses despite its practice of requesting information about a driver's lawful presence expiration received from the American Association of Motor Vehicle Administrators' system Verification of Lawful Status[15] (VLS). VLS pulls the information from the U.S. Citizenship and Immigration Service's (USCIS) online verification service, Systematic Alien Verification for Entitlements[16] (SAVE). During discussions with DPS staff during the 2025 APR, DPS officials speculated that employee error in handling attachments to the application might result in the State issuing a non-domiciled CDL that exceeds the expiration date of the lawful presence documents.

Another recurring error discovered during the 2025 APR is DPS's repeated issuance of non-domiciled CDLs to citizens of Canada. As explained in greater detail in section III(b) below, of the driver records sampled, FMCSA found three transactions where DPS issued a non-domiciled CDL to a citizen of Canada.

In addition, during FMCSA's discussions with DPS personnel as part of the 2025 APR, the Agency discovered DPS is issuing "temporary" CLPs and CDLs as a courtesy to drivers, and that DPS trains its employees to do so. In this regard, DPS issues paper temporary credentials pending final verification of a driver's lawful presence status. DPS personnel explained that, regardless of the proof of lawful status provided, all such paper temporary CLPs and CDLs are issued with an expiration date one year from the date of issuance.

---

[14] As set forth in sections III(a), III(b), and III(c), 6 of the 51 records sampled failed to comply with FMCSA's regulations.

[15] DPS staff VLS allows the transactions to be integrated with other transactions passed through AAMVA. *See* https://www.aamva.org/technology/systems/verification-systems/vls.

[16] "SAVE is a service by USCIS that helps Federal, State, and local benefit-issuing agencies, institutions, and licensing agencies determine the immigration status of benefit applicants, so only those entitled to benefits receive them." U.S. CITIZENSHIP AND IMMIGR. SERVS., *Guide to Understanding SAVE Verification Responses* (April 2022), https://www.uscis.gov/sites/default/files/document/guides/SAVE-Guide%20to%20Understanding%20SAVE%20Verification%20Responses.pdf.

During the 2025 APR, DPS was unable to provide evidence of sufficient management controls to prevent these errors or catch them if they occur. Further, DPS has not programmed its systems with sufficient measures to prevent errors from occurring. The repeated errors discovered during the 2025 APR indicate a systemic breakdown in DPS's issuance process for non-domiciled CLPs and CDLs. The transactions illustrating these compliance issues are discussed in greater detail below. FMCSA will provide electronic documentation for each through the State Compliance Records Enterprise (SCORE) system.

**a. Finding: 49 CFR § 384.212—The South Dakota DPS issued non-domiciled CLPs or CDLs with an expiration date that exceeded the expiration of the driver's lawful presence documents.**

During the 2025 APR, FMCSA discovered that three of the 51 driver records sampled showed that DPS issued a non-domiciled CLP or CDL for a period of validity that exceeded the driver's lawful presence document(s). These transactions are described below.

1. On July 3, 2025, DPS issued a paper temporary non-domiciled CDL with an expiration date of July 2, 2026 to a driver with the initials "MV" who is a citizen of Australia. At the time the transaction occurred, MV presented an Australian passport and I-94 form showing an expiration date of December 30, 2025. DPS did not produce evidence showing that it conducted a VLS query at the time of the transaction. A VLS query completed during the 2025 APR showed that MV's "admitted to" date was January 29, 2026. Despite not verifying MV's lawful status during the transaction, DPS issued a paper temporary non-domiciled CDL with an expiration date of July 2, 2026, more than *five months* after MV's lawful presence expired.

2. On April 29, 2025, DPS issued a non-domiciled CDL with an expiration date of June 8, 2029 to a driver with the initials "TN" who is a citizen of Mongolia. During the transaction, the applicant presented an EAD with an expiration date of June 8, 2026. A VLS query conducted during the transaction confirmed that TN's lawful presence status is set to expire on June 8, 2026. However, DPS issued a non-domiciled CDL with an expiration date of June 8, 2029, *three years* after the expiration of TN's lawful status. DPS informed FMCSA that, on August 28, 2025, DPS reissued the non-Domiciled CDL with a corrected expiration date of the June 8, 2026, though DPS has not provided FMCSA with any documentation showing that the correction occurred. Although DPS appears to have caught this mistake, corrected the expiration date of TN's non-domiciled CDL, and sent a replacement CDL, it lacked sufficient controls to prevent a mistake that went uncorrected for roughly four months.

3. On April 14, 2025, DPS issued a non-domiciled CDL with an expiration date of December 10, 2029 to a driver with the initials "FJN" who is a citizen of South Africa. At the time the transaction occurred, FJN presented a South African passport and I-94 form showing an expiration date of December 31, 2025. During the transaction, a VLS query confirmed that FJN's lawful presence status was set to expire on December 31, 2025. However, DPS issued a non-domiciled CDL with an expiration date of December 10, 2029, nearly *four years* after the expiration of FNJ's lawful status.

**b. Finding: 49 CFR § 384.212—The South Dakota DPS issued non-domiciled CLPs or CDLs to citizens of Canada.**

During the 2025 APR, FMCSA discovered that three of the driver records sampled showed that DPS issued a non-domiciled CLP or CDL to a driver who, as a citizen of Canada, was ineligible to receive a non-domiciled CDL. The transactions at issue are set forth below.

1. On June 24, 2025, DPS issued a non-domiciled CDL with an expiration date of July 17, 2027 to a driver with the initials "GBF" who is a citizen of Canada. At the time the transaction occurred, GBF's presented a Canadian passport and I-94 form showing that the driver was from Canada. DPS also conducted a VLS query prior to issuing the non-domiciled CDL. Despite confirming GBF's ineligibility for a non-domiciled CDL as a citizen of Canada, DPS issued a non-domiciled CDL.

2. On June 26, 2025, DPS issued a non-domiciled CDL with an expiration date of August 7, 2029 to a driver with the initials "TVW" who is a citizen of Canada. At the time the transaction occurred, TVW's passport and Form I-512L (Authorization for Parole of an Alien into the United States), as well as a VLS query report DPS obtained prior to issuing the non-domiciled CDL, showed the driver was from Canada. Despite TVW's ineligibility for a non-domiciled CDL, due to their status as a citizen of Canada, DPS issued a non-domiciled CDL.

3. On July 31, 2025, DPS issued a non-domiciled CDL with an expiration date of April 24, 2030 to a driver with the initials "CMV" who is a citizen of Canada. At the time the transaction occurred, CMV's EAD credential, as well as a VLS query report DPS obtained prior to issuing the non-domiciled CDL, showed the driver was from Canada. Despite CMV's ineligibility for a non-domiciled CDL, due to their status as a citizen of Canada, DPS issued a non-domiciled CDL.

**c. Finding: 49 CFR § 384.225—Issuance of "temporary" or "interim" non-domiciled CDLs.**

Through discussions with DPS personnel during the 2025 APR, FMCSA learned that DPS issues paper "temporary" non-domiciled CLPs and CDLs to drivers. DPS personnel explained that, regardless of the expiration date on the lawful status documents provided, such paper temporary CLPs and CDLs contain an expiration date of one year after the date of issuance.

DPS officials explained that they issue paper temporary credentials as a courtesy to applicants in a variety of situations, including where the applicant has been approved for an extension of lawful presence status in the United States, but a VLS query does not yet reflect the extension. For example, an applicant might bring in an updated I-94 form that contains an "admitted to" date that does not match the date generated by a VLS query. DPS personnel attested that VLS does not update to reflect lawful presence extensions until the initial period expires. In such situations, DPS provides a paper temporary credential so the applicant may continue to work.

This problem is two-fold. First, DPS sometimes issues paper temporary CLPs or CDLs pending final verification of the driver's lawful presence status. This practice increases the risk that DPS

will issue a non-domiciled CLP or CDL to a driver who is not lawfully present in the United States in violation of 49 CFR § 384.212. Second, DPS's practice of issuing paper temporary non-domiciled CLPs and CDLs with a blanket one-year period of validity increases the risk that DPS will issue a credential with an expiration date that exceeds the expiration of the driver's lawful presence documents.

## IV. Required Corrective Action

As noted above, approximately 185 drivers hold an unexpired CLP or CDL issued by the South Dakota DPS. FMCSA notes that South Dakota has already taken some corrective action; however, in light of the systemic errors and deficiencies in DPS's issuance of non-domiciled CLPs and CDLs uncovered by the 2025 APR, FMCSA determines that South Dakota must take the following actions:

- Immediately pause issuing non-domiciled CLPs and CDLs, as required in FMCSA's September 29, 2025, interim final rule;
- As soon as practicable, identify all unexpired non-domiciled CLPs and CDLs, including "temporary" licenses as discussed in section III(c) that were not issued in compliance with Parts 383 and 384;
- Conduct an internal audit to identify all procedural and programming errors; training and quality assurance problems; insufficient policies and practices; and other issues that have resulted in widespread noncompliance in issuing non-domiciled CLPs and CDLs;
- Notify FMCSA of the audit findings and the number of unexpired noncompliant non-domiciled CLPs and CDLs;
- Take immediate action to correct the deficiencies identified in DPS's internal audit and in this letter;
- Take immediate action to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs and reissue the licenses in accordance with Parts 383 and 384, as amended on September 29, 2025;
- Resume issuing non-domiciled CLPs and CDLs only after the State ensures that all statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resources assignments (facilities, equipment, and personnel), and enforcement practices meet each and every standard of Subpart B of Part 384 and 49 U.S.C. § 31311.

## V. Responding to this Preliminary Determination

The procedural regulations applicable to this action are found at 49 CFR § 384.307. Within 30 calendar days, the State must respond to this preliminary determination. The State's response must explain what corrective action it either has implemented or intends to implement to correct the deficiencies cited. The required corrective actions are set forth in section IV of this preliminary determination. The State must provide documentation of corrective action as required by FMCSA. In addition, the corrective actions may be implemented on a schedule mutually agreed upon by FMCSA and the State. Upon request by the State, an informal conference will be provided during this time.

Alternatively, the State's response may explain why FMCSA's preliminary determination is incorrect and may include any additional documentation the State wishes FMCSA to consider.

After reviewing a timely response to the preliminary determination by the State, FMCSA will notify the State of the final determination. In making its final determination, FMCSA will take into consideration the corrective action either implemented or planned to be implemented in accordance with the mutually agreed upon schedule.

## VI. Potential Penalties for a Final Determination of Substantial Noncompliance

If FMCSA issues a final determination of substantial noncompliance, the Agency may withhold up to four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds beginning in Fiscal Year (FY) 2027 that would otherwise be apportioned to South Dakota under 23 U.S.C. § 104(b)(1) and (2).[17] Accordingly, upon a final determination of substantial noncompliance, South Dakota risks losing up to approximately $13,250,000 for FY 2027.[18] Further, if the substantial noncompliance persists beyond the first fiscal year, FMCSA may withhold up to eight percent of these funds; therefore, South Dakota risks losing up to approximately $26,500,000 in the second and subsequent FY(s) of noncompliance.[19] Once funds are withheld following a substantial noncompliance determination, they are no longer available for apportionment to South Dakota.[20]

In addition, if FMCSA issues a final determination of substantial noncompliance, the Agency may decertify South Dakota's CDL Program. Decertification of South Dakota's CDL program would prohibit the State from issuing, renewing, transferring, or upgrading CLPs and CDLs until such time as FMCSA determines that DPS is in substantial compliance with 49 U.S.C. § 31311 and 49 CFR Part 384, Subpart B.[21]

## VII. Conclusion

The 2025 APR uncovered six non-domiciled CLP and CDL issuances sampled by FMCSA that failed to comply with Parts 383 and 384 because DPS issued non-domiciled CDLs to drivers who were not eligible and issued non-domiciled CDLs that extend beyond a driver's lawful presence. This is an unacceptable deviation from FMCSA's regulations when issuing credentials to operate commercial motor vehicles. DPS must take immediate corrective action to audit its non-domiciled CDL program, correct the deficiencies that FMCSA identified above, and any deficiencies identified through the State's internal audit, and void or rescind and reissue all non-domiciled CLPs and CDLs that failed to comply with Federal regulations at the time of issuance, renewal, transfer, or upgrade.

---

[17] 49 U.S.C. § 31314(c)(1); 49 CFR § 384.401(a).

[18] FMCSA estimates this amount based on FY 2026 funding levels.

[19] 49 U.S.C. § 31314(c)(2); 49 CFR § 384.401(b).

[20] 49 U.S.C. § 31314(d); 49 CFR § 384.403.

[21] 49 U.S.C. § 31312(a); 49 CFR § 384.405(a).

The State of South Dakota is an important partner in FMCSA's mission to reduce crashes, injuries and fatalities involving large trucks and buses, and the Agency makes this preliminary determination to help South Dakota come into substantial compliance. To continue in that spirit of partnership towards our common safety goals, my staff stands ready to assist DPS in resolving these serious issues.

Please note that this letter addresses noncompliance with DPS's issuance of non-domiciled CDLs only. FMCSA will separately address areas of noncompliance unrelated to non-domiciled CDLs. If you or your staff need additional information or assistance, please contact Philip Thomas, Deputy Associate Administrator for Safety, at philip.thomas@dot.gov.

Sincerely,

Jesse Elison
Chief Counsel

**U.S. Department of Transportation**

**Federal Motor Carrier Safety Administration**

**1200 New Jersey Ave, SE
Washington, DC 20590**

October 23, 2025

Via Electronic Mail and UPS
The Honorable Jared Polis
Governor of Colorado
State Capitol Building
200 E. Colfax Avenue, Room 136
Denver, CO 80203

Heidi Humphreys, Executive Director
Colorado Department of Revenue, Division of Motor Vehicles
1707 Cole Blvd, Suite 350
Golden, CO 80401

Dear Governor Polis and Ms. Humphreys:

The U.S. Department of Transportation's Federal Motor Carrier Safety Administration ("FMCSA" or "Agency") is required by statute to ensure that all States comply with the commercial driver's license (CDL) regulations.[1] In August 2025, FMCSA initiated an Annual Program Review (APR) of the Colorado Department of Revenue, Division of Motor Vehicles (Colorado DMV) CDL program in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. During the 2025 Annual Program Review, FMCSA obtained evidence of systemic policy, procedural, and programming errors in Colorado's issuance of non-domiciled commercial learner's permits (CLPs) and CDLs—that is, CLPs and CDLs issued to drivers who are not domiciled within Colorado. In this regard, FMCSA found that the Colorado DMV issued non-domiciled CDLs to drivers who did not qualify and issued non-domiciled CDLs that extend beyond expiration of drivers' lawful presence in the United States. Therefore, in accordance with 49 CFR §384.307(b), this letter constitutes FMCSA's preliminary determination that Colorado has failed to meet the requirement for substantial compliance with the standards for issuing non-domiciled CLPs and CDLs.[2] Colorado must take immediate corrective action, as set forth in section IV below, to address the deficiencies identified in this letter. The State's failure to do so may result in FMCSA initiating the withholding of certain Federal-aid highway funds and decertifying the State's CDL program.

---

[1] 49 U.S.C. § 31311; *see also* 49 CFR Part 384, Subparts B and C.

[2] FMCSA notes that Colorado issues non-domiciled CLPs and CDLs as "limited term" CLPs and CDLs. However, this preliminary determination uses the term "non-domiciled" CLPs and CDLs to ensure consistent terminology with Federal regulations.

## I. Background

The Commercial Motor Vehicle Safety Act of 1986,[3] as amended, established performance standards with which State CDL programs must comply to avoid having amounts withheld from Highway Trust Fund apportionment under 49 U.S.C. § 31314 and to avoid CDL program decertification under 49 U.S.C. § 31312.[4] In this regard, States are required to be in substantial compliance with the requirements of 49 U.S.C. § 31311(a) and its implementing regulations in 49 CFR Part 383 and Part 384, Subpart B. Under 49 CFR § 384.301(a), to be in substantial compliance with 49 U.S.C. § 31311(a), a State must meet each and every standard of Part 384, Subpart B by means of "the demonstrable combined effect of its statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resource assignments (facilities, equipment, and personnel), and enforcement practices."

As part of its oversight, FMCSA conducts comprehensive APRs of State CDL programs, in accordance with 49 CFR § 384.307, to verify that States are in substantial compliance. During an APR, FMCSA evaluates all aspects of the States' CDL program, including knowledge and skills testing procedures, CDL issuance processes, procedures to report convictions and withdrawals, compliance with FMCSA's physical qualification and Drug and Alcohol Clearinghouse programs, issuance of non-domiciled CDLs, and other areas.

At the conclusion of the APR, if FMCSA makes a preliminary determination that a State does not meet one or more of the minimum standards for substantial compliance under Part 384, Subpart B, FMCSA will notify the State accordingly.[5] As explained more fully in section V below, the State will have 30 calendar days to respond to the preliminary determination explaining the State's corrective action or, alternatively, why FMCSA's preliminary determination is incorrect.[6] If FMCSA makes a final determination of substantial noncompliance, FMCSA may initiate the withholding of certain Federal-aid highway funds and may decertify the State's CDL program.[7]

As part of the 2025 comprehensive APRs (2025 APRs), FMCSA conducted an in-depth review of State procedures and policies in issuing non-domiciled CLPs and CDLs. FMCSA's focus on State non-domiciled CDL issuance practices during the 2025 APR was consistent with Executive Order 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers."[8] The Executive Order directed FMCSA to "review non-domiciled [ ] CDLs issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities" and "to take appropriate actions to improve the effectiveness of current protocols…."[9] Accordingly, FMCSA conducted a thorough audit of the Colorado DMV's procedures and policies in issuing non-domiciled CLPs and CDLs as part of the 2025 APR.

[3] 49 U.S.C. § 31301 *et seq.*
[4] 49 U.S.C. § 31311(a).
[5] 49 CFR § 384.307(b). A preliminary determination of noncompliance is also known as a "finding."
[6] *Id.* at § 384.307(c).
[7] 49 U.S.C. §§ 31314(c), 31312; *see also infra* at section VI; 49 CFR § 384.307(d), 49 CFR Part 384, Subpart D.
[8] 90 Fed. Reg. 18759 (Apr. 28, 2025).
[9] Executive Order 14286 at 2; 90 Fed. Reg. 18759-60.

## II. Statutory and Regulatory Requirements for Issuing Non-Domiciled CLPs and CDLs

Under 49 U.S.C. § 31311(a)(12)(B)(ii), States are authorized to issue non-domiciled CDLs, but they must do so in accordance with regulations prescribed by FMCSA. The Agency's regulations in effect at the time of the 2025 APR[10] provided that States that issue non-domiciled CLPs and CDLs may only accept as valid proof of lawful presence (i) an unexpired employment authorization document (EAD) issued by the United States Customs and Immigration Service (USCIS) or (ii) an unexpired foreign passport accompanied by an approved I-94 form documenting the driver's most recent admittance into the United States.[11] In addition, State procedures for issuing, renewing, or upgrading a non-domiciled CLP and CDL must, at a minimum, be identical to those pertaining to any other CLP or CDL.[12]

Regulations in effect prior to September 29, 2025, require that States accept as valid only *unexpired* lawful presence documents, which also meant that the State must make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver's lawful presence document(s). In other words, because FMCSA's regulations considered only unexpired lawful presence documents to be valid, the Colorado DMV was required to ensure that the non-domiciled CLP or CDL period of validity *did not exceed* the expiration of the driver's lawful presence documents. Therefore, State driver's licensing agencies were required to ensure that the validity of non-domiciled CLPs or CDLs did not exceed the expiration date of drivers' lawful presence documents.

In addition, States may not issue a non-domiciled CLP or CDL to citizens of Mexico. In this regard, FMCSA has determined that the United Mexican States issues Licencias Federales de Conductor (Mexican CDLs) in accordance with standards that are consistent with 49 CFR Part 383.[13] Citizens of Mexico are authorized to operate a commercial motor vehicle in the United States with a Mexican CDL and, therefore, are prohibited from obtaining a non-domiciled CDL. FMCSA issued guidance ,now rescinded, stating that citizens of Mexico who are present in the United States under the Deferred Action for Childhood Arrivals (DACA) program are excepted from the prohibition.[14] Though FMCSA rescinded the guidance as part of the September 29, 2025 rulemaking, prior to that date, States were permitted to issue a non-domiciled CLP or CDL to citizens of Mexico *only* if they were present in the United States under the DACA program.

## III. 2025 Annual Program Review

FMCSA initiated Colorado's APR in August 2025 (2025 APR) in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. On or about August 20, 2025, the Colorado DMV informed

[10] On September 29, 2025, FMCSA issued an interim final rule (IFR) amending Federal regulations in 49 CFR Parts 383 and 384 applicable to State Driver's Licensing Agencies (SDLAs). These changes significantly limit the authority for SDLAs to issue and renew non-domiciled CLPs and CDLs. *See* Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 90 Fed. Reg. 46509 (Sept. 29, 2025). However, because the 2025 APR was conducted prior to publication of the IFR, the regulations cited in this preliminary determination of noncompliance reflect the pre-IFR text of Parts 383 and 384, specifically the 2024 edition of Title 49.

[11] 49 CFR §§ 383.71(f)(2)(i), 383.73(f)(3), 384.201, 384.212(b) (2024).

[12] *Id.* at § 383.73(f)(2) (2024).

[13] 49 CFR §§ 383.23, footnote 1; 383.71(f)(1)(i); and 383.73(f)(1) (2024).

[14] *See* https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled.

FMCSA that its records reflect that 1,848 drivers held an unexpired non-domiciled CLP or CDL issued by the Colorado DMV, as of August 20, 2025.

During the 2025 APR, FMCSA reviewed a random sample of 99 records of drivers issued a non-domiciled CDL by the Colorado DMV. FMCSA conducted its review between August 18 through 20, 2025. Approximately 22 percent of the driver records sampled failed to comply with requirements in 49 CFR Parts 383 and 384.[15]

The 2025 APR uncovered evidence of systemic policy, procedural, and programming errors. In this regard, of the driver records sampled, FMCSA found six, transactions where the Colorado DMV issued non-domiciled CDLs that exceeded the expiration date of the driver's lawful presence documents. During discussions with Colorado DMV staff during the 2025 APR, FMCSA learned that this error occurs when, during a SAVE inquiry initiated by the Colorado DMV, SAVE returns a result that requires a secondary inquiry. In these cases, an override of the current SAVE response is required. Any time the SAVE result is overridden the Colorado DMV's computer software defaults to a non-domiciled CDL expiration date that is generally four years from the date of issuance and that coincides with the applicant's birthdate if not manually corrected by an employee. If the employee does not notice and correct this error, the Colorado DMV's systems will issue a non-domiciled CDL that exceeds the expiration date of the lawful presence documents.

Another recurring error discovered during the 2025 APR is the Colorado DMV's repeated issuance of non-domiciled CDLs to citizens of Mexico who are not present in the United States under the DACA program. As explained in greater detail in section III(b) below, of the driver records sampled, FMCSA found 18 transactions where the Colorado DMV issued a non-domiciled CDL to a citizen of Mexico who is not present under DACA.

During the 2025 APR, the Colorado DMV was unable to provide evidence of sufficient management controls to prevent these errors or catch them if they occur. Further, the Colorado DMV has not programmed its systems with sufficient measures to handle exceptions or with "stop procedures" to prevent errors from occurring. The repeated errors discovered during the 2025 APR indicate a systemic breakdown in the Colorado DMV's issuance process for non-domiciled CLPs and CDLs. The transactions illustrating these compliance issues are discussed in greater detail below. FMCSA will provide electronic documentation for each through the State Compliance Records Enterprise (SCORE) system.

**a. Finding: 49 CFR § 384.212—The Colorado DMV issued non-domiciled CLPs or CDLs with an expiration date that exceeded the expiration of the driver's lawful presence documents.**

During the 2025 APR, FMCSA reviewed the Colorado Driver License, Record, Identification and Vehicle Enterprise Solution (Colorado DRIVES), an electronic system that contains driver

[15] As set forth in sections III(a) and III(b), 22 of the 99 records sampled failed to comply with FMCSA's regulations.

and driver license information, as well as vehicle registration records.[16] FMCSA discovered that six of the 99 driver records sampled showed that the Colorado DMV issued a non-domiciled CLP or CDL for a period of validity that exceeded the driver's lawful presence document(s). Two of the six transactions are also noncompliant because the Colorado DMV issued non-domiciled CDLs to citizens of Mexico who are not present under DACA; these two transactions are also listed in section III(b).

1. On May 9, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of January 1, 2028 to a driver with the initials "AMT." At the time the transaction occurred, AMT presented two documents: an EAD credential displaying an expiration date of March 23, 2024 and a Form I-797C indicating that AMT had applied for a change or extension of legal status. When the Colorado DMV conducted a SAVE inquiry, the query returned a message calling for additional verification. Rather than denying AMT a non-domiciled CDL, the Colorado DMV overrode the SAVE results. When the Colorado DMV overrides SAVE query results, the Colorado DRIVES system causes the expiration date of the license that is issued to default to four years after the issuance date if not manually changed by the DMV employee. Thus, the Colorado DMV issued a non-domiciled CDL with an expiration date of January 1, 2028, almost *four years* after the EAD's expiration.

2. On March 7, 2023, the Colorado DMV issued a non-domiciled CDL with an expiration date of January 30, 2027 to a driver with the initials "CEO" who is a citizen of Mexico present in the United States under the DACA program. At the time the transaction occurred, CEO's EAD credential showed an expiration date of February 14, 2025. During the transaction, the Colorado DMV failed to run a SAVE query as required, instead overriding the SAVE system. The Colorado DMV provided no explanation why it failed to query the SAVE system before overriding it. When the Colorado DMV overrides a SAVE query, the Colorado DRIVES system causes the expiration date of the license that is issued to default to four years after the issuance date if not manually changed by the DMV employee. Thus, the Colorado DMV issued a non-domiciled CDL with an expiration date of January 30, 2027, almost *two years* after the EAD's expiration date.

3. On June 24, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of December 15, 2028 to a driver with the initials "SLC" who is a citizen of Mexico.[17] At the time the transaction occurred, SLC's EAD credential showed an expiration date of November 13, 2026. During the transaction, the Colorado DMV conducted a SAVE query which produced a report that required an override. However, when the Colorado DMV overrides the results returned in a SAVE query, the Colorado DRIVES system causes the expiration date of the issued license to default to four years after the issuance date if not manually changed by the DMV employee. Thus, the

[16] https://dmv.colorado.gov/tow-carriers-and-abandoned-vehicles#:~:text=Colorado%20Driver%20License%2C%20Record%2C%20Identification%20and%20Vehicle,licenses%2C%20driver%20records%20and%20vehicle%20registration%20records.

[17] The entry for "SLC" is also listed under section III(b) because the Colorado DMV improperly issued SLC, a citizen of Mexico, a non-domiciled CDL and failed to provide evidence that SLC was a DACA recipient.

Colorado DMV issued a non-domiciled CDL with an expiration date of December 15, 2028, approximately *two years* after the EAD's expiration date.

4. On April 9, 2025, the Colorado DMV issued a non-domiciled CDL with an expiration date of July 26, 2029 to a driver with the initials "DGM" who is a citizen of Mexico present in the United States under the DACA program. At the time the transaction occurred, DGM's EAD credential showed an expiration date of August 22, 2026. However, when the Colorado DMV conducted an initial SAVE inquiry, SAVE produced a result that required an override of the system. When the Colorado DMV overrides the results returned in a SAVE query, the Colorado DRIVES system causes the expiration date of the issued license to default to four years after the issuance date if not manually changed by the DMV employee. A second SAVE query confirmed that DGM's EAD expires was set to expire on August 22, 2026, but the Colorado DMV failed to change the default expiration date. Thus, the Colorado DMV issued a non-domiciled CDL with an expiration date of July 26, 2029, almost *three years* after the EAD's expiration date.

5. On June 18, 2025, the Colorado DMV issued a non-domiciled CLP with an expiration date of June 18, 2026 to a driver with the initials "DR" who is a citizen of Mexico.[18] However, at the time the transaction occurred, DR's EAD credential showed an expiration date of March 2, 2026. Thus, the Colorado DMV issued a non-domiciled CLP with an expiration date of June 18, 2026, over *three months* after the EAD's expiration date. In a subsequent transaction, on July 28, 2025, the Colorado DMV issued a non-domiciled CDL to DR, this time with an expiration date of October 31, 2029. At the time of this second transaction, DR's EAD credential showed an expiration date of April 14, 2030. But, when the Colorado DMV queried SAVE prior to issuing the non-domiciled CDL, SAVE returned an EAD expiration date of March 2, 2026. In this instance, Colorado DMV favored the longer expiration date on the EAD card over the shorter expiration date from SAVE.

6. On July 17, 2025, the Colorado DMV issued a non-domiciled CDL with an expiration date of June 10, 2029 to a driver with the initials "FM" who is a citizen of Tajikistan. At the time the transaction occurred, FM presented an EAD credential with an expiration date of December 24, 2026. During the transaction, the Colorado DMV conducted an initial SAVE query which showed that FM's EAD was expired. In order to conduct a second SAVE query, the Colorado DMV overrode the Colorado DRIVES system. The results of the second SAVE query confirmed that FM's EAD credential was set to expire on December 24, 2026. However, when the Colorado DMV overrides the results returned in a SAVE query, the Colorado DRIVES system causes the expiration date of the issued license to default to four years after the issuance date, if not manually changed by the DMV employee. Thus, the Colorado DMV issued a non-domiciled CDL with an expiration date of June 10, 2029, *over two* years after the EAD's expiration date.

---

[18] The entry for "DR" is also listed under section III(b), since the Colorado DMV improperly issued DR, a citizen of Mexico, a non-domiciled CDL and failed to provide evidence that DR was a DACA recipient.

**b. Finding: 49 CFR § 384.212—The Colorado DMV issued non-domiciled CLPs or CDLs to citizens of Mexico.**

During the 2025 APR, FMCSA discovered that 18 of the 99 driver records sampled showed that the Colorado DMV issued a non-domiciled CLP or CDL to a driver who, as a citizen of Mexico who was not present in the United States under the DACA program, was ineligible to receive a non-domiciled CDL. As noted in section III(a) above, two of the 18 transactions also showed that the DMV issued a non-domiciled CLP or CDL for a period of validity that exceeded the driver's lawful presence document. The transactions at issue are set forth below.

1. On May 27, 2025, the Colorado DMV issued a non-domiciled CDL with an expiration date of November 25, 2029 to a driver with the initials "AAA" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

2. On August 24, 2022, the Colorado DMV issued a non-domiciled CDL with an expiration date of December 15, 2025 to a driver with the initials "BRM" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

3. On June 16, 2025, the Colorado DMV issued a non-domiciled CDL with an expiration date of December 17, 2029 to a driver with the initials "CCL" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

4. On August 20, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of October 12, 2027 to a driver with the initials "CDO" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

5. On July 29, 2025, the Colorado DMV issued a non-domiciled CDL with an expiration date of January 1, 2029 to a driver with the initials "DAC" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

6. On June 18, 2025, the Colorado DMV issued a non-domiciled CLP with an expiration date of June 18, 2026 to a driver with the initials "DR" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CLP or CDL as a citizen of Mexico.

7. On December 9, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of February 3, 2029 to a driver with the initials "FJE" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

8. On December 30, 2022, the Colorado DMV issued a non-domiciled CDL with an expiration date of November 24, 2026, to a driver with the initials "IMA" who is a citizen

of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

9. On August 27, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of October 23, 2028 to a driver with the initials "JAO" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

10. On February 23, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of November 25, 2028 to a driver with the initials "JCM" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico

11. On November 14, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of March 30, 2029 to a driver with the initials "JEM" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

12. On March 7, 2025, the Colorado DMV issued a non-domiciled CDL with an expiration date of August 16, 2029 to a driver with the initials "JFO" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico

13. On December 23, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of March 15, 2029 to a driver with the initials "LFM" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

14. On September 27, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of September 6, 2028 to a driver with the initials "LFR" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

15. On May 12, 2025, the Colorado DMV issued a non-domiciled CDL with an expiration date of February 27, 2029 to a driver with the initials "OQT" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico

16. On July 27, 2022, the Colorado DMV issued a non-domiciled CDL, with an expiration date of August 24, 2025 to a driver with the initials "RBR" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

17. On June 24, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of December 15, 2028 to a driver with the initials "SLC" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

18. On October 28, 2024, the Colorado DMV issued a non-domiciled CDL with an expiration date of October 2, 2028 to a driver with the initials "SVN" who is a citizen of Mexico. The Colorado DMV provided no evidence of DACA status, without which the driver would have been ineligible for a non-domiciled CDL as a citizen of Mexico.

## IV. Required Corrective Action

As noted above, approximately 1,848 drivers hold an unexpired, non-domiciled CLP or CDL issued by the Colorado DMV. In light of the systemic errors and deficiencies in the Colorado DMV's issuance of non-domiciled CLPs and CDLs uncovered by the 2025 APR, FMCSA determines that Colorado must take the following actions:

- Immediately pause issuing non-domiciled CLPs and CDLs, as required in FMCSA's September 29, 2025, interim final rule;
- As soon as practicable, identify all unexpired non-domiciled CLPs and CDLs that were not issued in compliance with Parts 383 and 384;
- Conduct an internal audit to identify all procedural and programming errors; training and quality assurance problems; insufficient policies and practices; and other issues that have resulted in widespread noncompliance in issuing non-domiciled CLPs and CDLs;
- Notify FMCSA of the audit findings and the number of unexpired noncompliant non-domiciled CLPs and CDLs;
- Take immediate action to correct the deficiencies identified in the Colorado DMV's internal audit and in this letter;
- Take immediate action to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs and reissue the licenses in accordance with Parts 383 and 384, as amended on September 29, 2025;
- Resume issuing non-domiciled CLPs and CDLs only after the State ensures that all statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resources assignments (facilities, equipment, and personnel), and enforcement practices meet each and every standard of Subpart B of Part 384 and 49 U.S.C. § 31311.

## V. Responding to this Preliminary Determination

The procedural regulations applicable to this action are found at 49 CFR § 384.307. Within 30 calendar days, the State must respond to this preliminary determination. The State's response must explain what corrective action it either has implemented or intends to implement to correct the deficiencies cited. The required corrective actions are set forth in section IV of this preliminary determination. The State must provide documentation of corrective action as required by FMCSA. In addition, the corrective actions may be implemented on a schedule mutually agreed upon by FMCSA and the State. Upon request by the State, an informal conference will be provided during this time.

Alternatively, the State's response may explain why FMCSA's preliminary determination is incorrect and may include any additional documentation the State wishes FMCSA to consider.

After reviewing a timely response to the preliminary determination by the State, FMCSA will notify the State of the final determination. In making its final determination, FMCSA will take into consideration the corrective action either implemented or planned to be implemented in accordance with the mutually agreed upon schedule.

## VI. Potential Penalties for a Final Determination of Substantial Noncompliance

If FMCSA issues a final determination of substantial noncompliance, the Agency may withhold up to four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds beginning in Fiscal Year (FY) 2027 that would otherwise be apportioned to Colorado under 23 U.S.C. § 104(b)(1) and (2).[19] Accordingly, upon a final determination of substantial noncompliance, Colorado risks losing up to approximately $24,500,000 for FY 2027.[20] Further, if the substantial noncompliance persists beyond the first fiscal year, FMCSA may withhold up to eight percent of these funds; therefore, Colorado risks losing up to approximately $49,000,000 in the second and subsequent FY(s) of noncompliance.[21] Once funds are withheld following a substantial noncompliance determination, they are no longer available for apportionment to Colorado.[22]

In addition, if FMCSA issues a final determination of substantial noncompliance, the Agency may decertify Colorado's CDL program. Decertification of Colorado's CDL program would prohibit the State from issuing, renewing, transferring, or upgrading CLPs and CDLs until such time as FMCSA determines that the Colorado DMV is in substantial compliance with 49 U.S.C. § 31311 and 49 CFR Part 384, Subpart B.[23]

## VII. Conclusion

The 2025 APR uncovered that more than 20 percent of the non-domiciled CLP and CDL issuances FMCSA sampled failed to comply with Parts 383 and 384 because the Colorado DMV issued non-domiciled CDLs to drivers who do not qualify or issued non-domiciled CDLs that extend beyond a driver's lawful presence. This is an unacceptable deviation from FMCSA's regulations when issuing credentials to operate commercial motor vehicles. The Colorado DMV must take immediate corrective action to audit its non-domiciled CDL program, correct the deficiencies that FMCSA identified above, and any deficiencies identified through the State's internal audit, and void or rescind and reissue all non-domiciled CLPs and CDLs that failed to comply with Federal regulations at the time of issuance, renewal, transfer, or upgrade.

The State of Colorado is an important partner in FMCSA's mission to reduce crashes, injuries and fatalities involving large trucks and buses, and the Agency makes this preliminary determination to help Colorado come into substantial compliance. To continue in that spirit of partnership towards our common safety goals, my staff stands ready to assist the Colorado DMV in resolving these serious issues.

---

[19] 49 U.S.C. § 31314(c)(1); 49 CFR § 384.401(a).
[20] FMCSA estimates this amount based on FY 2026 funding levels.
[21] 49 U.S.C. § 31314(c)(2); 49 CFR § 384.401(b).
[22] 49 U.S.C. § 31314(d); 49 CFR § 384.403.
[23] 49 U.S.C. § 31312(a); 49 CFR § 384.405(a).

Please note that this letter addresses noncompliance with the Colorado DMV's issuance of non-domiciled CDLs only. FMCSA will separately address areas of noncompliance unrelated to non-domiciled CDLs. If you or your staff need additional information or assistance, please contact Philip Thomas, Deputy Associate Administrator for Safety, at philip.thomas@dot.gov.

Sincerely,

Jesse Elison
Chief Counsel

An official website of the United States Government.

Back to Document Comments (/document/FMCSA-2025-0622-0001/comment?filter=FMCSA-2025-0622-4009)

Share

PUBLIC SUBMISSION

# Comment from Gursharanjit Sohal

Posted by the **Federal Motor Carrier Safety Administration** on Nov 10, 2025

Docket (/docket/FMCSA-2025-0622) / Document (FMCSA-2025-0622-0001) (/document/FMCSA-2025-0622-0001) / Comment

Comment

I got my cdl in 2015 almost 11 years and all of sudden I got the email from dmv that in next 20 days your cdl will be terminated n I gone in shock because I got too many expenses how I made the payments house mortgage truck n trailer payment n many other expenditures so please think again because all goes to banks
It's hard to survive

**Comment ID**

FMCSA-2025-0622-4513

**Tracking Number**

mhs-iewr-puoh

Give Feedback

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Nov 9, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government.

Back to Document Comments (/document/FMCSA-2025-0622-0001/comment?filter=FMCSA-2025-0622-5935%20)

Share

PUBLIC SUBMISSION

# Comment from Gurpreet Singh

Posted by the **Federal Motor Carrier Safety Administration** on Nov 13, 2025

Docket (/docket/FMCSA-2025-0622) / Document (FMCSA-2025-0622-0001) (/document/FMCSA-2025-0622-0001) / Comment

Comment

Please sir do not be biased and discriminate us by saying being non domicile we lack abilty to drive the semi. Im driving semi from 11 years with clean record and never had any accident. Can speak, read and write english pretty well. I have total 20 Years exoerince in driving in which 11 years driving semi here in usa. Have my document in order of work authorisation. Please reconsider your decision for non domicile. We studied and took proper training from the school. We have families to feed which depend on trucking. You can recheck all our documents.

**Comment ID**

FMCSA-2025-0622-5935

**Tracking Number**

mhx-0ok3-8ip4

Give Feedback

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Nov 13, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government.

Back to Document Comments (/document/FMCSA-2025-0622-0001/comment?filter=FMCSA-2025-0622-6487)

Share

PUBLIC SUBMISSION

# Comment from Anonymous

Posted by the **Federal Motor Carrier Safety Administration** on Nov 18, 2025

Docket (/docket/FMCSA-2025-0622) / Document (FMCSA-2025-0622-0001) (/document/FMCSA-2025-0622-0001) / Comment

Comment

20 years ago i received my Regular CDL, after i completed all of the courses, and passed all of the tests. It was only after 2017, that I no longer qualified for a regular CDL because of the new law change and went to Non-Domiciled CDL. For 20 years i have zero recordable accidents and I drove through all 48 states to deliver refrigerated goods to stores, on time deliveries and with the utmost respect. I am a stateless person, but one, that follows all the rules and laws, and I am the sole provider for my family. Please permit me to renew my CDL AS A STATELESS PERSON. For the past 21 years, I have walked a straight line and never wavered from it. I live for my family of 6 kids and my lovely wife, which are all US Citizens. All 6 children are US Born Citizens. Please dont take away my livlihood. I dont have any other professions that I know how to do, except Trucking, which has been my life.

Give Feedback

**Comment ID**

FMCSA-2025-0622-6487

**Tracking Number**

mi3-xw1f-vf6f

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Nov 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

ASAP

November 19, 2025

*Submitted via* www.regulations.gov

Derek D. Barrs
Administrator
Federal Motor Carrier Safety Administration
Department of Transportation
1200 New Jersey Avenue, SE, Washington, DC 20590

**Re: Docket No. FMCA–2025–0622; Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses**

Dear Administrator Barrs,

The Asylum Seeker Advocacy Project ("ASAP") respectfully submits the following comment in response to the interim final rule, *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 90 Fed. Reg. 46,509 (Sept. 29, 2025) (Docket No. FMCA–2025–0622) ("IFR" or "Rule").[1]

## I. ASAP's Interest in the IFR

The Asylum Seeker Advocacy Project ("ASAP") is a national voluntary membership organization of immigrants in the United States. ASAP provides its members with legal and community support, including time-sensitive updates about policies impacting asylum seekers; legal information, including a 50-state driver's license resource. ASAP also provides members with opportunities to work together to make a more fair and just immigration system based on member priorities, including timely access to employment authorization. Many ASAP members remain actively engaged with the organization both while they have pending asylum applications and even after winning asylum. Below are stories from ASAP members, both asylum seekers and asylees,[2] who would be impacted by limiting access to non-domiciles commercial driver's licenses ("CDL").

[1] On November 10, 2025, the United States Court of Appeals for the District of Columbia administratively stayed the Rule to give the court sufficient opportunity to consider emergency motions for stay of the Rule. *See Rivera Lujan, et al. v. Fed. Motor Carrier Safety Admin., et al.*, Case No. 25-1215 (D.C. Cir. Nov. 10, 2025). On November 13, 2025, the Court dissolved the administrative stay and granted the emergency motions for say of the Rule, holding that petitioners demonstrated that they are likely to succeed in their challenge to the IFR. *See id.* (D.C. Cir. Nov. 13, 2025).

[2] An asylum seeker is someone with a pending asylum application. An asylee is someone whose asylum application has been granted. Asylees are eligible to become lawful permanent residents one year after

228 Park Ave. S. #84810, New York, New York 10003-1502
info@asylumadvocacy.org | asaptogether.org

ASAP is uniquely positioned to offer insight into the IFR based on member feedback. At ASAP, we have heard from members who drive long haul trucks, school buses, and postal vehicles across the United States. These asylum seekers and asylees rely on the CDL they worked hard to obtain to support themselves, their families, and their communities. If the IFR stands, however, they would no longer be eligible to hold a CDL.[3] Thus, ASAP members and ASAP as an organization have a strong interest in ensuring asylum seekers and asylees continue to be eligible to obtain CDLs.

## II. The IFR is Arbitrary, Enacts Serious Harm, and Fails to Consider Reliance Interests

The Federal Motor Carrier Safety Administration's ("FMCSA" or "Agency") categorical ban on who the agency calculates are almost 200,000 work-authorized immigrants from holding CDLs is harsh, arbitrary, and counterproductive.[4] The IFR deprives thousands of asylum seekers and asylees of hard-earned careers and threatens their ability to earn a living, support their families, and contribute to essential industries during an ongoing driver shortage.[5] Additionally, many impacted drivers are also business owners who have created jobs for U.S. citizens and strengthened the American economy; these businesses, the jobs they provide, and their economic contributions are also at risk if the Rule remains in place.

In this comment, ASAP shares the stories of ASAP members whose careers, small businesses, and livelihoods have been upended by the IFR. These testimonials demonstrate that the Rule not only harms these ASAP members and similarly situated drivers, but also the stability of an industry critical to the national economy that is already suffering a labor shortage. These severe measures are not necessary, as the Rule fails to advance the purported goals of road safety and security. ASAP respectfully recommends that FMSCA rescind the IFR and allow all immigrants, including thousands of asylum seekers, with employment authorization and lawfully obtained CDLs, to continue driving, working, and supporting their communities across this country.

---

they being granted asylum. *See Green Card for Asylees*, USCIS, https://www.uscis.gov/green-card/green-card-eligibility/green-card-for-asylees.

[3] Under the IFR, "individuals excluded from eligibility for a non-domiciled CLP [commercial learner's permit] or CDL . . . include asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients." 90 Fed. Reg. at 46515. The only immigrants eligible for a non-domiciled CDL under the IFR are those with H-2A (Temporary Agricultural Workers), H-2B (Temporary Non-Agricultural Workers), or E-2 (Treaty Investor) visas. *See id.*

[4] *See* 90 Fed. Reg. at 46519 (FMCSA estimates that "roughly 194,000 current non-domiciled CDL holders will exit the freight market" because of the Rule).

[5] *See People seeking asylum are contributing to the workforce*, FWD.us, (Oct. 21, 2025), *https://www.fwd.us/news/people-seeking-asylum-are-contributing-to-the-workforce/* (estimating that about 180,000 asylum seekers work in the transportation sector).

### A. The IFR Threatens Asylum Seekers' Livelihoods

The IFR explicitly excludes from eligibility for a CDL almost all immigrants who are authorized to work in the United States, including asylum seekers and asylees, many of whom are ASAP members. *See* 90 Fed. Reg. at 46515. The impacted ASAP members include drivers from across the United States who have built careers and started businesses with their CDLs. They all share the same pride in their work and a deep concern about the devastating impact of the IFR. Some lost their CDL before the IFR was stayed and have not been able to reinstate their CDL, leaving them without work even as their financial obligations continue. Others fear that if the IFR stands, they will soon be jobless when their licenses expire or are revoked. For those who have spent years in the industry—maintaining excellent road records, investing in expanding their trucking businesses, and progressing through the ranks—this Rule abruptly halts their careers.

ASAP staff spoke with several members to understand their situations, help them find relevant services, and gather their testimonials for this comment. The stories of ASAP members[6] below illustrate the widespread, significant harm of the IFR on asylum seekers and asylees.

**Ali** is an asylee from Turkey who has lived in the U.S. for almost 15 years. A truck driver since 2019, he now runs his own business with eight trucks, hauling loads for Amazon nationwide. Ali's business supports a team of nine people—seven drivers, a dispatch operator, and a safety staff person—four of whom are U.S. citizens. Ali first came to the U.S. on an E-2 visa, a status eligible for a CDL under the Rule, but as an asylee with a more permanent immigration status in the U.S., he now faces losing his CDL if the IFR stands. To him, the distinction feels unfair and arbitrary. Ali's income pays his family's bills and allows him to set aside savings for his teenage daughter's university tuition. For Ali, the stress of losing his income and business is unbearable, especially since he has a clean driving record and always maintains the highest safety standards. Losing his CDL would not only end his livelihood but could also jeopardize the entire business he built, putting his team's jobs at risk.

**John** is an asylum seeker originally from Myanmar. John earned his CDL over four years ago. He started out hauling goods all over the U.S. and now works as a bus driver transporting Google employees. John's CDL expires in six months, and if the IFR remains in place, he will be unable to renew it. His license and work as a trucker have given him a stable life and the ability to support his family, while also providing a needed transportation service for employees of a major U.S. corporation. John is very stressed and concerned he will lose the career and life he has built, just because he is an asylum seeker. He would happily take more tests, go through additional background checks or do anything to show he is a qualified and safe driver.

**Rafad** is an Iraqi asylee. He moved to the U.S. in 2020 and was granted asylum in 2024. Rafad has driven commercial trucks for over two years, hauling loads safely for Amazon across the country. He recently started his own trucking business and purchased a semi-truck. When Rafad went to the DMV to renew his CDL last month, he was told he could not do so because of the IFR. This news devastated Rafad. As the sole breadwinner in his family, he supports his wife, two young children, and elderly parents. Additionally, his daughter has a serious degenerative

[6] The ASAP members referenced in this comment are using pseudonyms to protect their identities.

genetic condition which requires biweekly infusions at a children's hospital. Her treatment is expensive, and losing his CDL means potentially losing the ability to afford her care and support his family, including his two-year-old U.S. citizen son. Without his CDL, Rafad faces cascading hardships, as medical bills and basic household expenses would threaten his family's stability and his daughter's continued access to lifesaving treatment. Rafad is willing to go through more training or vetting—whatever it takes—to prove he is an excellent and safe driver and maintain his CDL.

**Paul**, an asylum seeker from Russia, has lived in the United States since early 2022. Before coming to the U.S. to seek asylum, Paul worked as a professional commercial truck driver in Russia and hauled loads across Europe for close to a decade without a single accident. Like many asylum seekers, Paul arrived with years of professional driving experience that makes him a reliably safe driver on U.S. roads. Soon after he moved to the United States, Paul obtained his work authorization and dedicated almost six months to studying and preparing for his CDL test. Paul passed on his first attempt and has had a valid CDL for over a year. Since then, he has worked transporting and delivering loads throughout the country. If the IFR is in place, Paul will be unable to renew his CDL when it expires next year. Without his CDL, Paul would lose his only source of income—Paul supports his two children and covers all of his family's expenses. He is deeply concerned that he will lose his career and ability to provide for his family. Paul just wants to continue driving, supporting his family, and working to help keep American supply chains running smoothly.

**Jeff** is an asylum seeker from Kenya. Jeff has been waiting in the government's asylum backlog for over ten years. For the past seven years, he has worked as a truck driver. He owns his own trucking company and has no accidents or infractions on his CDL record. In early October 2025, Jeff went to his local DMV office to renew his CDL, but was denied because of the Rule, even though he has a valid work permit. After learning that the IFR was administratively stayed, Jeff checked his local DMV's guidance and was disappointed to learn it had not been updated to allow him to reinstate his CDL. Jeff is now checking multiple times a day to try and reinstate his CDL and get back to driving but still has not been able to renew his CDL. Jeff has five children to support and his inability to work under the IFR adds yet another financial burden on his shoulders. He also feels frustrated and anxious and explains that staying at home without the ability to work is making him sick.

**James**, an asylum seeker from Burundi, has lived in the United States since early 2023. Since obtaining his CDL, James now works for a major freight transport and trucking company transporting refrigerated products throughout the country. Currently, James works full time driving on the road. He worries that if his CDL is revoked or if he is unable to renew it, he will lose everything. James supports his family, and he is very concerned that without his CDL, he will not be able to provide for himself and his family.

These member stories are just a few examples of the close to 200,000 drivers who the FMSCA estimates would be impacted and would face similar harms should the IFR remain in place. Moreover, these impacted drivers relied on the Agency's previous regulations and invested time and financial resources into obtaining CDLs and building their professions as commercial drivers. Indeed, issuing an emergency stay of the IFR pending court review, the D.C. Circuit Court

reasoned that "petitioners are likely to succeed on their claim that the FMCSA acted arbitrarily and capriciously in issuing the rule," in part because "the FMCSA seems to have failed to adequately consider the 'serious reliance interests' of those currently holding non-domiciled CDLs." Order, *Rivera Lujan et al. v. Fed. Motor Carrier Safety Admin.*, No. 25-1215 (D.C. Cir. Nov. 13, 2025), slip op. at 3; *see also id.* ("Petitioners have shown that they face irreparable harm because the rule threatens destruction of the individual petitioners' businesses"). If the Rule stands, hundreds of thousands of asylum seekers and immigrants with other categories of valid work authorization will be forced to sell their trucks, give up their careers, and rebuild their lives.

### B. The IFR Harms the United States Economy

In addition to the ongoing and severe harm the IFR inflicts on asylum seeker and other noncitizen CDL-drivers, the likelihood of harm to the broader American economy is substantial. The United States is in the midst of a truck driver shortage, with an estimated gap of 60,000 to 80,000 drivers.[7] Non-domiciled CDL drivers are critical to filling this labor gap and supporting the broad range of industries essential to the nation's supply chain.[8] In particular, asylum seekers fill approximately 180,000 transportation jobs across the country, including jobs that require CDLs.[9] Needlessly forcing out of the industry about 200,000 qualified drivers with CDLs who want to work and drive just because they hold a certain immigration status will exacerbate the shortage, and will almost certainly mean that U.S. companies and communities, as well as the economy, will suffer. Additionally, many businesses owned and operated by impacted drivers will likely shutter, resulting in job loss for both noncitizens and U.S. citizens alike.

### C. The IFR Fails to Advance the Goals of Safety and Security

There is no meaningful relationship between the IFR's restriction of access to CDLs for noncitizens in certain immigration statuses but not others, and the Agency's purported goals of safety and security. *See* 90 Fed. Reg. at 46510 (noting the IFR "strengthen[s] the security of the CDL issuance process" and "safety of CMV operations"); *id.* at 46515 ("This IFR revises the regulations to focus on lawful immigration status in the United States in certain employment-based nonimmigrant categories"). The Rule's attempt to connect specific immigration statuses with driver safety rests on several flawed premises and assertions, and thus likely violates the

---

[7] *See* Arturo Castellanos-Canales, *Addressing the U.S. Truck Driver Shortage: The Role of Foreign-Born Drivers, Visa Policy, and Supply Chain Impacts*, NATIONAL IMMIGRATION FORUM (Oct. 17, 2025), https://forumtogether.org/article/addressing-the-u-s-truck-driver-shortage-the-role-of-foreign-born-drivers-visa-policy-and-supply-chain-impacts/; *see also* Hugh Cameron, *America Doesn't Have Enough Truck Drivers*, NEWSWEEK (Jul. 10 2025), https://www.newsweek.com/america-trucking-shortage-logistics-supply-chain-2097123; Am. Pub. Transp. Ass'n, *Transit Workforce Shortage* (Mar. 2023), https://www.apta.com/wp-content/uploads/APTA-Workforce-Shortage-Synthesis-Report-03.2023.pdf.

[8] *See* Castellanos-Canales, *Addressing the U.S. Truck Driver Shortage: The Role of Foreign-Born Drivers, Visa Policy, and Supply Chain Impacts*, NATIONAL IMMIGRATION FORUM (Oct. 17, 2025), https://forumtogether.org/article/addressing-the-u-s-truck-driver-shortage-the-role-of-foreign-born-drivers-visa-policy-and-supply-chain-impacts/.

[9] *See People seeking asylum are contributing to the workforce*, FWD.us, (Oct. 21, 2025), *https://www.fwd.us/news/people-seeking-asylum-are-contributing-to-the-workforce/*.

Administrative Procedure Act ("APA"). *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (explaining that the APA "requires agencies to engage in reasoned decisionmaking" (internal quotation marks omitted)).

First, the Rule cites anecdotal data that fails to establish a credible link between specific immigration statuses and driver safety. The Agency points to five fatal crashes where noncitizens were behind the wheel as justification for the IFR's new restrictions on CDL eligibility, *id.* at 46512–13, but these accidents amount to a tiny fraction—*less than a quarter of one percent*—of the 2,397 fatal accidents involving trucks or buses in 2025.[10] Further, the IFR separately acknowledges that there is no reliable evidence indicating a relationship between a commercial driver's immigration status and driver safety. 90 Fed. Reg. at 46520 ("There is not sufficient evidence . . . to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or . . . violations"). Stripping thousands of qualified drivers of their CDLs and livelihoods on the basis of only a handful of isolated incidents violates the APA and does not demonstrate the Rule will improve road safety. *See, e.g.*, Order, *Rivera Lujan et al.*, No. 25-1215 (D.C. Cir. Nov. 13, 2025), slip op. at 3 (FMCSA likely acted arbitrarily and capriciously in issuing the IFR, because its own data indicates "that CDL holders excluded by the rule are involved in fatal crashes at a lower rate than CDL holders who are not excluded"); *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (Under the APA a court may set aside agency decision that is "unsupported by substantial evidence" (quoting 5 U.S.C. § 706(2)(E))).

Second, the IFR's claims about non-domiciled drivers and safety are contradictory and inconsistent. The Agency asserts that there is a "serious risk" that non-domiciled drivers are "unsafe or high-risk drivers" because their driving history is unknown, *id.* at 46514, yet many immigrants whom the IFR bars from holding a CDL have established driving histories in the United States. In the ASAP member stories detailed above for instance, Ali and Jeff lived in the United States for several years before obtaining their CDLs. And Deferred Action for Childhood Arrivals ("DACA") recipients, a group of immigrants also barred from obtaining CDLs under the Rule, have by definition of qualifying for DACA, continuously lived in the United States since before they were 16 years old.[11] Therefore, DACA recipients almost certainly learned to drive in the United States, and the government likely knows these individuals' entire driving histories.

The Agency's flawed logic is all the more evident because the IFR allows H-2A and H-2B visa holders to obtain CDLs, even though these programs are designed for temporary or seasonal workers who may not have as long-established driving histories in the U.S. as immigrants barred

---

[10] *Crash Statistics*, FED. MOTOR CARRIER SAFETY ADMIN. (Nov. 4, 2025), https://ai.fmcsa.dot.gov/crashstatistics?tab=Summary&type=&report_id=1&crash_type_id=1&datasource_id=1&time_period_id=2&report_date=2025&vehicle_type=1&state=AllStates&domicile=ALL&measure_id=1&operation_id=null.

[11] *See Consideration of Deferred Action for Childhood Arrivals (DACA) Frequently Asked Questions*, USCIS, https://www.uscis.gov/humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions.

from obtaining CDLs under the IFR.[12] The Agency's willingness to permit CDL eligibility for some non-permanent residents while denying it to others with documented U.S. driving histories reveals a "significant mismatch between the [FMSCA's] decision and rationale [it] provided," suggesting that the IFR is arbitrary and capricious. *Dep't of Com. v. New York*, 588 U.S. 752, 755 (2019); *see also* Order, *Rivera Lujan et al.*, No. 25-1215 (D.C. Cir. Nov. 13, 2025), slip op. at 4 (FMCSA likely acted arbitrarily and capriciously in issuing the IFR, in part because it did not demonstrate "any safety benefit from the rule" while "the county petitioner has furnished evidence that the rule would harm public safety by forcing it to replace safer experienced drivers with less-safe new drivers").

Third, the IFR ignores the rigorous safety requirements in place for all CDL-holders, standards that actually advance the objectives of promoting road safety. Under FMCSA regulations, obtaining a CDL requires passing stringent safety and competency checks. Applicants must undergo a ten-year driving record review, medical certification through a DOT physical, federally mandated entry-level driver training, and a three-part skills test covering inspection, control, and road performance. *See* 49 C.F.R. §§ 383.110 (CDL drivers must have "knowledge and skills" to operate a commercial vehicle); 383.111 ("[r]equired knowledge" in 20 general areas); 383.113 (required skills, including "safe on-the road driving skills"); 383.133 (CDL applicant testing methods and requirements); *see also* Fed. Motor Carrier Safety Admin., *How do I get a Commercial Driver's License?* (last visited November 7, 2025), https://www.fmcsa.dot.gov/registration/commercial-drivers-license/how-do-i-get-commercial-drivers-license. Additionally, drivers with serious traffic violations are disqualified from holding a CDL. *See* 49 C.F.R. § 383.51 (listing violations that result in CDL disqualification). These existing requirements ensure all CDL holders are thoroughly vetted for safety, directly undermining the Agency's assertion that an arbitrary subset of CDL holders pose an unknown or heightened risk. In adopting the IFR, the Agency failed to meaningfully consider alternatives that would advance roadway safety through these established regulatory mechanisms, rather than relying on particular immigration statuses as an inaccurate and unsupported proxy for safety risk.

## III. Conclusion

For the reasons stated above, ASAP urges the FMCSA to rescind the Rule in its entirety and permit all immigrants with employment authorization, including asylum seekers and asylees, the opportunity to obtain a CDL. At the very least, the Agency should have given the public advance notice and an opportunity to comment before issuing the IFR. Withdrawing the Rule would not only align the Agency's policy with its safety objectives, but also enable skilled, authorized drivers to continue contributing to their families, communities, local economies, and the nation's transportation work force.

[12] *See Temporary (Nonimmigrant) Workers*, USCIS, https://www.uscis.gov/working-in-the-united-states/temporary-nonimmigrant-workers.

Respectfully submitted,

Marcela Johnson
Litigation Counsel
Asylum Seeker Advocacy Project (ASAP)

Conchita Cruz
Co-Executive Director
Asylum Seeker Advocacy Project (ASAP)

Jessica Hanson
Senior Managing Attorney, Litigation
Asylum Seeker Advocacy Project (ASAP)

Education
Healthcare
Public Services

AFT, AFL-CIO

AFT Teachers
AFT PSRP
AFT Higher Education
AFT Public Employees
AFT Nurses and Health Professionals
AFT Retirees

555 New Jersey Ave. N.W.
Washington, DC 20001
202-879-4400
www.aft.org

Randi Weingarten
PRESIDENT

Fedrick C. Ingram
SECRETARY-TREASURER

Evelyn DeJesus
EXECUTIVE VICE PRESIDENT

VICE PRESIDENTS
J. Philippe Abraham
Frederick R. Albert
Jackie Anderson
LeRoy Barr
Victor M. Bonilla Sánchez
Vicky Rae Byrd
Zeph Capo
Larry J. Carter, Jr.
Kathy A. Chavez
Jaime Ciffone
Melissa Cropper
Amanda Curtis
James C. Davis
Stacy Davis Gates
GlenEva Dunham
Christian L. Fern
Francis J. Flynn
Jeffery M. Freitas
Ron Gross
Anthony M. Harmon
Karla Hernández-Mats
Jan Hochadel
David Keepnews, RN
Frederick E. Kowal
Terrence Martin, Sr.
Kara McCormick-Lyons
Daniel J. Montgomery
Michael Mulgrew
Cecily A. Myart-Cruz
Shari Obrenski
Melinda Person
Juan Ramirez
Andrew Spar
Denise Specht
Wayne Spence
Arthur G. Steinberg
Jessica J. Tang
Adam Urbanski
Debbie White, RN
Carl Williams
Lakia Wilson-Lumpkins
Sarah Wofford
Todd Wolfson

November 21, 2025

Dockets Operations
U.S. Department of Transportation
1200 New Jersey Ave. S.E.
West Building, Ground Floor
Washington, DC 20590-0001

**Comments on Docket No. FMCSA-2025-0622: Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)**

The AFT represents 1.8 million members—working in education, healthcare and public services—in more than 3,000 local affiliates nationwide. Approximately 13,500 workers in the U.S. transportation industry, including school bus drivers, maintenance drivers, civil engineers, and inspectors are AFT members.

We write in strong opposition to the interim final rule, "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)", issued by the Federal Motor Carrier Safety Administration (FMCSA) on Sept. 29, 2025. and urge the FMCSA to fully rescind it as soon as possible.

The interim rule, which went into effect immediately without first receiving public comment, makes drastic changes to federal regulations for how state driver's licensing agencies may issue commercial learning permits (CLPs) and commercial driver's licenses (CDLs) to individuals who are not U.S. citizens or lawful permanent residents.[1]

The rule eliminates the ability for most people in the United States who have legal work authorization, but who are not U.S. citizens or lawful permanent residents, to obtain or renew a CLP or CDL. These include broad categories of lawful immigrants, namely:

- Deferred Action for Childhood Arrivals (DACA) holders; People who have been granted permanent asylee or refugee status (or those applicants for asylum who are work-authorized while their application is pending); and
- Individuals with Temporary Protected Status (TPS) or parole;

Under the interim rule, the only immigrants eligible for a non-domiciled CDL or CLP are those with H-2A, H-2B or E-2 visas. This represents a significant change. In 2011, the FMCSA created the "non-domiciled" category of CDLs for individuals who qualify for a commercial driver's license who are in the U.S. legally but not U.S. citizens or lawful permanent residents. It was not restricted to a handful of visa categories.

[1] Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46519 (to be codified at 49 C.F.R. 383 and 384).

The AFT is a union of professionals that champions fairness; democracy; economic opportunity; and high-quality public education, healthcare and public services for our students, their families and our communities. We are committed to advancing these principles through community engagement, organizing, collective bargaining and political activism, and especially through the work our members do.

**The Interim Rule Causes Severe Harm**

This rule will hurt approximately 200,000 immigrant drivers who rely on their non-domiciled CDL to make a living and support their families.[2] According to FMCSA's own projections, roughly 97 percent of current non-domiciled CDL holders will lose their licenses over the next two years.[3]

Not only does this interim rule cut into the wages workers can make in the future; it renders past investments in training they or their employers have made a waste. This is not insignificant. The training needed to obtain a CDL is costly; current estimates show a CDL training course running up to $12,000.[4]

Workers hurt by the interim rule include AFT members, many of whom are school bus drivers who must have CDLs as a condition of employment. The job security, wages and benefits their CDL enabled are at risk because of this interim rule.

**The Rule Will Exacerbate Bus Driver Shortages that Hurt Students and Families**

The interim rule, if unchanged, will also harm the students and communities these AFT members serve. Throughout the U.S., there is a severe shortage of school bus drivers. The shortage has been constant since the Great Recession. As of September 2024, there were 12.2 percent fewer school bus drivers on the road than in September 2019.[5] When surveyed by the Associated Press and the University of Chicago, 80 percent of school administrators cited bus driver shortages as a challenge.[6]

Roughly half of all schoolchildren rely on bus services to get to school.[7] Reduced and unstable bus services cause school delays, disrupt learning time and contribute to absenteeism.[8] Because of reduced or unreliable transportation services, students are losing access to critical school resources—such as extracurricular programs and meals—and are experiencing higher rates of tardiness and absenteeism.[9] Chronic absences are linked to poorer academic performance as well as social and emotional outcomes not only for the students who are often late but also for their classmates.[10]

The bus driver shortage impacts students in large cities, suburbs and small towns—particularly those students with disabilities who travel longer distances for specialized schooling and those from low-income families. Many parents struggling to make ends meet lack easy access to a vehicle; they may have other care responsibilities, or their jobs may not be flexible enough to allow them time to provide transportation for their children.[11]

Excluding lawfully present immigrants from eligibility for non-domiciled CDLs will deepen the nationwide effects of the school bus driver shortage. At the AFT, we have already seen signs of this. An AFT local leader from one of our larger Texas affiliates met with district administrators who alerted her that

---

[2] 90 Fed Reg 46519 (Sept. 29, 2025)
[3] Id.
[4] How Much Does CDL School Cost?—Pricing Explained in 2025
http://www.ldtnation.com/blog/
[5] Economic Policy Institute, The School Bus Driver Shortage Remains Severe and Bus Driver Pay is Getting Worse, Nov. 14, 2024,
https://www.epi.org/blog/the-school-bus-driver-shortage-remains-severe-and-bus-driver-pay-is-getting-worse/
[6] Naaz Modan," School Transportation Challenges Impacting Academics, Attendance," K-12 Dive, Sept. 4, 2025,
https://www.k12dive.com/news/school-transportation-challenges-impacting-academics-attendance/759195/
[7] Id.
[8] See note 5
[9] Education Commission of the States, "The Road to Attendance: Chronic Absenteeism and School Bus Driver Shortages," Dec. 19, 2023,
https://www.ecs.org/the-road-to-attendance-chronic-absenteeism-and-school-bus-driver-shortages/
[10] Michael A. Gottfried, "The Achievement Effects of Tardy Classmates: Evidence in Urban Elementary Schools," 25 *Int'l J. Rsch., Pol'y, & Prac.* 3 (2014)
[11] See note 5

they had to transfer workers currently being trained to serve as school bus drivers. Another AFT state affiliate from the South has already fielded questions from one of its local unions with impacted members.

**Arguments that the Rule Will Improve Public Safety Are Unsupported**

For all the harm that the interim rule will result in, the justifications presented for it in the notice are sparse. While 2,305 fatal crashes involving citizen and noncitizen commercial drivers of large trucks have occurred this year,[12] in its notice the FMCSA focuses on only five accidents and argues that noncitizen commercial drivers are an imminent "threat to public safety and direct threat to national security."[13]

Yet the FMCSA fails to explain any connection between the drivers' immigration status and the cause of the crashes, and the FMCSA does not provide any data demonstrating that the selected category of noncitizens is more likely to be involved in fatal crashes.[14] The Interim Final Rule even acknowledges that there is insufficient evidence "to reliably demonstrate a measurable empirical relationship between the nation of domicile for a driver and safety outcomes."[15]

According to the FMCSA, the rule will increase safety by reducing "drivers with unknown driver safety records" because the "driving history exists predominantly or solely within a foreign jurisdiction." [16] This is faulty and contradictory considering the rule applies to DACA recipients, who came to the U.S. as young children, learned how to drive in the U.S. and have not lived outside of the U.S. as adults, resulting in driving histories that are completely within the U.S. By contrast, the visa categories that the department allows to still qualify for a non-domiciled CDL, H-2A, H-2B, or E-2 visa, are for short-term, even seasonal workers, who would have what the FMCSA describes as a driving history that "exists predominantly or solely within a foreign jurisdiction."[17]

The FMCSA also completely ignores the rigorous safety requirements already embedded in CDLs, such as the mandatory skills and knowledge test or the disqualification of drivers with serious traffic violations.[18] Rather than considering the efficacy of these measures, the FMCSA arbitrarily aims at certain immigration statuses without providing any rational, nondiscriminatory connection between these targeted groups and road safety.

According to a 2022 report issued by FMCSA, there were over 6,000 large trucks and buses involved in fatal crashes in 2022.[19] Assuming the number for 2025 is similar, FMCSA is disqualifying nearly 200,000 freight, bus drivers and commercial vehicle drivers, based on data showing that they are involved in fewer than one-tenth of 1 percent of crashes.

---

[12] *Crash Statistics,* Federal Motor Carrier Safety Administration (Sept. 26, 2025), https://ai.fmcsa.dot.gov/crashstatistics?tab=Summary&type=&report_id=1&crash_type_id=1&datasource_id=1&time_period_id=2&report_date=0&vehicle_type=2&state=NAT&domicile=ALL&measure_id=1&operation_id=null

[13] "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)," 90 Fed. Reg. 46514 (to be codified at 49 C.F.R. 383 and 384).

[14] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (finding that the agency must articulate a "rational connection between the facts found and the choice made").

[15] 90 Fed. Reg. 46520 (Sept. 29, 2025)

[16] 90 Fed Reg 46514 (Sept. 29, 2025)

[17] Id.

[18] 49 CFR 383.23; 49 CFR 383.51.

[19] 5 FMCSA, Large Truck and Bus Crash Facts 2022, https://www.fmcsa.dot.gov/safety/data-and-statistics/large-truck-andbus-crash-facts.

**The rule discriminates against immigrants**

The Trump administration is pursuing an aggressive anti-immigrant agenda across federal agencies, including the Transportation Department. On the day he was sworn in, President Trump issued 10 executive orders targeting immigrants, starting with Executive Order 14159 "Protecting American People Against Invasion," which described immigrants to the U.S. in menacing and derogatory language.[20] In the months following this first executive order, the Trump administration has all but halted refugee admissions, directed the Department of Homeland Security to deport 3,000 immigrants a day, and signed into law a tax package that includes $170 billion in new immigration enforcement dollars.[21] The driving force behind this interim rule is Executive Order 14286 "Enforcing Commonsense Rules of the Road for America's Truck Drivers," which was enacted in April and directed the transportation secretary to review non-domiciled CDLs.[22] In his press release accompanying the interim rule, Secretary Sean Duffy spoke of "dangerous foreign drivers" who were "a threat to the safety of every American family".[23] The rhetoric around this rule is steeped in anti-immigrant sentiment, and it is a part of a larger agenda; it is not grounded in facts or motivated by safety.

Immigrant commercial drivers, whether they drive school buses or freights, should not be prevented from maintaining and renewing their CDL just because they are immigrants, despite having sterling driving histories, skills and knowledge. It is an injustice to impacted workers and all who rely on them, including children who need to get to school. We urge the Department of Transportation to withdraw this interim rule.

Sincerely,

Randi Weingarten
President, AFT

RW : emc opeiu #2 afl-cio

[20] 90 Fed Reg 8443 (Jan. 29, 2025)
[21] American Immigration Council, "Mass Deportation: Analyzing the Trump Administration's Attacks on Immigrants, Democracy, and America," July 23, 2025, https://www.americanimmigrationcouncil.org/report/mass-deportation-trump-democracy/
[22] 90 Fed Reg 18759 (April 28, 2025)
[23] "Trump's Transportation Secretary Sean P. Duffy Takes Emergency Action to Protect America's Roads, Restrict Non-Domiciled CDLs," Sept. 26, Department of Transportation, https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-takes-emergency-action-protect-americas

An official website of the United States Government.

Back to Document Comments (/document/FMCSA-2025-0622-0001/comment?filter=FMCSA-2025-0622-7208)

Share

PUBLIC SUBMISSION

# Comment from Rafael Tavarez

Posted by the **Federal Motor Carrier Safety Administration** on Nov 25, 2025

Docket (/docket/FMCSA-2025-0622) / Document (FMCSA-2025-0622-0001) (/document/FMCSA-2025-0622-0001) / Comment

Comment

As a Non Domicile CDL holder I strongly support the rule on English proficiency and the cracking down on CDL schools that might be cheating the process..however people that went through the process of obtaining our CDLs the right way and are here legally with a valid work permit should be allowed to stay in their jobs because we have went through the same process that everyone else has done, it's simply unfair to categorize all Non-Domicile holders as bad apples, it's simply wrong. This is how I feed my family, i have been here for over twenty years and a clean driving record, there's no foreign driving record to look for because this is the only country i know and i call home, unfortunately both political parties have let us down when it comes to immigration and for me as a DACA recipient unfortunately there's no clear pathway to citizenship or I would already be a citizen. I love this country, this is my home! Please do what needs to be done to remove the bad apples but don't punish us all for the failures of a few. Thank you for allowing to leave my comment here and God bless America!

Give Feedback

**Comment ID**

FMCSA-2025-0622-7208

**Tracking Number**

mid-vrxg-o72c

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Nov 24, 2025

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

Unitarian Universalists for Social Justice
*UU advocacy in the nation's capital*

November 24, 2024

**Public Comment on Commercial Driver's License Standards: Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses** [Docket (FMCSA-2025-0622)]

Unitarian Universalists for Social Justice (UUSJ) strongly opposes the proposed rule that would restrict the issuance and renewal of non-domiciled commercial driver's licenses (CDLs). While highway safety is an important priority, the proposed restrictions do not recognize the actual low risk posed by non-domiciled drivers and lack sufficient data justification.

According to FMCSA's own reporting, only five fatal crashes in 2025 involved non-domiciled CDL holders—representing just 0.13% of the 3,800+ fatal truck crashes nationwide. This figure is statistically insignificant, especially when compared to the fact that non-domiciled drivers comprise approximately 3.5% to 4% of all CDL holders. If these drivers were inherently more dangerous, their crash rate would exceed their representation in the driving population. Instead, all the data suggests the opposite!

Moreover, overall trucking safety has improved in 2025, with an 8.2% decline in highway fatalities and the lowest mid-year fatality rate since 2014. These gains reflect the success of existing safety interventions—such as electronic logging devices, improved training, and vehicle technology—not demographic targeting. Further improvements might be achieved by better oversight of trucking companies and drivers to make sure that drivers have adequate training and that hours of service are strictly followed.

The lack of transparency surrounding the FMCSA audit, which was used to justify this rule, undermines public trust. Without access to the audit's findings, stakeholders cannot assess whether the identified licensing inconsistencies correlate with actual safety risks.

As a final point, UUSJ believes that all people have inherent worth and dignity and should be treated with respect, compassion, and justice. Given the lack of convincing safety data, this subtextual purpose of this rule appears to be to target immigrants who have USCIS employment authorizations and unjustly limit their employment opportunities.

In light of these facts, UUSJ urges FMCSA to reconsider this rule and pursue safety improvements through **evidence-based interventions** rather than nationality-based restrictions. The 200,000 non-domiciled CDL holders have legal work authorization and are taxpayers, good workers, and valued community members. At a time when trucking companies need more professional drivers this rule is both unjust and counterproductive.

Respectfully submitted, Unitarian Universalists for Social Justice.

7750 16th St. NW, Washington, DC 20012 • info@uusj.org • 202-600-9132 • www.uusj.org

American Association of Motor Vehicle Administrators

OUR VISION
Safe drivers
Safe vehicles
Secure identities
Saving lives!

November 28, 2025

Docket Operations
United States Department of Transportation
1200 New Jersey Avenue, SE
West Building, Ground Floor
Washington, DC 20590-0001

**RE: INTERIM FINAL RULE: RESTORING INTEGRITY TO THE ISSUANCE OF NON-DOMICILED COMMERCIAL DRIVER'S LICENSES (CDLs) [Docket No. FMCSA-2025-0622]**

The American Association of Motor Vehicle Administrators (AAMVA) appreciates the opportunity to comment on the continued integrity of the CDL program and efforts to improve highway safety. State Driver's Licensing Agencies (SDLAs) are committed safety partners in the administration of the federal CDL program.

While FMCSA issued an interim final rule to effectuate changes to the non-domiciled licensing program, AAMVA and its members would have preferred consideration of the traditional call and response a full regulatory process would have afforded the states. A traditional regulatory approach would have assisted the states in terms of informing the technical and administrative considerations associated with changes to the program and in terms of providing states with appropriate time to fully review and implement applicable program modifications.

AAMVA's comments address eight major categories of concern that impact states' ability to implement the IFR effectively:

I. Downgrade Requirements and Timing

II. Audit and Compliance Requirements for Previously Issued Credentials

III. Federal Agency Coordination and Notification

IV. SAVE System Usage and I-94 Documentation Requirements

V. Testing vs. Issuance Pause

VI. Implementation Timeline and Technical Assistance

VII. Data Sharing and Tracking

VIII. Additional Implementation Concerns

AAMVA requests that FMCSA provide written guidance addressing these issues as expeditiously as possible to minimize disruption to both state operations and affected drivers.

## I. DOWNGRADE REQUIREMENTS AND TIMING (§383.73(f)(5))

### Prospective Application vs. Retroactive Correction

The IFR states that its requirements apply prospectively to licenses issued or renewed after the issuance pause is lifted. However, § 383.73(f)(5) requires states to "initiate established State procedures for downgrading the non-domiciled CLP or CDL" within 30 days when notified that a holder no longer has lawful immigration status in a specified category. The downgrade provisions and some state Annual Program Review (APR) findings suggest states may be expected to audit or take corrective action on existing non-domiciled CDL/CLP holders whose credentials were properly issued under previous regulations but would not qualify under the new standards.



4250 FAIRFAX DRIVE, SUITE 1000, ARLINGTON, VA 22203 | 703.522.4200 | aamva.org

AAMVA requests clarification on whether FMCSA expects to leverage the Annual Program Review (APR) process to inform individual state corrective action plans associated with all already-issued licenses and whether state-initiated corrective action plans will be denied if they do not include correction of program errors based on the new criteria established in this IFR.

Additionally, AAMVA requests clarification on whether states would be required to proactively identify and take action against a driver who holds a non-domiciled CDL that was properly issued under the previous regulations but would not qualify under the new standards. While this does not appear to be an expectation of the IFR, conversations from state annual program reviews necessitate advance clarity on FMCSA expectations. The distinction between prospective application and retroactive correction has significant operational and resource implications on how states will handle the licensing process: Additionally, if states must proactively audit all existing non-domiciled CDL holders, this represents a substantial undertaking that will require:

- Pulling and reviewing records for current non-domiciled CDL holders
- Re-verifying immigration status through SAVE for each credential holder.
- Processing downgrade actions for potentially significant populations of drivers
- Managing potential legal challenges from affected drivers.

AAMVA recommends that FMCSA clarify that:

- New eligibility requirements apply only to applications for issuance, transfer, renewal, or upgrade submitted after a state has lifted the issuance pause and achieved compliance with the IFR.
- Existing non-domiciled CDLs issued properly under previous regulations remain valid until their stated expiration date, at which point the holder must meet the new requirements for renewal.

This approach would align with the stated prospective application of the rule, minimize resource burden on states, provide certainty to current credential holders, and focus enforcement resources on new applications and federal agency notifications.

### Administrative Corrections Triggering New Requirements

When requiring a driver to appear in person for an administrative transaction (such as correcting an expiration date, updating an address, reprinting a lost credential, or amending other non-substantive information), AAMVA requests clarification on whether this would trigger the application of the new eligibility requirements even if no change in the driver's immigration status has occurred. If this is FMCSA's expectation, it would create a circular problem where administrative corrections may inadvertently subject drivers to new standards, they were not previously subject to, potentially resulting in:

- A driver losing their non-domiciled CDL due to an administrative correction unrelated to their driving privileges or immigration status.
- Drivers avoiding necessary administrative corrections to prevent triggering new eligibility reviews.
- Inconsistent application of standards based on whether a driver sought administrative corrections.

If so, is this intended even when:

- The driver's underlying immigration status has not changed.
- The administrative action is necessitated by a system error or mandatory credential refresh.
- The driver is simply replacing a lost, stolen, or damaged credential?

This provision creates operational challenges in terms of when corrective actions are needed in the administrative process and whether drivers may lose their CDL privileges based solely on when they happen to need an administrative correction, rather than any change in their eligibility or conduct. It additionally may impact how the states choose to treat processes for administrative issues versus actions associated with more substantive actions on the credential.

AAMVA recommends that FMCSA clarify that administrative corrections do NOT trigger re-verification under the new standards unless the administrative action changes the expiration date of the credential to extend beyond its

current expiration or the driver voluntarily applies for renewal, upgrade, or transfer of the credential. Administrative actions such as correcting typographical errors; updating mailing addresses; reprinting lost, stolen, or damaged credentials with the same expiration date; and replacing credentials due to system upgrades or security feature updates should NOT trigger re-verification of eligibility under the new standards for credentials properly issued under prior regulations.

### Timeline for Downgrade Actions

§ 383.73(f)(5) requires states to "initiate established State procedures for downgrading the non-domiciled CLP or CDL" within 30 days of receiving notification and to complete the downgrade "within 30 days." State downgrade procedures vary significantly in complexity and timeline, and many include due process protections such as:

- Time needed to provide written notice to the credential holder.
- Opportunity for the credential holder to provide updated documentation or contest the downgrade.
- Administrative hearing rights
- Appeal processes
- Mandatory waiting periods before final action

AAMVA encourages FMCSA to clarify that this requirement means that states must leverage existing procedure by beginning the downgrade process within 30 days rather than complete and record the downgrade in CDLIS within 30 days. Additionally, AAMVA requests FMCSA provide clarification on how to treat a credential holder who provides updated documentation (e.g., renewed visa, updated I-94) showing continued eligibility before the downgrade is completed.

## II. FEDERAL AUDIT AND COMPLIANCE REQUIREMENTS FOR PREVIOUSLY ISSUED CREDENTIALS

FMCSA's APR findings have identified noncompliance in multiple states and "anticipates that the number of States discovered to have improperly issued non-domiciled CDLs [will] grow as FMCSA's APRs continue." From date forward, AAMVA asks whether states are federally required (or should be expected on an annual basis as part of the APR process) to conduct comprehensive audits of all issued non-domiciled CDLs/CLPs to determine if holders meet the new visa category requirements (H-2A, H-2B, E-2). AAMVA is aware that visa status, much like legal statuses, may be subject to change. If this is the expectation moving forward, it would add a level of complexity to the APR process. AAMVA additionally reminds that while SAVE is now capable of assisting in batch inquiries, many state systems are not currently configured to support batch credential verifications. AAMVA recommends that FMCSA clarify that comprehensive audits of all existing non-domiciled credentials are NOT federally mandated on a regular basis.

### Corrective Action Plans and APR Requirements

AAMVA requests FMCSA provide additional information on its expectations for state corrective action plans to ensure uniformity in approach and sufficiency in satisfying FMCSA concerns. This includes FMCSA guidance with respect to:

- Whether corrective action plans will be denied or deemed insufficient if they focus solely on prospective compliance with the new standards?
- What specific elements must be included in a corrective action plan to address non-domiciled CDL compliance?
- How will FMCSA evaluate state progress on corrective action plans related to non-domiciled CDL issuance?

## III. FEDERAL AGENCY COORDINATION AND NOTIFICATION

§ 383.73(f)(5) requires states to downgrade credentials upon receiving notification from FMCSA, DHS, State Department, or other federal agencies that a non-domiciled CLP or CDL holder no longer has lawful immigration status in a specified category. However, the IFR does not specify the mechanisms, format, or timeline for such notifications. In addressing the issue of taking action against issued licenses, AAMVA requests that FMCSA utilize

consistent terminology regarding expectation of the action. In some informal guidance, the States have been advised to "revoke" licenses issued to individuals. For the states, that may have a different meaning than actions like a downgrade, or even a cancellation of certain licenses. AAMVA requests that FMCSA be deliberate in the instructions they provide the states regarding taking various actions. While it can be viewed as a terminology issue, it does have very precise meaning in terms of how the state is able to accomplish the outcomes expected by FMCSA under statute and regulation.

### Proactive Notification Systems

AAMVA also requests clarification from FMCSA on the mechanism and timeline federal agencies (FMCSA, DHS, State Department) will utilize to proactively provide states with notifications regarding changes in non-domiciled CDL/CLP holders' immigration status and whether these individuals will be provided with a reference/case number for redress with the notifying agency. AAMVA also requests clarification on whether the process is expected to be automated or manual and the frequency with which these notifications will occur. Additionally, the States are interested in whether or not the listing will be provided to each individual state or provided via a centralized system, what specific information will be provided in those notifications to identify the appropriate driver and if both rationale and effective date of status change will be provided in those notifications and whether federal support for making changes to cases will be provided . As FMCSA plans integration of notification for certain cases as part of both the APR process and audit findings, it will be important to outline all expectations regarding the notification process, the expectations on frequency of engaging SAVE for legal status verification post-license issuance given legal status can change, and the timing of required actions as outlined in the prior section regarding "Timeline for Downgrade Actions."

AAMVA recommends that FMCSA clarify that States are NOT required to conduct ongoing independent monitoring of immigration status for existing non-domiciled CDL holders beyond first time issuance, transfer, renewal, or upgrade transactions as required by § 383.73(f)(3)(ii). Any requirement for ongoing monitoring of immigration status changes the dynamic of why and how the states are performing safety validation checks on eligibility for the credential and should not change so frequently that ongoing monitoring of status would have significant cost in terms of personnel, resources and administrative burden. The fiscal impact on the states would be tremendous given the frequency and potential for changing legal statuses.

## IV. SAVE SYSTEM USAGE AND I-94 DOCUMENTATION REQUIREMENTS

The IFR requires states to query SAVE and verify I-94/I-94A documentation showing specific visa classifications for applicants domiciled in a foreign jurisdiction. This creates several operational challenges and potential conflicts with existing REAL ID requirements.

The IFR requires that the expiration date for any non-domiciled CLP or CDL "match the expiration date of the Form I-94/I-94A or 1 year, whichever is sooner." § 383.73(f)(2)(iv). However, REAL ID regulations require states to use the SAVE verification response to determine the appropriate expiration date for credentials issued to individuals with temporary lawful status. See 6 CFR 37.21(b)(2). Many states issue a credential that serves as both the driver's license/CDL and as a REAL ID-compliant credential. For these states, conflicting federal requirements create an impossible compliance situation in that REAL ID requires the states to establish the validity of the credential using the SAVE system response as the expiration date. Per the requirements of the IFR, the non-domiciled CDL requirement is to use the "I-94 expiration date or 1 year, whichever is sooner." When this date does not correspond with the date of the SAVE system response, one or both of the program requirements will not be met.

The SAVE response and the I-94 expiration date are often different because SAVE may show a different expiration date based on the individual's authorized period of stay, employment authorization periods may extend beyond the I-94 admission period, or entire status changes may take effect after issuance of the I-94.

AAMVA requests clarification on how the states should reconcile differences between SAVE verification requirements under this IFR versus REAL ID requirements, particularly regarding expiration date validation. AAMVA requests that FMCSA coordinate with DHS to provide a single response to how states may satisfy both

REAL ID and non-domiciled CDL requirements regarding legal status and expiration date of the credential. Preferably, SAVE response would give the states a single, definitive source of the most accurate and up-to-date information and given it is required by both programs, should serve as the final arbiter of acceptable length of stay associated with credential validity.

FMCSA might accomplish this by modifying § 383.73(f)(2)(iv) to state: "For applicants domiciled in a foreign jurisdiction, the State must ensure that the period of validity of the non-domiciled CLP or CDL does not exceed the period of authorized stay as determined through the SAVE verification process, or 1 year, whichever is sooner." Additionally, FMCSA might enhance any transcription or interpretation errors by ensuring the SAVE system clearly provides response on non-domicile eligibility based on the three visa classifications described in the IFR as part of its query response. The provision of a simple yes or no to a SAVE query regarding non-domicile eligibility would alleviate the eligibility requirements associated with only H-2A, H-2B, E-2 visa classifications. Absent this notification States are again beholden to presentation of applicable documentation by the applicant.

Without consistent guidance on the application of both REAL ID (SAVE system) requirements with the IFR requirements utilizing the I-94, FMCSA has not provided information on how states should treat inconsistent information on differences in those dates or even differences with respect to appropriate visa classifications.

Additionally, and given the non-domicile program has been given specific attention through the APR process, are states expected to retain documentation with respect to SAVE queries and responses for audit purposes? If so, how long and in what format is this retention a requirement? AAMVA recommends that SAVE retain these records as needed rather than the states given the cost associated with record retention and the implications for review. It is AAMVA's understanding that SAVE already has such a capability.

Finally, AAMVA requests clarification on how to treat SAVE query returns that have a result of "Institute Additional Verification" or requires additional steps beyond the initial query. Under these conditions is it appropriate for a state to issue a temporary credential pending additional verification? Are states required to deny the application pending additional verification? Is FMCSA aware of the expected timeline associated with additional verification requests and how this may impact any workforce or labor issues experienced by specific labor demographics associated with the specific visa classes outlined in the IFR?

### Approved Asylees and Refugees

The IFR prohibits approved asylee and refugees from being issued Non-Domiciled CDL's. AAMVA requests clarity around whether these immigration statuses are also prohibited from being issued a Full-CDL since these individuals are not considered non-domiciled.

## V. TESTING VS. ISSUANCE PAUSE

§ 383.73(f)(3)(ii)(A) requires states to "pause issuance" of non-domiciled CDLs until their systems comply with the new requirements. However, the IFR does not explicitly address whether states can continue to administer CDL knowledge and skills tests to non-domiciled applicants during the compliance transition period. The regulations also do not describe the process for initiating issuance after the state has conformed with the requirements of the IFR.

### Testing During the Issuance Pause

Pending reinstatement of the formal non-domicile issuance process, states have requested whether or not FMCSA allows them to continue to administer CDL knowledge and skills tests to non-domiciled applicants during the compliance transition period. Additionally, can test results obtained during the pause be used for issuance after the pause is lifted, even if they exceed the normal test validity period? The lapse between testing and the issuance pause has significant operational implications including the potential to add to scheduling backlogs, third-party test oversight, and judicious treatment of those who have invested in CDL training and testing.

While many states continue to move beyond the pause and have conformed with the requirements of the IFR, AAMVA requests FMCSA clarify that states MAY continue to administer CDL knowledge and skills tests to non-domiciled applicants during the issuance pause, provided that applicants present evidence of lawful immigration status as defined in § 383.5 at the time of application and that the states verify this information as required by the IFR. AAMVA further requests FMCSA consider allowing test results obtained during the pause to remain valid for an extended time after the pause is lifted, to allow adequate time for issuance without requiring re-testing. AAMVA also requests clarification on whether FMCSA has an expected process to re-initiate non-domicile issuance following the pause.

### Third-Party Testing Vendors and Multi-State Considerations

There are additional implications for how states manage third-party testing and interactions between states with various levels of conformity with the IFR. For instance, how should states handle third-party testing vendors who may test applicants intending to obtain credentials in other states? Many third-party trainers may be located in states other than the state where applicants intend to obtain their credentials creating uncertainty about which state's compliance status governs testing.

With respect to the timing of the issuance, will FMCSA provide a status map of who has lifted their issuance pause? Will FMCSA provide centralized information regarding the eligibility for accepting out-of-state testers? Should states enter test results into their systems when they cannot verify whether the applicant's intended state of issuance has achieved compliance with the IFR? At what point in this process is the legal status check of SAVE expected between jurisdictions?

Additionally, AAMVA notes that third-party testers may not have access to the same tools that state examiners have. This includes access to SAVE and CDLIS. The IFR may very much change the ability of states to rely on third party testers, either intentionally or unintentionally, and will extend beyond just non-domiciled licensing.

AAMVA recommends that FMCSA clarify that the timing for establishing immigration status is prior to administering CDL tests to non-domiciled applicants regardless of where the applicant intends to obtain their credential.

### Impact of the Judicial Process

On November 10, 2025, the U.S. Court of Appeals for the DC Circuit issued an administrative stay of the interim final rule (IFR).On November 13, 2025, the Court issued an emergency stay of the interim final rule.

FMCSA has advised states with the following language via email:

"Due to the administrative stay, the IFR is, until further notice, not in effect. Until further notice, States are not prohibited from issuing non-domiciled CDLs and commercial learner's permits in accordance with the Federal regulations and guidance in effect immediately prior to issuance of the IFR."

Pending final judgement by the Court, the States are left in the difficult situation of navigating two separate regulations dictating the non-domiciled process. For states that have unpaused their process, AAMVA requests clarification on how the agency will handle instances of licenses issued under the pre-IFR regulations during the administrative/emergency stay that may not restrict the licenses to the three distinct visa categories and other program requirements as provided via the IFR.

### Out-of-State Conversions and Transfers

As an addition to the complexities surrounding the judicial process, the states may be in different situations regarding whether they have paused or unpaused their non-domiciled CDL issuance process. Given these potential differences, how can the states be sure which regulations a partner jurisdiction has utilized to process their transactions? Is it FMCSA's expectation that the states should pause all non-domiciled CDL/CLP transactions,

including out-of-state conversions/transfers or is there a way FMCSA can collectively communicate the status of each jurisdiction? Additionally, AAMVA requests clarification on the following scenarios:

If an individual holds a valid non-domiciled CDL from State A and wishes to transfer to State B:

a. Can State B process the transfer during its issuance pause?

b. Must State B verify that State A issued the original credential in compliance with the IFR?

c. Should State B treat transfers differently than initial issuance?

How should states handle situations where an applicant holds a non-domiciled CDL that was issued before the IFR took effect and wants to transfer to a new state?

a. Must the applicant meet the new IFR requirements for the transfer?

b. Or can the transfer proceed based on the validity of the existing credential?

## VI. COMPLIANCE CERTIFICATION AND PAUSE REMOVAL PROCESS

§ 384.301(q) requires that "A State must come into substantial compliance with the requirements of subpart B of this part and part 383 of this chapter related to non-domiciled CLPs and CDLs, effective September 29, 2025, prior to issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL." However, the IFR does not specify what process states must follow to demonstrate substantial compliance or obtain authorization to resume issuance.

To date, the states have notified FMCSA of their readiness to proceed with non-domiciled license issuance. Does FMCSA plan on describing a more formal process for indicating that a state has achieved compliance with the IFR and may resume non-domiciled CDL issuance? As noted above, states may need to understand whether other states have transitioned to active issuance under the new IFR. Additionally, the timing and difficulty of navigating the judicial actions associated with the differing regulations make application of the IFR difficult. Clarity on expectations from FMCSA on how states proceed may help avoid issues in audit and follow-up actions as states continue to deal with pressure from labor groups and individual applicants. FMCSA may want to consider how states submit formal requests to reinitiate their process and the timeline associated with any formalized process for review. AAMVA recommends that FMCSA rely as much as possible on a state's self-certification of readiness and communicate that status to other states via a centralized resource so that the states can conduct interstate transactions in confidence. Additionally, there may be some states that choose to discontinue their non-domiciled licensing process as a result of the IFR's changes. AAMVA requests that this too be provided via a centralized FMCSA resource so that states may take the appropriate actions to mitigate interjurisdictional fraud.

If anything, more detailed is required of the states in terms of a return to issuance, AAMVA requests FMCSA provide support to assist the states with compliance and regulatory transition efforts.

### Timeline Expectations

Reinitiating a non-domiciled program may vary depending on numerous state factors including system readiness and capabilities, staffing levels, the volume of non-domiciled credentials issued and state legislative or regulatory processes. In light of some of the enforcement actions taken with respect to certain states, does FMCSA have an expected timeline for state to achieve full compliance with the new requirements? Will FMCSA provide flexibility for states that face unique challenges in achieving compliance? As states pause non-domicile license issuance, how will FMCSA expect processing of notification of a change in status by federal agencies as the states work to implement the changes required by the IFR? Can states request extensions or variances based on documented challenges? Some states are in the midst of multi-year driver licensing system modernization projects and may have limited ability to make interim modifications. Additionally, some state procurement processes may require months to contract vendors for system modifications, and some states may require legislative approval for policy changes or funding for implementation.

### Technical Assistance and Best Practices

AAMVA requests that FMCSA provide technical assistance to states implementing the new requirements via as many outlets as possible. This includes roundtable discussions, leveraging the CDL Coordinators meeting with dedicated staff to discuss the issues raised in these comments. Additionally, for those unable to meet in person, AAMVA requests FMCSA provide the states with one-on-one consultation opportunities and virtual training webinars that allow access to FMCSA expertise as the states look to implement the requirements of the IFR. Additionally, AAMVA requests support for applicants that may have questions about the changes to IFR requirements such that the states can focus on license issuance to the appropriate applicants and refer questions on the change in procedure to FMCSA. If FMCSA can reiterate the availability of CDLPI dedicated funding to help facilitate any of these changes, that may be beneficial as well.

## VII. DATA RETENTION AND SHARING

The IFR creates new data collection, retention, and sharing requirements, but does not fully specify the mechanisms and protocols for these activities. This includes the new requirement that states retain copies of all documents involved in the licensing process including documents provided by the applicant to prove lawful immigration status and documents showing the results of any SAVE query to verify an applicant's lawful immigration status for no less than 2 years from the date of issuance. Additionally, under revised 384.212(a)(1)(iii) the IFR states that states must "provide copies of all documents involved in the licensing process to FMCSA within 48 hours after request." Given the expansion of the data retention and sharing expectations, the states have requested that FMCSA finalize and distribute a data sharing policy/agreement to facilitate that coordination between state partners and federal agencies. Either as part of that data sharing policy/agreement, the states have requested that FMCSA clarify:

- What data elements will be shared between federal agencies and states?
- What security and privacy protections will govern the sharing of immigration status information?
- Are states required to report information about non-domiciled CDL holders to federal agencies? If so, what information must be reported and how frequently.
- The mechanism by which data is reported from the agencies to the states and vice versa.

AAMVA recommends that FMCSA develop a standardized data sharing agreement that clearly defines what data will be shared and under what specific circumstances. AAMVA further recommends that FMCSA uses this standardized agreement to establish security and privacy protections consistent with applicable federal and state laws, identify the responsibilities of each party, and addresses liability and indemnification issues. AAMVA further recommends that FMCSA limit state reporting obligations to information already captured in CDLIS, rather than creating new reporting requirements.

### Non-Domiciled CDL Holders by Employer or Industry

The states have been asked repeatedly about whether or not there is data or statistics that show the number of non-domiciled CDL/CLP holders by employer or industry sector. If FMCSA has or is able to develop this resource, it will assist the states (and others) in gauging economic impacts of the non-domicile program. Understanding which industries employ non-domiciled CDL holders would help states anticipate and prepare for impacts on state economies, coordinate with affected industries and develop targeted outreach and education.

### Record Retention Requirements

§ 383.73(m)(2)(iii) requires states to retain copies of all documents involved in the licensing process for "no less than 2 years from the date of issuing." Is this requirement 2 years from the date of each transaction (issuance, renewal, etc.), 2 years from the expiration of the credential, or 2 years from the driver's last transaction with the state? AAMVA requests FMCSA clarify what specific documents must be retained as part of the application. Has FMCSA considered whether states need to retain records for individuals who move to another state, have their credential downgraded, or voluntarily surrender their credential. Record retention requirements have significant

operational and cost implications. Physical document retention requires secure storage space. Electronic retention requires server capacity and backup systems. With approximately 6,000 non-domiciled CDLs expected to be issued annually under the new standards, and each credential potentially requiring renewal annually, states will accumulate substantial documentation. As with other new requirements, AAMVA requests that FMCSA clearly state that CDLPI grant funding may be used for ongoing upkeep and maintenance of CDL record retention requirements. AAMVA also recommends that FMCSA clarify that the 2-year retention requirement runs from the date of the last transaction involving the credential (issuance, renewal, amendment, etc.). 2 years after the last transaction, if the credential has expired and has not been renewed, states may destroy records in accordance with their regular records retention schedules.

## VIII. ADDITIONAL IMPLEMENTATION CONCERNS

### Nomenclature for Non-Domiciled CLPs and CDLs

The preamble to the IFR states: "This IFR supersedes any past guidance on this issue and clarifies that §383.73(f)(2)(ii) and 383.153(c) require that the word 'non-domiciled' appear across a CLP or CDL and must 'be conspicuously and unmistakably displayed' on the face of the CLP or CDL when a State issues a non-domiciled CLP or CDL. States may not use other nomenclature (such as 'limited term' or 'temporary') as a substitute for 'non-domiciled,' use restriction codes that require the examination of fine print on the back of the license as a substitute for 'non-domiciled' on the face of the credential, or use any other alternatives to conspicuously and unmistakably displaying 'non-domiciled' on the face of the CDL or CLP." (90 FR 46523).

Many states currently use terms such as "limited term" or have existing credential designs that do not include "non-domiciled" on the face of the credential. Some states had received informal guidance from FMCSA that alternative nomenclature was acceptable.

Both the IFR and FMCSA since IFR issuance have informed that only “non-domiciled” is acceptable. AAMVA requests that FMCSA clarify that all states will be required to modify their existing non-domiciled credential designs to include the word "non-domiciled" on the face of the credential before resuming issuance.

Credential design changes require:

- Modifications to credential production systems
- Procurement of new credential stock (if physical credential changes are required)
- Updates to DMV system screens and workflows
- Staff training on new credential designs
- Communication to law enforcement and other verifiers about new designs

For states using centralized credential production, these changes may take several months to implement.

### Definition of "Issuing" and Related Transactions

The IFR frequently uses the phrase "issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL)." However, the scope and application of this definition creates uncertainty. Does every action that results in producing a physical credential constitute "issuing" for purposes of the IFR requirements? What specific transactions are included in "otherwise duplicating"?

- Replacing a lost or stolen credential?
- Replacing a damaged credential?
- Updating a mailing address?
- Adding or removing non-CDL endorsements?
- Correcting typographical errors?

Overly broad interpretation of "issuing" could create excessive burden for simple administrative corrections and create situations where drivers lose their CDL privileges due to administrative actions rather than safety concerns.

AAMVA recommends that FMCSA clarify that "Issuing" for purposes of requiring full compliance with IFR requirements includes only:

- Initial issuance of a non-domiciled CLP or CDL
- Renewal of a non-domiciled CLP or CDL
- Upgrade from a non-domiciled CLP to CDL, or from one class to another
- Transfer of a non-domiciled CDL from another state

And that purely administrative transactions that do NOT require full compliance include transactions involving reprinting a credential with the same expiration date due to:

- Loss, theft, or damage
- Update to mailing address (not legal name or identity)
- Correction of typographical errors that do not affect identity or immigration status.
- System or security feature upgrades requiring credential replacement.

### Coordination with Other Federal Requirements

- Can medical certifications extend beyond the credential expiration date?
- How are non-domiciled CDL holders subject to Clearinghouse query requirements?
- Can non-domiciled CDL holders be registered in the Clearinghouse?
- How should states handle applicants who were previously registered in the Clearinghouse under a different credential?

AAMVA recommends that FMCSA develop comprehensive guidance addressing how the non-domiciled CDL IFR interacts with other federal CDL requirements to ensure states implement all requirements consistently and correctly.

### Cost-Benefit Analysis

The IFR's regulatory analysis estimates relatively modest costs to states and drivers:

- Total 10-year cost of $10.9 million (discounted at 3%) or $9.4 million (discounted at 7%)
- Annualized costs of $1.6 million (at 3%) to $1.3 million (at 7%)

AAMVA believes these cost estimates significantly underestimate the actual burden on states by not including:

First-Year Implementation Costs - The analysis estimates first-year costs for program realignment of $3.2 million ($70,000 per state × 46 states). However, this estimate:

- Does not account for states with multiple legacy systems requiring modifications.
- Does not include costs for states that must procure new credential stock with updated designs.
- Does not include costs for legal review and approval of policy changes.
- Does not include training costs beyond the initial 15 minutes per transaction estimate.
- Does not account for opportunity costs of pausing issuance.
- Does not include costs for cases requiring additional verification through SAVE.
- Does not include new document storage costs (physical or electronic)
- Does not include costs for responding to FMCSA requests for documentation during APRs.
- Does not include costs for quality assurance and audit activities.

### Conclusion

AAMVA appreciates the opportunity to comment on this Interim Final Rule and recognizes FMCSA's commitment to ensuring the integrity of the CDL program. However, successful implementation of the IFR requires substantial clarification so that the states understand expectations and can properly administer the federal CDL program. AAMVA looks forward to our continued partnership that achieves shared safety objectives while minimizing disruption to drivers, employers, and state operations.

Cian Cashin
Vice President, Government Affairs
ccashin@aamva.org
American Association of Motor Vehicle Administrators
4250 Fairfax Drive, Suite 1000
Arlington, VA 22203

An official website of the United States government Here's how you know

Portions of the Department of Transportation are currently in shutdown/furlough status due to a lapse in appropriations. Please continue to monitor this page for updates on DOT's operating status.

United States Department of Transportation

FMCSA
Federal Motor Carrier Safety Administration

Search



# The Large Truck Crash Causation Study - Analysis Brief

Federal Motor Carrier Safety Administration
Office of Research and Analysis
Publication No. FMCSA-RRA-07-017
July 2007

## The Large Truck Crash Causation Study

The Federal Motor Carrier Safety Administration (FMCSA) and the National Highway Traffic Safety Administration (NHTSA) conducted the Large Truck Crash Causation Study (LTCCS) to examine the reasons for serious crashes involving large trucks (trucks with a gross vehicle weight rating over 10,000 pounds). From the 120,000 large truck crashes that occurred between April 2001 and December 2003, a nationally representative sample was selected. Each crash in the LTCCS sample involved at least one large truck and resulted in a fatality or injury.

The total LTCCS sample of 963 crashes involved 1,123 large trucks and 959 motor vehicles that were not large trucks. The 963 crashes resulted in 249 fatalities and 1,654 injuries. Of the 1,123 large trucks in the sample, 77 percent were tractors pulling a single semi-trailer, and 5 percent were trucks carrying hazardous materials. Of the 963 crashes in the sample, 73 percent involved a large truck colliding with at least one other vehicle.

## Defining Causation

Motor vehicle crashes are complex events. Usually they involve two or more vehicles. Elements that influence the occurrence of a crash may take place hours, days, or months before the crash. They include driver training and experience, vehicle design and manufacture, highway condition and traffic signaling, and weather conditions. Other elements may take place immediately before a crash, such as a decision to turn in traffic, a tire blowout, or snow. Crash reconstruction experts rarely conclude that crashes are the result of a single factor.

Fatigue, drinking alcohol, and speeding are major factors in motor vehicle crashes overall. Although their presence does not always result in a crash, these three factors, as well as other driver, vehicle, and environmental factors, can increase the risk that a crash will occur. In the LTCCS, 'causation' is defined in terms of the factors that are most likely to increase the risk that large trucks will be involved in serious crashes.

## Data Collection

Data for the 963 crashes in the LTCCS sample were collected at 24 sites in 17 States. A crash researcher and a State truck inspector traveled to each crash site as soon as possible after the crash occurred. The researchers collected crash scene data through interviews with drivers, passengers, and witnesses, and the inspectors conducted thorough inspections of the trucks, the drivers' logbooks, and other documentation. After leaving the crash scene, the researchers collected additional data through interviews with motor carriers and, when the actual drivers could not be interviewed, surrogate drivers. The researchers also reviewed police crash reports, hospital records, and coroners' reports and revisited the crash scenes.

For each crash, data were collected on up to 1,000 elements, including the condition of the truck driver and the other drivers involved before the crash; the drivers' behavior during the crash; the condition of the trucks and other vehicles; roadway factors; and weather conditions. Data were coded by crash experts, difficult cases were reviewed by FMCSA and NHTSA staff, and completed cases were put into a publicly available electronic database on FMCSA's Web site.

## National Crash Estimates

According to NHTSA's estimate, there were approximately 120,000 fatal and injury crashes nationwide during the 33-month study period that involved at least one large truck; 141,000 large trucks were involved in those crashes. Each of the 963 LTCCS study cases was assigned a sampling weight, which allows for national estimates of total fatal and injury truck crashes during the study period.

All study results presented here are national estimates for the 141,000 large trucks that were estimated by NHTSA to have been involved in fatal and injury crashes during the study period. The estimates may differ from true values, because they are based on a probability sample of crashes and not a census of all crashes. The size of the difference may vary, depending on which LTCCS sample is the focus of a particular table or

## Coding Crash Causation Variables

Many variables were coded from the hundreds of data elements collected on each crash. Three key variables were coded for assessing crash risk:

**Critical Event:** The action or event that put the vehicle or vehicles on a course that made the collision unavoidable. The critical event is assigned to the vehicle that took the action that made the crash inevitable.

**Critical Reason:** The immediate reason for the critical event (i.e., the failure leading to the critical event). The critical reason is assigned to the vehicle coded with the critical event in the crash. It can be coded as a driver error, vehicle failure, or environmental condition (roadway or weather).
Associated Factors: The person, vehicle, and environmental conditions present at the time of the crash. No judgment is made as to whether any factor is related to the reason for a particular crash, just whether the factor was present. The list of the many factors that can be coded provides enough information to describe the circumstances of the crash.

## Critical Events

Three major types of critical events were assigned to large trucks:

- Running out of the travel lane, either into another lane or off the road (32 percent of the large trucks in the LTCCS sample were assigned this critical event)
- Vehicle loss of control due to traveling too fast for conditions, cargo shift, vehicle systems failure, poor road conditions, or other reasons (29 percent)
- Colliding with the rear end of another vehicle in the truck's travel lane (22 percent).

## Critical Reasons

The percentage of large trucks coded with a critical reason depends on the type of crash:

Of the large trucks involved in all LTCCS crashes (single-vehicle and multi-vehicle), 55 percent were assigned the critical reason in crashes.
Of the large trucks involved in two-vehicle LTCCS crashes between one truck and one passenger vehicle (a car, van, pickup truck, or sport utility vehicle), 44 percent were assigned the critical reason.

Table 1 shows the critical reasons assigned, by major categories.

| Critical Reasons | Number of Trucks | Percent of Total |
|---|---|---|
| Driver | **68,000** | **87%** |
| Non-Performance | 9,000 | 12% |
| Recognition | 22,000 | 28% |
| Decision | 30,000 | 38% |
| Performance | 7,000 | 9% |
| Vehicle | **8,000** | **10%** |
| Environment | **2,000** | **3%** |
| Total Number of Large Trucks Coded with Critical Reason | **78,000** | **100%** |
| Total Number of Large Trucks Not Coded with Critical Reason | 63,000 | — |
| Total Number of Large Trucks Involved in Crashes | **141,000** | — |

Notes: Results shown are national estimates for the 141,000 large trucks estimated to have been involved in fatal and injury crashes during the study period. The estimates may differ from true values, because they are based on a probability sample of crashes and not a census of all crashes. Estimates are rounded to the nearest 1,000 large trucks.

Driver critical reasons are coded in four categories:

- Non-Performance: The driver fell asleep, was disabled by a heart attack or seizure, or was physically impaired for another reason.
- Recognition: The driver was inattentive, was distracted by something inside or outside the vehicle, or failed to observe the situation adequately for some other reason.
- Decision: For example, the driver was driving too fast for conditions, misjudged the speed of other vehicles, or followed other vehicles too closely.
- Performance: For example, the driver panicked, overcompensated, or exercised poor directional control.

## Associated Factors

Hundreds of associated factors were collected for each vehicle in each crash. In descending order, the top 10 factors coded for large trucks and their drivers were:

- Brake problems
- Traffic flow interruption (congestion, previous crash)
- Prescription drug use
- Traveling too fast for conditions
- Unfamiliarity with roadway
- Roadway problems
- Required to stop before crash (traffic control device, crosswalk)
- Over-the-counter drug use
- Inadequate surveillance
- Fatigue.

## Relative Risk

Relative risk analysis of the data on associated factors, using the critical event and critical reason coding, allows the sorting out of factors into those merely present at the time of the crash and those that increase the risk of having a crash. The trucks involved in LTCCS crashes can be divided into two groups: those that were assigned the critical event and critical reason and those that were not. When the presence of associated factors coded to the two groups is compared, the relative risk of each factor can be assessed, as the following examples illustrate:

If 30 percent of the trucks assigned the critical reason for a crash were coded with the driver associated factor 'traveling too fast for conditions,' while only 5 percent of the trucks that were not assigned the critical reason were coded with the same associated factor, it can be concluded that speed is a factor that increases the risk of being involved in a crash.
If 30 percent of the trucks assigned the critical reason for a crash were coded with the driver associated factor 'prescription drug use,' while 30 percent of the trucks that were not assigned the critical reason were also coded with the same associated factor, it can be concluded that prescription drug use is not a factor that increases the risk of being involved in a crash.

Table 2 shows the 19 associated factors that were coded most frequently for large trucks in the LTCCS, where there was a statistically significant association between the factor and the assignment of the critical reason. The order of the factors in the table is based on the number and percentage of trucks assessed with each factor. The relative risk number is a ratio of the critical reason coding for trucks coded with the factor, compared with trucks not coded with the factor. Thus, Table 2 shows that a truck with brake problems was 170 percent more likely to be coded with the critical reason for a crash than a truck that was not coded with the brake problems associated factor.

## Table 2

Associated Factors Assigned in Large Truck Crashes and Their Relative Risk Importance

| Factors | Number of Trucks | Percent of Total | Relative Risk |
|---|---|---|---|
| Vehicle: Brake problems | 41,000 | 29% | 2.7 |
| Driver: Traveling too fast for conditions | 32,000 | 23% | 7.7 |
| Driver: Unfamiliar with roadway | 31,000 | 22% | 2.0 |

| Factors | Number of Trucks | Percent of Total | Relative Risk |
|---|---|---|---|
| Environment: Roadway problems | 29,000 | 20% | 1.5 |
| Driver: Over-the-counter drug use | 25,000 | 17% | 1.3 |
| Driver: Inadequate surveillance | 20,000 | 14% | 9.3 |
| Driver: Fatigue | 18,000 | 13% | 8.0 |
| Driver: Felt under work pressure from carrier | 16,000 | 10% | 4.7 |
| Driver: Made illegal maneuver | 13,000 | 9% | 26.4 |
| Driver: Inattention | 12,000 | 9% | 17.1 |
| Driver: External distraction | 11,000 | 8% | 5.1 |
| Vehicle: Tire problems | 8,000 | 6% | 2.5 |
| Driver: Following too close | 7,000 | 5% | 22.6 |
| Driver: Jackknife | 7,000 | 5% | 4.7 |
| Vehicle: Cargo shift | 6,000 | 4% | 56.3 |
| Driver: Illness | 4,000 | 3% | 34.0 |
| Driver: Internal distraction | 3,000 | 2% | 5.8 |
| Driver: Illegal drugs | 3,000 | 2% | 1.8 |
| Driver: Alcohol | 1,000 | 1% | 5.3 |

**Notes:** Results shown are national estimates for the 141,000 large trucks estimated to have been involved in fatal and injury crashes during the study period. The estimates may differ from true values, because they are based on a probability sample of crashes and not a census of all crashes. Estimates are rounded to the nearest 1,000 large trucks.

Of the top 10 associated factors coded for large trucks, 3 do not appear in Table 2. For those three associated factors—traffic flow interruption, prescription drug use, and required to stop before crash—there was no significant difference in the frequency at which trucks with and without the factors were coded with the critical reason for a crash.

It is important to note both the number of times an associated factor is coded and its relative risk ratio. For example, the brake problems associated factor is the most frequently coded (29 percent), but it has a lower relative risk ratio than those for 13 other factors. Pre-crash cargo shift, with the highest relative risk ratio (56.3), was reported for only 4 percent of the large trucks involved in LTCCS crashes.

Of the 19 factors listed in Table 2, 15 are driver factors. Those 15 driver factors can be divided into two major groups. One group—fatigue, illness, and drug use (both legal and illegal)—reflects the condition of the driver before the crash. The other group—excessive speed, inadequate surveillance, illegal maneuver, inattention, distraction (outside the truck and inside the truck), and following too close—reflects driving mistakes.

## Large Truck – Passenger Vehicle Crashes

One-half of the LTCCS crashes involved collisions between a large truck and a passenger vehicle (car, pickup truck, van, or sport utility vehicle). In those crashes, the same associated factors coded most often for the large trucks usually were also coded most often for the passenger vehicles. For both large trucks and passenger vehicles, there was a statistically significant link between the following 10 associated factors (listed in descending order according to how often they were coded for the large truck) and coding of the critical reason:

- Interruption of the traffic flow
- Unfamiliarity with roadway
- Inadequate surveillance
- Driving too fast for conditions
- Illegal maneuver
- Inattention
- Fatigue
- Illness
- False assumption of other road user's actions
- Distraction by object or person inside the vehicle.

There are some important differences in the coding of associated factors between the two vehicle types. For large trucks, but not passenger vehicles, following too closely (a traffic situation that required a stop before the crash) and distraction outside the vehicle were statistically related to assignment of the critical reason. In addition, vehicle factors that were not coded or examined for the passenger vehicles (brakes, tires, jackknife, and cargo shift) were statistically linked to assignment of the critical reason for large trucks.

For passenger vehicles, but not for trucks, alcohol and illegal drug use have a statistically significant association with coding of the critical reason. These factors, combined with fatigue (coded twice as often for passenger vehicles as for large trucks) and illness (coded five times more often for passenger vehicles), show that passenger vehicle drivers were subject to adverse physical conditions more often than truck drivers were before the crashes occurred.

## Study and Data on FMCSA's Web Site

More information on the Large Truck Crash Causation Study can be found here. The LTCCS home page includes links to a downloadable version of the public database; users manual; codebook; 20 sample data tables; Report to Congress; LTCCS Analysis Series reports on the study methodology and on the use of the study data for statistical analyses of crash risk; and an overview presentation (PowerPoint) of the study results. For answers to specific questions, call the FMCSA Analysis Division at (202) 366-4039.

Last updated: Wednesday, April 16, 2014

U.S. DEPARTMENT OF TRANSPORTATION

**Federal Motor Carrier Safety Administration**

1200 NEW JERSEY AVENUE, SE

WASHINGTON, DC 20590

1-800-832-5660

Subscribe To Email Updates

**About**

About FMCSA
Regulations
Safety
Analysis
FMCSA Portal

**News and Events**

FMCSA Newsroom
Press Releases
Emergency Declarations

**Resources**

Career Center
Resources for Carriers
Resources for Consumers
Forms
Contact Us
Trending Topics

**Policies, Rights, Legal**

About DOT
Budget and Performance
Civil Rights
FOIA
Information Quality
No FEAR Act
Office of Inspector General
Privacy Policy
Vulnerability Disclosure Policy
USA.gov
Web Policies and Notices
Web Standards

JUSTICE at WORK

Formerly known as Friends of Farmworkers

November 25, 2025

*Uploaded to: https://www.regulations.gov/docket/FMCSA-2025-0622/document*

Dockets Operations
U.S. Department of Transportation
1200 New Jersey Avenue SE, West Building, Ground Floor
Washington, DC 20590-0001

**Re: Docket No. FMCSA-2025-0622, Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)**

Dear Federal Motor Carrier Safety Administration:

Justice at Work (Friends of Farmworkers, Inc. d/b/a Justice at Work) submits these comments to oppose the proposed rule, Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), by the Federal Motor Carrier Safety Administration ("FMCSA"). We oppose the arbitrary recission of this source of economic opportunity that is critical to many workers' livelihoods.

Justice at Work (JaW) provides free legal services and education to low-wage workers across the state of Pennsylvania as they pursue economic and social justice. As the vast majority of our clients are both immigrants and victims of workplace exploitation (e.g. wage theft, discrimination, sexual harassment, and/or labor trafficking), we are familiar with the nexus of vulnerabilities experienced by people who are relatively new to this country *and* who perform critical low-wage work, such as truck driving. FMCSA's proposed rule will further burden this particularly vulnerable population, exacerbate their hardship, and make it more difficult for them to rebuild their lives in recovering from unstable and oppressive circumstances.

This rule threatens the livelihoods of the approximately 200,000 workers who rely on their CDLs to provide for themselves and their families.[1] One of these workers is our former client, "Eddie." Eddie has been living and working in Pennsylvania since he was 16. He experienced wage theft and mistreatment at multiple restaurant jobs. He reported his wage theft to the U.S. Department of Labor (DOL), which triggered a broad investigation into the employer's illegal pay practices. By ensuring that workplace laws are properly enforced, Eddie's bravery in coming forward benefits all Pennsylvania workers. The U.S. Department of Homeland Security granted Eddie Deferred Action based on his helpfulness in DOL's investigation, as well as lawful work authorization based on his demonstration of economic necessity.

Eddie is the sole financial provider for his wife, his 11-year-old stepdaughter, and his 4-year-old son. Both of his children are U.S. citizens. He is also financially responsible for his parents, who live in

[1] Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46519 (to be codified at 49 C.F.R. 383 and 384).

Honduras and suffer from diabetes and other health issues. Eddie paid at least $4,500 for the coursework and training required to apply for his CDL. Since getting his CDL, he has never even received a ticket, let alone been involved in an accident. Eddie's CDL allows him to adequately provide for his family, and the stability it provides has been essential given the rising costs of daily living. The arbitrary recission of his CDL, based on no wrongdoing on his part, would mean a devastating loss of income for his entire family.

Although 2,305 fatal crashes involving citizen and noncitizen commercial drivers of large trucks have occurred this year,[2] FMCSA focuses on just 5 of these instances to blame noncitizens as an imminent "threat to public safety and direct threat to national security."[3] Yet these isolated anecdotes do not explain any connection between the drivers' immigration status and the cause of the crashes, and FMCSA fails to provide any data demonstrating that the selected category of noncitizens is more likely to be involved in fatal crashes. In doing so, FMCSA ignores the rigorous safety requirements already embedded in CDLs, such as the mandatory skills and knowledge test or the disqualification of drivers with serious traffic violations.[4] Rather than consider the efficacy of these measures, FMCSA arbitrarily aims at certain immigration statuses without providing any rational, nondiscriminatory connection between these targeted groups and road safety.[5]

As a result of this rule, hundreds of thousands of workers and their families will lose their source of income. Furthermore, the logistics industry will lose a critical component of their workforce amidst a labor shortage. Foreign-born drivers account for nearly one in six U.S. truck drivers, many of whom own small trucking businesses themselves.[6] These workers are filling an essential gap created by the nationwide shortage of drivers, and their loss will reverberate across the industry and threaten the nation's supply chain.[7]

For these reasons, we oppose the proposed rule.

Sincerely,

Solveig Olson-Strom
*Independence Foundation Fellow*
Justice at Work

---

[2] *Crash Statistics,* FED. MOTOR CARRIER SAFETY ADMIN. (Sept. 26, 2025), https://ai.fmcsa.dot.gov/crashstatistics?tab=Summary&type=&report_id=1&crash_type_id=1&datasource_id=1&time_period_id=2&report_date=0&vehicle_type=2&state=NAT&domicile=ALL&measure_id=1&operation_id=null
[3] Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46514 (to be codified at 49 C.F.R. 383 and 384).
[4] 49 CFR 383.23; 49 CFR 383.51.
[5] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983) (finding that the agency must articulate a "rational connection between the facts found and the choice made").
[6] Arturo Castellanos-Canales, *Addressing the U.S. Truck Driver Shortage: The Role of Foreign-Born Drivers, Visa Policy, and Supply Chain Impacts*, NATIONAL IMMIGRATION FORUM (Oct. 17, 2025), https://forumtogether.org/article/addressing-the-u-s-truck-driver-shortage-the-role-of-foreign-born-drivers-visa-policy-and-supply-chain-impacts/.
[7] *See* Hugh Cameron, *America Doesn't Have Enough Truck Drivers*, NEWSWEEK (Jul. 10 2025), https://www.newsweek.com/america-trucking-shortage-logistics-supply-chain-2097123.

UNITED STEELWORKERS

UNITY AND STRENGTH FOR WORKERS

November 25, 2025

Filed Electronically: www.regulations.gov
Docket ID: FMCSA-2025-0622-0001

Federal Motor Carrier Safety Administration
U.S. Department of Transportation
Washington, D.C. 20590

**RE: United Steelworkers comments on Commercial Driver's License Standards: Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (FMCSA-2025-0622).**

Dear Administrator Barrs:

On behalf of the 850,000 members of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), I write in response to FMCSA's request for comments regarding proposed amendments to federal regulations governing State Driver's Licensing Agencies (SDLAs) and the issuance of commercial driving credentials to foreign-domiciled individuals. For the reasons outlined below, USW strongly urges FMCSA not to move forward with these amendments that would prohibit issuing such credentials.

USW represents a diverse membership across multiple industries, particularly mining, transportation, and manufacturing. Many job classifications in these industries require a Commercial Driver's License (CDL). Our members who work in these job classifications have worked diligently for many years, continually improving their skills through ongoing training that ensures safe and efficient driving practices. Implementing this rule would prevent workers who hold valid work authorization, including those with Temporary Protected Status (TPS), asylum seekers, and Deferred Action for Childhood Arrivals (DACA) recipients, from continuing to do the job for which they trained. This rule would also lead to significant driver shortages among the companies we represent, resulting in staffing challenges and increased overtime burdens for our members.

For example, we represent members in the Northeast who operate school buses that serve their communities, ensuring students and families have a safe, reliable, and efficient means of transportation. This service is vital for maintaining consistent access to education and supporting the daily routines of countless households. The local union in this region

includes drivers with an average tenure of 20 years, and some have devoted more than 40 years to this work — reflecting an exceptional level of experience and commitment to public safety. Revoking or failing to renew their commercial driver's licenses would not only jeopardize these workers' livelihoods, but also harm the communities that depend on them. Such an action would severely disrupt school transportation, creating challenges that could only be resolved through costly and time-consuming efforts to rebuild adequate staffing levels.

Many of these members immigrated from Haiti and have valid work authorization under the Temporary Protected Status program. One member shared that he was in law enforcement in Haiti, working to prevent child trafficking over the border. He moved to the United States due to the unstable situation in his home country, and first worked as a school bus monitor before becoming a school bus driver. He takes great pride in his work and sees a connection between the work he was doing in Haiti with the work he does in the United States — protecting children. He feels like he is part of a team with parents, teachers, and other school bus drivers. He expressed that if this rule takes effect, it will take him away from his team.

Another member shared that he worked as part of a humanitarian organization in Haiti. He left Haiti due to the unstable situation, and obtained work authorization through the Temporary Protected Status program. He enjoys his job as a school bus driver, and feels that he is contributing to society. The possibility of this new rule taking effect is also causing him and his coworkers great stress as they will no longer be able to do their job.

Both members shared that they have followed every rule — obtaining work authorization legally, paying taxes, and avoiding criminal activity — yet they fear that if this rule goes into effect, they will lose the fair chance to provide for their families. As they and their coworkers await a decision, they said that a sense of sadness grows. They wonder about their future and the futures of the children they serve every day.

In addition to school bus drivers, USW represents many workers in the mining and manufacturing industries. Both industries rely heavily on commercial drivers to transport raw materials, finished products, and essential equipment between facilities and markets. Restricting or revoking their ability to obtain or renew commercial driver's licenses would disrupt critical supply chains, delay production schedules, and increase costs for companies already facing workforce challenges. These industries operate on tight timelines and depend on experienced drivers to maintain efficiency and safety. Removing any portion of this workforce would create severe shortages, forcing employers to resort to costly overtime or reduce output, ultimately harming both businesses and the broader economy.

In summary, FMCSA's proposed rule would prevent most legally authorized workers from obtaining or renewing CDLs; disrupt critical industries such as transportation, mining, and manufacturing; and harm communities that rely on experienced drivers for essential services, like school transportation. It would lead to workforce shortages, increased operational costs, and significant challenges for employers and families alike.

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union
Legislative and Policy Department, 1155 Connecticut Ave, N.W. 5th Floor, Washington, D.C. 20036
202-778-4384 • 202-293-5308 (Fax) • www.usw.org

For the above reasons, the United Steelworkers strongly urges FMCSA **not to move forward with this rule** and instead maintain current regulations that allow qualified, authorized individuals to continue contributing safely and effectively to our economy and communities. Thank you for your consideration.

Sincerely,

Roy Houseman, Jr.
Legislative Director
Assistant to the International President

**November 2025**

**Access to Commercial Driver's Licenses Public Comment**

**To: Federal Motor Carrier Safety Administration (FMCSA)**

**Re: Interim Final Rule (IFR) Docket Number: FMCSA-2025-0622**

My name is Sophie Shea, and I am writing as a representative of the Colorado Fiscal Institute to urge the removal of interim final rule FMCSA-2025-0622, which excludes immigrants with certain types of visas, including Deferred Action for Childhood Arrivals (DACA) recipients, Temporary Protected Status (TPS) holders, refugees, and asylum applicants, from obtaining Commercial Driver's Licenses (CDLs).

We estimate that there are about 98,802 immigrants in Colorado aged 21 to 64 who have lawful status but are not citizens. Immigrants who are lawfully present but not citizens include DACA recipients, TPS holders, refugees, and asylum applicants. In Colorado, we estimate that about 1,359 lawfully present noncitizen immigrants are in truck or bus driving industries that require a CDL, and this interim final rule threatens their livelihoods and the stability of their households, communities, and local economies.

Truck and bus drivers earn an average median income of $54,505. If these immigrants with lawful status lost their job due to losing access to their CDLs, we estimate an **annual loss of over $7.3 million in state and local tax dollars and more than $74 million in lost income earnings.**

For many bus and truck drivers, CDLs are tied to these Coloradans' ability to work. The trucking industry is composed mainly of small businesses, with 92% of carriers operating ten or fewer trucks. Those with lawful status who work as independent contractors and have bought trucks on loan will be mired in debt. Further restricting access to CDLs from immigrants with lawful status harms children and families who rely on trucking or transportation related income, as well as local communities and economies through lost earnings and lost tax dollars.

There are rippling economic costs associated with excluding immigrants with a variety of lawful statuses from obtaining CDLs. Blocking qualified immigrant workers from CDLs reduces workforce supply, increases freight costs, and hurts Colorado farmers, manufacturers, and small businesses that depend on affordable, reliable transportation.

According to the American Trucking Associations' trends report, trucks moved 11.27 billion tons of freight in 2024, making the industry an indispensable part of the economy. Yet the sector faces a persistent and growing shortage of truck drivers. In 2025, industry estimates placed the gap at between 60,000 and 80,000 drivers. This shortage has significant implications for supply chains and could lead to inflationary pressure. Foreign-born drivers have been instrumental in addressing these labor gaps, accounting for nearly one in six U.S. truck drivers. Research also shows that access to driver's licenses is associated with increased earnings and boosts local economies. This matters in a trucking sector facing persistent driver shortages and fragile supply chains.

There are both economic and safety benefits of licensing drivers with a variety of immigration statuses. Research supports that having fewer uninsured drivers on the road results in major savings in insurance costs. When more people become licensed, registered, and insured, all Coloradans save money. The Colorado Fiscal Institute estimates that Colorado's expanded access to driver's licenses for all Coloradans regardless of immigration status saves $127 million in insurance premiums every year because more people are insured. Insurance companies could also see increased revenue of about $360 million annually. In addition, undocumented drivers are eligible to register their vehicles, and state and local governments are able to collect revenue from almost 170,000 more vehicles. Commercial driver's licenses are no different: trained, tested, and insured CDL holders improve road safety and economic reliability, regardless of immigration status.

For additional context and data on the economic contributions of immigrants across Colorado, CFI offers the *Immigrants Power Colorado's Economy report series* which

includes statewide analysis and 12 county-level factsheets detailing immigrant representation across industries, gross domestic product (GDP) contributions by sector, tax revenue, and spending partner. For example, Transportation and Warehousing is a more than $25 billion industry across Colorado, and 6.7% of that industry's workforce is made up of immigrant workers who are responsible for more than $1.6 billion in GDP in that sector alone.

AFSCME
We Make America Happen

Lee Saunders
President
Elissa McBride
Secretary-Treasurer
Vice Presidents
Michael Avant Jr.
Oakland, CA
Jody Barr
New Britain, CT
Mark Bernard
Boston, MA
Ron Briggs
Latham, NY
Lester Crockett
New York, NY
Connie Derr
Albuquerque, NM
Shannon S. Douvier
St. Cloud, MN
Craig A. Ford
Newark, NJ
Henry A. Garrido
New York, NY
R. Sean Grayson
Worthington, OH
Veronica L. Gunn
Vernon, CA
Johanna Puno Hester
San Diego, CA
Kelly Indish
Flint, MI
Corey Hope Leaffer
Portland, OR
Roberta Lynch
Chicago, IL
Christopher Mabe
Westerville, OH
Jessica Martinez Santos
San Juan, PR
Sue McCormick
Duncansville, PA
Douglas Moore Jr.
San Diego, CA
Charmaine S. Morales
San Dimas, CA
Patrick Moran
Baltimore, MD
Michael Newman
Chicago, IL
Jeff Ormsby
Lexington, TX
Debbie Parks
Hamilton, NJ
Lloyd Permaul
Baton Rouge, LA
Randy Perreira
Honolulu, HI
Michael Rivera
Rochester, NY
Joseph P. Rugola
Columbus, OH
Paul Spink
Milwaukee, WI
Mary E. Sullivan
Albany, NY
Tom Tosti
Plymouth Meeting, PA
Anthony Wells
New York, NY
Mike Yestramski
Olympia, WA

November 25, 2025

Philip Thomas
Deputy Associate Administrator, Office of Safety
Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE
Washington, DC 20590

*Submitted via regulations.gov.*

**RE: Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), RIN 2126-AC98**

Dear Deputy Associate Administrator Thomas:

On behalf of the American Federation of State, County and Municipal Employees (AFSCME), I am pleased to submit these comments in response to the interim final rule (IFR) "Restoring Integrity to Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)." AFSCME urges the Federal Motor Carrier Safety Administration (FMCSA or "the agency") to withdraw this IFR and consider these comments in any future rulemaking.

AFSCME's 1.4 million members serve in hundreds of occupations across the nation — from nurses to corrections officers, child care providers to sanitation workers — providing the vital services that make America happen. AFSCME advocates for fairness in the workplace, excellence in public services and freedom and opportunity for all working families. Our members include local, state and federal government workers as well as private-sector workers who provide public services. A substantial number of AFSCME members are required to maintain CDLs to perform their job duties as school and city bus drivers, road and highway department employees and sanitation workers who keep our streets and highways clean and safe and many other public servants who help deliver important services that our communities rely on.

This IFR imposes sweeping new immigration-based restrictions that are arbitrary and capricious and could result in the immediate disenfranchisement of AFSCME members who are lawfully present and authorized to work in the United States and who have taken the steps to obtain a non-domiciled CDL to perform their essential job functions. Where AFSCME members need their non-domiciled CDL to simply do their jobs, this IFR directly threatens their livelihoods and their ability to provide for their families. Furthermore, the IFR does not adequately consider the costs of implementation, particularly costs associated with any disruption in state and local government services.

**FMCSA Risks Operational Disruptions in Certain Public Services**

The IFR could result in immediate operational disruptions for state and local government employers. Vital public services such as roadway maintenance, public works functions, transit operations and even school transportation require workers to maintain CDLs for certain occupations. The agency estimates that of the approximately 220,000 current CDL and



American Federation of State, County and Municipal Employees, AFL-CIO
TEL (202) 429-1000 FAX (202) 429-1293 TDD (202) 659-0446 WEB www.afscme.org 1625 L Street, NW, Washington, DC 20036-5687
#525-24

Commercial Learner's Permit holders impacted by this rule, 194,000 (i.e., approximately 5 percent of all active interstate CDL holders in 2024) will "exit the freight market" as the rule goes into effect.[1] The agency asserts that "the market will respond to this change in capacity as it has in the past, with rates adjusting and drivers and carriers entering the market where needed" and "motor carriers will have time to adjust their hiring based on the requirements set forth in this IFR."[2] FMCSA's analysis, however, falls far short of what is necessary to adequately assess the IFR's impact.

FMCSA does not track non-domiciled CDLs by industry or occupation and does not address potential impacts to sectors outside the freight market. For example, the agency offers no evidence that the market has responded or will respond to meet the needs of K-12 school districts attempting to address school bus driver shortages. In fact, school districts around the country continue to struggle with filling school bus driver vacancies, all of which require CDLs. This fact is confirmed both by AFSCME's experience, as a union representing thousands of school bus drivers, and by statistics tracking these shortages. School bus driver employment has not recovered to pre-pandemic levels and remains 9.5 percent (or approximately 21,000 jobs) below employment levels seen in 2019.[3] Transit agencies in recent years have also cited operator shortages, due in part to difficulty hiring and retaining workers with CDLs, as a key challenge to meeting operational goals.[4] A survey of public transit agencies conducted for the American Public Transportation Association between August and October 2024 found that "[m]ost agencies (67.5 percent) said it is either very difficult or difficult to hire bus operators, and only 3.5 percent reported that hiring operators is easy" and that "CDL requirements are one of the most challenging aspects of hiring transit bus operators."[5] A recent freight industry news outlet reports that the United States Postal Service (USPS) attempted to implement a policy that banned the use of contractors with non-domiciled CDLs in early October. After widespread and immediate disruptions to operations, USPS reversed the policy within days, allegedly due to "service and cost impacts too severe for an abrupt change."[6] While the IFR discusses compliance costs to states and drivers, there is no evaluation of the cost of disruptions to employer operations, particularly state and local governments, and the resulting disruption to critical public services. Given the recent USPS experience, it is clear that there are additional costs to implementation beyond those considered by FMCSA.

Moreover, the IFR failed to review impacts on employer operations, workforce displacement, service disruptions and specifically impacts on state and local government capacity to deliver services considering the difficulty those employers have reported in recruiting and retaining CDL holders. FMCSA did not include these factors within an aggregate burdens cost-benefit analysis.

---

[1] Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 90 Fed. Reg. 46509, 46519-46520 (Sept. 29, 2025).
[2] *Ibid* at 46530.
[3] "The school bus driver shortage has improved slightly but continues to stress K-12 public education." Sebastian Martinez Hickey, Economic Policy Institute, www.epi.org. Published November 3, 2025. Retrieved November 10, 2025.
[4] "Bus Driver Recruitment and Retention in Challenging Times," Transit Workforce Center. Published April 2022. Retrieved November 12, 2025.
[5] Christine Brittle and Julie Van Keuren, American Public Transportation Association, Impact of CDL Under-the-Hood Testing Requirement on Public Transit Agencies' Ability to Hire Bus Operators (Nov. 1, 2024), pp. 3-4, available at https://www.apta.com/wp-content/uploads/APTA-Impact-of-CDL-Under-the-Hood-Testing-Requirement-Nov-2024.pdf.
[6] "USPS tried to ban immigrant truck drivers – it went horribly." Craig Fuller, CEO. www.freightwaves.com. Published October 27, 2025. Retrieved November 10, 2025.

**IFR Fails to Establish Connection Between Safety and Immigration Status**

FMCSA collects and discloses detailed information on crashes involving large trucks and buses on a regular basis.[7] The report tracks crash information concerning property damage, types of vehicles involved, injuries to persons and drivers, road intersections at the crash site, reported weather conditions and other factors. FMCSA does not report on the immigration status of individual drivers involved in a crash or distinguish between crashes involving domiciled or non-domiciled CDL holders.

FMCSA has not demonstrated that non-domiciled CDL drivers are any more prone to accidents, let alone fatal roadway collisions, than other CDL holders. FMCSA identifies five fatal crashes in 2025 involving non-domiciled CDL holders and claims that each driver responsible for the collision would not have been able to obtain or renew their license under the revised regulations. FMCSA provides zero information and conducts no statistical analysis within the IFR on fatal crash rates for non-domiciled CDL holders on a state or national basis during the same period. It also provides no evidence demonstrating an elevated crash risk for employment authorized immigrants holding non-domiciled CDLs.

In fact, FMCSA admits in the rule that there is no evidence that lawfully present immigrants with work authorization pose any greater threat to the public than legal permanent residents (LPRs) and U.S. citizens. While FMCSA highlights five accidents involving immigrant workers, its own crash statistics show there was an average of over 5,000 fatal crashes per year involving large trucks and buses in calendar years 2021-2024.[8] Five accidents involving non-domiciled CDLs therefore establishes no correlation.

FMCSA's assertion that current state regulations do not allow for vetting of workers who have driving records in foreign jurisdictions is also plainly pretextual in light of the rule's exemption for workers in short-term, nonimmigrant guestworker visa programs, like H-2A, H-2B and E-2 treaty investors, IFR at 46516. FMCSA says employers of those exempted visa holders would seek to employ only safe drivers and would, therefore, vet them well, but this rationale does not explain why the same would not be true for public sector employers for whom the public interest, not profit, is their core mission. Government employers are held politically accountable in a way that private employers simply are not, and, thus, public employers are further incentivized to hire safe drivers. The exemption of nonimmigrant guest worker visa categories is especially irrational in comparison to the IFR's ban on Deferred Action for Childhood Arrivals (DACA) recipients holding CDLs, because individuals with DACA status are required to have been in the United States since 2007, far longer than any H-2A, H-2B or E-2 treaty investor visa holders, and, so, the driver records of those with DACA are likely to be the most easily accessible. This disconnect in who is included and excluded from the prohibition thus undermines FMCSA's assertions that a lack of access to driving records in foreign jurisdictions is a motivation for this rule, as the rule explicitly allows for those in the United States for less time (those on H-2A, H-2B, E-2 and some LPRs and U.S. citizens) to continue to obtain and renew CDLs over those with more time in the United States (those with DACA or other lawful work authorization).

Finally, there is also no evidence that immigrants with lawful work authorization pose any more threat to national security than U.S. citizens or LPRs. In fact, empirical studies show that immigrants are

---

[7] Federal Motor Carrier Safety Administration, "Crash Statistics," available at https://ai.fmcsa.dot.gov/CrashStatistics?tab=Summary&type=&report_id=1&crash_type_id=4&datasource_id=1&time_period_id=2&report_date=0&vehicle_type=1&state=NAT&domicile=ALL&measure_id=1&operation_id=null (last visited Nov. 24, 2025).
[8] The number of fatal crashes involving large trucks and buses averaged 5,062 per year in that four-year period. Ibid. (average calculated by author).

less likely to engage in crime and terrorism.[9] Even still, FMCSA — despite lacking any empirical evidence for its claim that the rule is connected to national security — cites to just one example of terrorism by a LPR with a CDL, using a vehicle that did not require a CDL to operate in the first place. *See* IFR, fn. 20. FMCSA concedes that the IFR would do nothing to prevent this situation from happening again. *Id.* In particular, the IFR does nothing to improve vetting of CDL applicants — instead it excludes an entire category of lawfully present and work authorized people without any evidence that the people in that category are more likely to pose a threat to national security. That inconsistency between the IFR's stated rationale and empirical evidence on national security only further calls the IFR into question.

**Conclusion**

FMCSA has not demonstrated any evidence-based connection between an individual's immigration status and the ability to safely operate a commercial motor vehicle, even where the interim final rule impacts individuals who are lawfully present and authorized to work in the U.S. The agency has also failed to consider the demonstrable risks to operations — particularly in state and local government services that provide critical services to communities across the country — that could accompany this rulemaking. For these reasons, AFSCME urges FMCSA to withdraw this rule.

Sincerely,

/s/ Dalia R. Thornton

Dalia R. Thornton
Director
Department of Research and Collective Bargaining Services

---

[9] *See, e.g.*, Ariel G. Ruiz Soto, Explainer: Immigrants and Crime in the United States, available at https://www.migrationpolicy.org/content/immigrants-and-crime; Robert Adelman, Lesley Williams Reid, Gail Markle, Saskia Weiss & Charles Jaret (2017) Urban crime rates and the changing face of immigration: Evidence across four decades, Journal of Ethnicity in Criminal Justice, 15:1, 52-77, DOI: 10.1080/15377938.2016.1261057; available at http://dx.doi.org/10.1080/15377938.2016.1261057

Asian American Legal Defense and Education Fund

99 Hudson Street, 12 FL
New York, NY 10013-2815
Tel: (212) 966-5932
Email: info@aaldef.org

November 25, 2025

Docket Operations
Federal Motor Carrier Safety Administration
U.S. Department of Transportation
1200 New Jersey Avenue SE
West Building, Ground Floor
Washington, DC 20590-0001

RE: Comments on Docket No. FMCSA-2025-0622: Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)

To Docket Operations:

The Asian American Legal Defense and Education Fund (AALDEF) was founded in 1974 to protect and promote the civil rights of Asian Americans. AALDEF serves diverse Asian communities around the country in solidarity with each other, communities of color, and marginalized groups. Community lawyering is at the heart of AALDEF's work, which combines litigation, advocacy, education, and organizing to secure human rights for all people.

The Asian American Legal Defense and Education Fund submits this comment to oppose the Federal Motor Carrier Safety Administration's interim final rule which bars broad categories of immigrants who are lawfully present in the U.S. and authorized to work from getting and maintaining their commercial driver's licenses (CDLs) and commercial learner's permits. The rule threatens the livelihoods of nearly 200,000 workers who currently fill a critical gap in the transportation industry and rely on their CDLs to provide for themselves and their families.

**Asian Immigrants Fill Critical Workforce Gaps**

Asian Americans are the country's fastest growing minority group. According to Pew Research Center, based on U.S. Census Bureau estimates, in 2023, the number of Asian Americans reached a new high of nearly 25 million, or 7% of the U.S. population. They also constitute the largest segment of new immigrants to the United States. Between 2000 and 2019, the Asian population in the United States grew by 81%, and the population is projected to pass 35 million by 2060. Native Hawaiians and Pacific Islanders were the third-fastest growing group, growing by 61% from 2000 to 2019. Their population is projected to pass 2 million by 2030.

Asian immigrants fill many critical workforce shortages in the U.S. including in the transportation industry as truck drivers. In the wake of the pandemic, the trucking industry experienced a massive labor shortage which is continuing today and is forecasted to grow by 2030. As in many sectors of the U.S. economy, immigrants are filling this gap, with foreign-born workers more likely than American born workers to be employed in the production, transportation, and material moving industries. Many bring critical skills and experience acquired in their countries of origin. Foreign-born workers account for nearly one in six U.S. truck drivers, many of whom own small trucking businesses themselves.

These truck drivers are lawfully present in the U.S. and authorized to work. They include DACA recipients, asylum seekers, refugees, and many others. For example, the Sikh community—like many other immigrant communities—has worked in the trucking industry for decades, and there are approximately 150,000 Sikh and Punjabi truck drivers contributing to the profession today. Many Sikh immigrants in the United States arrived as asylum seekers or remain in the process of seeking asylum. Indeed, national data shows that while asylum seekers comprise only 1.3% of the United States' worker population, asylum seekers make up 13% of workers in the transportation industry. Once lauded for their contributions to the industry, Asian and other immigrant truck drivers now face exclusion and the loss of their livelihoods solely based on their immigration status and regardless of their driving histories, skills, knowledge, or level of English proficiency.

**The Interim Final Rule is Arbitrary and Capricious**

Under the Administrative Procedure Act, an agency's actions qualify as "arbitrary" or "capricious" if they are not "the product of reasoned decision-making."[1] Additionally, a decision is typically deemed arbitrary and capricious if the agency considered an impermissible factor such as race or nationality or relied on information Congress did not intend it to consider.[2] The interim final rule is arbitrary and capricious on both fronts.

First, the Federal Motor Carrier Safety Administration (FMCSA) of the Department of Transportation (DOT) concedes in the rule itself that that there is no data indicating that excluding certain immigrant drivers will have any impact on public safety outcomes. Although 2,305 fatal crashes have occurred this year involving citizen and noncitizen commercial drivers of large trucks, and there have been an average 5,000 fatal crashes involving large trucks every year for the past four years, FMCSA focuses on just five instances in 2025 to blame noncitizens as an imminent "threat to public safety and direct threat to national security." Yet these isolated anecdotes do not explain any connection between the drivers' immigration status and the cause of the crashes, and FMCSA fails to provide any data or analysis demonstrating that its selected categories of

---

[1] *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012).

[2] *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Robbins v. Reagan*, 780 F.2d 37, 50 n.20 (D.C. Cir. 1985) ("An agency decision prompted by personal animus would run afoul of the requirement that agencies act in a reasoned, nonarbitrary manner.").

noncitizens are more likely to be involved in fatal crashes.

Indeed, FMCSA provides no rationale for distinguishing between different categories of immigration statuses as it permits H-2A, H-2B, or E-2 visa holders to obtain and maintain CDLs while excluding all other noncitizens with employment authorization in the U.S. FMCSA offers only that H-2A and H-2B workers have proof that they have entered the U.S. lawfully and proof of employment requiring a CDL. It bears noting that given the critical shortage of truck drivers in the U.S., many states offer apprenticeships and other incentives to train workers, especially immigrants, to obtain their CDLs, demonstrating an urgent need for workers with CDLs, whether or not they have an employer-sponsor like those with H-2A and H-2B visas. And of course, only those with employment authorization issued by USCIS can obtain those jobs. Moreover, FMCSA fails to weigh or acknowledge contradictory evidence suggesting that immigrants are safer drivers. For example, a study in Canada found that recent immigrant drivers were hospitalized 45% less than long-term residents because of a serious motor vehicle crash. In the United States, research on undocumented immigrants found that granting driving privileges to these drivers reduced the share of fatal hit-and-run crashes rather than increased them. Refugees, asylum seekers, DACA recipients, and other immigrants excluded by the interim final rule are not undocumented, but the study suggests that policy decisions premised on the assumption of elevated risk among immigrant drivers, or certain categories of immigrant drivers, lack a strong empirical foundation.

The absence of an empirical rationale for FMCSA's rule, its rhetoric describing the need for the rule, and the context surrounding the rule's promulgation demonstrate that FMCSA's decision to exclude certain categories of immigrants was impermissibly motivated by anti-immigrant bias. The day President Trump took office, he issued a series of executive orders starting broadly with orders such as EO 14159, "Protecting the American People Against Invasion," which alleges noncitizens in the U.S. unlawfully are "committing vile and heinous acts against innocent Americans,"[3] and going on to call for the exclusion of immigrants from wide-ranging aspects of American life.[4] By April, President Trump had issued EO 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers," directing the Secretary of Transportation to review non-domiciled CDLs.[5] Shortly after, the Department of Homeland Security (DHS) repeatedly highlighted a single accident involving a Sikh truck driver in social media posts, stating it would "work with [DOT] to root out and prevent illegal aliens from obtaining these licenses from sanctuary jurisdictions that put American drivers and passengers in danger." Those posts included pictures of the driver with text added across his chest by DHS: "Keep Criminal Illegal Aliens Out." By focusing on images of a Sikh driver

[3] 90 Fed. Reg. 8443 (Jan. 29, 2025).
[4] *See, e.g.*, "Protecting the Meaning and Value of American Citizenship," Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025) (purporting to strip birthright citizenship); "Preserving and Protecting the Integrity of Elections," Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) (aiming to overhaul and take control of states' election systems to make it harder for all Americans and especially naturalized citizens to vote); "Designating English as the Official Language of the United States," Exec. Order No. , 90 Fed. Reg. 11363 (Mar. 1, 2025) (purporting to designate English as the official language of American civic engagement).
[5] 90 Fed. Reg. 18759 (Apr. 28, 2025).

wearing a dastar, DHS was playing on Islamophobia which has often been misdirected at Sikhs in the U.S. since 9/11. Just seven weeks later, FMCSA promulgated the rule, without notice and comment and without any empirical justification other than the aforementioned five anecdotes, to exclude certain immigrants from obtaining or renewing their CDLs. When an agency relies on impermissible factors like race or nationality, courts have struck the rule down for being arbitrary or capricious.[6]

Finally, by focusing on just five incidents this year without any broader context of the safe routes completed by hundreds of thousands of foreign-born truck drivers each year, FMCSA ignores the rigorous safety requirements already embedded in CDLs, such as the mandatory skills and knowledge test or the disqualification of drivers with serious traffic violations.[7] Rather than consider the efficacy of these measures to improve its stated goal of public safety, FMCSA arbitrarily aims at certain immigration statuses without providing any rational, nondiscriminatory connection between these targeted groups and road safety.[8] Ultimately, with the projected loss of nearly 200,000 immigrant truck drivers whose CDLs will not be reissued as a result of this rule, public safety will be harmed as the driver shortage will lead to more work, more fatigue, and tighter deadlines for remaining truck drivers.

**Conclusion**

FMCSA must recognize that non-domiciled CDL drivers are part of a long tradition of immigrants contributing to the United States' transportation industry, from the 12,000 Chinese workers who built the western section of the transcontinental railroad in the 1860s, to the thousands of immigrants of various nationalities who worked in the Detroit auto industry in the early 1900s and built some of the first mass-produced cars in the United States, to the Yemeni sailors and ship workers employed in the Great Lakes shipping industry since the 1950s. As demonstrated throughout U.S. history, individuals of all nationalities are capable of filling some of the most physically and mentally demanding roles in our transportation and freight sectors, and our nation's capacity is what it is today in large part thanks to their aptitude.

The hardship this rule will cause truck drivers, their families, and their communities cannot be overstated. This rule threatens the livelihoods of nearly 200,000 workers across the country who are currently filling a critical labor shortage in the transportation industry. A recent example illustrates the magnitude of harm that can result when essential transportation workers lose their ability to work. In October 2025, AALDEF analyzed data collected by the New York Taxi Workers Alliance (NYTWA) from surveys of Uber and Lyft drivers who had their accounts deactivated. Sixty-nine percent of the respondents were Asian drivers as they, like Asian truck drivers, fill critical roles in the transportation industry. Although the deactivated drivers were largely long-

---

[6] *See, e.g.*, *CASA, Inc. v. Noem*, 2025 WL 1907378, at *22 (D. MD. July 10, 2025) (holding that the goal to reduce the number of non-white immigrants in the U.S. would render an agency decision arbitrary and capricious).
[7] *See* 49 C.F.R. § 383.23; 49 C.F.R. § 383.51.
[8] *See State Farm Mut.,* 463 U.S. at 43 (finding that the agency must articulate a "rational connection between the facts found and the choice made").

time workers with excellent satisfactory ratings, the majority were deactivated by Uber and Lyft without any prior notice or recourse. The sudden loss of income caused devastating financial hardship as well as severe emotional and social harm. Most drivers reported falling behind on rent, utility bills, and car payments with many losing their family's primary source of income. And many described the loss of their jobs as life-altering, citing depression, family breakdowns, and loss of dignity. By stripping immigrant truck drivers of their CDLs, regardless of their driving record or skill level, this rule will cause similar hardship.

For these reasons, we oppose the proposed rule.

Sincerely,

Oriana Farnham
Staff Attorney, Immigrant Rights Program

# Department of Secretary of State
# Bureau of Motor Vehicles

Shenna Bellows
*Secretary of State*

Catherine Curtis
*Deputy Secretary of State, BMV*

November 26, 2025

**Uploaded to: https://www.regulations.gov/docket/FMCSA-2025-0622/document**

Dockets Operations
U.S. Department of Transportation
1200 New Jersey Avenue SE, West Building, Ground Floor
Washington, DC 20590-0001

**Comments on Docket No. FMCSA-2025-0622: Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)**

Dear Dockets Operations:

The Department of Secretary of State and the Bureau of Motor Vehicles (BMV) of the State of Maine submit these comments voicing our strong opposition to the above-referenced Interim Final Rule "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)", by the Federal Motor Carrier Safety Administration ("FMCSA")[1].

Maine's Bureau of Motor Vehicles (BMV) serves the residents of the State and all users of Maine highways by qualifying and licensing drivers and by issuing state credentials and maintaining records of driver history, vehicle ownership, and vehicle registration. Under the auspices of the Secretary of State, the BMV provides various motor vehicle registration, license, and title services to the residents of Maine throughout the State. The BMV ensures that applicants applying for operator's licenses meet all federal or state eligibility criteria and have the ability, knowledge, and necessary skills for safe vehicle operation; investigates and licenses motor vehicle and trailer dealers; conducts hearings on violations of motor vehicle laws to determine if the individual's privilege to operate or register a vehicle should be suspended, withheld, or revoked, and determines when reinstatement is permissible. In a rural state such as Maine, where public transportation is scant, distances are long, and the ability to drive legally is typically essential both for employers to have access to a workforce and also for individuals to be able to support themselves and attend to the basic needs of their families, the BMV has an interest in any federal rules impacting Maine residents' ability to drive legally, such as this IFR.

---

1 Hereinafter referred to in this comment as "the IFR."

We oppose this rule both because of the process by which it was issued, and for its substance. The IFR harms employers who rely on immigrant non-domiciled CDL holder employees, and those immigrant non-domiciled CDL holders[2] for whom this emergency rule is an existential threat to their livelihoods, to their ability to support themselves and their families, and contribute economically in their Maine communities.

## 1. The procedure used in issuing the IFR was improper

A. The FMCSA bypassed legally required consultation with the States.
Title 49 USCA §31308 states, in its very first sentence, that only "(a)fter consultation with the States", shall the Secretary of Transportation issue regulations guiding eligibility for and issuance of CDLs. Indeed, the preamble to the IFR itself acknowledges that the Secretary of Transportation shall issue regulations "after consultation with the States".[3] Despite that, not only were States not consulted, they were notified for the first time of the new IFR only via a live-streamed press conference on Friday, September 26, 2025 announcing the IFR and its effective date the following Monday, September 29, 2025. The justifications proffered in the IFR for failing to consult with the States are not sufficient. As the D.C. Circuit Court of Appeals noted in its order granting an emergency stay of the IFR, the FMCSA's justifications for bypassing consultation are not grounded in the statute and are likely to fail on the merits.[4]

B. The IFR bypassed the usual PFR "notice and comment" rulemaking period without legitimate justification.

The justifications provided by the FMCSA for bypassing the usual notice and comment period offered *before* a new regulation is to take effect are specious. For example, the IFR preamble notes that it isn't possible to vet foreign domiciled CDL applicant's driving records for the past 10 years because their driving histories abroad are not accessible.[5] This ignores the fact that for years, until issuance of this IFR, federal regulations permitted immigrants holding a valid, unexpired USCIS employment authorization document (EAD) to obtain for a non-domiciled CDL.[6] Noncitizens with an EAD typically have been living in the U.S. long-term with legal statuses such as pending permanent residency or asylum applications or Temporary Protected Statuses. As such, they often have years of driving history in the U.S. that can be verified based on their REAL ID-compliant or standard driver's licenses issued to them in the States where they have resided. Underscoring the disingenuousness of this argument is the fact that the IFR would allow only three types of foreign domiciled noncitizens to be eligible for a non-domiciled CDL. Two of those categories, H-2A seasonal agricultural workers and H-2B non-agricultural

---

2 Our opposition to the IFR includes the impact it has regarding the process of issuing, and the harm caused to holders of, non-domiciled Commercial Learner's Permits (CLPs) but in this comment we use "CDL" to include both CDLs and CLPs, as appropriate.

3 https://www.federalregister.gov/d/2025-18869/p-88

4 Jorge Rivera Lujan *et al.* v. FMCSA *et al.*, U.S. Court of Appeals for the District of Columbia Circuit, Case #25-1215, Document #2145204 (11/13,2025). (Hereinafter Lujan v. FMCSA)

5 https://www.federalregister.gov/d/2025-18869/p-129

6 49 CFR §383.71(f)(2)(i), version in effect prior to the IFR's publication. Non-domiciled CDL applicants of course must have met all other eligibility and testing requirements before they would be issued a CLP or CDL.

seasonal workers, typically are issued visas for summer or winter seasons, returning to their home countries in between their temporary stays. At least in Maine, H-2A and H-2B visa holders, who retain their residences abroad, are far less likely to obtain a standard driver's than are longer-term residents who have a USCIS issued EAD. If Maine's experience is true nationwide, vetting the driver history of the very H-2A and H-2B visa holders the IFR proposes to allow to get non-domiciled CLPs is more out of reach than for holders of EADs.

Additionally, the IFR cites that a prior "notice and comment" period would have caused a surge in non-domiciled CDL applicants, as if such a surge of foreign born applicants would *per se* create a risk to public safety, ignoring the fact that any applicant must receive actual driving school training and on the road experience in commercial trucks and other commercial vehicles, successfully pass an exam before being issued a CLP, and successfully pass their CDL road test. Drivers hoping to find a job and economic opportunities via a non-domiciled CDL typically invest extensive time and money (CDL driving schools can cost thousands of dollars) to get the required knowledge and driving experience before they reach the stage of getting a non-domiciled CDL. And of course, SDLAs will also review their available prior driver history and other requirements before a prospective foreign-born person would be found eligible for a non-domiciled CDL. Getting a CDL takes planning and time. The fear of a harmful "surge" with a negative public safety impact as a result of a typical 60-day comment period prior to the rule's publication is disconnected from reality.

The FMCSA's other justifications similarly fail, and the agency should have issued a PFR, not an IFR, in order to allow for advance public notice and comment prior to, rather than following, the rule's promulgation. Prior public comment would also have allowed State driver license agencies (SDLA)'s to plan for a potential orderly transition before the effective date of the rule change.

## II. The IFR is arbitrary and capricious.

One need look no further to see the lack of justification for this IFR than the preamble's discussion of its "Benefits", where the IFR notes that "(t)here is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations."[7] It goes on to conclude "(g)iven insufficient evidence, a direct quantitative estimate of the potential safety benefits resulting from this IFR cannot be developed."[8]

Moreover, while the FMCSA's own data reveals that holders of non-domiciled CDLs represented about 5% of all CDL holders in 2024, [9] their data also showed as of September 26, 2025 – just before the IFR's issuance – there were 2,399 fatal crashes involving citizen and

[7] https://www.federalregister.gov/d/2025-18869/p-195
[8] https://www.federalregister.gov/d/2025-18869/p-198
[9] https://www.federalregister.gov/d/2025-18869/p-190

noncitizen commercial drivers of large trucks and buses in 2025.[10] Of these, the IFR identifies just 5 of these tragedies – or 0.21% of the identified fatal crashes - to blame non-domiciled CDL holders, typically immigrants with EADs, as an imminent "threat to public safety and direct threat to national security."[11] Apart from the fact that over 99% of the fatal crashes in 2025 were apparently caused by holders of regular CDLs, these isolated anecdotes do not explain any connection between the drivers' immigration status and the cause of the crashes, and FMCSA acknowledges, as noted above, that it lacks any reliable data demonstrating that the selected category of noncitizens is more likely to be involved in fatal crashes. This IFR ignores the rigorous safety requirements already embedded in CDLs, such as the mandatory skills and knowledge test or the disqualification of drivers with serious traffic violations.[12] Rather than consider the efficacy of these measures, or introduce proposed additional safety measures that would apply to all CDL holders, not just those with non-domiciled CDLs, FMCSA arbitrarily aims at certain immigration statuses without providing any rational, nondiscriminatory connection between these targeted groups and road safety.[13]

Furthermore, the rule change has an outsized impact on employers needing CDL drivers, and of those whose livelihoods depending on continuing to hold their non-domiciled CDL. The FMCSA estimates in the IFR's preamble that approximately 200,000 immigrants nationwide currently have non-domiciled CDLs, and that by restricting future eligibility only to those with H-2A, H-2B, or E-2 nonimmigrant visas, about194,000 individuals – ie. 97% of current non-domiciled CDL holders - will lose eligibility.[14] In Maine, that number is 100%. None of Maine's current CDL holders, although they have EADs, hold H-2A, H-2B, or E-2 nonimmigrant visas as the IFR would require. The economic toll in Maine as a result of this change will be significant, not only for those who will lose access to the livelihoods opened up by their non-domiciled CDLs, but also for Maine's employers who count on them to help make up for a chronic shortage of workers with CDLs.

When assessing the costs of this rule change, the IFR addresses the potential impact on commercial freight market, and essentially deems it negligible.[15] However, the FMCSA makes no assessment at all of the impact the IFR would have in the many other sectors where drivers need CDLs.[16] In Maine, for example, a shortage of school bus drivers drove the state's largest school district to launch a CDL course approved by Maine's BMV. Many of its graduates have been immigrants who eventually succeeded in passing all the eligibility and testing requirements to be issued non-domiciled CDLs, greatly alleviating the Portland School District's bus driver

---

10 *Crash Statistics,* FED. MOTOR CARRIER SAFETY ADMIN. (Sept. 26, 2025), https://ai.fmcsa.dot.gov/crashstatistics?tab=Summary&type=&report_id=1&crash_type_id=1&datasource_id=1&time_period_id=2&report_date=0&vehicle_type=2&state=NAT&domicile=ALL&measure_id=1&operation_id=null

11 Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46514 (to be codified at 49 C.F.R. 383 and 384).

12 49 CFR 383.23; 49 CFR 383.51.

13 *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983) (finding that the agency must articulate a "rational connection between the facts found and the choice made").

14 https://www.federalregister.gov/d/2025-18869/p-178 .

15 https://www.federalregister.gov/d/2025-18869/p-190 , stating "FMCSA believes there will be a limited economic impact on the freight market and motor carriers."

16 *See* Hugh Cameron, *America Doesn't Have Enough Truck Drivers*, NEWSWEEK (Jul. 10 2025), https://www.newsweek.com/america-trucking-shortage-logistics-supply-chain-2097123.

shortage.[17] Eliminating these immigrants' eligibility to renew their non-domiciled CDLs will reverse progress made and exacerbate still existing bus driver shortages in many Maine school districts. The IFR will also impact public transit services. Maine's largest public transit system would lose 10% of its bus drivers under this IFR.[18] Maine's construction sector, its logging industry, municipalities, and snow plow and hauling operations are just a few of the many other sectors that will feel the brunt of a reduced number of CDL drivers under this IFR, and none of these are considered in the IFR's assessment of the rule's impact, which only addresses the "commercial freight market."

In addition, the BMV is aware anecdotally that Maine's non-domiciled CDL holders not only are employed by others as CDL drivers, but also that some have purchased their own freight trucks and have started their own businesses. Whether employed by others, or self-employed, these immigrant non-domiciled CDL holders are contributing to our State's economy and communities. This rule, with no evidence that it will improve public safety, strips hard-working immigrants of their ability to support their families, and spend money in their local economies, with no sound rational.

For all these reasons, Maine's Department of Secretary of State and Bureau of Motor Vehicles oppose this IFR.

Sincerely,

Shenna Bellows
Secretary of State

Cathie Curtis
Deputy Secretary of State, BMV

17 https://www.pressherald.com/2025/09/22/maine-schools-struggling-to-hire-bus-drivers/

18 https://www.pressherald.com/2025/11/12/federal-cdl-rule-change-leaves-maines-immigrant-drivers-and-employers-in-limbo/

Docket No. FMCSA-2025-0622

Federal Motor Carrier Safety Administration

November 26, 2025

Re: “Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL) [Docket No. FMCSA-2025-0622]”

To Whom It May Concern:

We write to oppose the new immigration status-related restrictions in the Interim Final Rule (IFR), effective September 29, 2025, titled “Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL).”

I. Interest in the Rule

The undersigned organizations represent some of the nearly 200,000 immigrants who are at risk of losing their livelihoods because of this decision. We are concerned about the impact that this policy could have on the populations we serve, which include refugees, asylees, and humanitarian parolees, as well as other populations of humanitarian concern.

**Church World Service (CWS)** is a global humanitarian organization that for nearly 80 years has worked toward a vision of a world in which all people have food, voice, and a safe place to call home. Representing nine million people of faith across 14 faith-based organizations and denominations, CWS equips immigrants and the communities that welcome them with the resources they need to thrive. Through refugee resettlement offices, home study and post release services for children, and integration support for newcomers, CWS has a vested interest in ensuring our clients can be self-reliant in their new homes.

**The International Rescue Committee (IRC)** is dedicated to helping refugees whose lives and livelihoods have been shattered by conflict and disaster to survive, recover, and gain control of their future. The IRC is one of the leading providers of services for refugees, asylees and asylum seekers, humanitarian parolees, survivors of trafficking, and other vulnerable immigrants in the United States. The IRC’s economic empowerment programs support low-income individuals and families—including refugees and immigrants—in building financial stability, including services designed to help clients enter and advance in the workforce, strengthen their financial well-being, and pursue entrepreneurship.

**Orel Alliance** is a charitable organization founded in April 2024 in Omaha, Nebraska, with a goal of supporting both newly arrived Ukrainian families, as well as established families, with ongoing needs.

**Refugee Council USA (RCUSA)** is the only national coalition devoted to forcibly displaced people in the United States. RCUSA consists of more than 40 members, including the national resettlement agencies as well as other

organizations that directly serve refugees, newcomers, and immigrant populations affected by this rule change.

**The U.S. Committee for Refugees and Immigrants (USCRI)** is a nongovernmental, not-for-profit international organization dedicated to addressing the needs and rights of refugees, immigrants, unaccompanied children, asylum seekers and asylees, returnees, human trafficking survivors, and other vulnerable populations. Since the inception of the U.S. refugee program, USCRI has worked with the U.S. government to resettle more than 400,000 refugees. USCRI has supported many of these refugees in becoming self-sufficient through finding work as truck drivers, construction vehicle operators, or school bus drivers.

**World Relief** is a global Christian humanitarian organization founded in 1944 in the aftermath of World War II by the National Association of Evangelicals. Its mission is to boldly engage the world's greatest crises in partnership with the church. Since 1979, World Relief has resettled more than 300,000 refugees and currently offers programs to encourage family integration to refugees, asylees, survivors of human trafficking, and other immigrants in the United States, many of whom will be impacted by the IFR. World Relief has helped numerous humanitarian immigrants along the pathway to receiving their CDLs. For example, World Relief's Chicagoland office has helped over 100 immigrants become fully certified as CDL drivers, allowing them to support their families. Due to the rule change, approximately 60 of these drivers will be ineligible to renew their licenses.

As a result of the IFR, our clients are facing imminent harm.

II. The IFR Removes Lawful U.S. Residents, With Valid Work Authorizations, from the Trucking Workforce

To operate a commercial vehicle, such as a freight truck or school bus, an individual is required to obtain a CDL. Although individual states are charged with issuing CDLs, the process must comply with federal standards.[1] For example, CDL holders are required to pass a written exam and a driving test in order to qualify for the license.

In 2011, the Federal Motor Carrier Safety Administration (FMCSA) decided to limit access to CDLs to U.S. citizens and Lawful Permanent Residents (LPRs).[2] The FMCSA created a separate category—a *non-domiciled* CDL—for residents of foreign jurisdictions or states prohibited from issuing CDLs. Lawful U.S. residents with a valid work authorization, such as refugees and asylees, could also obtain a non-domiciled CDL.

Now, the FMCSA has decided to limit the issuance of non-domiciled CDLs to H-2A (Temporary Agricultural Workers), H-2B (Temporary Non-Agricultural Workers), and E-2

[1] 49 U.S.C. §§ 31301(4), 31302.
[2] 76 FR 26854.

(Treaty Investors) visa holders. The effect of this IFR is to render refugees, asylees, asylum seekers, Deferred Action for Childhood Arrivals (DACA) recipients, and humanitarian parolees ineligible for a non-domiciled CDL. As the IFR states:

> "An EAD [work authorization] will no longer be sufficient to obtain a non-domiciled CLP [commercial learner's permit] or CDL…These individuals excluded from eligibility for a non-domiciled CLP or CDL would include asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients."[3]

Refugees and asylees, through a rigorous vetting process, demonstrate that they have a well-founded fear of persecution in their home country. They include Afghans threatened by the Taliban, Uyghurs speaking out against the Chinese government, religious minorities unable to freely practice their faith, and others.

- A ***refugee,***[4] as defined in the 1980 Refugee Act, is an individual who has fled their country and cannot safely return because of a well-founded fear of persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion. Refugees are approved for travel by the State Department and vetted by numerous national security agencies, including the Department of Homeland Security. Only after approval for travel by the United States government are they flown to the United States.

- An ***asylee***[5] is someone who meets the same legal definition as a refugee but sought protection from within the United States or at a U.S. port of entry and has subsequently been granted humanitarian protection.

- A ***humanitarian parolee***[6] is someone who is granted temporary protection in (or permission to enter) the United States because of an urgent humanitarian need or a significant public benefit, such as fleeing war, political instability, or a severe natural disaster.

These individuals will be stripped of their livelihoods because of the FMCSA's decision. An estimated 194,000 people will be impacted.[7] Many of these individuals are the sole breadwinners in their families. They have worked hard to freight food that sustains our communities, yet this decision may now prevent them from being able to support their own families.

On November 10, 2025, the U.S. Court of Appeals for the District of Columbia Circuit issued an administrative stay in *Jorge Rivera Lujan v. Federal Motor Carrier Safety Administration*, pausing the implementation of the IFR.[8] While this has offered

---

[3] 90 FR 46509, 46515.
[4] 8 U.S.C. § 1101(a)(42).
[5] 8 U.S.C. § 1158.
[6] 8 U.S.C. § 1182(d)(5)(A).
[7] 90 FR 46509, 46519.
[8] *Jorge Rivera Lujan v. Fed. Motor Carrier Safety Administration,* Nos. 25-1215 & 25-1224 (D.C. Cir. Nov. 10, 2025) (per curiam)

temporary relief to our clients who would otherwise be impacted, we remain concerned about the impact of future implementation.

If not withdrawn, the FMCSA's decision to compel states to revoke their CDLs puts not only our clients at risk of financial devastation, but threatens the stability of an entire economic ecosystem, curtailing their purchasing power, and shrinking economic growth.[9] Additionally, the truck driving industry is facing steep labor shortages[10] in the aftermath of the COVID-19 pandemic, and immigrant drivers, including refugees, asylees, and humanitarian parolees, have helped keep U.S. supply chains afloat. There are approximately 3.5 million professional truckers[11] in the workforce, which skews older—the average age of a trucker is 47.[12] Removing 194,000 CDL holders from an aging workforce leaves the logistics industry less capable to respond to increases in demand for freight.

III. Harm Facing Our Clients

Upon arrival, refugees and other humanitarian populations often find that their foreign qualifications—including medical licensures, law degrees, and engineering certifications—are not recognized in the United States. Driven by the need for financial security and the desire to establish a stable livelihood, refugees and other humanitarian immigrants are often highly motivated to take on demanding jobs.

Because our clients are eager to achieve self-sufficiency, the undersigned organizations frequently encourage them to pursue careers in truck driving, a profession offering strong opportunities for stability and growth. They save for months to be able to pay for CDL training. They are willing to work long hours, manage challenging schedules, and meet the safety standards and other rigorous expectations of the trucking industry. As a result, many of our clients become successful truck drivers who are deeply valued by their employers.

These are some of their stories of success–all names have been changed to protect our client's privacy:

***Amir**** *arrived in Atantla, Georgia, as a refugee. After hearing that he dreamed of owning a home, his case manager told him he might earn enough to finance a mortgage if he pursued a CDL. Amir found work as a truck driver and began diligently saving*

---

[9] Wendy Edelberg, Guest Essay, *We're Seeing What a No-Immigration Economy Looks Like*, New York Times (Nov. 23, 2025), https://www.nytimes.com/2025/11/23/opinion/jobs-report-immigration-trump.html.
[10] Dilip Bhattacharjee et al., Article, *Navigating the Labor Mismatch in U.S. Logistics and Supply Chains*, McKinsey & Co. (Dec. 10, 2021), https://www.mckinsey.com/capabilities/operations/our-insights/navigating-the-labor-mismatch-in-us-logistics-and-supply-chains.
[11] Press Release, American Trucking Association, Truck Freight Tonnage and Revenues Rise in 2022, According to Report (2023), https://trucking.org/news-insights/truck-freight-tonnage-and-revenues-rise-2022-according-report.
[12] Abigail Huffman and Dan Murray, *Evolving Truck Driver Demographics: Issues and Opportunities* (July 2025).

*towards a down payment. Thanks to his career in trucking, Amir was able to purchase a home for him and his family.*

***Saif**** *arrived in the United States in June of 2023 as a refugee and found work as a Lyft driver. Struggling to pay the bills, he studied for his CDL and began working as a truck driver in time for his wife to welcome their baby boy.*

Many refugees and other humanitarian populations, after saving some money working as truck drivers, go on to open trucking companies of their own, employing native-born citizens and refugees alike:

***Omar****,* a young father and former Combat Linguist from Afghanistan arrived in Spokane, Washington seeking safety as a refugee. His service alongside U.S. Special Forces had put him in danger, forcing him to flee the only country he had ever known. Like so many refugees, the journey ahead wasn't easy. Determined to provide for his family and build a future, Omar worked tirelessly in Spokane's transportation industry. In just two years, he built experience, saved, and launched his own transportation services business.*

*Today, that business helps truckers across the U.S. find top-paying loads, stay on the road, and grow their own livelihoods without the stress of managing logistics. Omar's entrepreneurial success is inspiring, but perhaps even more impactful is how he's paying it forward. His business now serves major clients, including Costco, operates across Washington State, and hires fellow refugees who are starting over, just like he once was. "Problems will always arise," he shared, "but if you work hard and take risks, you'll figure it out and get to where you need to be."*

***Joe**** arrived in the United States as a refugee with no family and no livelihood. He spent months studying to get his CDL, and was excited to begin work as a truck driver after passing the exam. Driving a truck allowed him to save enough money to reunite with his family—including his youngest son, who he had never met before. Recently, he was able to finally purchase his own truck, which will allow him to start his own trucking business.*

But many of our clients now fear losing their jobs as a result of the IFR. Having already invested thousands of dollars in training, and with few other jobs that would offer them the pay and satisfaction of trucking, the implementation of the IFR would financially devastate them.

***Ali**** *is originally from Afghanistan and entered the United States in 2023 as a humanitarian parolee, and currently has a pending asylum application. He now lives in California with his wife and child. Wanting a better future for his family, he studied for three months and invested around $3,000 in training and exams for his CDL. Receiving his CDL was an important milestone for Ali because it opened the door to better job opportunities and allowed him to plan a secure financial future for his family. He was preparing to begin working as a semi-truck driver in November 2025, which would have significantly improved his family's financial stability.*

*Despite having a valid work permit and meeting all legal requirements, the IFR means that Ali will not be able to use the CDL that he invested time, money, and effort to obtain. "These new regulations feel unfair and discriminatory," Ali says. "Especially because they block people who are legally authorized to work in the United States from accessing a profession they are fully qualified for. The impact on my livelihood is severe. Losing the ability to work as a truck driver means losing the income that I was depending on to support my wife and child. It has created financial uncertainty, emotional stress, and fear about how I will continue to provide for my family. This abrupt change has disrupted my career plans and placed us in a very vulnerable position, despite my lawful status and full compliance with all state and federal requirements."*

***Khalil*** ** fled Afghanistan with his father on a Special Immigrant Visa (SIV) after the fall of Kabul in 2021. Khalil's father served the U.S. mission in Afghanistan as a security guard who worked in a zero unit with high-level U.S. intelligence. With the Taliban in power, staying in Afghanistan would be a huge risk for the family. Upon moving to the United States, Khalil picked up work as a truck driver, working long shifts in hopes of one day reuniting with his wife and two children. He has a clean driving record, with no accidents or major traffic violations.*

*Too old to become a permanent resident through his dad's SIV process, Khalil had to apply for asylum, which he was successfully granted last year. He has now applied for a Green Card and is waiting to hear back. Hearing about the IFR, Khalil felt he had to quit his job as a truck driver while waiting for his Green Card. His employer, valuing him, wanted him to stay. But the FMCSA's decision caused Khalil to fear he would be stopped by Immigration and Customs Enforcement (ICE) and detained while at work. After being informed of the Administrative Stay on the IFR issued by the DC Circuit Court, Khalil felt comfortable to resume work, but fears what will happen if the stay does not hold.*

***Kofi****, a refugee from the Democratic Republic of the Congo, lives with his wife and three children. He earns $19.50 per hour at a factory, and his wife works part-time for $15 per hour. With their combined salaries, they can pay rent and basic necessities, but live month to month. With the help of his resettlement agency, he enrolled in a truck driving school so that he could boost his earning potential. Kofi is an experienced driver and has driven delivery trucks safely across the African continent for many years. He was midway through the four-month program when he learned about the new immigration-related status restrictions on CDLs. Kofi has filed for a Green Card and is waiting for it to be approved and issued. In the meantime, the implementation of the IFR would prevent him from earning a living wage.*

Our Ukrainian clients particularly gravitate towards trucking. Many were admitted to the United States on humanitarian parole under the Uniting for Ukraine (U4U) program. As such, they are eligible to apply for a work permit. However, USCIS delays in processing work authorizations have already threatened their ability to support their families, a situation the implementation of the IFR would only worsen. Many have previous experience driving trucks in Europe, and those who are new to the field quickly develop

the competency needed to operate safely. If this IFR stands, Ukrainian parolees, asylees, and refugees would be excluded from the trucking workforce.

***Vlad*** fled Kharkiv, Ukraine with his wife and child and is currently based in Nebraska. They were able to come to the U.S. under Uniting for Ukraine as humanitarian parolees.*

*Before the war in Ukraine, Vlad had been a professional truck driver throughout Europe for 12 years. Upon arrival in the United States, he began working at grocery stores and a gas station, working as much as possible, until he could save enough money to pay for CDL training. He successfully completed the training and received his CDL in summer 2023. Vlad has had no accidents or tickets in Europe and has maintained this clean record in the U.S. Vlad applied for TPS in January 2025 and has also applied for asylum. Both cases are pending. He currently cannot work due to the USCIS delays, as his work permit has not been processed. Vlad had been employed at a trucking company based in Nebraska and continues to make payments on his financed semi truck even while he is unable to work. Vlad's employer would very much like to keep Vlad as an employee, given his excellent safety record and exemplary work ethic.*

*Vlad does not feel that he and his family can return to Ukraine. Kharkiv is still frequently attacked by Russian forces and drones, and Vlad has no desire to become a Russian citizen. Additionally, their home was destroyed in the early bombings. He wants to maintain a legal status here in the U.S. and has followed all USCIS rules and regulations. Vlad's CDL expires in October 2026, and he is very concerned that he will be unable to drive, and earn income, if the CDL restrictions stand.*

***Andriy*** fled to the United States in 2023, seeking refuge from the war with his family. He currently is reparoled under the Uniting for Ukraine program. Andriy supports a large family that includes his wife and two daughters—one of whom was born in the US—as well as his parents and his maternal grandmother. Before he obtained his CDL, he worked hard in the construction sector, specializing in tiling, to support his family. He saved up money for the course and spent two months studying intensively for his CDL, demonstrating full English language proficiency. Immediately after receiving his license, he secured a stable position as a truck driver, providing crucial income to support his household. If this decision stands, Andriy will not be able to provide sufficiently for his family.*

***Dmitry**,* his infant daughter and wife relocated from near the nuclear power facility in Zhaporizia, Ukraine, to Nebraska in 2024. Dmitry previously worked as a police officer and prison guard in Ukraine. When he arrived in the U.S., he began working night shifts at a local gas station. Dmitry saved up $5,000 to pay for CDL training as many of his friends had found successful careers in trucking. He is currently completing CDL training and worries that he has wasted a significant amount of money and time training for a profession he may not be allowed to work in. Dmitry reads, speaks and understands English nearly fluently and has had no traffic or other citations in Europe or in the U.S.*

***Aleksandr**** *is a Ukrainian truck driver who found safety in New Jersey through the Uniting for Ukraine humanitarian parole program. While Aleksandr did not receive notice of a revocation of their non-domiciled CDL, he felt compelled to stop working due to fear caused by the IFR and uncertainty about whether they would be targeted by immigration enforcement while at work.*

***Borys**** *arrived through the Uniting for Ukraine program with his wife and daughter. He passed his CDL exams, and began working as a long distance truck driver to support his family. "With the new regulations it will be very difficult, because this is the only income for my family," he says. "Please let us work."*

IV. Conclusion

Considering the substantial economic, humanitarian, and operational harms outlined above, we strongly urge FMCSA to rescind the IFR's immigration-status restrictions. Allowing refugees, asylees, humanitarian parolees, and other lawfully present immigrants with valid work authorization to obtain or renew CDLs is both consistent with federal law and essential to maintaining a stable commercial driving workforce. As the stories we shared testify, our clients take pride in their work as truck drivers, and want to continue working.

Thank you for the opportunity to provide comments on this IFR. Should you have any questions or wish to engage further with the undersigned organizations, please do not hesitate to contact Alexia Gardner at agardner@refugees.org.

Sincerely,

Church World Service

International Rescue Committee

Orel Alliance

Refugee Council USA

U.S. Committee for Refugees and Immigrants

World Relief

NEW YORK STATE | Office of Temporary and Disability Assistance

**KATHY HOCHUL**
Governor

**BARBARA C. GUINN**
Commissioner

**RAJNI CHAWLA**
Executive Deputy Commissioner

November 28, 2025

Dockets Operations
U.S. Department of Transportation
1200 New Jersey Avenue SE, West Building, Ground Floor
Washington, DC 20590-0001

Re: Comments on Docket No. FMCSA-2025-0622: Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)

To Whom It May Concern:

The New York State Office of Temporary and Disability Assistance (OTDA) submits these comments in response to the U.S. Department of Transportation Federal Motor Carrier Safety Administration Interim Final Rule (IFR) "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)" that was published in the Federal Register on September 29, 2025.

OTDA is charged with the supervision of several public benefit programs for the State of New York. OTDA's mission is to help vulnerable New Yorkers meet their essential needs and advance economically by providing opportunities for stable employment, housing, and nutrition. Accordingly, OTDA respectfully submits this comment to the IFR.

Sincerely,

Barbara C. Guinn

Barbara C. Guinn
Commissioner

## I. Introduction

The Office of Temporary and Disability Assistance (OTDA) is charged with the supervision of several public benefit programs for the State of New York, including Temporary Assistance for Needy Families (TANF), the Supplemental Nutrition Assistance Program (SNAP), the Home Energy Assistance Program (HEAP), and Refugee Resettlement Programs. OTDA's mission is to help vulnerable New Yorkers meet their essential needs and advance economically by providing opportunities for stable employment, housing, and nutrition.

OTDA submits these comments to oppose the Interim Final Rule (IFR), Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), by the Federal Motor Carrier Safety Administration ("FMCSA").

## II. The IFR Negatively Impacts Individuals and the Economy

OTDA opposes the changes made by this IFR that will prevent non-citizens from participating in this source of economic opportunity that is not only critical to many workers' livelihoods, but also to the U.S. economy.

OTDA's Bureau of Refugee Services (BRS) provides funding to not-for-profit organizations throughout the state to help refugees, asylees, and other humanitarian-based immigrants achieve economic and social self-sufficiency. These New Yorkers have employment authorization and pursue careers in many fields, including obtaining CDLs to lawfully operate commercial vehicles. Closing off this career opportunity would negatively impact the ability of these new Americans to meet their own economic needs and contribute to the larger economy. This rule threatens the livelihoods of the approximately 200,000 workers nationwide who rely on their CDLs to provide for themselves and their families.[1]

Foreign-born drivers account for nearly one in six U.S. truck drivers, many of whom own small trucking businesses themselves.[2] New York State already has a commercial driver shortage and has invested in CDL training programs to help fill the gap.[3] This rule would put up further barriers to meeting this crucial need.

## III. Data Cited by FMCSA does not Support the Need for this IFR

Although 2,305 fatal crashes involving citizen and noncitizen commercial drivers of large trucks have occurred between January and September 2025,[4] FMCSA focuses on just 5 of these instances to blame noncitizens as an imminent "threat to public safety and direct threat to national security."[5] Yet these isolated anecdotes do not explain any connection between the

---

[1] Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46518-46519.

[2] Arturo Castellanos-Canales, *Addressing the U.S. Truck Driver Shortage: The Role of Foreign-Born Drivers, Visa Policy, and Supply Chain Impacts*, NATIONAL IMMIGRATION FORUM (Oct. 17, 2025), https://forumtogether.org/article/addressing-the-u-s-truck-driver-shortage-the-role-of-foreign-born-drivers-visa-policy-and-supply-chain-impacts/.

[3] https://spectrumlocalnews.com/nys/central-ny/news/2025/07/14/combating-the-shortage-of-commercial-vehicle-drivers

[4] *Crash Statistics,* FED. MOTOR CARRIER SAFETY ADMIN. (Sept. 26, 2025), https://ai.fmcsa.dot.gov/crashstatistics?tab=Summary&type=&report_id=1&crash_type_id=1&datasource_id=1&time_period_id=2&report_date=0&vehicle_type=2&state=NAT&domicile=ALL&measure_id=1&operation_id=null

[5] Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46514.

drivers' immigration status and the cause of the crashes, and FMCSA fails to provide any data demonstrating that the selected category of noncitizens is more likely to be involved in fatal crashes. In doing so, FMCSA ignores the rigorous safety requirements already embedded in CDLs, such as the mandatory skills and knowledge test or the disqualification of drivers with serious traffic violations.[6] Rather than consider the efficacy of these measures, FMCSA arbitrarily aims at certain immigration statuses without providing any rational, nondiscriminatory connection between these targeted groups and road safety.[7]

## IV. Conclusion

As a result of this IFR, hundreds of thousands of workers and their families will lose their source of income. This runs counter to the very goals that OTDA tries to achieve by helping New Yorkers to advance economically. Furthermore, the logistics industry will lose a critical component of their workforce amidst a labor shortage. Foreign-born commercial truck drivers are filling an essential gap created by the nationwide shortage of drivers, and their loss will reverberate across the industry and threaten the nation's supply chain.[8] For all of these reasons, OTDA opposes the IFR and encourages FMCSA to rescind the IFR.

---

[6] 49 CFR 383.23; 49 CFR 383.51.

[7] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983) (finding that the agency must articulate a "rational connection between the facts found and the choice made").

[8] *See* Hugh Cameron, *America Doesn't Have Enough Truck Drivers*, NEWSWEEK (Jul. 10, 2025), https://www.newsweek.com/america-trucking-shortage-logistics-supply-chain-2097123.

Oregon
Tina Kotek, Governor

Department of Transportation
Driver and Motor Vehicle Services - DMV
1905 Lana Avenue, NE
Salem, Oregon 97314

November 26, 2025

Docket Operations
U.S. Department of Transportation
1200 New Jersey Avenue SE,
West Building, Ground Floor
Washington, DC 20590-0001

RE: Docket Number FMCSA-2025-0622 Restoring Integrity to the Issuance of Non-Domiciled Commercial Driver's Licenses

Dear Sir or Madam:

Oregon provides the following comments on the FMCSA's Interim Final Rule (IFR) limiting the authority of State Driver's Licensing Agencies (SDLAs) to issue and renew commercial learner's permits (CLPs) and commercial driver's licenses (CDLs) to non-domiciled individuals.

FMCSA's stated intent is to "restore integrity" to the CDL issuance process, but we are concerned that the justification for this rule does not appear to be supported by data. If the concern is truly about safety, then the data should clearly demonstrate a disproportionate risk associated with non-domiciled CDL holders. However, the IFR does not provide such evidence.

Without a data-driven rationale, this policy risks undermining the economic contributions of legally present temporary residents who rely on commercial driving to support themselves and their families, contribute to the economy, and pay taxes.

In the preamble to the rule, FMCSA acknowledges that it lacks sufficient data to demonstrate a measurable relationship between a driver's nation of domicile and safety outcomes. The agency states:

"There is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States… Given insufficient evidence, a direct quantitative estimate of the potential safety benefits resulting from this IFR cannot be developed." FMCSA did not seek such data from this state or, to our knowledge, from any other jurisdiction. The statement that there is "insufficient data" lacks integrity when in fact FMCSA simply did not seek the data.

And despite this admission, FMCSA proceeds to implement a sweeping restriction on non-domiciled CDL issuance without a data-driven safety rationale.

While any loss of life is undeniably tragic, citing five fatal crashes does not substantiate the claim that there is a systemic safety crisis. The IFR does not cite comparison data for fatal crashes involving other CDL holders. It might be that holders of non-domicile CDLs perform better, or comparably, in rates of crashes, serious injury crashes, and/or fatal crashes. Without that data, the IFR is based on pure conjecture. Oregon DMV quickly[1] analyzed data on fatal crashes involving Oregon licensed drivers in Commercial Motor Vehicle crashes from 2020 through 2025 (YTD). We found that zero such crashes involved a driver with a non-domicile CDL. Stated differently, with nearly six years of data, for fatal crashes involving a Commercial Motor Vehicle and an Oregon licensed driver, 0% involved a driver with a non-domicile CDL, while 100% involved a driver with a standard CDL. The FMCSA's assertion that the five highlighted tragedies demonstrate the need for sweeping regulatory changes is without basis. The lack of comprehensive data is being replaced by anecdotal examples, which is insufficient to justify the conclusion that current eligibility standards are overly broad or that non-domiciled drivers inherently pose a greater risk.

The IFR also notes that a handful of states were found by FMCSA to have had errors in some issuances of non-domicile CDLs. At least some of those states are challenging their findings, so at bare minimum the IFR is premature. More broadly, FMCSA is re-writing the fundamental regulations on who may obtain a credential, and other elements of that credential (e.g. one-year limit), purportedly based on an <u>initial</u> finding, that in <u>some</u> cases, in a <u>few</u> states, administrative errors might have occurred. Coupled with the complete lack of safety data, the proposed action lacks rationality.

Simultaneously, FMCSA claims the rule is exempt from the regulatory cost and repeal requirements of Executive Order 14192 (Unleashing Prosperity Through Deregulation) by classifying it as an "immigration-related function." This classification is used to bypass the Executive Order's requirement that new rules be offset by the elimination of at least 10 existing regulations.

This dual justification is contradictory. If the rule is not based on safety data, and FMCSA lacks immigration enforcement authority, then the agency cannot reasonably claim either a safety or immigration basis for the rule. CDL issuance is a transportation safety function under 49 U.S.C. § 31311, not an immigration enforcement mechanism.

FMCSA's justification for the IFR is internally inconsistent. The agency admits it lacks sufficient safety data to support the rule, yet claims the rule is exempt from regulatory cost controls under E.O. 14192 by classifying it as immigration related. This raises serious concerns about whether FMCSA is acting within its statutory authority. CDL issuance is a transportation safety function, not an immigration enforcement mechanism. If the rule cannot be justified on safety grounds, and FMCSA lacks immigration authority, then the legal basis for the IFR is fundamentally flawed.

Moreover, the rule's mandatory downgrade provision requires State Driver's Licensing Agencies (SDLAs) to act on federal immigration status determinations—such as when a non-domiciled CDL holder loses lawful status or violates visa terms. This effectively deputizes states to carry out federal immigration enforcement, a role that has traditionally been reserved for federal agencies.

[1] The short time for comment resulted in analysis limited to fatal crashes. A more detailed analysis of serious injury crashes, or all reportable crashes, might have been preferable.

By invoking an immigration exemption while lacking immigration authority, and by requiring states to enforce immigration consequences, FMCSA appears to be circumventing both its statutory mandate and constitutional limits. This undermines the transparency and accountability of the rulemaking process.

This rule risks undermining the economic stability of legally present temporary residents who rely on commercial driving as a lawful means of employment. These individuals contribute to the economy, support their families, and pay taxes. By limiting their access to licensure based on domicile status rather than individual qualifications or safety records, the IFR may inadvertently create barriers to workforce participation and economic integration—outcomes that are inconsistent with broader federal policy goals.

In summary, the IFR does not support the assertion of systemic safety failures. A data-driven analysis focused on safety could potentially strengthen safety on our roads, prevent the nearly immediate elimination of drivers' ability to make a living (and pay taxes), and uphold the very American value of fairness.

Thank you for the opportunity to comment and we look forward to FMCSA's response.

Sincerely,

/s/ Margaret Geer

CDL Program – Senior Policy Analyst
Driver and Motor Vehicle Services Division
Oregon Department of Transportation

126 Sewall Street
Augusta, ME 04330-6822
TTY/Voice: (207) 626-7058
Fax: (207) 621-8148
www.maineequaljustice.org

Maine Equal Justice
People Policy Solutions

**Catherine Buxton**
*Policy & Community Engagement Manager for the Peer Workforce Navigator Project*
207-610-9181
cbuxton@mejp.org

TO:
Dockets Operations
U.S. Department of Transportation
1200 New Jersey Avenue SE, West Building, Ground Floor
Washington, DC 20590-0001

Maine Equal Justice ("MEJ") submits the following comments strongly opposing the Federal Motor Carrier Safety Administration's ("FMCSA") September 29, 2025 Interim Final Rule ("IFR") which restricts access to Non-Domiciled Commercial Drivers' Licenses for nearly 200,000 qualified immigrant commercial drivers and permit holders. The IFR is arbitrary, discriminatory, and causes deep economic harm not only to Maine workers and their families, but to entire industries and our state's economy as a whole.

1. **Statement of Organizational Interest**

Maine Equal Justice is a non-partisan civil legal aid and economic justice organization, dedicated to building economic security, opportunity, and equity for all Mainers. We also spearhead the Peer Workforce Navigator Network ("PWN") and work in partnership with five community-based organizations and the Maine Department of Labor to connect low-income workers to education and training and in-demand careers. Through peer-to-peer navigation services we ensure unemployed and under-employed workers get connected to what they need to thrive in Maine's workforce. PWN increases economic mobility for working families and addresses critical workforce shortages through our work with local employers as well as training partners like area community colleges, adult education programs, trade unions, and apprenticeship programs. Our partners include employers and training providers in the trucking

and transportation sector all of whom are negatively impacted by FMCSA's 9/29 Interim Final Rule.

**2) Economic Impact: The IFR threatens the economic stability of Maine families, Maine industries, and Maine communities.**

In addition to limiting the issuance of new CDLs, the interim final rule restricts already qualified and experienced drivers from renewing licenses they have rightfully earned. This jeopardizes a stable career into which thousands of immigrant workers have invested many years and personal resources; acquiring debt for training, equipment, vehicles, and other business expenses. The rule has already generated confusion and distress for both drivers and employers who have relied on a consistent Non-Domiciled License renewal process for many years. Over the past month, nearly a dozen individuals with current CDL licenses reached out to PWN for help. Drivers were unsure of whether their licenses were still valid and they were unable to get clear guidance from area employers. A number of these drivers immediately quit their jobs, terrified that despite valid CDLs, employment authorization, and humanitarian immigration statuses, they would be subjected to detention or deportation. One such driver, upon hearing about the change in the news, immediately sold his tractor trailer back to his agency, and is now unemployed and struggling to find new work to support his family.

FMCSA's new rule was developed without a clear economic analysis of the proposed changes. Here in Maine, the impacts will be felt across many fields. Trucking is a significant industry; one out of 16 workers are employed in trucking and logistics jobs and over 5300 companies employ drivers and other transportation workers.[1] Despite its vast footprint, the Maine trucking industry is experiencing record workforce shortages, particularly for drivers. Just this past May, the Maine Motor Transport Association ("MMTA") estimated the state needs 1100 more drivers to meet existing demands.[2] Industry experts estimate FMCSA's new rule will remove upwards of 200 Maine drivers from the road, which will further shortages in the industry[3]. If there are fewer

---

[1] Maine Motor Transport Association, "Trucking Facts" 2025 - https://www.mmta.com/truckingfacts/
[2] Kennedy, Dan MMTA Press Release " MMTA's "Go Your Way" Campaign Launches Custom Trailer Wrap Design Platform to Inspire the Next Generation of Trucking Professionals" (May 19 2025)

[3] Benninghoff, G. (2025, November 12). Federal CDL change leaves Maine's immigrant drivers - and employers - in limbo. The Portland Press Herald.

license-holders, existing drivers may have to work overtime or drive longer trips, increasing the likelihood of distracted driving and potential crashes, a result that violates the agency's own safety rationale articulated in their interim rule.

The deleterious effects of this rule will be felt well beyond the transportation industry. MMTA states that Mainers rely on truck transport for over 80% of their material goods, which means CDL drivers are responsible for ensuring Mainers are connected to the things they need - like food and heating oil. Nearly all manufactured products in Maine rely on trucking to get goods to customers within our state and beyond. Likewise, every trucking trip adds revenue to state and federal highway funds, with $163 million paid by the industry each year in tolls and taxes.[4] Fewer drivers means fewer trips, causing delays in our local supply chain and decreasing sales and tax revenue, all of which puts the brakes on the economic engine of our state.

Maine towns and school districts also rely on immigrant drivers to fill much needed workforce gaps. In Portland, one in eight metropolitan bus drivers hold non-domiciled CDL licenses, which means Maine's largest city and public transit system stands to lose more than 10% of its operators.[5] Such shortages will create inevitable delays in scheduled transit, making it harder for people to get to work or medical appointments. Likewise, on the same day that FMCSA released the IFR, the Maine Department of Education announced that a month into the school year, school districts across the state still needed to fill 80 bus driver vacancies.[6] Maine's workforce agencies and trade associations have dedicated significant resources and effort to fill these workforce gaps with targeted campaigns and apprenticeship programs.[7] With an aging population, immigrant workers are one of the few positive and growing talent pools from which to fill critical positions in the industry.[8] This new rule not only threatens existing license holders, but interrupts efforts to

---

https://www.pressherald.com/2025/11/12/federal-cdl-rule-change-leaves-maines-immigrant-drivers-and-employers-in-limbo/

[4] Maine Motor Transport Association, "Trucking Facts" 2025 - https://www.mmta.com/truckingfacts/

[5] Snider, Ari, Federal Commercial Driverse License Restrictions Could Affect Over 100 Immigrants in Maine, https://www.mainepublic.org/immigration/2025-11-14/federal-commercial-driver-license-restrictions-could-affect-over-100-immigrants-in-maine

[6] Wooten, Ryan, News Center Maine, Maine schools face challenges with 80 bus driver vacancies statewide, https://www.newscentermaine.com/article/news/education/maine-schools-bus-driver-shortage-challenges/97-86e5833d-235c-4ea6-863e-7703b6f980f8 (Sep. 29, 2025)

[7] See "Go Your Own, Maine" advertising campaign at https://www.goyourwaymaine.com/why-trucking/

[8] Maine Department of Labor / CWRI, "Maine's Changing Labor Market" Report, https://www.maine.gov/labor/cwri/sites/maine.gov.labor.cwri/files/files/documents/ChangingLaborMarket.pdf, August 2024, Accessed November 2025

grow this essential workforce, causing interruptions to daily life not just for drivers themselves, but school children, workers, people with disabilities, and seniors who rely on public transportation every day.

**3) Reliance Interests: The IFR interrupts established workforce pathways for dozens of workers, burdening workers, employers, and training providers who have invested significant resources into growing the commercial trucking industry in Maine.**

The FMCSA fails to consider reliance interests in their new rule, a requirement under the Administrative Procedure Act whereby the agency must adequately address how stakeholders have relied on regulatory stability prior to a proposed rule change.[9] As previously mentioned, many Maine employers and trades unions have developed training pipelines and targeted their recruitment efforts to attract immigrant drivers. Employers have invested significant resources into the training, onboarding and retention of new drivers based on the understanding that employment authorized immigrants will be able to lawfully obtain non-domiciled CDLs. Likewise, educational institutions have developed CDL training programs and enrolled and offered scholarships and financial aid to countless students who are now no longer able to complete their programs and utilize their training. Not only is this a huge burden for individual students, it is a liability for schools who are not able to deliver on contracts with students *and* who stand to lose tuition revenue in future semesters should their applicant pool be reduced. In fact, we have heard from a local training partner that the Maine BMV advised them to stop enrolling students whose immigration status would not qualify them under the new rule.

**3a) Case study 1: Organizational Reliance Interest**

> *We share an additional example from a public adult education provider, Portland Adult Education ("PAE"). PAE recently started a new apprenticeship program for transportation careers in partnership with the local metropolitan transit authority and other private-sector transportation employers. PAE had already started their semester when the new rule was released. Students and teachers alike were devastated to realize that only one of the nearly two dozen students enrolled in the program would still qualify for a CDL under the new rule, despite all the students pursuing a lawful immigration*

---

[9] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020)

*process and possessing valid work authorization. PAE has had to completely pivot their curriculum. As a result they are offering more generalized job market training to students in the class, but the partnerships with specific employers have been broken and the class is less effective and does not deliver on its stated goals for students*.

**3b) Case study 2: Individual Reliance Interest**

*One PWN client, Timothee* is an asylum-seeker from Angola. He has an associates degree in technology from his home country and is fluent in English, but was struggling to find well-paying employment without a long work history in Maine. He wanted to work in the shipping and logistics industry, and felt that obtaining his CDL would help him launch a career where he could pivot to more technical roles in the future. He enrolled at a local for-profit training institution for an intensive CDL course which he completed in August 2025. This fall, he went to upgrade his CD learner's permit and take the license exam but was told by the institution that due to this sudden federal rule change impacting people with his immigration status, he was no longer eligible to apply for a license. Timothee had enrolled in this intensive course on the basis that he could easily pay back his debt once he was licensed and employed as a driver. Now, he has over $4000 in past-due tuition for a credential he cannot use. Despite an extensive search, he could not find relief from this debt from public sources and the school will not waive the fee. He remains stuck in his retail job earning just above minimum wage, and is now faced with a $200 payment plan to resolve the debt. He has to start his education and training journey over, having sunk nearly a year of work into a now unusable license, and will likely acquire more debt in the process.*

Under *State Farm*, the FMCSA must acknowledge and weigh reliance interests before adopting a rule that reverses or changes the status quo. FMCSA's new IFR neither acknowledges the reliance interests of any of the above named parties, nor provides adequate reasoning for disregarding these interests.

**4) Lack of compelling evidence: The new rule is based on unfounded safety concerns about non-citizen drivers. It discriminates against qualified and work authorized immigrants with lawful presence in the United States.**

Lastly, the FMCSA fails to provide accurate or compelling reasons for limiting licenses by certain immigration categories. Regardless of immigration status, all CDP and CDL holders are held to the same, consistent national standard and are evaluated by the same exams. We agree that the safety of our country's roadways is of the utmost importance and a grave concern for all Americans. Yet, the IFR does nothing to update any training requirements that might result in added driver precaution or added safety measures. Instead, the FMCSA points to just five instances of crashes involving non-citizen drivers, amongst the thousands that occur each year as a vague justification for the change.[10] Indeed, in the same guidance, the agency contradicts itself, acknowledging that there is no connection between a drivers' country of origin and their safety record, saying "[t]here is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations." If this is the case, then the agency has clearly not considered relevant factors or substantive data, and the rule arbitrarily limits CDL eligibility with little evidence that such a change will accomplish the "national security" goals articulated in the guidance. In fact, recent research studying crash data in Canada found that immigrant motorists were hospitalized in crashes 45% *less* often than long-time resident drivers, suggesting that immigrant drivers are in fact involved in fewer crashes and much less fatal ones as well. [11] Given the above reasons, the economic harm this rule change creates carries no clear benefit, is not based on a rational connection between facts presented, and as such should be considered arbitrary and capricious.[12]

Maine's transportation and logistics industry relies on immigrant drivers to fill workforce shortages and deliver the goods Mainers need. Likewise, Maine communities and schools rely on immigrant drivers to fill similar workforce gaps so that our modern transportation system can get

[10] Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46514 (to be codified at 49 C.F.R. 383 and 384).
[11] Redelmeier DA, Katz D, Lu H, Saposnik G. Roadway crash risks in recent immigrants. Accid Anal Prev. 2011 Nov;43(6):2128-2133. doi: 10.1016/j.aap.2011.05.036. Epub 2011 Jul 2. PMID: 21819843.
[12] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983)

people where they need to go with efficiency and safety. The same can be said for communities across the country, where nationwide, one in six CDL holders is a non-citizen and where this rule will also have detrimental effects. The FMCSA's interim final rule is not grounded in rational fact, it discriminates against a vital population within an essential workforce, and it has devastating economic impacts on workers, their families and their communities. We urge you to rescind this rule immediately.

MALDEF
The Latino Legal Voice for Civil Rights in America.

**Washington, D.C. Regional Office**
1016 16th Street, NW
Suite 100
Washington, DC 20036
*Tel:* 202.293.2828

**National Headquarters Los Angeles Regional Office**
634 S. Spring Street
Los Angeles, CA 90014
*Tel:* 213.629.2512

**Chicago Regional Office**
11 East Adams
Suite 700
Chicago, IL 60603
*Tel:* 312.427.0701

**San Antonio Regional Office**
110 Broadway
Suite 300
San Antonio, TX 78205
*Tel:* 210.224.5476

**Sacramento Policy Office**
1512 14th Street
Sacramento, CA 95814
*Tel:* 916.444.3031

***Submitted via www.regulations.gov***

November 26, 2025

Dockets Operations
U.S. Department of Transportation
1200 New Jersey Avenue SE, West Building, Ground Floor
Washington, DC 20590

**Re: Interim Final Rule by Federal Motor Carrier Safety Administration Regarding Non-Domiciled Commercial Drivers' Licenses; Docket ID. FMSCA-2025-0622.**

Dear Dockets Operations:

I write on behalf of MALDEF (Mexican American Legal Defense and Educational Fund) in response to the Interim Final Rule published by the Federal Motor Carrier Safety Administration (FMCSA) on September 29, 2025 (hereinafter "IFR").[1] Founded in 1968, MALDEF is the nation's leading Latino legal civil rights organization. Often described as the "law firm of the Latino community," MALDEF promotes social change through legislative and regulatory advocacy, community education, and high-impact litigation in voting rights, education, immigrant rights, employment, and freedom from open bias. MALDEF has a long history of fighting to secure services and fair treatment for immigrants.

MALDEF has grave concerns about the IFR's failure to follow the substantive and procedural requirements of the Administrative Procedure Act (APA). MALDEF is particularly concerned that the IFR prevents states from issuing "non-domiciled" commercial driver's licenses (CDLs) and commercial learner's permits (CLPs)[2] to immigrants who are not lawful permanent residents and who do not have an H-2A, H-2B, or E-2 visa.[3] As a result, the IFR will bar thousands of drivers with lawful

---

[1] Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46509 (Sept. 29, 2025) (to be codified at 49 C.F.R. pts. 383, 384).
[2] States may issue either resident or non-domiciled CDLs and CLPs. Only U.S. citizens and lawful permanent residents qualify for "resident" licenses and permits because they are "domiciled" in a U.S. state as defined by 49 C.F.R. § 383.5. *See* Commercial Driver's License Standards, Requirements and Penalties; Regulatory Guidance, 84 Fed. Reg. 8464, 8470 (2019). Prior to the IFR, immigrants who were neither U.S. citizens nor permanent residents – and who were not from Canada or Mexico – could obtain a non-domiciled CDL or CLP if they presented an I-94 form accompanied by an unexpired employment authorization document (EAD) or foreign passport. *See id.*
[3] *See* 90 Fed. Reg. at 46515.

immigration status from receiving or renewing these permits and licenses, and it will cause at least 194,000 drivers to lose their jobs.[4]

**For the following reasons, MALDEF strongly opposes the IFR and urges FMCSA to withdraw it in its entirety.**

## I. THE IFR VIOLATES THE SUBSTANTIVE REQUIREMENTS OF THE APA.

Under the APA, agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."[5] Agency action is considered arbitrary and capricious "if the agency has relied on factors which [sic] Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[6] For the following reasons, the IFR is arbitrary and capricious and therefore violates the APA.

### a. The IFR Fails to Connect Immigration Status with Driver Safety.

An agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[7] The IFR conditions eligibility for non-domiciled CDLs and CLPs on immigration status.[8] Therefore, FMSCA was required to explain a rational relation between certain immigration statuses and driver safety.[9]

The agency failed to "articulate a satisfactory explanation."[10] It did not provide any empirical evidence of a correlation between the safety of a non-domiciled driver and their immigration status. It therefore failed to establish that restricting non-domiciled CDLs and CLPs to only three categories of visa holders would improve road safety.[11] Moreover, the agency conceded that there "is not sufficient evidence . . . [to] demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States."[12] In other words, FMSCA admitted that it could not prove that non-domiciled drivers are more dangerous than domiciled drivers. By the agency's own admission, it failed to demonstrate the need for the IFR.

---

[4] *Id.* at 46519.
[5] 5 U.S.C. §§ 706(2)(A)-(D).
[6] *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co. (State Farm)*, 463 U.S. 29, 43 (1983).
[7] *Id.* at 43, 56 (citation and quotations omitted).
[8] *See* 90 Fed. Reg. at 46515.
[9] Because the IFR in effect determines employability of immigrants, resulting as noted in loss of jobs for 194,000 immigrants, and the Congress has delegated the determination of employability of immigrants solely to the Attorney General, *see* 8 U.S.C. § 1324a(h)(3), the FMSCA must justify its proposed rule on safety, not employability of immigrants. *See also infra* note 18.
[10] *State Farm*, 463 U.S. at 43.
[11] *See* 90 Fed. Reg. at 46520 ("Given insufficient evidence, a direct quantitative estimate of the potential safety benefits resulting from this IFR cannot be developed.").
[12] *Id.*

Undeterred, the agency promulgated the IFR, relying on five accidents from the last year to suggest that all immigrants, except three categories of visa holders, are too dangerous to hold CDLs.[13] These accidents are tragic, but the details recounted in the IFR show they were the product of individual driver error. Nothing in the IFR suggests that these accidents were more or less likely to happen if the drivers had been domiciled in the United States or held certain visas.

Moreover, these isolated incidents pale in comparison to the number of accidents involving domiciled commercial drivers. There have been 2,399 fatal large truck and bus accidents this year,[14] but FMSCA only cited five involving non-domiciled CDL holders. It is absurd, based on this evidence, to suggest that immigrants are uniquely dangerous drivers.

It is equally absurd to suggest that H-2A, H-2B, and E-2 visa holders are necessarily safer drivers than asylum seekers, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients. The agency states that because these visa holders are required to submit "proof of work," they are approved for jobs that may require a non-domiciled CDL.[15] However, the immigrants newly excluded under the IFR can also obtain employment authorization,[16] and are often approved by their employers for jobs that require CDLs.[17] The agency can point to nothing special about these visa categories that make these visa holders safer drivers than those excluded under the IFR.

In sum, because FMSCA failed to connect the excluded immigration statuses with driver safety, the IFR is arbitrary and capricious.[18]

**b. This Rule Cannot be Justified by Want of Access to Driver History.**

Government lawyers now defend the rule in court against a pending challenge as necessary to ensure that states do not award licenses to applicants without verified driving records.[19] As the *Rivera Lujan* petitioners responded, this is a post-hoc rationalization that contradicts the justification in the IFR.[20] And as described below, the agency failed to consider that the driving histories of many excluded immigrants are as accessible as those of the immigrants who can still obtain non-domiciled CDLs and CLPs under the IFR.

---

[13] *See id.* at 46512-13.
[14] *Crash Statistics,* FED. MOTOR CARRIER SAFETY ADMIN., https://ai.fmcsa.dot.gov/crashstatistics?tab=Summary&type=&report_id=1&crash_type_id=4&datasource_id=1&time_period_id=2&report_date=0&vehicle_type=1&state=NAT&domicile=ALL&measure_id=1&operation_id=null (Last accessed Nov. 11, 2025).
[15] *See* 90 Fed. Reg. at 46515.
[16] *See* 8 C.F.R. § 274A.12(c) (2025) (listing the immigrants eligible for employment authorization).
[17] *See* Emergency Motion for a Stay Pending Review for Petitioners-Appellants at 13, *Rivera Lujan et al. v. Fed. Motor Carrier Safety Admin et al.*, No. 25-1215 (D.C. Cir. Oct. 24, 2025).
[18] MALDEF also agrees with the King County petitioners that Congress did not give FMSCA the statutory authority to regulate based on immigration. *See* Emergency Motion for Stay Pending Review for Respondent at 14-15, *Martin Luther King, Jr. County v. Duffy et al.*, No. 25-1244 (Oct. 24, 2025).
[19] *See* Joint Response to Emergency Motions for Stay Pending Review for Respondents at 10-12, *Rivera Lujan, et al. v. Fed. Motor Carrier Safety Admin., et al.*, No. 25-1215,-1224 (D.C. Cir. Oct. 31, 2025).
[20] *See* Reply in Support of Emergency Motion for a Stay Pending Review for Petitioners at 3, *Rivera Lujan, et al. v. Fed. Motor Carrier Safety Admin., et al.*, No. 25-1215,-1224 (D.C. Cir. Nov. 3, 2025).

FMSCA concluded that state agencies issued CDLs to ineligible drivers because they could not obtain a ten-year driving history for applicants who had previously driven in foreign jurisdictions.[21] The agency also noted that because the IFR limits eligibility to three visa categories, fewer drivers with unknown safety records would be approved for licenses.[22]

The agency failed to establish that the driving records of the immigrants it now excludes are less accessible than those of select visa holders. For example, the rule bars DACA recipients from CDLs and CLPs,[23] even though they have lived most of their lives in the United States.[24] These immigrants likely learned to drive here and would have no foreign driving records; any driving records they have would be domestic and readily accessible.[25] Therefore, it cannot be true that it is always harder to access the driving records of a DACA recipient than those of an H-2A visa holder. The same could be said of many other excluded immigrants who either learned to drive in the United States or resided in the country for years.[26]

In banning classes of immigrants from CDLs and CLPs, FMSCA ignored that many immigrants have easily accessible driving records and that these records could be evaluated individually. Regardless, the agency's failure to consider an important aspect of the problem renders the IFR arbitrary and capricious.[27]

**c. FMSCA Failed to Appropriately Account for Reliance Interests Created by Prior Regulations.**

Because FMSCA "was not writing on a blank slate," it was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" in the IFR.[28] The agency's failure to do so makes its action arbitrary and capricious.[29]

For years, FMSCA regulations have allowed a range of immigrants with employment authorization to obtain non-domiciled CDLs and CLPs.[30] In 2019, FMSCA guidance explicitly stated that foreign drivers "holding an employment authorization document or an unexpired foreign passport . . . [and an] I–94 Arrival/Departure Record may obtain a non-domiciled CDL."[31] Relying on past regulations, roughly

---

[21] *See* 90 Fed. Reg. at 46514.
[22] *See id.* at 46516.
[23] *See id.* at 46515.
[24] This change has a significant impact on the Latino community because the vast majority of DACA recipients are Latino. *See Deferred Action for Childhood Arrivals (DACA) Data Tools*, MIGRATION POL'Y INST., https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles?gad_source=1&gad_campaignid=46884364&gbraid=0AAAAAD8CHmqLPMYT1QpgwkQFg8j-Tyje6&gclid=Cj0KCQiArOvIBhDLARIsAPwJXOav3jgdS-69PTNCS0wjpJeU0vuoXEjflqmwy_9ALvi9lIgmRYitteYaAs9REALw_wcB (last accessed Nov. 17, 2025).
[25] *See* Reply for Petitioners, *supra* note 20, at 4.
[26] *Cf. id.* at 4-5.
[27] *See State Farm*, 463 U.S. at 43.
[28] *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020).
[29] *See id.* at 30.
[30] *See* 90 Fed. Reg. at 46515.
[31] 84 Fed. Reg. at 8470.

220,000 people currently hold non-domiciled CDLs or CLPs.[32] Under the IFR, roughly 194,000 are expected to lose their licenses.[33]

The IFR glosses over the significant reliance interests created by prior agency rules. Although FMSCA acknowledges that many drivers will lose their licenses, it states that the costs are de minimis and that most drivers will find work in unrelated sectors, like construction.[34] However, the rule provides no explanation, let alone evidence, why these drivers will successfully transition to other sectors. Indeed, the agency largely ignores the effect the IFR will have on drivers who will lose their licenses.[35]

The IFR also fails to analyze whether these reliance interests are indeed outweighed by any benefit. The agency insists the IFR is a safety measure yet concedes it cannot quantify the safety benefit.[36] FMCSA also offers no explanation as to why stripping 194,000 drivers of their licenses is necessary for safety, nor does it assess whether the commercial driving market can remain safe after losing so many workers. Indeed, some evidence suggests the rule may harm, rather than promote, public safety.[37]

Because FMSCA failed to address the reliance interests and concluded without evidence that they are outweighed, the IFR is arbitrary and capricious.

## II. FMSCA FAILED TO COMPLY WITH THE PROCEDURAL REQUIREMENTS OF THE APA.

The IFR violates the APA by failing to comply with its procedural requirements. Under the APA, legislative rules must undergo notice and comment before taking effect, unless an agency finds for good cause that these procedures are "impracticable . . . or contrary to the public interest."[38] This good cause exception is "narrowly construed and only reluctantly countenanced."[39] It excuses notice and comment only "in emergency situations . . . or where delay could result in serious harm."[40] There must be a real crisis to invoke the good cause exception; "unsupported assertion[s]" are insufficient.[41]

Here, FMSCA manufactured an emergency based on scant evidence to justify an IFR. It claims there is a crisis based on five fatal accidents this year involving non-domiciled CDL holders, out of 2,399 total.[42] FMSCA fails to articulate why these five accidents create any more of an emergency than 2,394 caused

---

[32] *See* 90 Fed. Reg. at 46519.
[33] *Id.*
[34] *Id.* at 46520.
[35] The IFR also violates Executive Order 12866, which requires agencies to "propose or adopt a regulation only upon a reasoned determination that its benefits justify its cost" and "tailor regulations to impose the least burden on society." Exec. Order No. 12866, 3 C.F.R. 638 (1994). Without analysis of how non-domiciled CDL holders will transition to other sectors, the IFR cannot be based on a reasonable determination that it imposes the least societal burden.
[36] *See* 90 Fed. Reg. at 46520.
[37] *See* Reply for Petitioners, *supra* note 20, at 7.
[38] 5 U.S.C. § 553.
[39] *Tennessee Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1146 (D.C. Cir. 1992) (citation omitted).
[40] *Jifry v. F.A.A.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (citations omitted).
[41] *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 707 (D.C. Cir. 2014).
[42] *See* 90 Fed. Reg. at 46514; FED. MOTOR CARRIER SAFETY ADMIN., *supra* note 14.

by domiciled CDL holders.[43] Given that 120 people are killed in car crashes every day,[44] FMSCA should focus on efforts that actually address the dangers of driving on our roads rather than performative rulemaking that is not justified by evidence.

FMSCA also claims that complying with notice and comment procedures would have allowed a deluge of applications to be filed before the rule took effect, which would have caused states to issue licenses to ineligible applicants.[45] But, as the *Rivera Lujan* petitioners note, there is scant evidence to suggest there would be a surge in applications, or a corresponding surge in ineligible license holders.[46]

Ultimately, there is no good cause to justify forgoing notice and comment, and therefore the IFR violates the APA's procedural requirements.

## III. CONCLUSION

FMSCA wants to strip most non-domiciled CDL holders of their licenses because of five accidents and a series of unsupported aspersions cast against immigrant drivers. To do so, it promulgated an IFR that is substantively and procedurally defective for the reasons stated above. If it remains in place, it will result in a substantial negative impact on the Latino community and on the many immigrants who relied on prior regulations when they joined the commercial driving industry.

For the foregoing reasons, MALDEF urges FMSCA to withdraw the IFR in its entirety. Please feel free to contact us with any questions or concerns about these comments at (202) 293-2828 or at salarcon@maldef.org.

Sincerely,

*Sebastian T. Alarcon*

Sebastian T. Alarcon
Staff Attorney

---

[43] *See* FED. MOTOR CARRIER SAFETY ADMIN., *supra* note 14.
[44] *About Transportation Safety*, CTRS. FOR DISEASE. CONTROL & PREVENTION, https://www.cdc.gov/transportation-safety/about/index.html#:~:text=Overview,cost%20estimates%20for%20lives%20lost (last accessed Nov. 12, 2025).
[45] *See* 90 Fed. Reg. at 46515.
[46] *See* Motion for a Stay for Petitioners-Appellants, *supra* note 17, at 21-24.

THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

(617) 727-2200
www.mass.gov/ago

November 26, 2025

***Via Electronic Submission to Regulations.gov***

Secretary Sean Duffy
U.S. Department of Transportation
1200 New Jersey Avenue SE
Washington, DC 20590

Administrator Derek Barrs
Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE
Washington, DC 20590

**Re: Interim Final Rule and Request for Comments: "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)" (Docket No. FMCSA-2025-0622)**

Dear Secretary Duffy and Administrator Barrs:

We, the undersigned Attorneys General of Massachusetts, California, Arizona, Colorado, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Minnesota, Nevada, New Mexico, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington write in opposition to the above-entitled Interim Final Rule (IFR)[1] promulgated by the Department of Transportation and the Federal Motor Carrier Safety Administration (collectively, FMCSA). For the reasons that follow, FMCSA should rescind the IFR and should not repromulgate it as a final rule.

The IFR's dramatic new restrictions on eligibility for non-domiciled commercial driver's licenses (CDLs) and commercial learner's permits (CLPs) are unlawful. By FMCSA's own calculations, the IFR will strip nearly all of the country's 200,000 non-domiciled CDL holders of their licenses and their livelihoods, resulting in the loss of over 5% of the commercial driver workforce. FMCSA lacks the statutory authority to impose these restrictions, and its actions are arbitrary and capricious. FMCSA claims that the IFR's new restrictions are necessary for public safety, but the agency admits that it lacks evidence that these restrictions provide *any* additional safety

[1] *See* Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46,509 (Sept. 29, 2025), as corrected, 90 Fed. Reg. 47,627 (Oct. 2, 2025).

benefits. Further, while Congress has by statute mandated that FMCSA both (1) consult with the States *before* prescribing new regulations regarding the issuance of CDLs and CLPs, and (2) allow the public to review its proposed regulations and provide comments *before* the regulations go into effect, FMCSA circumvented these accountability provisions and made the IFR effective immediately, without any advance notice, opportunity to comment, consultation with the States, or consideration of the disruption the IFR would cause.

These unlawful actions have harmed and will continue to harm our States. Public and private employers—including State and local governments—depend on commercial drivers to drive the buses that bring children to school, to run the mass transit systems that transport people to work, to operate the construction vehicles that maintain and repair public roads, to drive the trucks that transport food and goods to businesses, and to provide many other indispensable services. The IFR will stop virtually all non-domiciled commercial drivers from performing these essential functions, raising costs and disrupting economic and other important activity across the nation. Tens of thousands of drivers will also face losing their licenses and their livelihoods. And the IFR will impose obligations directly on the States themselves, forcing them to overhaul their licensing systems and comply with needlessly burdensome requirements. These disruptions came without time for individuals, their families, their employers, or State and local governments to prepare, due to FMCSA's violation of the advance-consultation and notice-and-comment requirements that Congress mandated to prevent exactly this sort of rule by agency fiat.

The U.S. Court of Appeals for the D.C. Circuit has already temporarily stayed the IFR based on its determination that FMCSA's actions in promulgating the IFR were likely arbitrary, capricious, and unlawful.[2] While this stay may mitigate the impacts of the IFR for a time, FMCSA should not further delay in correcting its mistake and instead should rescind the IFR immediately and not repromulgate it as a final rule.

## BACKGROUND

According to the IFR notice, there are 3.8 million active interstate CDL holders in the United States.[3] Of those, approximately 200,000, or slightly over 5%, hold what are known as non-domiciled CDLs, which are available to individuals who are not U.S. citizens or permanent residents but who are lawfully present in the United States and have satisfied the training, skills, and knowledge tests and requirements applicable to all individuals seeking to hold CDLs.[4] Non-domiciled CDL holders include recipients of Deferred Action for Childhood Arrivals (DACA), who arrived in the United States as children and have continuously resided in the United States throughout their lives. Non-domiciled CDL holders also include other long-time U.S.

[2] *See Rivera Lujan v. FMCSA*, No. 25-1215, 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025).

[3] 90 Fed. Reg. at 46,520.

[4] *Id.*; 49 C.F.R. §383.71(f) (Sept. 28, 2025); *see* 49 C.F.R. pt. 383.

residents, such as individuals with temporary protected status or individuals who have been granted asylum or refugee status and may have lived in the United States for years or decades.

Even before the IFR was promulgated, all applicants for non-domiciled CDLs and CLPs were required to establish legal presence in the United States.[5] Specifically, even before the IFR, applicants already had to present documentation satisfying the standards for proving legal presence set forth by the U.S. Department of Homeland Security (DHS)—the federal department charged with the administration and enforcement of the nation's immigration and naturalization laws.[6]

The IFR—which FMCSA promulgated without any advance notice and without providing the public an opportunity to comment—imposes dramatic new restrictions on eligibility for non-domiciled CDLs and CLPs. In particular, the IFR restricts eligibility to three limited categories of individuals—Temporary Agricultural Workers (H-2A status), Temporary Non-Agricultural Workers (H-2B status), and Treaty Investors (E-2 status)—and bars all other non-U.S. citizens without lawful permanent residence from obtaining CDLs or CLPs.[7] This includes an outright bar on all asylum grantees, refugees, and DACA recipients—even though they are legally present and have legal authorization to work in the United States. Additionally, the IFR bars individuals in these categories who already have non-domiciled CDLs from renewing them—regardless of how many years or decades such individuals have held CDLs or whether their driving records demonstrate safe, conscientious, and legally compliant operations.

FMCSA estimates that there are roughly 200,000 non-domiciled CDL holders in the United States, and that the IFR will cause virtually all of them to lose their CDLs (as the CDLs come up for renewal), forcing them to exit the market entirely within two years.[8] FMCSA's own calculations state that this will result in a loss of approximately 5% of the nation's total CDL labor force.[9]

FMCSA claims that these dramatic restrictions on CDL and CLP eligibility are necessary for public safety.[10] At the same time, however, FMCSA expressly admits

---

[5] 49 C.F.R. §383.71(f)(2) (Sept. 28, 2025).

[6] 76 Fed. Reg. 26,854, 26,858 (May 9, 2011) ("adopt[ing] the appropriate documents from the most recent list that DHS adopted for proof of citizenship or legal presence").

[7] 90 Fed. Reg. at 46,515.

[8] *Id.* at 46,520.

[9] *Id.*

[10] *Id.* at 46,514 (claiming as justification for the IFR that "eligibility requirements to obtain a non-domiciled CLP and CDL are not narrowly tailored to provide a sufficient margin of safety to protect the traveling public"); *see id.* at 46,513–46,515.

that it has *no* evidence that the IFR or its new CDL and CLP eligibility restrictions would provide *any* additional public safety benefits.[11] Specifically, FMCSA admits:

> There is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations. FMCSA conducted a literature review and found a few articles focused on the safety performance impacts of undocumented immigrants or illegal aliens,[[12]] but has not obtained information on how many such drivers have sought to obtain a non-domiciled CDL in the United States. Given insufficient evidence, a direct quantitative estimate of the potential safety benefits resulting from this IFR cannot be developed.[13]

Indeed, FMCSA's own data indicates that the CDL holders who are excluded under the IFR are involved in fatal crashes at a *lower* rate than drivers who will not be affected by the IFR's new restrictions.[14]

## DISCUSSION

### I. The IFR unlawfully exceeds FMCSA's statutory authority.

Federal agencies "are creatures of statute and as such literally have no power to act except to the extent Congress authorized them." *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 912 (D.C. Cir. 2024) (quotation marks and brackets omitted). Accordingly, an agency violates the Administrative Procedure Act (APA) if it acts "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. §706(2)(C), or if it "relie[s] on factors which Congress has not intended it to consider." *Am. Clinical Lab. Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022) (quotation marks omitted).

FMCSA violated these principles. The agency states that the IFR "is issued with respect to an immigration-related function of the United States,"[15] but FMCSA has no authority to carry out immigration-related functions. While FMCSA invokes

---

[11] *Id.* at 46,520.

[12] FMCSA's references to articles that investigate undocumented immigrants are particularly specious. The IFR's exclusions are not targeted to undocumented immigrants. As discussed above, even before the IFR was promulgated, individuals who were not lawfully present in the United States were not allowed to apply for or obtain CDLs or CLPs. 49 C.F.R. §383.71(a)(5), (f)(2) (Sept. 28, 2025). The IFR's new exclusions extend to individuals who are lawfully present in the United States, including asylum grantees, refugees, and DACA recipients.

[13] 90 Fed. Reg. at 46,520.

[14] *See Rivera Lujan,* 2025 WL 3182504, at *2.

[15] 90 Fed. Reg. at 46,521.

49 U.S.C. §31305(a) for its authority to issue the IFR,[16] that section authorizes FMCSA only to prescribe regulations "on minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle." It does not grant FMCSA open-ended regulatory authority, much less immigration-related regulatory authority. FMCSA has no statutory authority to carry out immigration functions or to issue a regulation "with respect to an immigration-related function." *See, e.g.*, *California v. Trump*, No. 25-cv-208-JJM-PAS, 2025 WL 3072541, at *9 (D.R.I. Nov. 4, 2025) (Department of Transportation does not have authority to impose immigration-related conditions on federal transportation funding); *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1083–1084 (11th Cir. 2013) (enjoining Department of Labor rule regarding employment of foreign workers and holding it likely that "DOL has exercised a rulemaking authority that it does not possess," because "we would be hard-pressed to locate that power in one agency [DOL] where it had been specifically and expressly delegated by Congress to a different agency [DHS]").[17]

FMCSA's lack of immigration authority aside, the agency also overreads the statutes that it cites as justifying its action. As just discussed, for example, 49 U.S.C. §31305(a) allows FMCSA to promulgate regulations regarding testing and fitness; the statute enumerates eight specific things that such regulations "shall" or "may" do (*e.g.*, set minimum test scores). Nothing about the text, structure, history, or purpose of that provision gives the agency the power to completely exclude entire categories of applicants who are lawfully present in the United States based on their immigration status. The agency's references to 49 U.S.C. §31136(a)(1)–(2) and §31502(b) are similarly misplaced: those provisions likewise deal with safety standards for operation of vehicles—not the categorical exclusion of whole classes of drivers. FMCSA's invocation of 49 U.S.C. §31311(a)(12)(B)(ii) is inapt, too. Whatever power that statute gives the Secretary to "prescribe[]" regulations governing the CDL program, it does not grant the freewheeling authority FMCSA claims.

Finally, the IFR creates conflict with other statutory provisions. The Immigration and Nationality Act expressly prohibits employment discrimination on the basis of

---

[16] *Id.* at 46,511.

[17] In defending the IFR in litigation, FMCSA has attempted to deny that the IFR is an immigration-related rule. Instead, FMCSA claims that "immigration status is relevant here only insofar as it relates to the accessibility of driving records by licensing agencies within the United States and the availability of alternative vetting mechanisms." Joint Resp. to Emergency Mots. for Stay Pending Review at 16, *Rivera Lujan v. FMCSA*, No. 25-1215 (D.C. Cir. Oct. 31, 2025), Doc. No. 2143339. FMCSA does not explain how it can reconcile this position with its claim in the IFR notice that the IFR "is issued with respect to an immigration-related function of the United States." 90 Fed. Reg. at 46,521. Additionally, as discussed below, even if FMCSA's justification for the IFR really were only based on the supposed unavailability of foreign driving history, the IFR is arbitrary and capricious, as it is both irrationally overinclusive and irrationally underinclusive and reflects a total "disconnect between the decision made and the explanation given." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

citizenship against individuals who have been granted asylum or refugee status, among others. 8 U.S.C. §1324b(a)(1), (3)(B). Likewise, the Civil Rights Act prohibits employment discrimination on the basis of citizenship against individuals who have work authorization, including DACA recipients. 42 U.S.C. §1981; *see, e.g.*, *Anderson v. Conboy*, 156 F.3d 167, 169 (2d Cir. 1998) (explaining that §1981 "proscribes private alienage discrimination with respect to the rights set forth in the statute," including "contracts of employment"); *Rodriguez v. Procter & Gamble Co.*, 465 F. Supp. 3d 1301, 1315 (S.D. Fla. 2020) (holding that "the text and legislative history of Section 1981 confirm that the statute's protection against employer alienage discrimination applies to all work-authorized immigrations," including "DACA recipients"); *Juarez v. Nw. Mut. Life Ins. Co., Inc.*, 69 F. Supp. 3d 364, 368–370 (S.D.N.Y. 2014) (employer hiring policy that "discriminates against a subclass of lawfully present aliens" violates §1981). The IFR is impossible to reconcile with the policies embodied in these statutes.

## II. The IFR is arbitrary and capricious.

The IFR also violates the APA because it is arbitrary and capricious. As discussed above, FMCSA claims that the IFR's dramatic restriction on CDL and CLP eligibility is necessary for public safety.[18] At the same time, however, FMCSA expressly admits that it does not have evidence that the IFR provides any additional public safety benefits.[19] This alone is sufficient to render the IFR arbitrary, capricious, and unlawful. *See, e.g.*, *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 540 (D.C. Cir. 2025) ("[A]gency action is arbitrary and capricious if it relies upon a factual premise that is unsupported by substantial evidence."); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data . . . .").

The IFR notice cites five fatal crashes involving drivers with non-domiciled CDLs that occurred in calendar year 2025.[20] Anecdotal reference to five crashes without any context or comparative data is not evidence that the IFR provides any safety benefits—as the IFR notice itself concedes.[21] FMSCA offers no facts suggesting that non-domiciled CDL holders are responsible for a disproportionate portion of these fatal crashes. By way of comparison, in calendar year 2023 (the most recent year for which FMCSA crash statistics for CDL holders are publicly available), there were

[18] 90 Fed. Reg. at 46,513–46,515.

[19] *Id.* at 46,520 ("There is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations.").

[20] *Id.* at 46,512–46,514.

[21] *Id.* at 46,520.

4,043 fatal large-truck and bus crashes involving CDL drivers.[22] FMCSA's citation to five fatal crashes does not provide support for its claimed justification that non-domiciled CDL and CLP holders present a particular safety risk or that restricting non-domiciled CDL and CLP eligibility would benefit public safety.

The IFR notice claims that its restriction on non-domiciled CDL and CLP eligibility is necessary because regulations require States to obtain applicants' complete ten-year driving history from all States where applicants were previously licensed, and (so the IFR notice claims) States are unable to carry out this requirement for individuals whose driving history exists predominantly or solely within a foreign jurisdiction.[23] But the IFR's restrictions on CDL eligibility bear no relation to the accessibility of driving history. On the one hand, the IFR applies to individuals with temporary protected status, asylum, or refugee status who have resided in the United States for years or decades and whose driving history is entirely or predominantly U.S.-based.[24] On the other hand, the IFR maintains CDL eligibility for individuals like temporary workers and foreign treaty investors whose driving history is predominantly or entirely foreign-based and thus inaccessible by the States.[25] "[T]he disconnect between the decision made and the explanation given" evidences such a "significant mismatch" so as to further render the IFR arbitrary, capricious, and unlawful. *Dep't of Commerce v. New York*, 588 U.S. 752, 783–785 (2019); *see, e.g.*, *World Shipping Council v. Fed. Maritime Comm'n*, 152 F.4th 215, 223 (D.C. Cir. 2025) (discussing arbitrariness

[22] FMCSA, *Crash Statistics*, https://ai.fmcsa.dot.gov/CrashStatistics?tab=Driver&type=&report_id=36&crash_type_id=1&datasource_id=2&time_period_id=2&report_date=2023&vehicle_type=1&state=AllStates&domicile=ALL&measure_id=1&operation_id=null (FARS snapshot date Dec. 31, 2023) (last visited Nov. 26, 2025) (*Driver License Status Crash Statistics*). FMCSA statistics for calendar year 2025 states that there have been 3,136 fatal crashes involving large trucks and buses through October 31, 2025, but these statistics do not provide breakdowns by CDL status. FMCSA, *Crash Statistics*, https://ai.fmcsa.dot.gov/CrashStatistics?tab=Summary&type=&report_id=1&crash_type_id=1&datasource_id=1&time_period_id=2&report_date=2025&vehicle_type=1&state=AllStates&domicile=ALL&measure_id=1&operation_id=null (MCMIS snapshot date Oct. 31, 2025) (last visited Nov. 26, 2025).

[23] 90 Fed. Reg. at 46,514.

[24] For example, DACA recipients were required to have come to the United States prior to their sixteenth birthday and must have continuously resided in the United States since 2007. U.S. Citizenship and Immigr. Servs., *Consideration of Deferred Action for Childhood Arrivals (DACA) > Frequently Asked Questions*, https://www.uscis.gov/humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions (last updated Oct. 30, 2025).

[25] The general requirements for an individual to be a treaty investor, for example, are that the individual must be a national of a country with which the United States maintains a treaty of commerce and navigation, must have invested or be actively in the process of investing a substantial amount of capital in a bona fide enterprise in the United States, and must be seeking to enter the United States solely to develop and direct the investment enterprise. U.S. Citizenship and Immigr. Servs., *E-2 Treaty Investors*, https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-2-treaty-investors (last updated Apr. 8, 2025). There are no requirements that treaty investors have U.S. driving history—to the contrary, given the restriction that they may enter the United States "solely to develop and direct the investment enterprise," they are more likely to *not* have prior accessible U.S. driving history.

of "a seeming discrepancy in the reach of [an agency] Rule given its underlying rationale" where rule "is seemingly *under*inclusive" and also "*over*inclusive" compared to agency's supposed rationale (emphasis in original)).

## III. The IFR fails to take serious reliance interests into account.

As the Supreme Court has held, when agencies change their existing policies, they must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020); *Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 221–222 (2016). "It would be arbitrary and capricious to ignore such matters." *Regents*, 591 U.S. at 30.

Before the IFR was promulgated, FMCSA had a longstanding policy that non-U.S. citizens with legal authorization to work in the United States were permitted to obtain CDLs. During the last Trump Administration, FMCSA reaffirmed this policy, publicly stating that "[a] foreign driver holding an employment authorization document or an unexpired foreign passport accompanied by an approved Customs and Border Protection (CBP) I-94 Arrival/Departure Record may obtain a non-domiciled CDL."[26] Numerous parties, including CDL holders, their family members, their employers, and State and local governments, reasonably relied on this policy and FMCSA's guidance. These individuals and entities have serious reliance interests in CDL holders' continued ability to do their jobs, which require them to maintain and renew their CDLs, and in the time and money spent training those CDL holders. FMCSA's failure to consider these serious reliance interests in promulgating an IFR that effectively strips these CDL holders of their licenses as soon as they come up for renewal, or when States are notified of a purported change in immigration status, renders the IFR arbitrary, capricious, and unlawful. *See Regents*, 591 U.S. at 31–33 (finding agency's action in rescinding DACA program to be arbitrary and capricious because "[t]he consequences of the rescission . . . would 'radiate outward' to DACA recipients' families, including their 200,000 U.S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them," and the agency "should have considered those matters but did not."); *Encino Motorcars*, 579 U.S. at 224 ("In light of the serious reliance interests at stake, the [agency]'s conclusory statements do not suffice to explain its decision.").

FMCSA acknowledges that "[t]his IFR will impact motor carriers that currently, or intend to, employ non-domiciled CDL holders that are no longer eligible to receive a credential" but claims that "[m]otor carriers that currently employ non-domiciled

[26] 84 Fed. Reg. 8464, 8470 (Mar. 8, 2019) ("*Question 1:* May a foreign driver with an employment authorization document obtain a CDL to operate a [commercial motor vehicle] in the United States? *Guidance:* Yes. A foreign driver holding an employment authorization document or an unexpired foreign passport accompanied by an approved Customs and Border Protection (CBP) I-94 Arrival/Departure Record may obtain a non-domiciled CDL.").

CDL holders will have some time to adjust to the change as the drivers will be aware if their license will not be renewed under the standards set forth in this IFR. By providing this time for adjustment, FMCSA anticipates that impacts to motor carriers will be mitigated."[27] FMCSA further acknowledges that the roughly 200,000 non-domiciled CDL holders currently in the United States "will exit the market within approximately two years as their credential comes up for renewal" but claims that "due to this prolonged two-year period of attrition, motor carriers will have time to adjust their hiring based on the requirements set forth in this IFR, including by marketing available positions to drivers with the proper qualifications to obtain a CDL."[28]

FMCSA's claims that motor carriers and other employers will have "time to adjust" and can "adjust their hiring" over the next two years fail. Contrary to FMCSA's claim, the IFR did not provide any "time for adjustment"—it went into immediate effect the day it was published, *i.e.*, September 29, 2025. Individuals whose non-domiciled CDLs came up for renewal on September 30, 2025, for example, or in October or November 2025, had no way to renew their CDLs and thus were effectively stripped of their livelihood immediately and abruptly, without any "time for adjustment." Employers likewise effectively lost these employees (and the time and money spent in finding, hiring, and training them) immediately and abruptly, without any "time for adjustment" or any transition period to find, hire, or train replacements. The supposed "prolonged two-year period" to which FMCSA alludes is the estimated time it will take for *all* non-domiciled CDL holders to lose their CDLs and exit the market, not for any given non-domiciled CDL holder to do so. Assuming CDLs come up for renewal at a consistent rate, approximately 8,000 non-domiciled CDLs will come up for renewal every month and, under the IFR's new restrictions, will not be renewable, leading to continuous ongoing losses (8,000 holders losing their jobs and 8,000 vacancies that employers will have to fill each month), not a "prolonged two-year period" for adjustment, as FMCSA claims.

FMCSA additionally claims that it "anticipates that drivers who will no longer be eligible for a non-domiciled CDL will be able to find similar employment in other sectors (*e.g.*, construction, driving vehicles that don't require a CDL, etc.)" and "will experience some de minimis costs as they move from one industry to another when their current credential expires."[29] The IFR notice, however, cites no data that supports its assertions that such individuals will be able to find similar employment or that their costs would be merely de minimis. Further, FMCSA's claim that transition costs resulting from the loss of a CDL will be merely "de minimis" is contradicted by FMCSA's statement that "[a] non-domiciled CDL is a high-value economic credential."[30] The IFR notice does not reconcile these conflicting statements and does not

[27] 90 Fed. Reg. at 46,519.

[28] *Id.* at 46,520.

[29] *Id.*

[30] *Id.* at 46,514.

take into account the serious reliance interests that non-domiciled CDL holders, their families, and their employers have in these "high-value economic credentials." *See, e.g.*, *World Shipping Council*, 152 F.4th at 221 (D.C. Cir. 2025) ("[O]f course, it would be arbitrary and capricious for the agency's decision making to be internally inconsistent.") (citation and quotation marks omitted).

## IV. The IFR's immigration-document retention and turnover requirements are legally unsupported and unwarranted.

The IFR imposes new requirements for State Driver's Licensing Agencies (SDLAs) to retain copies of documents used to prove a non-domiciled CDL applicant's lawful status and documents showing the results of any query to DHS's Systematic Alien Verification for Entitlements system (SAVE) for at least two years, and to provide copies of all documents involved in the licensing process, including immigration documents and SAVE query results, to FMCSA within 48 hours after request.[31] These requirements are unsupported and unwarranted.

As the IFR notice acknowledges, these information-collection requirements are subject to the Paperwork Reduction Act of 1995 (PRA).[32] Under the PRA, an agency may not conduct or sponsor a collection of information unless the agency has complied with certain statutorily mandated steps. 44 U.S.C. §3507(a). These steps include conducting a review of the proposed collection to assess its necessity, how to efficiently use the information, and the burden imposed on the persons providing the information. *Id.* §§3506(c)(1), 3507(a)(1). The agency must also provide 60 days' notice in the Federal Register soliciting comments regarding necessity, minimizing burdens, and other topics. *Id.* §§3506(c)(2), 3507(a)(1)(D). Following a 60-day public comment period, the agency must certify, using supporting records or public comments, that the proposed collection of information meets ten statutory criteria, including that collection is "necessary for the proper performance of the functions of the agency," and that it "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency." *Id.* §3506(c)(3). The IFR's document retention and turnover requirements do not satisfy these criteria.

First, this information collection is not "necessary for the proper performance of the functions of the agency." As discussed above, FMCSA has no statutory authority to carry out immigration functions. *See, e.g.*, *California*, 2025 WL 3072541, at *9; *Bayou Lawn & Landscape*, 713 F.3d at 1083–1084. Instead, as relevant here, FMCSA's functions are to set "minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle," 49 U.S.C. §31305(a)—and again, as FMCSA itself admits, FMCSA has no evidence demonstrating a relationship between immigration status and the fitness of an individual operating a

---

[31] *Id.* at 46,516.

[32] *Id.* at 46,522.

commercial motor vehicle.[33] Requiring SDLAs to retain copies of immigration documents and SAVE query results (which DHS, the federal department charged with the administration and enforcement of the nation's immigration and naturalization laws, would already have) and to produce such documents to FMCSA is unnecessary for the proper performance of FMCSA's functions.

Second, even if collection and production of these documents were necessary for the proper performance of FMCSA's functions, the IFR does not "reduce[] to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency." Rather, the IFR places considerable burden on SDLAs. The IFR contains no limitation as to how many documents FMCSA can request, or when or how often it can make requests, and its requirement that SDLAs provide documents on a 48-hours turnaround is plainly impracticable and places significant burdens on SDLAs. Indeed, under that requirement, FMCSA could make a request for thousands of documents on a Friday evening at 8 p.m. and demand that the SDLA provide documents by Sunday evening at 8 p.m., without a single working day in between. The IFR notice does not contain any mention, much less explanation, of why this new 48-hour turnover requirement is necessary. As the FMCSA notes, regulations already provide for annual program reviews of SDLAs in accordance with 49 U.S.C. §31311 and 49 C.F.R. §384.307, in which SDLAs must cooperate and provide information to FMCSA.[34] FMCSA does not explain why a new, separate 48-hour turnover requirement is necessary in light of the regulations that already exist, or how such a requirement is consistent with its obligation to "reduce[] to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency."[35]

The IFR notice also states that the Consolidated Appropriations Act of 2005 requires agencies to assess the privacy impact of a regulation that will affect the privacy of individuals.[36] FMCSA claims that the IFR "would not result in the collection of personally identifiable information (PII)."[37] But the IFR requires SDLAs to collect and retain copies of non-domiciled CDL applicants' immigration documents (including passports and I-94s), which contain PII, and to provide copies of all documents involved in the licensing process to FMCSA. Contrary to FMCSA's claim, the IFR

[33] *Id.* at 46,520 ("There is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations.").

[34] *Id.* at 46,512.

[35] *Cf.* 59 Fed. Reg. 26,029, 26,038 (May 18, 1994) ("The FHWA [FMCSA's predecessor agency] will rely in the first instance on the State's certification. The State is in a better position to evaluate its own compliance with the standards.").

[36] 90 Fed. Reg. at 46,523.

[37] *Id.*

requires the collection of PII. FMCSA's failure to comply with the statutory requirement to assess the privacy impact of the PII collection was arbitrary and capricious.[38]

Finally, the IFR has already placed an extreme operational burden on SDLAs, which have needed to verify immediate compliance with the IFR's new requirements. As a result, many SDLAs had to stop issuing non-domiciled CDLs altogether. For many States, implementing these new technological capacities will further delay their ability to issue non-domiciled CDLs going forward. The IFR failed to acknowledge the burdens these changes would have on SDLAs.

## V. The IFR was unlawfully promulgated and violated the APA's requirement to provide notice and allow for public comment.

As the IFR notice itself acknowledges, "[u]nder the [APA], an agency must typically provide prior notice and an opportunity for public comment before a rule becomes effective."[39] The APA's notice-and-comment procedure is no mere check-the-box requirement—rather, the ability to comment on proposed rules protects the public's rights

> to present their views to the government agencies which increasingly permeate their lives. The interchange of ideas between the government and its citizenry provides a broader base for intelligent decision-making and promotes greater responsiveness to the needs of the people . . . . When substantive judgments are committed to the very broad discretion of an administrative agency, procedural safeguards that assure the public access to the decision-maker should be vigorously enforced.

*Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982). "[I]t is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018); *see Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979) ("In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment.").

FMCSA violated this statutory notice-and-comment requirement by promulgating the IFR and making it effective immediately without any advance notice or opportunity to comment. FMCSA claims that it was permitted to circumvent this

---

[38] The IFR notice refers to a "supporting Privacy Impact Analysis (PIA), available for review in the docket, [that] gives a full and complete explanation of FMCSA practices for protecting PII in general and specifically in relation to this final rule," but no such PIA is actually available for review on the docket. *See* FMCSA, Rulemaking Docket, *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*, https://www.regulations.gov/docket/FMCSA-2025-0622/document (last visited Nov. 26, 2025).

[39] 90 Fed. Reg. at 46,513.

congressional requirement because it found "good cause to issue this IFR without prior notice and comment and to make it effective immediately," supposedly because the IFR was immediately necessary "to address a recently discovered, two-front crisis that constitutes an imminent hazard to public safety and a direct threat to national security."[40] But an agency's claim of "good cause" to circumvent the APA notice-and-comment requirements that Congress has seen fit to impose on agencies is entitled to no deference. *See, e.g.*, *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014) ("[A]n agency has no interpretive authority over the APA; we cannot find that an exception applies simply because the agency says we should. Moreover, the good-cause inquiry is meticulous and demanding." (citations and quotation marks omitted)).

As discussed above, FMCSA itself expressly admits that it does not have evidence that the IFR will address an imminent hazard to public safety or provide any additional public safety benefits.[41] Nor does FMCSA support its claim that imminent national-security concerns warrant circumventing statutory notice-and-comment requirements.[42] Where, as here, an agency is "lacking record support proving the emergency" that it claims, its attempt to circumvent notice and comment and promulgate a rule with immediate effect is unlawful. *See, e.g.*, *Sorenson*, 755 F.3d at 707.

FMCSA claims that "providing advance notice through a proposed rule is impracticable and contrary to the public interest because it would actively subvert the rule's purpose by creating a foreseeable and concentrated surge in applications that would exacerbate the current safety crisis."[43] This argument fares no better. First, again, FMCSA itself expressly admits that it does not have evidence that the IFR will address an imminent hazard to public safety or provide any additional public safety benefits.[44] Second, the fact that proposing a rule might lead to an increase in applications before the rule goes into effect does not justify circumventing notice and comment. "The lag period before any regulation, statute, or proposed piece of legislation allow parties to change their behavior in response," but this does not "demonstrate the existence of an exigency justifying good cause" to circumvent the congressional mandate in the APA for notice and comment. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676 (9th Cir. 2021).

---

[40] *Id.* at 46,513–46,514.

[41] *Id.* at 46,520 ("Given insufficient evidence, a direct quantitative estimate of the potential safety benefits resulting from this IFR cannot be developed.").

[42] As its sole support, FMCSA cites only one incident that involved a *non*-commercial motor vehicle. *Id.* at 46,514 & n.20.

[43] *Id.* at 46,514.

[44] *Id.* at 46,520.

## VI. The IFR was unlawfully promulgated and violated the Commercial Motor Vehicle Safety Act's requirement for FMCSA to consult with the states.

As the IFR notice itself acknowledges, separate and apart from the APA's statutory requirement to provide notice and comment, the Commercial Motor Vehicle Safety Act of 1986 "requires the Secretary of Transportation (Secretary), *after consultation with the States*, to prescribe uniform minimum standards 'for testing and ensuring the fitness of an individual operating a commercial motor vehicle' (49 U.S.C. 31305(a))."[45] "Consultation" is not merely the opportunity for notice and comment under the APA. *Cal. Wilderness Coal. v. Dep't of Energy*, 631 F.3d 1072, 1087 (9th Cir. 2011) (explaining that the "interpretation of 'consult' to mean no more than notice-and-comment would render [statutory 'consultation' requirement] superfluous"); *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 118 (1st Cir. 2002) ("Consultation . . . must mean something more than general participation in the public comment process . . ., otherwise the consultation requirement would be rendered nugatory."). Rather, "[c]onsultation requires an exchange of information and opinions **before** the agency makes a decision. This requirement is distinct from the opportunity to offer comments on the agency's decision." *Cal. Wilderness*, 631 F.3d at 1093 (emphasis in original). "Consultation" further requires at least "*some* effort by [the agency] to receive . . . views regarding proposed regulations . . . and then consider such advice." *Campanale*, 311 F.3d at 120 (emphasis in original). "The consultative process dictated by Congress serves the purpose of permitting the States to participate in the formulation of federal policy in an area of major interest to the States." *Cal. Wilderness*, 631 F.3d at 1092.

FMCSA violated this statutory consultation requirement by promulgating the IFR and making it effective immediately without any consultation with the States. Promulgating the IFR without consultation disregards the States' knowledge and experience in having administered CDL programs for decades, and their heightened reliance interests after having invested money and labor in their existing systems. The abrupt changes to these systems have required and will further require significant outlays of State resources.

FMCSA claims that "the immediate need" to issue the IFR "means it is not practicable to consult with the States prior to promulgation of this rulemaking,"[46] but the Commercial Motor Vehicle Safety Act does not contain an exception to its consultation requirement for impracticability. And even if there were such an exception, as discussed above, FMCSA has not actually established or supported its supposed claim that there was a need to issue the IFR immediately or that the statutorily required consultation before doing so was not practicable.

[45] *Id.* at 46,511 (emphasis added); *see also id.* at 46,522–46,523.

[46] 90 Fed. Reg. at 46,523.

In defending the IFR in litigation challenging the IFR, FMCSA attempted to argue that it is not required to consult with the States when promulgating regulations under 49 U.S.C. §31305. Joint Resp. to Emergency Mots. for Stay Pending Review at 21, *Rivera Lujan v. FMCSA*, No. 25-1215 (D.C. Cir. Oct. 31, 2025), Doc. No. 2143339. This litigating-position reversal is wholly inconsistent with the IFR notice, which cites §31305 and affirms that FMCSA has a consultation requirement. This litigating-position reversal likewise is inconsistent with FMCSA's past rulemaking, where FMCSA has affirmed that rulemaking pursuant to §31305 requires consultation with the States. *See, e.g.*, 84 Fed. Reg. 32,689, 32,691 (July 9, 2019) ("The 1986 Act required the Secretary, after consultation with the States, to prescribe uniform minimum standards for the issuance of CDLs, including 'minimum standards for written and driving tests of an individual operating a commercial motor vehicle' (49 U.S.C. 31305(a)(1))."); *id.* at 32,695 (same); 89 Fed. Reg. 7327, 7329 (Feb. 2, 2024) (same). The D.C. Circuit rightly rejected FMCSA's attempt to reverse itself with respect to this consultation requirement. *Rivera Lujan*, 2025 WL 3182504, at *1.

## CONCLUSION

Because the IFR is arbitrary, capricious, and unlawful; because FMCSA promulgated it unlawfully without advance notice, comment, or consultation with the States; and because FMCSA itself expressly admits that it does not have evidence that the IFR provides any additional public safety benefits, FMCSA should not further delay in correcting its errors and should rescind the IFR and not repromulgate it as a final rule.

Sincerely,



ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*



ROB BONTA
*Attorney General*
*State of California*



KRISTIN K. MAYES
*Attorney General*
*State of Arizona*



PHILIP J. WEISER
*Attorney General*
*State of Colorado*

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*

KWAME RAOUL
*Attorney General*
*State of Illinois*

AARON M. FREY
*Attorney General*
*State of Maine*

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*

KEITH M. ELLISON
*Attorney General*
*State of Minnesota*

AARON D. FORD
*Attorney General*
*State of Nevada*

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*

RAÚL TORREZ
*Attorney General*
*State of New Mexico*

LETITIA JAMES
*Attorney General*
*State of New York*

DAN RAYFIELD
*Attorney General*
*State of Oregon*

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*

CHARITY R. CLARK
*Attorney General*
*State of Vermont*

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*

ASIAN LAW CAUCUS

55 Columbus Ave
San Francisco, CA 94111
415.896.1701 | fax 415.896.1702
asianlawcaucus.org

November 26, 2025

Philip Thomas, Deputy Associate Administrator
Office of Safety, FMCSA
1200 New Jersey Avenue, SE
Washington, D.C. 20590-0001

***Via Federal eRulemaking Portal***

Re: Public Comment on *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)* (Docket No. FMCSA-2025-0622)

Dear Mr. Thomas,

On behalf of Asian Law Caucus (ALC), the nation's oldest Asian-American civil rights organization and an organization committed to community lawyering, we write to urge you to rescind the Federal Motor Carrier Safety Administration's (FMCSA) Interim Final Rule, *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 90 FR 46509 (September 29, 2025) (Interim Final Rule, IFR, or rule) in its entirety. The IFR not only exceeds FMCSA's statutory authority by regulating matters of immigration, but it fails to meet the agency's statutory mandate to promote safety and is arbitrary and capricious as well. The agency also did not provide adequate reasoning for the public to comment on significant aspects of the rule, such that a further proposal and ability to comment would be necessary before any other rulemaking in this area.

The Interim Final Rule limits those who can receive non-domiciled CDLs and Commercial Learner's Permits (CLPs) to individuals with H-2A (temporary agricultural workers), H-2B (temporary non-agricultural workers), and E-2 visas (treaty investors and their employees). 90 FR at 46515.[1] The rule would unnecessarily prevent entire classes of lawfully present immigrants from obtaining, maintaining, or renewing non-domiciled CDLs, solely based on their immigration status or visa category.

By FMCSA's own estimation, the IFR will exclude nearly 200,000 drivers—including Deferred Action for Childhood Arrivals (DACA) recipients, asylees, refugees, Temporary Protected Status (TPS) holders, asylum applicants, U or T visa holders who are victims of crime or human trafficking, and people with deferred action or humanitarian parole—from being able to continue their work when their CDLs are due for renewal. 90 FR at 46515, 46520. These drivers are trained, tested, insured, and skilled professionals. Leaving this rule in place threatens to deprive them of their very livelihood and ability to care for their loved ones and communities.

[1] U.S. citizens and lawful permanent residents can also obtain non-domiciled CDLs and CLPs in certain situations. 90 FR at 46515.

**The Costs of this Rule to Drivers is Not "De Minimis"**

FMCSA's Interim Final Rule went into effect the same day it was issued—September 29, 2025—without considering how this sudden change might impact the drivers who rely on non-domiciled CDLs and CLPs for their livelihoods and the families and communities who depend on them. According to the rule, drivers "will be able to find similar employment in other sectors" with only "some de minimis costs." 90 FR at 46520. Yet the agency cites no support for this conclusion,[2] nor does it explain why the other sectors it identified—"construction, driving vehicles that don't require a CDL, etc."—would pay the same wages and offer the same protections these drivers now receive when the agency itself acknowledges that a non-domiciled CDL is "a high-value economic credential." *Id.* at 46514.

Instead, the cost of this IFR is devastating to the communities that we serve in so many ways—from the decrease in wage opportunities, the wasted months and monies spent applying for and renewing a CDL, and the equipment and contracts owner-operators had already invested into their businesses to the human dignity of losing one's livelihood and being targeted for what immigrant status or visa they hold, rather than anything they did.[3] Indeed, this rule also creates uncertainty for small and large carriers, who did not receive guidance from the agency on how to implement the rule after it was issued and are unable to plan their workforce and other needs. And it imparts substantial costs and burden on State agencies who need to implement these substantive changes with little additional guidance and already strained resources.

In the two months since the IFR's publication, ALC has engaged with dozens of commercial drivers in California and other States, who are experiencing this threat. We spoke with commercial drivers who had been driving for years without incident, who are sole sources of income for their families, who love their jobs, and who no longer can or will soon lose the very work they called their own.

We heard from Maria, a school bus driver from California who loves her work and spoke warmly of the children in her care. Maria had been driving a school bus for nearly eight years without incident, and previously, held a driver's license for several years without so much as a speeding ticket. Despite a clean safety record, an employer who values her work, and extensive training and verification, including passing two background checks and written and road tests in English, and additional classes every year to keep her license, Maria will be forced to quit her job for the sole reason that she is a DACA recipient and cannot renew her license under the IFR. She hoped to continue working as a school driver in the years to come and had relied on the ability to renew her CDL to provide for her family, until this rule shattered her dream.

---

[2] The IFR drew on occupational employment and wage data from the Bureau of Labor Statistics to estimate the wage rate of drivers with CDLs, which suggests it could have estimated the wages of drivers in the sectors and provided that technical information in the rule for public comment, but did not. 90 FR at 46517.

[3] U.S. Secretary of Transportation Sean Duffy, for example, justified the need for the rule to account for "dangerous foreign drivers" who are a "direct threat to the safety of every family on the road." *See Trump's Transportation Secretary Sean P. Duffy Takes Emergency Action to Protect America's Roads, Restrict Non-Domiciled CDLs,* Dep't of Transp. (Sept. 26, 2025), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-takes-emergency-action-protect-americas.

We heard from Christina,[4] an owner-operator from Texas who is the sole source of income for her family of five. When her license was due for renewal after the IFR went into effect, she was forced to downgrade her CDL to a regular driver's license for the sole reason that she was a U visa holder. Now she can no longer drive her truck or operate her business despite a clean safety record and valid work authorization. Her inability to continue her work has negatively affected her health, and she fears every day for her family's well-being.

These are but some of the stories we heard and continue to hear from individual drivers, owner-operators, and others. Yet nowhere in the rule does FMCSA discuss reliance interests, nor does the agency adequately show how it arrived at the rule's "de minimis" impact on drivers. When FMCSA discounted and failed to consider these costs and reliance interests when it issued the Interim Final Rule, it acted improperly and illegally, and for this reason alone, it must rescind the rule.

**The Interim Final Rule Does Not Produce a Net Safety Benefit**

FMCSA's "primary mission is to prevent commercial motor vehicle-related fatalities and injuries."[5] The IFR explains the Motor Carrier Safety Act of 1984 granted the agency "broad authority to issue regulations 'on commercial motor vehicle safety.'" 90 FR at 46511. Indeed, the IFR relies on three purported safety reasons for its issuance, namely five fatal accidents in 2025, what it calls "a systemic breakdown in State implementation of the [previous] rule," and an alleged inability to obtain an applicant's 10-year driving history from all States where the individual was previously licensed. *Id.* at 46514. Yet the evidence neither shows a link between the nation of domicile of a CDL holder and safety outcomes nor reveals a "systemic breakdown" in State implementation to justify FMCSA's near categorical exclusion of all non-domiciled CDL and CLP holders.

First, FMCSA's own data indicates that the CDL holders excluded by the rule are involved in fatal crashes at a lower rate than CDL holders who are not excluded. According to FMCSA, non-domiciled CDL holders account for approximately 5 percent of all CDL holders but only about 0.2 percent of fatal crashes. 90 FR at 46512, 46520 (documenting five fatal crashes involving non-domiciled CDL holders in 2025); FMCSA, Summary Report: CY 2025 Fatal Crashes, U.S. Dep't of Transp. (Sept. 26, 2025), https://perma.cc/KQ2S-YN23 (estimating a total of 2,399 fatal crashes involving large trucks and buses as of September 26, 2025).

Beyond the agency's own data, FMCSA acknowledged that "[t]here is not sufficient evidence, derived from well-designed, rigorous, quantitative analysis, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States." 90 FR at 46520. FMCSA's admission shows a lack of sufficient data to not only (1) restrict eligibility of non-domiciled CDLs and CLPs to only H-2A, H-2B, and E-2 visa holders but also (2) exclude all other immigrant drivers (except for lawful permanent residents in certain situations) from accessing these licenses and permits. Indeed, because there is data indicating that newly trained commercial drivers are involved in more accidents than their more

[4] Christina is a pseudonym to protect the identity of this individual.
[5] https://www.fmcsa.dot.gov/mission/about-us.

experienced counterparts[6] and FMCSA anticipates that less-experienced drivers would replace those now excluded under the IFR, 90 FR at 46520, the rule does not appear to produce any net safety benefit at all.

Second, the IFR's discussion of State implementation issues is misleading. The rule states that "FMCSA's [Annual Program Review] has demonstrated that approximately one in four non-domiciled CDLs California issued were not compliant with the requirements in 49 CFR parts 383 and 384." 90 FR at 46514. Yet the FMCSA's September 26, 2025 letter to California relied heavily on 25 examples where the expiration dates of a CDL did not match the expiration date of the driver's lawful presence document.[7] At the time of the letter (and even now) there is no requirement in 49 CFR parts 383 and 384 that these dates match, and FMCSA's letter tellingly cites to no authority for this position. *Id.* at 3. Without these 25 examples, the one in four figure changes to approximately 8.75 percent—a significant decrease from the figure cited in the IFR and relied upon by the agency to justify its categorical displacement of nearly 200,000 people.[8]

Finally, the IFR asserts that States are unable to obtain an applicant's 10-year driving history from all States where the individual was previously licensed when this history "exists predominantly or solely within a foreign jurisdiction." 90 FR at 46514. Yet this reasoning does not apply to DACA recipients and other individuals like asylees, TPS holders, or U and T visa holders, who often have previous driving records in the U.S. that States can verify prior to issuing a non-domiciled CLP and CDL. Moreover, some States already impose requirements on those obtaining a non-domiciled CLP or CDL so as to allow a vetting process, in addition to the background checks, written knowledge tests, entry-level driver training, driving skills test and other items required for these permits or licenses. Certain States, for example, require those applying for non-domiciled CDLs to first hold a regular driver's license issued by a U.S. State for at least one year.[9] Thus, the IFR's reliance on the inability of States to compel foreign jurisdictions to produce an applicant's driving history in some circumstances does not justify its exclusion of almost 200,000 drivers in all circumstances, especially when there are alternatives to vet applicants of these permits and licenses.

Taken together, FMCSA should rescind this Interim Final Rule because it acted arbitrarily and capriciously in issuing it. The agency itself concedes there is a lack of evidence to link the nation of domicile of a CDL driver and safety outcomes. In addition, the rule runs counter to the agency's own data and draws on misleading information to justify its exclusion of nearly all non-domiciled CDL holders. Put simply, there is no evidence that the rule will lead to net safety outcomes, in violation of FMCSA's mission and statutory mandate.

---

[6] *See Declaration of David Eldred* (Addendum 1, at 16-17), https://www.courtlistener.com/docket/71701019/01208789295/jorge-lujan-v-fmcsa/.

[7] U.S. Department of Transportation (DOT)/FMCSA - Letter to California - 2025 Annual Program Review Finding, at 5-11, https://www.regulations.gov/document/FMCSA-2025-0622-0463.

[8] Approximately a month after issuance of the IFR, DOT placed four additional preliminary determination of noncompliance letters in the rulemaking docket. These letters to other states also include examples of the matching expiration dates issue, with no citation to the Federal statutory or regulatory authority that requires that these dates match. Thus, these letters also undercut FMCSA's reliance on "a systemic breakdown in State implementation" to justify the IFR, as they—along with the letter to California—cast doubt on the agency's claim of a "crisis."

[9] *See, e.g.*, https://dld.utah.gov/cdl-original-not-us-citizen/ (Utah's DMV page); https://www.oregon.gov/odot/DMV/Pages/DriverID/CDLget.aspx (Oregon's DMV page).

**<u>FMCSA Lacked Good Cause to Bypass Notice and Comment Rulemaking and a Delayed Effective Date</u>**

FMCSA claims it had "good cause" to bypass requirements under the Administrative Procedure Act (APA) to engage in notice and comment rulemaking and delay the effective date of a rule after publication because these procedures are "contrary to the public interest" and "impracticable." 90 FR at 46513. In support, the agency relies on the three safety-related reasons discussed above, namely five fatal accidents in 2025, a "breakdown in State implementation of the [previous rule]" and States' alleged inability to obtain an applicant's previous driving history. The agency argues the combination of these three reasons "constitutes an imminent hazard that warrants immediate action to protect the traveling public." *Id.* at 46514.

Yet, as shown above, the agency's own data from 2025 reveals that the CDL holders excluded by the rule are involved in fatal crashes at a lower rate than CDL holders who are not excluded, and the agency did not note any particular increase in fatal crashes in recent months or years. In addition, FMCSA heavily relied on examples of expiration dates of CDLs that differed from the expiration dates of lawful presence documents to claim California did not comply with Federal regulations and to establish a "breakdown" in State implementation of the previous rule. But the previous rule did not require there to be matching expiration dates, such that removing these examples significantly reduces the State's alleged "error rate." Moreover, the IFR fails to account for the many drivers displaced by the IFR that are able to provide previous driving history records in the U.S., in addition to the existing screening requirements these drivers must meet to obtain a non-domiciled CDL. In other words, there was no "imminent hazard" or "systemic breakdown" in State implementation that warranted the extraordinary step of bypassing APA notice and comment requirements.

FMCSA also claims that advance notice would have created "a foreseeable and concentrated surge in applications" because, for example, applicants will "forum shop" and seek CDLs from States with purported "systemic weaknesses and high error rates." 90 FR at 46514-15. The agency cites an increase in the issuances of CLPs and CDLs between December 2020 and February 2022, "when the compliance date for FMCSA's [new rule on] entry-level driver training [ELDT] requirements was approaching." *Id.* at 46514. Yet FMCSA fails to show that the increase during this period was due to notice of the new regulations, and not some other factor. Indeed, the public had notice of the ELDT rule since at least 2016, when FMCSA issued a proposed rule and then a final rule with a compliance date of February 7, 2020. 81 FR 88790 (Dec. 8, 2016). The agency then extended this compliance date to February 7, 2022. 86 FR 34631 (June 30, 2021). FMCSA points to no evidence showing a surge in applications before the compliance date was extended, and indeed, it fails to note that the issuances of CDLs increased after the new requirements took effect, which undercuts the agency's argument that drivers were attempting to avoid compliance with the new rule. *See* 90 FR at 46515 n.22.

In addition, many States have requirements such as the need to provide proof of residency or have a regular driver's license for at least a year before an applicant can obtain a non-domiciled

CLP or CDL,[10] such that applicants cannot readily seek such a permit or license from these States as the IFR would have the public believe. And there are often time limits on when a driver can renew their CDL,[11] which deters a "rush" of activity as well. Indeed, FMCSA should know of these requirements as the Federal agency tasked with monitoring States' compliance with issuing CDLs and CLPs, but it conveniently failed to mention or consider these requirements at all. Along with the lack of a "safety crisis" and "systemic breakdown," this reason also fails to constitute good cause to bypass the APA's notice and comment requirements.

**FMCSA Failed to Consult States Prior to Issuing the Interim Final Rule**

FMCSA acknowledged that the IFR is based on the Commercial Motor Vehicle Safety Act of 1986 (CMVSA, 49 U.S.C. 31301, *et seq.*), as amended and that this statute requires "consultation with the States" prior to prescribing "minimum uniform standards 'for testing and ensuring the fitness of an individual operating a commercial motor vehicle.'" 90 FR at 46511.

The agency also acknowledged that the IFR amends regulations related to minimum uniform standards for issuing CDLs and CLPs by States and the information contained on each of these licenses and permits. For example, FMCSA states, "This IFR revises the regulations that allow SDLAs [State Driver's Licensing Agency] to issue and renew non-domiciled CLPs and CDLs . . . by revising to whom an SDLA may issue a non-domiciled CLP or CDL, what the requirements are for issuance, and when a non-domiciled CLP or CDL must be canceled or revoked." 90 FR at 46510; *see also id.* at 46517 (noting "non-domiciled" must appear on the face of the CDL and CLP) and 46523-26 (regulatory changes to State procedures for issuing CDLs and CLPs).[12] Under 49 U.S.C. 31308, regulations prescribing such minimum uniform standards must only issue "[a]fter consultation with the States."

Yet FMCSA failed to consult with the States before issuing the IFR, despite acknowledging in the rule that it was required to do so. 90 FR at 46511, 46523. The agency does not even address the consultation requirement in the preamble to the IFR—which lays out the legal basis and justification for the rule—and only explains, in the regulatory analyses discussion of E.O. 13132 (Federalism), that "the total cost to States of complying with these new regulations is not expected to be substantial" and that consultation was "not practicable." *Id.* at 46522-23.

But the consultation requirement in 49 U.S.C. 31308 does not contain any exceptions for when consultation with the States is not necessary. And FMCSA's explanation that consultation was "not practicable" is at odds with its clear ability to consult with other government agencies such as the U.S. Department of Labor (DOL) before the IFR's release. *See* 90 FR at 46516. Thus, the IFR was improperly issued because it failed to abide by the relevant statutory requirements and must be rescinded on this basis.

---

[10] *See id.*; *see also* https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/commercial-driver-licenses-cdl/ (California's DMV page); https://iowadot.gov/drivers-licenses-ids/commercial-drivers/get-cdl (Iowa's DMV page).
[11] *See, e.g.*, https://dol.wa.gov/driver-licenses-and-permits/commercial-driver-licenses-cdl/renew-your-cdl (Washington's DMV page); https://iowadot.gov/drivers-licenses-ids/commercial-drivers/renew-cdl (Iowa's DMV page).
[12] The agency also relied on requirements for State-issued commercial license documentation in explaining the IFR falls under a published categorical exclusion from the National Environment Policy Act of 1969. 90 FR at 46523.

**No Statute Authorizes the FMCSA to Restrict CLPs and CDLs Based on Immigration Status and Visa Category**

FMCSA lacks statutory authority to categorically limit States from issuing non-domiciled CDLs and CLPs to drivers based on their immigration status and visa category. *See generally* 90 FR 46509-26; *id.* at 46511 (Legal Basis section). Indeed, the statutory authorities cited by FMCSA do not list or allude to "immigration status" or "visa category" as a basis for restricting which drivers can receive CDLs or CLPs. *See, e.g.*, 49 U.S.C. 31305 (allows DOT to prescribe "minimum uniform standards for 'testing and ensuring the *fitness* of an individual operating a commercial motor vehicle'"); 49 U.S.C. 31136 ("prescribe minimum safety *standards for commercial motor vehicles*"); 49 U.S.C. 31502(b) ("prescribe *qualifications* and maximum hours of service of employees") (emphasis added).

FMCSA's issuance of the IFR despite the lack of a statute that authorizes it to regulate matters of immigration is especially troubling when the agency's own data undercuts its rationale that the rule is needed for safety reasons. Put another way, the agency is not only failing to meet its statutory mandate to promote safety, it is also exceeding its statutory authority to regulate in areas beyond its purview. Given that only certain Federal agencies are authorized to regulate and enforce immigration policy,[13] it is incumbent on the agency to make clear what statutory provision permits it to impose its sweeping immigration-based restrictions. When it does not and cannot—as FMCSA here—it must rescind that rule.[14]

**Restricting Eligibility of Non-Domiciled CDLs and CLPs to H-2A, H-2B, and E-2 Visa Holders Is Under-Inclusive and Arbitrary and Capricious**

The IFR states that FMCSA consulted with DOL's Office of Foreign Labor Certification (OFLC) in restricting those eligible for non-domiciled CLPs and CDLs to H-2A, H-2B, and E-2 visa holders. 90 FR at 46516. Based on this consultation, FMCSA "understands that employer applications related to commercial trucking typically include some combination of the following job requirements: possess U.S. CDL or foreign CDL equivalent, related work experience (12 months to 2 years), clean driving record, pass drug or medical testing, and knowledge or proficiency in English." *Id.* FMCSA concludes that "[t]his employer screening, in addition to the incentive to avoid unnecessarily repeating the lengthy job order process, helps ensure that the population of drivers being hired . . . are more likely to be drivers with safe driving records." *Id.*

Yet FMCSA failed to include information from its consultation with OFLC in the rulemaking docket to allow meaningful input and its restriction on non-domiciled CLPs and CDLs to those with H-2A, H-2B, and E-2 visas is both not reasonably explained and under-inclusive. This is

[13] Immigration 101: Executive Branch Agencies Involved with Immigration, https://www.congress.gov/crs-product/IF12424 (no mention of U.S. Department of Transportation or FMCSA); *California v. U.S. Dep't of Transp.*, No. 25-CV-208-JJM-PAS, 2025 WL 3072541, at *8 (D.R.I. Nov. 4, 2025) ("[DOT's] imposition of the [immigration enforcement conditions] exceeded their statutory authority. Had Congress wished to try to make federal transportation contingent on cooperation with federal civil immigration enforcement, it could certainly have attempted to do so.").
[14] Because FMCSA lacks authority to regulate and enforce immigration policy, it also cannot rely on the "immigration-related function" exception to claim that this rule is not subject to E.O. 14192.

because the agency's rationale failed to consider important aspects of the H-2A, H-2B, and E-2 programs and because the IFR prohibits individuals with other visas or immigration statuses from obtaining or renewing non-domiciled CLPs and CDLs even when these visa programs and statuses share similar characteristics as the H-2A, H-2B, and E-2 programs. Given the arbitrary and capricious nature of FMCSA's restriction of non-domiciled CLPs and CDLs to H-2A, H-2B, and E-2 visa holders, it must rescind the IFR.

***A Further Comment Period is Necessary to Address the OFLC Consultation***

FMCSA did not include in the rulemaking docket the information that OFLC provided or relayed as part of its consultation, which FMCSA used in deciding to restrict eligibility for non-domiciled CDLs and CLPs to certain employment-based nonimmigrant categories. 90 FR at 46516. As a result, commenters could not evaluate the information from DOL during the comment period and provide meaningful input. We accordingly request an additional opportunity to comment after the OFLC information is provided.

***The IFR is Inconsistent with the Nature of the H-2A, H-2B, and E-2 Visa Programs***

Even assuming the public could provide meaningful comment and FMCSA has statutory authority to regulate immigration, the agency's conclusion to restrict non-domiciled CLPs and CDLs to H-2A, H-2B, and E-2 visa holders is still arbitrary and capricious. Under the H-2A and H-2B programs, which OFLC administers alongside other agencies,[15] the qualifications listed in job orders submitted by employers must be "consistent with the normal and accepted qualifications required by employers that do not use H-2A workers in the same or comparable occupation and crops." 20 CFR 655.122(b) (H-2A program); 20 CFR 655.18(a)(2) (similar for H-2B program); 90 FR 46516 n.25. This makes sense, as the job order in these programs are first and foremost a means to recruit workers in the U.S. for the job opportunity. *See* 20 CFR 655.121(f); 20 CFR 655.18(a)(3). The idea here is to ensure there are no able, willing, and qualified workers in the U.S. who are interested in the job opportunity before an employer seeks or accepts H-2A or H-2B workers. 20 CFR 655.100; 20 CFR 655.1. And workers in the U.S. are defined to include those with valid immigration status, such as refugees, asylees, and other categories excluded under the IFR. 20 CFR 655.103 (definition of U.S. worker); 20 CFR 655.5 (same). Employers who hire workers in the U.S. through the job order process are certified for fewer H-2A or H-2B workers than they requested if their application otherwise meets the qualifications for certification. 20 CFR 655.165 (partial certification for H-2A program); 20 CFR 655.54 (same for H-2B program).

In other words, the population of drivers being hired under the H-2A and H-2B programs are no more likely to be drivers with safe driving records because the qualifications of these drivers are required by Federal regulations to be consistent with those of U.S. drivers and because the employer screening process FMCSA mentions is primarily a means to screen U.S. drivers, including those the IFR now excludes.

The IFR also cites "the incentive to avoid unnecessarily repeating the lengthy job order process" as why an employer would want to "thoroughly screen a prospective employee's driver safety

[15] OFLC does not administer the E-2 program. *See* https://www.dol.gov/agencies/eta/foreign-labor/programs.

record." 90 FR 46516 & n.25. However, it is unclear why employers would repeat the job order process because they failed to "thoroughly screen" a prospective H-2A or H-2B driver's safety record when the job order process is to recruit workers in the U.S., as mentioned above. In addition, employers can seek H-2A and H-2B workers from DOL without naming the workers in their applications, such that the incentive described in the IFR to screen a driver safety record so as to avoid repeating the "job order process" is less pronounced because employers themselves may not know who the workers are at the job order process. [16] This is especially the case as employers can and do receive certification from DOL, and approval from DHS, for a certain number of H-2A or H-2B workers that is greater than the number of workers they actually receive.[17]

In addition, H-2A and H-2B visas are required by the Immigration and Nationality Act and DOL and DHS regulations to be temporary or seasonal in nature. 8 U.S.C. 1101(a)(15)(H)(ii)(a), (ii)(b); 20 CFR 655.103(d); 8 CFR 214.2(h)(6)(ii)(B). H-2A visas are further restricted to labor or services of an agricultural nature and H-2B visas are capped by statute, except in certain situations. *Id.; see* 8 U.S.C. 1184(g)(1)(B), (g)(10).[18] And both programs limit job opportunities to particular geographic areas, except in select circumstances. *See* 20 CFR 655.130(e) (H-2A program); 20 CFR 655.15(f) (similar for H-2B program). But nowhere does the IFR discuss that commercial driving only occurs during certain times of the year, in certain sectors or select geographic areas, or how increased use of temporary visas could affect safety, which reflects that FMCSA did not consider an important aspect of the problem.

Employees that qualify for E-2 visa classification, moreover, must either be engaged in duties of an executive or supervisory character or have special qualifications—defined as "skills and/or aptitudes" that "are essential to the successful or efficient operation," including consideration of whether "the skills and qualifications are readily available in the United States." 8 CFR 214.2(e)(17)-(18). FMCSA did not adequately explain why it chose E-2 visas in particular as one of the eligible visa categories or how applicants for non-domiciled CLPs or CDLs would be able to qualify for E-2 visas, especially since the agency notes elsewhere that drivers with CDLs can easily transition to other jobs. 90 FR at 46520.

***The Purported Favorable Characteristics of H-2A, H-2B, and E-2 Visas are not Unique to Those Categories***

The IFR does not explain why other employment-based visa categories cannot now receive a non-domiciled CDL or CLP, such as PERM visa holders. Indeed, these other visa categories also

---

[16] OFLC does not know who the H-2A or H-2B workers are prior to certifying an employer's application. In addition, the U.S. Department of Homeland Security (DHS) may not know who the H-2A or H-2B workers are at the petition stage as an employer can file a petition seeking unnamed H-2A and H-2B beneficiaries in certain circumstances. *See* https://www.dol.gov/agencies/eta/foreign-labor/forms (DOL forms); https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2a-temporary-agricultural-workers (DHS H-2A forms); https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers (DHS H-2B forms).

[17] *See, e.g.*, https://www.congress.gov/crs-product/R48368 (noting employers do not always hire as many workers on H-2A visas as DOL certifies or USCIS approves).

[18] Additional information on the H-2B cap and those exempt from the cap can be found here: https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers.

have requirements the IFR mentions, such as labor certification through DOL, current employment, or other specified proof of work established through the Federal visa process. While the IFR notes the H-2A, H-2B, and E-2 programs contain the vast majority of individuals working in employment-based immigration categories that cover jobs that would require a non-domiciled CDL, it provides no citation for this conclusion for commenters to review and meaningfully provide input.

Nor did FMCSA adequately explain why employers generally are not incentivized to screen for drivers with clean driving records and the other characteristics OFLC relayed—e.g., ability to pass drug or medical tests and related work experience—given existing Federal requirements and potential repercussions for the company, including enforcement actions that FMCSA is authorized to bring. *See, e.g.*, 49 CFR 391.21 (background information needed for driver applications for employment); 49 CFR 391.43 (required medical and physical exams); 49 CFR 386.30 (motor carrier liability for action of employees). In other words, the job opportunity characteristics OFLC conveyed to FMCSA are not unique to the H-2A and H-2B programs. And as mentioned above, many of the non-domiciled CLP and CDL drivers excluded under the IFR do not have "unknown driver safety records"—including DACA recipients, asylees, TPS holders, U and T visa holders, and other drivers who already have previous driving histories in the U.S.—such that drawing on this basis to restrict eligibility to only H-2A, H-2B, and E-2 visa holders is neither reasonable nor reasonably explained.

**FMCSA Provided No Opportunity to Review the Supporting Privacy Impact Analysis**

The IFR states that, "[t]he supporting Privacy Impact Analysis (PIA), *available for review in the docket*, gives a full and complete explanation of FMCSA practices for protecting PII in general and specifically in relation to this final rule." 90 FR at 46523 (emphasis added). However, this PIA is not available in the rulemaking docket and thus, commenters were not able to review it during the public comment period to meaningfully provide input on how the rule could impact the privacy of affected individuals. Accordingly, we request an additional opportunity to comment after the PIA is provided.

**FMCSA Did Not Explain the Matching Expiration Date Requirement to Allow Meaningful Comment**

FMCSA acknowledges that the IFR "requires the expiration date of any non-domiciled CLP or CDL to match the expiration date of the Form I-94/I-94A or 1 year, whichever is sooner," among other changes. 90 FR at 46511; 90 FR at 46525 (codifying this requirement at 49 CFR 383.73(f)(2)(iv)). Yet the agency does not explain in the IFR why the expiration date of non-domiciled CLPs and CDLs need to match the expiration date of the Form I-94/I-94A. *See generally* 90 FR 46509-26. While the public may have its own theories or guesses as to why the agency amended its regulations to include this requirement, it is arbitrary and capricious to expect commenters to provide meaningful input on changes the agency failed to explain, let alone justify. And it is arbitrary and capricious for the agency to codify a substantive requirement with no explanation at all. FMCSA must therefore rescind the rule for this reason as well.

**<u>FMCSA Did Not Explain the One-Year Period of Validity to Allow Meaningful Comment</u>**

As mentioned, the expiration date for any nondomiciled CLP or CDL under the IFR is "the expiration of the [worker's] period of admission documented on the Form I–94/94A or 1 year, whichever is sooner." 90 FR at 46516. FMCSA explained that the one-year period "ensures that the SDLA will verify U.S. citizens and non-citizen nationals domiciled in a U.S. territory will be issued a non-domiciled CLP or CDL with an expiration date one year from the date of issuance to ensure consistency in the licensing process, which will reduce confusion for SDLAs issuing these non-domiciled credentials." *Id*.

Unlike the matching expiration requirement above, the IFR provides some explanation for the one-year period, but it fails to explain why a one-year period allows consistency and reduces confusion, but not another time period, such as two years. In other words, the IFR did not explain the significance of a one-year period, rather than some other time period that is applied consistently across States so as to reduce confusion. Because the IFR did not adequately explain why it chose a one-year period, commenters were unable to provide meaningful input on whether this time period or another time period would be more appropriate. For this reason too, FMCSA must rescind the rule.

* * *

All workers should be treated fairly and with dignity, regardless of origin or visa category, and afforded due process and the impartial administration of the law. This Interim Final Rule neither treats workers fairly nor impartially administers the law, and therefore cannot stand. We, as a nation, deserve better.

Yours,

Katherine Zhao
Joshua Rosenthal

TEAMSTERS CALIFORNIA

Jesse Elison
Chief Counsel
Federal Motor Carrier Safety Administration
U.S. Department of Transportation
1200 New Jersey Avenue SE
Washington, DC 20590-0001
Submitted via regulations.gov

November 28, 2025

**Re: Teamsters California Comment Opposing Restrictions on Noncitizen Commercial Driver's Licenses**

Dear Mr. Elison,

Teamsters California represents 250,000 workers across dozens of industries that power the state's economy and keep our communities running. Teamsters in California with commercial driver's licenses ("CDLs") do critical work day in and day out—delivering food, packages, and other goods, driving our children to school and our neighbors to work, and ensuring our communities are safe and clean. Our members have invested substantial time, training, and resources into becoming skilled drivers in reliance on being able to hold and use their CDL to support their families, and they have fought to maintain the highest possible safety standards in their workplaces.

For the reasons detailed below, Teamsters California opposes the U.S. Department of Transportation ("DOT") Federal Motor Carrier Safety Administration ("FMCSA") Rule prohibiting most noncitizens from obtaining or renewing their CDLs. *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*, FMCSA-2025-0622, 90 Fed. Reg. 46509 (Sept. 29, 2025) (the "Rule"). The Rule would deprive Teamster members of their jobs and careers, impose financial burdens on Teamster locals that represent these drivers, and jeopardize the well-being and security of our communities. Moreover, the Rule was issued unlawfully and is not based on sound evidence or analysis regarding safety risks or costs that the Rule will impose on impacted drivers, their coworkers, their families, their unions, and the economy. Teamsters California urges DOT/FMCSA to withdraw the Rule and to instead work collaboratively with labor unions representing these critical workers to invest in and improve driver and community safety.

**I. Teamster Drivers Will Lose Their Jobs and Livelihoods as a Result of the Rule**

Teamster drivers have invested significant time and resources into their careers as commercial drivers. Many of these drivers have accumulated decades of experience. Teamsters who would lose their CDLs as a result of the Rule include one member who has been driving a bus in the Los Angeles area for 20 years, and another member who has been delivering food to assisted living facilities and hotels for almost 15 years. These drivers have also paid out of pocket for extensive schooling, training, testing, and application fees. Just a few examples include one Teamster member who spent $4000 for trucking school, another who spent $3000 on training and fees, and another who spent $2000 on a driving course. Some have bought homes, cars, or trucks in reliance on their ability to continue working a well-paying union job that requires a CDL. Many Teamster drivers are the main or even sole providers for their families. The Rule—which would revoke the CDLs of these Teamster drivers and possible future Teamster drivers—would result in the loss of their hard-earned careers and impose severe financial and other hardships on them and their families.

FMCSA asserts that the almost 200,000 drivers who will lose their CDLs as a result of the Rule "will be able to find similar employment in other sectors (*e.g.*, construction, driving vehicles that don't require a CDL, etc.)" and that "[t]hey will experience some de minimis costs as they move from one industry to another when their current credential expires." Rule at 46520. This statement is divorced from reality. FMCSA provides no evidence for this claim, and in fact that claim runs counter to well-established research suggesting that job displacement is associated with subsequent unemployment, long-term earnings losses, and lower job quality; declines in psychological and physical well-being; loss of psychosocial assets; social withdrawal; family disruption; and lower levels of children's attainment and well-being.[1]

Below are just a few stories from Teamster members throughout California whose livelihoods would be jeopardized as a result of the Rule. As these examples illustrate, the Rule would impose extreme burdens on these drivers, their families, and their communities—costs that the Rule fails to take into account.

> One Teamster member who would lose his CDL as a result of the Rule has driven a bus route in Los Angeles for two decades. The loss of his CDL would be devastating for his family. He has two daughters, ages 7 and 10, and he is their primary breadwinner. His health insurance is also through his work, so if he lost his CDL he would struggle to support them and they would lose their health insurance. He is not even sure what he would do if he lost his CDL. His first thought would be to try to get a job doing package delivery or Uber, but he would

[1] Jennie E. Brand, *The Far-Reaching Impact of Job Loss and Unemployment*, ANNUAL REVIEW OF SOCIOLOGY (Aug. 1, 2016), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC4553243/.

also be barred from doing that if he lost his regular license too (which California has threatened). Aside from that, he would have to look for fast food work or manual labor work, which would likely be non-union and have worse hours, pay, and benefits, all of which would drastically affect his family.

Another Teamster driver who would lose his CDL as a result of the Rule operates a passenger bus in Los Angeles. Prior to becoming a driver, he worked at a factory producing goods for a popular chain restaurant. He was forced to leave that job after developing carpal tunnel syndrome due to the physical demands of that work. If he lost his CDL, he would not be able to return to that factory job or do many other kinds of factory work because of his condition. He is the main provider for a baby, an eight year old, and his mother. His job as a bus operator had the best pay and benefits of any job he ever had, and it is clear that an alternative position would be more strenuous and likely exacerbate his condition. It is daunting to think of losing everything he has built while trying to find a new job that can adequately support his family.

Another Teamster member who would lose his CDL as a result of the Rule drives a truck in the food delivery industry, delivering goods to hotels, restaurants, and assisted living facilities. When he first heard that he might lose his CDL, he considered going back into the restaurant industry, where he had to work three or four jobs every day of the week just to make enough to survive. He did not make anywhere close to what he is making now at his restaurant jobs, and he would also lose all of the benefits he currently has from his strong union job. He has two little kids, ages three and five, and if he had to work multiple jobs every day he would not be able to spend time with them and watch them grow up.

Another Teamster driver who would lose her CDL as a result of the Rule operates a school bus. She first got her CDL because she thought it was the best option to provide for herself and her family, given that she could not afford to go to college. Losing her CDL would not leave her with many viable options for work. The best alternative she has found so far has been delivering packages for Amazon, but that is not even close to being the same in terms of pay, hours, and benefits.

Another Teamster member who would lose his CDL as a result of the Rule delivers food to hospitals, restaurants, and hotels in Los Angeles. Even during the COVID-19 pandemic, he worked hard to make sure that deliveries were made on time and people were fed. He is the main provider for two young kids. If he lost his CDL, he would have to go back to juggling two or more jobs just to make ends meet, and he would lose the strong union benefits that he and his family depend on.

> Another Teamsters member who would lose her CDL as a result of the Rule delivers food to schools, hotels, and restaurants. Prior to obtaining her CDL, she worked in the food service industry and at a paper company. She is the sole breadwinner in her family and supports her two daughters and her mom. Her union job as a delivery driver enabled her to support her family without having to work two jobs every day of the week for 16 hours each day, as she previously did.

> Another Teamsters member who would lose his CDL as a result of the Rule has been delivering food to hospitals, schools, and assisted living communities for over a decade. He is the only member of his household currently working. If he lost his CDL and his union job, he and his family would be forced to relocate to another area, leaving behind their home and their close-knit community.

In allegedly assessing the cost of the Rule, the FMCSA failed to adequately address drivers' reliance interests on their continued ability to hold a CDL and failed to take into account the costs that drivers, their families, their unions, and their communities will bear as a result. Turning a blind eye to this reality does not negate the extreme and unjustified costs this Rule would impose on hundreds of thousands of drivers, all while failing to actually improve safety.

**II. The Rule Will Cause Economic Harm to Consumers, Businesses, and Unions**

The FMCSA also fails to address other significant costs beyond those incurred by directly impacted drivers and their families. These affected drivers, for example, work in industries that were considered essential during the COVID-19 shutdown—delivery of food and other critical goods, waste, and public transportation. Especially in industries such as these, many of which are already facing driver shortages,[2] taking these Teamster workers off the road will create critical gaps in service to our communities. Employees will be unable to get to work, kids will be unable to get to school, nursing homes and hospitals will not receive the food they need, our shelves will not be stocked, and waste will pile up on our street.

One Teamster member who drives a school bus and would lose her CDL as a result of the Rule is particularly worried that the Rule will mean that school bus drivers like her who know the routes and have relationships with the students will be forced out. Another Teamster member who would lose his CDL as a result of the Rule drives a bus in the Los Angeles area and is concerned that the students and people with disabilities who cannot drive and rely on his bus will lose out on the safe services he is providing. He explained that he has spent years making sure he is a safe

---

[2] Arturo Castellanos-Canales, *Addressing the U.S. Truck Driver Shortage: The Role of Foreign-Born Drivers, Visa Policy, and Supply Chain Impacts*, FORUM TOGETHER (Oct. 17, 2025), available at https://forumtogether.org/article/addressing-the-u-s-truck-driver-shortage-the-role-of-foreign-born-drivers-visa-policy-and-supply-chain-impacts/.

driver and learning the cities and routes where he drives in order to transport his community members to work, school, and appointments on a daily basis.

Further, removing these drivers from the CDL pool will create disruption in critical supply chains, which will in turn lead to longer delivery times, inventory shortages, and production delays throughout the economy, adversely affecting businesses and consumers.[3] For example, a Teamster driver who delivers food explained how safe and efficient food delivery is critical to the overall health and well-being of the communities that depend on those goods. Assisted living homes and hospitals rely on him to provide meals to residents and patients. Students rely on him in order to have lunch at school. Small businesses rely on him to be able to get what they need in order to continue functioning, as do larger hotels and restaurants. In a time when we most need to address the affordability crisis facing Americans across the country, forcing out nearly 200,000 drivers who are integral to ensuring consumer goods can safely and efficiently reach our homes and businesses defies logic.

Further, labor unions have a duty of fair representation to their members under the National Labor Relations Act. Pursuant to this duty, unions will be required to represent these drivers when they lose their licenses and their jobs. This will result in costly arbitrations or negotiations—costing Teamsters locals thousands of dollars in expenses, which are costs that the Rule does not account for. Already, Teamster representatives have had to spend hours answering questions from members and dealing with job loss caused by California's license revocation notices, as described in more detail below. Teamsters losing their CDLs will also impose burdens on their coworkers and other Teamster members, who will be forced to take on additional work to fill those gaps, further amplifying threats to safety. These costs—along with the costs on affected drivers—far outweigh the nonexistent safety benefits the FMCSA attempts to invent to justify the Rule.

**III. The Rule Will Make Our Communities Less Safe**

The Rule purports to restore integrity to the CDL issuance process by strengthening security and enhancing the safety of commercial motor vehicle operations. But DOT/FMCSA admits in the Rule that "[t]here is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations." Rule at 46520. This alone demonstrates the absence of a rational link between the Rule and its stated aim.

---

[3] Hugh Cameron, *America Doesn't Have Enough Truck Drivers*, NEWSWEEK (Jul. 10, 2025), available at https://www.newsweek.com/america-trucking-shortage-logistics-supply-chain-2097123.

TEAMSTERS CALIFORNIA

Instead of providing and analyzing the applicable data, DOT/FMCSA points to five fatal accidents in 2025 that involved non-domiciled CDL drivers. But according to the FMCSA's own published data, this means that non-domiciled CDL holders are significantly underrepresented among those drivers involved in fatal crashes, as non-domiciled CDL holders account for approximately 5 percent of all CDL holders but only about 0.2 percent of fatal crashes.[4] Thus, according to FMCSA's own data, replacing non-domiciled CDL drivers with domiciled CDL drivers, as the Rule would require, would not improve safety and would actually cause more accidents and fatalities on our roads.

Contrary to what FMCSA claims in its Rule, the nearly 200,000 non-domiciled CDL drivers who are at risk of losing their CDLs are highly qualified and rigorously screened. In order to obtain their CDL, Teamster drivers in this state undergo significant vetting processes through the California Department of Motor Vehicles ("DMV"), where they must provide extensive documentation on their 10-year driving history, a medical examination, fingerprints, knowledge tests, and skills tests, which include a vehicle inspection, a basic control skills test, and a road test. Prior to getting their CDLs, these drivers often undergo months of classroom and behind-the-wheel training, plus additional classes to receive certificates and endorsements. In addition, employers of Teamster drivers typically have their own layers of additional vetting, including drug tests and background checks, along with detailed safety protocols and regular comprehensive safety trainings. Further, FMCSA's claim that employers of workers holding temporary nonimmigrant visas like H-2A, H-2B, and E-2 visas somehow vet workers more thoroughly than employers of Teamster members or any other employer is not supported by evidence and is completely incongruent with what Teamsters actually experience and observe in their daily work. Rule at 46516.

Put simply, the loss of nearly 200,000 skilled, dedicated, and experienced CDL drivers nationwide will make our communities fundamentally less safe. Truck drivers already have one of the highest rates of injuries and illnesses of all occupations.[5] The loss of these experienced drivers will create significant burdens on remaining CDL drivers, increasing the risk of fatigue and stress, and therefore adversely affecting driver and community safety. It would also replace

---

[4] FMCSA, *Summary Report: CY 2025 Fatal Crashes* (Sept. 26, 2025), https://perma.cc/KQ2S-YN23 (estimating a total of 2,399 fatal crashes involving large trucks and buses as of September 26, 2025).

[5] Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook, Heavy and Tractor-trailer Truck Drivers*,
available at https://www.bls.gov/ooh/transportation-and-material-moving/heavy-and-tractor-trailer-truck-drivers.htm (visited Nov. 22, 2025).

experienced drivers with less experienced drivers, who statistically are more prone to accidents.[6] Thus, the Rule, which cruelly robs Teamster CDL drivers of their long-term careers, will also result in more, not less, fatalities and overall cause a decline in community safety.

**IV. The Rule Was Issued Unlawfully**

FMCSA issued its Rule without giving the public notice and an opportunity to comment as required by the Administrative Procedure Act and without consulting with the states as required under law. *See* 5 U.S.C. § 553(b) & (c) and 49 U.S.C. § 31308. Here, FMCSA asserted that this was a crisis situation premised on safety, which prevented it from engaging in notice and comment rulemaking and consulting with states. But as described above, FMCSA admits there is no evidence supporting its position that there is a crisis or that its Rule is rationally related to addressing such a crisis. In fact, directly contrary to the FMCSA's claims, the data demonstrates that the Rule will have adverse effects on safety. For these reasons, among others, the Court of Appeals for the D.C. Circuit issued a stay of the Rule, finding that the challengers to the Rule had a likelihood of succeeding on the merits. *See Rivera Lujan v. FMCSA*, Case No. 25-1215 (D.C. Cir. Nov. 13, 2025).

If FMCSA had consulted with the public and the states as required, it would have been able to better assess the alleged need for the Rule and the harm the Rule will cause. Perhaps FMCSA would have decided not to issue the Rule at all, given that it is based on a false premise, significantly deprives those who have relied on FMCSA's prior rules of an important benefit, and will hurt workers, unions, and our economy. Instead, FMCSA issued the Rule, effective immediately, accompanied by demands from the DOT to the State of California to immediately cease issuing non-domiciled CDLs, under threat that the FMCSA would withhold federal highway funds from the state—starting at nearly $160 million in the first year and doubling in year two.[7] As described below, these threats, which were based on an unlawful Rule, have already created chaos and disruption in California, which FMCSA has an obligation to correct.

---

[6] Naomi Dunn et al., *Commercial Motor Vehicle Driver Risk Based on Age and Driving Experience (Report #20-UI-079)*, NATIONAL SURFACE TRANSPORTATION SAFETY CENTER FOR EXCELLENCE (Apr. 17, 2020), available at https://vtechworks.lib.vt.edu/server/api/core/bitstreams/a5800006-4b00-4854-bd5c-1f3e76f5d5c1/content.

[7] *Trump's Transportation Secretary Sean P. Duffy Takes Emergency Action to Protect America's Roads, Restrict Non-Domiciled CDLs*, U.S. Department of Transportation Press Release (Sept. 26, 2025), available at https://www.fmcsa.dot.gov/newsroom/trumps-transportation-secretary-sean-p-duffy-takes-emergency-action-protect-americas-roads.

**V. The Rule is Already Creating Chaos and Disruption in California**

Upon receiving FMCSA's threats to withhold hundreds of millions of dollars in federal highway funds, California issued approximately 17,000 notices to California drivers instructing them that the DMV would cancel their CDL within 60 days unless they provided legal presence documents that met new federal guidelines under the Rule, such as evidence of permanent residency or U.S. citizenship.[8] But even more concerning, the Teamsters have received reports that the California DMV is already cancelling and refusing to fix or renew affected drivers' CDLs based on the Rule, and drivers have already been taken out of service as a result of losing their CDLs based on California's attempt to comply with an unlawful Rule. The DMV's notices, along with the in-person experiences that drivers are having at DMVs, have created mass fear and confusion across California. Drivers have had to assess their options and have expended time and money to address the possibility and actuality of losing their licenses and careers. Likewise, Teamsters locals representing these drivers have had to invest significant resources into understanding the implications of the Rule and helping affected drivers, including assisting them in finding alternate employment wherever feasible.

While these letters may have been initiated by the State of California before the D.C. Circuit's stay, the D.C. Circuit has now stayed the Rule in its entirety. This means it is unlawful for the State of California to require drivers to meet the now-stayed requirements in the Rule, or for California to refuse to allow drivers to renew their CDLs even if they are lawfully eligible for a CDL at this moment. And it is imperative that FMCSA take immediate action to make clear to the State of California that because of the D.C. Circuit stay, California and our drivers are not subject to the Rule—as a failure to do so would arguably be in contempt of the D.C. Circuit's stay order. Thus, the FMCSA must clearly and immediately cease its threats of withholding federal highway funds from the State of California, and inform California that it cannot take any action to enforce the Rule that is currently stayed by the D.C. Circuit.

**V. Conclusion: FMCSA Should Immediately Withdraw the Rule**

In conclusion, the Rule is unlawful and entirely ineffective at actually making our roads more safe. The Rule would harm, not help, efforts to improve our collective well-being. Teamster drivers are essential community members whose work undergirds our supply chains, our public transportation, our schools, our waste systems, and more. These drivers are parents, caregivers, main providers, and union members who only want to do their work well and earn an honest

---

[8] *Newson Caught Redhanded: Trump's Transportation Secretary Sean P. Duffy Exposes California Illegally Issued 17,000 Commercial Driver's Licenses, Gets Them Canceled*, U.S. Department of Transportation Press Release (Nov. 12, 2025), available at https://www.transportation.gov/briefing-room/newsom-caught-redhanded-trumps-transportation-secretary-sean-p-duffy-exposes.

TEAMSTERS CALIFORNIA

living for it. Depriving these drivers of their hard-earned careers will disrupt not only their own lives, but also public services, transit systems, flow of goods, community networks, and countless other aspects of daily life.

If DOT/FMCSA truly wants to make commercial driving safer for drivers and for our communities, it would regulate technology companies that are pushing a future that puts profits over people, eliminates jobs, and drives working families out of our communities. It would prevent the proliferation of dangerous autonomous vehicles that lack the experienced human operators they need to safely operate. And it would take other concrete steps that actually support drivers, and ensure that they are fairly compensated for the backbreaking work they do every day and afforded the basic protections they deserve.

Instead, DOT/FMCSA is going after hardworking Teamster members and possible future Teamster members, many of whom have been safely driving and keeping our communities running for decades. It is not legal, it is not right, and it will not make anyone safer. Thus, DOT/FMCSA should immediately withdraw the Rule and focus on developing regulations that will actually benefit working families, rather than targeting the immigrant workers who form the backbone of our economies and our communities.

Sincerely,

Victor Mineros
Co-Chair
Teamsters California

Peter Finn
Co-Chair
Teamsters California

**Federal Motor Carrier Safety Administration**

**1200 New Jersey Avenue, SE Washington, D.C. 20590**

November 18, 2025

VIA ELECTRONIC MAIL
Attention: State Driver's Licensing Agencies (SDLAs):

On September 29, 2025, the Federal Motor Carrier Safety Administration (FMCSA) published an Interim Final Rule (IFR) amending Federal regulations in 49 CFR Parts 383 and 384 applicable to SDLAs' issuance of non-domiciled commercial learner's permits (CLPs) and commercial driver's licenses (CDLs). *See* Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 90 Fed. Reg. 46509 (Sept. 29, 2025), Docket No. FMCSA–2025–0622.[1] The rule, if finalized as written, would amend 49 CFR Parts 383 and 384 to limit the eligibility for non-domiciled CLPs and CDLs and would require, in part, that SDLAs query the Systematic Alien Verification for Entitlements and retain copies of the application documents for no less than 2 years. The changes would strengthen the security of the CDL issuance process and enhance the safety of commercial motor vehicle operations by revising to whom an SDLA may issue a non-domiciled CLP or CDL, what the requirements are for issuance, and when a non-domiciled CLP or CDL must be canceled or revoked.

FMCSA strongly encourages SDLAs to review the IFR and provide comments, data, or other information relevant to the rulemaking. FMCSA will consider all comments and materials received during the comment period, which closes on **November 28, 2025**.

Sincerely,

Larry W. Minor
Associate Administrator for Policy

cc: Ian Grossman, President and CEO
American Association of Motor Vehicle Administrators

Bill McBride, Executive Director
National Governors Association

Collin Mooney, Executive Director
Commercial Vehicle Safety Alliance

---

[1] As FMCSA previously notified you, on November 13, 2025, the U.S. Court of Appeals for the District of Columbia Circuit issued an Order in *Lujan v. FMCSA*, Case No. 25-1215, staying the effective date of the IFR pending court review. Due to the stay, the IFR is, until further notice, not in effect. Accordingly, until further notice, States are not prohibited from issuing non-domiciled CLPs and CDLs in accordance with the Federal regulations and guidance in effect immediately prior to issuance of the IFR.

November 28, 2025

Federal Motor Carrier Safety Administration
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

*SUBMITTED VIA REGULATIONS.GOV*

**RE: Docket No. FMCSA-2025-0622**

Dear Docket Clerk:

The below-signed local governments and individual local government leaders ("Local Government Signatories")[1] offer the following comments and questions regarding the U.S. Department of Transportation's (DOT) Interim Final Rule (IFR) entitled "Restoring Integrity to the Issuance of Non-Domiciled Drivers Licenses (CDL)," published in the Federal Register at 90 Fed. Reg. 46509 (Sept. 29, 2025). The Local Government Signatories' comments focus on Sections V(C), V(D), VI(A), VI(B), and IX(A) of the IFR, specifically, the Federal Motor Carrier Safety Administration's (FMCSA's) failure to consider the IFR's on-the-ground harms or appropriately tailor the rule to the harm it seeks to address.

A number of critical local government services depend upon licensed commercial motor vehicle drivers, including school buses, road maintenance and repair, utility service, disaster response, and infrastructure construction. Drivers employed by the Local Government Signatories who provide these services are required to have valid commercial driver's licenses ("CDLs") to operate the necessary commercial motor vehicles. To appropriately provide such services, the Local Government Signatories depend on access to a sufficient pool of licensed, commercial drivers whose licensing status is both stable and predictable. Even prior to the IFR, local governments faced substantial shortages of qualified CDL drivers.

By issuing the IFR, FMCSA immediately altered a program that had been in place for nearly 15 years, without input from those most impacted by the changes. The IFR failed to account for the way in which it would directly and substantially impact local governments' ability to provide

[1] Local Government Signatories hail from across the country, and their jurisdictions differ in size, demographics, and policy priorities. Local Government Signatories also differ in the way in which they provide transportation-related services—including public transportation, school buses, and critical safety-related services like highway maintenance and snow plowing—to their communities. Some provide these services directly; others provide them indirectly, as funders or members of public authorities; yet all rely on these services as part of a broader network of public services. Notwithstanding these variations, all local governments share a fundamental interest in providing effective and reliable public services to their constituents and keeping their communities safe, including by ensuring road safety. That is especially true for local governments like these Signatories, who often act as first responders to vehicular accidents and have unique interests in protecting their residents.

essential services, thereby reducing affordability, harming families who depend on school busing and other services, and impairing public safety. By FMCSA's own estimates, of the 200,000 non-domiciled CDL holders in the country, 194,000 of them will exit the freight market because they lose their CDLs as a result of the IFR.[2] That means approximately five percent of all active CDL holders, based on 2024 numbers, risk losing their licenses.[3] Such individuals will no longer be able to perform their essential jobs. Local governments, such as the Signatories, that rely on these commercial drivers to provide essential services will be left understaffed. The depleted pool of potential CDL candidates resulting from the IFR will make it even harder to replace these drivers and drive up costs for public and private entities employing CDL drivers or using their services.

The Local Government Signatories and the essential services they provide will suffer needless tangible harm despite the purely speculative safety benefits of the IFR. By FMCSA's own acknowledgement, there is no evidence that the IFR will result in any safety benefits, because there is no evidence that the immigration status of a non-domiciled CDL holder, or even the domiciled or non-domiciled status of a CDL holder, has an impact on road safety.[4] FMCSA therefore implemented a new regulation without any demonstrated need, in contravention of Department of Transportation policy.[5] Moreover, given the significant adverse impacts and minimal benefits, the IFR is inconsistent with a recent Department of Transportation order requiring the use of "sound economic principles and analysis supported by rigorous cost-benefit requirements and data-driven decisions," the avoidance of adverse impacts to families and communities including a reduction in transportation services, and the administration of statutes in a manner that enhances safety and access to jobs.[6]

The Local Government Signatories strongly agree with the importance of ensuring that "only individuals who have been determined by relevant State licensing agencies—in accordance with Federal standards—to be qualified to operate large commercial vehicles are allowed to drive such vehicles on the Nation's roadways."[7] The Local Government Signatories recognize FMCSA's interest in ensuring that all State licensing agencies adhere to these requirements. The IFR in its present form, however, does not address those compliance issues. The IFR also does not show any impacts to safety specifically associated with the domiciled or non-domiciled status of a CDL holder, nor does it account for the real harms that would result from reducing the availability of qualified CDL holders performing a variety of safety-critical and essential public services.

The Local Government Signatories respectfully request that FMCSA withdraw the IFR given that there is no data to support its causal benefit to road safety. In the alternative, before issuing any final rule, FMCSA should collect data to better study and understand the underlying drivers of road safety, after which the agency can revise the IFR, accounting for public comments, as required

---

[2] Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 90 Fed. Reg. 46509, 45619 (Sept. 29, 2025).

[3] *Id*. at 46520.

[4] *Id.*

[5] DOT Order 2100.6B, "Policies and Procedures for Rulemaking" § 6(a) (Mar. 10, 2025).

[6] DOT Order 2100.7, "Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities" § 5 (Jan. 29, 2025).

[7] 90 Fed. Reg. at 46511.

by the Administrative Procedure Act. FMCSA can take less burdensome measures while it carefully and expeditiously considers these issues. Through collaboration and data collection, those tasked with implementing changes to CDL eligibility can do so in a manner that promotes widespread compliance, enhances the safety of commercial vehicle operations, and is workable for those local governments that rely on commercial drivers to provide critical services. That approach is also more likely to improve road safety and prevent fatal crashes.

The Local Government Signatories appreciate the opportunity to provide comments on the IFR. It is especially critical that FMCSA seriously consider the IFR's on-the-ground impacts before deciding whether to move forward with issuing a final rule. Given these impacts and the lack of evidence that the IFR will result in any safety benefits, the Local Government Signatories urge FMCSA to withdraw the IFR. But should FMCSA decide to proceed, the recent stay of the IFR indicates significant changes are necessary before FMCSA publishes a final rule.[8] The Local Government Signatories look forward to continued collaboration and engagement on these important issues.

## I. FMSCA Must Account for the IFR's Real-World Impacts and the Substantial Reliance Interests the IFR Would Disrupt.

Fewer licensed commercial drivers and a smaller pool of potential drivers will translate directly into disrupted and curtailed government services. Accordingly, the IFR will not only impact those who rely on these services, but harm those local governments that rely on the availability of CDL holders to provide these services and who now will be forced to expend additional resources to respond to this sudden disruption. The Administrative Procedure Act requires agencies to "assess whether there were reliance interests [in their previous policies], determine whether [those interests] were significant, and weigh any such interests against competing policy concerns."[9] Although the IFR lacks supporting data of any causal safety benefits in the first place, should FMCSA choose to proceed, FMCSA must consider the following impacts and reliance interests before finalizing the rule.

*Core Local Government Services*: Local governments rely on workers licensed to operate commercial motor vehicles for a wide range of critical services. These include: public transportation; school buses; highway and road maintenance and repair; response to inclement weather; gas, electricity, and other utility service; and disaster response, mitigation, and recovery. In addition, the construction of necessary infrastructure (e.g., roads, electrical transmission and generation, airports, housing, ports, water, sewer, data centers) depends on having CDL holders on site to aid in construction, to supply materials, and to haul fill. Those services will suffer directly because the IFR reduces the availability of CDL holders.

For example, one Signatory reports it already has extreme difficulty hiring and retaining CDL drivers. Fourteen of its fifty-three positions that require a CDL (26 percent) are currently open and have been for an average of three months. These unfilled jobs undermine the jurisdiction's ability to provide government services such as trash cleanup and emergency response. The IFR will

---

[8] *Lujan v. Fed. Motor Carrier Safety Admin.*, 25-1215, 2025 U.S. App. LEXIS 29835 (D.C. Cir. Nov. 13, 2025).

[9] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

further reduce the already limited number of CDL holders in the job market and thus make it harder for the Signatory to deliver these important services to its people.

Similarly, the IFR will impede local governments and associated entities in their ability to prepare for and recover from natural disasters, like Hurricane Helene in North Carolina, the Guadalupe River floods in Texas, tornado outbreaks in the South, or the Los Angeles wildfires. Disaster response heavily relies on the timely receipt of equipment and workers. Thinning forests; protecting coastlines; supplying food, fuel, and water to residents who have lost their homes; clearing flood zones; and ensuring road access for other emergency responders involve heavy hauling, which requires heavy trucks and commercially licensed drivers. During the Guadalupe flood response, for example, local tow truck drivers became essential for "clearing the way for emergency crews, recovering submerged vehicles and delivering life-saving supplies."[10] Commercially licensed drivers are also utilized "when electric utilities send trucks, equipment, and staff to restore energy infrastructure after a hurricane."[11] And when serious thunder or winter storms knock out the electricity, commercial trucks play a crucial role in clearing debris and getting the power back on for thousands of people.[12] With a diminished workforce of licensed commercial drivers, local governments may no longer be able to rely on drivers to aid in disaster response.

*Transit, Motorcoach, and School Bus Services*: Without sufficient drivers, transit systems, which are already facing substantial driver shortages and serious fiscal constraints, will be forced to further cut back on services to families, whether by limiting hours or frequency of service or suspending certain service routes.[13] Driver shortage impacts are not limited to large, urban transit systems, but also impact rural communities, where motorcoaches and school buses can play a role in bridging service gaps.[14] Fewer school bus operators similarly raise the likelihood of reduced or

---

[10] Alicia Neaves, *The Unseen First Responders: Tow Crews Fuel Hope After Hill Country Floods*, Kens5 (July 10, 2025 at 10:23 PM CDT), https://www.kens5.com/article/news/state/texas-news/texas-flood/texas-floods-first-responders-tow-crews-fuel-hope-hill-country/273-a2f3f29b-b69f-4734-830a-48633149e274.

[11] *See* U.S. Dep't of Transp. Fed. Highway Admin., *Resources for Commercial Vehicles Involved in Emergency Response* 1 (2021), https://ops.fhwa.dot.gov/publications/fhwahop21009/fhwahop21009.pdf.

[12] *National Grid Restores Power to More Than 57,900 Customers in Mohawk Valley and Northern New York After Damaging Thunderstorms*, National Grid (June 22, 2025 at 6:00 PM), https://www.nationalgridus.com/News/2025/06/National-Grid-Restores-Power-to-More-Than-57,900-Customers-in-Mohawk-Valley-and-Northern-New-York-After-Damaging-Thunderstorms-/ (severe thunderstorms in northern New York impacted 94,300 electricity customers and crews were mobilized to clear debris and repair widespread damage and downed power lines); Edgar Sandoval, Sophie Kasakove, & Maggie Astor, *Winter Storm Disrupts U.S. With Power Outages and Icy Roads*, N.Y. Times (Feb. 03, 2022), https://www.nytimes.com/live/2022/02/03/us/winter-storm-snow-ice?bcrFallback=bcrFallback (300,000 homes and business lost power following a winter storm).

[13] *See, e.g.*, Matthew Dickens, *Am. Pub. Transp. Ass'n, Policy Brief: Workforce Shortages Impacting Public Transportation Recovery* 3 (2022), https://www.apta.com/wp-content/uploads/APTA-SURVEY-BRIEF-Workforce-Shortages-March-2022.pdf (showing 71% of 117 agencies delayed or cut services due to staffing shortages); Laura Bliss, *There's a Bus Driver Shortage. And No Wonder*, Bloomberg (June 28, 2018, at 8:00 AM ET), https://www.bloomberg.com/news/articles/2018-06-28/there-s-a-bus-driver-shortage-and-no-wonder (noting significant shortages in Seattle, New Jersey, Denver, Los Angeles, Toledo, Gainesville, and New Hampshire, many of them leading to delays and cuts in service).

[14] U.S. Dep't of Transp. Climate Change Center, *Climate Strategies that Work: InterCity Buses* 3 (2025), https://www.transportation.gov/sites/dot.gov/files/2024-10/Intercity%20Buses%20PDF%20%282%29.pdf (bus services "connect rural residents to major urban centers, offering connections to essential services and economic opportunities").

less reliable service or entire cuts to bus routes, impacting students, parents, and teachers, and reducing access to critical school resources, such as school meals and extracurricular programs.[15] These changes impact the reliance interests not only of the people who depend on these services, but also the local governments who have designed the bus routes and made certain planning decisions with the assumption that there would not be substantial changes to their commercial driver workforce without reason.

These consequences are not theoretical. The Nation has experienced recent driver workforce shortages that illustrate the impact of insufficient drivers on local government services. For example, a 2022 survey from the American Public Transportation Association found that 96 percent of transit agencies faced workforce shortages, with 84 percent of agencies reporting impacts on service.[16] These impacts hit bus operations most severely, with 94 percent of agencies reporting that bus operator positions were the most or second-most challenging to fill.[17] Due to these workforce shortages, public transit agencies reported cutting, delaying, and cancelling transit service.[18] One-third of agencies stated that these impacts to their services were having a negative effect on the reliability of their service.[19]

The IFR will only further exacerbate these shortages and ensuing reliability issues. This unreliability then disrupts the lives of people who depend on these services to get to their jobs, school, healthcare appointments, and visit friends and family. Such disruption also plainly runs counter to a DOT order that requires, to the extent practicable, administration of DOT policies to maximize benefits including economic opportunities, such as "increased access to jobs, healthcare facilities … commercial activity, or any actions or project components that will … enabl[e families and communities] to participate more fully in our economy."[20] Decreased and unreliable transit service will make it far more difficult for the people who rely on these services to access job opportunities, commercial centers, and other economic activities.

*Economic Impacts*: Local governments may face broader economic effects due to the IFR. For example, governments typically spend money to recruit and train employees. Funds already spent on drivers who are stripped of their licenses by the IFR cannot be recouped. For example, under the IFR, Martin Luther King, Jr. County in Washington stands to lose 50 active, non-domiciled bus drivers and an additional four recent trainees, which represent an investment of over $800,000 in training costs.[21] The need to replace these drivers, thereby spending additional funds on recruitment and training, further compounds these costs. Applicable laws, regulations, or policies often impose substantial training requirements, lengthening the time and increasing the cost of

---

[15] *See* Cindy Long, *School Bus Driver Shortage Persists*, neaToday (Dec. 14, 2023), https://www.nea.org/nea-today/all-news-articles/school-bus-driver-shortage-persists.

[16] Am. Pub. Transp. Ass'n, *Transit Workforce Shortage* 1 (2023), https://www.apta.com/wp-content/uploads/APTA-Workforce-Shortage-Synthesis-Report-03.2023.pdf.

[17] Dickens, *supra* note 13, at 2.

[18] *Id*.

[19] *Id*.

[20] DOT Order 2100.7, "Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities" § 5(d) (Jan. 29, 2025).

[21] Emergency Mot. for Stay Pending Judicial Review 37, *Lujan*, 2025 U.S. App. LEXIS 29835, Dkt. No. 2142094.

replacing drivers.[22] Likewise, with a limited pool of licensed drivers, localities may need to address critical needs by relying on increased overtime or temporarily relocating workers, which increases the cost of services.[23]

Moreover, because most local governments operate on fixed budgets, they are limited in their ability to address the effects of the IFR through increased expenditures.[24] They may not be able to, for example, raise salaries, offer recruitment bonuses, or support additional overtime pay, forcing cuts to critical services. When local governments reached their budgets for the year and allocated funding, they relied on the availability of their current pool of commercial drivers and could not know to account for significant losses to that pool and the need to train replacement drivers. Furthermore, if local governments are forced to expend additional resources on addressing commercial driver shortages, they may also be forced to redirect funding away from their other critical services.

*Trucking and Supply Chain Impacts*: Local governments also depend on the transportation of goods into their communities to perform many of their vital functions. The Nation's supply chain for these goods depends in large part on truck drivers, as became evident in recent years when the country experienced truck driver shortages.[25] The IFR will almost certainly disrupt supply chains, which will further impede local governments' ability to deliver vital services. Without an adequate trucking workforce, local governments will struggle with shortages of materials to support construction projects, increased port congestion, and delays in procurement of critical goods and projects like housing or electrical infrastructure.[26] More than just impacting the delivery of goods, driver shortages can also lead to increased rates for freight operations and higher prices, which

[22] *See* Am. Pub. Transp. Ass'n, *supra* note 16, at 2, 18–22; Bob Costello & Alan Karickhoff, Am. Trucking Ass'n, *Truck Driver Shortage Analysis* 4 (2019), https://www.trucking.org/sites/default/files/2020-01/ATAs%20Driver%20Shortage%20Report%202019%20with%20cover.pdf.

[23] *See, e.g.*, Christine Brittle & Julie Van Keuren, Am. Pub. Transp. Ass'n, *Impact of CDL Under-the-Hood Testing Requirement on Public Transit Agencies' Ability to Hire Bus Operators* 3 (2024), https://www.apta.com/wp-content/uploads/APTA-Impact-of-CDL-Under-the-Hood-Testing-Requirement-Nov-2024.pdf (transit agencies report that worker shortages increase the amount of overtime the agencies pay); Mark Heinz, *'Logistical Nightmare': Short on Plow Drivers & Hammered By Weather, WYDOT Had Harrowing Winter*, Cowboy State Daily (May 6, 2023), https://cowboystatedaily.com/2023/05/06/a-logistical-nightmare-short-on-plow-drivers-and-hammered-by-weather-wydot-had-a-harrowing-winter/ (plow operator shortages caused extra work and wear and tear on equipment that put the Wyoming Department of Transportation $9.7 million over its expected budget).

[24] Jed Herrmann & Teryn Zmuda, *Tough Challenges for Counties in a New Era of Fiscal Federalism*, Governing (Aug. 15, 2025), https://www.governing.com/management-and-administration/tough-challenges-for-counties-in-a-new-era-of-fiscal-federalism.

[25] Hugh Cameron, *America Doesn't Have Enough Truck Drivers*, Newsweek (July 10, 2025, at 02:01 PM ET), https://www.newsweek.com/america-trucking-shortage-logistics-supply-chain-2097123; Madeleine Ngo & Ana Swanson, *The Biggest Kink in America's Supply Chain: Not Enough Truckers*, N.Y. Times (Nov. 9, 2021), https://www.nytimes.com/2021/11/09/us/politics/trucker-shortage-supply-chain.html; Costello & Karickoff, *supra* note 22, at 1; Catie Edmonson, *'What Does a Trucker Look Like?' It's Changing, Amid a Big Shortage*, N.Y. Times (July 28, 2018), https://www.nytimes.com/2018/07/28/us/politics/trump-truck-driver-shortage.html.

[26] Peter S. Goodman, *The Real Reason America Doesn't Have Enough Truck Drivers*, N.Y. Times (Feb. 9, 2022), https://www.nytimes.com/2022/02/09/business/truck-driver-shortage.html ("[A] shortage of truck drivers is frequently cited as an explanation for shortages of many other things — from construction supplies to electronics to clothing."); Jack Kelly, *There Is A Massive Trucker Shortage Causing Supply Chain Disruptions And High Inflation*, Forbes (Jan. 12, 2022, at 11:51 AM ET), https://www.forbes.com/sites/jackkelly/2022/01/ 12/there-is-a-massive-trucker-shortage-causing-supply-chain-disruptions-and-high-inflation/; Ngo & Swanson, *supra* note 25.

will particularly affect cash-strapped local governments and their residents who are already stressed by the cost of goods and services.[27]

With nearly 200,000 current non-domiciled CDL holders exiting the freight market as a result of the IFR,[28] supply chains will almost certainly be disrupted on a scale similar to the workforce shortages experienced in the aftermath of the pandemic. In 2021, the American Trucking Association reported that the industry was short by 80,000 drivers, an all-time high for the industry.[29] The American Trucking Association further estimated that shortage could double to 160,000 drivers in 2030.[30] Already, 69 percent of freight businesses are struggling to meet demand as a result of these shortages,[31] and "to keep up with demand over the next decade, trucking will need to recruit nearly one million new drivers."[32] The IFR will instead narrow the available pool of drivers and seriously impact the interests of local governments who rely on the reliable, cost-effective delivery of these goods. For the same reasons, FMCSA's claim that motor carriers will be able to adjust their hiring and limit the economic impact on the freight market[33] is based on unfounded assumptions: The experience of freight businesses demonstrates that there is not a pool of potential CDL holders who are not affected by the IFR that could easily take the place of the drivers who stand to lose their credentials as a result of this rule.

## II. The IFR Will Have Adverse Impacts on Safety, While Failing to Address the Safety Risks FMCSA Identified and Sought to Mitigate.

The Local Government Signatories acknowledge and support the importance of FMCSA's goal to enhance the integrity of commercial licensing and the safety of commercial motor vehicle operations. The IFR, however, does not address any lapses in compliance with commercial licensing requirements by CDL-issuing entities, but rather is a blanket ban on certain classes of non-domiciled drivers holding CDLs. Broadly stripping CDLs from those classes of drivers does not correlate with improved safety outcomes. As the IFR itself acknowledges, there is insufficient evidence "to reliably demonstrate a measurable empirical relationship between the nation of domicile for a [commercial driver's license] driver and safety outcomes."[34] By contrast, the failure to appropriately tailor the IFR will result in a significant reduction in the availability of commercial drivers, which will translate into increased risk of harm to the public.

---

[27] Edmonson, *supra* note 25.

[28] 90 Fed. Reg. at 46519.

[29] Press Release, Am. Trucking Ass'n, *ATA Chief Economist Pegs Driver Shortage at Historic High* (Oct. 25, 2021), https://www.trucking.org/news-insights/ata-chief-economist-pegs-driver-shortage-historic-high.

[30] *Id*.

[31] Hugh Cameron, *America's Trucking Industry is in Deep Trouble*, Newsweek (Oct. 13, 2025, at 5:40 AM ET), https://www.newsweek.com/us-trucking-industry-deep-trouble-10861497.

[32] Press Release, Am. Trucking Ass'n, *supra* note 29.

[33] 90 Fed. Reg. at 46520.

[34] *Id*.

A. The IFR Imposes New Burdens That Will Harm Road Safety.

Local governments rely on employees with CDLs to provide critical services designed to improve the safety of public roads. By reducing the pool of eligible commercial drivers available to support these safety services, the IFR will result in fewer safety services and increased risks of harm. Accordingly, the Local Government Signatories urge FMCSA to consider the increased risk of harm to the public from the diminishment of local government services that promote safety.

Maintenance of local roads, in particular, is critical for overall roadway safety because although "local roads are less traveled than State highways, they have a much higher rate of fatal and serious injury crashes."[35] Local governments provide services such as regular repair and maintenance of roads and improvement of road design to enhance safety.

Local government safety services also include essential seasonal services, such as clearing roadways of snow and ice and natural disaster response. Snow and ice clearing services ensure safe and reliable access to roads for emergency services and the public alike, which further promotes safety. By way of illustration, a local government facing a shortage of snowplow operators is unlikely to be able to pre-treat or treat roadways as early or as frequently, resulting in more hazardous conditions. This will increase the number of crashes and their consequences. In some cases, they may be forced to close roads entirely and for a longer time until they can be plowed.[36] Doing so risks stranding people at home and delaying emergency response services from reaching people in need.[37] Every minute counts for health, fire, and police emergencies, and less snow and ice removal capacity will increase those minutes at the cost of human lives. And, snow and ice control is already very expensive. Winter road maintenance accounts for roughly over 24 percent of State DOT budgets for highway and traffic services.[38] Each year, State and local agencies spend more than 4.6 billion dollars on snow and ice control operations.[39] Driver shortages will likely further drive up these costs and add to the burden on local governments to maintain these critical services.[40] A smaller pool of commercially licensed drivers therefore risks community safety by limiting local governments' efforts to mitigate natural disasters in advance and respond to them when they strike.

Federal Highway Administration (FHWA) data show that the risks and impacts of snow and ice are already large.[41] On average (based on 2019–2023 data), freezing precipitation each year causes

---

[35] Fed. Highway Admin., U.S. Dep't of Transp., FHWA-SA-21-033, *Local Road Safety Plans*, https://highways.dot.gov/sites/fhwa.dot.gov/files/Local%20Road%20Safety%20Plans_508.pdf.

[36] Heinz, *supra* note 23.

[37] See Michelle Bandur, *'It's a Hiring Problem': Tahoe Basin Resident Fear Snow Plow Driver Shortage Will Leave Them Stranded at Home*, KCRA3 (Nov. 12, 2024, at 7:12 PM ET), https://www.kcra.com/article/tahoe-basin-snow-plow-driver-shortage/62888030.

[38] U.S. Dep't of Transp. Fed. Highway Admin., *How Do Weather Events Affect Roads?*, https://ops.fhwa.dot.gov/weather/roadimpact.htm.

[39] *Id.*

[40] *See, e.g.*, Brittle & Keuren, *supra* note 23 (transit agencies report that worker shortages increase the amount of overtime the agencies pay); Heinz, *supra* note 23 (plow operator shortages caused extra work and wear and tear on equipment that put the Wyoming Department of Transportation $9.7 million over its expected budget).

[41] *How Do Weather Events Affect Roads?*, *supra* note 38.

219,942 crashes, injures 34,206 people, and kills 407 people.[42] Reductions in the availability of CDL drivers to apply deicers, plow snow, and manage debris will further increase these crashes, injuries, and fatalities. Weather also has a major impact on road mobility. Travel time delay on high-capacity roads can increase by 11 to 50 percent depending on the severity of the weather event.[43] Heavy snow can cause freeway free-flow speed to decrease by 35 to 40 percent and road capacity to reduce by 30 percent.[44] Light snow can decrease flow rates by 5 to 10 percent.[45] The decreased availability of CDL drivers to manage these road conditions will further exacerbate delays and costs for public, private and commercial persons and entities. The causality is clear, as opposed to the purely speculative safety benefits claims by FMCSA for the IFR.[46]

Reducing the pool of eligible commercial drivers will directly impact the safety of residents in the Local Government Signatories' jurisdictions. The IFR decreases the number of drivers available to support these services, resulting in fewer safety efforts and increased risk of harm. Furthermore, a depleted workforce increases risk by requiring drivers to work longer or more frequently, which decreases safety due to driver fatigue. Longer shifts can also contribute to driver burnout, further exacerbating workforce shortages.[47] Moreover, losing experienced CDL drivers may put new CDL drivers on the road, when local governments are able to find replacements at all. But newly trained drivers are involved in more accidents, on average, than their more experienced colleagues.[48] The rate of preventable crashes is also significantly higher on average for drivers with less commercial driving experience.[49] Driving experience, as compared to age, is a greater indicator of crash rates and crash involvement.[50] Replacing a non-domiciled CDL driver with any driver who has just received their CDL or who has yet to even receive one will decrease safety and increase the incidence of crashes and moving violations. Not only does the IFR lack a persuasive safety justification, it will actively contribute to decreased safety on the roads.

---

[42] *Id*.

[43] *Id*.

[44] U.S. Dep't of Transp. Fed. Highway Admin., *Emperical Studies on Traffic Flow in Inclement Weather* 2-8, 2-11 (2006), https://ops.fhwa.dot.gov/publications/weatherempirical/weatherempirical.pdf.

[45] *Id*. at 2-3.

[46] According to FHWA, each year trucking companies or CVOs lose an estimated 32.6 billion vehicle hours due to weather-related congestion in 281 of the nation's metropolitan areas. *How Do Weather Events Affect Roads?*, *supra* note 38. Adverse weather conditions affect freight traffic 4.6 percent of the time at a national average. Daniel Krechmer et. al., U.S. Dep't of Transp. Fed. Highway Admin., *Weather Delay Costs to Trucking* 3 (2012), https://rosap.ntl.bts.gov/view/dot/3384. Nearly 12 percent of total estimated truck delay is due to weather in the 20 cities with the greatest volume of truck traffic. *How Do Weather Events Affect Roads?*, *supra* note 38. The cost of weather-related delay to the freight industry was estimated at $8.659 billion or 1.6 percent of the total estimated freight market of $574 billion when the study was conducted in 2012. Krechmer, *supra* note 46, at 3.

[47] Brittle & Keuren, *supra* note 23.

[48] Decl. of David Eldred, Chief Administrative Officer ("CAO") for the Metro Transit Dep't of Martin Luther King, Jr. Cnty., Wash. 16, *Lujan*, 2025 U.S. App. LEXIS 29835, Dkt. No. 2142094; Naomi Dunn, Susan Soccolich, & Jeffrey Hickman, Nat'l Surface Transp. Safety Center for Excellence, *Commerical Motor Vehicle Driver Risk Based on Age and Driving Experience*, 37 (2020), https://vtechworks.lib.vt.edu/server/api/core/bitstreams/a5800006-4b00-4854-bd5c-1f3e76f5d5c1/content.

[49] Dunn, Soccolich, & Hickman, *supra* note 48, at 21, 23, 37.

[50] *Id*. at 37, 38.

Pursuant to the Administrative Procedure Act and for the purpose of discharging its statutory duties, FMCSA must consider the implications for roadway safety that may arise from limiting the availability of commercial driver's license holders to perform these safety-critical functions.

B. The IFR Does Not Address the Problems that FMCSA has Identified.

FMCSA has not demonstrated that there is any link between the problem it has identified and its chosen solution. In the IFR, FMCSA "uncovered systematic procedural and computer programming errors, significant problems with staff training and quality assurance, and policies that lack sufficient management controls in the issuance of non-domiciled CLPs and CDLs by multiple SDLAs," and "identified at least five fatal crashes involving non-domiciled CDL holders." [51] But restricting eligibility for CDLs addresses none of these problems.

First, restrictions on eligibility for non-domiciled CDLs will not help address any of the deficiencies in States' administrative processes identified by FMCSA. The eligibility restrictions cannot address procedural or programming errors, will not address gaps in training or quality assurance, and do nothing to improve management controls. The IFR does not include any regulatory changes that would address those problems or any issue relating to States' administration of CDL licensing. To the contrary, FMCSA's indictment of State practices suggests that any claimed safety benefits from the IFR will fail to materialize. Moreover, FMCSA does not explain why States' failure to enforce existing standards demonstrates that the standards themselves must change. The IFR provides no reason to think that States' errors relating to programming, training, quality assurance, and management controls would not apply equally to a State's handling of both domiciled and non-domiciled CDLs.

Nor does the occurrence of five fatal crashes justify FMCSA's revision of the standards for CDL holders. The IFR fails to draw a connection between the immigration status of the CDL holders involved in the fatal crashes it cites and the fact that those crashes occurred. FMCSA admits that it has no evidence to demonstrate any "relationship between the nation of domicile for a CDL driver and safety outcomes in the United States."[52] Without such evidence, FMCSA cannot rule out the possibility that holders of non-domiciled CDLs are *safer*, on average, than their domiciled counterparts. There are vastly more fatal crashes associated with domiciled CDLs, but that does not justify restricting their ability to hold a CDL just based on their domiciled status.

That problem also undercuts FMCSA's cost-benefit analysis. FMCSA claims that the IFR would have positive net benefits if it results in 0.085 fewer fatal crashes per year, or in other words, if it prevents 1.3 percent of the five fatal crashes involving non-domiciled CDL holders this year.[53] But FMCSA assumes that those crashes would not have occurred, or at least not all would have occurred, if the non-domiciled CDL holders had not been driving. That presupposes that: (1) the domiciled CDL holders who replaced those non-domiciled CDL holders could be expected to practice safer driving habits and avoid a greater number of crashes; (2) the fatalities were in any way correlated with the driver's domicile; or (3) the trips that resulted in those five crashes would

---

[51] 90 Fed. Reg. at 46512.

[52] *Id.* at 46520.

[53] *Id.* at 46521.

have been eliminated, instead of shifted to domiciled CDL holders. The first two premises are obviously incorrect, as seen from the many fatal crashes caused by U.S.-domiciled CDL holders. As noted above, newer CDL drivers have *more* accidents than those with experience, so replacing existing non-domiciled CDL drivers with new CDL drivers will cause more accidents.[54] Again, there is no data to support any conclusions that domiciled versus non-domiciled CDL drivers are safer or less likely to be involved in an accident. The third presupposition is plausible, but not reflected in FMCSA's analysis, because elimination of these trips would necessarily and significantly impact the freight market or government services. FMCSA's analysis significantly undercounts the real risk of accidents involving domiciled CDL holders or the costs of disruption to the freight market and is therefore fundamentally flawed.

The agency should redo its cost-benefit analysis to determine the actual market disruption and the number of additional crashes that would result from replacing non-domiciled CDL holders with additional domiciled CDL holders on the roadways. FMCSA cannot premise its cost-benefit conclusions on flawed assumptions without evidence that the benefits it assumes actually would occur.

The IFR also ignores that driving history is readily available for current holders of non-domiciled CDLs. Applicants who have been driving commercial motor vehicles in the United States pursuant to existing standards have a demonstrated history of either safe or dangerous driving, which is as easily available to State licensing authorities as the history of a domiciled-CDL holder. Nonetheless, FMCSA prevents CDL renewals for every holder of a non-domiciled CDL, without regard for their past driving history. FMCSA has no reason to forbid nondomiciled CDL holders with a demonstrated history of safe driving on U.S. roads from renewing their CDLs indefinitely. As drafted, the IFR forces the Local Government Signatories to use the services of untested seasonal workers or novices rather than longtime, proven employees.

At bottom, the IFR depends on the existence of a correlation between domicile status and safety that is unsupported by the record. That makes the burdens FMCSA imposes indefensible and unjustifiable.

**Conclusion**

In summary, the Local Government Signatories ask FMCSA to consider the harms to a number of critical government services that rely on commercially licensed drivers and the safety implications of those effects on safety-critical local government services. We urge FMCSA to withdraw or materially revise the IFR to account for these harms and to adopt regulatory policy that more closely aligns to the best available safety data and evidence.

The Local Government Signatories further strongly urge FMCSA to consider collecting additional data to better understand the problem facing it. The IFR's cherry-picking of five incidents in a

[54] Dunn, Soccolich, & Hickman, *supra* note 48, at 37.

single year out of likely thousands[55] suggests that, despite FMCSA's extensive data collection, it does not have sufficient data to link domicile status to the safety and fitness of CDL holders. FMCSA could have required States, employers, or other entities to report data about crashes to determine what factors actually jeopardize roadway safety and to analyze if any correlation exists. Data collection is a natural next step. If, on the other hand, FMCSA already has data that it can use to better understand how a CDL holder's domicile status impacts road safety, then it should disclose and rely on that data instead of speculating.

We look forward to working with you to address these concerns and appreciate the opportunity to provide these comments.

Respectfully submitted,

Local Governments and Local Government Leaders
(listed in Appendix A)

[55] In 2022, 6050 large trucks and buses were involved in fatal crashes. There is little reason to think that number has changed so drastically since then that five represents a significant fraction. *See* U.S. Dept. of Transp. Fed. Highway Admin., *Large Truck and Bus Crash Facts 2022*, https://www.fmcsa.dot.gov/safety/data-and-statistics/large-truck-and-bus-crash-facts-2022-1 (last updated Oct. 10, 2025).

## Appendix A – List of Signatories

### Local Governments

City of Albany, New York

Albany City Attorney's Office, New York

City of Alexandria, Virginia

City of Cambridge, Massachusetts

Montgomery County, Maryland

City of New York, New York

Portland City Attorney's Office, Oregon

### Local Government Leaders

Celina Benitez
*Mayor, City of Mount Rainier, Maryland*

Jesse Brown
*Councilmember, City of Indianapolis, Indiana*

Chelsea Byers
*Mayor, City of West Hollywood, California*

Chris Canales
*Councilmember, City of El Paso, Texas*

Michael Chameides
*Supervisor, County of Columbia, New York*

John Clark
*Mayor, Town of Ridgway, Colorado*

Alison Coombs
*Councilmember, City of Aurora, Colorado*

Christine Corrado
*Councilmember, Township of Brighton, New York*

Nikki Fortunato Bas
*Supervisor, Alameda County, California*

Brenda Gadd
*Councilmember, Metropolitan Nashville and Davidson County, Tennessee*

Caroline Torosis
*Mayor Pro Tempore, City of Santa Monica, California*

Terry Vo
*Councilmember, Metropolitan Nashville and Davidson County, Tennessee*

Ginny Welsch
*Councilmember, Metropolitan Nashville and Davidson County, Tennessee*

Robin Wilt
*Councilmember, Township of Brighton, New York*

**Federal Motor Carrier Safety Administration**
**U.S. Department of Transportation**
**Docket: FMCSA-2025-0622**

**Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)**

**Submitted By:**
**Washington Trucking Associations**
**2102 Carriage Drive SW**
**Bldg. F**
**Olympia, WA 98502**

**November 28, 2025**

**Contact:**
**Abigail S. Potter**
**Director of Safety & Compliance**
**253-838-1650**

I. Introduction

The Washington Trucking Associations (WTA) submits these comments to the Federal Motor Carrier Safety Administration (FMCSA) in response to the September 29, 2025, interim final rule (IFR) titled "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)."[1] As a representative voice of the motor carriers domiciled and operating in the State of Washington, WTA is deeply invested in strengthening the federal CDL issuance process to enhance safety on our nation's roadways. WTA appreciates the opportunity to provide feedback on this important rulemaking and offers these comments to support FMCSA's goals while identifying potential areas for modification that would help mitigate the current economic impact and address the industry's immediate compliance concerns.

II. Summary of WTA's Position

The WTA members commend FMCSA for identifying a critical loophole in the CDL issuance and renewal process. The tragic events in Florida on August 12, 2025, may have been prevented if the driver's employment authorization expiration had been directly linked to the validity of their CDL. WTA supports FMCSA's intent to ensure that only individuals with lawful U.S. employment authorization are permitted to operate commercial motor vehicles (CMVs). The IFR strengthens the State Driver's Licensing Agencies' (SDLAs) vetting requirements for Commercial Learner's Permit (CLP) applicants and CDL holders, representing an important step toward that goal.

However, while WTA members strongly support the IFR's objectives, the strict limitation of eligible employment categories (i.e., H-2A, H-2B, and E-2 visa holders) has resulted in a significant number of drivers with strong safety records either losing or facing imminent downgrades of their

[1] *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL): Interim Final Rule; Request for Comments*, 90 Fed. Reg. 46,509 (Sept. 29, 2025).

CDLs.[2] The swift implementation of the rule has also created compliance uncertainty, particularly for carriers employing drivers who currently possess lawful employment authorization but may not have all the documentation required under the new definition of "Evidence of Lawful Immigration Status"[3] and have an active CDL. This uncertainty heightens the risk that motor carriers may unknowingly fall out of compliance, exposing them to potential liability and inconsistent enforcement actions across state lines.[4] Additionally, limiting eligibility to only three visa categories without clearly demonstrating a safety-related justification risks undermining the effectiveness and durability of the rule. Notably, the U.S. Court of Appeals for the District of Columbia Circuit has stayed the rule, finding that FMCSA had not sufficiently explained how the narrowed categories would advance highway safety.[5] WTA encourages a more measured, safety-focused approach to ensure that the rule can be implemented in a manner that provides motor carriers with the predictability necessary for continued safe and efficient operations.

Although most WTA members have made operational adjustments, the cost of replacing experienced, safety-conscious drivers who are no longer eligible to maintain a CDL, due to the IFR's narrow definition of "lawful immigration status," will be substantial. The introduction of less experienced drivers or individuals with a prior safety violation into these roles may inadvertently impact the safety performance of numerous motor carriers across the industry. These disruptions not only strain motor carrier operations but also risk undermining the progress made toward reducing crashes and improving compliance outcomes nationwide.

Our membership wants to be very clear that maintaining a CDL is a privilege and not a right. All CDL holders, whether U.S. citizens, Green Card holders, U.S. Visa holders, or any other individuals with valid U.S. employment authorization, ***must*** comply with all applicable federal and state laws and regulations, including English language proficiency standards,[6] to operate *any* CMV on our nation's roadways. Accordingly, WTA urges FMCSA to revise the IFR to restore eligibility for all individuals with lawful employment authorization, ensuring that the rule's safety objectives are met without unnecessarily disqualifying experienced, qualified drivers.

## III. Strengthening the SDLA CDL/CLP Vetting Process

As mentioned, WTA strongly supports FMCSA's efforts to strengthen SDLA vetting procedures for CDL/CLP issuance and renewal processes, including verification and documentation of valid U.S. employment authorization. In states such as Washington, where citizenship and immigration status are legally recognized as protected classes, the Washington State Department of Licensing (WADOL) and employers may not, except as permitted under the federally mandated Form

---

[2] WTA has identified twelve member companies employing more than sixty CDL holders who have already been, or will soon be, affected by the IFR. These figures represent only a sample of WTA's membership and may not reflect the full extent of impacts among WTA member companies. They also do not include additional impacts reported to WTA by municipal transit agencies and school districts, which are not within WTA's membership. All of the affected drivers identified by WTA possess valid, lawful employment authorization but will lose eligibility to maintain their CDL solely because they do not hold one of the three visa types recognized under the new definition of "Evidence of Lawful Immigration Status."

[3] 49 C.F.R. § 383.5 ("Evidence of lawful immigration status") (2025).

[4] Okla. S.B. 20, 59th Leg., 1st Reg. Sess. (Okla. 2025) (enrolled) (amending Okla. Stat. tit. 47, § 6-111 to require non-domiciled CDL/CLP holders to present proof of citizenship and a valid work visa).

[5] *Jorge Rivera Lujan et al. v. Fed. Motor Carrier Safety Admin.*, ___ F.4th ___ (D.C. Cir. Nov. 13, 2025) (per curiam) (No. 25-1215) (granting stay pending review).

[6] Washington Trucking Associations, Letter to Governor Robert Ferguson on Enforcement of Federal English Language Proficiency Guidelines (Aug. 27, 2025), https://acrobat.adobe.com/id/urn:aaid:sc:VA6C2:87645862-df2c-48b3-85ce-5298e991924f.

I-9 process, review, obtain, or discuss an individual's citizenship or employment authorization status.[7] By establishing federal requirements for SDLAs to review supporting documentation, such as Employment Authorization Documents (EADs), I-94 forms, and foreign passports, the FMCSA would effectively preempt state prohibitions that otherwise prevent these verification checks. Furthermore, the requirement would allow Washington state employers the ability to inquire about an individual's citizenship or employment authorization status.

Additionally, WTA believes that non-domiciled CDL/CLP expirations should be directly tied to the verified U.S. employment authorization. While WTA recognizes the desire to review non-domiciled immigration paperwork at least annually, WTA does not believe there is a strong safety justification for the annual review unless one of the required documents on file is set to expire. The elimination of the yearly arbitrary renewal requirements would ensure continuous compliance with federal immigration requirements without imposing unnecessary administrative burdens on drivers, motor carriers, or state agencies. Imposing unnecessary administrative burdens of this nature is inconsistent with the President's directives on regulatory efficiency.[8]

A significant source of frustration within the trucking industry is not directed toward individuals with lawful work authorization who comply with all Federal Motor Carrier Safety Regulations (FMCSRs), but rather toward those who have been permitted to obtain CLPs and CDLs, and operate on public roadways, without the English language proficiency (ELP) necessary to communicate critical safety information to law enforcement or emergency responders.[9] Historically, motor carriers have carried the responsibility of ensuring a driver's English proficiency.[10] However, with the elimination of the Interstate Commerce Commission (ICC)[11] and establishment of uniform CDL standards,[12] the SDLAs represent the first and most critical opportunity to assess an individual's English Language Proficiency (ELP) prior to authorizing an individual to operate.

WTA strongly recommends that FMCSA amend 49 C.F.R. § 383.133(b)(3) to prohibit states from administering the knowledge tests required to obtain a CLP and required endorsements in any language other than English. In Washington State, for example, CLP knowledge and endorsement tests are currently offered in English, Russian, Spanish, and Serbian–Croatian. WTA believes FMCSA should establish regulatory requirements mandating that all knowledge tests be conducted exclusively in English.[13] Furthermore, WTA recommends that FMCSA require SDLAs to assess ELP for all drivers at the time of both issuance and renewal. Establishing uniform ELP assessments at the SDLA level would help ensure safety, improve regulatory consistency, and reduce the compliance burden currently placed on motor carriers.

---

[7] *See. Wash. Rev. Code Ann*. § 49.60.030 (West 2024); *Wash. Admin. Code* § 162-12-140(3)(a) (2024) (prohibiting employers from requesting or verifying an individual's citizenship or immigration status except as required by federal law, thereby limiting post-I-9 inquiries).

[8] Exec. Order No. 14192, *Unleashing Prosperity Through Deregulation*, Jan. 31, 2025, 90 Fed. Reg. 9065.

[9] 49 C.F.R. § 391.11(b)(2) (2025).

[10] *English Language Requirement; Qualifications of Drivers*, 62 Fed. Reg. 45,200, 45,200–01 (Aug. 26, 1997).

[11] Motor Carrier Act of 1980, Pub. L. No. 96-296, 94 Stat. 793 (1980).

[12] Commercial Motor Vehicle Safety Act of 1986, Pub. L. No. 99-570, tit. XII, 100 Stat. 3207-170 (1986).

[13] See 49 C.F.R. § 383.133(c)(5) (2025) (requiring CDL skills tests to be conducted in English without interpreters or translation devices). This requirement evaluates only an applicant's ability to understand and respond verbally in English; it does not assess reading comprehension. Given that drivers must also "read and speak the English language sufficiently" to perform safety-sensitive functions, 49 C.F.R. § 391.11(b)(2) (2025), administering CDL knowledge tests exclusively in English is consistent with the underlying federal language-proficiency standards.

IV. Limiting Valid Employment Categories for CDL Positions

WTA members support FMCSA's goal of strengthening the integrity of the CDL process through increased state-level vetting during both the initial issuance and renewal. Our members understand that compliance with federal laws and regulations yields direct and demonstrable improvements in both operational productivity and safety results. However, WTA disagrees with the assertion that excluding otherwise qualified individuals solely on the basis of broad immigration classifications, rather than safety-related criteria, will result in measurable safety improvements.

For Washington state, WTA members have identified several non-domiciled CDL holders with strong safety records and proven driving histories who are now ineligible to retain their CDLs under the IFR's new requirements.[14] Removing these proven, safety-conscious drivers from the industry will create a series of unintended economic and safety consequences. Economically, carriers face higher operational costs due to the need to recruit, screen, and train replacement drivers—a process estimated to cost between $7,000 and $20,000 per new hire when factoring in recruitment, staff time, federally mandated pre-employment screening, and training expenses.[15] From a safety standpoint, turnover introduces additional risk, as new drivers are less familiar with company equipment, routes, and safety culture—factors well-documented to influence increased crash risk.[16]

The trucking industry's current challenge is not a shortage of drivers, but a shortage of qualified drivers. Many carriers report rejecting up to 90% of applicants because they fail to meet basic federal or company standards for employment in interstate commerce.[17] The IFR's broad exclusion of lawfully authorized, safe, and experienced drivers, therefore, compounds this quality problem by removing individuals who have already demonstrated strong adherence to compliance and measurable safety performance.

In many cases, these drivers possess valid Employment Authorization Documents (EADs) and extensive U.S. driving histories that exceed the three-year minimum review period required by 49 C.F.R. §391.23. Furthermore, many hold Hazardous Materials Endorsements (HME) and/or Transportation Worker Identification Credentials (TWIC), both of which require comprehensive background checks by the U.S. Department of Homeland Security (DHS) Transportation Security Administration (TSA). These federally administered vetting processes provide additional assurance of an individual's eligibility and trustworthiness to perform safety-sensitive functions, calling into question the IFR's assertion that the inclusion of asylees and refugees poses "a direct threat to national security."[18]

While the FMCSRs do not require carriers to review foreign driving histories, industry best practices encourage good-faith efforts to obtain and evaluate at least three years of prior driving experience, whether gained domestically or abroad. Many WTA members already follow these enhanced verification practices to help ensure the quality and compliance of their drivers.

---

[14] *Id.* at 2.

[15] Rodriguez, Julie; Kosir, Michael; Lantz, Brenda; Griffin, Gene; & Glatt, Janice, *The Costs of Truckload Driver Turnover*, Staff Paper No. SP-146 (Apr. 2000), Upper Great Plains Transportation Institute, North Dakota State University. https://www.ugpti.org/resources/reports/downloads/sp-146.pdf

[16] Nat'l Acads. of Scis., Eng'g & Med., *Pay and Working Conditions in the Long-Distance Truck and Bus Industries: Assessing for Effects on Driver Safety and Retention* 85–88 (Nat'l Acads. Press 2024). https://nap.nationalacademies.org/read/27892/chapter/7

[17] American Trucking Ass'ns, *ATA Statement on Flaws in Bureau of Labor Statistics' Driver Shortage Article*, Mar. 19, 2019 (press release), https://www.trucking.org/news-insights/ata-statement-flaws-bureau-labor-statistics-driver-shortage-article.

[18] *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses* (CDL), 90 Fed. Reg. 46514 (Sept. 29, 2025).

Recognizing that driving cultures, roadway conditions, and traffic enforcement standards differ substantially around the world, federal Entry-Level Driver Training (ELDT) requirements[19] apply to all non-citizens who do not hold either a valid Canadian or Mexican CDL. Additionally, Washington State goes a step further and requires CDL training schools to meet a minimum 160-hour requirement to obtain a Class A CDL.

Within the IFR, FMCSA states that affected "drivers will exit the market within approximately two years… and that the market will respond to this change in capacity as it has in the past, with rates adjusting and drivers and carriers entering the market where needed. Further, due to the prolonged two-year period of attrition, motor carriers will have time to adjust their hiring based on the requirements set forth in this IFR, including by marketing available positions to drivers with the proper qualifications to obtain a CDL."[20] While FMCSA's assumption suggests a gradual and manageable transition, many WTA members report a very different reality. There is a clear disconnect between the IFR's projected timeline and the immediate disruptions already being experienced by motor carriers on the ground.

Since the rule went into effect, hundreds of non-domiciled CDL holders in Washington have already been downgraded, including numerous drivers employed by WTA members across a range of operations. WTA fully recognizes the need for FMCSA's swift action to close existing gaps in the CDL process. However, the sudden downgrades of drivers with long tenures and strong safety records have caught many motor carriers off guard. These developments have also raised questions about how employers should handle individuals who still possess an active CDL but no longer meet the new definition of "evidence of lawful immigration status."

Under 49 C.F.R. § 383.37, employers are not expressly prohibited from allowing drivers with active CDLs to operate until FMCSA or an SDLA imposes a formal downgrade or disqualification. Nevertheless, once an employer has actual knowledge that a driver no longer qualifies for an eventual CDL renewal, they are placed in an untenable position. While such use may not technically violate the compliance requirements under 49 C.F.R. part 383, the potential liability exposure has led many motor carriers to reassign affected employees to non-CDL positions or terminate employment altogether, which has caused significant operational challenges.

These circumstances illustrate the need for a more balanced and evidence-based approach that upholds the integrity of the CDL issuance process while supporting FMCSA's mission, "to reduce crashes, injuries and fatalities involving large trucks and buses."[21] The removal of experienced, safety-conscious drivers has not only reduced the number of available qualified CDL holders but has also placed employers in difficult compliance positions, requiring them to navigate conflicting obligations under federal and state law. Targeted revisions to the IFR are therefore necessary to ensure that motor carriers are not exposed to undue liability while striving to remain compliant. As FMCSA evaluates next steps, WTA encourages the Agency to prioritize data-driven strategies that strengthen state-level oversight, enhance driver training and qualification systems, and promote consistent enforcement—areas where thoughtful reforms can yield the most direct and measurable highway safety improvements.

---

[19] 49 C.F.R. pt. 380, subpt. F–G (2025).

[20] *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses* (CDL), 90 Fed. Reg. 46520 (Sept. 29, 2025).

[21] Federal Motor Carrier Safety Administration, *Our Mission*, U.S. Dep't of Transp., https://www.fmcsa.dot.gov/mission (last visited Nov. 12, 2025).

V. Recommendations to Improve Highway Safety

WTA urges FMCSA to adopt a holistic, data-driven approach to strengthen the CDL program and safety oversight framework. Rather than relying on the IFR's narrow definition of permissible employment categories, FMCSA should base eligibility standards on research-supported indicators that more accurately reflect a driver's likelihood of safe performance. Studies such as the American Transportation Research Institute's (ATRI) Crash Predictor Analysis[22] and the forthcoming findings from FMCSA's Crash Causal Factors Program (CCFP)[23] provide a more reliable foundation for identifying the qualifications and behaviors most associated with future crash involvement. Aligning CDL eligibility, vetting, and disqualification standards with these evidence-based findings will better advance FMCSA's mission while avoiding unnecessary economic disruption for compliant carriers and experienced drivers.

FMCSA's planned CCFP will play a critical role in advancing regulatory reforms that are grounded in a deeper, evidence-based understanding of how and why large-truck crashes occur. By expanding on the original Large Truck Crash Causation Study with updated sampling, modernized methodologies, and a significantly larger dataset, the CCFP will generate more detailed and representative insights into the human, vehicle, infrastructure, and environmental factors that contribute to crash events. These findings should inform not only the refinement and strengthening of CDL disqualification standards but also broader improvements across fleet safety management practices, government oversight systems, and roadway and infrastructure design. WTA looks forward to FMCSA's release of the CCFP results once the study is completed, as the insights generated will be valuable in informing future policy discussions, guiding program improvements, and supporting data-driven safety strategies across the industry.

The current CDL disqualification framework should be strengthened to focus more directly on the driver behaviors that research shows are most predictive of future crash risk. ATRI's Crash Predictor Analysis consistently demonstrates that violations such as failure to yield (141% increased crash likelihood), improper signaling (116%), a prior crash (113%), reckless driving (104%), erratic lane changes (77%), and speeding (48%) are among the clearest indicators of elevated crash risk.[24] Targeting disqualification criteria around these data-validated behaviors would enhance FMCSA's ability to identify and remove the small proportion of drivers who present the greatest threat to highway safety. Strengthening these standards would also lessen the burden on motor carriers, who increasingly must sift through large pools of applicants who do not come close to meeting WTA members' internal safety benchmarks. Ensuring that an accumulation of these high-risk convictions triggers immediate CDL disqualification by SDLAs would create the consistent, timely enforcement necessary to keep unsafe drivers out of safety-sensitive positions.

As FMCSA reevaluates its disqualification framework, the Agency should also investigate whether establishing a minimum of one year of standard (non-commercial) driving experience before applying for a CDL would help ensure that new entrants possess adequate baseline driving skills. A one-year requirement, implemented with limited exceptions for specialized workforce-training programs, could reduce avoidable training burdens on carriers and improve the overall preparedness

---

[22] American Transportation Research Institute, Predicting Truck Crash Involvement: 2022 Update (Oct. 2022), https://truckingresearch.org/2022/10/predicting-truck-crash-involvement-2022-update/.

[23] Federal Motor Carrier Safety Administration, Crash Causal Factors Program (CCFP), U.S. DOT (last updated July 17, 2025), https://www.fmcsa.dot.gov/CCFP.

[24] American Transportation Research Institute, Predicting Truck Crash Involvement: 2022 Update (Oct. 2022), https://truckingresearch.org/2022/10/predicting-truck-crash-involvement-2022-update/.

of individuals entering CDL training. Ensuring timely downgrades for drivers who lose eligibility is equally critical to maintaining a safe and qualified driver workforce.

A reliable and accountable training pipeline must support a strengthened qualification framework. Improving the Entry-Level Driver Training (ELDT) program will require more consistent audits, stronger documentation requirements, and expedited removal of non-compliant schools from the Training Provider Registry (TPR). While enhanced oversight may increase administrative responsibilities, it will reduce training variability and help ensure that new drivers receive instruction aligned with federal expectations and industry safety standards.

Finally, these improvements should be paired with stronger and more interconnected data systems. State CDL databases currently operate independently, which can allow high-risk or disqualified drivers to obtain licenses in other jurisdictions without detection. Connecting these systems for real-time status verification, similar to FMCSA's other safety databases, would significantly reduce multi-state fraud and promote consistent enforcement. Additionally, addressing long-standing gaps in the Motor Carrier Management Information System (MCMIS) is essential, as roughly 90 percent of motor carriers lack a formal safety rating. Therefore, the FMCSA must prioritize accurate and timely data to ensure that unsafe or non-compliant operators cannot evade oversight.

## VI. Conclusion

WTA appreciates FMCSA's commitment to strengthening the integrity of the CDL issuance and renewal process and shares the Agency's goal of ensuring that only qualified, safety-conscious individuals operate commercial motor vehicles on our nation's roadways. The IFR represents meaningful progress toward addressing long-standing gaps in non-domiciled CDL oversight. However, its narrow limitations on employment authorization categories have produced significant, immediate impacts for motor carriers and experienced drivers who continue to meet all applicable safety and compliance requirements.

As outlined in these comments, WTA believes that a more balanced, evidence-based approach, in which CDL eligibility and disqualification standards are tied to data-supported indicators of future crash risk, will more effectively advance FMCSA's safety mission while minimizing unnecessary operational and economic disruption. Strengthening disqualification criteria for high-risk driving behaviors, evaluating the need for baseline driving experience prior to CDL application, improving the accountability of the ELDT framework, and modernizing state and federal level data systems are all practical, targeted strategies that can deliver measurable safety improvements across the industry.

WTA respectfully urges FMCSA to revise the IFR in a manner that restores eligibility for all individuals with lawful employment authorization and focuses regulatory requirements on factors most directly linked to highway safety. Our members stand ready to collaborate with FMCSA as the Agency considers refinements of the requirements and continues its work to strengthen the CDL program. We appreciate the opportunity to provide these comments and look forward to continued engagement on this important issue.

**Comment on FMSCA Interim Final Rule regarding Commercial Driver's License Standards: Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses**

**Interim Final Rule Published: 90 Fed. Reg. 46509 (September 29, 2025)**

**Docket No. FMSCA-2025-0622**

**Federal Register No. 2025-18869**

**Submitted by Martin Luther King County by and through its Metro Transit Department**

[1]Martin Luther King County, a home rule charter county and political subdivision of the State of Washington, acting by and through its Metro Transit Department ("King County Metro"), submits this comment on the Interim Final Rule ("IFR") promulgated by the Federal Motor Carrier Safety Administration ("FMCSA") on September 29, 2025, at 90 Fed. Reg. 46509 and codified at 49 CFR Parts 383 and 384. To provide context for King County Metro's comments, it is first necessary to provide some background regarding King County and its robust public transportation services.

**A. <u>King County</u>**

Located in the Pacific Northwest and covering 2,307 square miles, King County has almost twice the land area of the State of Rhode Island and is the twelfth most populous county in the United States. King County contains over 800,000 acres of forests, more than 60 named lakes, over 3,000 miles of rivers and streams, and is bounded by Puget Sound to the west. King County's April 1, 2025 estimated population was 2,411,700. With approximately 25% of its population having been born outside of the United States, King County is a diverse and vibrant community. Upward of 170 languages and dialects are

1

spoken. A language other than English is the primary language spoken at home in roughly 30% of King County households.

King County is served by a general municipal government operating as a home rule charter county under the authority of the Washington Constitution, Article II, §4. The County provides a full range of services – local and regional, urban and rural – across the County's diverse geography and communities, managing nearly 17,700 employees and an overall budget of approximately $10.2 billion dollars per year.

**B. Metro**

Among those services is a broad set of transit and transportation modalities that provide a wide range of mobility options for King County residents and visitors alike. King County's Metro Transit Department is one of the few transit agencies that is operated by a general municipal government rather than a special purpose government. In 2024, King County Metro Transit had a ridership of approximately 88,902,700, and it averaged about 302,900 riders per weekday as of the second quarter of 2025. Ridership counts individual passenger boardings of Metro motor buses, trolley buses, the South Lake Union and First Hill Streetcars in downtown Seattle, and Dial-A-Ride Transit, or DART, a smaller transit vehicle service for communities needing more flexible service due to lower population density, greater distances, and fewer public transportation options. King County Metro also provides a robust suite of paratransit services, marketed as its Access service, as well as a host of other on-demand transportation services (e.g. Metro Flex), as well as vanpools and other services.

According to the APTA 2025 Public Transportation Fact Book, King County Metro is the tenth largest bus agency in the United States.

[1] Other transit agencies in the top ten include MTA New York City Transit (#1), Chicago Transit Authority (#3), Washington Metropolitan Transportation Authority (#6), Massachusetts Bay Transportation Authority (#6), Southeastern Philadelphia Transportation Authority (#8), and City and County of San Francisco (#9). *Id.* Also according to APTA, in 2024 Metro was one of just five transit agencies in the nation with over 50,000,000 annual riders and was the second-fastest growing with a 14% ridership increase year over year.[2]

King County Metro operates its fixed-route bus, paratransit, and vanpool services throughout the county, which includes 39 cities, towns, and unincorporated areas – among them the cities of Seattle, Bellevue, Kirkland, Redmond, Sammamish, Issaquah, Shoreline, Tukwila, Renton, Auburn, Kent, and Federal Way. In addition to its bus transit operations, Metro also operates a water taxi system on the Puget Sound. Further, Metro operates and maintains the Sound Transit Link light rail system and the Seattle streetcar system through contracts with the Central Puget Sound Regional Transit Agency ("Sound Transit") and the City of Seattle, respectively. None of King County Metro transit operations cross any state lines.

King County Metro has over 5,800 employees and approximately 1,400 buses in its fleet, spread across eight transit bases and numerous ancillary facilities. It serves over 7,100 bus stops, numerous park-and-ride lots, sixteen transit centers, and three passenger

ferry terminals across the county. It also maintains substantial maintenance and repair facilities at multiple locations.

## C. Bus Operator Recruitment and Training

With about 2,600 drivers, King County Metro runs a continuous recruitment process. Active recruitment is necessary to replace drivers who leave the department, replace retiring drivers, cover leave events, and staff new routes. In order to deliver planned service levels across all existing routes, and staff new routes and future service increases, Metro must not only maintain but also grow its corps of drivers. Even relatively small variations in available drivers can negatively impact service to the public. Metro's recruitment efforts for its employees include advertising, attending job fairs, paying amongst the highest regional wages, and offering competitive benefits, including sick and vacation leave. Legal immigrants have been an important focus of this recruitment effort.

Metro thoroughly vets applicants for the Bus Operator position during the hiring process. Prior to receiving a conditional offer of employment, applicants are required to apply for the position and sit for an interview. If they receive a conditional offer, applicants must then successfully complete the Pre-Employment Process (PEP) within 45 days. The PEP requires applicants to:

1. Obtain their Washington State Commercial Learners Permit (CLP) by passing three written knowledge tests. These include the Commercial Driver License (CDL) tests for general knowledge (A, B & C), the air brakes test, and the test for carrying passengers.
2. Pass a Department of Transportation (DOT) physical examination.

3. Pass a five-year driving record review.

4. Pass a drug screening.

5. Pass a criminal background check.

6. Present documents sufficient to meet U.S. Citizenship and Immigration Services ("USCIS") guidelines for employment verification.

After their hire, trainees must complete a ten-week training program. Federal and state laws require that operators of transit vehicles maintain valid CDLs. King County Metro, with the agreement of Washington State, runs its own CDL training and testing program. The program consists of two primary components: classroom instruction including preparation and testing for the CDL (for new hires who do not already have a CDL) and training on, and practice of, the skills to be a Transit Operator. As a part of their training, operators drive with skilled Metro instructors to learn and practice the skills needed. Operators must learn and are expected to follow an extensive list of policies and procedures comprising a 200-page manual. Important bus operator skills include operating a coach in traffic, providing good customer service to all passengers, and requesting assistance when needed via radio to the Transit Control Center. This training focuses on safety and includes practice operating a bus in revenue service, which means under supervision while paying customers are on board. Trainees are assessed on their ability to drive safely, provide good customer service, be aware of their surroundings, and manage distractions before they graduate from the program.

Following completion of CDL training, each trainee must complete mandatory CDL testing. Under U.S. Department of Transportation ("US DOT") rule 49 C.F.R.§ 391.11(b)(2),

all commercial motor vehicle drivers must be able to read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records.

**D. Summary of the IFR's Effects**

The IFR prevents a state from issuing a non-domiciled Commercial Learner Permit ("CLP") or Commercial Driver License ("CDL") to asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients. Under the IFR, apart from citizens and permanent residents, immigrants and nonimmigrants lawfully permitted to work in the United States are barred from obtaining a CLP or CDL unless they fall into one of the following narrow visa categories: H-2A (Temporary Agricultural Workers), H-2B (Temporary Non-Agricultural Workers), or E-2 (Treaty Investors). King County Metro understands that after September 29, 2025, anyone who is not a citizen, permanent resident, or a person holding one of those three visas is ineligible to receive, renew, update, or even change the address associated with their non-domiciled CLP or CDL.

**E. Impact of the IFR's Effects on Metro Operations**

Because the IFR effectively deprives drivers in the affected categories from holding CDLs, it will disrupt Metro operations and negatively impact transit options available to the public. These individuals serve a crucial role in our workforce. If a current King County Metro Transit Operator loses their CDL, they cannot perform their job and will be terminated. If a person who is in the training program loses their CLP or CDL or becomes

ineligible to obtain one, they are not able to complete the training program and will not continue in employment.

Nationwide, transit agencies have been struggling to rebuild their workforce since the pandemic. Agencies, including King County Metro, have suspended service and been unable to deliver promised levels of service. This includes both operating routes with shortened hours of service or less frequent service and suspending other routes entirely. As agencies attempt to staff service levels, drivers work more overtime, which may lead to fatigue and safety issues. This overtime also impacts budget and raises the general cost of service. Although these issues impacted Metro prior to the adoption of the IFR, DOT's actions in adopting the IFR make the situation worse by excluding otherwise eligible drivers from the workforce.

When the FMCSA restricted "evidence of lawful immigration status" to just three narrow visa classifications – the H-2A, Temporary Agricultural Workers, H-2B, Temporary Non-Agricultural Workers, and E-2, Treaty Investors – it limited the availability of CDLs for non-domiciled drivers to the stringent caps on those three visas. As a practical matter, none of these visa categories provide the longer-term workers that Metro requires for an effective bus transit system. Few commercial drivers will qualify for a Temporary Agricultural Worker or Treaty Investor visa. The H-2B visa is for temporary jobs where there is a one-time need, seasonal need, peak load, or intermittent need – common fields include landscaping, construction, hospitality, and seafood processing. As described below, these criteria are not useful for the continual need for training, hiring, and retaining Metro's drivers. Moreover, the visa cap for H-2B visas is 66,000 for FY 2026. These visas are

issued in two half-year tranches. The first 33,000 cap for FY 2026 was reached on September 12, two weeks before FMCSA announced its new IFR.[3]

Due to expansion of service, retirement, and other types of employee turnover, King County Metro recruits, hires, and trains drivers on a continuous basis to ensure we can deliver planned levels of service and meet the needs of the community. The implementation of the IFR will shrink our available applicant pool at the same time it causes loss of existing experienced, highly trained drivers who are lawfully permitted to work in the United States under federal law. Metro estimates about 10% of the trainees in this year's recruitment classes are directly impacted and rendered ineligible for CDLs under the IFR.

King County Metro estimates that up to 100 current Metro employees work in job classifications that require or often require a CDL but are now ineligible to hold a CDL under the IFR. More than half of these employees are bus operators, all of whom are required to have a valid CDL. The remaining employees include positions such as mechanics and first line supervisors, many, but not all of whom, must possess a CDL. As these other workers lose their CDLs, they will no longer be able to drive buses for testing, vehicle recovery, etc., and Metro will need to redeploy existing assets or, potentially, hire and train new employees for these tasks. Together, these impacts will add stress on Metro's ability to provide transit services to the public.

After the IFR was issued, the Washington State Department of Licensing ("WA DOL") directed King County Metro to forbid trainees who are disqualified under the IFR from taking the CDL exam. Four trainees in the current training class were not permitted to take the

exam, and they will not be allowed to train in revenue service. Metro will be required to remove these four trainees from the training program, and they will lose the opportunity to become bus operators.

King County Metro made conditional employment offers to eleven additional applicants who are also ineligible for non-domiciled CDLs under the IFR. Because they will not be allowed to take the CDL exam or obtain a CDL, Metro was required to rescind these eleven conditional offers of employment.

Five King County Metro bus operators were issued incorrect CDLs by WA DOL and needed to have them replaced with corrected versions. However, before WA DOL could issue corrected CDLs, FMCSA adopted the IFR, and those five drivers, who remain authorized to work in the United States, now can no longer receive a corrected CDL. These five drivers will not be able to continue in their bus operator positions.

Going forward, as a result of the IFR, other King County Metro drivers who previously would have been eligible to renew their non-domiciled CDLs because they are legally authorized to work in the United States will now be unable to renew. They will lose their livelihoods and community identities as public transit drivers – not for any safety-related reason, but simply because they are not citizens, permanent residents, or people who possess an E-2, H-2A, or H-2B visa.

King County Metro understands from WA DOL that approximately 4,200 drivers currently hold Washington State-issued non-domiciled CDLs, and only about 26 will be eligible to renew under the new IFR – roughly 0.6%. The impact on Metro operations is

substantial. The IFR removes nearly all non-domiciled drivers from the available applicant pool and the bus operator workforce.

Going forward, the IFR would require Metro to significantly adjust its recruitment approach to comply with the limitations that the IFR places on applicants in the affected immigration categories. This will have the impact of excluding immigrants in these affected categories from being employed as bus operators or in any other positions requiring a CDL. This will narrow the pool of potential applicants, limiting Metro's ability to select the very best candidates to join its training program.

The cost of training a replacement bus operator is approximately $15,000 per driver. This money is now a loss for each of the drivers whose CDL has or will be revoked or for whom CDL testing was denied. Specifically, King County spent approximately $60,000 on the four trainees that recently completed its training program but are now ineligible to take the CDL exam. If the IFR remains in effect, King County Metro faces a substantial risk these applicants will move on to other employment and Metro will permanently lose those investments.

King County Metro had also spent approximately $75,000 training the bus drivers who recently had their CDLs revoked by DOL because they became ineligible under the IFR. If the IFR remains in effect, King County Metro will permanently lose the investments it made in those drivers. Finally, King County Metro spent approximately $675,000 training the roughly 45 bus drivers that currently hold CDLs but are now ineligible to renew their licenses under the IFR and thus will become ineligible to drive within the next year. Once

those now-ineligible drivers are refused renewal of their CDLs, King County Metro will lose the investments it made in training those bus operators.

Metro operates on a very tight budget that is built months in advance of the budget year. The loss of Metro's investment in its operator training cannot be easily replaced. Not only is there limited budget to pay for recruiting and training new operators, the uncertainty caused by the IFR also creates significant challenges in creating future budgets.

There is also an opportunity cost to King County Metro of replacing these operators. Metro closely tracks attrition in the bus operator classification and is aggressively hiring and training both to replace leaving operators and to increase the overall number of operators. Metro is growing its bus operator workforce in order to restore suspended service and meet planned new growth in bus service. Metro has not estimated the specific impacts to its ability to deliver added hours of bus service, but at present we believe that another likely negative impact of the IFR will be a reduced frequency of service compared to what Metro had planned going forward.

The loss of experienced operators due to the IFR will also have a negative impact on safety. In our experience, newly trained operators are involved in more accidents than their more experienced colleagues. This is understood to be normal in the transit industry. As operators gain experience, they become safer drivers. This trend is demonstrated by Metro's "Accidents by Seniority" 2016-2025 data illustrated in the chart below, which identifies the total number of preventable accidents Metro bus operators have for each year of driving experience, aggregated over a ten-year span. The data confirm a consistent trend over time – the longer King County Metro can keep drivers in service, the safer the

service Metro provides to King County residents and visitors. If Metro must hire and train new operators to replace experienced operators who lose their CDLs as a result of the IFR, Metro expects to experience a negative safety impact in its operations.




**F.** **<u>The IFR will not significantly affect roadway fatalities.</u>**

In addition to creating new risks by forcing King County Metro to hire and train additional new drivers who, in statistical terms,  are potentially more likely to be at risk of an accident in the first few years of their careers, relative to more experienced drivers, the IFR will not significantly affect roadway fatalities at the national level, because FMCSA's hand-picked fatal accidents involving non-domiciled CDL holders are not even a drop in the sea of highway collisions. See 90 Fed. Reg. 46509 at 46512, 46520 (FMCSA's own data, estimating that non-domiciled CDL holders account for approximately 5 percent of all CDL holders but only about 0.2 percent of fatal crashes). The IFR also fails to account for the primary factors that are known to contribute to roadway fatalities, such as alcohol use, speeding, and failure to use seatbelts. Immigration status is not one of those factors.

The basis for the IFR appears to be a contrived emergency. The Federal government frets about the inability to review the driving history of people who have arrived in this country over the past 5-10 years (see 90 Fed. Reg. 46509 at 46514), but if that is the basis for the IFR then it is overinclusive because it sweeps in many more people, particularly DACA recipients, who—by definition—are people that arrived here as children and who likely have reviewable driving records in this country, the same as US citizens and lawful permanent residents.

While the IFR also makes passing references to terrorist threats and the 9/11 attacks, see 90 Fed. Reg. 46509 at 46511, 46514, even the FMCSA itself does not appear to believe that is a rational basis for the IFR: Nowhere in the IFR is there even a hint of a suggestion that anyone, anywhere, has acquired a non-domicile CDL under a false name, or for malicious purposes, much less to carry out a violent attack. The IFR also conveniently fails to mention that the one truck-attack event cited in the IFR (90 Fed. Reg 46509 at 46514 footnote 20) was carried out by a *lawful permanent resident* of the US, driving a rented vehicle that did not actually require a CDL to operate. The IFR would not have prevented that attack, or stopped that individual from acquiring a full CDL, let alone a non-domiciled CDL. And the IFR also fails to mention the most deadly truck-attack in US history, the 1995 bombing of the Alfred P. Murrah building in Oklahoma City, which was carried out by *a US citizen* who was also an honorably-discharged Army veteran, using a similar rented truck that did not require a CDL to operate. The IFR will not protect anyone, anywhere, from such attacks. The IFR's invocation of "terrorism" and 9/11 is nothing more than a baseless scare tactic.

FMCSA also claims that there is an "imminent hazard to public safety," 90 Fed. Reg. 46509 at 46514, but FMCSA identifies no serious ongoing safety threat. Instead, FMCSA identifies just five crashes that occurred this year involving drivers who had lawfully issued non-domiciled CDLs but were not one of the eligible statuses under the IFR. *Id.* at 46512–13. And according to FMCSA's own data, non-domiciled CDL holders account for approximately 5 percent of all CDL holders but only about 0.2 percent of fatal crashes. See 90 Fed. Reg. 46509 at 46512, 46520; compare FMCSA, *Summary Report: CY 2025 Fatal Crashes*, U.S. Dep't of Transp. (Sept 26, 2025), available online at https://perma.cc/KQ2S-YN23 (captured November 12, 2025) (estimating a total of 2,399 fatal crashes involving large trucks and buses as of September 26, 2025). In the IFR itself, **FMCSA admits that "*[t]here is not sufficient evidence, derived from well-designed, rigorous, quantitative analysis, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes[.]*"** 90 Fed. Reg 46509 at 46520 (emphasis added.) And if King County and other employers have to hire new, inexperienced drivers to replace the roughly 200,000 more-experienced but non-domiciled drivers that would be forced out of the market, it is hard to see how the rule would produce any net safety benefit, because those new drivers are more likely to make mistakes in their first years of service. See Section E, above (graph showing number of accidents sorted by years of experience among Metro bus operators).

While reducing accidents is a worthy goal, FMCSA's latest available report states, that "[i]n 2021, ***5,904*** large trucks and buses were involved in fatal crashes." (Emphasis

added.) Cherry-picking five crashes over the course of a year is a very weak basis to justify a punitive new rule, given that those five crashes would amount to just .00085—or 0.085%, ***less than one-tenth of one percent***— of the 5,094 crashes identified in FMCSA's latest available report. Indeed, for the first half of 2025 the National Highway Traffic Safety Administration (NHTSA) projects a more than 8% *decrease* in motor vehicle fatalities, amounting to 17,140 deaths (as compared to 18,680 for the same period in 2024), even as vehicle miles traveled increased by 12.1 *billion* miles for that period.[4] In comparison, the five crashes in 2025 that FMCSA uses to justify its rule (see 90 Fed. Reg 46502 at 46512-13) account for twelve (12) fatalities in total – each one a terrible loss, to be sure, but accounting for just .00007—or 0.007%, ***less than 1/100th of one percent***—of all roadway fatalities in the first half of 2025.[5] And the number of people killed in traffic crashes involving large trucks *decreased* by more than 8% in 2023, the last full year for which NHTSA has data[6]—a percentage that is ***four orders of magnitude*** greater than the contribution of FMCSA's hand-picked five crashes in 2025.

That same NHTSA report identifies three major behavioral focus areas that contribute to roadway fatalities: alcohol-impaired driving, speeding involvement, and restraint (seatbelt) use. Immigration status is not one of those focus areas.

**G. Conclusion**

The IFR will significantly affect King County Metro's ability to recruit, train, and retain qualified drivers. The IFR is already negatively impacting King County Metro, and those impacts will persist over time. Other, similarly situated entities are undoubtedly experiencing similar impacts. And yet the IFR provides no identifiable benefit to King

County, Washington State, or the nation in terms of safety. In the near term the IFR could actually reduce safety as Metro brings on new operators to replace experienced drivers who are unable to renew their CDLs under the IFR. Meanwhile, the data collected by FCMSA and its sister agency NHTSA do not support the assertion that non-domiciled CDL holders pose a material threat to the road-going public, much less a national safety concern. Collisions involving large trucks are significantly decreasing year over year. There is no sound factual basis to warrant the IFR, which is a highly disruptive rule that will substantially, negatively impact the public transit and trucking industries across the nation, especially without prior notice or comment. Whatever FMCSA's ultimate policy objectives may be, the IFR is not an appropriate tool to accomplish them. For all of these reasons, King County Metro respectfully requests that the FMCSA promptly rescind the IFR and restore the previous rule as it existed prior to September 29, 2025. The key to increasing safety among CDL holders is not to discriminate among individuals on the basis of immigration status, but rather to more actively enforce the pre-existing CDL regime.

---

[1] https://www.apta.com/wp-content/uploads/APTA-2025-Public-Transportation-Fact-Book.pdf at page 35 (Table 4).

[2] See https://www.metro-magazine.com/10232607/aptas-transit-wrapped-names-agencies-with-top-ridership-gains (visited April 17, 2025). According to the same source, Metro was second only to the Washington D.C. Metropolitan Area Transit Administration (WMATA), which had a 20% ridership increase.

[3] https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-non-agricultural-workers/cap-count-for-h-2b-nonimmigrants (accessed Oct. 22, 2025).

[4] *NHTSA Reports Sharp Drop in Traffic Fatalities in First Half of 2025* (September 16, 2025), available online at https://www.nhtsa.gov/press-releases/nhtsa-reports-sharp-drop-traffic-fatalities-first-half-2025, (visited November 5, 2025).

[5] The number is even lower if one excludes the four deaths from the August and July 2025 incidents that FMCSA emphasizes in its IFR justification at 90 Fed. Reg. 46512-13, which deaths are outside of the 6-month January-to-June period that NHTSA used. During that six-month period, the three remaining crashes that FMCSA emphasizes (in May, March, and January 2025, respectively)

accounted for eight fatalities, or .000045 (0.0045%, ***less than 5/100ths of one percent***) of the 17,140 highway deaths that NHTSA projects for the first six months of 2025.

[6] See NHTSA, Traffic Safety Facts Research Note, *Overview of Motor Vehicle Crashes in 2023* (DOT HS 813 705) (April 2025), available online at https://crashstats.nhtsa.dot.gov/#!/ (visited November 5, 2025).